IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| VIRGINIA HOPPER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:07-cv-457-MEF |
| | ) | |
| JACKIE GRAHAM; THE | ) | |
| PERSONNEL BOARD OF THE | ) | |
| STATE OF ALABAMA; JOE | ) | |
| DICKSON; JOE MCMILLAN; | ) | |
| JOYCE O'NEAL; ELLEN | ) | |
| MCNAIR; JAMES ANDERSON; | ) | |
| PAGE WALLEY | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANT WALLEY'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM BRIEF

**COMES NOW**, Defendant Page Walley, Commissioner of the Alabama Department of Human Resources, by and through his undersigned counsel, and moves this Court to grant summary judgment to him pursuant to Rule 56 of the Federal Rules of Civil Procedure with respect to all claims against him. Summary judgment is appropriate because the plaintiff has failed to establish a genuine issue of fact and Defendant Walley is entitled to summary judgment as a matter of law. This motion is based upon the grounds listed below, as well as the argument contained herein and the evidentiary materials filed contemporaneously with this motion.

<u>**TABLE OF CONTENTS**</u>

**EXHIBIT LIST**                                              **Page  3**

**I. BACKGROUND**                                             **Page  4**

**II. STATEMENT OF FACTS**                                    **Page  5**

**III.  ARGUMENT**                                            **Page  10**

A.  THE PLAINTIFF'S DISMISSAL FROM EMPLOYMENT                 Page  10
WITH DHR SHOULD BE AFFIRMED IN ACCORDANCE
WITH THE ALABAMA ADMINISTRATIVE PROCEDURES ACT.

B.  PLAINTIFF RECEIVED A FAIR AND UNBIASED                    Page  15
HEARING AND WAS NOT DENIED HER CONSTITUTIONAL
RIGHTS TO DUE PROCESS OR EQUAL PROTECTION.

C.  THERE ARE NO ACCUSATIONS MADE AGAINST                     Page  17
DEFENDANT WALLY IN COUNTS 2 AND 3 OF THE
PLAINTIFF'S COMPLAINT.

D.  DEFENDANT WALLEY DID NOT ENGAGE IN A                      Page  18
CONSPIRACY TO DENY MS HOPPER A FAIR AND
UNBIASED HEARING, DENY HER DUE PROCESS, OR DENY
HER EQUAL PROTECTION UNDER THE LAW.

E.  PLAINTIFF'S CLAIMS AGAINST DEFENDANT                      Page 19
WALLEY IN HIS OFFICIAL CAPACITY ARE BARRED
BY THE ELEVENTH AMENDMENT.

F.  DEFENDANT WALLEY IS ENTITLED TO QUALIFIED                 Page  21
IMMUNITY ON PLAINTIFF'S CLAIMS AGAINST HIM IN HIS
INDIVIDUAL CAPACITY.

**IV.  CONCLUSION**                                           **Page  23**

## EXHIBIT LIST

Exhibit 1.    Affidavit of Defendant Page Walley, 5 pages

Exhibit 2.    Affidavit of DHR Personnel Director Thomas King, 4 pages

Exhibit 3    Transcript of the deposition of Plaintiff, Virginia Hopper

> Pages A - C contains the cover page and the signed certification pages of the original deposition transcript. Behind that is a copy of the entire deposition transcript in condensed format, Bate Stamp numbered 1 through 75, followed by the deposition exhibits, Bate Stamp numbered 76 through 150.

Exhibit 4    Transcript of the DHR pre-termination hearing

> Pages A – B contains the cover page and signed certification page of the original hearing transcript. Behind that is a copy of the entire hearing transcript in condensed format, Bate Stamp numbered 1 through 55, followed by the hearing exhibits, Bate Stamp numbered 56 through 283.

In Exhibits 3 and 4, there are four pages of the condensed transcript on each Bate Stamp numbered page. References to the transcript first list the Bate Stamp page number, followed by the transcript page number, followed by the line number. (e.g. BP____, TP___, Line___) Paragraph references are listed as Para.____, with paragraph 1 being the first full or partial at the top of the page.

# I.  BACKGROUND

This lawsuit was filed in the Montgomery Circuit Court by the Plaintiff, Ms. Virginia Hopper, on April 20, 2007.  Ms. Hopper asked the Circuit Court to review the decision of the Administrative Law Judge and the State of Alabama Personnel Board in upholding her termination of employment by the Alabama Department of Human Resources (will also be referred to as DHR in this brief) Ms. Hopper also alleged violations of her constitutional rights to due process and equal protection.  (District Court Doc. 1, part 2, p.1-11).  The defendants are Jackie Graham, Director of the State of Alabama Personnel Department, the five board members of the State Personnel Board, Joe Dickson, Joe McMillan, Joyce O'Neal, Ellen McNair, and James Anderson, and the Commissioner of the Alabama Department of Human Resources, Page Walley.[1]

On May 22, 2007, the defendants jointly filed a notice of removal to this honorable court. (District Court Doc. 1).  An Answer was filed by the defendants on June 5, 2007 (District Court Doc 3) and an amended Answer and Counterclaim were filed by the defendants on September 18, 2007. (District Court Doc 17).

---

[1] The undersigned counsel, Joel Marsh, is only representing Page Walley in this lawsuit.

## II.  STATEMENT OF FACTS

The Plaintiff, Ms. Virginia Hopper, worked for the State of Alabama Comptroller's Office from 2002 to 2006.  When she first started working at the Comptroller's office, she was an Account Technician.  (Exhibit 3, BP 18, TP 65 Line 7).  In November 2003, she submitted an application to the State of Alabama Personnel Department for a position as an Accountant. (Exhibit 3, BP 109).  The requirements to be eligible for an Accountant position are listed in the Accountant Announcement. (Exhibit 4, BP 111).  Those requirements include a college education with a major in Accounting or business Administration and at least five college level accounting courses.  Ms. Hopper wrote on her Accountant application that she had a degree from "Trinity University" with a Major in "Bus Admin."  She listed the address of Trinity University as "715 Stadium Dr San Antonio, TX 78212."  (Exhibit 3, BP 109).  Trinity University is a college in San Antonio, Texas.  (Exhibit 4, BP 56, Para 3).  The application also has a section towards the bottom of the page that states: "List courses (and hours) which are particularly related to the position."  Ms. Hopper wrote under this block "See attached list."  A list was attached to the application that listed 22 courses with course numbers and abbreviated course names. (Exhibit 3, BP 111).  Ms. Hopper also attached a resume to her application (Exhibit 3, BP 112) where she wrote under the heading "Education" the words "Trinity University San Antonio, TX 78212-7200   Graduation Date: May 2002."

Based on this application, Ms. Hopper was promoted to the position of Accountant at the Comptroller's Office in July 2004.  (Exhibit 4, BP 268).  In April 2006, Ms. Hopper transferred to DHR to work as an Accountant.(Exhibit 1, Page 2, Para 2).

Before Ms. Hopper transferred to DHR, the Comptroller's Office had started an investigation concerning the validity of Ms. Hopper's college degree.  (District Court Doc

33, BP 741, TP 79, line 9). Ms. Hopper was asked to provide a copy of the diploma. (Exhibit 4, BP 37, TP 141, line 20). Ms. Hopper provided the Comptroller with a document that was entitled "Trinity College & University." (Exhibit 3, BP 95). It stated that Ms. Hopper had been awarded a Bachelor of Science Degree with a Major in Business Administration. There was no address on the document or any indication where this institution was located. The Comptroller's Office staff was still concerned that the degree may not be valid. However, these suspicions had not been confirmed when Ms. Hopper asked to be transferred to DHR, so they did not stop the transfer. (District Court Doc 33, BP 744, TP 90, line 20 to TP 92, line 5).

State Personnel Department staff was notified of this possible problem and conducted an investigation of Ms. Hopper's record. They contacted Trinity University in San Antonio. However, that institution had no record that Ms. Hopper ever attended classes these. Further investigation revealed that Trinity College and University had no affiliation with Trinity University in San Antonio, Texas, but rather was a "diploma mill" operating from the British Virgin Islands. (Exhibit 4, BP 56 to 57). This entity, according to their web site, offered degrees based on an applicant's past work experience for a fee of $695.00. It was also discovered that 17 of the course names and course numbers listed on the attachment to Ms. Hopper's Accountant application corresponded with course names and numbers offered at Trinity University in Texas. The remaining 5 courses appeared to be from Troy University in Montgomery. (Exhibit 4, BP 56-57).

In late April or early May 2006, State Personnel staff notified Mr. Thomas King, DHR Personnel Director, that it appeared that Ms. Hopper did not have a valid degree. (Exhibit 2, Page 1, Para 4). Mr. King met with Ms. Hopper on May 8, 2006 and informed her of the information that had been provided by the State Personnel Department. She was

told that she would be receiving a Charge Letter notifying her of proposed disciplinary actions.  Mr. King asked her if she had anything to say in response.  She did not and he told her to think about it overnight and to come back the next day.  He also told her that she could resign from her position before the Charge Letter was served on her.  (Exhibit 2, Page 2, Para 4).

Ms. Hopper did not provide any explanation concerning her degree, nor did she resign.  On May 9, 2006, a Charge Letter signed by the DHR Commissioner, Page Walley, was served on Ms. Hopper.  (Exhibit 2, Page 3, Para 1).  Commissioner Walley is the Appointing Authority for all State DHR employees (Exhibit 1, Page 1, Para 4).  In the Charge Letter, Ms. Hopper was informed of the charges against her, that the charges could result in her termination, and that a pre-termination hearing would be conducted by a hearing officer to gather facts and make recommendations.  (Exhibit 3, BP 115).  An amended Charge Letter was served on her on June 12, 2006.  (Exhibit 3, BP 117).

On June 22, 2006, the pre-termination hearing was held.  (Exhibit 4, Page A).  Ms. Hopper attended the hearing along with her Counsel.  Ms. Hopper offered evidence at the hearing, was given the opportunity to call witnesses and cross examine witnesses against her, and testified under oath on her own behalf.  (Exhibit 3, BP 33, TP 125, lines 6-22).  Ms. Hoper testified that she found Trinity College and University through their web site on the internet.  (Exhibit 4, BP 18, TP 65, line 9).    She sent them information concerning her work history, four courses that she had completed at Troy University, two courses she completed at a Vocational College in Wetumpka, and four two-day work related seminars.  (Exhibit 4, BP 14, TP 49, line 16 to BP 15, TP 55, line 9).  She completed no on-line coursework, took no exams, wrote no papers, and did no studying. (Exhibit 3, BP 73, TP 282, line 3 to line 18).    She paid Trinity College and University approximately $700.00

(Exhibit 3, BP 25, TP 93, lines 8)  and received the "diploma" in the mail, along with a transcript showing the courses that she received credit for.  She was awarded credit for 34 courses. (Exhibit 3, BP 25, TP 92, line 14 to TP 93, line 5 and BP 88).

When Ms. Hopper was questioned at the hearing why she listed Trinity College in San Antonio, Texas on her Accountant application, she stated that she was confused about the identity of the two institutions and did not realize that they were separate entities.  She said she was at work when she filed out the application and claimed that she went to the web site of Trinity University, thinking it was the same place that awarded her the degree. (Exhibit 4, BP 17, TP 61, line 15 to TP 62, line 21).

After the hearing was adjourned, the hearing officer prepared a recommendation to Commissioner Page Walley.  (Exhibit 3, BP 120-122).    In that recommendation he wrote that the evidence showed that Ms. Hopper knew she did not have a degree from Trinity University in Texas when she completed her application and that she was not qualified for the position of Accountant as she did not have a valid degree.  (Exhibit 3, BP 121, last Para continuing to BP 122).    Commissioner Walley reviewed the recommendation and evidence and concluded that Ms. Hopper should be terminated.  Exhibit 1, Page 3, Para 2).  He signed a termination letter to her dated August 14, 2006.  In that letter, he told her that she had 10 days to appeal the decision to the State Personnel Board. (Exhibit 3, BP 119).

On August 14, 2006, Ms. Hopper appealed to the State Personnel Board.  A hearing de novo was scheduled.  Based on an objection by Ms. Hopper that the State Personnel Board Administrative Law Judges had a conflict, Mr. Dan Morris, an attorney and then Assistant Director of the Alabama Department of Transportation, was appointed to serve as the ALJ for Ms. Hopper's case.  (Exhibit 3, BP 125, last two paras).

The hearing before Mr. Morris was held on December 18, 2006.  (District Court Doc 33, BP 722, P1, line 18).  Ms. Hopper attended, presented evidence, called witnesses, cross-examined witnesses called by DHR, and testified on her own behalf.  (Exhibit 3, BP 34, TP 127, line 1 to TP 129, line 7).    The evidence was similar to that presented in the first hearing.  After the hearing, Mr. Morris prepared a recommendation to the State Personnel Board.  (Exhibit 3, BP 123 to 132).    In that recommendation he made findings that Ms. Hopper falsified her Accountant application and that she was not qualified to be an Accountant with the State of Alabama as she did not have a valid degree.   He recommended that her discharge from employment with DHR be upheld.  (Exhibit 3, BP 131).

The State Personnel Board reviewed the recommendation of Mr. Morris and allowed DHR and Ms. Hopper's attorney to make an oral argument at the Board meeting on March 14, 2007.  (Exhibit 3, BP 133,  Para 1).    The Board issued it decision that same day and upheld Ms. Hopper's dismissal from employment with DHR saying that the decision of the appointing authority to dismiss Ms Hopper was supported by the evidence and that termination was warranted.  (Exhibit 3, BP 133, last Para).

On   April 20, 2007, Ms. Hopper filed this lawsuit appealing the decision of the State Personnel Board and seeking damages for the violations of her constitutional rights.

## III.  ARGUMENTS

### A.  THE PLAINTIFF'S DISMISSAL FROM DHR SHOULD BE AFFIRMED IN ACCORDANCE WITH THE ALABAMA ADMINISTRATIVE PROCEDURES ACT

Count 1 of Ms Hopper's complaint is a Petition for Review under the *Alabama Administrative Procedures Act (APA)*. *Ala. Code* §41-22-1.  The dismissal of employees from positions with the State of Alabama and its agencies is governed by the *APA*.  *Ala. Code* §41-22-20 sets forth the procedure that a person uses in seeking judicial review of a decision of an administrative agency.  The judicial review is not a trial de novo.[2]  *Ala. Code* §41-22-20(i).  The review shall be conducted by the court without a jury and shall be confined to the record.[3] *Ala Code* §41-22-20(j).

Section 41-22-20(k) of the *APA* sets forth the standard of review that a court uses in reviewing an administrative appeal.  That section reads as follows:

> (k) Except where judicial review is by trial de novo, the agency order shall be taken as prima facie just and reasonable and the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact, except where otherwise authorized by statute. The court may affirm the agency action or remand the case to the agency for taking additional testimony and evidence or for further proceedings. The court may reverse or modify the decision or grant other appropriate relief from the agency action, equitable or legal, including declaratory relief, if the court finds that the agency action is due to be set aside or modified under standards set forth in appeal or review statutes applicable to that agency or if substantial rights of the petitioner have been prejudiced because the agency action is any one or more of the following:
>
> (1) In violation of constitutional or statutory provisions;
> (2) In excess of the statutory authority of the agency;
> (3) In violation of any pertinent agency rule;
> (4) Made upon unlawful procedure;
> (5) Affected by other error of law;

---

[2] There are limited exceptions, which are not applicable in this case, in which a trial de novo by the court is provided for.
[3] In accordance with Ala. Code §41-22-20(k),the administrative record has previously been filed with this court by the State Personnel Department (District Court Doc 33)

(6) Clearly erroneous in view of the reliable, probative, and substantial
evidence on the whole record; or
(7) Unreasonable, arbitrary, or capricious, or characterized by an abuse
of discretion or a clearly unwarranted exercise of discretion.

In Count I of the complaint, Ms. Hopper alleges that the finding of the Personnel

Board of the State of Alabama upholding her termination is:

a) In violation of the constitutional and statutory provisions, i.e. denial
of due process and equal protection of law;
b) In excess of the authority of the agency;
c) In violation of agency rules;
d) Made on unlawful procedure;
e) Affected by error of law;
f) Erroneous in view of the reliable, probative and substantial evidence
on the whole record; and/or
g) Unreasonable, arbitrary, or capricious, characterized by an abuse of
discretion or was clearly an unwarranted exercise of discretion.

Ms. Hopper does not provide any specific information concerning these violations or how

they apply to her case.

There were no violations of Ms. Hopper's constitutional rights to due process or

equal protection (discussed in more detail below). There is no evidence that DHR acted in

excess of its authority. Defendant Walley had the authority and duty as appointing

authority to dismiss employees when allegations of misconduct were established. (See *Ala*

*Code* §36-26-27; Dismissals and disciplining of employees generally and Exhibit 1, Page

1, last Para.). There is no evidence that the dismissal of Ms. Hopper was in violation of

agency rules, made on unlawful procedure, or affected by errors of law. All actions taken

against her were in accordance with the state law, the rules of the State Personnel Board,

and the DHR Personnel policies and procedures. (Exhibit 1, Page 3, Para 3)

There is also no evidence in this case that DHR's decision to terminate Ms. Hopper

or the State Personnel Board's decision to uphold that termination was erroneous in view

of the evidence on the whole record or that it was unreasonable, arbitrary or capricious,

characterized by an abuse of discretion or was an unwarranted exercise of discretion. The evidence against her could not be clearer. Ms. Hopper lied when she completed her application for Accountant with the state. (Exhibit 1, Page 2, last Para). Ms. Hopper found a diploma mill on the internet called Trinity College and University. (Exhibit 4, BP 56-57). She paid approximately $700.00 (Exhibit 3, BP 25, TP 93, line 8) and in turn received a "diploma" and a "transcript" showing that she had been granted a BA in Business Administration and credit for 34 courses (Exhibit 3, BP 25, TP 92, line 14, and BP 88), all without doing a single minute of studying, reading, or writing, and without taking any tests or exams. (Exhibit 3, BP 73, TP 282, line 3 to line 14). At that time she had a total of four college courses that she had taken at Troy University, four seminars that she attended, two vocational classes that she had taken in Wetumpka, and her work experience. (Exhibit 4, BP 14, TP 49, line 16 to BP 15, TP 55, line 9).

Ms. Hopper claimed that she thought the diploma she received was valid and legitimate. However, her claim stretches creditability in light of the fact that she listed the real Trinity University in Texas on her Accountant application and even listed its street address. (Exhibit 3, BP 109). Furthermore, the courses that she listed on the attachment to her application are courses from the real Trinity University, not the ones listed on the transcript she received from Trinity College and University. (Exhibit 4, BP 56-57)

Ms. Hopper attempts to explain all these errors by saying that it all was just innocent mistakes. (Exhibit 4, BP 17, TP 61, line 15 to TP 62, line 21). However, her explanations are not creditable and two separate hearing officers have concluded, after hearing all the evidence, that she falsified her Accountant application. (Exhibit 3, BP 120-122 and BP 123-132).

Even if one could believe, despite all the evidence to the contrary, that Ms. Hopper had confused the real Trinity University with the diploma mill Trinity, it still is not believable that she thought that she had a valid degree. Ms. Hopper had taken four college classes at Troy University at the time that she got her fake degree. (Exhibit 3, BP 17, TP 59, line 4). She has two children who both had attended college and graduated. She knew the hard work and effort that went into getting a college degree. (Exhibit 3, BP 12, TP 41, line 20). Yet she still claims that it never occurred to her that a college that gives her credit for 34 classes based on the limited information she provided might be selling junk diplomas.

Even if there had been no evidence that Ms. Hopper falsified her application for an Accountant position, the decision to terminate her employment would still be correct. To work as an Accountant for the state of Alabama, a person must have a valid college degree. (Exhibit 4, BP 111). Even Ms. Hopper now admits that there is a problem with the piece of paper that she called a diploma. After the initial investigation was started, she wrote a letter to Ms. Jackie Graham, dated May 15, 2006, in which she attached a copy of her transcript from Troy University. She said in that letter, "I will not be able to attach my transcript from Trinity College and University; I have came (sic) to the knowledge the transcript and diploma are not as they were represented to me and at this point I do not want to list them or claim them." (District Court Doc. 33, BP 559). Additionally, Ms. Hopper admitted at her deposition on May 20, 2008, that she understood that she was not qualified for the position of Accountant with DHR.

    4   Q.  Do you think it's unreasonable that DHR -- With

    5        what you know now, do you think it's

    6        unreasonable that DHR or the State is not giving

7        you credit for having a degree from Trinity

8        College & University?

9    A.   Not for not having this degree, no, sir.  That's

10       the policy for them not to take it.  I do not.

11   Q.   And you don't think that's unreasonable based on

12       what you know now?

13   A.   Not for this particular side of it, no, sir.  I

14       think I've been treated unfairly.

15   Q.   In what ways specifically?

16   A.   That they didn't listen to my side of it and

17       understand what happened to me and at least let

18       me roll back.  I didn't ask to stay an

19       Accountant.  I asked to roll back to what I was

20       a permanent thing of before.

21   Q.   And do you understand that you don't qualify for

22       the Accountant position at this point?

23   A.   Yes, sir.  In the State's eyes, I understand that.

(Exhibit 3, BP 74, TP 288, lines 4-23)

As discussed above, the agency order upholding the termination of Ms. Hopper shall be taken as prima facie just and reasonable and the court should not substitute its judgment for that of the agency as to the weight of evidence on questions of fact. *Ala Code* §41-22-20(k).  The courts have consistently upheld the right of state agencies to make decisions of fact and have limited the scope of review.  The trial court is required to review State Personnel Board's ruling under standard of review set out in this section.  *State*

*Personnel Bd. v. Wallace,* 659 So.2d 683 (Ala.Civ.App.1995). To the extent that review of legal issue, in Personal Board's affirmance of termination of police officer's employment, was predicated on factual matters, the Court of Civil Appeals presumed Personnel Board's findings of fact were correct. *Smith v. State Dept. of Public Safety*, 716 So.2d 693 (Ala.Civ.App.1998), rehearing denied. In an administrative appeal case, when there is ample evidence to support the decision of the administrative agency, it is not the duty of the trial court to substitute its judgment for that of the administrative agency. *Alabama Dept. of Public Health v. Perkins*, 469 So.2d 651 (Ala.Civ.App.1985). Unless otherwise authorized by statute, the final rulings of a state agency must be reviewed with an attendant presumption of correctness. *Benton v. Alabama Bd. of Medical Examiners,* 467 So.2d 234 (Ala.1985).

B.  PLAINTIFF RECEIVED A FAIR AND UNBIASED HEARING AND WAS NOT DENIED HER CONSTITUTIONAL RIGHTS TO DUE PROCESS OR EQUAL PROTECTION.

In Count I and Count IV of her Complaint, Ms. Hopper alleges that Defendant Walley denied her a fair and unbiased hearing, denied her due process, and denied her equal protection under the law. However, the facts that Ms. Hopper herself lists in her Complaint shows that she was given due process in both her pre-termination hearing at DHR and in her post-termination hearing before the State Personnel Board.

The United States Supreme Court in *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985) held that an employee with a property interest in his job "is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the

story."  The Eleventh Circuit held, in *Narey v. Dean*, 32 F.3d 1521 (11th Cir. 1994), that a pre-termination "hearing is not a mini-trial and 'need not definitely resolve the propriety of the discharge.  It should be an initial check against mistaken decisions -- essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and supported by the proposed action."  (See also *City of Orange Beach v. Duggan* 788 So.2d 146 (Ala.2000)).  The Alabama Supreme Court in *Stallworth v. City of Evergreen* 680 So.2d 229 (Ala.1996) said the essential requirements of due process are notice and an opportunity to respond.

Prior to her pre-termination hearing, Ms. Hopper was given a charge letter (Exhibit 3, BP 115 - 118) and specifically notified of the charges against her.  She attended her hearing, was represented by counsel, testified under oath, was given the opportunity to call witnesses, present evidence, and make arguments to the hearing officer.  (Exhibit 3, BP 33, TP 125, lines 6-22).

Likewise, at the post-termination hearing before the State Personnel Board hearing officer, she was given notice of the charges, given an opportunity to conduct discovery, attended the hearing, called witnesses, including Defendant Walley, presented evidence, cross-examined DHR witnesses, and testified on her own behalf.  (Exhibit 3, BP 34, TP 127, line 1 to TP 129, line 7).  The Personnel Department even appointed an outside hearing officer for this hearing after she raised objections to the Personnel Department ALJs hearing her case.  (Exhibit 3, BP 125, last two Paras).  When this hearing officer ruled against her, she appeared before the full board and her attorney made an argument to them concerning her case.  (Exhibit 3, BP 133, Para 1).  The due process that she was given was above and beyond what the courts require for administrative hearings.

Additionally, she has given no specific examples in Counts I or IV as to how her due process rights were violated or how she was denied equal protection under the law.

The decision of the State Personnel Board upholding the dismissal of Ms. Hopper from employment with DHR should be upheld.

C.  THERE ARE NO ACCUSATIONS MADE AGAINST DEFENDANT WALLY IN COUNTS II AND III OF THE PLAINTIFF'S COMPLAINT.

In Count II, Ms Hopper claims that she was denied a full and fair hearing and that her rights to due process and equal protection were violated when the State Personnel Board ALJ denied her certain 3rd party discovery in the post-termination hearing.  As stated in his affidavit, Defendant Walley played no part in the post-termination hearing other than being called as a witness by Ms. Hopper.  (Exhibit 1, Page 5, Para 3).  It is unclear, in fact, if this claim is against any of the defendants since the violations she is alleging would be regarding actions taken by the independent ALJ, Mr. Dan Morris, who is not an employee of the State Personnel Department, the State Personnel Board, Defendant Walley or DHR.  Rather, he worked at that time for the Alabama Department of Transportation.  (Exhibit 3, BP 132).  In any event, there are clearly no allegations against Defendant Walley in Count II.

In Count III of her complaint, Ms. Hopper alleges that Defendant Jackie Graham violated her rights to due process by meeting with the DHR Personnel Director prior to giving Ms. Hopper an opportunity to respond to the charges against her.  Ms. Hopper specifically asks for damages only against Defendant Graham and it is clear that there are no allegations against Defendant Walley in Count III.

D.  DEFENDANT WALLEY DID NOT ENGAGE IN A CONSPIRACY TO DENY MS

HOPPER A FAIR AND UNBIASED HEARING, DENY HER DUE PROCESS, OR

DENY HER EQUAL PROTECTION UNDER THE LAW.

In Count IV of her Complaint, Ms. Hopper alleges that Defendant Walley,

Defendant Graham, and others, to include the Director and Assistant Director of the DHR

Personnel Office, conspired to deny her a fair and unbiased hearing, due process, and equal

protection.  However, she alleges no facts or specific information concerning this alleged

conspiracy.

In *Fullman v. Graddick*, 739 F.2d 553 (11th Cir. 1994) the court said that in civil

rights and conspiracy actions, more than mere conclusory notice pleadings is required.

Specifically in a conspiracy, a defendant must be informed of the nature of the conspiracy

which is alleged.  It is not enough to simply aver in the complaint that a conspiracy

existed." id at 556, 557.  In Ms. Hopper's complaint, she does exactly what the Eleventh

Circuit said should not be done.  She merely states that there was a conspiracy without any

information to inform Defendant Walley of the nature of the conspiracy alleged.

Even if there were more details about the conspiracy, the allegation would still fail

in that the alleged conspiracy was to deny due process and equal protection rights of Ms.

Hopper.  As has already been discussed, there is no evidence of any violation of either of

these constitutional rights by Defendant Walley or by members of the DHR Personnel

Office.  Her due process rights were fully protected in the pre-termination and post-

termination hearings.  Liability for civil conspiracy rests upon the existence of an

underlying wrong and if the underlying wrong provides no cause of action, then neither

does the conspiracy.' " *Ex parte Alabama Dep't of Transp.,* 764 So.2d 1263, 1271

(Ala.2000) (quoting *Jones v. BP Oil Co.,* 632 So.2d 435, 439 (Ala.1993)).

Finally, to have a conspiracy, there must be two or more people having an agreement or acting together to further the wrongful act. Civil conspiracy is a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means." *Keith v. Witt Auto Sales, Inc.,* 578 So.2d 1269, 1274 (Ala.1991) (citing *Eidson v. Olin Corp.,* 527 So.2d 1283 (Ala.1988)). There is no evidence that Defendant Wally entered into an agreement with anyone concerning Ms. Hopper. He specifically states in his affidavit that he had no agreement with anyone concerning Ms. Hopper or her case. (Exhibit 1, Page 4, Para 2). Mr. King, the DHR Personnel Director also states that there was no agreement between any of the parties. Exhibit 2, Page 3, Last Para). Ms. Hopper, in her deposition states that she has no information that Defendant Walley had an agreement with anyone concerning her case. (Exhibit 3, BP 73, TP 285, line 12 to BP 74, TP 287, line 13). Without an agreement and without an underlying wrongful act, there is no conspiracy. This count against Defendant Walley should be dismissed.

E.   PLAINTIFF'S CLAIMS AGAINST DEFENDANT PAGE WALLEY IN HIS OFFICIAL CAPACITY ARE BARRED BY THE ELEVENTH AMENDMENT.

The Eleventh Amendment to the Constitution of the United States provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State." U.S.CONST. Am. XI. The Amendment also applies to suits in federal court against a state by its own citizens. *See Hans v. Louisiana*, 134 U.S. 1, 18-19, 10 S.Ct. 504, 33 L.Ed. 842 (1890). The protection provided to states by the Eleventh Amendment has been extended to protect state entities, *see Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) ("suit in which the State or one of its agencies or departments is

named as defendant is proscribed by the Eleventh Amendment…regardless of the relief sought"), and state officials in their official capacities, *see Kentucky v. Graham*, 473 U.S. 159, 166-167, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).   Essentially, the Eleventh Amendment creates a sovereign immunity for suit in federal court which the states enjoy unless it has been surrendered.  *See Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 266-267, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997) "[A]n assertion of Eleventh Amendment immunity must be resolved before a court may address the merits of the underlying claims." *Seaborne v. State of Florida Department of Corrections*, 143 F.3d 1405 (11th Cir. 1998).

    To ascertain whether an entity is an arm of the state, the Court must examine state law.  *Brown v. East Central Health District*, 752 F.2d 615, 617 (11th Cir. 1985).  By statute, the state and county Departments of Human Resources have sovereign immunity. ALA.CODE § 38-2-8 (1975); *Mitchell v. Davis*, 598 So.2d 801 (Ala. 1992) ("DHR and the BCDHR [Barbour County DHR], as State agencies, can assert the defense of absolute immunity from suit.").

    The Eleventh Amendment to the United States Constitution bars a suit against state officials when "the state is the real, substantial party in interest."  *Ford Motor Company v. Department of Treasury (Ind.)*, 323 U.S. 459, 464, 469, 65 S.Ct. 347, 89 L.Ed. 389 (1945). Thus, "[t]he general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter."  *Hawaii v. Gordon*, 373 U.S. 57, 58, 83 S.Ct. 1052, 10 L.Ed.2d 191 (1963).   Individuals are considered to be arms of the state where they act in their official capacities.  *Louisiana Land & Exploration Co. v. State Mineral Board*, 229 F.2d 5 (5th Cir. 1956).

In dismissing claims brought against Department of Human Resources employees in their official capacities, in *Ross v. State of Alabama*, 893 F.Supp. 1545 (M.D.Ala. 1995), the court stated the principle of law as follows:

> Likewise, the court finds that the plaintiffs may not seek monetary relief from Jones and Parsons in their official capacities. In *Carr*, the Court of Appeals for the Eleventh Circuit held that "[l]awsuits against a state official in his or her official capacity are suits against the state when 'the state is the real substantial party in interest.'" 916 F.2d at 1524 (quoting *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 101, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984)). When a plaintiff seeks monetary relief from a state employee in his or her official capacity, as here, "the state is considered the real party in interest because an award of damages would be paid by the state." *Id.* (citation omitted). Based on the foregoing authority, the court finds that the § 1983 claims asserted against the Houston County DHR and Jones and Parsons in their official capacities are due to be dismissed.

*Ross*, 893 F.Supp. at 1550 (footnotes omitted).

All claims against Defendant Walley in his official capacity should be dismissed.

## F.  DEFENDANT PAGE WALLEY IS ENTITLED TO QUALIFIED IMMUNITY ON PLAINTIFF'S CLAIMS AGAINST HIM IN HIS INDIVIDUAL CAPACITY.

Defendant Walley is entitled to qualified immunity for all claims against him in his individual capacity. The applicable standard of qualified immunity was defined in *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), and redefined in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) so as to delete inquiry into subjective motivations that "can be particularly disruptive of effective government." *Harlow* 102 S.Ct. at 2738. The standard of qualified immunity as redefined, focuses "on the objective reasonableness of an official's conduct." *Harlow*, 102 S.Ct. at 2738. It provides that, when an official's duty legitimately requires action in which clearly established rights are not implicated, the public interest may be better served by action

taken with independence and without fear of consequences.  An official is "not expected to anticipate subsequent legal developments, nor can he fairly be said to know that the law forbade conduct not previously identified as unlawful."  *Harlow*, 102 S.Ct. at 2728. Further, the immunity doctrine "recognizes that officials can act without fear of harassing litigation, only if they reasonably can anticipate when their conduct may give rise to liability for damages and only if unjustified lawsuits are quickly terminated."  *Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 3020, 82 L.Ed.2d 139 (1984).

In Crosby v. Monroe County, 394 F.3d 1328 (11th Cir.2004) the court said:

> To be eligible for qualified immunity, the official must first establish that he was performing a "discretionary function" at the time the alleged violation of federal law occurred. *Holloman ex rel. Holloman v. Harland,* 370 F.3d 1252, 1263-64. (11th Cir.2004).  Once the official has established that he was engaged in a discretionary function, the plaintiff bears the burden of demonstrating that the official is not entitled to qualified immunity. *Id.* at 1264. In order to demonstrate that the official is not entitled to qualified immunity, the plaintiff must show two things: (1) that the defendant has committed a constitutional violation and (2) that the constitutional right the defendant violated was "clearly established" at the time he did it. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001); *Holloman,* 370 F.3d at 1264.  To determine whether an official was engaged in a discretionary function, we consider whether the acts the official undertook "are of a type that fell within the employee's job responsibilities." *Holloman,* 370 F.3d at 1265.

Defendant Walley's action in terminating the employment of Ms. Hopper clearly fell within his job responsibilities as the appointing authority for the State DHR office. (Exhibit 1, Page 1, last Para).  Further, there is no evidence of any constitutional violation as has previously been discussed.  Defendant Walley is entitled to qualified immunity on all counts against him in his individual capacity.

## IV.  CONCLUSION

For the reasons stated above, Defendant Walley should be granted summary judgment on all claims against him and he should be dismissed from this lawsuit. Additionally, the decision of the State Personnel Board to uphold the termination of Ms. Hopper from employment with DHR should be affirmed.

TROY KING
ATTORNEY GENERAL

SHARON E. FICQUETTE
ASSISTANT ATTORNEY
GENERAL

*//s// Joel C. Marsh*
JOEL C. MARSH (MAR 052)
Assistant Attorney General
Ala. Dept. of Human Resources
P. O. Box 304000
Montgomery, AL 36130-4000
Ph: (334) 242-9330
Fax: (334) 242-0689

ATTORNEY FOR PAGE B.
WALLEY

**CERTIFICATE OF SERVICE**

I hereby certify that I have served the foregoing Motion and Brief for Summary Judgment on the following individuals by electronic filing, on this the 30th day of May 2008.

Jim L. DeBardelaben, Esq.
P.O. Box 152
Montgomery, AL 36101-0152

Alice Ann Byrne, Esq.
300 Folsom Administrative Building
64 N. Union St.
Montgomery, AL 36130-4100

Joana S. Ellis, Esq.
P.O. Box 303351
Montgomery, AL 36130-3351

//s// *Joel C. Marsh*
JOEL C. MARSH (MAR 052)
Assistant Attorney General

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

VIRGINIA HOPPER                    )
                                   )
    Plaintiff,                     )
                                   )
v.                                 )    CASE NO. 2:07-cv-457-MEF
                                   )
JACKIE GRAHAM; THE                 )
PERSONNEL BOARD OF THE             )
STATE OF ALABAMA; JOE              )
DICKSON; JOE MCMILLAN;             )
JOYCE O'NEAL; ELLEN                )
MCNAIR; JAMES ANDERSON;            )
PAGE WALLEY                        )
                                   )
    Defendants.                    )
                                   )
                                   )
STATE OF ALABAMA                   )
                                   )
COUNTY OF MONTGOMERY               )

## AFFIDAVIT

Before me, the undersigned authority, personally appeared, PAGE B. WALLEY, who is known to me and who, having been first duly sworn, deposes and states as follows:

"My name is Page Walley. I am a resident of Lee County, Alabama, and am over the age of 19 years. I am competent to provide the sworn statements contained in this affidavit.

I am the Commissioner of the Alabama Department of Human Resources (DHR). I was appointed to this position on January 1, 2004.

As the Commissioner of the Alabama Department of Human Resources, I am responsible for all of the programs that DHR administers including child welfare, adult services, food stamps, financial assistance, and child support collections. I am also the Appointing Authority of

EXHIBIT
1

1

all of the employees who are assigned to the Department of Human Resources State Office. One of my duties as the Appointing Authority is to terminate the employment of DHR employees for misconduct, for not having the necessary qualifications for a position, and for other reasons as set forth in the Alabama law and the State Personnel Board Rules.

I have read the Complaint filed in this case by Ms. Virginia Hopper. Ms. Hopper started working in the Finance Office at the DHR State Office on April 16, 2006 as an Accountant (State Personnel classification 10611-Accountant.) Prior to this she was working as an Accountant at the State of Alabama Comptroller's Office. The Comptroller's Office is part of the State of Alabama Finance Department, which is a separate state agency, and is not part of DHR.

I was told by the DHR personnel office that they had been informed that there may be a problem with Ms. Hopper's degree that she used to qualify for her position as an Accountant with the State of Alabama. Based on this information, I signed a Charge Letter addressed to her dated May 9, 2006 and later signed an amended Charge Letter dated June 12, 2006. In these letters, I informed her that I had information that she may have falsified her application to be an Accountant with DHR and that it appeared that she did not qualify for the position of Accountant. I also informed her that a pre-termination hearing would be conducted by a hearing officer to hear evidence about these allegations and, if the allegations were proven to be true, that she could be terminated from her position with DHR.

The pre-termination hearing was held on June 22, 2006 before a hearing officer. I received the recommendation of the hearing officer sometime in August 2006. The hearing officer concluded that Ms. Hopper did falsify her application for the Accountant position and further that she did not have a valid degree necessary to be an Accountant with DHR. On August 14, 2006, I signed a letter to Ms. Hopper informing her that her employment with DHR

2

was being terminated. I also informed her in the letter that she had ten days to request a hearing before the State Personnel Board.

I did not speak to the State Personnel Director, Ms. Jackie Graham, write to Ms. Graham, or communicate with Ms. Graham in any manner about Ms. Hopper, the evidence concerning Ms. Hopper's degree, or about any other matter involving Ms. Hopper, either before or after the DHR pre-termination hearing of Ms. Hopper. I did not communicate with anyone else at the State Personnel Department or with any members of the State Personnel Board concerning Ms. Hopper or her employment and dismissal. The only communication that I had with anyone concerning Ms. Hopper, or her case, was with members of my DHR personnel office and with members of my DHR legal office. I made no decision on Ms. Hopper's dismissal until I read the report from my hearing officer after the pre-termination hearing was completed.

Ms. Hopper's pre-termination hearing was fair and provided her with due process. She attended the DHR hearing, was represented by counsel at the hearing, presented evidence, questioned witnesses, and testified to the hearing officer. This hearing was conducted in accordance with the rules of the State Personnel Board and the guidelines in the DHR Personnel Policy and Procedures Manual. The hearing officer insured that Ms. Hopper had an ample opportunity to present her side of the story before I made any decision about her termination.

I did not deprive Ms. Hopper of her constitutional rights of due process or equal protection. I did not act in excess of my authority or the authority of DHR in directing that a pre-termination hearing be held concerning the charges in her charge letter or in my dismissal of Ms. Hopper. I have not acted in violation of any agency rules. I did not terminate Ms. Hopper based on any unlawful procedure. There were no errors of law in the processing of Ms. Hopper's case or in her dismissal. The decision to terminate her was based on reliable, probative and

substantial evidence. I was not involved in any abuse of discretion or an unwarranted exercise of discretion and the decision to terminate Ms. Hopper was not unreasonable, arbitrary or capricious. On the contrary, the evidence showing that Ms. Hopper falsified her Accountant application and that she did not have a valid Accounting Degree was overwhelming.

I did not have any agreement with, or enter into any conspiracy with, the State Personnel Director Ms. Jackie Graham, the DHR Personnel Director, the DHR Assistant Personnel Director, or anyone else, to deny Ms. Hopper a fair and unbiased hearing, her due process, or her equal protection under the law. As the appointing authority, I made the decision to terminate her employment.

I did not base my decision to terminate Ms. Hopper's employment with DHR on the investigation of her degree conducted by the State Personnel Department or on any information provided by the State Comptroller's Office. My decision to terminate Ms. Hopper's employment was based on the evidence established at the DHR pre-dismissal hearing and the recommendation of the hearing officer. This evidence included Ms. Hopper's own testimony that the document she calls a degree was given to her by Trinity College and University (a diploma mill in the Virgin Islands that she found on the Internet.) She did not take any on-line courses. The document that she calls a diploma was given to her based on their review of the four courses that she took at Troy University, two courses taken at Wetumpka Vocational College, four two-day work related seminars, and her work experience. The hearing officer concluded, and I concurred, that Ms. Hopper intentionally falsified her Accountant application and that Ms. Hopper does not have a valid college degree, which is a requirement to be an Accountant. I know that there was an argument made at the pre-termination hearing by Ms. Hopper that the State of Alabama Personnel Office did not require that a degree of an applicant

4

come from an "accredited" college or university. However, the issue of whether Trinity College and University was accredited was not a factor in my decision to terminate Ms. Hopper. My decision was based on the facts that she did not have a valid degree from any university or college. What she had from Trinity College and University was not a valid degree, but rather a piece of paper given to her based on the few courses that she had taken and her work experience.

It is one of my duties as the Commissioner of DHR and as the Appointing Authority for DHR, to decide whether employees should be dismissed when evidence of misconduct or evidence that they don't qualify for their position is presented and proven in a pre-termination hearing. I used my discretion and judgment and made the decision to terminate the employment of Ms. Hopper.

I was not involved in any decisions regarding Ms. Hopper's post-termination hearing before the State Personnel Board. My only involvement in the post-termination hearing was being called by Ms. Hopper's attorney as a witness in the hearing.

I have acted in the line and scope of my duties in all of the actions that I have taken regarding Ms. Hopper and the termination of her employment with DHR. None of the actions that I have taken were done in any personal capacity."

Page B. Walley, Ph.D.
Commissioner,
**Alabama Department of Human Resources**
Sworn to and subscribed
before me on this the _28th_
day of _May_, 2008.

Notary Public, State at Large

My Commission Expires: _4/30/2011_

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| **VIRGINIA HOPPER** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 2:07-cv-457-MEF** |
| | ) | |
| **JACKIE GRAHAM; THE** | ) | |
| **PERSONNEL BOARD OF THE** | ) | |
| **STATE OF ALABAMA; JOE** | ) | |
| **DICKSON; JOE MCMILLAN;** | ) | |
| **JOYCE O'NEAL; ELLEN** | ) | |
| **MCNAIR; JAMES ANDERSON;** | ) | |
| **PAGE WALLEY** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |
| **STATE OF ALABAMA** | ) | |
| | ) | |
| **COUNTY OF MONTGOMERY** | ) | |

## AFFIDAVIT

Before me, the undersigned authority, personally appeared, Thomas King, who is known to me and who, having been first duly sworn, deposes and states as follows:

"My name is Thomas King. I am a resident of Montgomery County, Alabama, and am over the age of 19 years. I am competent to provide the sworn statements contained in this affidavit.

I am the Director of the Alabama Department of Human Resources (DHR) Personnel Office. I was appointed to this position in December 2000.

In late April or early May of 2006, I was informed by the State of Alabama Personnel Department that Ms. Virginia Hopper, an Accountant in the DHR Finance Office, had an



1

Accountant degree that may not be valid. On May 4, 2006, I met with Ms. Jackie Graham and other staff from the State Personnel Department. DHR Commissioner Walley did not attend this meeting. I was provided a copy of an investigation report that staff from the State Personnel Department had prepared concerning an investigation of Ms. Hopper's college degree. It appeared from this information that Ms. Hopper's degree was not valid. I made no decision that day concerning Ms. Hopper's employment and I had no agreement with Ms. Graham or anyone else concerning what should be done with this information.

There was no discussion in this meeting about denying Ms. Hopper any of her due process rights or equal protection rights. DHR works very hard to insure that all employees are treated fairly and provided with appropriate due process before any disciplinary action is taken against them. Before we make a decision to terminate any merit employee, that employee is given a full hearing before an independent hearing officer that is not associated with his or her case in any way. In fact, I have been told that DHR provides more due process to its employees facing termination than do most other state agencies.

After the May 4, 2006 meeting, I met with DHR Commissioner Walley to discuss the case. He is the appointing authority for all DHR State Office employees, including Ms. Hopper. As appointing authority, he makes the final decision on the hiring and dismissal of all DHR State Office employees. He decided to give Ms. Hopper a Charge Letter and to schedule a pre-termination hearing before a hearing officer. Commissioner Walley made no decision at that time concerning the ultimate outcome of the case.

Prior to giving Ms. Hopper a Charge Letter, I called her into my office along with her supervisor and told her what we suspected about her degree. She offered no explanation. I told her that we planned to give her a Charge Letter, but for her to go home and think about things

2

that evening. I asked her to come back to see me the next day and to tell me anything that she wanted me to know about this issue before she received her Charge Letter. I also informed her that she had the option to resign before the Charge Letter was served if she wanted to do so. Ms Hopper returned to see me the next day, but she offered no information about her degree. She was served the Charge Letter that day.

The pre-termination hearing for Ms. Hopper was held on June 22, 2006. The hearing officer concluded that Ms. Hopper had falsified her application to be an Accountant with the State of Alabama and that she did not have a valid degree necessary to be an Accountant. Based on the evidence and recommendation of the hearing officer, Commissioner Walley decided to terminate Ms. Hopper's employment with DHR.

Though Commissioner Walley and I discussed Ms. Hopper's case both before and after the pre-termination hearing, we had no agreement concerning her employment with DHR. The decision to terminate Ms. Hopper's employment was his alone. We never discussed denying her any of her constitutional rights, including her right to due process or her right to equal protection. On the contrary, we insured that she had a fair hearing before an unbiased hearing officer. I have had no discussions or agreements with anyone at DHR or outside of DHR concerning denying Ms. Hopper of any of her constitutional rights. I was not involved in the post-termination hearing that Ms. Hopper had before the State Personnel Board ALJ other than being called as a witness by Ms. Hopper's attorney."

**Thomas King**
**Director**
**Alabama Department of Human Resources**
**Personnel Office**

Sworn to and subscribed before me on this the _____30th_____ day of _____May_____, 2008.

_____
Notary Public, State at Large

My Commission Expires: _____4/30/2011_____

4

ORIGINAL                                          1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                    NORTHERN DIVISION

4

5    VIRGINIA HOPPER,

6          Plaintiff,

7    Vs.                          CIVIL ACTION NO.
                                  2:07-CV-457-MEF
8    JACKIE GRAHAM, et al.,

9          Defendants.

10

11                * * * * * * * * * * * *

12                      VOLUME II

13

14                * * * * * * * * * * * *

15         **DEPOSITION OF VIRGINIA HOPPER**, taken pursuant

16   to stipulation and agreement before Pamela A. Wilbanks,

17   Certified Court Reporter, ACCR# 391, Registered

18   Professional Reporter and Commissioner for the State of

19   Alabama at Large, in the Law Offices of Jim

20   DeBardelaben, 1505 Madison Avenue, Montgomery, Alabama,

21   on Tuesday, May 20, 2008, commencing at approximately

22   9:00 a.m.

23                * * * * * * * * * * * *

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P
                (334) 263-4455

EXHIBIT
3
Page A

292

REPORTER'S CERTIFICATE

STATE OF ALABAMA:

MONTGOMERY COUNTY:

        I, Pamela A. Wilbanks, CCR, Registered

Professional Reporter, and Commissioner for the State

of Alabama at Large, do hereby certify that I reported

the deposition of:

                    VIRGINIA HOPPER

who was first duly sworn by me to speak the truth, the

whole truth and nothing but the truth, in the matter

of:

                    VIRGINIA HOPPER,

                    Plaintiff,

                    Vs.

                    JACKIE GRAHAM, et al.,

                    Defendants.

                    In The U.S. District Court

                    For the Middle District of Alabama

                    Northern Division

                    2:07-CV-457-MEF

on Tuesday, May 20, 2008.

        The foregoing 291 computer printed pages

contain a true and correct transcript of the

ORIGINAL                                           293

1   examination of said witness by counsel for the parties

2   set out herein.  The reading and signing of same is

3   hereby waived.

4           I further certify that I am neither of kin nor

5   of counsel to the parties to said cause nor in any

6   manner interested in the results thereof.

7           This 23rd day of May 2008.

15   _____
     Pamela A. Wilbanks, ACCR #334
16   Expiration Date:  9-30-2008
     Registered Professional Reporter
17   and Commissioner for the State
     of Alabama at Large

ORIGINAL                                             1

STATE OF ALABAMA

DEPARTMENT OF HUMAN RESOURCES

IN RE:   VIRGINIA HOPPER

        Personnel Hearing

\* \* \* \* \* \* \* \* \* \* \* \*

**PROCEEDINGS BEFORE THE HONORABLE PHILIP O. TYLER**, reported by Lyn Daugherty, Certified Shorthand Reporter and Commissioner for the State of Alabama at Large, at the Department of Human Resources, Legal Division, Gordon Persons Building, Montgomery, Alabama, on Thursday, June 22nd, 2006, commencing at approximately 9:05 a.m.

\* \* \* \* \* \* \* \* \* \* \* \*

EXHIBIT
4
Page   A

166

1                    REPORTER'S CERTIFICATE

2     STATE OF ALABAMA:

3     MONTGOMERY COUNTY:

4              I, Lyn Daugherty, Certified Shorthand

5     Reporter and Commissioner for the State of Alabama

6     at Large, do hereby certify that I reported the

7     proceedings in the matter of:

8              VIRGINIA HOPPER,

9              Personnel Hearing

10             STATE OF ALABAMA

11             DEPARTMENT OF HUMAN RESOURCES

12    On Thursday, June 22nd, 2006.

13             The foregoing 165 computer-printed pages

14    contain a true and correct transcript of said

15    proceedings.

16             I further certify that I am neither of kin

17    nor of counsel to the parties to said cause nor in

18    any manner interested in the results thereof.

19             This 10th day of November 2005.

20

21    _____

22    Lyn Daugherty
      Certified Shorthand Reporter
      And Commissioner for the
23    State of Alabama at Large

# TRANSCRIPT OF PROCEEDINGS

## June 22, 2006

## Pages 1 through 166

# CONDENSED TRANSCRIPT AND CONCORDANCE PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

Page 1

```
 1              STATE OF ALABAMA
 2     DEPARTMENT OF HUMAN RESOURCES
 3
 4
 5   IN RE:  VIRGINIA HOPPER
 6          Personnel Hearing
 7
 8
 9
10          * * * * * * * * * * * * *
11
12
       PROCEEDINGS BEFORE THE HONORABLE PHILIP O.
13
     TYLER, reported by Lyn Daugherty, Certified
14
     Shorthand Reporter and Commissioner for the State
15
     of Alabama at Large, at the Department of Human
16
     Resources, Legal Division, Gordon Persons Building,
17
     Montgomery, Alabama, on Thursday, June 22nd, 2006,
18
     commencing at approximately 9:05 a.m.
19
20          * * * * * * * * * * * * *
21
22
23
```

Page 2

```
 1              APPEARANCES
 2
 3   ON BEHALF OF MS. HOPPER:
 4   Mr. Jim L. DeBardelaben
       Attorney at Law
 5     1505 Madison Avenue
       Montgomery, Alabama
 6
 7   ON BEHALF OF DHR:
 8   Mr. Joel C. Marsh
       Department of Human Resources
 9     P.O. Box 304000
       Montgomery, Alabama 36130
10
     ALSO PRESENT: Mr. Hopper
11
            * * * * * * * * * * * * *
12
            EXAMINATION INDEX
13
     WITNESSES FOR DHR
14
     VIRGINIA HOPPER
15
       DIRECT BY MR. MARSH . . . . . . . . 17
16
     VERA WARREN
17
       DIRECT BY MR. MARSH . . . . . . . . 80
18
       CROSS BY MR. DEBARDELABEN  . . . . 106
19
20   WITNESSES FOR MS. HOPPER
21   VIRGINIA HOPPER
22     DIRECT BY MR. DEBARDELABEN . . . . 117
23     CROSS BY MR. MARSH . . . . . . . . 141
```

Page 3

```
 1              EXHIBIT INDEX
 2   DHR
 3    1   Documents provided to DHR from the State      5
          Personnel Office
 4
 5    2   List of courses from Troy University        18
 6    3   Troy University catalog taken off the       24
          Internet
 7    4   Application for account clerk position      34
 8    5   Application for examination for             36
          Accounting Tech I
 9
10    6   Accounting Technician I announcement        40
          dated October 6th, 1999
11    7   Accountant announcement dated November      42
          12th, 2003
12
13    8   Application for examination for             43
          accountant
14    9   List of courses of study from Trinity       65
          University in San Antonio, Texas
15
16   10   Letter to Ms. Hopper from the personnel     76
          department
17   11   Web pages from Wikipedia                    93
18   12   Web pages from Bronte International          98
          University's web site
19
20   13   Information from Bronte International       101
          University
21   14   Information from Bronte International       101
          University
22
23   15   Amended charge letter                       97
```

Page 4

```
 1   Hopper
 2    1   Documents Ms. Hopper presented to          117
          Trinity College and University
 3
 4    2   Copy of degree Ms. Hopper received from    120
          Trinity College and University
 5    3   List of courses taken off the Internet     121
 6    4   Motion for entry of final judgment and     124
          order of permanent injunction
 7
 8    5   Final order and judgment                   124
 9    6   Copy of Ms. Hopper's transcript from       127
          Troy University
10    7   Original complaint of Trinity University   129
          against Trinity College and University
11
12    8   Information from the Internet about        129
          Trinity College and University
13    9   Information from the Internet about        129
          Trinity College and University
14
15   10   Information received from Trinity          135
          College and University
16   11   Copies of evaluations            165
17
18
19          * * * * * * * * * * * * *
20
21
22
23
```

Page 5

1      (DHR Exhibit 1 was marked for
2      identification.)
3      * * * * * * * * * * * * *
4      HEARING OFFICER: All right.
5      Let's go on the record, then.
6      The style of this case is
7      State of Alabama Department of
8      Human Resources, In Re:
9      Virginia Hopper, personnel
10     hearing. My name is Philip
11     Tyler. I'm the administrative
12     hearing officer for your case
13     today. Today's date is June
14     the 22nd, 2006, and the time
15     is approximately 9:06.
16         Ms. Hopper, the reason
17     that we're here today is that
18     it has been alleged by the
19     Department of Human Resources
20     that you provided false
21     information on your job
22     application as an accountant.
23     The Department of Human

Page 6

1      Resources alleges that that's
2      in violation of the rules of
3      the State Personnel Board
4      670-X-19-.01(2)(F). And that
5      section is entitled
6      falsification of records,
7      dash, application for
8      employment.
9          And, Mr. DeBardelaben,
10     I'm going to need you to slide
11     back just a minute so I can --
12     I need to be able to see that
13     she's getting everything.
14         This hearing will proceed
15     much as a trial in state court
16     would as far as general
17     procedure and decorum, which
18     is expected. DHR has the
19     burden of proof. The standard
20     of proof is preponderance of
21     evidence. And,
22     Mr. DeBardelaben, I think you
23     wanted to bring up a matter on

Page 7

1      the record.
2          MR. DEBARDELABEN: Yes, sir. A
3      couple of them. Number one,
4      we'd like to know exactly what
5      false information she is
6      allegedly to provide. And I
7      believe the section said --
8      and what they say on all
9      application -- I think you
10     have misstated it. I think it
11     says -- let me pull the
12     application out so I can get
13     the wording exactly correct --
14     verify that all statement or
15     attachment to this application
16     true and correct to the best
17     of my knowledge. I don't
18     think it has a blanket false
19     information. I think you have
20     to have intent and it says to
21     the best of my knowledge.
22     That's what the application
23     says. And that's -- But we

Page 8

1      are trying to figure out to
2      this date what we're defending
3      against. False information
4      can be anything. You know, is
5      it her age, is it her sex, is
6      it her race. That could be
7      all false information. I
8      think we're entitled to the
9      silver bullet of what we
10     should defend against, and
11     that's what we're asking
12     this -- instead of a blanket
13     shotgun, I think we're
14     entitled to that.
15         I think I -- I don't want
16     to assume. I can read their
17     letter and say it's right,
18     but -- you know, what we're
19     defending against. But I
20     would like to know the
21     specific one -- you know,
22     silver bullets we have to
23     defend against. That's all.

000003

Page 9

1    HEARING OFFICER:  Mr. Marsh.
2    MR. MARSH:  The charge letter
3       indicated that she was -- as
4       far as the false statement on
5       her application that she
6       indicated that she had a B.S.
7       degree from Troy University in
8       San Antonio, Texas and
9       attached a list of courses
10      that she had taken related to
11      her accounting position from
12      that institution and that the
13      investigation indicated that
14      she did not have a degree from
15      Trinity University in San
16      Antonio, Texas and had not
17      taken those courses at that
18      university -- or had taken any
19      courses at that university.
20      That's in the charge letter.
21   HEARING OFFICER:  Are those the
22      crux of the charges?
23   MR. MARSH:  Well, there's two.

Page 10

1       One , that she's not qualified
2       for he r current position
3       be cause she does not have a
4       de gree and, two, that she
5       fa lsified the application when
6       she  completed it.  That's in
7       the  amended charge letter.  So
8       ba sically there's -- even if
9       e vidence is deduced that she
10      didn't inte ntionally falsify
11      a nything, our position would
12      be  she still can't be an
13      a ccountant because she doesn't
14      ha ve a degree, which is a
15      re quirement for the position.
16   HEARING OFFICER:
17      Mr. De Bardelaben.
18   MR. DEBARDELABEN:  Our re sponse to
19      tha t, all the requirement is
20      is to ha ve a bachelor's
21      de gree.  That's all the
22      re quirement is is a bachelor
23      de gree in accounting or

Page 11

1    business administration.  And
2    then it goes down and then it
3    said including completion of
4    five college level courses,
5    four of which must be
6    Principles I and II and
7    Intermediate I and II
8    equivalent courses.
9       And it's real
10   interesting.  They go down
11   here and note -- and this is
12   on the accountant
13   qualification.  Each
14   accounting course completed
15   should be listed separately on
16   the application.  Qualifying
17   college level accounting
18   course is defined as courses
19   accepted by an accredited
20   four-year college or
21   university.  The college
22   courses -- accounting courses
23   have to be accepted by an

Page 12

1    accredited.  But the
2    bachelor's degree does not say
3    accredited university.  Now,
4    it's not only on this case it
5    doesn't say that.  It's on any
6    case.  Now, if they want to
7    come up and say she doesn't
8    have a degree, she has a
9    degree.  Unfortunately, it
10   wasn't what we thought it was
11   from, and we can prove that.
12   But she has a degree.  What
13   the State hasn't done and the
14   State should have done and the
15   State should have done it long
16   ago is to define it has to be
17   from an accredited college or
18   university.  They still
19   haven't.  They might have now,
20   but up until the time of this
21   case.
22      Now, if you're going to
23   say she can't have it and this

Transcript of Proceedings | Virginia Hopper | June 22, 2006

Page 13

```
1      is not acceptable, we're going
2      to have to go back and the
3      State of Alabama is going to
4      have to go back and look at
5      everybody's degree.  And
6      that's going to be thousands
7      of degrees.  And I guarantee
8      you when they start looking,
9      you're going to have many,
10     many people that have the same
11     situation, got hoodwinked just
12     like this lady.  And I don't
13     think they dispute from what
14     I've seen that she had college
15     level courses from Troy
16     University in accounting
17     courses.  I don't think that's
18     even in dispute.  Is it, Joel?
19          MR. MARSH:  No.  From what we can
20     tell she did take five college
21     level courses at Troy
22     University.  But, I mean,
23     we'll get into the evidence
```

Page 14

```
1      in --
2          MR. DEBARDELABEN:  What I was
3      going to do if they -- I would
4      make a motion that this be
5      dismissed.  In his opening
6      he's already said, you know,
7      she had a degree and she got
8      the five college level
9      courses.  Now, what they did
10     not show and what the State
11     does not require -- you know,
12     you might say it's a
13     technicality, but this is what
14     the State did not require is
15     from an accredited college or
16     school or institution.  It
17     just said a bachelor of
18     science degree.  Maybe we
19     should assume we knew.  But
20     it's -- The State knows these
21     places exist.  How many of our
22     work force know you can't do
23     that?  Because I thought
```

Page 15

```
1      Phoenix University was on-line
2      when that came out, you know.
3      And you look at Troy.  Well,
4      my mother graduated from Troy
5      State many years ago, Troy
6      State teacher college.  Then
7      it became Troy State College.
8      Then it became Troy State
9      University.  Then it's become
10     Troy University.  And we have
11     the same situation with
12     Trinity.  You know, and I
13     think the -- what you've got
14     to show here is she knew it
15     was wrong.  And that's what
16     the -- that's what their
17     application says.
18          HEARING OFFICER:  I think you've
19     made a motion to -- that the
20     charges be dismissed, and that
21     motion is hereby denied.  Are
22     there other matters that we
23     need to address --
```

Page 16

```
1          MR. MARSH:  Not that I'm aware of.
2          HEARING OFFICER:  -- as far as an
3      opening?  Okay.  DHR, are you
4      ready to proceed?
5          MR. MARSH:  Yes, sir.
6          HEARING OFFICER:
7      Mr. DeBardelaben, are you
8      ready to proceed?
9          MR. DEBARDELABEN:  Yes, sir.
10         HEARING OFFICER:  DHR, call your
11     first witness.
12         MR. MARSH:  We would call
13     Ms. Hopper.
14         HEARING OFFICER:  Ms. Hopper, if
15     you'll raise your right hand.
16     * * * * * * * * * * * *
17         VIRGINIA HOPPER
18     The witness, after having first been duly sworn
19     to speak the truth, the whole truth and nothing but
20     the truth testified as follows:
21         DIRECT EXAMINATION
22     BY MR. MARSH:
23     Q.  Ms. Hopper, you are Ms. Virginia Hopper,
```

000005

Page 17

1    employee of DHR, the subject of this
2    hearing today; is that correct?
3    A.  I am.
4    Q.  Ms. Hopper, how long have you worked for
5    DHR?
6    A.  Totally, sir, or this last --
7    Q.  This most current time.
8    A.  I came March the 17th of this year.
9    Q.  And prior to that, where did you work?
10   A.  Department of Finance at the comptroller's
11   office.
12          (DHR Exhibit 2 was marked for
13          identification.)
14   Q.  Now, there's been some discussion this
15   morning about your -- that you do have
16   college courses that you took at Troy
17   University, Troy State. It's now called
18   Troy University. I'd like to show you what
19   I've marked as DHR Exhibit 2.
20          MR. MARSH: I've got a 1, but I'm
21   going to come back to that.
22   Q.  This is DHR Exhibit 2, which is a statement
23   from Troy University listing out the

Page 18

1    courses you took and the dates on those.
2    Would you take a look at DHR Exhibit 2 for
3    me.
4          MR. MARSH: And just for the
5          record I've given a complete
6          copy of all the exhibits to
7          Mr. DeBardelaben this morning,
8          so he's got those in front of
9          him.
10   Q.  Now, Ms. Hopper, on this list that was
11   provided by Troy it indicates you took
12   Principles of Accounting I.
13          MR. DEBARDELABEN: We're going to
14          object to this. There is no
15          indication this had been
16          provided by Troy. Jeanie
17          Bracken's name on here.
18          There's nothing whatsoever on
19          this record that shows Troy
20          University provided this.
21          It's a handwritten document
22          and it says something verbally
23          confirm date per Lynn Lewis,

Page 19

1    registrar at Troy University.
2    And that's only on one item.
3    So it does not appear that
4    this is a document -- a proper
5    document from Troy University
6    and there's no indication of
7    where it was -- who produced
8    it. There's a letter back
9    there, but, I mean --
10   apparently an envelope, but we
11   don't know if that envelope
12   goes with this exhibit.
13   Because the only one that can
14   tell us that would be a lady
15   by the name of Jeanie
16   Bracken. And I can't
17   cross-examine this, so we
18   would object to this.
19   HEARING OFFICER: Mr. Marsh.
20   MR. MARSH: Ms. Warren can testify
21   as to the -- how this record
22   came into DHR's possession.
23   Right now I haven't even

Page 20

1    offered it yet. I was
2    questioning the witness about
3    it to see if the dates -- if
4    she disputed these dates that
5    were listed here. But, I
6    mean, if we want to put
7    Ms. Warren on to certify
8    this -- where this document
9    came from and --
10   HEARING OFFICER: She can testify
11   to that later. The objection
12   is overruled. Continue,
13   please.
14   Q.  Ms. Hopper, if you would, look at this.
15   And the -- As you can see, it lists that
16   you took Principles of Accounting I and
17   II. Is that accurate? Did you take
18   Principles of Accounting I and II at Troy
19   University?
20   A.  I did.
21   Q.  And did you complete those in June and
22   August of 1988 -- excuse me -- 1998?
23   A.  Well, I wouldn't be able to actually sit

Page 21

1    here and tell you the exact date, but I
2    would say that that was probably correct.
3    Q.  As to the government accounting, did you
4        take government accounting at Troy
5        University, which is listed as -- I'm
6        sorry -- Accounting 394?
7    A.  I did.
8    Q.  And, again, it indicates you got a B in the
9        course and graduated -- or completed the
10       course rather in August of 1999. To the
11       best of your knowledge, is that accurate
12       that that's when you finished that course?
13   A.  I would say yes.
14   Q.  The CIS 140, a basic microcomputing
15       course. What kind of course was that?
16       MR. MARSH:  And I'm sorry,
17           Dr. Tyler. I'm not giving
18           you --
19       HEARING OFFICER:  That's all
20           right. Just wait. I'll
21           review it after it's admitted.
22   Q.  Your basic microcomputing course, can you
23       tell me what kind of course that is?

Page 22

1    A.  Well, I don't actually know what you're
2        asking me. We went -- The course covered a
3        lot of area. It covered the computer,
4        computer parts, how the computer operated.
5    Q.  Did the course cover -- Was it an
6        accounting course or computer course?
7    A.  Computer course.
8    Q.  The next course listed is Accounting 293,
9        managerial accounting, with a completion
10       date of March 2000. Did you take that
11       course, and is that the approximate time
12       that you finished the course?
13   A.  I did take that course at Troy. And like I
14       said, with the dates I'm assuming those are
15       correct. I wouldn't be able to say yes
16       without looking.
17   Q.  Let me ask you this: How do the terms run
18       at Troy? Do you know when they start and
19       stop? Do they have standard times? For
20       instance, many universities run from, you
21       know, September through December. How is
22       that set up at Troy?
23   A.  Well, now, when I took my first classes at

Page 23

1    Troy, they were on the semester system --
2    excuse me -- on the course system and they
3    changed to the semester system. So as far
4    as that, I'm not sure about that. I know
5    they had courses all through the summer. I
6    think -- To the best of my knowledge, Troy
7    probably has classes year-round. Is that
8    what you need to know?
9    Q.  That's fine. If you're not certain what
10       their schedule is, that's fine.
11       Let's go to the final course. It's
12       Accounting 3391, intermediate accounting.
13       You received an A in the course.
14       Indication of graduation date of March of
15       '03. Did you take that course?
16   A.  I did.
17   Q.  And is that the approximate time that you
18       completed the course?
19   A.  I believe that would be.
20       (DHR Exhibit 3 was marked for
21           identification.)
22   Q.  Let me show you what's marked as DHR
23       Exhibit 3. This is a -- taken off the

Page 24

1    Internet.
2        HEARING OFFICER:  Mr. Marsh,
3           before we go to that piece of
4           evidence, let's go back to --
5           I think you had -- you were
6           talking about Exhibit 2, were
7           you not --
8        MR. MARSH:  Yes.
9        HEARING OFFICER:  -- just before?
10          And did you make a motion that
11          that be admitted?
12       MR. MARSH:  My understanding is
13          you were deferring that. I'll
14          make the motion now that I
15          admit it. I didn't know if
16          you --
17       HEARING OFFICER:  All right.
18          Yes. Then let's defer it
19          until you get some more
20          testimony and then I'll review
21          that exhibit. Okay. Go
22          ahead.
23   Q.  DHR Exhibit 3 is Troy University catalog

**Page 25**

1  taken off of the Internet with a listing of
2  courses. If you would look at that and
3  compare it to your -- what you've got
4  listed there as the courses that you take
5  or from your memory for that matter as to
6  the courses that you took at Troy.
7       MR. DEBARDELABEN: Your Honor, I'm
8       going to object to that,
9       because looking at this
10      document it said the academic
11      year 2005 and 2006. From the
12      question he just asked her,
13      the latest academic year was
14      2003. So I don't think a 2005
15      and 2006 document would be
16      relevant to courses that
17      ended. And I think what
18      his -- he showed was from June
19      '98 through May 2003 there
20      is -- and he's apparently
21      going to ask her about -- you
22      know, it might be the same.
23      It might not be the same. But

**Page 26**

1       the document he is showing
2       does not show these are the
3       courses taken in the time
4       period or the numbers of the
5       courses in the time period
6       that he is questioning her
7       about. I just don't think
8       this is a -- this is a later
9       document.
10      MR. MARSH: Well, that's exactly
11      what I was going to ask
12      Ms. Hopper is to -- yes, this
13      is the current information in
14      the catalog, whether this
15      corresponds to these courses
16      she's taken. We don't have
17      catalogs going back to '99 in
18      our possession. I was going
19      to question to see based on
20      the description of these
21      courses if this reflects what
22      she took when she took these
23      courses. If it doesn't, then

**Page 27**

1       she can tell me that and then
2       that goes to the admissibility
3       of the document.
4            MR. DEBARDELABEN: Your Honor,
5       then he's asking her about
6       what Troy State wrote down.
7       She is not -- necessarily she
8       took the course. I would dare
9       say I couldn't tell you what
10      any of my courses were in
11      college I took if I looked at
12      the description now and
13      probably any of us sitting
14      here. It's just not a
15      relevant document. Troy State
16      I'm sure has their course
17      description of that time
18      period.
19      HEARING OFFICER: Mr. Marsh.
20      MR. MARSH: I'll stand by what I
21      said earlier that we are
22      asking her if this reflects --
23      if she doesn't know, she

**Page 28**

1       doesn't know. But if it
2       reflects based on the
3       description the courses that
4       she took at Troy University.
5       If they don't, then the
6       document wouldn't be relevant.
7       HEARING OFFICER: Overruled.
8            Proceed with the question.
9  Q.  Would you look at that document. The first
10     course that you took was the Accounting 291
11     Principles of Accounting I. That course is
12     listed on the course description as
13     Accounting 2291, Principles of Accounting
14     I. Would you read that description and see
15     if that course as described reflects what
16     you took at Troy University?
17 A.  I would say it did.
18 Q.  Now, would you look at Accounting 2292,
19     Principles of Accounting II, which you took
20     at Troy and listed there. Would you look
21     at that description and tell me if that
22     describes the course that you took at Troy
23     University.

Page 29

1  A.  You know, the statement that's on this
2      piece of paper and you look at it and you
3      say, yes, it basically corresponds. I'm
4      not going to say that's all-inclusive.
5  Q.  Sure.
6  A.  So what do you need to know? As in
7      comparison do these appear to be the same
8      courses or the same type courses?
9  Q.  Yes, ma'am.
10  A.  Yes.
11  Q.  If you would look at Accounting 394,
12      governmental accounting, which is about the
13      fifth item down on the course listing. The
14      same question for that one. Does that
15      appear to describe the course you took?
16  A.  It does.
17  Q.  Down to the Accounting 293, managerial
18      accounting. Actually that one's not even
19      on the list. Go down to Accounting 3391,
20      intermediate accounting, which is the third
21      course here, Intermediate Accounting I.
22      Does that describe in general terms the
23      course that you took at Troy University?

Page 30

1  A.  In general terms I would say yes.
2      MR. MARSH: I would offer DHR
3      Exhibit 2 to be admitted. I'm
4      sorry. 3. I said 2. I
5      should have said 3.
6      HEARING OFFICER:
7      Mr. DeBardelaben.
8      MR. DEBARDELABEN: Your Honor,
9      here again, this is
10      2005-2006. She's no expert in
11      that area. I just don't think
12      she's qualified. I think
13      those documents are
14      irrelevant.
15      HEARING OFFICER: Mr. Marsh, any
16      response?
17      MR. MARSH: Well, I would simply
18      say that she stated on the
19      record that those courses
20      appeared to generally describe
21      the courses that she took when
22      she was there and that's what
23      we're offering it for.

Page 31

1      HEARING OFFICER: Im going to
2      allow it. And if I could see
3      what it is that you're
4      admitting. Have you put
5      the – has a label been put on
6      it?
7      MR. MARSH: Yes, sir. I've still
8      got 2 here since that's been
9      deferred. This is DHR 3.
10      HEARING OFFICER: Thank you, sir.
11      If you will, give me the
12      numbers of those courses
13      again, the ones that you asked
14      her about.
15      MR. MARSH: Yes It was –
16      Starting at the top it was the
17      Accounting 2291, Principles of
18      Accounting I; and 2292,
19      Principles of Accounting II;
20      then 3391, Intermediate
21      Accounting I; 3394,
22      governmental accounting; and
23      managerial accounting.

Page 32

1      MR. DEBARDELABEN: Managerial
2      accounting?
3      MR. MARSH: Yes Thank you.
4      HEARING OFFICER: 3393?
5      MR. MARSH: Yes Managerial
6      accounting.
7      HEARING OFFICER: All right.
8      Proceed.
9  A.  You did not ask me about managerial
10      accounting.
11      MR. MARSH: Let me go back, then.
12      No. I'm sorry. Not the
13      managerial accounting. It was
14      just the Principles of
15      Accounting I and II,
16      government accounting and
17      intermediate accounting.
18      HEARING OFFICER: You asked her
19      about four courses?
20      MR. MARSH: Yes. Yes.
21      HEARING OFFICER: Thank you.
22  Q.  Ms. Hopper, I'd like to go back, then, to
23      your employment. Prior, I think you said,

**Page 33**

1    to working at DHR -- Maybe we didn't cover

2    this. Prior to working at DHR this past

3    time, where were you working?

4  A.  Finance department.

5  Q.  And how long did you work there?

6  A.  I would say four years.

7  Q.  And prior to that --

8  A.  Can I look at dates? Would you like me to

9    look at dates?

10  Q.  Sure. If you've got dates, that would be

11    good.

12  A.  I went to the comptroller's office in

13    February of 2002 and I left in 04 of 2006.

14  Q.  And where were you prior to the

15    comptroller's office?

16  A.  DHR.

17  Q.  And what was your position at DHR at that

18    time?

19  A.  When I left?

20  Q.  When you started with DHR. I'm sorry.

21  A.  Account clerk.

22       (DHR Exhibit 4 was marked for

23       identification.)

**Page 34**

1  Q.  Let me show you what's marked as DHR

2    Exhibit 4, which is an application for

3    account clerk position. Would you look at

4    that and tell me if you recognize that

5    document.

6  A.  What do you mean by recognize?

7  Q.  Do you know what this document is?

8  A.  It's an application.

9  Q.  And is that your signature at the bottom of

10    that?

11  A.  Yes.

12  Q.  And this is an application for account

13    clerk; is that right?

14  A.  Yes.

15  Q.  And if you would look at pages 2, 3 and 4

16    of that document, is that your resume that

17    was attached to the document?

18  A.  It is.

19  Q.  And did you prepare that resume?

20  A.  I did.

21  Q.  Now, on this document you list courses that

22    you had taken and you list the Troy

23    Principles of Accounting I and II. You

**Page 35**

1    also list an intro into accounting as a

2    WCS. Can you tell me what that is?

3  A.  I think that's a typo and it should be

4    WVS. It's Wetumpka Vocational.

5  Q.  And what is Wetumpka Vocational School?

6    What kind of school is it? I'm not

7    familiar with it. Can you describe it for

8    me?

9  A.  Continuing education.

10  Q.  Is it a private or public school?

11  A.  Public.

12  Q.  And do you know is it run by the Elmore

13    County Board of Education or some other

14    institution?

15  A.  Well, I wouldn't -- I don't know that. I'm

16    not sure about that.

17  Q.  Is this a vocational school that you

18    attended while in high school or is this

19    after high school?

20  A.  After high school.

21       MR. MARSH: I would offer DHR

22       Exhibit 4 into evidence.

23       HEARING OFFICER:

**Page 36**

1       Mr. DeBardeleben.

2       MR. DEBARDELEBEN: No objection.

3       HEARING OFFICER: The exhibit is

4       admitted.

5  Q.  Now, how long -- let me back up. After

6    your account clerk position, what was the

7    next position you had at DHR?

8  A.  Accounting tech.

9       (DHR Exhibit 5 was marked for

10       identification.)

11  Q.  Let me show you what's marked as DHR

12    Exhibit 5, which is an application for

13    examination for Accounting Tech I. Is that

14    your signature at the bottom, ma'am?

15  A.  It is.

16  Q.  And did you complete this form?

17  A.  I did.

18  Q.  Now, let me ask you here the -- attached to

19    that is, again, a resume. Is that your

20    resume?

21  A.  It is.

22  Q.  Also attached in the back is a letter dated

23    January 6th, 2000. Is that your signature

Page 37

```
 1        on that letter?
 2     A. It is.
 3     Q. And this letter is providing additional
 4        information about two courses. What
 5        prompted you writing this letter to the
 6        personnel department?
 7     A. I believe I received a letter telling me
 8        that I did not have all the courses that
 9        were required.
10     Q. And in this letter you said you had -- you
11        told them that you had taken Basic
12        Accounting 9099. Is that the course that
13        you took at the vocational school --
14     A. It is.
15     Q. -- or somewhere else?
16     A. No. That's the basic or intro to
17        accounting.
18     Q. And then also you've got Course 293,
19        Managerial Accounting?
20     A. It is.
21     Q. And is that the course you took at Troy
22        University?
23     A. It is.
```

Page 38

```
 1     Q. Now, you're aware that Troy University said
 2        that by the document they provided that
 3        that course was not completed until March
 4        of 2000 and which -- before you indicated
 5        that appeared to be a correct date if this
 6        letter is dated January of 2000?
 7     A. I am. And when I went over to state
 8        personnel to inquire about the letter I
 9        received, they told me that as long as you
10        were registered in the course and taking
11        the course, as long as you had completed
12        the course before your test date. And that
13        was the reason for supplying the copy of my
14        registration at Troy.
15     Q. And when was your test date? Do you know?
16     A. I do not.
17     Q. Do you know who you talked to?
18     A. Lee Fryer. He also knew that the intro to
19        accounting was Wetumpka Vocational School.
20        It was listed on the resume.
21     Q. And attached to that -- Do you know what
22        the document behind the letter is, if you
23        would look?
```

Page 39

```
 1     A. It's the registration showing that I was
 2        registered in that class at Troy.
 3     Q. And did you make the changes to the course
 4        description above that, the basic micro
 5        course?
 6     A. No. They changed -- changed that because I
 7        believe the room number or something had
 8        changed on it.
 9     Q. So this is something that was changed by
10        Troy University?
11     A. When I registered -- or after I had
12        registered, they came back and changed the
13        numbers. That was just microcomputing.
14        But managerial was not changed.
15            MR. MARSH: I would offer this as
16            DHR Exhibit 5.
17            HEARING OFFICER:
18            Mr. DeBardelaben:
19            MR. DEBARDELABEN: No objection.
20            HEARING OFFICER: Admitted.
21            (DHR Exhibit 6 was marked for
22            identification.)
23            MR. MARSH: DHR Exhibit 6 I'd like
```

Page 40

```
 1        to offer at this point. It's
 2        the Accounting Technician I
 3        course description. Excuse
 4        me. Accounting Technician I
 5        announcement dated October
 6        6th, 1999, which would
 7        correspond to the application
 8        period. I would offer this
 9        now. You've got a copy in
10        your --
11            MR. DEBARDELABEN: Your Honor, you
12        know, I assume these are
13        correct. But out of abundance
14        of caution there has been no
15        proof from anybody that these
16        are what they are or what they
17        purport to be. There's been
18        no testimony to them. And
19        only for that reason -- except
20        they haven't been properly
21        authenticated I would object.
22        They probably are what they
23        are purported to be, but they
```

Page 41

1    haven't been proven, so I
2    don't know.
3    HEARING OFFICER: Tell me again
4       what the document is.
5    MR. MARSH: It's the announcement
6       of the Accounting Technician I
7       dated October 6th of 1999,
8       office of the State of Alabama
9       Personnel Department.
10   HEARING OFFICER: Can you --
11      Mr. Marsh, can you offer some
12      kind of authentication?
13   MR. MARSH: Yes. Ms. Warren
14      can --
15   HEARING OFFICER: Hold on to that
16      one and let her authenticate
17      that one. That was 6; right?
18   MR. MARSH: Yes.
19   HEARING OFFICER: And we are also
20      holding -- what was it?
21      Number 2? And tell me again
22      what was Exhibit 1 was going
23      to be.

Page 42

1    MR. MARSH: 1 is the list of
2       documents from -- that were
3       provided to DHR from the state
4       personnel office that
5       initiated this whole thing.
6       It was the record that was
7       given to us and I'm going to
8       introduce that through
9       Ms. Warren.
10   HEARING OFFICER: Thank you.
11   (DHR Exhibit 7 was marked for
12      identification.)
13   MR. MARSH: Next I'd offer what's
14      marked as DHR Exhibit 7, which
15      is the accountant announcement
16      dated November 12th, 2003.
17      Again, at the top State of
18      Alabama Personnel Department.
19      And, again, I would offer
20      this. If we need to,
21      Ms. Warren can authenticate
22      this one as well.
23   MR. DEBARDELABEN: We would have

Page 43

1    our same objection, Your
2    Honor.
3    HEARING OFFICER: Sustained.
4       Let's let her authenticate
5       that.
6    (DHR Exhibit 8 was marked for
7       identification.)
8  Q. Ms. Hopper, I would like to show you what
9       I've marked as DHR Exhibit 8, which is an
10      application for examination for
11      accountant. Is that your signature at the
12      bottom of this application?
13 A. It is.
14 Q. And did you type this application up and
15      fill out the blanks in this application?
16 A. I did.
17 Q. And is this -- Where were you employed at
18      the time that you completed this
19      application?
20 A. Department of Finance.
21 Q. And did you become an accountant while you
22      were at the Department of Finance?
23 A. I did.

Page 44

1  Q. Let me ask you at the bottom on the
2       certification statement. Did you read that
3       statement before you signed this form?
4  A. I did.
5  Q. Did you understand when you read that any
6       false statements may cause me to be denied
7       the chance for testing, to be removed from
8       an employment register, or to be released
9       from employment?
10      MR. DEBARDELABEN: Your Honor, I'm
11         going to object unless he
12         reads the entire certification
13         statement. I'm going to
14         object to any bits and pieces
15         of it. It's a different
16         statement than what he read.
17         The entire statement --
18      HEARING OFFICER: How long is the
19         certification statement?
20      MR. MARSH: It's not that long.
21         It's on the application. I'll
22         be happy if we need to read it
23         into the record as well.

Page 45

1      HEARING OFFICER: Let's do that,
2      please.
3      MR. MARSH: Certification
4      statement. I certify that all
5      statements on or attached to
6      this application are true and
7      correct to the best of my
8      knowledge. I know that any
9      false statements may cause me
10      to be denied the chance for
11      testing, to be removed from
12      employment register, or to be
13      released from employment. I
14      will not discuss the test I
15      have taken. I further
16      authorize the release of all
17      relevant prior employment,
18      military service, academic
19      slash school and criminal
20      records. If employed, I
21      agree, consistent with
22      applicable laws, to receive
23      compensatory time off in lieu

Page 46

1      of overtime compensation for
2      any overtime hours worked.
3    Q. Ms. Hopper, will you follow along. Does
4      that accurately describe what's written on
5      that form?
6    A. It does.
7    Q. If you would turn back -- Well, first let's
8      continue looking at page 1. Under the list
9      of courses it says see attached list. Is
10      that accurate?
11    A. It is.
12    Q. If you would look back to the third page of
13      that document. Is that a list of courses
14      that you provided when you submitted this
15      application?
16    A. It is.
17    Q. And did you type up and prepare this list
18      yourself?
19    A. I did.
20    Q. And is that your resume attached behind
21      those?
22    A. It is.
23    Q. Now, let's look at these courses that you

Page 47

1      listed here as part of your application.
2      The first five courses appear to correspond
3      or be the same courses that you took at
4      Troy University; is that correct?
5    A. It is.
6    Q. Now, starting with the next courses,
7      accounting -- or I assume it's accounting.
8      It says A-C-C-T 1301 financial accounting.
9      On down I count 17 courses listed there.
10      Where did you take those courses? If they
11      were different places, we'll need to do one
12      by one. If it's the same, we can do it
13      together.
14    A. These courses I received credit for from
15      Trinity University -- Trinity College and
16      University.
17    Q. And how did that come about? I mean, how
18      did you do that? Did you decide to go back
19      to school and register for Trinity, or how
20      did it come that you got this credit from
21      Trinity University?
22    A. I supplied Trinity University with the
23      courses I had taken prior and my work

Page 48

1      history.
2    Q. Now, how did you find Trinity University?
3      How did you find out about it?
4      HEARING OFFICER: Wait a minute.
5      Would you repeat your answer
6      to that, please, ma'am? Ask
7      the question again and let her
8      repeat the answer.
9      MR. MARSH: You're going to have
10      to help me. I don't remember
11      what I asked her.
12      HEARING OFFICER: How did you --
13      You say you sent credit for
14      courses -- You don't have to
15      repeat the question. Did you
16      say that you sent credit for
17      courses that you had taken
18      previously?
19    A. I sent documentation to Trinity University
20      for courses I had previously taken.
21      MR. DEBARDELABEN: College and
22      University.
23    A. Trinity College and University for courses

Page 49

1    I had previously taken. I sent resumes
2    with work experience.
3         HEARING OFFICER: And the courses
4         previously taken, were those
5         college level courses or were
6         they --
7    A. It was all of them. It was courses from
8    college. It was courses that was provided
9    by employment. It was courses --
10   continuing education courses.
11        HEARING OFFICER: Okay. Thank
12        you, ma'am. Go ahead.
13   Q. Well, let's follow up on that. Which
14   college courses did you provide to Trinity
15   College and University?
16   A. I provided them with Principles of
17   Accounting I, Principles of Accounting II,
18   governmental and managerial.
19   Q. And tell me more specifically, what else
20   did you provide them? You said you
21   provided them information on other
22   courses. Tell me what other courses you
23   have taken.

Page 50

1    A. Advanced Technology Group in 1999. That
2    was at AUM TechnaCenter.
3    Q. Tell me what that is. What kind of course
4    is that? I don't know what that is.
5    A. It was courses -- computer programs,
6    computer -- it was computer courses.
7    Q. And I'm sorry. That was where? At AUM did
8    you say?
9    A. AUM TechnaCenter.
10   Q. And what other courses had you taken that
11   you provided to Trinity College and
12   University?
13   A. Departmental training -- that was with the
14   Insurance Department -- Windows '95 and
15   '98; Wetumpka Vocational School, 1993
16   Computer Applications I and II, Basic
17   Accounting; NAIC reinsurance seminar in
18   1996; NOL --
19   Q. I'm sorry. Let me stop you there. The one
20   you said before, NIC what --
21   A. NAIC reinsurance.
22   Q. And what kind of course was this or where
23   did you take this course?

Page 51

1    A. This course was in Texas and it was a
2    seminar and it was basically going over --
3    that's the National Association of
4    Insurance Commissioners going over the
5    process of filing reinsurance.
6    Q. Was this a course that your employer sent
7    you to, or did you go to it on your own?
8    A. It was.
9    Q. And how many days was that course?
10   A. Two.
11   Q. And what was the next one, please?
12   A. NOLHGA seminar.
13   Q. And what is that?
14   A. It was a seminar on the Life and Health and
15   Guaranty Association.
16   Q. And where was that given?
17   A. I believe that was in Texas also, but I'm
18   not sure about that.
19   Q. And how many days was that seminar?
20   A. It was two also.
21   Q. What else?
22   A. NAIC reinsurance seminar, 1995.
23   Q. And how many days was that course?

Page 52

1    A. It was two.
2         HEARING OFFICER: Ms. Hopper, who
3         was your employer at that
4         time?
5    A. Insurance department. I was a contract
6    employee with the reinsurance division with
7    insurance. Now, my contract --
8         HEARING OFFICER: State of
9         Alabama?
10   A. Yes. But my contract was not with the
11   Insurance Department. It was actually with
12   the receivership division, which is a
13   section under the Insurance Department.
14   But the Insurance Department at that time
15   didn't have so much control over
16   receivership division.
17   Q. We were at that we did the NAIC seminar,
18   two days. What's the next one?
19   A. Wetumpka Vocational School in '95. That
20   was Windows 3.1.
21   Q. Okay.
22   A. And Sir, S-I-R, slash, M-G-I-G-F working
23   together seminar. I believe that might

Transcript of Proceedings                    Virginia Hopper                    June 22, 2006

Page 53

1    have been the other one that was in Texas.
2    I might have told you wrong on the other
3    one. That was in 1995 -- 4. Excuse me.
4    Q.  What kind of seminar was that? What did it
5    cover?
6    A.  It was covering with the guaranty fund and
7    guaranty associations working with
8    insurance receivers.
9    Q.  And how many days was that?
10   A.  I can't really remember on that one.
11   Q.  Was it less than a week, more than a week?
12   A.  It was less than a week.
13   Q.  What else, please?
14   A.  Okay. And the departmental training on
15   Windows '95 and '98.
16   Q.  Okay. I got that one.
17   A.  Oh, I'm sorry.
18   Q.  That's all right.
19   A.  And the Wetumpka Vocational School in '93.
20   It was Computer Applications I and II and
21   basic accounting.
22   Q.  And that was the one, again, from Wetumpka?
23   A.  It was.

Page 54

1    Q.  Okay. What else?
2    A.  I provided them with my resumes and work
3    history, because you have down that I had
4    the Troy classes; is that right?
5    Q.  Yes, ma'am. Yes, ma'am. You said you had
6    provided the Troy classes. Or if you
7    didn't -- I'm not sure we did. Let me make
8    sure we got that for the record. You did
9    provide them the five classes you took at
10   Troy?
11   A.  Well, I didn't provide them five because I
12   had not finished the one. I provided them
13   with four.
14   Q.  Okay. And you said also provided resumes
15   and work experience?
16   A.  I did.
17   Q.  Now --
18   A.  A copy of my contract when I was a contract
19   employee.
20   Q.  Now, we've talked about on your work
21   experience you worked for the finance
22   department. You've worked for DHR both
23   before and after the finance department.

Page 55

1    You worked for the Department of
2    Insurance. Prior to those positions, what
3    other positions have you held that you
4    provided information on to Trinity?
5    A.  Now, I didn't provide any other information
6    to them. That was all that I provided them
7    was my work history with receivership
8    division and the later that you had just
9    said.
10   Q.  And after providing them with this
11   information, what happened after that?
12   What was the next thing that happened in
13   the step toward getting this degree from
14   Trinity College and University?
15   A.  Well, I mean, the exact next step there
16   were a couple of telephone conversations,
17   and like I said, this was faxed to them.
18   Is that what you're asking me?
19   Q.  Yes, ma'am.
20   A.  Okay.
21   Q.  And then what happened after that? Did
22   they contact you? Did they send you
23   something? Is that when you got your

Page 56

1    degree? I'm just trying to figure out the
2    course of events here.
3    A.  Oh, okay. So after all this, eventually
4    they sent me my degree.
5    Q.  I'm going to show you what is just one part
6    of DHR Exhibit 1. Do you recognize what
7    that document is?
8    A.  I do.
9    Q.  And what is that?
10   A.  This is the degree I received from Trinity
11   College and University.
12   Q.  How long from the point that you first
13   contacted them was it to the point that you
14   got your degree from them?
15   A.  I don't know the exact time frame.
16   Q.  Do you know roughly? Was it weeks, months?
17   A.  It was at least -- I hate to say when I
18   don't know for sure. But it was at least a
19   month or longer.
20   Q.  Less than six months? Is that fair to say?
21   A.  Okay. We'll say less than six months.
22   We'll say six months or less. Does that
23   work?

14 (Pages 53 to 56)

Page 57

1   Q.  Yes, ma'am. Let me just go back. I want
2       to make sure that I'm clear on the courses
3       and material that you submitted. You
4       submitted them to Trinity College and
5       University for the four classes from Troy,
6       an AUM advanced technician computer course,
7       departmental training Windows '95 and '98,
8       which, I assume, is a computer course?
9   A.  Uh-huh (positive response).
10  Q.  Your Wetumpka Vocational computer course I
11      and II and then three seminars that you
12      attended two days each while at the
13      university -- while at the Insurance
14      Department. That was the NAIC, the NOIHGA
15      I think you said and the N --
16  A.  NOL, National Association of Life and
17      Health Guaranty Association.
18  Q.  And then you had a Wetumpka Vocational
19      School, Windows 3.1, the guaranty fund
20      course, which was less than a week, and
21      your vocational school basic accounting
22      course?
23  A.  (Witness nods head).

Page 58

1   Q.  Was there anything else in addition to this
2       and your work history, your resumes that
3       you provided them?
4   A.  No.
5   Q.  Now, did you get a transcript back from
6       them showing which courses you were getting
7       credit for, or did you just get the
8       diploma?
9   A.  I got a transcript and several letters from
10      them.
11  Q.  And do you know what courses were listed on
12      that transcript? Can you recall?
13  A.  You know I can't sit here and tell you
14      those courses.
15  Q.  Do you have a copy of what they provided
16      you?
17  A.  I have a copy of the courses that went back
18      to another discussion with talking with
19      them.
20  Q.  I'm sorry. I don't understand what you're
21      saying.
22          MR. DEBARDELABEN: They gave her a
23      copy of the courses that --

Page 59

1       when she was trying to figure
2       out what to put down and she
3       was talking I guess -- is this
4       which school?
5          THE WITNESS: Trinity College and
6       University. This number is
7       the one I called.
8          MR. DEBARDELABEN: Yeah. But this
9       is from Trinity University.
10         THE WITNESS: And that was what we
11      discussed.
12  Q.  Did you actually get --
13         THE WITNESS: And this is where
14      the list came from.
15  Q.  Did you actually get a transcript from
16      Trinity College and University showing --
17  A.  I did.
18  Q.  -- courses? Do you have that transcript?
19         THE WITNESS: Do you have it?
20         MR. DEBARDELABEN: I don't know if
21      I've got it or not. I don't
22      think I have it.
23             I don't have it.

Page 60

1   Q.  Could you tell me, then, to the best of
2       your memory what courses you got credit for
3       from Trinity College and University?
4   A.  It would be these courses that were listed.
5   Q.  So is it your testimony that the courses
6       that are listed on DHR Exhibit 8 are the
7       courses you got credit for from Trinity
8       College and University?
9   A.  When I spoke with her on the telephone, I
10      had pulled this up and I --
11  Q.  I'm sorry. Spoke with who on the
12      telephone?
13  A.  Trinity College and University. I had this
14      number. I called her. We were talking
15      about courses. And this is the list of
16      courses that she marked for me -- or she
17      told me and I marked of saying that these
18      were equivalent to the courses that I
19      received credit for.
20         HEARING OFFICER: Are we going to
21      admit that document that
22      she's --
23         MR. DEBARDELABEN: It's got -- It

Transcript of Proceedings           Virginia Hopper           June 22, 2006

Page 61

```
1          needs a little explanation.  I
2          can make it or she can make
3          it.
4       MR. MARSH:  If we could, that
5          would be helpful, because I'm
6          not entirely clear where this
7          document came from.
8       HEARING OFFICER:  I'm sorry.
9          Mr. DeBardelaben, are you
10         going to admit this when she
11         testifies?
12      MR. DEBARDELABEN:  Yes, sir.
13      HEARING OFFICER:  Let's hold that,
14         then, too.
15  Q.  Now, let me ask you, then, the list that's
16      on your -- attached to your application of
17      courses after the governmental accounting,
18      which you took at Troy, these are the
19      courses that you got credit from from
20      Trinity College and University.  Is that
21      your testimony?
22  A.  That's correct.
23  Q.  Now, do you know where Trinity College and
```

Page 62

```
1       University is located?
2   A.  I believed it to have been located in San
3       Antonio, Texas.
4   Q.  Do you know now if that is true?
5   A.  I know now that that is not true.
6   Q.  Do you know now where that college is
7       located?
8   A.  I do not know exactly where it is located.
9       We tried to make contact with them.  I
10      called the phone numbers I had.  I e-mailed
11      the address that I had.  I did everything
12      trying to get that information and I was
13      not able to.  The closest thing that I had
14      it said that they were in Louisiana.  I had
15      two -- I had a phone number that I called
16      repeatedly when all this came up.  I called
17      it over and over.  It -- There was a
18      message on there saying due to telephone
19      technicalities.  And I tried -- like I
20      said, I e-mailed the address that I had
21      also and I never got a response from that.
22  Q.  Now, when you filled out your -- this
23      application for employment on page 1 you --
```

Page 63

```
1       under name and location of school you
2       indicated that you attended Trinity
3       University with an address of 715 Stadium
4       Drive, San Antonio, Texas 78212.
5   A.  That's correct.
6   Q.  Now, have you attended any courses at
7       Trinity University on Stadium Drive in San
8       Antonio, Texas?
9   A.  At that university?
10  Q.  Yes, ma'am.
11  A.  Attended them physically at that
12      university?
13  Q.  Yes, ma'am.
14  A.  No, sir.
15  Q.  To your knowledge, do you have any college
16      credits from Trinity University located in
17      San Antonio, Texas?
18  A.  Now, I did think that to be the truth at
19      that time.
20  Q.  What do you think now?
21  A.  Well, now I know that that's not the truth.
22  Q.  Why did you put this address -- Where did
23      you get the address that you put on here
```

Page 64

```
1       from?
2   A.  I got it off the Internet.
3   Q.  And was this after you had already received
4       your diploma?
5   A.  It was.
6   Q.  Did you not have an address at the time
7       that you submitted your application to them
8       and all this paperwork you sent to them?
9       Did you mail that to an address on Stadium
10      Drive in San Antonio, Texas?
11  A.  I didn't mail anything.
12  Q.  How did it get to them?
13  A.  I faxed the information that we talked
14      about earlier.
15  Q.  Did you have an address at all at that time
16      that you were contacting Trinity College
17      and University?
18  A.  I did not.  I believed it to be San
19      Antonio, Texas.
20  Q.  And what led you to believe that?
21  A.  Because I thought that it was Trinity
22      University in San Antonio, Texas.
23  Q.  And was there something on the web site
```

000017

Page 65

1    that led you to believe that?
2  A.  Whenever you typed Trinity, it went to
3    Trinity University and you clicked on that
4    first link and that's where it went every
5    time.
6  Q.  But that's not where you went when you got
7    the information to send in for your
8    diploma, is it?
9  A.  No. When I sent in for my diploma, I just
10   typed on-line degrees.
11      (DHR Exhibit 9 was marked for
12      identification.)
13  Q.  Let me show you what I've marked here as
14   DHR Exhibit 9. It's a list of courses of
15   study from Trinity University in San
16   Antonio, Texas. Would you look at page 94
17   of that document. Do you see there where
18   it's got Accounting 1301, Fundamentals of
19   Financial Accounting?
20  A.  I do.
21  Q.  And does that number correspond to what you
22   listed on your resume -- I mean, on your
23   application?

Page 66

1  A.  It does.
2  Q.  Did you take this course?
3  A.  I received credit from that course -- for
4   that course.
5  Q.  From Trinity University in San Antonio,
6   Texas?
7  A.  See, you're asking me that. And at the
8   time I believed that to be the truth. I
9   now know that that's not true, so how do I
10   answer?
11  Q.  Tell me what you know now. What I'm asking
12   you is the fact. Not what you believed at
13   the time, but what do you know now is the
14   fact?
15  A.  What I signed my name to I believed that
16   that was the truth.
17  Q.  I'm not asking about the signing right
18   now. I'm just asking did you take that
19   course at Trinity University in San
20   Antonio, Texas?
21  A.  No, sir.
22  Q.  And you did not receive any credit from
23   Trinity University in San Antonio, Texas

Page 67

1    for that course?
2  A.  No, sir.
3  Q.  Looking at the second course Accounting
4   1302. Again, that's on your resume and
5   listed here. Did you take that course at
6   Trinity University in Texas?
7  A.  With the same scenario as we had in the
8   first one; correct?
9  Q.  Yes, ma'am.
10  A.  Okay. The answer would be no.
11  Q.  And continuing with all these. I'm not
12   going to go through each one of these
13   individually. But with each of these --
14   which if we took the time, we could go
15   through and find them all in the Trinity
16   course description -- did you take a course
17   or get credit from Trinity University in
18   San Antonio, Texas for any of the courses
19   listed here on your application?
20  A.  No.
21  Q.  Now, you testified earlier that you had
22   been provided a transcript. Why did you
23   not use that transcript as your source of

Page 68

1    information when you completed this
2    application?
3  A.  I pulled that up at work when I was getting
4   ready to fill out my application. And the
5   reason I didn't use the transcript that I
6   had, the courses didn't look exactly the
7   same to me. So when I got home, I called
8   that number and I asked the question that I
9   had to ask. And someone called me back
10   from Trinity College and University and we
11   went over the sheet that I had and they
12   said that was the new course numbers and
13   told me exactly what they were equivalent
14   to. And so that's why I used these new
15   course numbers. They said they were the
16   exact same thing, that they just had a
17   different number on them.
18  Q.  So rather than put down the courses that
19   were listed on your transcript, you used
20   new course numbers that were given to you
21   over the phone?
22  A.  Well, no, sir. I had the document in my
23   hand looking at it.

Page 69

1  Q.  But the document in your hand from Trinity
2      College and University didn't have these
3      course numbers on it, did it?
4  A.  The document I had in my hand did have
5      those course numbers on it.
6  Q.  And where did that come from, that
7      document?
8  A.  It came off the Internet.
9  Q.  It's the one you printed off the Internet?
10 A.  Yes.
11 Q.  Not your transcript that came from Trinity
12     College and University?
13 A.  Right.  That was my reason for calling
14     them.
15 Q.  And is it your testimony that you truly
16     believe that you have been given credit for
17     all of these courses when you listed these
18     on this application?
19 A.  It is.
20 Q.  Based on your experience and the courses
21     that you listed earlier that you had taken
22     do you think would have given you enough
23     experience and learning to qualify for a

Page 70

1      business statistics course?  Where would
2      you have gotten that kind of information or
3      what information did you provide them that
4      would lead you to think you could --
5  A.  I provided them with my resumes and my work
6      experience.
7  Q.  Did you question at all any of these
8      courses that they gave you credit for as to
9      why you got credit for courses like that?
10 A.  No, I didn't.  I believed Trinity
11     University be a reputable institute of
12     higher learning and that's what I believed
13     that I was dealing with.  I didn't even
14     think to question them at any time.
15 Q.  Ms. Hopper, when you took Intermediate
16     Accounting I at Troy University, how many
17     hours a week did you go to school?
18 A.  I don't remember how many hours I went.
19     Whatever times that we were scheduled to go
20     I went.  I never missed a class.
21 Q.  Was it three hours, four hours?  Let's say
22     three or more hours.  Let me ask you that.
23 A.  All total you're asking me for the course?

Page 71

1  Q.  No, ma'am.  Per week how many hours a week
2      did you --
3  A.  I don't know.  I went two days a week.
4  Q.  Went two days a week?
5  A.  I did.
6  Q.  Was it over an hour each time?
7  A.  I would believe it to be.
8  Q.  How much time do you think you had to put
9      into preparing for your accounting classes
10     that you took at Troy University per week
11     just on average?
12 A.  In class time and work time?
13 Q.  Not class time.  How much preparation time,
14     study time, study for tests, getting ready
15     for class, that type of thing?
16 A.  Two hours.
17 Q.  And how many weeks did the course last?
18 A.  I'm not sure, but I would say that it was
19     eight.
20 Q.  So it would be fair to say that you put
21     many hours into each one of the courses you
22     took at Troy University?
23 A.  It would be.

Page 72

1  Q.  Ms. Hopper, did it never occur to you that
2      knowing what it takes to take a college
3      course that it was unusual that you got
4      credit for 17 college courses without
5      having to do any course work?
6  A.  No, sir.  Because the way it was explained
7      to me -- I mean, from what I submitted to
8      them had been years.  And from what it was
9      explained to me then that's how they
10     evaluated that and I had no reason not to
11     think that that wasn't correct.  They went
12     back to 1993.
13 Q.  And looked at your work history at the
14     institute -- the insurance --
15 A.  Receivership.
16 Q.  Receivership.  Thank you.  And at DHR and
17     the finance office?
18 A.  She seemed most -- Trinity University
19     seemed most interested in my work at
20     receivership more so.  I think also they
21     looked at -- in the finance department, but
22     she seemed most interested in the
23     receivership.

Page 73

1  Q. I've just got a couple more and we can take
2      a break if we need to. And to clarify --
3      and I may have asked this and I apologize
4      if I'm repeating myself. Other than the
5      material you submitted to Trinity College
6      and University, is it your testimony that
7      you took no course work or did no course
8      work for that Trinity College and
9      University?
10 A. It is.
11 Q. Let me show you --
12     MR. MARSH: I would like to offer
13        into evidence DHR Exhibit 8,
14        which was the Accountant I
15        application, and DHR Exhibit
16        9, which is the Trinity course
17        listing -- Trinity University
18        in Texas course listing. That
19        would be 8 and 9.
20     MR. DEBARDELABEN: We have no
21        problem with 8. 9, here
22        again, it says effective June
23        2006 for the 138th academic

Page 74

1      year. We have nothing to
2      verify. We would object to
3      it on that ground. We don't
4      dispute it's probably what it
5      says it is, but I don't think
6      it's relevant to this case.
7      Again, it's 2006 and it was
8      only effective in June of
9      2006. By the very nature of
10     what it represents it is, it's
11     not applicable to what we have
12     before us.
13     HEARING OFFICER: What is the
14        actual exhibit? What is 9?
15     MR. MARSH: It's a listing of
16        courses from the Trinity
17        University in Texas web site.
18        It's the '05-'06 course
19        listing.
20     MR. DEBARDELABEN: No, sir. It
21        says effective June 2006 on
22        the front of it.
23     MR. MARSH: Excuse me. The June

Page 75

1      '06 course listing. And
2      Ms. Hopper, just to respond,
3      identified those course
4      listings as corresponding to
5      the ones on her application.
6      HEARING OFFICER: I'm going to
7         admit it.
8      MR. MARSH: And I'm sorry. There
9         was no objection to 8, which
10        was the application?
11     MR. DEBARDELABEN: No objection.
12     HEARING OFFICER: Right.
13     MR. MARSH: Dr. Tyler, this is 8.
14     HEARING OFFICER: You took
15        testimony, too, in relation to
16        the Trinity University. I
17        assume that's a diploma. Are
18        you going to admit that with
19        Exhibit 1?
20     MR. MARSH: Yes, sir. That's part
21        of Exhibit 1 and I'll admit
22        that through Ms. Warren.
23     (DHR Exhibit 10 was marked for

Page 76

1      identification.)
2  Q. Ms. Hopper, let me show you what I've
3      marked as DHR Exhibit 10. Do you recognize
4      that letter?
5  A. I do.
6  Q. What prompted that -- That's a letter from
7      the personnel department to you. What
8      prompted that letter?
9      MR. DEBARDELABEN: We're going to
10        object, Your Honor.
11        Ms. Hopper didn't write this
12        letter. Only Jackie Graham,
13        the state personnel director,
14        can answer that question.
15     HEARING OFFICER: Sustained.
16 Q. Let me ask it another way. Did you ask the
17     personnel department for opinion about your
18     ability to get on the rehire register?
19 A. I can't remember the exact nature, but I
20     did write Ms. Graham a letter.
21 Q. And is this a letter you received in
22     response from her?
23 A. It is.

Transcript of Proceedings                Virginia Hopper                June 22, 2006

---

Page 77

1        MR. MARSH: I would offer that as
2        DHR Exhibit 10.
3        HEARING OFFICER:
4        Mr. DeBardelaben.
5        MR. DEBARDELABEN: I have no
6        objections to that.
7        HEARING OFFICER: It's admitted.
8        MR. MARSH: Can we take a
9        five-minute break?
10       HEARING OFFICER: Absolutely.
11       We're in recess for five
12       minutes.
13       (Brief recess was taken.)
14  Q.  Ms. Hopper, I just have one or two more
15       questions. The Troy College and University
16       where you got your degree from, to your
17       knowledge is that the -- or have they
18       changed their name now to what's known as
19       Bronte University?
20       MR. DEBARDELABEN: Objection.
21       MR. MARSH: What grounds? I just
22       asked the question.
23       MR. DEBARDELABEN: Well, you can

---

Page 78

1        answer if Troy University
2        changed their name.
3        THE WITNESS: Trinity.
4        HEARING OFFICER: I think you may
5        have misstated the question.
6        MR. MARSH: Did I say Troy? I'm
7        sorry. Let me back up.
8        That's a good objection.
9        HEARING OFFICER: Restate the
10       question.
11  Q.  Trinity College and University where you
12       got your degree, to your knowledge, have
13       they changed their name to Bronte
14       University?
15  A.  To my knowledge knowing that I didn't. But
16       according to some of the papers that you
17       provided me with, it appears that that
18       would be -- you're saying did I have
19       knowledge of it. I didn't. But I know you
20       provided me with something that showed a
21       copy.
22  Q.  So your only knowledge came from the
23       documents that we provided to you, then?

---

Page 79

1   A.  Right.
2        MR. MARSH: That's all I have.
3        MR. DEBARDELABEN: I want to
4        reserve my questions and call
5        her as my witness.
6        HEARING OFFICER: I'm sorry?
7        MR. DEBARDELABEN: I'm going to
8        reserve my questions at this
9        point in time.
10       HEARING OFFICER: All right, sir.
11       MR. MARSH: My next witness will
12       be Ms. Vera Warren.
13       HEARING OFFICER: Ms. Warren, if
14       you'll raise your right hand.
15       * * * * * * * * * * * * *
16            VERA WARREN
17   The witness, after having first been duly sworn
18  to speak the truth, the whole truth and nothing but
19  the truth testified as follows:
20            DIRECT EXAMINATION
21  BY MR. MARSH:
22  Q.  Ms. Warren, state your full name, please.
23  A.  Vera Warren.

---

Page 80

1   Q.  And, Ms. Warren, where do you work?
2   A.  The Department of Human Resources personnel
3        office.
4   Q.  And what is your job there?
5   A.  Assistant personnel director.
6   Q.  And have you been involved in Ms. Hopper's
7        case leading up to this hearing today?
8   A.  Yes.
9   Q.  And first of all I want to go back and see
10       if we can clear up a couple of these
11       exhibits just to keep things straight and
12       we'll go forward. Let me show you what's
13       marked as DHR Exhibit 6, which is the
14       Accounting Technician I announcement. Do
15       you recognize that document?
16  A.  Yes, I do.
17  Q.  And what is that?
18       MR. DEBARDELABEN: Your Honor,
19       unless she was employed on
20       October 6th, 1999 in this
21       position, I don't think she
22       would have and knew it at that
23       point in time. This was

---

20 (Pages 77 to 80)

Page 81

1       effective October 6th, 1999.
2           I would object.
3           HEARING OFFICER: Go ahead and ask
4           her that question, please,
5           sir.
6   Q.  What is that document?
7           HEARING OFFICER: I mean, ask her
8           about when she was employed.
9   Q.  Ms. Warren, when were you employed with
10      this department? Approximately when did
11      you start?
12  A.  Over 20 years ago.
13  Q.  And how long have you worked in the
14      personnel department?
15  A.  Most of that time. Since 1980-something.
16  Q.  Let me simplify this. In 1999 were you
17      working in the personnel department?
18  A.  Yes, I was.
19  Q.  And what is that document there?
20  A.  This document is an examinations
21      announcement that is issued to all
22      departments by the state personnel
23      department.

Page 82

1   Q.  And where did that -- Where did you obtain
2       that from?
3   A.  State personnel department sends copies of
4       job announcements weekly to all the
5       agencies, and this came out of our record
6       in personnel.
7   Q.  So do you maintain those?
8   A.  Yes. We keep them in a file.
9           MR. MARSH: I would offer DHR
10          Exhibit 6.
11          MR. DEBARDELABEN: No objection.
12          HEARING OFFICER: It's admitted.
13          This is 6; right?
14          MR. MARSH: Yes, sir.
15  Q.  Let me show you what was marked as DHR
16      Exhibit 7. Again, what is that document?
17  A.  Examinations announcement provided by the
18      state personnel department.
19  Q.  For what position?
20  A.  This was for the accountant.
21  Q.  And what's the date on that?
22  A.  The date is November 12, 2003.
23  Q.  And, again, where did that document come

Page 83

1       from?
2   A.  It was sent to our department by the state
3       personnel department. We maintain it in a
4       file in our office, and this is a copy of
5       that document from our files.
6           MR. MARSH: I would offer DHR
7           Exhibit 7.
8           MR. DEBARDELABEN: No objection.
9           HEARING OFFICER: Admitted.
10  Q.  Ms. Warren, tell me how you first became
11      aware that there could be an issue
12      involving Ms. Hopper's employment with DHR.
13  A.  I received a call from the state personnel
14      department who informed me that we had --
15          MR. DEBARDELABEN: Objection.
16          Hearsay, Your Honor.
17          MR. MARSH: I would, as I
18          mentioned earlier, point out
19          that hearsay is not a relevant
20          objection in a hearing of this
21          nature. Hearsay is admissible
22          evidence. There is no
23          exclusion for it. Obviously

Page 84

1       the hearing officer can give
2       what weight he chooses to give
3       to information that is
4       hearsay, but it is admissible.
5           HEARING OFFICER: Overruled.
6           Proceed with the question.
7   Q.  How did you first become aware --
8   A.  I was contacted. My boss was out of town
9       that day and someone called me from state
10      personnel -- I believe it was Jackie
11      Graham, but it could have been Sandy
12      Speakman, who is the attorney there. It
13      was one of the two. I believe it was
14      Jackie -- to say that we had employed
15      someone who used to work for us who had
16      falsified her application who did not have
17      a degree and that they had conducted an
18      investigation and had found it to be true
19      falsification.
20  Q.  And as a result of that phone call, what
21      happened next?
22  A.  I called my boss --
23  Q.  You say your boss. Who is your boss?

Page 85

1  A.  Butch King.
2     -- and informed him of what I had been
3     told by state personnel.  And I called
4     state personnel back to ask if we could set
5     up a meeting after my boss returned --
6     after Butch returns in office.  And so I
7     did call and we scheduled a meeting with
8     state personnel to review what they had.
9  Q.  When did this meeting take place?
10 A.  It was May 4th.
11 Q.  Where did the meeting take place?
12 A.  In state personnel department.
13 Q.  And who was at this meeting?
14 A.  To my recollection it was Jackie Graham,
15    who is personnel director; Paul Thomas, who
16    is the deputy personnel director; Sandy
17    Speakman, who is an attorney.  I was there;
18    Butch King, who is personnel director for
19    DHR; Stan Goolsby, who is the analyst who
20    did the investigation; Darby Forester, who
21    is supervisor over the classification
22    division in state personnel.  Those are the
23    names that I can remember -- individuals I

Page 86

1     can remember.
2  Q.  Let me show you what's marked as DHR
3     Exhibit 1.  Do you recognize that document?
4  A.  Yes.
5  Q.  What is that document?
6  A.  This is the information that state
7     personnel provided to us when we met with
8     them on May 4th.
9  Q.  And did you discuss the material that was
10    in this packet of documents?
11 A.  Yes.  They went through each document and
12    sort of gave us an explanation as to -- you
13    know, the top letter was just a summary of
14    the investigation and we talked about the
15    job application, college courses at Troy
16    State -- or Troy University, college
17    courses at Trinity University and Trinity
18    College and University.  We talked about
19    that, which at the time that state
20    personnel provided us information, they
21    informed them that it was no longer Trinity
22    College and University but Bronte
23    International University in the British

Page 87

1     Virgin Islands.
2        MR. MARSH:  I would offer DHR
3        Exhibit 1 into evidence.
4        MR. DEBARDELABEN:  Your Honor, we
5        would object because Mr. --
6        number one, it's to Jackie
7        Graham.  There's nothing shown
8        that Ms. Warren got it.  We're
9        not able to question
10       Ms. Graham or Darby Forester
11       or Stan Goolsby.  For that
12       reason we object.  We don't
13       know how they got this stuff.
14       We don't know what they
15       researched.  We don't know
16       what procedures they went
17       through.  It's not
18       self-proving on its face and
19       that's why we would object.
20       We have no way to
21       cross-examine these people.
22       MR. MARSH:  I would just respond
23       that Ms. Warren testified how

Page 88

1     it came to her possession,
2     even though it was not
3     addressed to her.  Testified
4     the discussions that revolved
5     around this particular
6     document.  This document was
7     provided to Ms. Hopper at the
8     time that the charge letter
9     was presented to her.  This
10    entire document -- Let me take
11    it back.  Was not provided at
12    the time the charge letter was
13    presented, but she was given
14    access to a copy of this
15    document after the charge
16    letter was presented to her.
17       HEARING OFFICER:  And how long ago
18       was that?
19 Q.  Ms. Warren, that was -- approximately how
20    long after the charge letter was she given?
21 A.  I can't remember.  She and I met and I
22    handed her -- she scheduled a meeting with
23    me.

**Page 89**

1  HEARING OFFICER: Was this over a
2  month ago?
3  A. About three weeks ago maybe, something like
4  that.
5      MR. MARSH: Therefore, there would
6      have been obviously
7      opportunity to -- if they had
8      concerns about some of the
9      information to question or to
10     ask for those witnesses. But,
11     again, there is no exclusion
12     for hearsay evidence in this
13     type of hearing.
14     MR. DEBARDELABEN: Your Honor,
15     it's not up for us to disprove
16     the case. They have to prove
17     the case. They just can't
18     present a document and say
19     this is true. Y'all can
20     question it. It's up to them
21     to prove the document to put
22     it in. I mean, this is like
23     what we say is true, now

**Page 90**

1      you've got to disprove it.
2      No, sir. Under the merit
3      system they have to prove
4      their case. We don't have to
5      disprove it. And the way
6      they're presenting evidence is
7      everything we say is true; we
8      don't have to prove anything.
9      HEARING OFFICER: I'm going to
10     admit it.
11     MR. DEBARDELABEN: We object, Your
12     Honor.
13     MR. MARSH: DHR Exhibit 1.
14 Q. Now, after this meeting with state
15    personnel, what next steps were taken in
16    this case?
17 A. After we talked with state personnel, we
18    came back to the office and talked about
19    the charge letter. The charge letter was
20    drawn up and we scheduled a meeting with
21    Ms. Hopper and discussed what state
22    personnel had told us, told her that we
23    were having a hearing and provided her with

**Page 91**

1      the charge letter.
2 Q. Now, as part of your investigation of this,
3    did you have an opportunity to meet with a
4    Ms. Jeanie Bracken?
5 A. Yes.
6 Q. And who is Ms. Bracken?
7 A. She is a supervisor over in the
8    comptroller's office. She said she
9    supervised Ms. Hopper at the time that she
10   worked there.
11 Q. Let me show you what was previously marked
12    as DHR Exhibit 2, which we deferred ruling
13    on. Do you recognize that document?
14 A. Yes.
15 Q. And what is that?
16 A. This is the document that Ms. Bracken
17    provided to me. She stated that this was
18    information that she had gotten from Troy
19    University.
20     MR. DEBARDELABEN: Your Honor, I'm
21     going to object what
22     Ms. Bracken said. Again, if
23     they wanted Ms. Bracken to put

**Page 92**

1      this document, they had the
2      obligation to put Ms. Bracken
3      here. Here again, it's --
4      they haven't laid any kind
5      of -- I don't care what kind
6      of court you're in. You've
7      got to lay some predicate.
8      And Ms. Bracken is the only
9      one that can lay the predicate
10     for this. We're getting into
11     double and triple hearsay now.
12     MR. MARSH: If I could just
13     respond. Again, hearsay is
14     not one of the exclusion rules
15     here. But also Ms. Hopper
16     looked at this document and
17     verified the information that
18     was written on here in
19     addition to what Ms. Warren is
20     going to testify about as far
21     as the information she
22     received concerning its
23     validity.

23 (Pages 89 to 92)

000024

Page 93

1    MR. DEBARDELABEN: Ms. Hopper
2    didn't verify all the
3    information written on this
4    document she said.
5    HEARING OFFICER: Ill admit it.
6  Q.  Now, did you do any additional research or
7    look at any additional information
8    concerning Trinity College and University?
9  A.  I did. I found the web site and just sort
10    of read about -- general information about
11    it. Looked at some of the courses that
12    they offered. I just wanted to see for
13    myself what was out there.
14    (DHR Exhibit 11 was marked for
15    identification.)
16  Q.  Let me show you what's marked as DHR
17    Exhibit 11, which is webpages taken from
18    Wikipedia, which is an on-line
19    encyclopedia. Do you recognize that
20    document?
21  A.  Yes.
22  Q.  And have you seen that web page where this
23    document came from?

Page 94

1  A.  I have.
2  Q.  And does that document discuss Trinity
3    College and University and Bronte College?
4  A.  Yes, it does.
5    MR. MARSH: I would offer DHR
6    Exhibit 11.
7    MR. DEBARDELABEN: Your Honor, we
8    would object to this document
9    because it was obviously
10    pulled up after the charge
11    letter went out. Charge
12    letter -- first charge letter
13    is dated in May. This
14    document wasn't pulled up
15    until 6/7/06.
16    HEARING OFFICER: The charge
17    letter was May of '06?
18    MR. DEBARDELABEN: The first
19    charge letter went out in
20    May. I think it was May
21    19th. And then they come back
22    and amend it June 12th. And I
23    think even under their own

Page 95

1    rules here it is today is less
2    than a week later they amended
3    it. That's what I want to
4    know which one we're under.
5    We haven't had at least time
6    enough with the amended
7    letter. They're changing the
8    charges. You can't have --
9    You've got to -- Even their
10    rules give you time. They
11    amended it and gave us less
12    than a week. I don't think
13    we're here on that June
14    19th -- I mean, June 12th
15    letter. Can't be.
16    MR. MARSH: Today is the 22nd.
17    The letter was presented to
18    Ms. Hopper on the 12th. The
19    rules provide for a 10-day
20    notice.
21    MR. DEBARDELABEN: That's not 10
22    days, Your Honor. That's nine
23    days. Tomorrow would be 10

Page 96

1    days. You start counting
2    after the day you -- It was
3    dated the 12th, so we have the
4    13th, 14th, 15th, 16th, 17th,
5    18th, 19th, 20th, 21st, 22nd
6    is 10 days. We've got to have
7    at least 10 days notice and
8    we're having the hearing on
9    the 10th day.
10    MR. MARSH: I would assert that
11    that is the 10 days notice and
12    this is the first time there's
13    been any objection raised of
14    the timeliness of this charge
15    letter. I've heard nothing
16    about that prior to this
17    moment.
18    MR. DEBARDELABEN: We don't have
19    to raise it when they don't
20    follow their own rules, Your
21    Honor.
22    HEARING OFFICER: Is that in the
23    form of an objection?

Page 97

1    MR. DEBARDELABEN: Yes, sir.
2    HEARING OFFICER: Overruled. And
3       the Trinity University
4       document, what number is
5       that?
6    MR. MARSH: Trinity document is
7       11.
8    HEARING OFFICER: It's admitted.
9    MR. MARSH: Do you want to go
10      ahead and admit 15 now since
11      we're discussing it? It's the
12      charge letter.
13   HEARING OFFICER: Yes.
14   (DHR Exhibit 15 was marked for
15      identification.)
16   MR. DEBARDELABEN: We would
17      object. Is that the 19th
18      charge letter, the amended
19      charge letter?
20   MR. MARSH: June 12th amended
21      charge letter DHR Exhibit 15.
22   MR. DEBARDELABEN: Your Honor, we
23      would just, out of an

Page 98

1       abundance of caution, object
2    to that. I know you're going
3    to overrule, but I think I
4    have to put my objection into
5    it.
6    HEARING OFFICER: It's overruled.
7    MR. DEBARDELABEN: Try to preserve
8       what I can.
9    HEARING OFFICER: I understand. I
10      do understand.
11   (Defendant's Exhibit 12 was marked
12      for identification.)
13 Q. Ms. Warren, I'd like to show you what's
14   marked DHR Exhibit 12.
15   HEARING OFFICER: Before we leave
16      this, it has been admitted.
17      What was the amendment? What
18      was it amended to show?
19   MR. MARSH: The items that are in
20      bold were added. There are
21      some on the first page and
22      second page. Otherwise, it's
23      the identical letter. It was

Page 99

1       just some additional material
2       added in that related to being
3       qualified for the position.
4 Q. Ms. Warren, I've handed you DHR Exhibit
5    12. Do you recognize that document?
6 A. Yes.
7 Q. And what is that?
8 A. Again, this is information that I -- a web
9    site that I had viewed, Bronte
10   International University, which is the old
11   Trinity College and University.
12 Q. Is that their current web site --
13 A. Yes.
14 Q. -- discussing course offerings and --
15 A. Yes.
16 Q. -- procedures for the university --
17 A. Yes.
18 Q. -- or for the Trinity -- Bronte?
19   MR. DEBARDELABEN: May I take her
20      on voir dire.
21   MR. MARSH: You can cross-examine
22      a witness. I'm not sure how
23      you voir dire a witness.

Page 100

1    MR. DEBARDELABEN: This again,
2       Your Honor, this is on 6/21,
3       two days after the charge
4       letter. And they want to
5       introduce something two days
6       after the charge letter that
7       we weren't given notice of.
8       This is two days afterwards,
9       after we get the charge
10      letter.
11   MR. MARSH: I mean, for
12      clarification, I guess, the
13      primary information concerning
14      the allegations was provided
15      timely to her. There was
16      additional information pulled
17      off the Internet to help
18      explain the connection between
19      Trinity College and University
20      and Bronte University, which
21      is what it's now known as.
22      I'm placing that as an
23      assertion, obviously not

Transcript of Proceedings     Virginia Hopper      June 22, 2006

Page 101

1  testifying. There is, again,
2  no obligation under the rules
3  that govern this procedure
4  that documents -- that any
5  documents be provided at the
6  time of charge letter or any
7  specific time at all. In
8  fact, if you read the rules in
9  the personnel manual, it
10  states -- even discusses
11  entering documents during the
12  hearing. So, I mean, we are
13  clearly within the bounds of
14  the rules that guide this
15  proceeding.
16    HEARING OFFICER: I'm going to
17   admit it.
18   (DHR Exhibits 13 and 14 were marked
19   for identification.)
20 Q. Ms. Warren, I'm going to go ahead and show
21  you these next two together. 13 and 14,
22  again, do you recognize those documents?
23 A. Yes.

Page 102

1 Q. And what are those?
2 A. Again, it's information on Bronte
3  University accreditation, membership and
4  accreditation and a sample copy of the
5  certificate for a bachelor's degree.
6 Q. From Bronte University?
7 A. From Bronte University.
8    MR. MARSH: I would offer these
9   two documents as DHR Exhibits
10   13 and 14 for my last two.
11   HEARING OFFICER:
12   Mr. DeBardelaben, do you have
13   13 and 14?
14   MR. DEBARDELABEN: Yes, sir. I
15   think they got different
16   documents. I object and would
17   like to take her on voir
18   dire. On 13 it had
19   documents -- the front page
20   and the documents attached to
21   it did not come from the same
22   web site of what they
23   apparently are saying. It's a

Page 103

1  mix-match of documents
2  produced together to make it
3  look like something it's not.
4   MR. MARSH: No, sir. There was no
5   intent to make it look like
6   something it's not. Those
7   were documents dealing with
8   the accreditation agency
9   that --
10   MR. DEBARDELABEN: May I get my
11   objection in. She said 13 was
12   what she got on Bronte
13   University. That is run
14   off -- The first sheet of 13
15   is run off on 6/22/06 and that
16   came from and it had Bronte
17   International University. You
18   look at the second sheet was
19   ran off on 6/21/06.
20   Nonrecognized accreditation
21   agencies is at the top of it.
22   And that's on the third
23   sheet. On the fourth sheet

Page 104

1  it's something called --
2   HEARING OFFICER:
3   Mr. DeBardelaben, I think I
4   can cut through. 13 will not
5   be admitted. What about 14?
6   MR. DEBARDELABEN: 14 I have no
7   problem with. I would also on
8   12 like to point out to Your
9   Honor they still got
10   apparently some mix-matched
11   sheets in 12. A lot of it is
12   Bronte University, but you get
13   back here at the last -- well,
14   it looks like it's all Bronte
15   University on 12. Just
16   different pages.
17   HEARING OFFICER: I think we ruled
18   on 12.
19   MR. DEBARDELABEN: Yeah, we did.
20   MR. MARSH: 14.
21   MR. DEBARDELABEN: 14 is just a
22   copy of her diploma that just
23   doesn't have her name on it.

000027

Page 105

1    HEARING OFFICER: 14 is a dmitted.
2    MR. MARSH: Just for c larification
3       just so I'm c lear --
4    HEARING OFFICER: Just for
5       c larification, 14 is a Bronte
6       diploma .
7    MR. MARSH: Sa mple diploma from
8       the ir web site, yes, sir.
9    HEARING OFFICER: All right. It's
10      a dmitted.
11   MR. MARSH: Just so I'm c lear, we
12      ha ve admitted all documents --
13      DHR Doc uments 1 through 15
14      with the exception of 13. Is
15      tha t --
16   HEARING OFFICER: Tha t's correct.
17      Now, I ha ve one question. As
18      fa r as the -- Is there an
19      a ctual diploma and will that
20      be -- will you be asking that
21      tha t be admitted? Will either
22      of you be asking --
23   MR. DEBARDELABEN: We will put her

Page 106

1       actual diploma in, Your Honor,
2       what she received. I think
3       you need that.
4    HEARING OFFICER: All right, sir.
5    MR. MARSH: That's all we have.
6    MR. DEBARDELABEN: I have a few of
7       Ms. Warren. And I think I can
8       use your exhibits.
9    CROSS-EXAMINATION
10   BY MR. DEBARDELABEN:
11   Q. Let me show you what's been previously
12      marked as, I think, 7. It's the
13      application for an accountant. You
14      testified to that, didn't you, in 2003?
15   A. It's the same one.
16   MR. MARSH: If I could provide her
17      with 7 so she could look at
18      it.
19   MR. DEBARDELABEN: That would be
20      fine.
21   HEARING OFFICER: She can look at
22      this one if --
23   MR. MARSH: I've got it right

Page 107

1       here. Thank you.
2    Q. Now, are you looking at that one? What are
3       the qualifications you need to apply? Read
4       that.
5    A. Bachelor's degree with a major in
6       accounting or business administration
7       including completion of five college level
8       accounting courses, four of which must be
9       Principles I and II and Intermediate I and
10      II or equivalent courses.
11   Q. Okay. Is there any question that
12      Ms. Hopper has her accounting courses?
13   A. I'm sorry?
14   Q. Did she have her five college level --
15      Strike that question.
16      Now, there's another -- To get credit
17      for the college level accounting courses
18      there's a note. What must those accounting
19      courses comply with? Look under your note.
20   A. Do you want me to just read that?
21   Q. Yes.
22   A. Each accounting course completed should be
23      listed separately on the application.

Page 108

1       Qualifying college level accounting courses
2       are defined as courses that are acceptable
3       by an accredited four-year college or
4       university towards a major in accounting,
5       including --
6    Q. Something course work?
7    A. -- something course work. Income tax
8       courses will not be applied toward the five
9       accounting courses.
10   Q. Auditing course work I think is the word.
11   A. Well, that's what I was going to guess,
12      sir.
13   Q. Okay. Now, for the college level
14      accounting courses to apply, they have to
15      be accepted by an accredited four-year
16      college or university?
17   A. That is correct.
18   Q. Now, in 2003 did the State require the
19      bachelor's degree to be from an accredited
20      college or university? Does it say that --
21   A. It doesn't say this on the announcement.
22   Q. Is there anyplace in the rules that -- on
23      announcements or anyplace that says it has

Transcript of Proceedings      Virginia Hopper      June 22, 2006

Page 109

1      to be an accredited college and University?
2   A.   It probably is in state personnel.
3   Q.   But have you ever seen that?
4   A.   I've seen it before.
5   Q.   Where?
6   A.   In state personnel.
7   Q.   But it's not on the announcement?
8   A.   It's not on the announcement.
9   Q.   Now, where did you graduate from?
10   A.   Alabama State University.
11   Q.   Did you take any courses anyplace else?
12   A.   Troy.
13   Q.   What was Troy when you went there?
14   A.   Troy State.
15   Q.   Troy State College?
16   A.   University. TSUM here in Montgomery.
17   Q.   What is it now?
18   A.   Troy University.
19   Q.   It changed names, didn't it?
20   A.   Yes.
21   Q.   You're aware that colleges change names,
22      aren't you?
23   A.   Yes.

Page 110

1   Q.   During your research on -- Did you
2      extensively research Trinity College and
3      University?
4   A.   I didn't do extensive research. I just
5      pulled up web site information.
6   Q.   Were you aware of a lawsuit by Trinity
7      University against Trinity College and
8      University?
9   A.   Not until Ms. Hopper brought it to our
10      attention.
11   Q.   That took place in November?
12   A.   No.
13   Q.   That took place in 2004?
14   A.   No, sir.
15   Q.   You weren't aware of that?
16   A.   No.
17   Q.   Do you have any paperwork today to show
18      with you that there are any universities or
19      colleges that -- or diploma places that the
20      State does not accept? Is there a list by
21      the State?
22   A.   There probably are in state personnel and
23      I --

Page 111

1   Q.   Excuse me. Do you have it with you today?
2   A.   No, sir. I do not have it with me.
3   Q.   Do you know of a list and have you seen a
4      list or do you have a list in your
5      personnel office? You've been in personnel
6      20 years now; right?
7   A.   Yes, sir.
8   Q.   Do you have a list of colleges and
9      universities that are accepted by the
10      state?
11   A.   You mean --
12   Q.   For degrees.
13   A.   Yes. I've seen --
14   Q.   My question, do you have the list?
15   A.   No. But you're asking me if I've seen it,
16      and, yes, I have.
17   Q.   Where was that?
18   A.   In the state personnel department.
19   Q.   And when would that --
20   A.   And we've had a catalog. There are
21      catalogs.
22   Q.   And when was that list made?
23   A.   I don't know.

Page 112

1   Q.   You don't know. Did you see it during this
2      period of time?
3   A.   Not within the past couple of months, no,
4      sir.
5   Q.   In the past two or three years?
6   A.   Yes.
7   Q.   So they could have made that list after
8      this situation came up with Ms. Hopper,
9      couldn't they?
10   A.   The list that I saw were a list of
11      accredited colleges and universities. It's
12      a catalog.
13   Q.   I appreciate your answer. But I said they
14      could have made that list after the
15      situation, after she had her diploma. You
16      don't know?
17   A.   I don't know who they are, no, sir.
18   Q.   You don't even know who made up the list,
19      do you?
20   A.   The accrediting sources.
21   Q.   You don't know --
22   A.   No.
23   Q.   You don't know if it's a State of Alabama

000029

Page 113

1    list or if it's some other accrediting
2    source list?
3    A.  Well, it's not a list.  It's a catalog.
4        And, no, it's not just State of Alabama.
5        It's all the universities in the United
6        States.  That includes Alabama.
7    Q.  And my question was this:  So there's a
8        list made up of accredited universities in
9        the United States?
10   A.  Yes, sir.
11   Q.  Has the State of Alabama ever made a rule
12       or regulation to your knowledge that
13       they're not going to accept a degree or a
14       diploma from anything but an acceptable --
15       an accredited institution and accredited by
16       certain agencies?
17   A.  That was at one time, yes, sir.
18   Q.  Is it valid now?
19   A.  I don't know now.
20   Q.  So from what you're telling me, you don't
21       know if it's valid to accept this from the
22       rules of the state personnel board, Trinity
23       College and University as an acceptable

Page 114

1    source.  You don't know if they had
2    anything saying you couldn't accept that,
3    do you?
4    A.  I don't know if they had anything that says
5        you couldn't.
6    Q.  Now, you were called over to this meeting I
7        think you said occurred on the first part
8        of May that Jackie Graham, Paul Thomas,
9        Sandy Speakman, you, Butch King, Stan
10       Goolsby and Darby Forester was in.  Was
11       that about May 4th?
12   A.  Yes, sir.
13   Q.  Did the state personnel direct y'all to
14       take this action against Ms. Hopper?
15   A.  No, sir.
16   Q.  Could it have not been taken?
17   A.  It -- Not -- You can make decisions whether
18       to pursue disciplinary action.  And
19       falsification of records we've always
20       pursued disciplinary action against an
21       employee.
22   Q.  Now, you do agree that if somebody put
23       something down on an application which they

Page 115

1    believe to be true and correct at the time
2    they put it down they weren't falsifying,
3    were they?
4    A.  No, I don't believe that.
5    Q.  You don't believe that?
6    A.  I mean, I say falsification is
7        falsification.
8    Q.  So you don't believe that if I certified
9        that all statements on or attached to this
10       application are true and correct to the
11       best of my knowledge, you don't think that
12       has any validity, do you?
13   A.  I don't think that negates falsification.
14   Q.  How many people in the 20 years since
15       you've been employed with the Department of
16       Public Health --
17   A.  Human Resources.
18   Q.  -- Human Resources have you gone back and
19       researched their college degrees?
20   A.  I've not researched any Department of Human
21       Resources employees' college degrees.  I've
22       questioned some if there was something
23       questionable.  I've called universities to

Page 116

1    verify information and to verify whether or
2    not they've had a degree.  I've done that
3    over the years.  Maybe 10 people over the
4    years.
5    Q.  Maybe 10 over the years.  So how many times
6        have you been called over to state
7        personnel about somebody's, quote,
8        qualification for a job?
9    A.  This is my first time.
10   Q.  Now, are you familiar with Ms. Hopper's
11       work record?
12   A.  No, sir.
13   Q.  Are you familiar that her entire work
14       record she's got either meets standards or
15       consistently exceeds standards?
16   A.  I'm not familiar with.  I've not heard
17       anything differently.
18   Q.  Have you asked her boss if she was
19       qualified to actually perform the job she
20       was in?
21   A.  No, sir, I have not, because minimum
22       qualifications determine that prior to
23       being placed in the position.

Page 117

1  Q.  And you can't -- You have no evidence here
2     today that says the State has any kind of
3     rule or regulation about what degrees to
4     accept from what colleges?
5  A.  I have no paper evidence to say that.
6        MR. DEBARDELABEN: I have no
7      further questions.
8        MR. MARSH: Nothing further.
9        MR. DEBARDELABEN: We're going to
10     straighten out a couple of
11     things. Recall Ms. Hopper.
12     How do we mark our exhibits?
13        HEARING OFFICER: If you'll just
14     mark it with the last name.
15     Just mark Hopper.
16     (Hopper Exhibit 1 was marked for
17     identification.)
18     DIRECT EXAMINATION
19  BY MR. DEBARDELABEN:
20  Q.  Ms. Hopper, is that what you presented to
21     Trinity College and University when you
22     gave them your -- except for the last page
23     there? Is that what you presented to them?

Page 118

1  A.  I didn't have this. I had listed my
2     courses.
3  Q.  Is that what you presented to Trinity
4     College and University?
5  A.  It is.
6  Q.  And how did you present that to them?
7  A.  I faxed it to them.
8  Q.  Is that everything you presented?
9        MR. DEBARDELABEN: We took a
10     couple of things out, Joel,
11     from this part.
12        MR. MARSH: Oh, okay.
13  Q.  Now, Ms. Hopper, what was your
14     understanding that Trinity College and
15     University was going to do?
16  A.  They were going to verify this information
17     that I presented to them and let me know
18     how many credits and what credits I was to
19     receive for this.
20  Q.  When you received information from Trinity
21     College and University, did you receive --
22     they award you a degree based on that.
23     Were you offered an opportunity to go

Page 119

1     through some type of graduation ceremony?
2  A.  I was.
3  Q.  And where was that graduation ceremony to
4     be held?
5  A.  San Antonio, Texas.
6  Q.  They were going to have it -- And how did
7     you find that out?
8  A.  I was talking to Trinity College and
9     University on the telephone, because she
10     was telling me that there would be fees for
11     verifying this, the information I gave her,
12     and that if I was short for any credit that
13     I would have to take credits through them.
14     And she also said that in the fee that I
15     paid that she would at that time set me up
16     and help me order my cap and gown and tell
17     me about making arrangements to walk.
18  Q.  And what did you understand -- And that was
19     supposed to be in San Antonio, Texas?
20  A.  San Antonio, Texas, yes, sir.
21  Q.  Now, did you go out there and walk?
22  A.  No, sir, I didn't, because my family
23     couldn't go and I wasn't going to go

Page 120

1     without them. I told her at that time if
2     we were going to make those arrangements
3     that I would get back in touch with her.
4        MR. DEBARDELABEN: Your Honor, we
5     move to introduce Hopper
6     Exhibit 1.
7        MR. MARSH: No objection.
8        HEARING OFFICER: Admitted.
9        MR. DEBARDELABEN: This will be
10     Hopper 2.
11     (Hopper Exhibit 2 was marked for
12     identification.)
13  Q.  Can you tell me what Hopper Exhibit 2 is?
14  A.  This is a copy of my degree that I received
15     from Trinity College and University.
16        MR. DEBARDELABEN: We move to
17     introduce the degree.
18        MR. MARSH: No objection.
19        HEARING OFFICER: Admitted.
20     (Hopper Exhibit 3 was marked for
21     identification.)
22  Q.  Can you tell me what Hopper Exhibit 3 is?
23  A.  This is a list of courses that I got off

000031

Page 121

1   the Internet.
2   Q. Now, tell me how you pulled that off the
3     Internet.
4   A. I went to --
5   Q. What did you type in?
6   A. Trinity College and University.
7   Q. And what came up?
8   A. A link -- A site that you link to.
9   Q. And what did the site say?
10   A. Trinity University.
11   Q. When did you pull that list up, ma'am?
12   A. 3/10 of 2003.
13   Q. And there's a phone number written down
14     there. What is that phone number?
15   A. That phone number is Trinity College and
16     University that I called.
17   Q. Were the course numbers on that sheet in
18     front of you different from the course
19     numbers on what they gave you credit for?
20   A. They're different in numbers to the
21     original numbers on my transcript.
22   Q. Did you telephone the number on the bottom
23     that you've handwritten in? First of all,

Page 122

1   did you handwrite that number in?
2   A. I did.
3   Q. Did you telephone that number to find out
4     the difference in the course numbers?
5   A. I did.
6   Q. What institution were you talking to?
7   A. I was talking to Trinity College and
8     University.
9   Q. Now, have you subsequently learned, since
10     all this came about, that the page you have
11     in front of you is actually the course
12     numbers that Trinity University gives?
13   A. Yes, sir.
14   Q. And you thought that was the same course
15     numbers -- I mean, same as Trinity College
16     and University?
17   A. I did.
18      MR. DEBARDELABEN: We move to
19      introduce that. That tells
20      you where she got the course
21      numbers.
22      MR. MARSH: I haven't seen it yet.
23   Q. Now, do those numbers on that sheet

Page 123

1   correspond with the course numbers you put
2   on your application?
3   A. Yes.
4      MR. MARSH: No objection.
5      HEARING OFFICER: It's admitted.
6   Q. After all this came about, did you discover
7     that there was a lawsuit by Trinity
8     University against Trinity College and
9     University?
10   A. Yes, sir, I did.
11   Q. And there was a -- the reason basically for
12     the lawsuit that Trinity University in San
13     Antonio did not want Trinity College and
14     University using the same name?
15   A. That's true.
16   Q. Are these court documents that reflect the
17     final order and judgment and a motion for
18     entry of a final order and judgment --
19     Hopper 4 a copy of the motion for entry of
20     final judgment and order of permanent
21     injunction filed in the United States
22     District Court for the Western District of
23     Texas, San Antonio Division, Trinity

Page 124

1   University versus Trinity College and
2   University?
3   A. It is.
4      (Hopper Exhibits 4 and 5 were
5      marked for identification.)
6   Q. Is Hopper 5 the final order and judgment in
7     the case in Texas District Court we just
8     referred to between Trinity University and
9     Trinity College and University?
10   A. It is.
11      MR. DEBARDELABEN: Your Honor, we
12      offer those as court documents
13      and admit it basically to show
14      that it's been many people ...
15      HEARING OFFICER: Mr. Marsh.
16      MR. MARSH: Give me just one
17      second. I haven't seen these
18      before. I just want to thumb
19      through them.
20      (Brief pause.)
21      MR. MARSH: Well, my only
22      objection is that the document
23      entitled final judgment and

Page 125

1    order of permanent injunction
2    is there are handwritten
3    annotations on that one. The
4    final judgment and order of
5    permanent injunction is part
6    of a bigger package here.
7    There's a copy there. This
8    particular one has handwritten
9    annotations. I don't know
10   where they came from, so I
11   object to it based on the
12   grounds of those --
13   MR. DEBARDELABEN: We'll redact
14   the handwritten -- you know, I
15   don't care if they're
16   redacted. These are basically
17   offered for the --
18   HEARING OFFICER: Let me just
19   answer the question before you
20   go forward. Is the judgment
21   in the big package the same as
22   the second judgment?
23   MR. DEBARDELABEN: The judgment in

Page 126

1    the big package is, from what
2    I can gather, Your Honor, for
3    the judge to sign. He signed
4    it in the little package.
5    HEARING OFFICER: I see.
6    MR. DEBARDELABEN: And the
7    handwritten annotations I have
8    no problem if they're
9    redacted. They aren't offered
10   for any truthfulness or --
11   HEARING OFFICER: You don't happen
12   to have a clean copy of that
13   order signed or --
14   MR. DEBARDELABEN: No, sir.
15   That's the only copy we have,
16   Your Honor. I didn't put it
17   on it. It came to me that
18   way.
19   HEARING OFFICER: How many
20   handwritten notes are there,
21   Mr. Marsh?
22   MR. MARSH: There's one, two,
23   three, four --

Page 127

1    MR. DEBARDELABEN: They can be
2    redacted, Your Honor. The
3    handwritten notes are just not
4    important.
5    MR. MARSH: I mean, I am
6    comfortable with letting this
7    come in with your assertion
8    that you'll not consider the
9    handwritten notes. I mean, I
10   don't think they're that
11   significant anyway, so ...
12   HEARING OFFICER: I'll admit them
13   and I won't consider the
14   handwritten notes.
15   (Hopper Exhibit 6 was marked for
16   identification.)
17   MR. DEBARDELABEN: Your Honor, we
18   want to show you this with
19   Joel's permission. This is
20   the certified copy, original
21   copy, and we're going to
22   introduce a -- after
23   Ms. Hopper looks at it a copy

Page 128

1    of her certified transcript
2    from Troy University.
3    Q. Is that your certified transcript from Troy
4    University?
5    A. It is.
6    MR. DEBARDELABEN: Your Honor, we
7    move to admit Hopper Number
8    6. And we have the original
9    here if you would like to
10   peruse it.
11   MR. MARSH: No objection.
12   HEARING OFFICER: Admitted.
13   MR. DEBARDELABEN: Your Honor,
14   with agreement with Joel --
15   and I thought I made a copy
16   yesterday and I didn't see
17   it. We have the original
18   complaint of Trinity
19   University against Trinity
20   College and University and
21   we'll do that as Hopper Number
22   7. That might educate you a
23   little bit more on this

000033

Page 129

1       situa tion.
2       (Hoppe r Exhibit 7 was marked for
3       ide ntification.)
4       HEARING OFFICER: Oka y.
5       MR. DEBARDELABEN: Your Honor, by
6           a greement this is the original
7           c omplaint, Exhibit 7.
8       HEARING OFFICER: Exhibit 7 is
9           a dmitted.
10      MR. DEBARDELABEN: And this will
11          be a Composite Exhibit 8.
12      (Hoppe r Exhibits 8 and 9 were
13          ma rked for identification.)
14  Q.  Ms. Hopper, is this where you went on-line
15      with Trinity Colle ge and University and
16      pulled up information concerning Trinity
17      College and University?
18  A.  Yes, sir, it is.
19  Q.  Is that just a composite exhibit of the
20      pa ges that were pulled up?
21  A.  Yes.
22      MR. DEBARDELABEN: We move to
23          introduc e that, Your Honor.

Page 130

1       HEARING OFFICER: Any objection on
2           8?
3       MR. MARSH: No.
4       HEARING OFFICER: 8 is admitted.
5       MR. MARSH: Hopper Exhibit 9 is
6           the first page of what you
7           previously denied DHR's
8           admission to accreditation.
9           If it's admitted, I would
10          re-move to submit the
11          remaining parts of --
12      HEARING OFFICER: 9 will not be
13          admitted.
14  Q.  Let me ask you about this. Is the reason
15      you thought Trinity College and University
16      was an acceptable college is that it -- the
17      information you had showed that it was
18      accredited?
19  A.  Yes, sir.
20  Q.  And where did you get that information that
21      you -- led you to believe it was an
22      accredited institution?
23  A.  Off the Internet at the web site.

Page 131

1   Q.  Is Hopper Exhibit 9 the information you
2       received from the web site that led you to
3       believe it was an accredited acceptable
4       institution?
5   A.  Yes, sir.
6       MR. DEBARDELABEN: Your Honor, I'm
7           introducing it for the purpose
8           of that's what led her to
9           believe it was an accredited
10          acceptable institution and
11          that is information she had
12          received.
13      HEARING OFFICER: Mr. Marsh.
14      MR. DEBARDELABEN: Not for the
15          truthfulness of this document,
16          but for what led to her
17          conclusion.
18      MR. MARSH: Well, again, I would
19          assert that, you know, we had
20          offered evidence challenging
21          that accreditation, and if
22          this is going to be admitted,
23          we want to reoffer the

Page 132

1           information that we obtained
2           from the web site showing that
3           this is not an accepted
4           accreditation agency.
5       MR. DEBARDELABEN: Your Honor,
6           they gave information on
7           Bronte. That's the
8           difference. Theirs was on
9           Bronte. What she always dealt
10          with was Trinity College and
11          University. She never dealt
12          with Bronte International.
13          That happened after the
14          lawsuit and it was changed.
15          We're just going to what she
16          had in her knowledge and what
17          was offered at the time she
18          was doing this.
19      HEARING OFFICER: I'm going to
20          admit this and I'm not going
21          to admit the exhibit on
22          Bronte.
23      MR. MARSH: Let me clarify. It

33 (Pages 129 to 132)

Transcript of Proceedings                    Virginia Hopper                    June 22, 2006

Page 133

1      was not an exhibit on Bronte
2      that I was offering.
3      HEARING OFFICER:  Go ahead and
4      clarify.
5      MR. MARSH:  The exhibit I had
6      offered is discussing that
7      accreditation association,
8      neither Bronte or Trinity. It
9      doesn't talk about either one
10     of them.  It talks about the
11     accreditation association that
12     accredited both Trinity and
13     Bronte, which we provided
14     evidence are the same
15     University but the name
16     changed.  I wasn't discussing
17     either one of them.  I was
18     discussing the association
19     that accredited them.
20     MR. DEBARDELABEN:  Your Honor,
21     we're not disputing it's
22     probably not accredited, but
23     they represented and gave her

Page 134

1      information it was
2      accredited.  That's what we're
3      coming from.  Whether it's
4      accredited or not accredited
5      that's one thing.  But it's
6      what she believes and put
7      down.  But the State has not
8      put on any evidence they
9      require accreditation of
10     colleges and universities.
11     HEARING OFFICER:  This is Hopper
12     9, which will be admitted.
13     What was the exhibit you
14     wanted in?  What was the
15     number?
16     MR. MARSH:  It was 13.
17     HEARING OFFICER:  DHR 13 will also
18     be admitted.
19     (Hopper Exhibit 10 was marked for
20     identification.)
21  Q.  Did you receive what we marked as Exhibit
22     10 from Trinity College and University?
23  A.  Sir?

Page 135

1   Q.  Did you receive what we offered as Exhibit
2      10 from Trinity College and University?
3   A.  I did.
4   Q.  Did that show various items they offered
5      for sale, including graduation tassels, et
6      cetera?
7   A.  Yes, sir.
8   Q.  And a graduation ring?
9   A.  Right.
10  Q.  And you got this after you got your
11     diploma?
12  A.  I did.
13     MR. DEBARDELABEN:  Your Honor, we
14     just offer that for what it's
15     worth to show that.
16     HEARING OFFICER:
17     Mr. DeBardelaben, clarify just
18     slightly what it is worth.
19     MR. DEBARDELABEN:  Well, it shows
20     that Trinity College and
21     University is holding
22     themselves to the university.
23     They hold themselves out as --

Page 136

1      HEARING OFFICER:  That's fine.
2      MR. DEBARDELABEN:  -- as issuing
3      rings, as having graduations,
4      selling it --
5      MR. MARSH:  We have no objection.
6      MR. DEBARDELABEN:  -- as all
7      universities do their
8      paraphernalia to make money.
9      HEARING OFFICER:  10 is admitted.
10  Q.  Now, did I understand you correctly to say
11     that when you talked to them about going
12     through graduation it was to be held in San
13     Antonio, Texas?
14  A.  Yes, sir, that's correct.
15  Q.  And is that another reason you thought
16     Trinity College and University and Trinity
17     University is one and the same institution?
18  A.  It was.
19     MR. DEBARDELABEN:  No further
20     questions, Your Honor.
21     HEARING OFFICER:  Mr. Marsh.
22     MR. MARSH:  Could I see -- and I
23     don't know.  It was the sheet

34 (Pages 133 to 136)

Page 137

1    that had the course listings
2    on it. I didn't get a copy of
3    that one.
4    HEARING OFFICER: Is it your
5    exhibit or --
6    MR. DEBARDELABEN: It's mine.
7    HEARING OFFICER: Those are the
8    Hopper exhibits.
9    MR. DEBARDELABEN: Before you get
10   into that, I've got a couple
11   of questions.
12   HEARING OFFICER: Go ahead.
13   Q. (Continuing by Mr. DeBardelaben:) What has
14   been your annual evaluations in the last --
15   just say three annual evaluations?
16   A. Consistently exceeds standards.
17   Q. And how long have you been rated on the
18   accountant job? Do you have those
19   evaluations?
20   A. I do. Do you need those? Let's see. I
21   was going to pull my exact dates. I was
22   promoted to accountant on 6/26 of 2004, so
23   it's been two years.

Page 138

1    Q. Do you have the evaluations from that
2    period of time?
3    A. (Indicating).
4    Q. And what has your evaluation since you were
5    promoted to Accountant I been?
6    A. Consistently exceeds standards.
7    MR. DEBARDELABEN: We're going to
8    offer these, Your Honor, the
9    evaluation if you want to look
10   at them and we'll let her make
11   us a copy.
12   MR. MARSH: These all appear to be
13   out of her personnel files.
14   We don't object, although we'd
15   ask that Ms. Vera stay in the
16   room. We can make the copies
17   after the hearing concludes.
18   HEARING OFFICER: I believe that's
19   Exhibit 11. We will make a
20   copy of Hopper 11 after the
21   hearing. But Hopper 11 is
22   admitted. All right.
23   Proceed, please.

Page 139

1    Q. Ms. Hopper, would you be willing for your
2    job to be reclassified as an account clerk,
3    what you had before?
4    A. No, sir.
5    Q. Have you had any option at this point in
6    time if you stay employed with the State of
7    Alabama except to fight this?
8    A. No, sir, I do not. Not to my understanding
9    I don't have an option.
10   Q. They haven't offered you any other option?
11   A. No, sir.
12   Q. And if you resign -- they ask you to
13   resign, you couldn't be employed for how
14   many years -- reemployed?
15   A. Five years.
16   Q. And is this the only source of health
17   insurance you and your family have?
18   A. Yes, sir.
19   Q. At any time when you were filling out these
20   applications, were you aware of anything
21   you put on there that was false?
22   A. No, sir.
23   Q. Did you fill them out to the best of your

Page 140

1    ability?
2    A. I did.
3    Q. Were you ever told by Ms. Bracken that she
4    was mad because you left the comptroller's
5    office to come back to DHR?
6    A. I wasn't told in those exact words, but I
7    was told several times when I first told
8    her that I was going to be looking to leave
9    and that I would let her know before that
10   she was displeased with it. She didn't say
11   I am mad, but she let me know that she was
12   very much displeased.
13   HEARING OFFICER: Clarify for me
14   who Ms. Bracken is again,
15   please.
16   MR. DEBARDELABEN: That was the
17   one that initiated that
18   exhibit, Your Honor, from Troy
19   State apparently that
20   initiated this whole
21   situation.
22   HEARING OFFICER: Was she your
23   former supervisor?

Transcript of Proceedings       Virginia Hopper       June 22, 2006

Page 141

1    THE WITNESS: Yes, sir.
2    HEARING OFFICER: And at what
3      department was that?
4    THE WITNESS: Finance department,
5      comptroller's office.
6    HEARING OFFICER: Proceed.
7    MR. DEBARDELABEN: That's all I
8      have, Your Honor.
9    HEARING OFFICER: Mr. Marsh.
10    MR. MARSH: Just a few things.
11        CROSS-EXAMINATION
12  BY MR. MARSH:
13  Q.  Ms. Hopper, before you left the finance
14    office, comptroller's office, they were
15    questioning your degree there, were they
16    not?
17  A.  The day that I gave them my letter to leave
18    was the first day I heard anything about it
19    at all.
20  Q.  And they asked at that point for a copy of
21    your diploma?
22  A.  Yes, sir.
23  Q.  And did you give it to them that same day?

Page 142

1  A.  No, sir. It was late afternoon. I went
2    straight home to get it. And when I came
3    back, there was no one there for me to show
4    it to. They had already gone. They gave
5    me 24 hours to produce it, and had anyone
6    been there -- we came back to town with
7    it. I had it that day.
8  Q.  Now, let me ask you about this Exhibit 3
9    just so I can clarify what this is. This
10    is a document that you pulled up off the
11    Internet; is that correct?
12  A.  It is.
13  Q.  And how did you find this document on the
14    Internet?
15  A.  I went to Trinity -- I can't remember
16    exactly if it was Trinity.edu. I believe
17    that was it -- to pull up the course
18    numbers.
19  Q.  And is it your testimony that you then
20    called Trinity College and University about
21    this document?
22  A.  It is.
23  Q.  And that you called because you said these

Page 143

1    numbers did not match what was on your
2    transcript?
3  A.  Did not exactly match them, no, sir.
4  Q.  And is it your testimony that you were told
5    that the course numbers had changed?
6  A.  That's exactly my testimony, yes, sir.
7    They said -- Trinity College and University
8    said the course numbers had changed and
9    they were the same courses that was
10    equivalent.
11  Q.  So why didn't you list the course numbers
12    that were given to you rather than the
13    changed course numbers that was after the
14    fact?
15  A.  Because she said those were the new course
16    numbers.
17  Q.  But they weren't the course numbers in
18    effect when you were given credit for the
19    courses, were they?
20  A.  She said -- Trinity College and University
21    said they were the same thing.
22  Q.  But they weren't the course numbers -- The
23    question is, they weren't the course

Page 144

1    numbers that were in effect at the time you
2    were given your diploma and transcript; is
3    that correct?
4  A.  Yes, sir.
5  Q.  And you had that transcript in your
6    possession and could have listed those
7    numbers down if you chose to?
8  A.  Yes, sir.
9    MR. MARSH: I don't have anything
10    further.
11    HEARING OFFICER: I have just a
12    couple of questions about this
13    document if I could ask. Now,
14    when you took this document
15    off of the Internet, I'm
16    assuming that there were no
17    X's in these boxes?
18  A.  No, sir, there were not.
19    HEARING OFFICER: And did you put
20    the X's in the boxes?
21  A.  Yes, sir.
22    HEARING OFFICER: And did you do
23    that while you were on the

000027

Page 145

```
 1        phone with them and they said
 2        you can check this because
 3        this is what you're getting
 4        credit for?
 5  A.  Yes, sir.
 6        HEARING OFFICER:  And that's how
 7        this document came about?
 8  A.  It was an equivalent to the course that was
 9        on the other list.  She just said they were
10        new numbers.  Trinity College and
11        University told me they were new numbers,
12        and I got her to go over each one with me.
13        HEARING OFFICER:  And she went
14        over each one and said you
15        have credit for this one, this
16        one, and you made X's when she
17        said --
18  A.  I did.
19        HEARING OFFICER:  - you had
20        credit for that particular
21        course?
22  A.  I did, yes, sir.
23        HEARING OFFICER:  Okay.
```

Page 146

```
 1        Mr. Marsh, anything else?
 2        MR. MARSH:  I have no further
 3        questions.  We would like to
 4        make a summation.
 5        HEARING OFFICER:
 6        Mr. DeBardelaben, do y'all
 7        rest as far as --
 8        MR. DEBARDELABEN:  We rest, Your
 9        Honor.
10        HEARING OFFICER:  All right.
11        Mr. Marsh, we'll hear from
12        you.
13        MR. MARSH:  We would assert that
14        we have, in fact, proven the
15        charges in the charge sheet,
16        that Ms. Hopper did, in fact,
17        make false statements on her
18        application and that she
19        did -- and that she does, in
20        fact, not have the
21        qualifications for the
22        position that she currently
23        holds with DHR.
```

Page 147

```
 1        Ms. Hopper filled out her
 2        application for examination
 3        for accountant.  In the block
 4        where it said provide
 5        information on all schools
 6        attended, she listed Trinity
 7        University in San Antonio,
 8        which she has admitted she
 9        hasn't attended any University
10        other than Troy and AUM.  In
11        addition, it says list courses
12        which are relevant to the
13        position, and she said see the
14        attached list in which she has
15        15 or 16 courses that she has
16        not taken.
17        It stretches the
18        imagination for someone who
19        has taken college courses, as
20        she has done at Troy, who
21        knows what work you have to do
22        to get a degree -- or to get
23        credit for a course to stand
```

Page 148

```
 1        here and say, well, I filed to
 2        get credit for these 15
 3        courses by submitting some
 4        information from my work and
 5        two-hour seminars that she
 6        attended.  It simply stretches
 7        the imagination.  It's not
 8        believable that she truly
 9        thought she had a degree.  She
10        has a piece of paper from
11        Trinity College and University
12        now known as Bronte College,
13        which we provided information
14        on, which is not worth much
15        more than the piece of paper
16        it is typed up on.  It is a
17        diploma mill that is churning
18        out documents for people who
19        pay the fee.
20        There's been, you know,
21        discussion today about whether
22        Alabama -- State of Alabama
23        requires accreditation --
```

Page 149

1  requires that you attend an
2  accredited University or not.
3  And really that's not even the
4  issue whether they were or
5  were not accredited, although
6  we've again presented
7  information questioning their
8  accreditation. The issue is
9  you have to attend a
10  University period. That did
11  not happen here. She did not
12  take these courses. She did
13  not do on-line work. There
14  are on-line universities out
15  there which require you to do
16  course work. None of that was
17  done. She submitted an
18  application and she said
19  approximately a month or so
20  later she got credit for 17
21  courses and a degree, having
22  only sat through five courses
23  that she took.

Page 150

1  I think it's clear that
2  when she filled out this
3  application she knew the
4  information was not correct.
5  I think it's clear even
6  despite that that she
7  currently has no degree and
8  therefore is not qualified for
9  the position. Even if you
10  accept the fact that this was
11  a mistake on her part, she
12  does not have a degree from a
13  University. She has a piece
14  of paper that was given to her
15  by an offshore diploma mill.
16  Additionally, the
17  position of accounting -- of
18  accountant requires five
19  courses, which I think we've
20  discussed and has been in
21  evidence, four of which are
22  Principles of Accounting I and
23  II and Intermediate Accounting

Page 151

1  I or II or equivalent
2  courses. She does not have
3  Intermediate Accounting II on
4  her transcript and there are
5  no equivalent courses in the
6  five that she took at Troy
7  University that would equate
8  to Intermediate Accounting
9  II. The governmental
10  accounting course which she
11  took on there, if you'll look
12  at the course description
13  which we provided to you, is
14  not an equivalent course to
15  Intermediate Accounting II.
16  It doesn't even have the same
17  prerequisites as Intermediate
18  Accounting II. It has
19  lower -- I mean, a lower level
20  prerequisite than Intermediate
21  Accounting II, and we would
22  assert that she doesn't have
23  one of the five courses that

Page 152

1  she needs to, in fact, hold
2  the position that she has.
3  I'm not going to go back
4  through all this evidence.
5  You've got plenty here to look
6  at. I'm not going to go
7  through it page by page. But
8  suffice it to say that we have
9  proven, in fact, that she has
10  falsified her application and
11  she is not qualified to be an
12  accountant. It really flies
13  in the face of people who do
14  work hard who are -- hold down
15  a job and have a family and go
16  back to school at night and
17  weekends and get the degree.
18  It really flies in the face of
19  that to come in with a degree
20  based on paying a fee and
21  submitting some seminars and
22  past work experience. And we
23  would ask that you recommend

000029

Page 153

1   to the committee -- to the
2   appointing authority that she
3   be discharged.
4   HEARING OFFICER:
5     Mr. DeBardelaben.
6   MR. DEBARDELABEN: Yes, sir.
7     First I would like to address
8     the courses he said she
9     doesn't have. If you'll look
10    at DHR Exhibit 8. It is
11    apparent that when she
12    attached her resume she has
13    all the five courses listed
14    and they are checked off.
15    Accounting 394, governmental
16    accounting, that's checked
17    off. Intermediate Accounting
18    I is checked off. Managerial
19    Accounting, which is 293, is
20    checked off. Principles of
21    Accounting II, which is 292,
22    is checked off. And
23    Accounting 291, Principles of

Page 154

1   Accounting I is checked off.
2   They checked it off that she
3   had these degrees. They're --
4   HEARING OFFICER: Is that DHR H or
5     is that --
6   MR. DEBARDELABEN: DHR 8 is the
7     exhibit. And they checked
8     them off what the courses she
9     was related. You know, so far
10    as between Trinity and Trinity
11    University, I think the
12    information provided shows
13    there's been a great deal of
14    problems with this Trinity
15    College and University
16    claiming to be Trinity
17    University. They went so far
18    with Ms. Hopper to say you
19    will walk in San Antonio,
20    Texas. They were leading
21    everyone to believe they was
22    one and the same.
23      When you represent

Page 155

1   something you believe is true,
2   although it might be false,
3   you're not falsifying. And I
4   think when you read the
5   document down here, it says
6   the application is true and
7   correct to the best of my
8   knowledge.
9     Now, let's go back. And
10    the State wants to say diploma
11    mill. State has not proven,
12    has not offered any evidence
13    to say that this diploma can't
14    be accepted. They haven't
15    offered any evidence what
16    their standards are on
17    accepting diplomas. Now,
18    should they have those
19    standards? Yes, sir, they
20    should have them. Do they
21    have them? Apparently not.
22    It hasn't been offered in this
23    hearing. They haven't proved

Page 156

1   that this is a degree that
2   can't be accepted. They
3   proved that Ms. Hopper got
4   probably hoodwinked.
5     But what stands out more
6   than anything else, Your
7   Honor, her annual evaluation
8   of consistently exceeds
9   standards. Consistently.
10  When there was a question, she
11  answered them. If you pull up
12  something on the Internet and
13  you put the numbers down --
14  Remember when DHR was trying
15  to prove what courses she had
16  at Troy, they go back to the
17  present course and say did
18  that explain it. But that's
19  okay for DHR to do that. But
20  when Ms. Hopper did that and
21  say these are the present
22  courses I took, this is what I
23  thought it would relate to,

Page 157

1   you can look at it, they said
2   there's something wrong with
3   that. She's falsifying. They
4   argue one way and say, oh, we
5   can show that, you know, these
6   are generally the courses
7   because we all know the old
8   course numbers are gone.
9   English 101 when I was in
10  college is not the same
11  English that my child takes in
12  college or your child takes.
13  But we can go by and say this
14  is what we basically have.
15  That's not falsifying. She
16  has done nothing to falsify an
17  application. She met all the
18  requirement. Maybe the State
19  don't have the proper
20  requirements. The State, what
21  they should say on these, if
22  they're going to hold them to
23  that, is a bachelor degree

Page 158

1   from an accepted or credited
2   college or university. They
3   don't say that.
4        She had the five college
5   level accounting courses. We
6   gave you certified copies of
7   those records. So she
8   qualifies. And if this is
9   going to be the case with
10  Ms. Hopper, then every
11  employee in the state so they
12  get -- so she gets the equal
13  protection of the law is going
14  to have to be looked at to see
15  if any other employees are in
16  this situation. And we all
17  know this is probably going to
18  be, if not thousands, going to
19  be hundreds of employees in
20  the same situation as
21  Ms. Hopper not realizing they
22  are. But they are. This is
23  a -- If Ms. Hopper was an

Page 159

1   employee that had a bad work
2   record that has done things to
3   get ahead, no, she's one of
4   the state's better employees
5   consistently exceeds
6   standards. She gets bonuses
7   for that. Saying she can't do
8   the work, she's doing the
9   work. She's consistently
10  exceeding the standards the
11  State puts up there. I
12  believe that's the highest she
13  can get. And her -- Ever
14  since she's been an accountant
15  she has consistently exceeded
16  standards. She's doing the
17  work. She's doing the job.
18  You've got a good employee
19  here.
20       There's been nothing said
21  about her employability. It's
22  little technicalities and they
23  want to bring that she's not

Page 160

1   qualified. But when you look
2   at what they say the
3   qualifications are, she is
4   qualified. If they want to
5   bring up technicalities,
6   they've got to apply the same
7   technicalities to themselves.
8   You can't apply it different
9   ways. So she has a bachelor's
10  degree. They did not say from
11  an accredited institution.
12  They just said a bachelor's
13  degree. I think and I think
14  you think and I think
15  everybody in the room probably
16  thinks they should say from an
17  accredited institution, but
18  they didn't. And why is that
19  so important? Because when
20  you go down here on the note,
21  it says qualifying college
22  level accounting courses are
23  defined as courses that are

Page 161

1  accepted by an accredited
2  four-year college or
3  university. That tells you
4  the bachelor's degree doesn't
5  have to be from the accredited
6  college or university on the
7  face of it. They make a
8  distinction.
9      And Ms. Hopper is a fine
10 employee. She's done fine
11 work for the State. We can
12 understand the State changing
13 their rules from this point
14 hence, but they haven't now.
15 And we don't think this lady,
16 being the employee that she
17 is, should be terminated
18 because of something that she
19 did not intentionally or
20 willfully do. She thought she
21 was qualified. Thank you,
22 sir.
23 HEARING OFFICER: All right.

Page 162

1      We're going to close the
2  hearing. I want to thank you
3  for the way this hearing ran,
4  the way it was presented. It
5  was well-argued. The
6  attorneys did a very good
7  job. And I appreciate the way
8  that it was -- that the
9  hearing was handled. I'm not
10 going to rule today. There's
11 a lot here and there's a lot
12 to consider. I'm going to
13 take this matter under
14 advisement.
15     I'm going to ask the
16 attorneys -- both attorneys
17 for proposed orders within 10
18 days of today's date. I'm
19 going to ask that you share
20 those proposed orders with
21 each other. I will keep the
22 record open for those orders
23 only. The record will remain

Page 163

1  open until I receive the
2  proposed orders, and then
3  within 30 days of receipt of
4  the last proposed order I will
5  render a final decision in
6  this matter.
7  MR. DEBARDELABEN: Are you doing
8      10 calendar days or 10
9      workdays?
10 HEARING OFFICER: 10 calendar
11     days.
12 MR. DEBARDELABEN: I've got a
13     federal trial starting next
14     week. Could we do that 14
15     calendar days?
16 HEARING OFFICER: Absolutely.
17 MR. MARSH: Let me jump in here
18     too. I'm sorry. I'm in
19     depositions tomorrow and then
20     I've got a long-standing
21     vacation. I will be out of
22     the state starting Monday and
23     will not be back until the

Page 164

1      5th.
2  HEARING OFFICER: What would y'all
3      propose?
4  MR. DEBARDELABEN: What about by
5      the 10th of July?
6  MR. MARSH: That will work.
7  HEARING OFFICER: 10th of July
8      will work for me also.
9  MR. DEBARDELABEN: Is that a
10     weekday?
11 MR. MARSH: It's a Monday.
12 MR. DEBARDELABEN: Let's make it
13     the 12th.
14 HEARING OFFICER: July 12th.
15     Let me go back and let me
16     just restate that proposed
17     orders are due by July 12th,
18     that the record will remain
19     open for those proposed orders
20     only until July 12th, and then
21     after receipt of the last
22     proposed order I'll render a
23     final decision within 30 days

Transcript of Proceedings                    Virginia Hopper                    June 22, 2006

Page 165

1              in writing to the attorneys.
2              MR. DEBARDELABEN:  I would only
3                ask if the State's going to
4                have the access to the
5                transcript that we be allowed
6                the same access to the
7                transcript for the proposed
8                order.
9              MR. MARSH:  We're not planning on
10               ordering at this point.
11             MR. DEBARDELABEN:  Okay.
12             HEARING OFFICER:  If there's
13               nothing else, this hearing is
14               adjourned.
15             (Hopper Exhibit 11 was marked for
16               identification.)
17             (Proceedings were concluded at
18               approximately 11:55 a.m.)
19
20         * * * * * * * * * * * * * *
21
22
23

Page 166

1              REPORTER'S CERTIFICATE
2      STATE OF ALABAMA:
3      MONTGOMERY COUNTY:
4              I, Lyn Daugherty, Certified Shorthand
5      Reporter and Commissioner for the State of Alabama
6      at Large, do hereby certify that I reported the
7      proceedings in the matter of:
8              VIRGINIA HOPPER,
9              Personnel Hearing
10             STATE OF ALABAMA
11             DEPARTMENT OF HUMAN RESOURCES
12     On Thursday, June 22nd, 2006.
13          The foregoing 165 computer-printed pages
14     contain a true and correct transcript of said
15     proceedings.
16          I further certify that I am neither of kin
17     nor of counsel to the parties to said cause nor in
18     any manner interested in the results thereof.
19          This 10th day of November 2005.
20
21         _____
           Lyn Daugherty,
22         Certified Shorthand Reporter
           And Commissioner for the
23         State of Alabama at Large

000043

Case 2:07-cv-00457-MEF-WC    Document 37-7    Filed 05/30/2008    Page 19 of 25
Transcript of Proceedings                Virginia Hopper                June 22, 2006

Page 1

**A**

ability 76:18 140:1
able 6:12 20:23 22:15
 62:13 87:9
about 4:11,13 17:15
 20:2 23:4 24:6 25:21
 26:7 27:5 29:12
 31:14 32:9,19 35:16
 37:4 38:8 47:17 48:3
 51:18 54:20 60:15
 64:14 66:17 76:17
 81:8 86:14,18 89:3,8
 90:18 92:20 93:10,10
 96:16 104:5 114:11
 116:7 117:3 119:17
 122:10 123:6 130:14
 133:9,10 136:11
 141:18 142:8,20
 144:12 145:7 148:21
 159:21 164:4
above 39:4
Absolutely 77:10
 163:16
abundance 40:13 98:1
academic 25:10,13
 45:18 73:23
accept 110:20 113:13
 113:21 114:2 117:4
 150:10
acceptable 13:1 108:2
 113:14,23 130:16
 131:3,10
accepted 11:19,23
 108:15 111:9 132:3
 155:14 156:2 158:1
 161:1
accepting 155:17
access 88:14 165:4,6
according 78:16
account 3:7 33:21 34:3
 34:12 36:6 139:2
accountant 3:11,13
 5:22 10:13 11:12
 42:15 43:11,21 73:14
 82:20 106:13 137:18
 137:22 138:5 147:3
 150:18 152:12
 159:14
accounting 3:8,9 9:11
 10:23 11:14,17,22
 13:16 18:12 20:16,18
 21:3,4,6 22:6,8,9
 23:12,12 28:10,11,13
 28:13,18,19 29:11,12
 29:17,18,19,20,21
 32:2,6,10,13,15,16
 32:17 34:23 35:1
 36:8,13 37:12,17,19
 38:19 40:2,4 41:6

47:7,7,8 49:17,17
 50:17 53:21 57:21
 61:17 65:18,19 67:3
 70:16 71:9 80:14
 107:6,8,12,17,18,22
 108:1,4,9,14 150:17
 150:22,23 151:3,8,10
 151:15,18,21 153:15
 153:16,17,19,21,23
 154:1 158:5 160:22
accreditation 102:3,4
 103:8,20 130:8
 131:21 132:4 133:7
 133:11 134:9 148:23
 149:8
accredited 11:19 12:1
 12:3,17 14:15 108:3
 108:15,19 109:1
 112:11 113:8,15,15
 130:18,22 131:3,9
 133:12,19,22 134:2,4
 134:4 149:2,5 160:11
 160:17 161:1,5
accrediting 112:20
 113:1
accurate 20:17 21:11
 46:10
accurately 46:4
action 114:14,18,20
actual 74:14 105:19
 106:1
actually 20:23 22:1
 29:18 52:11 59:12,15
 116:19 122:11
added 98:20 99:2
addition 58:1 92:19
 147:11
additional 37:3 93:6,7
 99:1 100:16
Additionally 50:16
address 15:23 62:11,20
 63:3,22,23 64:6,9,15
 153:7
addressed 88:3
adjourned 165:14
administration 11:1
 107:6
administrative 5:11
admissibility 27:2
admissible 83:21 84:4
admission 130:8
admit 24:15 60:21
 61:10 75:7,18,21
 90:10 93:5 97:10
 101:17 124:13
 127:12 128:7 132:20
 132:21
admitted 21:21 24:11
 30:3 36:4 39:20 77:7
 82:12 83:9 97:8

98:16 104:5 105:1,10
 105:12,21 120:8,19
 123:5 128:12 129:9
 130:4,9,13 131:22
 134:12,18 136:9
 138:22 147:8
admitting 31:4
advanced 50:1 57:6
advisement 162:14
after 16:18 21:21 35:19
 35:20 36:5 39:11
 54:23 55:10,11,21
 56:3 61:17 64:3
 79:17 85:5,6 88:15
 88:20 90:14,17 94:10
 96:2 100:3,6,9 112:7
 112:14,15 123:6
 127:22 132:13
 135:10 138:17,20
 143:13 164:21
afternoon 142:1
afterwards 100:8
again 21:8 30:9 31:13
 36:19 41:3,21 42:17
 42:19 48:7 53:22
 67:4 73:22 74:7
 82:16,23 89:11 91:22
 92:3,13 99:8 100:1
 101:1,22 102:2
 131:18 140:14 149:6
against 4:10 8:3,10,19
 8:23 110:7 114:14,20
 123:8 128:19
age 8:5
agencies 82:5 103:21
 113:16
agency 103:8 132:4
ago 12:16 15:5 81:12
 88:17 89:2,3
agree 45:21 114:22
agreement 128:14
 129:6
ahead 24:22 49:12 81:3
 97:10 101:20 133:3
 137:12 159:3
Alabama 1:1,15,17 2:5
 2:9 5:7 13:3 41:8
 42:18 52:9 109:10
 112:23 113:4,6,11
 139:7 148:22,22
 166:2,5,10,23
allegations 100:14
alleged 5:18
allegedly 7:6
alleges 6:1
allow 31:2
allowed 165:5
all-inclusive 29:4
along 46:3
already 14:6 64:3

142:4
although 138:14 149:5
 155:2
always 114:19 132:9
amend 94:22
amended 3:22 10:7
 95:2,6,11 97:18,20
 98:18
amendment 98:17
analyst 85:19
annotations 125:3,9
 126:7
announcement 3:9,11
 40:5 41:5 42:15
 80:14 81:21 82:17
 108:21 109:7,8
announcements 82:4
 108:23
annual 137:14,15
 156:7
another 58:18 76:16
 107:16 136:15
answer 48:5,8 66:10
 67:10 76:14 78:1
 112:13 125:19
answered 156:11
Antonio 3:14 9:8,16
 62:3 63:4,8,17 64:10
 64:19,22 65:16 66:5
 66:20,23 67:18 119:5
 119:19,20 123:13,23
 136:13 147:7 154:19
anybody 40:15
anyone 142:5
anyplace 108:22,23
 109:11
anything 8:4 10:11
 58:1 64:11 90:8
 113:14 114:2,4
 116:17 139:20
 141:18 144:9 146:1
 156:6
anyway 127:11
apologize 73:3
apparent 153:11
apparently 19:10 25:20
 102:23 104:10
 140:19 155:21
appear 19:3 29:7,15
 47:2 138:12
APPEARANCES 2:1
appeared 30:20 38:5
appears 78:17
applicable 45:22 74:11
application 3:7,8,12
 5:22 6:7 7:9,12,15,22
 9:5 10:5 11:16 15:17
 34:2,8,12 36:12 40:7
 43:10,12,14,15,19
 44:21 45:6 46:15

142:4
amend 94:22
47:1 61:16 62:23
 64:7 65:23 67:19
 68:2,4 69:18 73:15
 75:5,10 84:16 86:15
 106:13 107:23
 114:23 115:10 123:2
 146:18 147:2 149:18
 150:3 152:10 155:6
 157:17
applications 50:16
 53:20 139:20
applied 108:8
apply 107:3 108:14
 160:6,8
appointing 153:2
appreciate 112:13
 162:7
approximate 22:11
 23:17
approximately 1:18
 5:15 81:10 88:19
 149:19 165:18
area 22:3 30:11
argue 157:4
around 88:5
arrangements 119:17
 120:2
asked 25:12 31:13
 32:18 48:11 68:8
 73:3 77:22 116:18
 141:20
asking 8:11 22:2 27:5
 27:22 55:18 66:7,11
 66:17,18 70:23
 105:20,22 111:15
assert 96:1 131:19
 146:13 151:22
assertion 100:23 127:7
Assistant 80:5
association 51:3,15
 57:16,17 133:7,11,18
associations 53:7
assume 8:16 14:19
 40:12 47:7 57:8
 75:17
assuming 22:14 144:16
attached 9:9 34:17
 36:18,22 38:21 45:5
 46:9,20 61:16 102:20
 115:9 147:14 153:12
attachment 7:15
attend 149:1,9
attended 35:18 57:12
 63:2,6,11 147:6,9
 148:6
attention 110:10
attorney 2:4 84:12
 85:17
attorneys 162:6,16,16
 165:1

Transcript of Proceedings          Virginia Hopper                    June 22, 2006

Page 2

**Auditing** 108:10
**August** 20:22 21:10
**AUM** 50:2,7,9 57:6
  147:10
**authenticate** 41:16
  42:21 43:4
**authenticated** 40:21
**authentication** 41:12
**authority** 153:2
**authorize** 45:16
**Avenue** 2:5
**average** 71:11
**award** 118:22
**aware** 16:1 38:1 83:11
  84:7 109:21 110:6,15
  139:20
**A-C-C-T** 47:8
**a.m** 1:18 165:18

**B**

**B** 21:8
**bachelor** 10:22 14:17
  157:23
**bachelor's** 10:20 12:2
  102:5 107:5 108:19
  160:9,12 161:4
**back** 6:11 13:2,4 17:21
  19:8 24:4 26:17
  32:11,22 36:5,22
  39:12 46:7,12 47:18
  57:1 58:5,17 68:9
  72:12 78:7 80:9 85:4
  88:11 90:18 94:21
  104:13 115:18 120:3
  140:5 142:3,6 152:3
  152:16 155:9 156:16
  163:23 164:15
**bad** 159:1
**based** 26:19 28:2 69:20
  118:22 125:11
  152:20
**basic** 21:14,22 37:11,16
  39:4 50:16 53:21
  57:21
**basically** 10:8 29:3
  51:2 123:11 124:13
  125:16 157:14
**became** 15:7,8 83:10
**become** 15:9 43:21
  84:7
**before** 1:12 24:3,9 38:4
  38:12 44:3 50:20
  54:23 74:12 98:15
  109:4 124:18 125:19
  137:9 139:3 140:9
  141:13
**BEHALF** 2:3,7
**behind** 38:22 46:20
**being** 99:2 116:23
  161:16

**believable** 148:8
**believe** 7:23:19 37:7
  39:7 51:17 52:23
  64:20 65:1 69:16
  71:7 84:10,13 115:1
  115:4,5,8 130:21
  131:3,9 138:18
  142:16 154:21 155:1
  159:12
**believed** 62:2 64:18
  66:8,12,15 70:10,12
**believes** 134:6
**best** 7:16,21 21:11 23:6
  45:7 60:1 115:11
  139:23 155:7
**better** 159:4
**between** 100:18 124:8
  154:10
**big** 125:21 126:1
**bigger** 125:6
**bit** 128:23
**bits** 44:14
**blanket** 7:18 8:12
**blanks** 43:15
**block** 147:3
**board** 6:3 35:13 113:22
**bold** 98:20
**bonuses** 159:6
**boss** 84:8,22,23,23 85:5
  116:18
**both** 54:22 133:12
  162:16
**bottom** 34:9 36:14
  43:12 44:1 121:22
**bounds** 101:13
**Box** 2:9
**boxes** 144:17,20
**Bracken** 19:16 91:4,6
  91:16,22,23 92:2,8
  140:3,14
**Bracken's** 18:17
**break** 73:2 77:9
**Brief** 77:13 124:20
**bring** 6:23 159:23
  160:5
**British** 86:23
**Bronte** 3:18,19,21
  77:19 78:13 86:22
  94:3 99:9,18 100:20
  102:2,6,7 103:12,16
  104:12,14 105:5
  132:7,9,12,22 133:1
  133:8,13 148:12
**brought** 110:9
**Building** 1:16
**bullet** 8:9
**bullets** 8:22
**burden** 6:19
**business** 11:1 70:1
  107:6

**Butch** 85:1,6,18 114:9
**B.S** 9:6

**C**

**C** 2:8
**calendar** 163:8,10,15
**call** 16:10,12 79:4
  83:13 84:20 85:7
**called** 17:17 59:7 60:14
  62:10,15,16 68:7,9
  84:9,22 85:3 104:1
  114:6 115:23 116:6
  121:16 142:20,23
**calling** 69:13
**came** 15:2 17:8 19:22
  20:9 39:12 59:14
  61:7 62:16 69:8,11
  78:22 82:5 88:1
  90:18 93:23 103:16
  112:8 121:7 122:10
  123:6 125:10 126:17
  142:2,6 145:7
**cap** 119:16
**care** 92:5 125:15
**case** 5:6,12 12:4,6,21
  74:6 80:7 89:16,17
  90:4,16 124:7 158:9
  111:20 112:12 113:3
**catalog** 3:5 24:23 26:14
  111:20 112:12 113:3
**catalogs** 26:17 111:21
**cause** 44:6 45:9 166:17
**caution** 40:14 98:1
**ceremony** 119:1,3
**certain** 23:9 113:16
**certificate** 102:5 166:1
**certification** 44:2,12,19
  45:3
**certified** 1:13 115:8
  127:20 128:1,3 158:6
  166:4,22
**certify** 20:7 45:4 166:6
  166:16
**cetera** 135:6
**challenging** 131:20
**chance** 44:7 45:10
**change** 109:21
**changed** 23:3 39:6,6,8
  39:9,12,14 77:18
  78:2,13 109:19
  132:14 133:16 143:5
  143:8,13
**changes** 39:3
**changing** 95:7 161:12
**charge** 3:22 9:2,20 10:7
  88:8,12,15,20 90:19
  90:19 91:1 94:10,11
  94:12,16,19 96:14
  97:12,18,19,21 100:3
  100:6,9 101:6 146:15
**charges** 9:22 15:20

95:8 146:15
**check** 145:2
**checked** 153:14,16,18
  153:20,22 154:1,2,7
**child** 157:11,12
**chooses** 84:2
**chose** 144:7
**churning** 148:17
**CIS** 21:14
**claiming** 154:16
**clarification** 100:12
  105:2,5
**clarify** 73:2 132:23
  133:4 135:17 140:13
  142:9
**class** 39:2 70:20 71:12
  71:13,15
**classes** 22:23 23:7 54:4
  54:6,9 57:5 71:9
**classification** 85:21
**clean** 126:12
**clear** 57:2 61:6 80:10
  105:3,11 150:1,5
**clearly** 101:13
**clerk** 3:7 33:21 34:3,13
  36:6 139:2
**clicked** 65:3
**close** 162:1
**closest** 62:13
**college** 4:2,4,10,12,13
  4:15 11:4,17,20,21
  12:17 13:14,20 14:8
  14:15 15:6,7 17:16
  27:11 47:15 48:21,23
  49:5,8,14,15 50:11
  55:14 56:11 57:4
  59:5,16 60:3,8,13
  61:20,23 62:6 63:15
  64:16 68:10 69:2,12
  72:2,4 73:5,8 77:15
  78:11 86:15,16,18,22
  93:8 94:3,3 99:11
  100:19 107:7,14,17
  108:1,3,13,16,20
  109:1,15 110:2,7
  113:23 115:19,21
  117:21 118:4,14,21
  119:8 120:15 121:6
  121:15 122:7,15
  123:8,13 124:1,9
  128:20 129:15,17
  130:15,16 132:10
  134:22 135:2,20
  136:16 142:20 143:7
  143:20 145:10
  147:19 148:11,12
  154:15 157:10,12
  158:2,4 160:21 161:2
  161:6
**colleges** 109:21 110:19

111:8 112:11 117:4
  134:10
**come** 12:7 17:21 47:17
  47:20 69:6 82:23
  94:21 102:21 127:7
  140:5 152:19
**comfortable** 127:6
**coming** 134:3
**commencing** 1:18
**Commissioner** 1:14
  166:5,22
**Commissioners** 51:4
**committee** 153:1
**compare** 25:3
**comparison** 29:7
**compensation** 46:1
**compensatory** 45:23
**complaint** 4:10 128:18
  129:7
**complete** 18:5 20:21
  36:16
**completed** 10:6 11:14
  21:9 23:18 38:3,11
  43:18 68:1 107:22
**completion** 11:3 22:9
  107:7
**comply** 107:19
**composite** 129:11,19
**comptroller's** 17:10
  33:12,15 91:8 140:4
  141:5,14
**computer** 22:3,4,4,6,7
  50:5,6,6,16 53:20
  57:6,8,10
**computer-printed**
  166:13
**concerning** 92:22 93:8
  100:13 129:16
**concerns** 89:8
**concluded** 165:17
**concludes** 138:17
**conclusion** 131:17
**conducted** 84:17
**confirm** 18:23
**connection** 100:18
**consider** 127:8,13
  162:12
**consistent** 45:21
**consistently** 116:15
  137:16 138:6 156:8,9
  159:5,9,15
**contact** 55:22 62:9
**contacted** 56:13 84:8
**contacting** 64:16
**contain** 166:14
**continue** 20:12 46:8
**continuing** 35:9 49:10
  67:11 137:13
**contract** 52:5,7,10
  54:18,18

Case 2:07-cv-00457-MEF-WC    Document 37-7    Filed 05/30/2008    Page 21 of 25
Transcript of Proceedings              Virginia Hopper                    June 22, 2006

Page 3

control 52:15
conversations 55:16
copies 4:16 82:3 138:16
  158:6
copy 4:3,8 18:6 38:13
  40:9 54:18 58:15,17
  58:23 78:21 83:4
  88:14 102:4 104:22
  120:14 123:19 125:7
  126:12,15 127:20,21
  127:23 128:15 137:2
  138:11,20 141:20
correct 7:13,16 17:2
  21:2 22:15 38:5
  40:13 45:7 47:4
  61:22 63:5 67:8
  72:11 105:16 108:17
  115:1,10 136:14
  142:11 144:3 150:4
  155:7 166:14
correctly 136:10
correspond 40:7 47:2
  65:21 123:1
corresponding 75:4
corresponds 26:15
  29:3
counsel 166:17
count 47:9
counting 96:1
County 35:13 166:3
couple 7:3 55:16 73:1
  80:10 112:3 117:10
  118:10 137:10
  144:12
course 11:14,18 21:9
  21:10,12,15,15,22,23
  22:2,5,6,6,7,8,11,12
  22:13 23:2,11,13,15
  23:18 27:8,16 28:10
  28:11,12,15,22 29:13
  29:15,21,23 37:12,18
  37:21 38:3,10,11,12
  39:3,5 40:3 50:3,22
  50:23 51:1,6,9,23
  56:2 57:6,8,10,20,22
  66:2,3,4,19 67:1,3,5
  67:16,16 68:12,15,20
  69:3,5 70:1,23 71:17
  72:3,5 73:7,7,16,18
  74:18 75:1,3 99:14
  107:22 108:6,7,10
  121:17,18 122:4,11
  122:14,20 123:1
  137:1 142:17 143:5,8
  143:11,13,15,17,22
  143:23 145:8,21
  147:23 149:16
  151:10,12,14 156:17
  157:8
courses 3:4,14 4:5 9:9

9:17,19 11:4,8,18,22
  11:22 13:15,17,21
  14:9 17:16 18:1 23:5
  25:2,4,6,16 26:3,5,15
  26:21,23 27:10 28:3
  29:8,8 30:19,21
  31:12 32:19 34:21
  37:4,8 46:9,13,23
  47:2,3,6,9,10,14,23
  48:14,17,20,23 49:3
  49:5,7,8,9,10,14,22
  49:22 50:5,6,10 57:2
  58:6,11,14,17,23
  59:18 60:2,4,5,7,15
  60:16,18 61:17,19
  63:6 65:14 67:18
  68:6,18 69:17,20
  70:8,9 71:21 72:4
  74:16 86:15,17 93:11
  107:8,10,12,17,19
  108:1,2,8,9,14
  109:11 118:2 120:23
  143:9,19 147:11,15
  147:19 148:3 149:12
  149:21,22 150:19
  151:2,5,23 153:8,13
  154:8 156:15,22
  157:6 158:5 160:22
  160:23
court 6:15 92:6 123:16
  123:22 124:7,12
cover 22:5 33:1-53:5
  covered 22:2,3
  covering 53:6
credit 47:14,20 48:13
  48:16 58:7 60:2,7,19
  61:19 66:3,22 67:17
  69:16 70:8,9 72:4
  107:16 119:12
  121:19 143:18 145:4
  145:15,20 147:23
  148:2 149:20
  credited 158:1
  credits 63:16 118:18,18
  119:13
criminal 45:19
CROSS 2:18,23
CROSS-EXAMINA...
  106:9 141:11
  cross-examine 19:17
  87:21 99:21
  crux 9:22
current 10:2 17:7
  26:13 99:12
  currently 146:22 150:7
  cut 104:4

_____ D _____

Darby 85:20 87:10
  114:10

dare 27:8
dash 6:7
date 5:13 8:2 18:23
  21:1 22:10 23:14
  38:5,12,15 82:21,22
  162:18
dated 3:10,11 36:22
  38:6 40:5 41:7 42:16
  94:13 96:3
dates 18:1 20:3,4 22:14
  33:8,9,10 137:21
Daugherty 1:13 166:4
  166:21
day 84:9 96:2,9 141:17
  141:18,23 142:7
  166:19
days 51:9,19,23 52:18
  53:9 57:12 71:3,4
  95:22,23 96:1,6,7,11
  100:3,5,8 162:18
  163:3,8,11,15 164:23
deal 154:13
dealing 70:13 103:7
dealt 132:9,11
DeBardelaben 2:4,18
  2:22 6:9,22 7:2 10:17
  10:18 14:2 16:7,9
  18:7,13 25:7 27:4
  30:7,8 32:1 36:1,2
  39:18,19 40:11 42:23
  44:10 48:21 58:22
  59:8,20 60:23 61:9
  61:12 73:20 74:20
  75:11 76:9 77:4,5,20
  77:23 79:3,7 80:18
  82:11 83:8,15 87:4
  89:14 90:11 91:20
  93:1 94:7,18 95:21
  96:18 97:1,16,22
  98:7 99:19 100:1
  102:12,14 103:10
  104:3,6,19,21 105:23
  106:6,10,19 117:6,9
  117:19 119:20 120:4,9
  120:16 122:18
  124:11 125:13,23
  126:6,14 127:1,17
  128:6,13 129:5,10,22
  131:6,14 132:5
  133:20 135:13,17,19
  136:2,6,19 137:6,9
  137:13 138:7 140:16
  141:7 146:6,8 153:5
  153:6 154:6 163:7,12
  164:4,9,12 165:2,11
December 22:21
decide 47:18
decision 163:5 164:23
decisions 114:17
decorum 6:17

deduced 10:9
defend 8:10,23
Defendant's 98:11
defending 8:2,19
defer 24:18
deferred 31:9 91:12
deferring 24:13
define 12:16
defined 11:18 108:2
  160:23
degree 4:3 9:7,14 10:4
  10:14,21,23 12:2,8,9
  12:12 13:5 14:7,18
  55:13 56:1,4,10,14
  77:16 78:12 84:17
  102:5 107:5 108:19
  113:13 116:2 118:22
  120:14,17 141:15
  147:22 148:9 149:21
  150:7,12 152:17,19
  156:1 157:23 160:10
  160:13 161:4
degrees 13:7 65:10
  111:12 115:19,21
  117:3 154:3
denied 15:21 44:6
  45:10 130:7
department 1:2,15 2:8
  3:16 5:7,19,23 17:10
  33:4 37:6 41:9 42:18
  43:20,22 50:14 52:5
  52:11,13,14 54:22,23
  55:1 57:14 72:21
  76:7,17 80:2 81:10
  81:14,17,23 82:3,18
  83:2,3,14 85:12
  111:18 115:15,20
  141:3,4 166:11
departmental 50:13
  53:14 57:7
departments 81:22
depositions 163:19
deputy 85:16
describe 29:15,22
  30:20 35:7 46:4
described 28:15
describes 28:22
description 26:20
  27:12,17 28:3,12,14
  28:21 39:4 40:3
  67:16 151:12
despite 150:6
determine 116:22
DHR 2:7,13 3:2,3 5:1
  6:18 16:3,10 17:1,5
  17:12,19,22 18:2
  23:20,22 24:23 30:2
  31:9 33:1,2,16,17,20
  33:22 34:1 35:21
  36:7,9,11 39:16,21

39:23 42:3,11,14
  43:6,9 54:22 56:6
  60:6 65:11,14 72:16
  73:13,15 75:23 76:3
  77:2 80:13 82:9,15
  83:6,12 85:19 86:2
  87:2 90:13 91:12
  93:14,16 94:5 97:14
  97:21 98:14 99:4
  101:18 102:9 105:13
  134:17 140:5 146:23
  153:10 154:4,6
  156:14,19
DHR's 19:22 130:7
difference 122:4 132:8
different 44:15 47:11
  68:17 102:15 104:16
  121:18,20 160:8
differently 116:17
diploma 58:8 64:4 65:8
  65:9 75:17 104:22
  105:6,7,19 106:1
  110:19 112:15
  113:14 135:11
  141:21 144:2 148:17
  150:15 155:10,13
diplomas 155:17
dire 99:20,23 102:18
direct 2:15,17,22 16:21
  79:20 114:13 117:18
director 76:13 80:5
  85:15,16,18
discharged 153:3
disciplinary 114:18,20
discover 123:6
discuss 45:14 86:9 94:2
discussed 59:11 90:21
  150:20
discusses 101:10
discussing 97:11 99:14
  133:6,16,18
discussion 17:14 58:18
  148:21
discussions 88:4
dismissed 14:5 15:20
displeased 140:10,12
disprove 89:15 90:1,5
dispute 13:13,18 74:4
disputed 20:4
disputing 133:21
distinction 161:8
District 123:22,22
  124:7
division 1:16 52:6,12
  52:16 55:8 85:22
  123:23
document 18:21 19:4,5
  20:8 25:10,15 26:1,9
  27:3,15 28:6,9 34:5,7
  34:16,17,21 38:2,22

000046

Transcript of Proceedings | Virginia Hopper | June 22, 2006

Page 4

| | | | | |
|---|---|---|---|---|
| 41:4 46:13 56:7 | 115:15 139:6,13 | 143:3,6 | fact 66:12,14 101:8 | 130:6 140:7 141:18 |
| 60:21 61:7 65:17 | employee 17:1 52:6 | examination 2:12 3:8 | 143:14 146:14,16,20 | 153:7 |
| 68:22 69:1,4,7 80:15 | 54:19 114:21 158:11 | 3:12 16:21 36:13 | 150:10 152:1,9 | five 11:4 13:20 14:8 |
| 81:6,19,20 82:16,23 | 159:1,18 161:10,16 | 43:10 79:20 117:18 | fair 56:20 71:20 | 47:2 54:9,11 77:11 |
| 83:5 86:3,5,11 88:6,6 | employees 115:21 | 147:2 | false 5:20 7:5,18 8:3,7 | 107:7,14 108:8 |
| 88:10,15 89:18,21 | 158:15,19 159:4 | examinations 81:20 | 9:4 44:6 45:9 139:21 | 139:15 149:22 |
| 91:13,16 92:1,16 | employer 51:6 52:3 | 82:17 | 146:17 155:2 | 150:18 151:6,23 |
| 93:4,20,23 94:2,8,14 | employment 6:8 32:23 | exceeded 159:15 | falsification 6:6 84:19 | 153:13 158:4 |
| 97:4,6 99:5 124:22 | 44:8,9 45:12,13,17 | exceeding 159:10 | 114:19 115:6,7,13 | five-minute 77:9 |
| 131:15 142:10,13,21 | 49:9 62:23 83:12 | exceeds 116:15 137:16 | falsified 10:5 84:16 | flies 152:12,18 |
| 144:13,14 145:7 | encyclopedia 93:19 | 138:6 156:8 159:5 | 152:10 | follow 46:3 49:13 96:20 |
| 155:5 | ended 25:17 | except 40:19 117:22 | falsify 10:10 157:16 | follows 16:20 79:19 |
| documentation 48:19 | English 157:9,11 | 139:7 | falsifying 115:2 155:3 | force 14:22 |
| documents 3:3 4:2 | enough 69:22 95:6 | exception 105:14 | 157:3,15 | foregoing 166:13 |
| 30:13 42:2 78:23 | entering 101:11 | exclusion 83:23 89:11 | familiar 35:7 116:10 | Forester 85:20 87:10 |
| 86:10 101:4,5,11,22 | entire 44:12,17 88:10 | 92:14 | 116:13,16 | 114:10 |
| 102:9,16,19,20 103:1 | 116:13 | excuse 20:22 23:2 40:3 | family 119:22 139:17 | form 36:16 44:3 46:5 |
| 103:7 105:12,13 | entirely 61:6 | 53:3 74:23 111:1 | 152:15 | 96:23 |
| 123:16 124:12 | entitled 6:5 8:8,14 | exhibit 3:1 5:1 17:12 | far 6:16 9:4 16:2 23:3 | former 140:23 |
| 148:18 | 124:23 | 17:19,22 18:2 19:12 | 92:20 105:18 146:7 | forward 80:12 125:20 |
| doing 132:18 159:8,16 | entry 4:6 123:18,19 | 23:20,23 24:6,21,23 | 154:9,17 | found 84:18 93:9 |
| 159:17 163:7 | envelope 19:10,11 | 30:3 33:22 34:2 | faxed 55:17 64:13 | four 11:5 32:19 33:6 |
| done 12:13,14,15 116:2 | equal 158:12 | 35:22 36:3,9,12 | 118:7 | 54:13 57:5 70:21 |
| 147:20 149:17 | equate 151:7 | 39:16,21,23 41:22 | February 33:13 | 107:8 126:23 150:21 |
| 157:16 159:2 161:10 | equivalent 11:8 60:18 | 42:11,14 43:6,9 56:6 | federal 163:13 | fourth 103:23 |
| double 92:11 | 68:13 107:10 143:10 | 60:6 65:11,14 73:13 | fee 119:14 148:19 | four-year 11:20 108:3 |
| down 11:2,10 27:6 | 145:8 151:1,5,14 | 73:15 74:14 75:19,21 | 152:20 | 108:15 161:2 |
| 29:13,17,19 47:9 | et 135:5 | 75:23 76:3 77:2 | fees 119:10 | frame 56:15 |
| 54:3 59:2 68:18 | evaluated 72:10 | 80:13 82:10,16 83:7 | few 106:6 141:10 | from 3:3,4,14,15,17,18 |
| 114:23 115:2 121:13 | evaluation 138:4,9 | 86:3 87:3 90:13 | fifth 29:13 | 3:19,21 4:3,8,11,13 |
| 134:7 144:7 152:14 | 156:7 | 91:12 93:14,17 94:6 | fight 139:7 | 4:14 9:7,11,14 12:11 |
| 155:5 156:13 160:20 | evaluations 4:16 | 97:14,21 98:11,14 | figure 8:1 56:1 59:1 | 12:17 13:13,15,19 |
| Dr 21:17 75:13 | 137:14,15,19 138:1 | 99:4 117:16 120:6,11 | file 82:8 83:4 | 14:15 15:4 17:23 |
| drawn 90:20 | even 10:8 13:18 19:23 | 120:13,20,22 127:15 | filed 123:21 148:1 | 19:5 20:9 22:20 25:5 |
| Drive 63:4,7 64:10 | 29:18 70:13 88:2 | 129:2,7,8,11,19 | files 83:5 138:13 | 25:11,18 40:15 42:2 |
| due 62:18 164:17 | 94:23 95:9 101:10 | 130:5 131:1 132:21 | filing 51:5 | 42:3 44:7,9 45:11,13 |
| duly 16:18 79:17 | 112:18 149:3 150:5,9 | 133:1,5 134:13,19,21 | fill 43:15 68:4 139:23 | 47:14,20 49:7 53:22 |
| during 101:11 110:1 | 151:16 | 135:1 137:5 138:19 | filled 62:22 147:1 | 55:13 56:10,12,14 |
| 112:1 | events 56:2 | 140:18 142:8 153:10 | 150:2 | 57:5 58:5,9 59:9,14 |
| | eventually 56:3 | 154:7 165:15 | filling 139:19 | 59:15 60:3,7 61:7,19 |
| **E** | ever 109:3 113:11 | exhibits 18:6 80:11 | final 4:6,7 23:11 | 61:19 62:21 63:16 |
| each 11:13 57:12 67:12 | 140:3 159:13 | 101:18 102:9 106:8 | 123:17,18,20 124:6 | 64:1 65:15 66:3,5,22 |
| 67:13 71:6,21 86:11 | every 65:4 158:10 | 117:12 124:4 129:12 | 124:23 125:4 163:5 | 67:17 68:10 69:1,6 |
| 107:22 145:12,14 | everybody 160:15 | 137:8 | 164:23 | 69:11 72:7,8 74:16 |
| 162:21 | everybody's 13:5 | exist 14:21 | finance 17:10 33:4 | 76:6,22 77:6 78:22 |
| earlier 27:21 64:14 | everyone 154:21 | expected 6:18 | 43:20,22 54:21,23 | 82:2 83:1,5,13 84:9 |
| 67:21 69:21 83:18 | everything 6:13 62:11 | experience 49:2 54:15 | 72:17,21 141:4,13 | 91:18 93:17,23 102:6 |
| educate 128:22 | 90:7 118:8 | 54:21 69:20,23 70:6 | financial 47:8 65:19 | 102:7,21 103:16 |
| education 35:9,13 | evidence 6:21 10:9 | 152:22 | find 48:2,3 67:15 119:7 | 105:7 108:19 109:9 |
| 49:10 | 13:23 24:4 35:22 | expert 30:10 | 122:3 142:13 | 113:14,20,21 117:4 |
| effect 143:18 144:1 | 73:13 83:22 87:3 | explain 100:18 156:18 | fine 23:9,10 106:20 | 118:11,20 120:15 |
| effective 73:22 74:8,21 | 89:12 90:6 117:1,5 | explained 72:6,9 | 136:1 161:9,10 | 121:18 125:10 126:1 |
| 81:1 | 131:20 133:14 134:8 | explanation 61:1 86:12 | finished 21:12 22:12 | 128:2,3 131:2 132:2 |
| eight 71:19 | 150:21 152:4 155:12 | extensive 110:4 | 54:12 | 134:3,22 135:2 138:1 |
| either 105:21 116:14 | 155:15 | extensively 110:2 | first 16:11,18 22:23 | 140:18 146:11 148:4 |
| 133:9,17 | exact 21:1 55:15 56:15 | e-mailed 62:10,20 | 28:9 46:7 47:2 56:12 | 148:10 150:12 158:1 |
| Elmore 35:12 | 68:16 76:19 137:21 | | 65:4 67:8 79:17 80:9 | 160:10,16 161:5,13 |
| employability 159:21 | 140:6 | **F** | 83:10 84:7 94:12,18 | front 18:8 74:22 |
| employed 43:17 45:20 | exactly 7:4,13 26:10 | face 87:18 152:13,18 | 96:12 98:21 103:14 | 102:19 121:18 |
| 80:19 81:8,9 84:14 | 62:8 68:6,13 142:16 | 161:7 | 114:7 116:9 121:23 | 122:11 |

Fryer 38:18
full 79:22
fund 53:6 57:19
Fundamentals 65:18
further 45:15 117:7,8
  136:19 144:10 146:2
  166:16

**G**

gather 126:2
gave 58:22 70:8 86:12
  95:11 117:22 119:11
  121:19 132:6 133:23
  141:17 142:4 158:6
general 6:16 29:22
  30:1 93:10
generally 30:20 157:6
gets 158:12 159:6
getting 6:13 55:13 58:6
  68:3 71:14 92:10
  145:3
give 31:11 84:1,2 95:10
  124:16 141:23
given 18:5 42:7 51:16
  68:20 69:16,22 88:13
  88:20 100:7 143:12
  143:18 144:2 150:14
gives 122:12
giving 21:17
go 5:5 11:10 13:2,4
  23:11 24:3,4,21
  29:19 32:11,22 47:18
  49:12 51:7 57:1
  67:12,14 70:17,19
  80:9,12 81:3 97:9
  101:20 118:23
  119:21,23,23 125:20
  133:3 137:12 145:17
  152:3,6,15 155:9
  156:16 157:13
  160:20 164:15
goes 11:2 19:12 27:2
going 6:10 12:22 13:1,3
  13:6,9 14:3 17:21
  18:13 25:8,21 26:11
  26:17,18 29:4 31:1
  41:22 42:7 44:11,13
  48:9 51:2,4 56:5
  60:20 61:10 67:12
  75:6,18 76:9 79:7
  90:9 91:21 92:20
  98:2 101:16,20
  108:11 113:13 117:9
  118:15,16 119:6,23
  120:2 127:21 131:22
  132:15,19,20 136:11
  137:21 138:7 140:8
  152:3,6 157:22 158:9
  158:13,17,18 162:1
  162:10,12,15,19

165:3
gone 115:18 142:4
  157:8
good 33:11 78:8 159:18
  162:6
Goolsby 85:19 87:11
  114:10
Gordon 1:16
gotten 70:2 91:18
govern 101:3
government 21:3,4
  32:16
governmental 29:12
  31:22 49:18 61:17
  151:9 153:15
gown 119:16
graduate 109:9
graduated 15:4 21:9
graduation 23:14
  119:1,3 135:5,8
  136:12
graduations 136:3
Graham 76:12,20
  84:11 85:14 87:7,10
  114:8
great 154:13
ground 74:3
grounds 77:21 125:12
Group 50:1
guarantee 13:7
guaranty 51:15 53:6,7
  57:17,19
guess 59:3 100:12
  108:11
guide 101:14

**H**

H 154:4
hand 16:15 68:23 69:1
  69:4 79:14
handed 88:22 99:4
handled 162:9
handwrite 122:1
handwritten 18:21
  121:23 125:2,8,14
  126:7,20 127:3,9,14
happen 126:11 149:11
happened 55:11,12,21
  84:21 132:13
happy 44:22
hard 152:14
hate 56:17
having 16:18 72:5
  79:17 90:23 96:8
  136:3 149:21
head 57:23
health 51:14 57:17
  115:16 139:16
hear 146:11
heard 96:15 116:16

141:18
hearing 1:6 5:4,10,12
  6:14 9:1,21 10:16
  15:18 16:2,6,10,14
  17:2 19:19 20:10
  21:19 24:2,9,17
  27:19 28:7 30:6,15
  31:1,10 32:4,7,18,21
  35:23 36:3 39:17,20
  41:3,10,15,19 42:10
  43:3 44:18 45:1 48:4
  48:12 49:3,11 52:2,8
  60:20 61:8,13 74:13
  75:6,12,14 76:15
  77:3,7,10 78:4,9 79:6
  79:10,13 80:7 81:3,7
  82:12 83:9,20 84:1,5
  88:17 89:1,13 90:9
  90:23 93:5 94:16
  96:8,22 97:2,8,13
  98:6,9,15 101:12,16
  102:11 104:2,17
  105:1,4,9,16 106:4
  106:21 117:13 120:8
  120:19 123:5 124:15
  125:18 126:5,11,19
  127:12 128:12 129:4
  129:8 130:1,4,12
  131:13 132:19 133:3
  134:11,17 135:16
  136:1,9,21 137:4,7
  137:12 138:17,18,21
  140:13,22 141:2,6,9
  144:11,19,22 145:6
  145:13,19,23 146:5
  146:10 153:4 154:4
  155:23 161:23 162:2
  162:3,9 163:10,16
  164:2,7,14 165:12,13
  166:9
hearsay 83:16,19,21
  84:4 89:12 92:11,13
held 55:3 119:4 136:12
help 48:10 100:17
  119:16
helpful 61:5
hence 161:14
her 8:5,5,6 9:5,11 10:2
  25:12,21 26:6 27:5
  27:22 31:14 32:18
  41:16 43:4 48:7,11
  58:22 60:9,14 75:5
  76:22 79:5 81:4,7
  84:16 88:1,3,9,16,22
  90:22,23 99:19
  100:15 102:17
  104:22,23 105:23
  106:16 107:12,14
  112:15 116:13,18
  119:11 120:1,3 128:1

131:8,16 132:16
133:23 138:10,13
140:8,9 145:12
146:17 147:1 150:11
150:14 151:4 152:10
153:12 156:7 159:13
159:21
high 35:18,19,20
higher 70:12
highest 159:12
him 18:9 85:2
history 48:1 54:3 55:7
  58:2 72:13
hold 41:15 61:13
  135:23 152:1,14
  157:22
holding 41:20 135:21
holds 146:23
home 68:7 142:2
**Honor** 25:7 27:4 30:8
  40:11 43:2 44:10
  76:10 80:18 83:16
  87:4 89:14 90:12
  91:20 94:7 95:22
  96:21 97:22 100:2
  104:9 106:1 120:4
  124:11 126:2,16
  127:2,17 128:6,13
  129:5,23 131:6 132:5
  133:20 135:13
  136:20 138:8 140:18
  141:8 146:9 156:7
**HONORABLE** 1:12
hoodwinked 13:11
  156:4
**Hopper** 1:5 2:3,10,14
  2:20,21 3:15 4:1,2,3
  5:9,16 16:13,14,17
  16:23,23 17:4 18:10
  20:14 26:12 32:22
  43:8 46:3 52:2 70:15
  72:1 75:2 76:2,11
  77:14 88:7 90:21
  91:9 92:15 93:1
  95:18 107:12 110:9
  112:8 114:14 117:11
  117:15,16,20 118:13
  120:5,10,11,13,20,22
  123:19 124:4,6
  127:15,23 128:7,21
  129:2,2,14 130:5
  131:1 134:11,19
  137:8 138:20,21
  139:1 141:13 146:16
  147:1 154:18 156:3
  156:20 158:10,21,23
  161:9 165:15 166:8
**Hopper's** 4:8 80:6
  83:12 116:10
hour 71:6

hours 46:2 70:17,18,21
  70:21,22 71:1,16,21
  142:5
**Human** 1:2,15 2:8 5:8
  5:19,23 80:2 115:17
  115:18,20 166:11
hundreds 18:19

**I**

identical 98:23
identification 5:2 17:13
  23:21 33:23 36:10
  39:22 42:12 43:7
  65:12 76:1 93:15
  97:15 98:12 101:17
  117:17 120:12,21
  124:5 127:16 129:3
  129:13 134:20
  165:16
identified 75:3
**II** 11:6,7 20:17,18
  28:19 31:19 32:15
  34:23 49:17 50:16
  53:20 57:11 107:9,10
  150:23 151:1,3,9,15
  151:18,21 153:21
imagination 147:18
  148:7
important 127:4
  160:19
includes 113:6
including 11:3 107:7
  108:5 135:5
Income 108:7
**INDEX** 2:12 3:1
indicated 9:3,6,13 38:4
  63:2
indicates 18:11 21:8
**Indicating** 138:3
indication 18:15 19:6
  23:14
individually 67:13
individuals 85:23
information 3:19,21
  4:11,13,14 5:21 7:5
  7:19 8:3,7 26:13 37:4
  49:21 55:4,5,11
  62:12 64:13 65:7
  68:1 70:2,3 84:3 86:6
  86:20 89:9 91:18
  92:17,21 93:3,7,10
  99:8 100:13,16 102:2
  110:5 116:1 118:16
  118:20 119:11
  129:16 130:17,20
  131:1,11 132:1,6
  134:1 147:5 148:4,13
  149:7 150:4 154:12
informed 83:14 85:2
  86:21

**initiated** 42:5 140:17
140:20
**injunction** 4:6 123:21
125:1,5
**inquire** 38:8
**instance** 22:20
**instead** 8:12
**institute** 70:11 72:14
**institution** 9:12 14:16
35:14 113:15 122:6
130:22 131:4,10
136:17 160:11,17
**insurance** 50:14 51:4
52:5,7,11,13,14 53:8
55:2 57:13 72:14
139:17
**intent** 7:20 103:5
**intentionally** 10:10
161:19
**interested** 72:19,22
166:18
**interesting** 11:10
**intermediate** 11:7
23:12 29:20,21 31:20
32:17 70:15 107:9
150:23 151:3,8,15,17
151:20 153:17
**International** 3:18,19
3:21 86:23 99:10
103:17 132:12
**Internet** 3:6 4:5,11,13
24:1 25:1 64:2 69:8,9
100:17 121:1,3
130:23 142:11,14
144:15 156:12
**intro** 35:1 37:16 38:18
**introduce** 42:8 100:5
120:5,17 122:19
127:22 129:23
**introducing** 131:7
**investigation** 9:13
84:18 85:20 86:14
91:2
**involved** 80:6
**involving** 83:12
**irrelevant** 30:14
**Islands** 87:1
**issue** 83:11 149:4,8
**issued** 81:21
**issuing** 136:2
**item** 19:2 29:13
**items** 98:19 135:4

**J**

**Jackie** 76:12 84:10,14
85:14 87:6 114:8
**January** 36:23 38:6
**Jeanie** 18:16 19:15
91:4
**Jim** 2:4

**job** 5:21 80:4 82:4
86:15 116:8,19
137:18 139:2 152:15
159:17 162:7
**Joel** 2:8 13:18 118:10
128:14
**Joel's** 127:19
**judge** 126:3
**judgment** 4:6,7 123:17
123:18,20 124:6,23
125:4,20,22,23
**July** 164:5,7,14,17,20
**jump** 163:17
**June** 1:17 5:13 20:21
25:18 73:22 74:8,21
74:23 94:22 95:13,14
97:20 166:12
**just** 6:11 13:11 14:17
18:4 21:20 24:9
25:12 26:7 27:14
30:11 32:14 39:13
55:8 56:1,5 57:1 58:7
65:9 66:18 68:16
71:11 73:1 75:2
77:14,21 80:11 86:13
87:22 89:17 92:12
93:9,12 97:23 99:1
104:15,21,22 105:2,3
105:4,11 107:20
110:4 113:4 117:13
117:15 124:7,16,18
125:18 127:3 129:19
132:15 135:14,17
137:15 141:10 142:9
144:11 145:9 160:12
164:16

**K**

**keep** 80:11 82:8 162:21
**kin** 166:13
**kind** 21:15,23 35:6
41:12 50:3,22 53:4
70:2 92:4,5 117:2
**King** 85:1,18 114:9
**knew** 14:19 15:14
38:18 80:22 150:3
**know** 7:4 8:4,18,20,21
14:6,11,22 15:2,12
19:11 22:1,18,21
23:4,8 24:15 25:22
27:23 28:1 29:1,6
34:7 35:12,15 38:15
38:17,21 40:12 41:2
45:8 50:4 56:15,16
56:18 58:11,13 59:20
61:23 62:4,5,6,8
63:21 66:9,11,13
71:3 78:19 86:13
87:13,14,15 95:4
98:2 111:3,23 112:1

112:16,17,18,21,23
113:19,21 114:1,4
118:17 125:9,14
131:19 136:23 140:9
140:11 148:20 154:9
157:5,7 158:17
**knowing** 72:2 78:15
**knowledge** 7:17,21
21:11 23:6 45:8
63:15 77:17 78:12,15
78:19,22 113:12
115:11 132:16 155:8
**known** 77:18 100:21
148:12
**knows** 14:20 147:21

**L**

**L** 2:4
**label** 31:5
**lady** 13:12 19:14
161:15
**laid** 92:4
**Large** 1:15 166:6,23
**last** 17:6 71:17 102:10
104:13 117:14,22
137:14 163:4 164:21
**late** 142:1
**later** 20:11 26:8 55:8
95:2 149:20
**latest** 25:13
**law** 2:4 158:13
**laws** 45:22
**lawsuit** 110:6 123:7,12
132:14
**lay** 92:7,9
**lead** 70:4
**leading** 80:7 154:20
**learned** 122:9
**learning** 69:23 70:12
**least** 56:17,18 95:5
96:7
**leave** 98:15 140:8
141:17
**led** 64:20 65:1 130:21
131:2,8,16
**Lee** 38:18
**left** 33:13,19 140:4
141:13
**Legal** 1:16
**less** 53:11,12 56:20,21
56:22 57:20 95:1,11
**let** 7:11 22:17 23:22
32:11 34:1 36:5,11
36:18 41:16 43:4
44:1 48:7 50:19 54:7
57:1 61:15 65:13
70:22 73:11 76:2,16
78:7 80:12 81:16
91:11 93:16 106:11

118:17 125:18
130:14 132:23
138:10 140:9,11
142:8 163:17 164:15
164:15
**letter** 3:15,22 8:17 9:2
9:20 10:7 19:8 36:22
37:1,3,5,7,10 38:6,8
38:22 76:4,6,8,12,20
76:21 86:13 88:8,12
88:16,20 90:19,19
91:1 94:11,12,12,17
94:19 95:7,15,17
96:15 97:12,18,19,21
98:23 100:4,6,10
101:6 141:17
**letters** 58:9
**letting** 127:6
**let's** 5:5 23:11 24:4,18
43:4 45:1 46:7,23
49:13 61:13 70:21
137:20 155:9 164:12
**level** 11:4,17 13:15,21
14:8 49:5 107:7,14
107:17 108:1,13
151:19 158:5 160:22
**Lewis** 18:23
**lieu** 45:23
**Life** 51:14 57:16
**like** 7:4 8:20 13:12
17:18 22:13 32:22
33:8 39:23 43:8
55:17 62:19 70:9
73:12 89:3,22 98:13
102:17 103:3,5 104:8
104:14 128:9 146:3
153:7
**link** 65:4 121:8,8
**list** 3:4,14 4:5 9:9 18:10
29:19 34:21,22 35:1
42:1 46:8,9,13,17
59:14 60:15 61:15
65:14 110:20 111:3,4
111:4,8,14,22 112:7
112:10,10,14,18
113:1,2,3,8 120:23
121:11 143:11 145:9
147:11,14
**listed** 11:15 20:5 21:5
22:8 25:4 28:12,20
38:20 47:1,9 58:11
60:4,6 65:22 67:5,19
68:19 69:17,21
107:23 118:1 144:6
147:6 153:13
**listing** 17:23 25:1 29:13
73:17,18 74:15,19
75:1
**listings** 75:4 137:1
**lists** 20:15

**little** 61:1 126:4 128:23
159:22
**located** 62:1,2,7,8
63:16
**location** 63:1
**long** 12:15 17:4 33:5
36:5 38:9,11 44:18
44:20 56:12 81:13
88:17,20 137:17
**longer** 56:19 86:21
**long-standing** 163:20
**look** 13:4 15:3 18:2
20:14 25:2 28:9,18
28:20 29:2,11 33:8,9
34:3,15 38:23 46:12
46:23 65:16 68:6
93:7 103:3,5,18
106:17,21 107:19
138:9 151:11 152:5
153:9 157:1 160:1
**looked** 27:11 72:13,21
92:16 93:11 158:14
**looking** 13:8 22:16
25:9 46:8 67:3 68:23
107:2 140:8
**looks** 104:14 127:23
**lot** 22:3 104:11 162:11
162:11
**Louisiana** 62:14
**lower** 151:19,19
**Lyn** 1:13 166:4,21
**Lynn** 18:23

**M**

**mad** 140:4,11
**made** 15:19 111:22
112:7,14,18 113:8,11
128:15 145:16
**Madison** 2:5
**mail** 64:9,11
**maintain** 82:7 83:3
**major** 107:5 108:4
**make** 14:4 24:10,14
39:3 54:7 57:2 61:2,2
62:9 103:2,5 114:17
120:2 136:8 138:10
138:16,19 146:4,17
161:7 164:12
**making** 119:17
**managerial** 22:9 29:17
31:23 32:1,5,9,13
37:19 39:14 49:18
153:18
**manner** 166:18
**manual** 101:9
**many** 13:9,10 14:21
15:5 22:20 51:9,19
51:23 53:9 70:16,18
71:1,17,21 115:14
116:5 118:18 124:14

Case 2:07-cv-00457-MEF-WC    Document 37-7    Filed 05/30/2008    Page 25 of 25
Transcript of Proceedings                Virginia Hopper                June 22, 2006

Page 7

126:19 139:14
**March** 17:8 22:10
  23:14 38:3
**mark** 117:12,14,15
**marked** 5:1 17:12,19
  23:20,22 33:22 34:1
  36:9,11 39:21 42:11
  42:14 43:6,9 60:16
  60:17 65:11,13 75:23
  76:3 80:13 82:15
  86:2 91:11 93:14,16
  97:14 98:11,14
  101:18 106:12
  117:16 120:11,20
  124:5 127:15 129:2
  129:13 134:19,21
  165:15
**Marsh** 2:8,15,17,23 9:1
  9:2,23 13:19 16:1,5
  16:12,22 17:20 18:4
  19:19,20 21:16 24:2
  24:8,12 26:10 27:19
  27:20 30:2,15,17
  31:7,15 32:3,5,11,20
  35:21 39:15,23 41:5
  41:11,13,18 42:1,13
  44:20 45:3 48:9 61:4
  73:12 74:15,23 75:8
  75:13,20 77:1,8,21
  78:6 79:2,11,21 82:9
  82:14 83:6,17 87:2
  87:22 89:5 90:13
  92:12 94:5 95:16
  96:10 97:6,9,20
  98:19 99:21 100:11
  102:8 103:4 104:20
  105:2,7,11 106:5,16
  106:23 117:8 118:12
  120:7,18 122:22
  123:4 124:15,16,21
  126:21,22 127:5
  128:11 130:3,5
  131:13,18 132:23
  133:5 134:16 136:5
  136:21,22 138:12
  141:9,10,12 144:9
  146:1,2,11,13 163:17
  164:6,11 165:9
**match** 143:1,3
**material** 57:3 73:5 86:9
  99:1
**matter** 6:23 25:5
  162:13 163:6 166:7
**matters** 15:22
**may** 25:19 44:6 45:9
  73:3 78:4 85:10 86:8
  94:13,17,20,20 99:19
  103:10 114:8,11
**maybe** 14:18 33:1 89:3
  116:3,5 157:18

**ma'am** 29:9 36:14 48:6
  49:12 54:5,5 55:19
  57:1 63:10,13 67:9
  71:1 121:11
**mean** 13:22 19:9 20:6
  34:6 47:17 55:15
  65:22 72:7 81:7
  89:22 95:14 100:11
  101:12 111:11 115:6
  122:15 127:5,9
  151:19
**meet** 91:3
**meeting** 85:5,7,9,11,13
  88:22 90:14,20 114:6
**meets** 116:14
**membership** 102:3
**memory** 25:5 60:2
**mentioned** 83:18
**merit** 90:2
**message** 62:18
**met** 86:7 88:21 157:17
**micro** 39:4
**microcomputing** 21:14
  21:22 39:13
**might** 12:19 14:12
  25:22,23 52:23 53:2
  128:22 155:2
**military** 45:18
**mill** 148:17 150:15
  155:11
**mine** 137:6
**minimum** 116:21
**minute** 6:11 48:4
**minutes** 77:12
**missed** 70:20
**misstated** 7:10 78:5
**mistake** 150:11
**mix-match** 103:1
**mix-matched** 104:10
**moment** 96:17
**Monday** 163:22 164:11
**money** 136:8
**Montgomery** 1:17 2:5
  2:9 109:16 166:3
**month** 56:19 89:2
  149:19
**months** 56:16,20,21,22
  112:3
**more** 24:19 49:19
  53:11 70:22 72:20
  73:1 77:14 128:23
  148:15 156:5
**morning** 17:15 18:7
**most** 17:7 72:18,19,22
  81:15
**mother** 15:4
**motion** 4:6 14:4 15:19
  15:21 24:10,14
  123:17,19
**move** 120:5,16 122:18

128:7 129:22
**much** 6:15 52:15 71:8
  71:13 140:12 148:14
**must** 11:5 107:8,18
**myself** 73:4 93:13
**M-G-I-G-F** 52:22

### N

**N** 57:15
**NAIC** 50:17,21 51:22
  52:17 57:14
**name** 5:10 18:17 19:15
  63:1 66:15 77:18
  78:2,13 79:22 104:23
  117:14 123:14
  133:15
**names** 85:23 109:19,21
**National** 51:3 57:16
**nature** 74:9 76:19
  83:21
**necessarily** 27:7
**need** 6:10,12 15:23
  23:8 29:6 42:20
  44:22 47:11 73:2
  106:3 107:3 137:20
**needs** 61:1 152:1
**negates** 115:13
**neither** 133:8 166:16
**never** 62:21 70:20 72:1
  132:11
**new** 68:12,14,20
  143:15 145:10,11
**next** 22:8 36:7 42:13
  47:6 51:11 52:18
  55:12,15 79:11 84:21
  90:15 101:21 163:13
**NIC** 50:20
**night** 152:16
**nine** 95:22
**nods** 57:23
**NOIHGA** 57:14
**NOL** 50:18 57:16
**NOLHGA** 51:12
**None** 149:16
**Nonrecognized** 103:20
**note** 11:11 107:18,19
  160:20
**notes** 126:20 127:3,9
  127:14
**nothing** 16:19 18:18
  74:1 79:18 87:7
  96:15 117:8 157:16
  159:20 165:13
**notice** 95:20 96:7,11
  100:7
**November** 3:11 42:16
  82:22 110:11 166:19
**number** 7:3 39:7 41:21
  59:6 60:14 62:15
  65:21 68:8,17 87:6

97:4 121:13,14,15,22
  122:1,3 128:7,21
  134:15
**numbers** 26:4 31:12
  39:13 62:10 68:12,15
  68:20 69:3,5 121:17
  121:19,20,21 122:4
  122:12,15,21,23
  123:1 142:18 143:1,5
  143:8,11,13,16,17,22
  144:1,7 145:10,11
  156:13 157:8

### O

**O** 1:12
**object** 18:14 19:18 25:8
  40:21 44:11,14 74:2
  76:10 81:2 87:5,12
  87:19 90:11 91:21
  94:8 97:17 98:1
  102:16 125:11
  138:14
**objection** 20:11 36:2
  39:19 43:1 75:9,11
  77:20 78:8 82:11
  83:8,15,20 96:13,23
  98:4 103:11 120:7,18
  123:4 124:22 128:11
  130:1 136:5
**objections** 77:6
**obligation** 92:2 101:2
**obtain** 82:1
**obtained** 132:1
**obviously** 83:23 89:6
  94:9 100:23
**occur** 72:1
**occurred** 114:7
**October** 3:10 40:5 41:7
  80:20 81:1
**off** 3:5 4:5 23:23 25:1
  45:23 64:2 69:8,9
  100:17 103:14,15,19
  120:23 121:2 130:23
  142:10 144:15
  153:14,17,18,20,22
  154:1,2,8
**offer** 30:2 35:21 39:15
  40:1,8 41:11 42:13
  42:19 73:12 77:1
  82:9 83:6 87:2 94:5
  102:8 124:12 135:14
  138:8
**offered** 20:1 93:12
  118:23 125:17 126:9
  131:20 132:17 133:6
  135:1,4 139:10
  155:12,15,22
**offering** 30:23 133:2
**offerings** 99:14
**office** 3:3 17:11 33:12

33:15 41:8 42:4
  72:17 80:3 83:4 85:6
  90:18 91:8 111:5
  140:5 141:5,14,14
**officer** 5:4,12 9:1,21
  10:16 15:18 16:2,6
  16:10,14 19:19 20:10
  21:19 24:2,9,17
  27:19 28:7 30:6,15
  31:1,10 32:4,7,18,21
  35:23 36:3 39:17,20
  41:3,10,15,19 42:10
  43:3 44:18 45:1 48:4
  48:12 49:3,11 52:2,8
  60:20 61:8,13 74:13
  75:6,12,14 76:15
  77:3,7,10 78:4,9 79:6
  79:10,13 81:3,7
  82:12 83:9 84:1,5
  88:17 89:1 90:9 93:5
  94:16 96:22 97:2,8
  97:13 98:6,9,15
  101:16 102:11 104:2
  104:17 105:1,4,9,16
  106:4,21 117:13
  120:8,19 123:5
  124:15 125:18 126:5
  126:11,19 127:12
  128:12 129:4,8 130:1
  130:4,12 131:13
  132:19 133:3 134:11
  134:17 135:16 136:1
  136:9,21 137:4,7,12
  138:18 140:13,22
  141:2,6,9 144:11,19
  144:22 146:5,6,13,19
  145:23 146:5,10
  153:4 154:4 161:23
  163:10,16 164:2,7,14
  165:12
**offshore** 150:15
**oh** 53:17 56:3 118:12
  157:4
**okay** 16:3 24:21 49:11
  52:21 53:14,16 54:1
  54:14 55:20 56:3,21
  67:10 107:11 108:13
  118:12 129:4 145:23
  156:19 165:11
**old** 99:10 157:7
**one** 7:3 8:21 10:1 19:2
  19:13 29:14 41:16,17
  42:22 47:11,12 50:19
  51:11 52:18 53:1,3
  53:10,16,22 54:12
  56:5 59:7 67:8,12
  69:9 71:21 77:14
  84:13 87:6 92:9,14
  95:4 105:17 106:15
  106:22 107:2 113:17

124:16 125:3,8
126:22 133:9,17
134:5 136:17 137:3
140:17 142:3 145:12
145:14,15,16 151:23
154:22 157:4 159:3
ones 31:13 75:5
one's 29:18
only 12:4 19:2,13 40:19
74:8 76:12 78:22
92:8 124:21 126:15
139:16 149:22
162:23 164:20 165:2
on-line 15:1 65:10
93:18 129:14 149:13
149:14
open 162:22 163:1
164:19
opening 14:5 16:3
operated 22:4
opinion 76:17
opportunity 89:7 91:3
118:23
option 139:5,9,10
order 4:6,7 119:16
123:17,18,20 124:6
125:1,4 126:13 163:4
164:22 165:8
ordering 165:10
orders 162:17,20,22
163:2 164:17,19
original 4:10 121:21
127:20 128:8,17
129:6
other 15:22 35:13
49:21,22 50:10 53:1
53:2 55:3,5 73:4
113:1 139:10 145:9
147:10 158:15
162:21
Otherwise 98:22
out 7:12 8:1 15:2 17:23
40:13 43:15 48:3
56:1 59:2 62:22 68:4
82:5 83:18 84:8
93:13 94:11,19 97:23
104:8 117:10 118:10
119:7,21 122:3
135:23 138:13
139:19,23 147:1
148:18 149:14 150:2
156:5 163:21
over 38:7 51:2,4 52:15
62:17,17 68:11,21
71:6 81:12 85:21
89:1 91:7 114:6
116:3,3,5,6 145:12
145:14
overrule 98:3
overruled 20:12 28:7

84:5 97:2 98:6
overtime 46:1,2
own 51:7 94:23 96:20

_____ P _____
package 125:6,21
126:1,4
packet 86:10
page 46:8,12 62:23
65:16 93:22 98:21,22
102:19 117:22
122:10 130:6 152:7,7
pages 3:17,18 34:15
93:17 104:16 129:20
166:13
paid 119:15
paper 29:2 117:5
148:10,15 150:14
papers 78:16
paperwork 64:8
110:17
paraphernalia 136:8
part 47:1 56:5 75:20
91:2 114:7 118:11
125:5 150:11
particular 88:5 125:8
145:20
parties 166:17
parts 22:4 130:11
past 33:2 112:3,5
152:22
Paul 85:15 114:8
pause 124:20
pay 148:19
paying 152:20
people 13:10 87:21
115:14 116:3 124:14
148:18 152:13
per 18:23 71:1,10
perform 116:19
period 26:4,5 27:18
40:8 112:2 138:2
149:10
permanent 4:6 123:20
125:1,5
permission 127:19
personnel 1:6 3:3,15
5:9 6:3 37:6 38:8
41:9 42:4,18 76:7,13
76:17 80:2,5 81:14
81:17,22 82:3,6,18
83:3,13 84:10 85:3,4
85:8,12,15,16,18,22
86:7,20 90:15,17,22
101:9 109:2,6 110:22
111:5,5,18 113:22
114:13 116:7 138:13
166:9
Persons 1:16
peruse 128:10

Philip 1:12 5:10
Phoenix 15:1
phone 62:10,15 68:21
84:20 121:13,14,15
145:1
physically 63:11
piece 24:3 29:2 148:10
148:15 150:13
pieces 44:14
place 85:9,11 110:11
110:13
placed 116:23
places 14:21 47:11
110:19
placing 100:22
planning 165:9
please 20:13 45:2 48:6
51:11 53:13 79:22
81:4 138:23 140:15
plenty 152:5
point 40:1 56:12,13
79:9 80:23 83:18
104:8 139:5 141:20
161:13 165:10
position 3:7 9:11 10:2
10:11,15 33:17 34:3
36:6,7 80:21 82:19
99:3 116:23 146:22
147:13 150:9,17
152:2
positions 55:2,3
positive 57:9
possession 19:22 26:18
88:1 144:6
predicate 92:7,9
preparation 71:13
prepare 34:19 46:17
preparing 71:9
preponderance 6:20
prerequisite 151:20
prerequisites 151:17
present 2:10 89:18
118:6 156:17,21
presented 4:2 88:9,13
88:16 95:17 117:20
117:23 118:3,8,17
149:6 162:4
presenting 90:6
preserve 98:7
previously 48:18,20
49:1,4 91:11 106:11
130:7
primary 100:13
Principles 11:6 18:12
20:16,18 28:11,13,19
31:17,19 32:14 34:23
49:16,17 107:9
150:22 153:20,23
printed 69:9
prior 17:9 32:23 33:2,7

33:14 45:17 47:23
55:2 96:16 116:22
private 35:10
probably 21:2 23:7
27:13 40:22 74:4
109:2 110:22 133:22
156:4 158:17 160:15
problem 73:21 104:7
126:8
problems 154:14
procedure 6:17 101:3
procedures 87:16
99:16
proceed 6:14 16:4,8
28:8 32:8 84:6
138:23 141:6
proceeding 101:15
proceedings 1:12
165:17 166:7,15
process 51:5
produce 142:5
produced 50:7 103:2
programs 50:5
promoted 137:22 138:5
prompted 37:5 76:6,8
proof 6:19,20 40:15
proper 19:4 157:19
properly 40:20
propose 164:3
proposed 162:17,20
163:2,4 164:16,19,22
165:7
protection 158:13
prove 12:11 89:16,21
90:3,8 156:15
proved 155:23 156:3
proven 41:1 146:14
152:9 155:11
provide 7:6 49:14,20
54:9,11 55:5 70:3
95:19 106:16 147:4
provided 3:3 5:20
18:11,16,20 38:2
42:3 46:14 49:8,16
49:21 50:11 54:2,6
54:12,14 55:4,6 58:3
58:15 67:22 70:5
78:17,20,23 82:17
86:7,20 88:7,11
90:23 91:17 100:14
101:5 133:13 148:13
151:13 154:12
providing 37:3 55:10
public 35:10,11 115:16
pull 7:11 121:11
137:21 142:17
156:11
pulled 60:10 68:3
94:10,14 100:16
110:5 121:2 129:16

129:20 142:10
purport 40:17
purported 40:23
purpose 131:7
pursue 114:18
pursued 114:20
put 20:6 31:4,5 59:2
63:22,23 68:18 71:8
71:20 89:21 91:23
92:2 98:4 105:23
114:22 115:2 123:1
126:16 134:6,8
139:21 144:19
156:13
puts 159:11
P.O 2:9

_____ Q _____
qualification 11:13
116:8
qualifications 107:3
116:22 146:21 160:3
qualified 10:1 30:12
99:3 116:19 150:8
152:11 160:1,4
161:21
qualifies 158:8
qualify 69:23
qualifying 11:16 108:1
160:21
question 25:12 26:19
28:8 29:14 48:7,15
68:8 70:7,14 76:14
77:22 78:5,10 81:4
84:6 87:9 89:9,20
105:17 107:11,15
111:14 113:7 125:19
143:23 156:10
questionable 115:23
questioned 115:22
questioning 20:2 26:6
141:15 149:7
questions 77:15 79:4,8
117:7 136:20 137:11
144:12 146:3
quote 116:7

_____ R _____
race 8:6
raise 16:15 79:14 96:19
raised 96:13
ran 103:19 162:3
rated 137:17
rather 21:10 68:18
143:12
Re 1:5 5:8
read 8:16 28:14 44:2,5
44:16,22 93:10 101:8
107:3,20 155:4
reads 44:12

**ready** 16:4,8 68:4
71:14
**real** 11:9
**realizing** 158:21
**really** 53:10 149:3
152:12,18
**reason** 5:16 38:13
40:19 68:5 69:13
72:10 87:12 123:11
130:14 136:15
**recall** 58:12 117:11
**receipt** 163:3 164:21
**receive** 45:22 66:22
118:19,21 134:21
135:1 163:1
**received** 4:3,14 23:13
37:7 38:9 47:14
56:10 60:19 64:3
66:3 76:21 83:13
92:22 106:2 118:20
120:14 131:2,12
**receivers** 53:8
**receivership** 52:12,16
55:7 72:15,16,20,23
**recess** 77:11,13
**reclassified** 139:2
**recognize** 14:4,6 56:6
76:3 80:15 86:3
91:13 93:19 99:5
101:22
**recollection** 85:14
**recommend** 152:23
**record** 5:5 7:1 18:5,19
19:21 30:19 42:6
44:23 54:8 82:5
116:11,14 159:2
162:22,23 164:18
**records** 6:6 45:20
114:19 158:7
**redact** 125:13
**redacted** 125:16 126:9
127:2
**reemployed** 139:14
**referred** 124:8
**reflect** 123:16
**reflects** 26:21 27:22
28:2,15
**register** 44:8 45:12
47:19 76:18
**registered** 38:10 39:2
39:11,12
**registrar** 19:1
**registration** 38:14 39:1
**regulation** 113:12
117:3
**rehire** 76:18
**reinsurance** 50:17,21
51:5,22 52:6
**relate** 156:23
**related** 9:10 99:2 154:9

**relation** 75:15
**release** 45:16
**released** 44:8 45:13
**relevant** 25:16 27:15
28:6 45:17 74:6
83:19 147:12
**remain** 162:23 164:18
**remaining** 130:11
**remember** 48:10 53:10
70:18 76:19 85:23
86:1 88:21 142:15
156:14
**removed** 44:7 45:11
**render** 163:5 164:22
**reoffer** 131:23
**repeat** 48:5,8,15
**repeatedly** 62:16
**repeating** 73:4
**reported** 1:13 166:6
**Reporter's** 14 166:5,22
**REPORTER'S** 166:1
**represent** 154:23
**represented** 133:23
**represents** 74:10
**reputable** 70:11
**require** 14:11,14
108:18 134:9 149:15
**required** 37:9
**requirement** 10:15,19
10:22 157:18
**requirements** 157:20
**requires** 148:23 149:1
150:18
**research** 93:6 110:1,2,4
**researched** 87:15
115:19,20
**reserve** 79:4,8
**resign** 139:12,13
**Resources** 1:2,16 2:8
5:8,19 6:1 80:2
115:17,18,21 166:11
**respond** 75:2 87:22
92:13
**response** 10:18 30:16
57:9 62:21 76:22
**rest** 146:7,8
**restate** 78:9 164:16
**result** 84:20
**results** 166:18
**resume** 34:16,19 36:19
36:20 38:20 46:20
65:22 67:4 153:12
**resumes** 49:1 54:2,14
58:2 70:5
**returned** 85:5
**returns** 85:6
**review** 21:21 24:20
85:8
**revolved** 88:4
**re-move** 130:10

**right** 5:4 8:17 16:15
19:23 21:20 24:17
32:7 34:13 41:17
53:18 54:4 66:17
69:13 75:12 79:1,10
79:14 82:13 105:9
106:4,23 111:6 135:9
138:22 146:10
161:23
**ring** 135:8
**rings** 136:3
**room** 39:7 138:16
160:15
**roughly** 56:16
**rule** 113:11 117:3
162:10
**ruled** 104:17
**rules** 6:2 92:14 95:1,10
95:19 96:20 101:2,8
101:14 108:22
113:22 161:13
**ruling** 91:12
**run** 22:17,20 35:12
103:13,15

---

**S**

**sale** 135:5
**same** 13:10 15:11
25:22,23 29:7,8,14
43:1 47:3,12 67:7
68:7,16 102:21
106:15 122:14,15
123:14 125:21
133:14 136:17
141:23 143:9,21
151:16 154:22
157:10 158:20 160:6
165:6
**sample** 102:4 105:7
**San** 3:14 9:8,15 62:2
63:4,7,17 64:10,18
64:22 65:15 66:5,19
66:23 67:18 119:5,19
119:20 123:12,23
136:12 147:7 154:19
**Sandy** 84:11 85:16
114:9
**sat** 149:22
**saw** 112:10
**saying** 58:21 60:17
62:18 78:18 102:23
114:2 159:7
**says** 7:11,20,23 15:17
18:22 46:9 47:8
73:22 74:5,21 108:23
114:4 117:2 147:11
155:5 160:21
**scenario** 67:7
**schedule** 23:10
**scheduled** 70:19 85:7

88:22 90:20
**school** 14:16 35:5,6,10
35:17,18,19,20 37:13
38:19 45:19 47:19
50:15 52:19 53:19
57:19,21 59:4 63:1
70:17 152:16
**schools** 147:5
**science** 14:18
**second** 67:3 98:22
103:18 124:17
125:22
**section** 6:5 7:7 52:13
**see** 6:12 20:3,15 26:19
28:14 31:2 46:9
65:17 66:7 80:9
93:12 112:1 126:5
128:16 136:22
137:20 147:13
158:14
**seemed** 72:18,19,22
**seen** 13:14 93:22 109:3
109:4 111:3,13,15
122:22 124:17
**self-proving** 87:18
**selling** 136:4
**semester** 23:1,3
**seminar** 50:17 51:2,12
51:14,19,22 52:17,23
53:4
**seminars** 57:11 148:5
152:21
**send** 55:22 65:7
**sends** 82:3
**sent** 48:13,16,19 49:1
51:6 56:4 64:8 65:9
83:2
**separately** 11:15
107:23
**September** 22:21
**service** 45:18
**set** 22:22 85:4 119:15
**several** 58:9 140:7
**sex** 8:5
**share** 162:19
**sheet** 68:11 103:14,18
103:23,23 121:17
122:23 136:23
146:15
**sheets** 104:11
**short** 119:12
**Shorthand** 1:14 166:4
166:22
**shotgun** 8:13
**show** 14:10 15:14
17:18 23:22 26:2
34:1 36:11 43:8 56:5
65:13 73:11 76:2
80:12 82:15 86:2
91:11 93:16 98:13,18

101:20 106:11
110:17 124:13
127:18 135:4,15
142:3 157:5
**showed** 25:18 78:20
130:17
**showing** 26:1 39:1 58:6
59:16 132:2
**shown** 87:7
**shows** 18:19 135:19
154:12
**sign** 126:3
**signature** 34:9 36:14
36:23 43:11
**signed** 44:3 66:15
126:3,13
**significant** 127:11
**signing** 66:17
**silver** 8:9,21
**simplify** 81:16
**simply** 30:17 148:6
**since** 31:8 81:15 97:10
115:14 122:9 138:4
159:14
**sir** 7:2 16:5,9 17:6 31:7
31:10 52:22 61:12
63:14 66:21 67:2
68:22 72:6 74:20
75:20 79:10 81:5
82:14 90:2 97:1
102:14 103:4 105:8
106:4 108:12 110:14
111:2,7 112:4,17
113:10,17 114:12,15
116:12,21 119:20,22
122:13 123:10
126:14 129:18
130:19 131:5 134:23
135:7 136:14 139:4,8
139:11,18,22 141:1
141:22 142:1 143:3,6
144:4,8,18,21 145:5
145:22 153:6 155:19
161:22
**sit** 20:23 58:13
**site** 3:18 64:23 74:17
93:9 99:9,12 102:22
105:8 110:5 121:8,9
130:23 131:2 132:2
**sitting** 27:13
**situation** 13:11 15:11
112:8,15 129:1
140:21 158:16,20
**six** 56:20,21,22
**slash** 45:19 52:22
**slide** 6:10
**slightly** 135:18
**some** 17:14 24:19
35:13 41:11 78:16
89:8 92:7 93:11

98:21 99:1 104:10
113:1 115:22 119:1
148:3 152:21
somebody 114:22
somebody's 116:7
someone 68:9 84:9,15
147:18
something 18:22 39:7,9
55:23 64:23 78:20
89:3 100:5 103:3,6
104:1 108:6,7 114:23
115:22 155:1 156:12
157:2 161:18
somewhere 37:15
sorry 21:6,16 30:4
32:12 33:20 50:7,19
53:17 58:20 60:11
61:8 75:8 78:7 79:6
107:13 163:18
sort 86:12 93:9
source 67:23 113:2
114:1 139:16
sources 112:20
speak 16:19 79:18
Speakman 84:12 85:17
114:9
specific 8:21 101:7
specifically 49:19
spoke 60:9,11
Stadium 63:3,7 64:9
Stan 85:19 87:11 114:9
stand 27:20 147:23
standard 6:19 22:19
standards 116:14,15
137:16 138:6 155:16
155:19 156:9 159:6
159:10,16
stands 156:5
start 13:8 22:18 81:11
96:1
started 33:20
starting 31:16 47:6
163:13,22
state 1:1,14 3:3 5:7 6:3
6:15 12:13,14,15
13:3 14:10,14,20
15:5,6,7,8 17:17 27:6
27:15 38:7 41:8 42:3
42:17 52:8 76:13
79:22 81:22 82:3,18
83:2,13 84:9 85:3,4,8
85:12,22 86:6,16,19
90:14,17,21 108:18
109:2,6,10,14,15
110:20,21,22 111:10
111:18 112:23 113:4
113:11,22 114:13
116:6 117:2 134:7
139:6 140:19 148:22
155:10,11 157:18,20

158:11 159:11
161:11,12 163:22
166:2,5,10,23
stated 30:18 91:17
statement 7:14 9:4
17:22 29:1 44:2,3,13
44:16,17,19 45:4
statements 44:6 45:5,9
115:9 146:17
states 101:10 113:6,9
123:21
state's 159:4 165:3
statistics 70:1
stay 138:15 139:6
step 55:13,15
steps 90:15
still 10:12 12:18 31:7
104:9
stop 22:19 50:19
straight 80:11 142:2
straighten 117:10
stretches 147:17 148:6
Strike 107:15
study 3:14 65:15 71:14
71:14
stuff 87:13
style 5:6
subject 17:1
submit 130:10
submitted 46:14 57:3,4
64:7 72:7 73:5
149:17
submitting 148:3
152:21
subsequently 122:9
suffice 152:8
summary 86:13
summation 146:4
summer 23:5
supervised 91:9
supervisor 85:21 91:7
140:23
supplied 47:22
supplying 38:13
supposed 119:19
sure 23:4 27:16 29:5
33:10 35:16 51:18
54:7,8 56:18 57:2
71:18 99:22
Sustained 43:3 76:15
sworn 16:18 79:17
system 23:1,2,3 90:3
S-I-R 52:22

T

take 13:20 18:2 20:17
21:4 22:10,13 23:15
25:4 47:10 50:23
66:2,18 67:5,16 72:2
73:1 77:8 85:9,11

88:10 99:19 102:17
109:11 114:14
119:13 149:12
162:13
taken 3:5 4:5 9:10,17
9:18 23:23 25:1 26:3
26:16 34:22 37:11
45:15 47:23 48:17,20
49:1,4,23 50:10
69:21 77:13 90:15
93:17 114:16 147:16
147:19
takes 72:2 157:11,12
taking 38:10
talk 133:9
talked 38:17 54:20
64:13 86:14,18 90:17
90:18 136:11
talking 24:6 58:18 59:3
60:14 119:8 122:6,7
talks 133:10
tassels 135:5
tax 108:7
teacher 15:6
tech 3:8 36:8,13
TechnaCenter 50:2,9
technicalities 62:19
159:22 160:5,7
technicality 14:13
technician 3:9 40:2,4
41:6 57:6 80:14
Technology 50:1
telephone 55:16 60:9
60:12 62:18 119:9
121:22 122:3
tell 13:20 19:14 21:1,23
27:1,9 28:21 34:4
35:2 41:3,21 49:19
49:22 50:3 58:13
60:1 66:11 83:10
119:16 120:13,22
121:2
telling 37:7 113:20
119:10
tells 122:19 161:3
terminated 161:17
terms 22:17 29:22 30:1
test 38:12,15 45:14
testified 16:20 67:21
79:19 87:23 88:3
106:14
testifies 61:11
testify 19:20 20:10
92:20
testifying 101:1
testimony 24:20 40:18
60:5 61:21 69:15
73:6 75:15 142:19
143:4,6
testing 44:7 45:11

tests 71:14
Texas 3:14 9:8,16 51:1
51:17 53:1 62:3 63:4
63:8,17 64:10,19,22
65:16 66:6,20,23
67:6,18 73:18 74:17
119:5,19,20 123:23
124:7 136:13 154:20
thank 31:10 32:3,21
42:10 49:11 72:16
107:1 161:21 162:2
their 8:16 15:16 23:10
27:16 77:18 78:2,13
90:4 94:23 95:9
96:20 99:12 105:8
115:19 136:7 149:7
155:16 161:13
Theirs 132:8
themselves 135:22,23
160:7
thereof 166:18
thing 42:5 55:12 62:13
68:16 71:15 134:5
143:21
things 117:11 118:10
141:10 159:2
think 6:22 7:9,10,18,19
8:8,13,15 13:13,17
15:13,18 23:6 24:5
25:14,17 26:7 30:11
30:12 32:23 35:3
57:15 59:22 63:18,20
69:22 70:4,14 71:8
72:11,20 74:5 78:4
80:21 94:20,23 95:12
98:3 102:15 104:3,17
106:2,7,12 108:10
114:7 115:11,13
127:10 150:1,5,19
154:11 155:4 160:13
160:13,14,14 161:15
thinks 160:16
third 29:20 46:12
103:22
Thomas 85:15 114:8
though 88:2
thought 12:10 14:23
64:21 122:14 128:15
130:15 136:15 148:9
156:23 161:20
thousands 13:6 158:18
three 57:11 70:21,22
89:3 112:5 126:23
137:15
through 22:21 23:5
25:19 42:8 67:12,15
75:22 86:11 87:17
104:4 105:13 119:1
119:13 124:19
136:12 149:22 152:4

152:7
thumb 124:18
Thursday 1:17 166:12
time 5:14 12:20 17:7
22:11 23:17 26:3,5
27:17 33:3,18 43:18
45:23 52:4,14 56:15
63:19 64:6,15 65:5
66:8,13 67:14 70:14
71:6,8,12,12,13,13
71:14 79:9 80:23
81:15 86:19 88:8,12
91:9 95:5,10 96:12
101:6,7 112:2 113:17
115:1 116:9 119:15
120:1 132:17 138:2
139:6,19 144:1
timeliness 96:14
timely 100:15
times 22:19 70:19
116:5 140:7
today 5:13,17 17:2
80:7 95:1,16 110:17
111:1 117:2 148:21
162:10
today's 5:13 162:18
together 47:13 52:23
101:21 103:2
told 37:11 38:9 53:2
60:17 68:13 85:3
90:22,22 120:1 140:3
140:6,7,7 143:4
145:11
tomorrow 95:23
163:19
top 31:16 42:17 86:13
103:21
total 70:23
Totally 17:6
touch 120:3
toward 55:13 108:8
towards 108:4
town 84:8 142:6
training 50:13 53:14
57:7
transcript 4:8 58:5,9
58:12 59:15,18 67:22
67:23 68:5,19 69:11
121:21 128:1,3 143:2
144:2,5 151:4 165:5
165:7 166:14
trial 6:15 163:13
tried 62:9,19
Trinity 3:14 4:2,4,10
4:10,12,13,14 9:15
15:12 47:15,15,19,21
47:22 48:2,19,23
49:14 50:11 55:4,14
56:10 57:4 59:5,9,16
60:3,7,13 61:20,23

63:2,7,16 64:16,21
65:2,3,15 66:5,19,23
67:6,15,17 68:10
69:1,11 70:10 72:18
73:5,8,16,17 74:16
75:16 78:3,11 86:17
86:17,21 93:8 94:2
97:3,6 99:11,18
100:19 110:2,6,7
113:22 117:21 118:3
118:14,20 119:8
120:15 121:6,10,15
122:7,12,15 123:7,8
123:12,13,23 124:1,8
124:9 128:18,19
129:15,16 130:15
132:10 133:8,12
134:22 135:2,20
136:16,16 142:15,20
143:7,20 145:10
147:6 148:11 154:10
154:10,14,16
**Trinity.edu** 142:16
**triple** 92:11
**Troy** 3:4,5 4:9 9:7
13:15,21 15:3,4,5,7,8
15:10 17:16,17,18,23
18:11,16,19 19:1,5
20:18 21:4 22:13,18
22:22 23:1,6 24:23
25:6 27:6,15 28:4,16
28:20,22 29:23 34:22
37:21 38:1,14 39:2
39:10 47:4 54:4,6,10
57:5 61:18 70:16
71:10,22 77:15 78:1
78:6 86:15,16 91:18
109:12,13,14,15,18
128:2,3 140:18
147:10,20 151:6
156:16
**true** 7:16 45:6 62:4,5
66:9 84:18 89:19,23
90:7 115:1,10 123:15
155:1,6 166:14
**truly** 69:15 148:8
**truth** 16:19,19,20
63:18,21 66:8,16
79:18,18,19
**truthfulness** 126:10
131:15
**Try** 98:7
**trying** 8:1 56:1 59:1
62:12 156:14
**TSUM** 109:16
**turn** 46:7
**two** 9:23 10:4 37:4
51:10,20 52:1,18
57:12 62:15 71:3,4
71:16 77:14 84:13

100:3,5,8 101:21
102:9,10 112:5
126:22 137:23
**two-hour** 148:5
**Tyler** 1:13 5:11 21:17
75:13
**type** 29:8 43:14 46:17
71:15 89:13 119:1
121:5
**typed** 65:2,10 148:16
**typo** 35:3

## U

**Uh-huh** 57:9
**under** 46:8 52:13 63:1
90:2 94:23 95:4
101:2 107:19 162:13
**understand** 44:5 58:20
98:9,10 119:18
136:10 161:12
**understanding** 24:12
118:14 139:8
**Unfortunately** 12:9
**United** 113:5,9 123:21
**universities** 22:20
110:18 111:9 112:11
113:5,8 115:23
134:10 136:7 149:14
**university** 3:4,5,14,20
3:21 4:2,4,9,10,10,12
4:13,15 9:7,15,18,19
11:21 12:3,18 13:16
13:22 15:1,9,10
17:17,18,23 18:20
19:1,5 20:19 21:5
24:23 28:4,16,23
29:23 37:22 38:1
39:10 47:4,15,16,21
47:22 48:2,19,22,23
49:15 50:12 55:14
56:11 57:5,13 59:6,9
59:16 60:3,8,13
61:20 62:1 63:3,7,9
63:12,16 64:17,22
65:3,15 66:5,19,23
67:6,17 68:10 69:2
69:12 70:11,16 71:10
71:22 72:18 73:6,9
73:17 74:17 75:16
77:15,19 78:1,11,14
86:16,17,18,22,23
91:19 93:8 94:3 97:3
99:10,11,16 100:19
100:20 102:3,6,7
103:13,17 104:12,15
108:4,16,20 109:1,10
109:16,18 110:3,7,8
113:23 117:21 118:4
118:15,21 119:9
120:15 121:6,10,16

122:8,12,16 123:8,9
123:12,14 124:1,2,8
124:9 128:2,4,19,20
129:15,17 130:15
132:11 133:15
134:22 135:2,21,22
136:16,17 142:20
143:7,20 145:11
147:7,9 148:11 149:2
149:10 150:13 151:7
154:11,15,17 158:2
161:3,6
**University's** 3:18
**unless** 44:11 80:19
**until** 12:20 24:19 38:3
94:15 110:9 163:1,23
164:20
**unusual** 72:3
**use** 67:23 68:5 106:8
**used** 68:14,19 84:15
**using** 123:14

## V

**vacation** 163:21
**valid** 113:18,21
**validity** 92:23 115:12
**various** 135:4
**Vera** 2:16 79:12,16,23
138:15
**verbally** 18:22
**verified** 92:17
**verify** 7:14 74:2 93:2
116:1,1 118:16
**verifying** 119:11
**versus** 124:1
**very** 74:9 140:12 162:6
**viewed** 99:9
**violation** 6:2
**Virgin** 87:1
**Virginia** 1:5 2:14,21
5:9 16:17,23 166:8
**vocational** 35:4,5,17
37:13 38:19 50:15
52:19 53:19 57:10,18
57:21
**voir** 99:20,23 102:17

## W

**wait** 21:20 48:4
**walk** 119:17,21 154:19
**want** 8:15 12:6 20:6
57:1 79:3 80:9 95:3
97:9 100:4 107:20
123:13 124:18
127:18 131:23 138:9
159:23 160:4 162:2
**wanted** 6:23 91:23
93:12 134:14
**wants** 155:10
**Warren** 2:16 19:20

20:7 41:13 42:9,21
75:22 79:12,13,16,22
79:23 80:1 81:9
83:10 87:8,23 88:19
92:19 98:13 99:4
101:20 106:7
**wasn't** 12:10 72:11
94:14 119:23 133:16
140:6
**way** 72:6 76:16 87:20
90:5 126:18 157:4
162:3,4,7
**ways** 160:9
**WCS** 35:2
**web** 3:17,18,18 64:23
74:17 93:9,17,22
99:8,12 102:22 105:8
110:5 130:23 131:2
132:2
**week** 53:11,11,12 57:20
70:17 71:1,1,3,4,10
95:2,12 163:14
**weekday** 164:10
**weekends** 152:17
**weekly** 82:4
**weeks** 56:16 71:17 89:3
**weight** 84:2
**well** 9:23 15:3 20:23
22:1,23 26:10 30:17
35:15 42:22 44:23
46:7 49:13 54:11
55:15 63:21 68:22
77:23 104:13 108:11
113:3 124:21 131:18
135:19 148:1
**well-argued** 162:5
**went** 22:2 33:12 38:7
58:17 65:2,4,6 88:11
70:18,20 71:3,4
72:11 86:11 87:16
94:11,19 109:13
121:4 129:14 142:1
142:15 145:13
154:17
**were** 20:5 23:1 24:5,6
24:13 27:10 33:3,14
37:9 38:10 42:2
43:17,22 47:11 49:4
49:5 52:17 55:16
58:6,11 60:4,14,18
62:14 64:16 68:13,15
68:19,20 70:19 81:9
81:16 90:15,23 98:20
101:18 103:7 110:6
112:10 114:6 115:3
118:16,23 119:6
120:2 121:17 122:6
124:4 129:12,20
138:4 139:19,20
140:3 141:14,15

143:4,9,12,15,18,19
143:21 144:1,2,16,18
144:23 145:9,11
149:4,5 154:20
165:17
**weren't** 100:7 110:15
115:2 143:17,22,23
**Western** 123:22
**Wetumpka** 35:4,5
38:19 50:15 52:19
53:19,22 57:10,18
**we'll** 13:23 47:11 56:21
56:22 80:12 125:13
128:21 138:10
146:11
**we're** 5:17 8:2,8,11,13
8:18 13:1 18:13
30:23 76:9 77:11
87:8 92:10 95:4,13
96:8 97:11 117:9
127:21 132:15
133:21 134:2 138:7
162:1 165:9
**we've** 54:20 96:6
111:20 114:19 149:6
150:19
**whatsoever** 18:18
**while** 35:18 43:21
57:12,13 144:23
**whole** 16:19 42:5 79:18
140:20
**Wikipedia** 3:17 93:18
**willfully** 161:20
**willing** 139:1
**Windows** 50:14 52:20
53:15 57:7,19
**witness** 16:11,18 20:2
57:23 59:5,10,13,19
78:3 79:5,11,17
99:22,23 141:1,4
**witnesses** 2:13,20 89:10
**word** 108:10
**wording** 7:13
**words** 140:6
**work** 14:22 17:9 33:5
47:23 49:2 54:2,15
54:20 55:7 56:23
58:2 68:3 70:5 71:12
72:5,13,19 73:7,8
80:1 84:15 108:6,7
108:10 116:11,13
147:21 148:4 149:13
149:16 152:14,22
159:1,8,9,17 161:11
164:6,8
**workdays** 163:9
**worked** 17:4 46:2
54:21,22 55:1 81:13
91:10
**working** 33:1,2,3 52:22

53:7 81:17
**worth** 135:15,18
148:14
**wouldn't** 20:23 22:15
28:6 35:15
**write** 76:11,20
**writing** 37:5 165:1
**written** 46:4 92:18 93:3
121:13
**wrong** 15:15 53:2
157:2
**wrote** 27:6
**WVS** 35:4

**X**

**X's** 144:17,20 145:16

**Y**

Yeah 59:8 104:19
**year** 17:8 25:11,13
74:1
**years** 15:5 33:6 72:8
81:12 111:6 112:5
115:14 116:3,4,5
137:23 139:14,15
**year-round** 23:7
**yesterday** 128:16
**y'all** 89:19 114:13
146:6 164:2

**0**

**01(2)(F)** 6:4
**03** 23:15
**04** 33:13
**05** 74:18
**06** 74:18 75:1 94:17

**1**

**1** 3:3 4:2 5:1 17:20
41:22 42:1 46:8 56:6
62:23 75:19,21 86:3
87:3 90:13 105:13
117:16 120:6
**10** 3:15 4:14 75:23 76:3
77:2 95:21,23 96:6,7
96:11 116:3,5 134:19
134:22 135:2 136:9
162:17 163:8,8,10
166:19
**10th** 96:9 164:5,7
**10-day** 95:19
**101** 3:19,21 157:9
**106** 2:18
**11** 3:17 4:16 93:14,17
94:6 97:7 138:19,20
138:21 165:15
**11:55** 165:18
**117** 2:22 4:2
**12** 3:18 82:22 98:11,14
99:5 104:8,11,15,18

**12th** 3:11 42:16 94:22
95:14,18 96:3 97:20
164:13,14,17,20
**120** 4:3
**121** 4:5
**124** 4:6,7
**127** 4:8
**129** 4:10,11,13
**13** 3:19 101:18,21
102:10,13,18 103:11
103:14 104:4 105:14
134:16,17
**13th** 96:4
**1301** 47:8 65:18
**1302** 67:4
**135** 4:14
**138th** 73:23
**14** 3:21 101:18,21
102:10,13 104:5,6,20
104:21 105:1,5
163:14
**14th** 96:4
**140** 21:14
**141** 2:23
**15** 3:22 97:10,14,21
105:13 147:15 148:2
**15th** 96:4
**1505** 2:5
**16** 147:15
**16th** 96:4
**165** 4:16 166:13
**17** 2:15 47:9 72:4
149:20
**17th** 17:8 96:4
**18** 3:4
**18th** 96:5
**19th** 94:21 95:14 96:5
97:17
**1980-something** 81:15
**1988** 20:22
**1993** 50:15 72:12
**1995** 51:22 53:3
**1996** 50:18
**1998** 20:22
**1999** 3:10 21:10 40:6
41:7 50:1 80:20 81:1
81:16

**2**

**2** 3:4 4:3 17:12,19,22
18:2 24:6 30:3,4 31:8
34:15 41:21 91:12
120:10,11,13
**20** 81:12 111:6 115:14
**20th** 96:5
**2000** 22:10 36:23 38:4
38:6
**2002** 33:13
**2003** 3:11 25:14,19
42:16 82:22 106:14

108:18 121:12
**2004** 110:13 137:22
**2005** 25:11,14 166:19
**2005-2006** 30:10
**2006** 1:17 5:14 25:11
25:15 33:13 73:23
74:7,9,21 166:12
**21st** 96:5
**22nd** 1:17 5:14 95:16
96:5 166:12
**2291** 28:13 31:17
**2292** 28:18 31:18
**24** 3:5 142:5
**291** 28:10 153:23
**292** 153:21
**293** 22:8 29:17 37:18
153:19

**3**

**3** 3:5 4:5 23:20,23
24:23 30:4,5 31:9
34:15 120:20,22
142:8
**3.1** 52:20 57:19
**3/10** 121:12
**30** 163:3 164:23
**304000** 2:9
**3391** 23:12 29:19 31:20
**3394** 31:21
**3395** 32:4
**34** 3:7
**36** 3:8
**36130** 2:9
**394** 21:6 29:11 153:15

**4**

**4** 3:7 4:6 33:22 34:2,15
35:22 53:3 123:19
124:4
**4th** 85:10 86:8 114:11
**40** 3:9
**42** 3:11
**43** 3:12

**5**

**5** 3:3,8 4:7 36:9,12
39:16 124:4,6
**5th** 164:1

**6**

**6** 3:9 4:8 39:21,23
41:17 80:13 82:10,13
127:15 128:8
**6th** 3:10 36:23 40:6
41:7 80:20 81:1
**6/21** 100:2
**6/21/06** 103:19
**6/22/06** 103:15
**6/26** 137:22
**6/7/06** 94:15

**65** 3:14
**670-X-19** 6:4

**7**

**7** 3:11 4:10 42:11,14
82:16 83:7 106:12,17
128:22 129:2,7,8
**715** 63:3
**76** 3:15
**78212** 63:4

**8**

**8** 3:12 4:11 43:6,9 60:6
73:13,19,21 75:9,13
129:11,12 130:2,4
130:10 154:6
**80** 2:17

**9**

**9** 3:14 4:13 65:11,14
73:16,19,21 74:14
129:12 130:5,12
131:1 134:12
**9:05** 1:18
**9:06** 5:15
**9099** 37:12
**93** 3:17 53:19
**94** 65:16
**95** 50:14 52:19 53:15
57:7
**97** 3:22
**98** 3:18 25:19 50:15
53:15 57:7
**99** 26:17





# STATE OF ALABAMA
## PERSONNEL DEPARTMENT
### 300 Folsom Administrative Building
### Montgomery, Alabama 36130-4100
### Telephone: (334) 242-3389 Fax: (334) 242-1110
### www.personnel.state.al.us

Jackie Graham
**State Personnel Director**
Paul D. Thomas
**Deputy Director**

# C O N F I D E N T I A L

May 4, 2006

## MEMORANDUM

To:     Jackie Graham

From:  Darby Forrester and Stan Goolsby

Subject:  Virginia Swearengin Hopper - Employee Verification of Education

Accountant – Department of Human Resources (PCQ#0806900) – Effective 04/16/06

     Recent notification of discrepancies associated with Ms. Virginia Swearengin Hopper's academic accomplishments resulted in an investigation to verify Ms. Hopper's educational background. The primary purpose of the investigative process was to determine the validity of the Bachelor of Science in Business Administration from Trinity University in San Antonio, Texas that is listed on Ms. Hopper's employment application for the Accountant classification.

     According to Ms. Hopper's employment application, she earned her degree from Trinity University 715 Stadium Drive San Antonio, TX 78212 in May 2002 (see attachment 1). Included with the application was an attachment listing 22 academic courses successfully completed by Ms. Hopper that were relevant to the Accountant job (see Attachment 2). According to Trinity University's website (www.trinity.edu), seven of the 22 courses that were listed (ACCT 1301; ACCT 1302; MGMT 2301; FNCE 3301; BUSN 3302; BUSN 4301 and BUSN 3303) correspond with the curriculum listed for a Bachelor of Science in Business Administration while 10 of the courses (ACCT 4344; MKTG 2302; MGMT 3372; FNCE 3351; FNCE 3352; FNCE 4351; MKTG 4381; MKTG 3381; BUSN 3301; and BUSN 3341) are similar in abbreviation and course title (see attachment 3). The remaining five courses (ACCT 291; ACCT 292; ACCT 391 and ACCT 394) are consistent with courses listed on Troy University – Montgomery's website (www.montgomery.troy.edu) for the Sorrell College of Business (see attachment 4).

     On April 5, 2006, Ms. Hopper was asked to provide the Department of Finance with verification of her Bachelor of Science in Business Administration from Trinity University in San Antonio, Texas. As a response to this request, Ms. Hopper submitted a copy of a diploma for a Bachelor of Science in Business Administration from Trinity College and University received on May 25, 2002. The institution listed on this document (Trinity College and University) did not coincide with the name of the institution listed on the application for

**000056**

EXHIBIT
OHR 1

Jackie Graham
May 4, 2006
Page 2 of 2

employment (Trinity University in San Antonio, TX). A copy of the diploma provided by Ms. Hopper is provided as Attachment 5.

Information obtained during the investigative process revealed that Trinity College and University, which is now referred to as Bronte International University (BIU), is based in Tortola, British Virgin Islands. None of the courses presented on BIU's website (www.biu-edu.org) are consistent with those included on Ms. Hopper's relevant list of completed academic courses. In fact, the course abbreviations and titles do not match any of those submitted by Ms. Hopper. BIU uses a 3 alpha – 3 numeric coding system (see attachment 6) in abbreviating course titles while the list provided by Ms. Hopper consists of a 4 alpha – 4 numeric coding system. There also appears to be some uncertainty as to whether or not BIU is recognized as an accredited institution by any credible accrediting agencies. This uncertainty is stated based upon the assertion that the institution awards educational credit for past work experiences for a fee of $695 for a bachelor's degree or an associate's degree (see attachment 7).

It is very clear that when Ms. Hopper completed and submitted her application for employment into the Accountant classification on November 21, 2003, she claimed having obtained a Bachelor of Science in Business Administration from Trinity University in San Antonio, TX and not Trinity College and University (now referred to as BIU) of Tortola, British Virgin Islands. The list of relevant courses Ms. Hopper provided with her Accountant employment application specifically lists those offered by Trinity University in San Antonio, TX. Furthermore, we received written documentation from Trinity University in San Antonio, TX that indicated that they do not have any records for Virginia S. Hopper (SSN: xxx-xx-4190); that they do not provide online or correspondence courses for their students; and that they are not affiliated with any other Trinity Colleges or Universities (see attachment 8).

Accordingly, it is determined that Ms. Hopper fraudulently represented her educational accomplishments that eventually led to her employment as an Accountant with the Department of Finance as well as her current employment with the Department of Human Resources.

Enclosures:   Attachment 1 – Employment Application -- Copy of Cover Page – Dated 11/21/03
              Attachment 2 – Relevant List of Completed Courses
              Attachment 3 – Trinity University, San Antonio, TX – Common Curriculum
              Attachment 4 – Troy University-Montgomery – Core Curriculum for Bus Admin
              Attachment 5 -- Diploma – Copy Submitted by Ms. Hopper for Verification
              Attachment 6 – Bronte International University – Course Descriptions
              Attachment 7 – Bronte International University -- Fees
              Attachment 8 – Letter from Trinity University, San Antonio, TX – Dated 4/20/06

**Attachment 1**

# TION FOR EXAMINATION

STATE OF ALABAMA
PERSONNEL DEPARTMENT
64 NORTH UNION STREET
P O BOX 304100
MONTGOMERY, ALABAMA 36130-4100

**AN EQUAL OPPORTUNITY EMPLOYER**

**General Instructions**

A separate application is required for each job. **Do not write in shaded areas.** Complete all parts of the application. Applications not properly completed will be returned. Photocopied and facsimile applications will be accepted.

1C3 707 21 P 1 53

ENTER SOCIAL SECURITY NUMBER BELOW.

| 4 | 2 | 3 | - | 7 | 4 | - | 4 | 1 | 9 | 0 |

| **Examination For Which You Are Applying** (one per application) | 10611 | | **Option** (if applicable) |
|---|---|---|---|
| 10611 Accountant | | | |

Full Name  __Virginia__  __S__  __Hopper__
                First            Middle           Last

Address  __200__  __Alpha Lane__
        House or Apartment Number       Street

__Deatsville__       __AL__       __Elmore__    __26__    36022
City          State         County        Zip Code

Telephone Number: Home ( __334__ ) __285-6226__      Work ( __334__ ) __242-2224__
                  Area Code                       Area Code

**The following information is required for governmental reporting or recordkeeping purposes:**

Date of Birth  __05__  __06__  __1954__       Sex (check one)  1. ( ) Male   2. (X) Female
          (Month)  (Day)   (Year)

Race (check one)  1. (X) White   2. ( ) Black   3. ( ) Hispanic  4. ( ) Asian or Pacific Islander   5. ( ) American Indian or Alaskan Native  6. ( ) Other

| **EDUCATION:** | CIRCLE OR BRACKET THE HIGHEST GRADE OF SCHOOL COMPLETED. | ED | 3/ |
|---|---|---|---|
| High School Diploma or GED? (X) Yes  ( ) No | 1  2  3  4  5  6  7  8  9  10  11  [12]  College  1  2  3  [4] | LC | 70C |

**PROVIDE INFORMATION ON ALL SCHOOLS ATTENDED.  SPECIFY UNDERGRADUATE OR GRADUATE WORK.**

| Name and Location of School | Dates of Attendance Month/Year From | To | Credit Hours Sem. | Qtr. | Did You Graduate? Yes | No | Type of Degree and Date | Major |
|---|---|---|---|---|---|---|---|---|
| Trinity University  715 Stadium Dr | | | | | | X | BS – May 2002 | Bus Admin |
| San Antonio, TX 78212 | | | | | | | | |

**PROFESSIONAL LICENSE OR CERTIFICATE**

| License/Certificate Issued By | Field/Trade/Specialization | License/Certificate No. | Issue Date | Expiration Date |
|---|---|---|---|---|
| | | | | |

**LIST COURSES (AND HOURS) WHICH ARE PARTICULARLY RELATED TO THE POSITION** (attach additional sheets, if needed).
__See attached list__

## CERTIFICATION STATEMENT

    I certify that all statements on or attached to this application are true and correct to the best of my knowledge.  I know that any false statements may cause me to be denied the chance for testing, to be removed from an employment register, or to be released from employment.  I will not discuss the test I have taken.  I further authorize the release of all relevant prior employment, military service, academic/school and criminal records.  If employed I agree, consistent with applicable laws, to receive compensatory time off in lieu of overtime compensation for any overtime hours worked.

Signature  _Virginia S. Hopper_     Date  _11/21/2003_

**During the application process, including testing and employment consideration, your name may be removed from an employment register for any disqualifying reason.**

000058

Attachment 2

Virginia Hopper    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

COURSES WHICH ARE PARTICULARLY RELATED TO THE POSITION

ACCT 291  Prin of Acct I

ACCT 292  Prin of Acct II

ACCT 293  Managerial Acct

ACCT 391  Intermediate Acct I

ACCT 394  Governmental Acct

ACCT 1301  Financial Accounting

ACCT 1302  Managerial Accounting

ACCT 4344  Auditing

MGMT 2301  Management

MKTG 2302  Marketing

MGMT 3372  Org Behavior

FNCE 3301 Finance

FNCE 3351 Instit & Mkts

FNCE 3352  Investments

FNCE 4351  Mgmt/Policy

MKTG 4381  Mktg Mgmt

MKTG 3381  Consum Behavior

BUSN 3301 Statistics

BUSN 3302  Busn Law I

BUSN 3341  Busn Law II

BUSN 4301 Busn Policy

BUSN 3303 Quant/Mgr'l Decision Making

# Business Administration
# B. S. Concentrations and Requirements

The requirements for the Bachelor of Science in Business Administration degree are as follows:

I.    The common curriculum.

II.    A core curriculum in Business Administration (24 hours):

ACCT 1301 - Fundamentals of Accounting
ACCT 1302 - Fundamentals of Managerial Accounting
BUSN 2301 - Statistics for Management and
Economics
BUSN 3302 - Legal Concepts of Business I
*BUSN 4301 - Business Policy and Strategy
**FNCE 3301 - Financial Administration of Business
Firms
MKTG 2301 - Principles of Marketing
MGMT 2301 - Management of Organizations

*  Students should note that ECON 1312 is prerequisite
for BUSN 4301. In order to satisfy this prerequisite
requirement, ECON 1312 may not be taken on a pass/fail
basis.

**  Students should note that ECON 1311 is prerequisite
for FNCE 3301 In order to satisfy this prerequisite
requirement, ECON 1311 may not be taken on a pass/fail
basis

III.    Completion of BUSN 3303 - Quantitative Managerial
Decision Making

IV.    Completion of a concentration in Business Administration,
choosing from one of the following:  Accounting, Finance,
Management, Marketing, and International Business.  No course
taken by a student may count toward more than one concentration
requirement.

V.    Completion of elective hours that bring the total in Business
Administration courses to at least 45 semester hours.

VI.    Completion of general electives outside of Business
Administration sufficient to bring the total semester hours earned for
a degree to 124.

A student who pursues either a major or minor in Business Administration must

000C60

take 50% of the Business Administration credit hours that apply toward his/her degree at Trinity University. At least 50% of the credit hours required for a concentration must be taken at TrinityUniversity.

000061

Attachment 4

### SORRELL COLLEGE OF BUSINESS

**Accreditation**
**B.S. / B.A. Business Administration Degree Requirements**
**Business Administration Core (42 Hours)**
**Majors:**
  Accounting Major (30 Hours)
  Finance Major (30 Hours)
  General Business Major (30 Hours)
  Information Systems Major (30 Hours)
  Management Major (30 Hours)
  Marketing Major (30 Hours)
  Risk Management and Insurance Major (30 Hours)
**B.A.S. in Resources and Technology Management**
**Business, Associate of Science (60 Hours)**
**Minors:**
  Business Administration Minor (18 Hours)
  Information Systems Minor (18 Hours)

University Overview

Student Admissions
  and Regulations

General Studies Program

Special Academic
  Offerings

Financial Information

Degrees and Required
  Credit Hours

Colleges

Course Descriptions

Board of Trustees,
  Administration, Faculty

Index

TROY Home
Catalog Table of Contents

The academic mission of the Sorrell College of Business is to prepare a diverse bo
students for entry and personal growth in business and government-related career:
means of high quality instruction delivered in traditional, nontraditional, and emergi
electronic formats.

Our students are currently employed in, or endeavor to be employed in, business,
government, public accounting, the U.S. military, and not-for-profit organizations, b
United States and the world over. Today many are, or intend to be, self-employed.
Undergraduate students are prepared for admission to graduate programs in busin
information systems, and professional schools of law. Sorrell College of Business s
graduate with the knowledge and skills needed to communicate effectively, to mak
and socially-responsible decisions, and to understand diverse and international cul

Sorrell College of Business faculty members are highly qualified and possess diver
academic and business backgrounds. Because our faculty members have "real-wo
experience, course instruction focuses not only on vital concepts but also on practi
application of these concepts.

All academic programs offered by the college assist students to develop the knowle
skills, and attitudes necessary to understand and cope with the challenges faced b
and organizational leaders in a dynamic, global workplace. The curriculum is highly
to the needs of students and the requirements of their employers. Combining the r
of the curriculum with the fact that our faculty holds students to a high standard thro
their academic experience at Troy means that the academic programs offered thro
Sorrell College of Business are designed to provide a firm foundation for professior
business leaders who, upon graduation, will have the skills necessary to embark or
change course in, successful careers in business, industry, and government.

Majors within the Bachelor of Science (or Arts) Business Administration degree are
accounting, general business, finance, information systems, management, marketi
risk management and insurance. Within the management and general business ma
students may select concentrations that focus on international business, business
economics, human resource management, small business and entrepreneurship, a
production and operations management. Within the information systems major, stu
focus on networking, general information systems, or web development. A Bachelo
Applied Science degree is offered in resources and technology management. Mino
offered in business administration and information systems.

000082

## ACCREDITATION

Troy University, through its Sorrell College of Business, is nationally accredited by Association of Collegiate Business Schools and Programs (ACBSP) to offer baccal degree programs in accounting, finance, general business, information systems, management, and marketing. The ACBSP has also accredited Troy to offer the Ma Business Administration.

### B.S. / B.A. BUSINESS ADMINISTRATION DEGREE REQUIREMENTS

| General Studies | 48 hours[1] |
|---|---|
| Business Administration Core | 42 hours [2, 3, 4] |
| Courses in the major | 30 hours [3, 4] |
| Total | 120 hours |

[1] The 48 hours of general studies must include six hours of Principles of Econom and MTH 2201, completed with a grade of C or better.

[2]Students must complete the following lower-level courses (or their approved tra credit equivalents) with a grade of C or higher in each course before registering for level course in the business curriculum: ENG 1101/03, ENG 1102/04, MTH 2201, | ACT 2291, ACT 2292, ECO 2251, ECO 2252, QM 2241, LAW 2221, and all 2000-| courses in the major and minor. Students may enroll concurrently in the last of thes along with their initial 3000-level courses subject to their adviser's approval and cor with published prerequisite requirements. Under no condition may a student enroll 4000level course without the satisfactory completion (grade of C or higher) of the lc courses listed above.

[3]Transfer credit will not be awarded for any course to be used in the business cc major in which a C grade or higher has not been achieved.

[4]Students must achieve an overall C average in both their business core and the business major in order to be eligible to graduate. All courses should be taken in th appropriate numerical sequence (i.e., 3000-level courses should be completed bef attempting 4000-level courses).

 *top*

### BUSINESS ADMINISTRATION CORE (42 HOURS)

| ACT | 2291 | (3) | Principles of Accounting I |
|---|---|---|---|
| ACT | 2292 | (3) | Principles of Accounting II |
| BUS | 3382 | (3) | Business Communications |
| FIN | 3331 | (3) | Managerial Finance I |
| FIN | 3332 | (3) | Managerial Finance II |
| IS | 3300 | (3) | Introduction to Information Systems |
| LAW | 2221 | (3) | Legal Environment of Business |
| MGT | 3371 | (3) | Principles of Management |
| MGT | 3373 | (3) | Operations Management |
| MGT | 4476 | (3) | Strategic Management |
| MKT | 3361 | (3) | Principles of Marketing |

000063

| QM | 2241 | (3) | Business Statistics I |
|----|------|-----|----------------------|
| QM | 3341 | (3) | Business Statistics II |

*Select one course with permission of faculty adviser:*

| ACT | 4435 | (3) | International Accounting |
|-----|------|-----|------------------------|
| ECO | 4451 | (3) | International Trade |
| FIN | 4435 | (3) | International Banking and Finance |
| MGT | 4478 | (3) | International Management |
| MKT | 4468 | (3) | International Marketing |

*Select one business administration major (30 hours):*
- Accounting
- Finance
- General Business
- Information Systems
- Management
- Marketing
- Risk Management and Insurance

 *top*

## ACCOUNTING MAJOR (30 HOURS)

### B.S./B.A. in Business Administration degree with a major in accounting (ACT

| ACT | 3391 | (3) | Intermediate Accounting I |
|-----|------|-----|---------------------------|
| ACT | 3392 | (3) | Intermediate Accounting II |
| ACT | 3394 | (3) | Governmental Accounting |
| ACT | 3395 | (3) | Managerial/Cost Accounting |
| ACT | 4491 | (3) | Advanced Accounting I |
| ACT | 4494 | (3) | Income Tax I |
| ACT | 4495 | (3) | Income Tax II |
| ACT | 4497 | (3) | Auditing |

*Select one accounting elective:*

| ACT | 3396 | (3) | Accounting Information Systems |
|-----|------|-----|-------------------------------|
| ACT | 4496 | (3) | Managerial/Cost Accounting II |
| ACT | 4498 | (3) | Advance Auditing |

*Select one upper level business course elective.*

 *top*

## FINANCE MAJOR (30 HOURS)

| FIN | 4431 | (3) | Financial Management |
|-----|------|-----|---------------------|
| FIN | 4432 | (3) | Investments |
| FIN | 4437 | (3) | Financial Institutions |

*Select six electives:*

000064

| FIN | 3333 | (3) | Financial Mathematics |
|-----|------|-----|------------------------|
| FIN | 3334 | (3) | Financial Statement Analysis |
| FIN | 3336 | (3) | Real Estate Finance I |
| FIN | 3337 | (3) | Personal Financial Planning |
| FIN | 4419 | (3) | Speculative Markets |
| FIN | 4434 | (3) | Financial Modeling |
| FIN | 4436 | (3) | Securities Analysis |
| FIN | 4438 | (3) | Bank Management |
| FIN | 4439 | (3) | Finance Seminar |
| FIN | 4440 | (3) | Real Estate Finance II |
| FIN | 4454 | (3) | Public Finance |
| FIN | 4495 | (3) | Selected Topics in Finance |
| RMI | 3335 | (3) | Principles Of Management and Insurance |

*Select one upper level business course elective.*

 *top*

## GENERAL BUSINESS MAJOR (30 HOURS)

*B.S./B.A. in Business Administration degree with a major in general business*
*Concentrations in general business, business economics, international bus*
*small business and entrepreneurship*

*Select one upper level course in three of the following five areas:*
– Accounting
– Economics
– Finance
– Management
– Marketing

*Select one concentration (21 hours):*
Business Economics Concentration:
· *Select five upper level economics courses (15 hours).*
· *Select two upper level finance courses (six hours).*

General Business Concentration:
· *Select seven upper level courses among the business disciplines, with a limit of th*
*courses in one discipline.*

International Business Concentration:
·*Select three of the following courses not used to satisfy the business core global i*
*requirement (nine hours):*

| ACT | 4435 | (3) | International Accounting |
|-----|------|-----|--------------------------|
| ECO | 4451 | (3) | International Trade |
| FIN | 4435 | (3) | International Banking and Finance |
| MGT | 4478 | (3) | International Management |
| MKT | 4468 | (3) | International Marketing |

000065

*Select two upper level business course electives (six hours).*
*Select two modern foreign language courses (six hours).*

Small Business and Entrepreneurship Concentration:

| MGT | 4475 | (3) | Small Business Management |
|-----|------|-----|---------------------------|
| *Select four of the following courses:* | | | |
| ACT | 3396 | (3) | Accounting Information Systems |
| MGT | 3375 | (3) | Human Resource Management |
| MGT | 4472 | (3) | Organizational Behavior |
| MGT | 4460 | (3) | Introduction to Project Management |
| MKT | 3365 | (3) | Integrated Marketing Communications |
| MKT | 4463 | (3) | Retailing |

*Select two upper level business course electives (six hours).*

 *top*

000066

Attachment 5

# Trinity
## College & University

has conferred upon

# Virginia Swearengin Hopper

the degree, rank and academic status

## Bachelor of Science

with a major in

## Business Administration

Distinction

All requirements of the Board of Regents and Examiners having been successfully completed. All rights and privileges thereunto appertaining are hereby awarded.

Signed and sealed upon this twenty-fifth day of May two thousand and two



Rowena Ho. Kingta

Dominick Christian Joseph

000067

British Virgin Islands      Attachment 6



**Undergraduate Program**

**Certificate of Tax and Financial Planning**

**Available Degrees**

**Course Descriptions**



# COURSE
# DESCRIPTIONS

Below are a sampling of course descriptions for some of the majors offered by Bronte International University. The courses listed below are college level academic courses.

BIU help all I ever Yc



These courses are considered for the purpose of establishing EQUIVALENCY of knowledge gained from work or other activities in our assessment process based upon your qualifications.

## ACCOUNTING

**ACC-101 - Principles of Financial Accounting**

Financial Accounting is designed to provide students with basic level of knowledge in recording business transactions, summarizing business activities, and preparing, interpreting, and utilizing financial statements. Topics focus on accounting principles, systems and cycles, transactions, income statements, depreciation, merchandising, inventory control, assets and liabilities, and financial partnerships.

**ACC-102 - Principles of Managerial Accounting**

Managerial Accounting emphasizes the information managers need to make decisions and the types of analysis appropriate to each decision. Topics include budgeting, cost/profit relationships, cost accounting systems, cash flow, inventory and process costing, pricing, capital budgeting, product mix planning, operations, control and evaluation performance.

**ACC-421 - Federal Income Taxation**

A comprehensive coverage of the federal income tax structure as it pertains to individuals, partnerships and corporate taxpayers. Topics include: classification of taxpayers; determination of gross income; exemptions; taxable income; computation of tax; special tax computations; credits against tax.

## ANTHROPOLOGY

**AN-101 - Introduction to Anthropology**

The study of culture as the expression of human values, behavior and social organization in its unique and varied forms throughout the world, past and present. The course attempts to document that diversity and to demonstrate the inherent logic of each culture in the light of the problems people need to solve and the environments to which they must adapt.

000068

## ARCHAEOLOGY

ARC-101 - Introduction to Western Archaeology

New scientific tools and sophisticated research designs are revolutionizing our ideas about what ancient societies were like, how they developed and how their civilizations collapsed. Research at the spectacular Classic Maya Center is the basis for the broadly comparative perspective of the course. Students will also learn how archaeology helps us understand ancient people by reconstructing their past.

## ART

ART-100 - A World of Art

This is a unique art appreciation course designed to give students an in-depth understanding of works of art, by first giving them an insight to the mind of the modern artist and his/her working process. Through a series of video programs, the course follows ten different contemporary artists as they work on individual projects from start to finish. As well as learning the principles of design and different types of media artists employ, students will learn about the process of artistic creation.

ART-166 - Art History I

Examines the works of art that have come to define the Western visual tradition from ancient Greece through the Renaissance. An appreciation of the formal qualities, iconography and technical achievements of significant works of art is emphasized. The course also shows how these works of art closely reflect the prevailing attitudes of the society in which they were created, as well as the goals of the artists.

ART-167 - Art History II

This course is the second half of Western Art History and continues to examine the works of art that have come to define the Western visual tradition from the Baroque period to the present day. An appreciation of the formal qualities, iconography and technical achievements of significant works of art is emphasized. The course also shows how these works of art closely reflect the prevailing attitudes of the society in which they were created, as well as the goals of the artists.

## ASIAN STUDIES

ASS-301 - Asian Studies I

This course offers a survey of the modern history, economics, politics and cultures of the Pacific Basin region. This interdisciplinary Asian- Studies course explores how the Pacific Basin has evolved to emerge as a principle political and economic center for the next century. Throughout the course, four major themes emerge: modernity versus tradition; the conflict between East and West; democracy, political authority and economic growth; and the role of the United States in the Pacific.

AST-101 - Introductory Astronomy

Introductory Astronomy explores a broad range of astronomy topics, concepts and principles, from the motions of the visible sky to dark matter, from our own planet to the stars and galaxies. The course examines evidence for the big bang and continuing evolution of the universe and tracks the formation, life, and death of the stars. Throughout the course, special emphasis is placed

000069

on the scientific evidence that astronomers have come to know about the universe, and how they continue to seek answers to some of the most fundamental questions.

## BIOLOGY

BIO-101 - Introductory Biology

This course is designed as an introductory biology course for non-science majors. The video programs reveal current trends in molecular biology, illustrate scientists at work and discuss the challenges and opportunities in this growing field. The course incorporates natural history examples and includes a general introduction to the nature of life. Topics also include DNA; genetics; reproduction; animal physiology, including circulation and immunology; and ecology.

BIO-108 - Nutrition

This introductory course is intended to provide accurate and scientifically sound information on human nutrition. Topics covered in the course include food choices; the digestive system; metabolism; the effects of carbohydrates, fats, and proteins on health; nutrition in various stages of the life cycle; vitamins and minerals; and the effect of diet in the presence of diabetes and cardiovascular disease.

## BUSINESS EDUCATION

BUE-101 - Personal Finance for 2000 and Beyond

A one-semester course in financial planning that provides information for making sound financial choices.

## BUSINESS

BUS-101 - Introduction to Business

Introduction to Business is a one semester course for students who want to expand their understanding about business. The course presents an inside view of business, dissecting the realities and complexities of the ever-changing world of business in today's modern society. From the internal functions of a business to the challenges of business to the challenges of business on an international scale, the course provides a comprehensive view of the contemporary environment of business.

BUS-161 - Business Mathematics

The following topics are covered in this course: integers, fractions and decimals; round numbers; complex fractions; ratios, proportions, and percentages; averages; formulas and linear equations; business applications.

BUS-421 - Business Policy

Capstone review of senior management decision areas, using concepts covered in an undergraduate course in business policy or corporate planning. Topics include: corporate goals and resources, financial analysis, long-range plans, policy models, and management strategy. Case problems are used to integrate theories and apply concepts to simulate situations.

## CHEMISTRY

CHE-101 - Survey of Chemistry

000070

CHE-100 - Survey of Chemistry

Developed for non-science majors, this course de-emphasizes mathematical problem solving in favor of presenting a unified view of chemistry. Chemical principles, facts and theories are presented through practical applications, illustrations and experiments. The historical foundations, recent developments and future directions of chemistry are also presented. This course will not satisfy the chemistry requirement for Natural Science or Applied Science and Technology degree programs.

CHE-111 - General Chemistry I

Presents the essential concepts of chemistry and how we come to know and understand those concepts, focusing on the study of molecules and how their atoms bond together. Suitable for nonscience majors.

CHE-112 - General Chemistry II

Builds on knowledge gained in CHE-111-OL General Chemistry I. Includes study of liquids and solids, chemical reactivity, chemical kinetics acid-base chemistry, thermodynamics, and electrochemistry. Suitable for nonscience majors.

CHE-240 - Elementary Organic Chemistry

A survey of the basic principles of organic chemistry. Topics include saturated, unsaturated and aromatic hydrocarbons; isomerism, sugars, fats and oils; proteins and nucleic acids; and molecular structure and spectroscopy.

## COMPUTER INFORMATION SYSTEMS

CIS-107 - Computer Concepts and Applications

The course is designed to: provide a comprehensive overview of the comprehensive overview of the computer, what it is, what it can and cannot do, how it operates, and how it may be instructed to solve problems; familiarize learners with the terminology of date processing; examine the application of the computer to a broad range of organizational settings and social environments; prepare learners to understand and utilize computers in both their personal and professional lives.

## COMMUNICATIONS

COM-120 - Introduction to Mass Communications I

Mass communication and the new media technologies of cyberspace have become central to the psychological, social, economic, and political realities of the human experience. It is more important than ever for students of all disciplines to understand the role the media play in their world, their culture, and their lives. This course examines the media innovations, inventions, industries, and people that historically and currently have changed and challenged our world. Emphasizing the history of mass media as well as the current trends, this course presents information and activities designed to enable students to appreciate and evaluate the quality of print, audio, video, film and television. The course considers ethics, advertising, public relations, and audience feedback in the context of mass communication. Global media on society are also discussed. Topics covered include: Media History; Mass Media in Society; Print History; Images in Media; Newspaper Industry; Book Industry; Radio History; Radio Industry; recording Industry; Film History.

COM-121 - Introduction to Mass Communications II

000071

Mass communication and the new media technologies of cyberspace have become central to the psychological, social economic, and political realities of the human experience. It is more important than ever for students of all disciplines to understand the role the media plays in their world, their culture, and their lives. This course examines the media innovations, inventions, industries, and people that historically and currently have changed and challenged our world. Emphasizing the history of mass media as well as the current trends, this course presents information and activities to enable students to appreciate and evaluate the quality of print, audio, video, film and television. The course considers ethics, advertising, public relations, and audience feedback in the context of mass communication. Global media and the effect of mass media on society are also discussed. Topics covered include: Television History; Broadcast Television; Cable TV and Beyond; Television News; Print News; Public Relations; Advertising Media Rights and Responsibilities; Media Ethics; Audience and Feedback; Media Impact.

COM-209 - Public Speaking

Public Speaking focuses on developing effective presenting skills in front of live audiences. The course moves from an overview of topic- selection, research, structuring, writing, and rehearsal skills to student participation on topics similar to what may be encountered in business or social situations. Historical and contemporary speeches are analyzed, practical techniques are emphasized in message delivery, audience expectations, informative and persuasive approaches, the use of supportive materials and audio-visuals, gesture and physical environment, impromptu speeches, question/answer segments, panel structures, and the use of humor. Students produce three presentations on video tape for instructor review, beyond any previous sales or social presentations that the student regularly makes. A fourteen-part study guide is provided for the student to respond to by engaging in structuring, rehearsing, and delivering their speeches. Detailed outlines are submitted prior to actual presentations for instructor review and commentary. Students review the speaking style of two live speakers during the course.

COM-322 - Language in Social Contexts

Language is the center of all human activity. It defines who we are, what we can accomplish , what we have learned about our past and finally, what future generations will come to learn about us. In learning about language, we come to more fully appreciate who we are. This course will consider several aspects of how the language we speak and the societies we live in affect each other.

COM-335 - Elements of Intercultural Communication

This course presents a broad theoretical base in the study of intercultural communications. Its emphasis is the study of the many complex elements and processes involved in the sending and receiving of messages within intercultural contexts. The aim of the course is to increase the student's sensitivity, understanding, and awareness of intercultural differences and similarities that lead to more effective communication. The basic concepts, principles and skills for improving communication between persons from different minority, racial, ethnic, cultural and intercultural backgrounds will be covered.

**COMPUTER SCIENCE**

COS-101 - Introduction to Computers

This course provides a broad, general introduction to computers including an introducton to programming using the QBASIC language. the course covers hardware and software fundamentals, essential computer applications, computer networking, how to use a computer to solve a problem and the impact of the information age on our work, our homes, society and the future. The course assists students in acquiring the ability to describe the uses of a 000072

variety of computer hardware and software, explain how computers are used for a variety of applications, and provides insight into computer networking and its impact upon society. Students learn how to write programs using the QBASIC language to solve problems.

COS-116 - C Programming

C Programming provides an opportunity to study and gain experience with one of the most popular computer languages. Students will learn to write, debug and run programs in C language- the increasingly popular UNIX-related, intermediate-level software development language. The course covers operations, variables, loops, functions, pointers, input-output, data types, structure and file operations.

COS-213 - C++ Programming

C++ is an object-oriented extension of the C Computer Language. C++ is the most popular and high-potential object-oriented programming language in the United States and possibly the world. This course explores C++ programming in the context of object-oriented software development. Object orientation will be defined in terms of five object characteristics (encapsulation, relationship, inheritance, polymorphism, and dynamic building) used to build object-oriented programs.

COS-231 - Assembly Language

An introduction to the study of the basic structure and language of machines. Topics include basic concepts of Boolean algebra, number systems, language, addressing techniques, data representation, file organization, symbolic coding and assembly systems, use of macros, batch operation and job handling.

COS-241 - Data Structures

Advanced techniques for program construction and testing are emphasized. Topics include linked lists, trees, sorting, searching, string manipulation, and dynamic storage.

COS-330 - Computer Architecture

The analysis and design of the major elements of a digital computer. The specification of the interconnection of these elements to form a digital computer. This specification is accomplished with the aid of a special purpose register transfer language (similar to programming language). Control of the register-transfer sequence is treated from both the hardwired and microprogrammed view points. Interrupts and I/O are treated.

COS-352 - Operating Systems

Students will acquire an understanding of the role that an operating system has in the computing environment. The student will have hands on experience and assignments on four major operating systems ranging from microcomputer to mainframes. These operating systems are MS-DOS, VMS, UNIX, IBM, USE. Topics will include process management, device management, file structures, utilities, performance evaluation and networking.

**CONTROLS**

CTR-211 - Electronic Instrumentation and Control

Automatic testing of electronic devices; electronic instrumentation and control: physical properties and their measurement. Industrial electronic circuit applications; interfacing process variables; motor motor control and

000073

servo systems; numeric control systems; programmable controllers; industrial robots.

## EARTH SCIENCE

EAS-101 - General Earth Science

This course introduces basic concepts of science in general and geoscience in particular. The course emphasizes the evolution of the earth and the development of the theoretical model of the earth as a whole. Topics include earth and other planets in the solar system; earth's oceans, interior and atmosphere; and a look toward the earth's future. It is designed for students with a general interest in and curiosity about the earth, and is not intended for science majors.

## ECONOMICS

ECO-111 - Macroeconomics

Macroeconomics deals with broad economic aggregates, such as national income, the overall level of prices, employment and unemployment, and the money supply. Topics covered include the meanings and measurements of gross national product; business cycles; the effect of government expenditure and taxation; causes of inflation and unemployment; and international trade and the balance of payments. The course examines the major historic and contemporary events that have shaped the 20th century American economics. The course involves solving economic problems which require basic college mathematical skills.

ECO-112 - Microeconomics

This course demonstrates how the basic principles of economics apply to current U.S. economic problems and provides practice in applying economic analysis. It focuses on individual economic units and how purchase and production decisions determine prices and quantities sold. These principles are applied to a wide variety of economic problems which require basic college mathematical skills.

ECO-490 - International Economics

Pure or "real" aspects of international trade, including the basic comparative advantage model, commercial policy (tariffs, quotas, etc.), economic integration, role of international trade in economic development. Monetary aspects of international trade, including international capital movements, foreign exchange market, concepts and measurement of balance of payments, alternative means of correcting disequilibrium in the balance of payments, and international monetary arrangements.

## ENGINEERING MECHANICS

EGM-330 - Fluid Mechanics

The properties and behavior of fluids: density, pressure, fluid static, buoyancy, hydraulic devices. Course examines fluid dynamics, continuity of flow, Bernoulli's equation, Venturi's principle, the Pilot tube, and fundamentals of dynamic lift. Orifices, nozzles, tubes, valves, and other applications of flow control devices. Discussion of viscosity and flow losses are incorporated.

## ENGLISH COMPOSITION

ENC-101 - English Composition I

000074

This course focuses on teaching English composition and rhetoric from a process perspective. With an emphasis on audience awareness and purpose for writing, this course presents deliberate strategies for prewriting and revision. As the first course on college level writing, there is emphasis on the skills needed for academic and business writing.

ENC-102 - English Composition II

A continuation of English Composition I. Essay writing, writing a research paper, writing across the curriculum, writing for business and writing about literature are the essential components of this course. The course objectives are developed through applications to real life situations. Some library research is required.

**ENGLISH**

ENG-201 - Technical Writing

Technical writing for industry, business and research, focusing on the special requirements of the professional report.

ENVIRONMENTAL SCIENCE

ENS-200 - Environmental Science

This course provides a systematic inquiry into the state of the global environment. It focuses on the threats to different natural systems and the complex interconnections between human society and the environment. It provides an understanding of the sciences and ways of thinking involved in the study of the environment

**FILM**

FIL-110 - American Cinema

American Cinema is an introductory course in film studies. Through this course, students will learn to become more active and critical viewers as they question the images of America they see on the movie screen and redefine their own relationship to those images. The course endeavors to help students to increase their understanding of films as art, as cultural artifacts, as an economic force and as a system of representation and communication. Students will learn about the invention of the motion picture camera, the rise of the studio system, and the production of popular genres such as the western, the comedy, and the combat film, while examining the development of an American narrative tradition and the evolution of character with genres.

**FINANCE**

FIN-301 - Principles of Finance

Managerial finance and the environment within which the financial decision-maker functions. Topics include: concepts and tools of financial analysis; working capital management; capital budgeting; the cost of capital; long-term financial management. Familiarity with basic accounting is essential.

**GEOLOGY**

GEO-151 - Physical Geology

Description of composition and structure of earth physical processes which

000075

change earth's surface.

## HISTORY

HIS-101 - Western Civilization I

Exploring the cultural and philosophical movements that have influenced the Western world from ancient times to the present. The course covers the influential pre Western civilizations through the classic period of the High Middle Ages. Material is integrated from a variety of academic areas and stimulates critical thinking.

HIS-102 - Western Civilization II

Exploring the cultural philosophical movements that have influenced the Western world from ancient times to the present. The course commences with the end of the Middle Ages and continues through industrial modernization to the present. Material is integrated from a variety of academic areas and stimulates critical thinking.

HIS-113 - American History I

This course focuses on the origin and growth of the United States from 1492 to 1865. It also examines the social, economic and political development of the country with special emphasis on the major events from the English settlement at Jamestown to the Civil War.

HIS-114 - American History II

This course focuses on the transformation of the United States from 1865 to the present. Emphasis is on the transformation from an agrarian nation and minor member of the international community to an industrial world power. Beginning with the reconstruction of the South after the Civil War, the course traces the social, economic and political development of the country through the 1980s.

HIS-210 - American Civil Rights Movement

This course offers a comprehensive history of the people, stories, events and issues of the 20th century struggle for social justice in America. The course examines the Civil Rights Movement in terms of its impact on American society. It also considers the rise of other movements which transformed the face of American culture and discusses their influences on creating a new generation of American leadership.

HIS-219 - Introduction to the History of Women And Family in America

This a course on women and the family in the United States from 1607 to 1870, which emphasizes the diverse experiences of ordinary people - of Indians and immigrants, of slaves and free African-Americans, of indentured servants and pioneer families - as it examines change in both the ideals and the reality of family life. Two other themes which complement the diversity and ideal/real themes are the gender division of labor in families and family resilience in the face of social and economic change.

HIS-235 - American Civil War

Based on the award-winning PBS series "The Civil War," this course presents the entire sweep of the war, from the battlefields to the homefronts, from the politicians and generals to the enlisted men and their families. Attention is given to the causes of the war, why the North won and the assassination of Lincoln.

000076

Lincoln.

HIS-261 - Introduction to the Chinese History and Culture

This course examines China's people, history, and heritage and explores a civilization that is more than 5,000 years old. Ancestral customs and beliefs, which still survive in parts of the countryside, are discussed. And the events of Tiananmen Square, where political tensions erupted in apocalyptic violence, are also examined. Intimate, rarely seen glimpses of daily life reveal the conflict between long- established customs and government-mandated changes. The course explores such issues as causes for the political and cultural forces that have unified China despite the great variety of its regions and its people; the incendiary public discontent that flared into violence at Tiananmen Square; and whether China's future is more likely to be one of turbulence and upheaval or peaceful evolution.

HIS-301 - African History and Culture

African History and Culture examines the history and contemporary life of Africa through its triple heritage: indigenous, Islamic and Western. This course offers a new perspective on Africa, explores the real story of the continent and looks at modern Africa with new insight. The course also examines African economic and social systems, examining both inherent conflicts and Africa's relationships with the rest of the world.

HIS-302 - The Renaissance: Origins of the Modern West

The Renaissance brought transformation of systems of government, technology, economic enterprise, social ideas and art that continue to influence contemporary society. This course explores the fundamental changes that occurred in Europe between the late 14th and late 17th centuries and shows how the issues raised in this period continue to influence the modern world. Topics focus on politics, war, dissent, economics, art and science, as well as on rulers, religious leaders, and soldiers.

HIS-310 - The Middle East

This course is not a traditional history course, but a multidisciplinary perspective on a region of the world which effects the entire world. The course focuses on the complex interrelationships of history, religion, economics, diplomacy, politics, geography and military strategy in the Middle East. Study is focused on four topics: the physical and cultural setting, the Middle East and the West, the twentieth century, and problem areas.

HIS-333 - Modern Latin America and the Caribbean

This course presents a multidisciplinary study of the 20th century political, economic, social and cultural history of Latin America and the Caribbean. It covers key issues and events crucial to understanding the development of the modern day Americans; the relationship of Latin America and the Caribbean to the rest of the world; historical roots of regional tensions; national economics of the Americas; political instability, reform movements and revolutions; impact of migration and urbanization; regional ethnic identities; role of women; religious upheaval; cultural/artistic movements; and issues of sovereignty

HIS-356 - War and American Society

Focuses on the effects of war on American society, from the Revolutionary War to the present.

**HUMANITIES**

000077

HUM-409 - The Age of the Enlightenment

This course explores the culture of the Age of Reason at its height through the in-depth study of a number of major texts and of certain leading figures. There is an interdisciplinary approach embodying, for instance, historical, literary and philosophical approaches. The works of fiction and poetry, philosophy, history, science, music and art are studied in their own right, but are also interconnected as mutually illuminating phenomena.

## JOURNALISM

JOU-352 - News Writing

News Writing is a comprehensive journalism course designed to teach students how to start, develop and polish hard news and feature stories. In addition, related styles, such as editorial and column writing, are explored along with issues of language use, media ethics and media law. The course explores both journalism styles in broadcast and public relations, as well as print journalism.

## LAW

LAW-201 -Business Law

An introductory course to the area of business law. Topics covered are the nature and meaning of law, contract law, sales contracts, commercial paper, agency law, property and the influence of government regulation.

## LITERATURE

LIT-101 - Introduction to Modern English and American Literature I

Introduces students to English and American works from the period between 1789 and 1901. Provides a general introduction to literature and literary analysis; discussion of major cultural movements of the 19th century; and an anthology which includes selections by Blake, Wordsworth, Keats, Whitman, Dickinson, and Browning.

LIT-102 - Introduction to Modern English and American Literature II

Introduces students to English and American prose and poetry of the 20th century. Explores the ways in which 20th century writers have sought to go beyond the literature of earlier eras by experimenting with new ideas and new forms of expression. Examines influential figures of literary modernism - writers who sought ways to respond to the fragmentation and impersonality of modern life. Also examines postmodernist writers from the period after World War II to the present.

LIT-130 - Analysis and Interpretation of Literature

Incorporating both contemporary and traditional works, this course is organized around three major genres of literature - short fiction, poetry and drama - allowing students to examine the literary elements of character, plot and symbolism. Critics and noted authors share perspectives on various works and the craft of writing. The course also places a strong emphasis on writing about literature as a way to learn and use advanced compositional techniques.

LIT-221 - Introduction to Children's Literature

Designed to inform students about the history and diversity of children's literature, this course covers a variety of recommended works and suggests

000078

criteria for selecting and evaluating alternative books. Specific genres covered include traditional fiction, historical fiction, multi-cultural literature, works of contemporary realistic fiction and information books. Requires regular access to a library with children's books.

LIT-320 - Shakespeare I

Examines eight plays to illustrate Shakespeare's range and variety. One history, three comedies, three tragedies, and a romance are covered.

LIT-337 - Twentieth-Century African American Novel

While focusing on the contemporary black novel, the course emphasizes the development, diversity, and quality of African American literature. Works other than popular and current novels promote a wider acquaintanceship with some of the major African American writers of the 20th century.

LIT-347 - Modern American Poetry

Modern American Poetry chronicles the collective achievement of America's great poets and their contributions to our national poetry. The course focuses on works of poetry rather than on biography, and conveys poetry as a dynamic, living art form in this country. Documentary, dramatic and experimental film techniques are skillfully combined in this course.

## MANAGEMENT

MAN-301 - Principles of Management

Introductory course in management. Includes essential skills in planning and organizing, staffing and directing, controlling decision making, motivation, communication, and the application of management principles to the business organization.

MAN-331 - Human Resources Management

The following topics are covered: The field of personnel; Employment; Job analysis; Training and Development; Performance Appraisal; Motivation, Communication, and Leadership Styles; Compensation; Security; Personnel Legislation; Labor Relations; and, Current Issues.

MAN-372 - International Management

This subject places an emphasis on business behavior and organization including comparative management in various cultures. Management practices in Europe, Asia, Latin and South Americas, and Africa are contrasted with the strategies and operating principles of American firms. Consideration is given to analysis and comparison of the factors that influence business policy and organizational behavior in different societies and the implications of cultural differences on the rapidly growing trend toward multinational companies.

MAN-373 - Managerial Communications

The application of oral and written communication prinicples to managerial situations; an overview, simulation, and analysis of the communication process in the business environment. Topics include: alleviation of barriers; structure; information overload; interpersonal techniques such as transactional analysis, nonverbal and behavioral aspects.

MAN-432 - Small Business Management

000079

Small Business Management provides students with an understanding of the tools entrepreneurs require to compete effectively in the world of business. Students observe a variety of small businesses in action and gain a first hand look at how to start a small business, evaluate business opportunities, market products or services, manage personnel and fiscal demands, and more. Wrap-up discussions feature business experts who analyze the issues addressed by the business owners and offer relevant advise

## MARKETING

MAR-306 - Creating and Implementing the Electronic Enterprise

Explores the theories, concepts, practices, and technologies being developed to plan, implement, and manage product- and service-based electronic enterprises.

MAR-310 - Principles of Sales

Designed to introduce students to the principles of selling and to the role of the professional salesperson in the marketing process. The course explores the characteristics and skills necessary for success in sales; techniques for importance of relationship building, product knowledge, and post-sales service in long-term, consultative-style selling; territory and sales management; and selling in the global marketplace.

MAR-432 - Product and Services Development for Electronic Enterprise

Examines the market research, idea-generation, project-creation, testing, and commercialization processes that are involved in product development. Looks at how the use of electronic media for promotion and delivery is likely to affect those processes.

MAR-441 - Marketing with Electronic Media

Examines marketing as an organizational strategy, with emphasis on marketing communications as the component most relevant to usage of electronic media. Investigates the range of tools that enable electronic marketing.

## MATHEMATICS

MAT-115 - Intermediate Algebra

Topics include operations with algebraic expressions, linear equations and inequalities, systems of linear equations, algebraic fractions and fractional equations, application, graphing, and an introduction to functions. One year of high school algebra is needed to succeed in the course.

MAT-121 - College Algebra

An introductory college algebra course which provides an understanding of algebraic process and practical applications. Topics include quadratics, systems of linear equations, inequalities, complex numbers and logarithms, permutations and combinations, composite and inverse functions, and polynomial, exponential, and logarithmic functions.

MAT-128 - Precalculus for Business

Precalculus is designed to prepare students for courses in calculus and higher mathematics. It is broadbased to prepare students for courses in business. Active participation by students is fostered by means of a variety of activities.

000080

Learning is facilitated by shifting the focus from purely computational skills emphasized in more elementary mathematics courses to truly analytical skills. Topics covered include equations and inequalities; linear and quadratic functions; trigonometric functions, identities, equations and applications; systems of equations and inequalities, and analytic geometry (parabola) and series and sequences.

MAT-129 - Precalculus for Technology

Precalculus is designed to follow courses in college alegebra, and to prepare students for courses in calculus and higher mathematics. It is broad-based to prepare students for courses in technology. Specific target population is students in the Applied Science and Technology degree program. Active participation by students is fostered by means of variety of activities. Learning is facilitated by shifting the focus from purely computational skills emphasized in more elementary mathematics courses to truly analytical skill. Topics covered include: exponential and logarithmic functions; exponential and trigonometric functions; exponential and trigonometric functions; trigonometric identities and equations, applications of trigonometry; systems of equations, systems of inequalities, series and sequences; and analytic geometry.

MAT-231 - Calculus I

Calculus I is an intensive, higher level course in mathematics that builds on courses like Precalculus for Technology. It aims at serving the needs of a wide student audience, including students in engineering mathematics, the physical and life sciences, and economics, and is constructed around multiple focal points to help students become creative and efficient problem solvers, using technology as a means of discovery of numerical, graphical and analytical solutions to problems In addition, communication skills are emphasized, and students are required to interpret, describe, discuss, justify and conjecture as they search for solutions to problems. Real-life applications provide links with students' life worlds. Topics covered in he course include: the Cartesian plane, limits and continuity, problems of tangents, velocity and instantaneous rates of change, rules for differentiation, implicit differentiation, maxima and minima theory, antiderivatives and the indefinite integral, exponential and logarithmic functions, and area between curves.

MAT-232 - Calculus II

Calculus II is an intensive, higher level course in mathematics that builds on Calculus I. It aims at serving the needs of a wide student audience, including students in engineering, mathematics, the physical and life sciences, and economics, and is constructed around multiple focal points with the intention of helping students become creative and efficient problem solvers, using technology as a means of discovery of numerical graphical and analytical solutions to problems. In addition, communication skills are emphasized, and students are required to interpret, describe, dicuss, justify and conjecture as they search for solutions to problems. Real-life applications provide links with students' life worlds. Topics covered in the course include: inverse function: exponential, logarithmic, and inverse trigonometric functions; techniques of integration; parametric equations and polar coordinates; infinite sequences and series; three-dimensional analytic geometry and vectors; partial derivatives.

MAT-270 - Discrete Mathematics

This course is an introduction to sets, alphabets, formal languages and elementary logic and the study of recursively defined functions, algebraic structures and relations with emphasis on applications to computer science.

**MECHANICAL ENGINEERING TECHNOLOGY**

000081

MET-311 - Machine Design I

The application of principles of mechanisms and strength of materials to mechanical design. Topics include theories of failure, fatigue, weldments, fasteners, spring and other machine elements subject to static and dynamic loading.

MET-312 - Machine Design II

A continuation of Machine Design I. Including the design of power screws, brakes, clutches, belt and chain drives, gears, gear trains, bearings, thick-wall cylinders, and other machine elements.

## NUCLEAR TECHNOLOGY

NUC-412 - Radiation Biophysics

A study of the effects of radiation at the cellular and subcellular level. Emphasis will be placed on the chemical effects of ionizing radiation, the dose-response relationship in macromolecules, and the over all effects at the cellular level.

NUC-413 - Radiation Interactions

An advanced undergraduate course, which builds upon fundamental charged particles with matter. The course serves two purposes. First, it reviews the physics of the atom, radioactive decay and the interaction of charged particles with matter. Second, it describes the methods of radiation detection, and radiation dosimetry and shielding. Topics include the atomic model, nuclear radiation and the nucleus, radioactive decay curves, interaction of heavy charged particles with matter, interactions of electrons and positrons with matter, characteristics of charged particle tracks, interactions of photons with matter, methods of radiation detection, energy absorption and radiation dosimetry, and radiation attenuation and shielding

NUC-452 - Radiation Dosimetry

An advanced undergraduate course dealing with an analysis of the deposition of energy in tissue building upon the fundamental concepts taught in NUC-412-GS Radiation Biophysics and NUC-413-GS Radiation Interactions. This course involves a study of the theories currently in use to determine doses received both from radiation sources and radioactive materials located outside and from with the body. The various models which describe the distribution of radionuclides within the body and specific interactions with the organic systems are covered, along with an evaluation of various dosimetric systems.

## OPERATIONS MANAGEMENT

OPM-301 - Intro to Operations Management

Survey of operations management using system concepts to stress coordination, optimization, & control of materials, equipment & people to the management of all types of organizations. Topics include: logistics; production; purchasing; inventory control; and other areas of operations management & research.

## PHILOSOPHY

PHI-286 - Contemporary Ethics

Ethical traditions, ethical analysis of issues arising in interpersonal and

000082

Bronte International University

ethical traditions, ethical analysis of issues arising in interpersonal and personal-societal relationships and in professional and occupational roles (such as law, government, medicine, business, military service, journalism), relationships between ethical traditions and ethical analysis of situations.

PHI-376 -Major Philosophers: From Socrates to Sartre

Examines six major philosophers of Western Civilization: Plato, Descartes, Hume, Hegel, Marx and Sartre. Each philosopher's distinctive treatment of the real problems of his time conditioned the way in which later thinkers dealt with similar problems, and raised new problems which became the subject matter for future thought and investigation.

PHI-384 - Ethics and the Business Professional

This course focuses primarily on ethics as applied to business professionals. In addition to introducing many concepts of ethics, the course encourages students to develop practical methods and models for thinking about and resolving ethical issues and conflicts, and applying these to ethical issues and problems that arise in business. It investigates institutions and their personnel and practices in light of ethical considerations, covering a broad range of political, economic, societal and philosophical views.

## PHOTOGRAPHY (FILM)

PHO-101 - Introduction to Photography

Introduction to Photography is designed to help students discover and develop the skills required to use photography confidently and effectively. A major emphasis of the course is to improve visual awareness. The Internet provides exciting opportunities to share rich visual experiences by viewing and studying students' work as well as the works of professional photographers. Completion of assignments will require students to interact frequently with assigned textbook, relevant web sites, and to apply these insights to their own photography. Significant discovery occurs through studying and sharing commentary pertaining to visual materials. For this reason, the instructor will routinely select student photographs from each assignment and moderate constructive commentary resulting from students viewing that work in an "online" gallery.

## PHYSICS

PHY-111 - Physics I

First-semester introductory course intended for nonscience majors. Focuses on mechanics and the properties of matter and includes study of motion and energy.

PHY-112 - Physics II

Second-semester introductory course intended for nonscience majors. Emphasizes the comprehension of topics such as electricity, magnetism, electromagnetism, light, and optics.

## POLITICAL SCIENCE

POS-110 - American Government

This American government survey course explores the development and nature of American political culture, constitutional and structural arrangements, policy-making processes, and sources of conflict and consensus. Provides opportunities for students to learn how to access their

000083

government.

POS-309 - Dilemmas of War and Peace

This course examines war and peace historically and in the contemporary world. It is designed to provide a comprehensive introduction to the problem of war and peace as it confronts the human race. In the context of the potential scale and destructiveness of modern warfare, the course explores and encourages critical thinking on the history of war and peace, the causes of war, the role of cultural and structural aspects influencing war and peace, and visions and strategies for the future.

POS-310 - Constitutional Issues

This is a course on constitutional rights and public policy. The focus of the course is a series of thirteen controversial constitutional issues, such as capital punishment, affirmative action, abortion, executive privilege and national security vs. freedom of the press. The course examines the human stories behind landmark Supreme Court cases which have helped define the Bill of Rights; how the Constitution adapts to changing times; how the Supreme Court corrects the errors of past courts; and how the balance between individual and societal rights is achieved.

**PSYCHOLOGY**

PSY-101 -Introduction to Psychology

This course examines the fundamental principles and major concepts of psychology. Topics include: the brain and behavior, sensation and perception, conditioning and learning, motivation and emotion, life- span development, the self, stress and health issues, and the methodology of psychology.

PSY-211 - Developmental Psychology

The study of lifespan development; biological development; perception; learning and memory; cognition and language; social, emotional and personality development.

PSY-317 - Worlds of Childhood

Worlds of childhood, and advanced-level child development course, traces life's most extraordinary journey - the universal journey from babyhood to puberty. The course is distinguished by its multicultural and cross-cultural focus. Examining twelve families living on five continents, this course serves as a visually exciting and vital resource for learning how children grow in the many diverse and pluralistic worlds of childhood

PSY-322 - Research in Experimental Psychology

An introduction to the research methods used by experimental psychologists as they attempt to understand the behavior of humans and lower animals. Examples of research studies, chosen from a variety of areas of experimental psychology, demonstrate these methods and provide an understanding of the type of knowledge these studies have produced.

PSY-331 - Introduction to Counseling

This course offers a discussion of the theories and techniques of counseling, with emphasis on developing listening, attending and observational skills.

PSY-350 - Abnormal Psychology

000084

Explores the complex causes, manifestations and treatments of common behavioral disorders. Abnormal behavior is introduced in the context of psychological well-being to show that these behaviors range along a continuum from functional to dysfunctional.

PSY-369 - People and Organizations

This course focuses on two broad concerns: the nature of modern bureaucracies and the ways in which they affect their individual members, and the ways in which bureaucracies affect contemporary society. The approach to these issues is primary analytical and theoretical, with specific concerns presented within the context of organizational studies.

Social Psychology

This course surveys the field of social psychology and explores major topics, including communication, friendship, prejudice, conformity, leadership, aggression and altruism. The course aims to teach students to evaluate interpersonal communication and media presentations of current issues.

**RELIGION**

REL-371 - Myth and Culture

Myth and Culture presents the world's mythologies as taken from the lectures of Joseph Campbell, world-renowned scholar and mythologist. Students will gain an understanding of mythology's role in human history and religions throughout the world. Topics include: origins of man and myth, gods and goddesses, eastern philosophy, Arthurian legends, Tristan and Isolde, the Tibetan Book of the Dead and more

REL-439 -The Religious Quest

The course is designed as an intensive one-semester course in world religions. Emphasis is on specific forms of religious expression and practice, rather than the more abstract or theological aspects. Religions covered by the course are those of the majority of humankind and living traditions in today's world (Hinduism, Buddhism, religions of China and Japan, Judaism, Christianity, Islam and several African religions).

**SOCIOLOGY**

SOC-101 - Introduction to Sociology

What is the link between an individual and society? What is the social/ cultural impact on the development of personality? How does modern society differ from societies of the past? These questions are representative of those explained in this course, which examines the broad range of human social relationships and social structures, and the many forces - historical, cultural and environmental - that shape them. The central aim of this course is to guide students in the development of a sociological imagination grounded in a knowledge of sociological perspectives.

SOC-210 - Marriage and the Family

Marriage and the family provides students with an understanding of the various approaches to studying the family and the varieties of U.S. family forms. It explores the family life cycle - mate selection, parenting and the major processes of family interaction. Lastly, it looks at some of the problematic aspects of the U.S. family, including stress, divorce and the elderly.

000085

SOC-315 - Social Gerontology

This course in gerontology is designed to provide students with an understanding of old age as a stage of life. It examines the impact of society on aging and of aging on society, provides a foundation for understanding the processes of aging and old age, and introduces considerations regarding the importance of health-related and/or medical perspectives in studying aging. The approach of the course responds to the demographic wave that is sweeping our nation and world by exploring questions about what roles people will play in their eighth, ninth and tenth decades, and how institutions may evolve to address their needs.

SOC-322 - Dealing with Diversity

Failure to deal with diversity in society has led to increasing polarization among groups of people, and with increasing tension, frustration and anger. Based on the premise that the more we understand, the less we fear, this course introduces people from many diverse poopulations-Native Americans, Hispanic-Americans, Asian- Americans and Euro-Americans. Dealing With Diversity assists the different constraints and motivations of people from differing backgrounds.

SOC-335 - The Adult Years

This is an interdisciplinary social science course that explores the inner lives of adults and the relationships of those inner lives to family, work, education, and the community. The course focuses on adult years as composed of variability and change rather than predictable, sequential developmental stages. The course dispels myths about adult life and incorporates current research on adults.

SOC-376 - Women and Social Action

The course examines the impact gender stereotypes and barriers have on women's lives and how they intersect with other systems, such as age class, disability, ethnicity, race; religion and sexual orientation. This course will assist the student in analyzing and evaluating whether or not the goals and methods of particular social actions are consistent with an empowerment model of social change.

**SOCIAL SCIENCES**

SOS-110 - Living in the Information Age

Living in the Information Age is an introductory level course intended primarily for students who are reentering academic study after a considerable hiatus in their formal schooling. Students will assess and strengthen their academic skills in reading, writing, calculating, and computing; and complete a number of assignments which will put these skills to practical use. The subject matter of the course is of natural interest and will also complement the instructional methods, which rely heavily on the use of computers and electronic communications. Students enrolling for this course must have access to a computer with CD ROM drive and a floppy disk drive. Windows 95 required.

SOS-304 - Drugs and Society

This course focuses on physiological, psychological and sociological aspects of drug abuse, including identification and discussion of historical and contemporary patterns. It endeavors to provide a balanced, factual account of drug abuse, including legal and ethical issues, pharmacological aspects and approaches to treatment and prevention of substance abuse. The course

000086

examines past and present drug abuse treatment modalities and analyses factors and institutions at local, state and national level that affect the delivery of drug abuse services.

## SPANISH

SPA-101 - Elementary Spanish I

An introduction to the spoken and written language, emphasizing the skills of comprehension, speaking, reading, and writing.

SPA-102 - Elementary Spanish II

Continued study of the introduction to the spoken and written language, emphasizing the skills of comprehension, speaking, reading, and writing.

SPA-103 - Elementary Spanish III

Continued study of the introduction to the spoken and written language, emphasizing the skills of comprehension, speaking, reading, and writing.

## STATISTICS

STA-201 - Principles of Statistics

An introduction to descriptive and inferential statistics. Measures of central tendency; variability; correlation; regression; hypothesis testing; non-parametric statistics.

© 2004 by Bronte International University. Please read our **Privacy Notice**

000087

Attachment 7



| HOME | BIU FASTTRACK | AVAILABLE DEGREES | BIU CAREERS | CONTA |



**Getting Started**

**How to Apply**

**Fees**

**Credit For Prior Learning**

**About Us**

**Memberships and Accreditations**

**Frequently Asked Questions**

# BIU
# FEES

Our fees are Prior Learning Assessment (PLA) fees based upon the number and type of credit hours sought by an applicant toward a Certificate, Associates or Bachelor degree. Fees are NEVER based upon the amount of credit earned, if any, but so-called 'diploma mills' use this tactic to the discredit of legitimate organizations that attempt to practice the standards of PLA in compliance with recommendations of the U.S. Department of Education. In other words, our fees are based upon the work involved in assessing the number of units assessed and NOT the number of units awarded.

**This is What You Get for Your Money!**

**DEGREE**
Printed on the highest quality parchment paper to the highest standards, it is easily comparable or better than the finest produced by any university in the world. It is 8.5 x 11 inches.

VIEW THE DEGREE

**STUDENT RECORD**
Upon graduation, the university issues the official academic record, the STUDENT RECORD. This important document is proof of graduation and is based upon our assessment of your qualifications, showing all college level courses credited, all pertinent information, including research and other topics. *A FEE OF $95.00 IS REQUIRED FOR THIS SERVICE. All previous courses recorded on a sealed transcript must be mailed to our student records office. Please allow 2 to 4 weeks for delivery.*

VIEW THE STUDENT RECORD

**ACADEMIC LETTER OF RECOMMENDATION**
A formal letter from the university is sent verifying the conferring of your degree and the date of your graduation.

VIEW THE LETTER OF RECOMMENDATION

**ALUMNI IDENTIFICATION CARD**
A wallet sized Identification Card showing your name and confirming your status as a member of the alumni.

VIEW THE I.D. CARD

**REPLICA OF YOUR DEGREE ETCHED IN BRONZE**
A special offer with a Retail Value of $149 for only $39.95: YOUR degree is etched in bronze on a beautiful bronze plaque for wall display.

VIEW THE BRONZE PLAQUE

BIU help
all I ever
Yc

000088

**FOR GRADUATES !**
LIFETIME CHARTER MEMBERSHIP IN CIPM-USA for only $24.95!
In addition to the Degree, Student Record, Letter of Recommendation, Bronze Plaque and Lifetime Verification Service, we also offer a CHARTER MEMBERSHIP into the exclusive and limited Chartered Institute of Professional Management (CIPM-USA). The CIPM is a worldwide professional organization devoted to management development and personal development. CIPM members have exclusive opportunities to build their professional knowledge and to meet other like-minded professionals in all parts of the world.

Membership in CIPM is $300 per year but Bronte International University has arranged for its Bachelor and Master degree graduates to obtain a LIFETIME CHARTER MEMBERSHIP for only $24.95! This offer is good for a limited time only.

Membership includes a beautiful Certificate of Membership, showing your Charter Membership, an ideal credential to hang on your office wall and to copy and hand over to your Human Resources Department for placement in your file. You will also receive a wallet size Membership Card!
VISIT CIPM-USA WEBSITE (www.cipmusa.org)

**PAYMENT METHODS**

AMEX, VISA, MASTERCARD, DISCOVER CARD, CHECK, MONEY ORDER OR BANK WIRE TRANSFER

Fee payments are never accepted unless and until an applicant is approved. DO NOT SEND OR ENCLOSE PAYMENT WITH YOUR APPLICATION. Upon approval, we will send you our Notification of Acceptance Letter, via email. You are requested to make payment at the time of your acceptance of our offer.

Certificates - $195
Associate Degree - $695
Bachelor - $695

Note: A discount of 10 percent is offered to all who pay by bank wire.

**Shipping Charges**

All shipping is via FedEx or UPS unless otherwise requested. All approved transactions are shipped within five working days of confirmation of receipt of payment.

Domestic: $15.00
Canada: $50.00
International: $135.00

**REFUND POLICY**

Bronte International University replaces at NO CHARGE to you any shipment damaged or lost.

If within three (3) days of receipt of your documents, you decide that we have fallen short of your expectations, simply return the complete package, just as you received it, and we will adjust, credit, exchange or refund your fees.

WHAT ARE YOU WAITING FOR? THERE IS NO CHARGE FOR APPLYING.
CLICK HERE

000089

Attachment 8



# TRINITY
## UNIVERSITY

April 20, 2006

Trinity University
Office of the Registrar
One Trinity Place
San Antonio, TX  78212
Phone: (210) 999-7201
Fax: (210) 999-7202

Attn: Sandy Speakman, State of Alabama
Fax: (334) 353-4481

Re: Virginia S. Hopper

Good afternoon Sandy-

We have been unable to locate records for Virginia S. Hopper, SSN: xxx-xx-4190. Trinity University, San Antonio, TX, does not provide online or correspondence courses for our students, and we are not affiliated with any other Trinity Colleges or Universities.

If you have any questions, please feel free to contact me directly at (210) 999-7204 or lbethell@trinity.edu. Have a wonderful day!

Sincerely,


L. Marie Bethell
Student Records Coordinator.

Request for degree verification from Troy University at Montgomery

## Applicant's Information

Applicant's Name:     **Virginia Swearengin Hopper**

Applicant's Address:  **200 Alpha Lane**
                      **Deatsville, AL   36022**

Social Security #:    **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**

Date of Birth:        **05/06/1954**

Degree Title:         _none_          Date Degree Awarded: _none_

School Attended:      **Troy University**
School Location:      **Montgomery, AL**

Total credit hours completed:  _18_

| Course # | Course Name | | Date Completed | |
|---|---|---|---|---|
| ACT-291 | Prin of Acct I | A | June 1998 | |
| ACT 292 | Prin of Acct II | A | August 1998 | |
| ACT 394 | Govt' Acct | B | August 1999 | |
| CIS 140 | Basic Micro computing | A | | |
| ACT 293 | Managerial Acct | C | March 2000 | |
| ACCT 3391 | Intermediate Acct | A | May 2003 | (verbally confirmed date) |

Total credit hours transferred in to TSU:    _0_
Total credit hours transferred out from TSU: _0_

## Hiring Location Information:

**State of Alabama, Department of Finance**
**100 N. Union Street**
**Montgomery, AL   36130**

**Contact:** **Jeanne C. Brackin**
            **Supervisor, Fiscal Management Section**
**Office Phone:**  **(334)242-7064**
**Office Fax:**    **(334)242-2440**

per Lynn Lewis Registrar at Troy

241-9511

000091



EXHIBIT
DHR 2



**TROY**
UNIVERSITY

P.O. Drawer 4419
Montgomery,
Alabama
36103-4419



Office of the Comptroller
attn: Jeanne Brackin
1000 N. Union Street
RSA Union Suite 220
Montgomery, AL 36130



MONTGOMERY
PM
4 APR
2006

0004608343
APR 04 2006
MAILED FROM ZIP CODE 36104

$ 00.39°

000092

EXHIBIT

OHR 3

6/21/06

PENGAD-Bayonne, N. J.

TROY Undergraduate Catalog 2005-2006

## WELCOME TO TROY UNIVERSITY

### TABLE OF CONTENTS
### GENERAL INFORMATION
### ACCREDITATION INFORMATION
### UNIVERSITY MISSION STATEMENT

The Academic Year 2005-2006 marks a significant milestone in the history of this venerable institution of higher education dedicated to excellence in all of its endeavors. By the direction of the Board of Trustees, Troy State University becomes Troy University in August, 2005, to reflect more accurately its evolving mission and stature.

This name change represents the fifth major advancement in the storied, dynamic rise of the University to national and international prominence. Enabled by an act of the Alabama Legislature in February 1887, Troy Normal School, or teachers college, as it became familiarly known, matriculated its first class in September, 1887.

From the outset, the institution quickly earned a reputation for innovation and accessibility. Troy Normal became Troy State Teachers College in 1929, Troy State College in 1957, and Troy State University in 1967.

The Montgomery campus earned independent accreditation in 1983, as did the Dothan campus in 1985. The Phenix City campus and the locations around the nation and the world administered by University College have always operated under the accreditation of the Troy Campus. In 2005 the separately accredited campuses were merged into a single university structure forming Troy University.

The Troy University calendar information may be found in each Schedule of Classes or on the following Troy website: www.troy.edu.

**Policy Statement**
This catalog is the official announcement of the programs, requirements, and regulations of the university, and students enrolling in the university are subject to the provisions as stated. Fees and other charges, courses, requirements, and conditions are subject to change without notice. The university reserves the right to cancel any class or section for insufficient enrollment. Although the publisher of this catalog has made every reasonable effort to attain factual accuracy herein, no responsibility is assumed for editorial, clerical or printing errors or errors occasioned by honest mistake. All information contained in this catalog is subject to change by appropriate officials of Troy University without prior notice.
Troy University does not discriminate on the basis of sex, age, color, race, national origin, religion, handicap veteran status or sexual orientation in its admissions, education, employment, or access to its programs. The university fully complies with the following: Civil Rights Act of 1964 and its amendments; Federal Executive Order 11246; Educational Amendments of 1972 and 1974; the Vietnam Era Veterans Readjustment Assistance Act of 1972; Age Discrimination Act of 1975; Family Educational Rights and Privacy Act of 1974; and the Uniformed Services Employment and Reemployment Rights Act of 1994.
Disclosure of a student's social security number is voluntary and mandatory, and this university is authorized under federal law to enroll nonimmigrant aliens as students. The university complies with guidelines and regulations established by the Department of Health and Human Services and the Food and Drug Administration of the United States Government.

University Overview

Student Admissions
and Regulations

General Studies Program

Special Academic
Offerings

Financial Information

Degrees and Required
Credit Hours

Colleges

Course Descriptions

Board of Trustees,
Administration, Faculty

Index

Case 2:07-cv-00457-MEF-WC    Document 37-9    Filed 05/30/2008    Page 19 of 25

TROY Undergraduate Catalog 2005-2006

**TROY Home**
**Catalog Table of Contents**

Please consult the Troy University Web Site for changes which may have occurred, or contact the Web Coordinator.
TROY UNIVERSITY Troy, Alabama 36082, 800-551-9716, 334-670-3000, www.troy.edu

## Accounting COURSES (ACT)

**ACT 2291    Principles of Accounting I (3)**
Modern financial accounting theory and practices applied to sole proprietorships, partnerships, and corporations.

**ACT 2292    Principles of Accounting II (3)**
Modern financial and managerial accounting theory and practices applied to an organization's liabilities, cash flows, planning, budgeting, and control. *Prerequisite: ACT 2291.*

**ACT 3391    Intermediate Accounting I (3)**
Theory and applications of assets, liabilities, and owners' equity, revenues, expenses, and analytical process. *Prerequisite: ACT 2292.*

**ACT 3392    Intermediate Accounting II (3)**
Theory and applications of assets, liabilities, and owners' equity, pensions, leases, earnings per share, and analytical process. *Prerequisite: ACT 3391.*

**ACT 3394    Governmental Accounting (3)**
Municipal and governmental accounting; preparation and use of budgets, records, and statements. *Prerequisite: ACT 2292.*

**ACT 3395    Managerial/Cost Accounting I (3)**
Manufacturing and distribution cost accounting, material, labor and overhead costs in job order and process cost accounting. These courses must be taken in sequence. *Prerequisite: ACT 2292.*

**ACT 3396    Accounting Information Systems (3)**
Principles underlying establishment of complete accounting systems; applications to typical business organization; emphasis on the functions of control and protection. *Prerequisite: ACT 2292.*

**ACT 4435    International Accounting (3)**
An overview of emerging issues related to international accounting and reporting of financial information across national boundaries. The course will address topics such as accounting and auditing standards, disclosure practices, and financial reporting in a global business environment. *Prerequisite: ACT 3392.*

**ACT 4491    Advanced Accounting (3)**
Theory and applications of accounting for business combinations, branches and segments, partnerships, and foreign currency transactions and translations. *Prerequisite: ACT 3392.*

**ACT 4494    Income Tax Accounting I (3)**

University Overview

Student Admissions and Regulations

General Studies Program

Special Academic Offerings

Financial Information

Degrees and Required Credit Hours

Colleges

Course Descriptions

Board of Trustees, Administration, Faculty

Index

TROY Home
Catalog Table of Contents

000095

Principals and dictates of individual capital and taxation of individual income. *Prerequisite: ACT 2292.*

**ACT 4495 Income Tax Accounting II (3)**

Tax Laws and regulations for partnership, corporations, estates and fiduciaries. *Prerequisite: ACT 4494.*

**ACT 4496 Managerial/Cost Accounting II (3)**

Manufacturing and distribution cost accounting, material, labor and overhead costs in job order and process cost accounting. These courses must be taken in sequence. *Prerequisite: ACT 3395.*

**ACT 4497 Auditing (3)**

Auditing theory as contained in official pronouncements. Emphasis will be placed on material required for the CPA exam as it relates to professional ethics, audit engagement, internal control, audit sampling, evidence gathering and auditors' reports. *Prerequisite: ACT 3392.*

**ACT 4498 Advanced Auditing (3)**

Auditing theory and procedures as applied to transaction cycles, revenue cycles, expenditure cycles, and cash balances. This course covers EDP auditing as well as internal, operational, and governmental auditing. *Prerequisite: ACT 4497.*

000096

Form Revised November 1997

DO NOT WRITE IN THIS SPACE

# APPLICATION FOR EXAMINATION

RETURN TO: STATE PERSONNEL DEPARTMENT,
64 NORTH UNION STREET, SUITE 300
MONTGOMERY, ALABAMA 36130

**AN EQUAL OPPORTUNITY EMPLOYER**

**General Instructions**

A separate application is required for each job. **Do not write in shaded areas.** Complete all parts of the application. Applications not properly completed will be returned. Photocopied and facsimile applications will be accepted.

ENTER SOCIAL SECURITY NUMBER BELOW.

| 4 | 2 | 3 | - | 7 | 4 | - | 4 | 1 | 9 | 0 |

**Examination For Which You Are Applying** (one per application)    10601    Option (if applicable)

Account Clerk                                                      10601

Full Name   Virginia        S.        Hopper
            First           Middle              Last

Address   200 Alpha Lane
          House or Apartment Number        Street

Deatsville        AL                    Elmore                36022
City              State                 County                Zip Code

Telephone Number: Home ( 334 ) 285-6226        Work ( 334 ) 353-4112
                       Area Code                    Area Code

**The following information is required for governmental reporting or recordkeeping purposes:**

Date of Birth    5        6        54        Sex (check one)  1. ( ) Male   2. (X) Female
                 (Month)  (Day)   (Year)

Race (check one) 1. (X) White   2. ( ) Black   3. ( ) Hispanic  4. ( ) Asian or Pacific Islander   5. ( ) American Indian or Alaskan Native  6.( ) Other

---

**EDUCATION:**                        CIRCLE OR BRACKET THE HIGHEST GRADE OF SCHOOL COMPLETED.        ED

High School Graduate or GED? (X) Yes  ( ) No   1  2  3  4  5  6  7  8  9  10  11  [ 12 ]  College 1  2  3  4   LC

**PROVIDE INFORMATION ON ALL SCHOOLS ATTENDED.  SPECIFY UNDERGRADUATE OR GRADUATE WORK.**

| Name and Location of School | Dates of Attendance Month/Year From | To | Credit Hours Sem. | Qtr. | Did You Graduate? Yes | No | Type of Degree and Date | Major |
|---|---|---|---|---|---|---|---|---|
| See Attached | | | | | | | | |

**PROFESSIONAL LICENSE OR CERTIFICATE**

| License/Certificate Issued By | Field/Trade/Specialization | License/Certificate No. | Issue Date | Expiration Date |
|---|---|---|---|---|
| | | | | |

**LIST COURSES (AND HOURS) WHICH ARE PARTICULARLY RELATED TO THE POSITION** (attach additional sheets, if needed).

TSUM Principles of Accounting II 5qtr. hrs.
TSUM Principles of Accounting I 5qtr. hrs.
WCS  Intro into Accounting

**CERTIFICATION STATEMENT**

I certify that all statements on or attached to this application are true and correct to the best of my knowledge. I know that any false statements may cause me to be denied the chance for testing, to be removed from an employment register, or to be released from employment. I will not discuss the test I have taken. I further authorize the release of all relevant prior employment, military service and criminal records. If employed I agree, consistent with applicable laws, to receive compensatory time off in lieu of overtime compensation for any overtime hours worked.

000097

Signature   Virginia S. Hopper        Date   8/28/98

During the application process, including testing and employment consideration,
your name may be removed from an employment register for any disqualifying reason.

**EXHIBIT**
DHR 4

200 Alpha Lane
Deatsville, Alabama
36022

Phone (334) 285-6226

# Virginia Hopper

**Objective**

To make effective use of my experience, work skills, and personal attributes in a position in accounting.

**Qualifications**

Experience in accounting, insurance experience in underwriting, return of premium, Workers Compensation reinsurance claims, computer skills, general office skills, and organizational skills.

**Education**

Lee High School          Montgomery, Alabama
Troy State University      Montgomery, Alabama
Wetumpka Vocational School  1993
   Computer Applications I & II
   Accounting
Wetumpka Vocational School  1995
   Windows 3.1
SIR/NCIGF Working Together Seminar  1994
NAIC Reinsurance Seminar 1995
NOLHGA Seminar 1995
NAIC Reinsurance Seminar 1996

**Computer Skills**

Proficient in WordPerfect 6.0, Lotus 1-2-3, Dbase III, and Quicken
Currently  training in Word, Excel, and Access

**Employment History**

2/94 – Present    **State of Alabama, Department of Insurance**

**Receivership Division  (Contract)**



Accounting Technician II

- Reconcile Bank Statement for all estates

000098

- Prepare cash balance, transactions, and missing check reports
- Retrieve data from an on line accounting system
- Schedules of short term investment maturities
- Journalize and enter data into an on line accounting system
- Compile and prepare subsidiary accounts
- Prepare and process checks by on computer system
- Calculate and file claims subject to reinsurance
- Research records and provide medical updates on claimants for reinsurers
- Account receivables, agents collection accounts, premium collections
- Calculate and process return of premium
- Communicate with policyholders and agents
- Communicate with providers on behalf of claimants
- Maintain mortgage loan accounts

After fifteen years as homemaker and mother of two, I returned to the business world.

1/78 – 7/79    **State of Alabama, Department of Corrections**

**Kilby Correctional Institution**

Medical Records Clerk Typist

- Interviewed incoming inmates and prepared medical history files
- Maintained daily records on inmate patients, updated medical and dental file
- Scheduled appointments for doctor and dentist
- Calculated and prepared reports of inmates funds

8/76 – 10/77   **State of Alabama, Department of Health**

000099

## Vital Statistics

### Clerk Typist

- Checked and coded birth certificates from every county in the state
- Communicated with county officials for necessary information
- Numbered and bound birth certificates into volumes monthly

### 1/75 – 7/76   State of Alabama, Department of Revenue

### Sales Tax Division

### Clerk Typist

- Interviewed applicants and issued sales tax numbers
- Checked monthly sales tax reports
- Closed tax numbers for business
- Corrected and updated information on licensed business

### 9/71 – 12/74   American Fire and Casualty Insurance Company

### Insurance Clerk

- Prepared rate quotes
- Calculated return of unearned premium
- Prepared check request
- Accounts receivables, received and posted premium payments

**Extracurricular**   Member of First Assembly of God church choir and drama team.

000100

**APPLICATION FOR EXAMINATION**

DO NOT WRITE IN THIS SPACE

RECEIVED

Oct 25  2 36 PH '99

STATE OF ALABAMA
PERSONNEL DEPARTMENT

RETURN TO: STATE OF ALABAMA
PERSONNEL DEPARTMENT
64 NORTH UNION STREET
P O BOX 304100
MONTGOMERY, ALABAMA 36130-4100

AN EQUAL OPPORTUNITY EMPLOYER

**General Instructions**

A separate application is required for each job. **Do not write in shaded areas.** Complete all parts of the application. Applications not properly completed will be returned. Photocopied and facsimile applications will be accepted.

ENTER SOCIAL SECURITY NUMBER BELOW.

| 4 | 2 | 3 | - | 7 | 4 | - | 4 | 1 | 9 | 0 |

Examination For Which You Are Applying (one per application)  10603   Option (if applicable)

Accounting Tech I - 10603

Full Name  Virginia  S.  Hopper
           First        Middle        Last

Address  800  Alpha  Lane.
         House or Apartment Number   Street

Deatsville  AL.  Elmore  36022
City        State    County    Zip Code

Telephone Number: Home (334) 285-6226  Work (334) 353-4112
                       Area Code              Area Code

The following information is required for governmental reporting or recordkeeping purposes:

Date of Birth  05  06  54   Sex (check one) 1. ( ) Male  2. (✓) Female
               (Month) (Day) (Year)

Race (check one) 1. (✓) White  2. ( ) Black  3. ( ) Hispanic  4. ( ) Asian or Pacific Islander  5. ( ) American Indian or Alaskan Native  6. ( ) Other

---

EDUCATION:                    CIRCLE OR BRACKET THE HIGHEST GRADE OF SCHOOL COMPLETED.   ED

High School Graduate or GED? (✓) Yes  ( ) No   1  2  3  4  5  6  7  8  9  10  11  (12)  College 1  2  3  4   LC

PROVIDE INFORMATION ON ALL SCHOOLS ATTENDED. SPECIFY UNDERGRADUATE OR GRADUATE WORK.

| Name and Location of School | Dates of Attendance Month/Year From | To | Credit Hours Sem. | Qtr. | Did You Graduate? Yes | No | Type of Degree and Date | Major |
|---|---|---|---|---|---|---|---|---|
| Robert E. Lee - Montgomery | 9/68 | 5/71 | | | ✓ | | Grad 5/71 | Business |
| Troy State - Montgomery | 6/98 | 8/99 | | 15 hrs. | | | | |

PROFESSIONAL LICENSE OR CERTIFICATE

| License/Certificate Issued By | Field/Trade/Specialization | License/Certificate No. | Issue Date | Expiration Date |
|---|---|---|---|---|
| | | | | |

LIST COURSES (AND HOURS) WHICH ARE PARTICULARLY RELATED TO THE POSITION (attach additional sheets, if needed).

| Principles of Accounting I | 5 hrs. | Governmental Accounting | 5 hrs. | C 140 |
| Principles of Accounting II | 5 hrs. | AA Managerial Acc' | 5 hrs. | N/C |

---

CERTIFICATION STATEMENT

I certify that all statements on or attached to this application are true and correct to the best of my knowledge. I know that any false statements may cause me to be denied the chance for testing, to be removed from an employment register, or to be released from employment. I will not discuss the test I have taken. I further authorize the release of all relevant prior employment, military service and criminal records. If employed I agree, consistent with applicable laws, to receive compensatory time off in lieu of overtime compensation for any overtime hours worked.

000101

Signature  Virginia S. Hopper   Date  10/25/99

During the application process, including testing and employment consideration, your name may be removed from an employment register for any disqualifying reason.

EXHIBIT
DHR 5

SOCIAL SECURITY NUMBER : 4 2 3 - 4 4 - 4 1 9 0

..st three reliable persons, not relatives or present employer, who know you well enough to give information about you.

| NAME | ADDRESS AND PHONE NUMBER | EMPLOYER |
|---|---|---|
| ..ttie Walker | 40 Weoka Rd. Wetumpka (334) 567-8752 | State of AL - Dept. of Insurance |
| ..rina McLain | 8816 Green Chase Dr. Mont (334) 215-0174 | State - AL - Dept of Insurance |
| ..ev Morris Pate | 1828 Winona Ave. Mont (334) 264-4995 | Pastor - First Assembly - Millbrook |

Should you need testing accommodations due to a health problem or disability, you must contact the State Personnel Department.

Have you ever been involuntarily terminated, discharged, forced or asked to resign from any job?    ( ) Yes   (✓) No

If you answered Yes to the above question, attach an explanation on a separate sheet noting any mitigating or extenuating circumstances.

Have you ever been convicted of a misdemeanor or felony crime?    ( ) Yes   (✓) No

If you answered Yes to the above question, list in the space below all prior misdemeanor and felony convictions and any extenuating or mitigating circumstances regarding such convictions.  If necessary, you may use a separate sheet or sheets and attach to application.

NOTE: A CRIMINAL CONVICTION WILL NOT NECESSARILY BE A BAR TO CONSIDERATION FOR EMPLOYMENT, EXCEPT THAT A FELONY CONVICTION WILL BAR EMPLOYMENT IN A LAW ENFORCEMENT JOB;  THE DISCLOSURE OF A MISDEMEANOR CONVICTION WILL NOT AUTOMATICALLY RESULT IN DISQUALIFICATION.  CRIMINAL HISTORIES WILL BE SUBMITTED TO THE NATIONAL CRIME INFORMATION CENTER (NCIC) FOR VERIFICATION.  FAILURE TO DISCLOSE A CONVICTION MAY BE CONSIDERED AS GROUNDS FOR DISQUALIFICATION. FOR THESE REASONS, APPLICANTS SHOULD BE CAREFUL TO DISCLOSE ALL CRIMINAL CONVICTIONS.

## WORK HISTORY
## THIS SECTION MUST BE COMPLETED REGARDLESS OF WHETHER OR NOT A RESUME' IS ATTACHED.

Begin with your PRESENT or most recent employment.  List in REVERSE ORDER periods of employment.  Each time you changed jobs or your title changed should be listed as a separate period.  Describe in detail your duties. (Attach additional sheets if needed.)

1. Current or Last Employer  See Attached Resume.    Your Official Job Title

Address    Type of Business

| FROM Month    Year | TO Month    Year | Total Months | Number of Hours Per Week | Beginning Salary $ ____ Per ____ | Ending Salary $ ____ Per ____ | May we contact your employer? ( ) Yes    ( ) No |
|---|---|---|---|---|---|---|

Number/Title of Employees You Supervised On a Continuing Basis    Equipment You Operated

Name, Title and Telephone Number of Supervisor    Reason for Leaving

Describe Your Duties in Detail

000102

  
SOCIAL SECURITY NUMBER : 4 2 3 · 7 4 · 4 1 9 0

| 2. Employer | | | | Your Official Job Title | | |
|---|---|---|---|---|---|---|
| Address | | | | Type of Business | | |

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
|---|---|---|---|---|---|---|---|---|
| Month | Year | Month | Year | | | $ Per | $ Per | ( ) Yes ( ) No |

| Number/Title of Employees You Supervised On a Continuing Basis | Equipment You Operated |
|---|---|
| Name, Title and Telephone Number of Supervisor | Reason for Leaving |

Describe Your Duties in Detail

| 3. Employer | | | | Your Official Job Title | | |
|---|---|---|---|---|---|---|
| Address | | | | Type of Business | | |

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
|---|---|---|---|---|---|---|---|---|
| Month | Year | Month | Year | | | $ Per | $ Per | ( ) Yes ( ) No |

| Number/Title of Employees You Supervised On a Continuing Basis | Equipment You Operated |
|---|---|
| Name, Title and Telephone Number of Supervisor | Reason for Leaving |

Describe Your Duties in Detail

| 4. Employer | | | | Your Official Job Title | | |
|---|---|---|---|---|---|---|
| Address | | | | Type of Business | | |

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
|---|---|---|---|---|---|---|---|---|
| Month | Year | Month | Year | | | $ Per | $ Per | ( ) Yes ( ) No |

| Number/Title of Employees You Supervised On a Continuing Basis | Equipment You Operated |
|---|---|
| Name, Title and Telephone Number of Supervisor | Reason for Leaving |

Describe Your Duties in Detail

5. USING THE ABOVE FORMAT, SHOW OTHER EXPERIENCE BY USING ADDITIONAL SHEETS.

000103

# Virginia Hopper

200 Alpha Lane
Deatsville, Alabama 36022
Phone (334) 285-6226

**Objective**

To make effective use of my experience, work skills, and personal attributes in a position in State Government.

**Qualifications**

Experience in accounting, insurance experience in underwriting, Workers Compensation reinsurance claims, researching and investigating claims and complaints, computer skills, general office skills, and organizational skills. Office management skills and ability to communicate well with others.

**Education**

Troy State University   Montgomery, Alabama
AUM- Advance Technology Group 1999
        MS Excel 97
NAIC Reinsurance Seminar  1996
Wetumpka Vocational School  1995
    Windows 3.1
NAIC Reinsurance Seminar  1995
NOLHGA Seminar  1995
SIR/NCIGF Working Together Seminar  1994
Wetumpka Vocational School  1993
    Computer Applications I & II
    Intro Accounting
Lee High School   Montgomery, Alabama  Gradation Date: May 1971

**Computer Skills**

Proficient in WordPerfect 6.0, Lotus 1-2-3, Dbase III, Quicken and Excel
Good working knowledge of Access and Word

**Employment History**

2/94 – Present    **State of Alabama, Department of Insurance**

**Receivership Division   (Contract)**

Accounting Technician II

- Estate Management - manage day to day activities of insolvent insurance companies

000104

- Delegate or assign task to the support team as needed

- Supervise work of the office support team performing duties in processing division records, procedures and production

- Confer with support team members to solve problems relating to coordination of work and other matters

- Review and approve status reports and petitions on each estate before they are filed with the courts

- Reconcile Bank Statement for all estates

- Prepare Balances Sheets and Income Statements

- Prepare cash balance, transactions, and missing check reports

- Schedules of short term investment maturities

- Journalize and enter data into an on line accounting system

- Compile and prepare subsidiary accounts

- Calculate and file claims subject to reinsurance

- Prepare and process checks by computer

- Verify and approve bills for payment

- Communicate with attorneys and accountants to provide financial information on receivership estates

- Interview complainants, policyholders, and agents and correspond in order to gather information and resolve complaints

- Evaluate contractual provisions of insurance policies and provide a means of expediting or settling claims

- Prepare computer and tapes for nightly back


1/78 – 7/79    **State of Alabama, Department of Corrections**

**Kilby Correctional Institution**

Medical Records Clerk Typist

- Interviewed incoming inmates and prepared medical history files

- Maintained daily records on inmate patients

- Updated medical and dental files

000105

- Scheduled appointments for doctor and dentist
- Calculated and prepared reports of inmates funds

## 8/76 – 10/77   State of Alabama, Department of Health

### Vital Statistics

Clerk Typist

- Checked and coded birth certificates from every county in the state
- Communicated with county officials for necessary information
- Numbered and bound birth certificates into volumes monthly

## 1/75 – 7/76   State of Alabama, Department of Revenue

### Sales Tax Division

Clerk Typist

- Interviewed applicants and issued sales tax numbers
- Checked monthly sales tax reports
- Closed tax numbers for business
- Corrected and updated information on licensed business

## 9/71 – 12/74   American Fire and Casualty Insurance Company

Insurance Clerk

- Prepared rate quotes
- Calculated return of unearned premium
- Prepared check request
- Accounts receivables, received and posted premium payments
- Answer calls for general questions from consumers

**Extracurricular activities**     Member of First Assembly of God church choir and drama team.

000106

SOCIAL SECURITY NUMBER : 4 3 3 - 7 9 4 1 9 0

## COMPLETE THIS SECTION IF YOU ARE CLAIMING VETERAN'S PREFERENCE

If you claim Veteran's Preference, check the type below. Attach copies (which will not be returned) of the required documents to your application to support your claim.
( ) Veteran (5 points) - Requires DD214 or document showing dates of service and type of discharge. If this has been submitted previously and is on file with this office, you may disregard this requirement.
( ) Disabled Veteran (10 points) - Requires DD214 or other document as above and letter of disability from V.A. dated within last 6 months. V.A. letter must be kept updated until register is established or you lose the extra 5 points.
( ) Deceased Veteran's spouse (10 points) - Requires DD214 or other document as above and marriage and death certificates. Cannot be claimed if spouse remarries.
( ) Disabled Veteran's spouse (10 points) - Requires DD214 or other document as above and V.A. letter of disability dated within last 6 months. Cannot be claimed unless still married to disabled veteran.
( ) Permanently Disabled Veteran (10 points) - Requires DD214 or other document as above indicating veteran is permanently disabled or DD214 or other document and V.A. letter indicating permanent disability.

## COMPLETE THIS SECTION IN ORDER TO BE SCHEDULED FOR WRITTEN EXAMS

Written exams will be given in the places below for which a sufficient number of applicants express preference. Indicate by number your 1st, 2nd and 3rd choices.

1 ( ) Alexander City      3 ( ) Birmingham     5 ( ) Dothan         7 ( ) Linden        9 ( ) Montgomery   12 ( ) Tuscaloosa
2 ( ) Andalusia           4 ( ) Decatur        6 ( ) Jacksonville   8 ( ) Mobile        10 ( ) Selma

If you qualify, you will receive a notice showing the place and time you are to report for the exam.

### Where did you learn of this job? (check all that apply)

1 ( ) State Employment Service      5 (✓) Friend/Relative              9 ( ) Legislative Representative      13 ( ) TV/Radio Commercial
2 ( ) Job Announcement Notice       6 ( ) Dept. News Bulletin          10 ( ) State Recruiter/Counselor      14 ( ) Other _____
3 ( ) Newspaper                     7 ( ) Rehabilitation Services      11 ( ) State Personnel Dept. Information Board
4 ( ) College Placement/Career Office  8 ( ) High School Counselor    12 ( ) Outreach Program (i.e. Church)

## AVAILABILITY

81 - Northwest Alabama
17 Colbert
30 Franklin
39 Lauderdale
40 Lawrence

84 - Jasper/
Winfield Area
29 Fayette
38 Lamar
47 Marion
64 Walker
67 Winston

87 - East Central Alabama
08 Calhoun
09 Chambers
14 Clay
15 Cleburne
19 Coosa
56 Randolph
61 Talladega
62 Tallapoosa

90 - Montgomery Area
01 Autauga
26 Elmore
43 Lowndes
51 Montgomery

93 - South Central Alabama
07 Butler
18 Conecuh
20 Covington
21 Crenshaw
27 Escambia
50 Monroe

82 - Huntsville/
Decatur Area
36 Jackson
42 Limestone
45 Madison
48 Marshall
52 Morgan

85 - Tuscaloosa Area
04 Bibb
32 Greene
33 Hale
54 Pickens
60 Sumter
63 Tuscaloosa

88 - Southwest Alabama
12 Choctaw
13 Clarke
46 Marengo
65 Washington

91 - Phenix City/
Troy Area
03 Barbour
06 Bullock
41 Lee
44 Macon
55 Pike
57 Russell

94 - Dothan Area
16 Coffee
23 Dale
31 Geneva
34 Henry
35 Houston

83 - Northeast Alabama
10 Cherokee
25 DeKalb
28 Etowah

86 - Birmingham Area
05 Blount
22 Cullman
37 Jefferson
58 Shelby
59 St. Clair

89 - Selma/Clanton Area
11 Chilton
24 Dallas
53 Perry
66 Wilcox

92 - Mobile Area
02 Baldwin
49 Mobile

95 - Statewide
(You will be considered for vacancies throughout the state. Relocation may be necessary.)

Please answer the following questions with care. List in the spaces provided those areas of the state in which you would accept employment. You will be considered for employment only in the locations you indicate. You may choose a combination of up to three counties and/or regions from the list above. If you list a region, you will be considered available for all counties in that region. The counties in each region are listed alphabetically below the region. You will not be considered for jobs involving overnight travel or shift work unless you so indicate.

List the numbers of up to 3 counties and/or regions where you are willing to work   90  _____  _____

If you want to be considered for appointment by only certain state agencies, indicate here _____

Will you accept work involving overnight travel?  ( ) Yes  (✓) No      Will you accept part-time work?  ( ) Yes  (✓) No

Will you accept temporary work?  ( ) Yes  (✓) No

Which shifts are you willing to work?  0. ( ) all shifts  1. ( ) 1st only  2. ( ) 2nd only  3. ( ) 3rd only  4. ( ) 1st and 2nd only  5. ( ) 1st & 3rd only  6. ( ) 2nd & 3rd only

Enter the earliest date you will be available to interview for employment. (Your name will not appear on a list of eligibles until this date.)   11 / 15 / 99
                                                                                                                                            Month  Day  Year

NOTE:    Your name will be placed on inactive status for this class after declining three offers of employment consideration or failing to reply to a written inquiry concerning your availability. Your name may be restored to the active register by written request.

000107

STATE PERSONNEL DEPARTMENT

January 6, 2000

2000 JAN -6  A 10: 36

Lee Frier — *said as long as he took it before test date - OK!*
State of Alabama
Personnel Department
300 Folsom Administrative Bldg
Montgomery, Alabama 36130-2301

RE: Accounting Technician 10603

Dear Lee,

I received notice that I did not have required credit hours for the above position. Please add credit for 099 - Basic Accounting - 5 hours and 293- Managerial Accounting - 5 hours.

Thanks so much for your help in this matter. If more is needed please advise. I can be reached at (334) 353-4112 work and (334) 285-6226 at home.

Sincerely,

*Virginia Hopper*
Virginia Hopper
SS# 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

TROY STATE UNIVERSITY SYSTEM
REGISTRATION STATEMENT/INVOICE

Ms. Virginia G. Hopper
200 Alpha Lane
36022

SCHEDULE INFORMATION:          TERM: 007WN          PROGRAM: B1
LOCATION: M01   REG STATUS: P   DATE: 11/09/99   ID # 0360263   SS# 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
PHONE: (Home) 334-285-6221          (Work) 334-353-4112
MAJOR: BUS   MINOR:          ADVISOR:          OPERATOR: greg3

| COURSE SEC | TITLE | PC LOC BLDG ROOM DAYS | TIME | INSTRUCTOR CRE |
|---|---|---|---|---|
| CIS 140 AC | Basic Microcom | W  WHIT 323  MW | 04:30-06:00P Stech Cind | 3. |
| ACT 293 AA | Managerial Acc | W  WHIT 329  MW | 06:15-08:15P Franklin | 5. |
| | | | TOTAL CREDITS: | 8. |

EMPLOYER INFORMATION (Make any corrections as necessary):
Employer Name: STAT OF AL DEPT OF INS.
Job Title:
Address: 64 N. UNION          City: Montgomery
Country:          State: AL          Zip: 36130
GET F/A CREDITS BASED ON FULL TIME:
                    Previous Balance: $  0.00
                    INSTATE UNDERGRAD TUITI   464.00
                    COMPUTER AND INFO SCI L    20.00

TOTAL (potential FA credits)  #   0.00        CURRENT BALANCE:  $   494.00
METHOD OF PAYMENT:   X Check or Money Order Attached 11/15/99 Amount $ 40.00
                     __ Financial Aid:   Type _____

TO INSURE PROPER CREDIT, PLEASE RETURN CASHIER COPY AND PAYMENT TO:
                    Troy State University, Montgomery
                    P.O. DRAWER 4419
                    Montgomery, AL 36103-4419
I agree that by signing and submitting this registration, I am financially
responsible for all tuition and fees due and personally responsible for meeting
class prerequisites and/attendance policies.
Student Signature _____          _____ 11/15/99
In case of emergency, please contact: Name: _____   Phone: _____

000109

**Announcement date: October 6, 1999**

State of Alabama
Personnel Department
64 North Union Street
P.O. Box 304100
Montgomery, AL 36130-4100
**(334) 242-3389**
Internet: www.personnel.state.al.us

## ACCOUNTING TECHNICIAN I - 10603
## $21,764 - $33,082

*Department: Various*
*Location: Statewide*

### TYPE OF EXAMINATION

A written test will be conducted for applicants who meet the qualifications below. An **open-competitive register** will be established composed of the names of applicants who pass the test.

The written test will measure your knowledge of accounting, math, and English. The test will also measure the ability to read and comprehend, ability to perform mathematical operations such as computing percentages and decimals, adding, subtracting, multiplying, and dividing.

### QUALIFICATIONS NEEDED TO APPLY
- High School Graduation and completion of five (5) college-level accounting courses.
- Two-years of accounting, bookkeeping, or fiscal clerical experience.

### KIND OF WORK

This is responsible para-professional accounting work. Employees in this class are usually responsible for independently performing bookkeeping activities, maintaining general ledger and accounts, and preparing accounting reports. Duties may include ledger posting, balancing, and control; reconciling accounting transactions; preparing financial reports; compiling data and statistical reports; and maintaining a complete set of general accounting books.

### HOW TO APPLY

Use an Application for Examination form. You can get the form at this office. You can also get the form at an Alabama Employment Service office. You must send your application to the State Personnel Department. This job classification will remain open for applications **until further notice**. Photocopied and facsimile applications are accepted. Our fax number is 334-242-1110.

*Individuals currently on the register must reapply to remain eligible for employment.*
**THE STATE OF ALABAMA IS AN EQUAL OPPORTUNITY EMPLOYER**

000110



Announcement date: <u>November 12, 2003</u>

**State of Alabama**
**Personnel Department**
**64 North Union Street**
**P O Box 304100**
**Montgomery, AL 36130-4100**
**(334)-242-3389**
**Internet: <u>www.personnel.state.al.us</u>**

## Announcement of Continuous Merit System Examination

# ACCOUNTANT - 10611
# $26,410.80 - $40,055.60

| Accountant (10611) | Salary $26,410.80 - $40,055.60 |
|---|---|

**Departments:** Various
**Location:** Statewide

### TYPE OF EXAMINATION

An **open-competitive** register will be established by scores achieved on a written test. The written test will comprise 100% of the final score.

### QUALIFICATIONS NEEDED TO APPLY

You **must** have the following to qualify:

- Bachelor's degree with a major in Accounting or Business Administration, including completion of five (5) college level accounting courses (four of which must be Principles I and II and Intermediate I and II or equivalent courses)

**Note:** Each accounting course completed should be listed separately on the application. Qualifying college-level accounting courses are defined as courses that are acceptable by an accredited four-year college or university towards a major in accounting, including writing coursework. Income tax courses will <u>not</u> be counted towards the five required accounting courses.

### KIND OF WORK

This is beginning professional level accounting work in the application of accounting and auditing principles, methods, and procedures in the establishment, analysis, and maintenance of fiscal records. Employees in this class perform professional accounting and auditing work of routine difficulty according to established procedures and regulations. Employees may also assist higher-level accountants in providing specific analyses, interpretations, and preparation of complex financial reports. Other employees in this class perform various phases of complex audits and make professional decisions and judgments in accordance with generally accepted auditing and accounting practices.

### HOW TO APPLY

Use an Application for Examination form. You can get the form at this office or at an Alabama Employment Service Office. It can also be downloaded from our web site. You must send your application to the State Personnel Department. This announcement will remain open **until further notice**. Photocopied and facsimile applications are accepted. Our fax number is 334-242-1110.

*Individuals currently on the register must reapply to remain eligible for employment.*

## THE STATE OF ALABAMA IS AN EQUAL OPPORTUNITY EMPLOYER

000111

EXHIBIT
D#R 7

Form 3 - Revised November 2000

# APPLICATION FOR EXAMINATION

DO NOT WRITE IN THIS SPACE

RETURN TO: STATE OF ALABAMA
PERSONNEL DEPARTMENT
64 NORTH UNION STREET
P O BOX 304100
MONTGOMERY, ALABAMA 36130-4100

AN EQUAL OPPORTUNITY EMPLOYER

**General Instructions**

A separate application is required for each job. **Do not write in shaded areas.** Complete all parts of the application. Applications not properly completed will be returned. Photocopied and facsimile applications will be accepted.

ENTER SOCIAL SECURITY NUMBER BELOW.

| 4 | 2 | 3 | - | 7 | 4 | - | 4 | 1 | 9 | 0 |

Examination For Which You Are Applying (one per application)    10611    Option (if applicable)

10611 Accountant

| Full Name | Virginia | S | Hopper |
| | First | Middle | Last |

| Address | 200 | Alpha Lane | | |
| | House or Apartment Number | Street | | |
| | Deatsville | AL | Elmore | 26 | 36022 |
| | City | State | County | | Zip Code |

Telephone Number: Home ( 334 ) 285-6226    Work ( 334 ) 242-2224
                  Area Code                      Area Code

**The following information is required for governmental reporting or recordkeeping purposes:**

Date of Birth    05    06    1954    Sex (check one) 1. ( ) Male  2. (X) Female
                (Month) (Day) (Year)

Race (check one) 1. (X) White   2. ( ) Black   3. ( ) Hispanic  4. ( ) Asian or Pacific Islander   5. ( ) American Indian or Alaskan Native  6. ( ) Other

| EDUCATION: | CIRCLE OR BRACKET THE HIGHEST GRADE OF SCHOOL COMPLETED. | ED 3/ |
| High School Diploma or GED? (X) Yes  ( ) No | 1  2  3  4  5  6  7  8  9  10  11  [12]  College 1  2  3  [4] | LC 100 |

PROVIDE INFORMATION ON ALL SCHOOLS ATTENDED.  SPECIFY UNDERGRADUATE OR GRADUATE WORK.

| Name and Location of School | Dates of Attendance Month/Year From | To | Credit Hours Sem. | Qtr. | Did You Graduate? Yes | No | Type of Degree and Date | Major |
|---|---|---|---|---|---|---|---|---|
| Trinity University 715 Stadium Dr | | | | | X | | BS – May 2002 | Bus Admin |
| San Antonio, TX 78212 | | | | | | | | |

PROFESSIONAL LICENSE OR CERTIFICATE

| License/Certificate Issued By | Field/Trade/Specialization | License/Certificate No. | Issue Date | Expiration Date |
|---|---|---|---|---|
| | | | | |

LIST COURSES (AND HOURS) WHICH ARE PARTICULARLY RELATED TO THE POSITION  (attach additional sheets, if needed).
See attached list

## CERTIFICATION STATEMENT

I certify that all statements on or attached to this application are true and correct to the best of my knowledge.  I know that any false statements may cause me to be denied the chance for testing, to be removed from an employment register, or to be released from employment.  I will not discuss the test I have taken.  I further authorize the release of all relevant prior employment, military service, academic/school and criminal records.  If employed I agree, consistent with applicable laws, to receive compensatory time off in lieu of overtime compensation for any overtime hours worked.

000112

Signature  Virginia S. Hopper          Date  11/21/2003

During the application process, including testing and employment consideration, your name may be removed from an employment register for any disqualifying reason.

EXHIBIT
DHR 8

SOCIAL SECURITY NUMBER : 4 2 3 - 7 4 - 4 1 9 0

et three reliable persons, not relatives or present employer, who know you well enough to give information about you.

| NAME | ADDRESS AND PHONE NUMBER | EMPLOYER |
|---|---|---|
| Peggy Stieringer | 645 Japonica Rd  Prattville, AL    271-7742 | State Of Alabama ADEM |
| Vicke Vuittonet | 633 Cousins Rd  Wetumpka, AL    514-0441 | |
| Craig Nelson | 240 Second Street  Wetumpka AL    567-8839 | State of Alabama  DHR |

Should you need testing accommodations due to a health problem or disability, you must contact the State Personnel Department.

Have you ever been involuntarily terminated, discharged, forced or asked to resign from any job?    ( )   Yes    ( X ) No

If you answered **Yes** to the above question, attach an explanation on a separate sheet noting any mitigating or extenuating circumstances.

Have you ever been convicted of a misdemeanor or felony crime?    ( )    Yes    ( X )No

If you answered **Yes** to the above question, list in the space below all prior misdemeanor and felony convictions and any extenuating or mitigating circumstances regarding such convictions.  If necessary, you may use a separate sheet or sheets and attach to application.

_____
_____
_____
_____
_____

NOTE: A CRIMINAL CONVICTION WILL NOT NECESSARILY BE A BAR TO CONSIDERATION FOR EMPLOYMENT, EXCEPT THAT A FELONY CONVICTION WILL BAR EMPLOYMENT IN A LAW ENFORCEMENT JOB;  THE DISCLOSURE OF A MISDEMEANOR CONVICTION WILL NOT AUTOMATICALLY RESULT IN DISQUALIFICATION.  CRIMINAL HISTORIES WILL BE SUBMITTED TO THE NATIONAL CRIME INFORMATION CENTER (NCIC) FOR VERIFICATION.  FAILURE TO DISCLOSE A CONVICTION MAY BE CONSIDERED AS GROUNDS FOR DISQUALIFICATION. FOR THESE REASONS,  APPLICANTS SHOULD BE CAREFUL TO DISCLOSE ALL CRIMINAL CONVICTIONS.

## WORK HISTORY
### THIS SECTION MUST BE COMPLETED REGARDLESS OF WHETHER OR NOT A RESUME' IS ATTACHED.

Begin with your PRESENT or most recent employment.  List in REVERSE ORDER periods of employment.  Each time you changed jobs or your title changed should be listed as a separate period. Describe in detail your duties. (Attach additional sheets if needed.)

| 1.  Current or Last Employer | | | | Your Official Job Title | | |
|---|---|---|---|---|---|---|
| SEE ATTACHED | | | | | | |
| Address | | | | Type of Business | | |

| FROM Month   Year | TO Month   Year | Total Months | Number of Hours Per Week | Beginning Salary $ ___ Per ___ | Ending Salary $ ___ Per ___ | May we contact your employer? ( ) Yes   ( ) No |
|---|---|---|---|---|---|---|
| Number/Title of Employees You Supervised On a Continuing Basis | | | | Equipment You Operated | | |
| Name, Title and Telephone Number of Supervisor | | | | Reason for Leaving | | |
| Describe Your Duties in Detail | | | | | | |

000113

less than 6 months

Virginia Hopper    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

COURSES WHICH ARE PARTICULARLY RELATED TO THE POSITION

Troy - 4 days

ACCT 291  Prin of Acct I  ✓

ACCT 292  Prin of Acct II  ✓

ACCT 293  (Managerial Acct)  ✓

ACCT 391  Intermediate Acct I  ✓

ACCT 394  (Governmental Acct)  ✓

ACCT 1301  Financial Accounting

ACCT 1302  Managerial Accounting

ACCT 4344  Auditing

MGMT 2301  Management

MKTG 2302  Marketing

MGMT 3372  Org Behavior

FNCE 3301 Finance

FNCE 3351 Instit & Mkts

FNCE 3352  Investments

FNCE 4351  Mgmt/Policy

MKTG 4381  Mktg Mgmt

MKTG 3381  Consum Behavior

BUSN 3301 Statistics

BUSN 3302  Busn Law I

BUSN 3341  Busn Law II

BUSN 4301  Busn Policy

BUSN 3303 Quant/Mgr'l Decision Making

Aum
Advance tech
Computer courses

Dept. training
windows 95 + 98

Wet Vocation Comp 1 + 2

NAIC reinsure - Texas
Seminar - 2 days

NOI AGA Seminar -
life + Health - 2

NAIC - reinsur sem. - 2

wet Voc school. window 3.1

Sir / NGIEF - Gaurenty funds
less than week

Wet. Voc school - Basic
acct.

Also provide
contract

000114

# Virginia Hopper
SS# 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

200 Alpha Lane
Deatsville, Alabama 36022
Phone (334) 285-6226

 **Objective**
To make effective use of my experience, work skills, and personal attributes as an accountant in State Government.

 **Qualifications**
Experience in accounting, researching and investigating claims and complaints, computer skills, office skills, and organizational skills. Office management skills and ability to communicate well with others.

**Education**
Trinity University   San Antonio, TX 78212-7200   Gradation Date: May 2002
Troy State University    Montgomery, Alabama
AUM- Advance Technology Group 1999
Lee High School    Montgomery, Alabama   Gradation Date: May 1971

**Computer Skills**
Proficient in Word, Lotus 1-2-3, Dbase III, Quicken and Excel
Good working knowledge of Access, State's Systems, CAS (Central Accounting System), and AFNS Regions

**Employment History**

2/2002 – Present   **State of Alabama, Department of Finance**
                   **Office of State Comptroller - Accounting Tech**

- Audit various claims to determine they are legal and proper

- Record miscellaneous refund payments received and prepare checks for deposit to the State Treasury

- Process vouchers for payments into the AFNS "E" region and CAS (State's Central Accounting System)

- Audit warrant amounts, post warrant data and mail payments to vendors

- Enter and process Request for Cash Transfers from departments into CAS, Interfund Cash Transfer System, on a daily basis

- Audit and process Electronic Warrants from departments in CAS on a daily basis and balance with Treasurer's Office

- Schedule, enter into CAS, and approve Debt Service payments

- Maintain and review expenditure and budgetary control accounts and report as to account status

- Make adjustment journal vouchers, verifying current accounting principles and mathematical accuracy

000115

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 Virginia Hopper

- Process end of fiscal year accounts payable journal vouchers ensuring that data is correct and proper

**6/2000-2/2002  State of Alabama, Department of Human Resources**
**Finance Division − Accounting Tech**

- Investigate, research, and resolve problems in order to assist vendors, resolve discrepancies, and correct departmental records

- Set up purchase orders and record the accounting codes

- Reconcile purchase orders and invoices; verify, code, and balance   records

- Calculate accounting distribution, allocate cost items to a variety of accounts

- Record payment dates, payment amounts, and balances per vendor accounts

- Check balances and retrieve data from the accounting system

- Prepare data and complete computer input forms to be processed by computer to generate payment voucher

- Batched documents to be keypunched, maintained control totals, and balance control totals to compute-generated totals

- Assist in the development of modifications and additions to accounting system and operations

**2/1994 − 6/2000   State of Alabama, Department of Insurance**
**Receivership Division  - Accountant (Contract)**

- Estate Management - manage day to day activities of insolvent insurance companies

- Delegate or assign task to the support team as needed

- Supervise work of the office support team performing duties in processing division records, procedures and production

- Review and approve status reports and petitions on each estate before they are filed with the courts

- Authorized check signer

- Reconcile bank statements and investment statements for all estates

- Prepare Balances Sheets and Income Statements

000116



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 Virginia Hopper

- Prepare cash balance, transactions, and missing check reports

- Maintain schedule of investment maturities, contact bank to purchase or sell

- Journalize and enter data into an on line accounting system

- Compile and prepare subsidiary accounts, post data to general ledger accounts from subsidiary

- Calculate and file claims subject to reinsurance

- Prepare and process checks by computer

- Audit and approve bills for payment

- Interview complainants, policyholders, and agents and correspond in order to gather information and resolve complaints

- Evaluate contractual provisions of insurance policies and provide a means of expediting or settling claims

 Member of First Assembly of God church choir and drama team.

# TRINITY UNIVERSITY

## COURSES OF STUDY

### Undergraduate and Graduate Studies

Effective June 2006

FOR THE 138th ACADEMIC YEAR

000118



EXHIBIT

DHR 9

# TABLE OF CONTENTS

Academic Calendar ................................................................................................................1
    Commonly Observed Special Days ....................................................................6
Summary of Important Fiscal Dates ....................................................................................7
General Information ..............................................................................................................8
    Statement of Institutional Mission ....................................................................8
    The Charter ..........................................................................................................8
    Accreditation ........................................................................................................9
    Non-Discrimination and Diversity Policy ........................................................9
    Security Policy Statement ..................................................................................9
    Electronic Communication ................................................................................9
    Endowed Scholarship Funds ..........................................................................10
Enrollment Information ......................................................................................................19
    Admission Policy ..............................................................................................19
    Dual Credit ........................................................................................................19
    Admission Deficiencies ....................................................................................19
    International Student Requirements ................................................................20
    Student Leave ....................................................................................................20
    Readmission to the University ........................................................................20
    Registration ......................................................................................................20
    Add/Drop Period ..............................................................................................21
    Withdrawal from a Course ..............................................................................21
    Withdrawal from the University ......................................................................21
    Health Services, Health Record, and Insurance ..........................................22
    Credit from Other Institutions and by Examination ......................................22
    Transfer Credit ..................................................................................................22
    Study Abroad and Off-Campus Study ............................................................23
    Credit by Examination ......................................................................................24
    College Board Advanced Placement Program ..............................................24
    International Baccalaureate Program ..............................................................24
    Departmental Examinations ............................................................................24
    Credit by Examination Policies ......................................................................24
    Air Force Reserve Officer Training Corps Program ......................................25
        General ........................................................................................................25
        Four-Year Program ....................................................................................25
        Two-Year Program ....................................................................................26
        Flight Training ............................................................................................26
        Scholarships and Remuneration ............................................................26
        Uniforms and Equipment ........................................................................26
    Correspondence Study ....................................................................................26
Financial Aid ......................................................................................................................27
    Need-based Financial Aid ................................................................................27
    Standards of Academic Progress Policy for Financial Aid ..........................27
    Types of Financial Aid ......................................................................................28
    Outside Scholarships ......................................................................................29
    External Sources of Aid ....................................................................................29
    Financial Aid Award ........................................................................................29
    Renewal of Financial Aid ................................................................................29

000119

**TRINITY UNIVERSITY**

Financial Options ................................................................29
Monthly Payment Plan .......................................................29
Family Loan Programs .......................................................29
How to Apply for Financial Aid ...........................................29
Application Instructions ......................................................30
Important Dates for Financial Assistance at Trinity ............30
Degree Requirements .................................................................32
Undergraduate Studies ......................................................32
Trinity Curriculum ..............................................................32
Student Responsibility .......................................................32
Common Curriculum ..........................................................33
The Major ............................................................................38
Interdisciplinary Second Major ..........................................39
Beyond the Classroom:
Trinity University's Intensive Learning Experience ...........39
The Minor ...........................................................................39
Graduation with Honors .....................................................39
Departmental/Major Honors .........................................39
University Honors ..........................................................40
Phi Beta Kappa ..................................................................40
Residency Requirement .....................................................41
Preprofessional Programs .................................................41
Health Professions Advisory Committee .......................41
Prelaw Advisory Committee ..........................................41
Guidance for Students Interested in Ministry .....................42
General Degree Regulations ..............................................42
Awarding of Degrees ....................................................42
Application for a Degree ................................................42
Bulletin Requirements ...................................................42
Music Ensembles ..........................................................42
Interpretation of Degree Requirements ........................42
Academic Regulations ................................................................43
Undergraduate Studies ......................................................43
Semester Hours .................................................................43
Academic Load ...................................................................43
Full-Time Enrollment ..........................................................43
Undergraduate Enrollment in Graduate Courses ..............43
Classification of Students ...................................................43
Grades ...............................................................................44
Grading System ..................................................................44
Grade Point Average ..........................................................44
Grades in Major or Minor ...................................................45
Grades for Prerequisite Courses .......................................45
Grade Reports ...................................................................45
Pass/Fail Option .................................................................45

ii

## TABLE OF CONTENTS

Incomplete Grades..................................................................................45
Repeating of Courses ............................................................................46
Dean's List ..............................................................................................46
Access to Records..................................................................................46
Transcripts of Credit...............................................................................46
Academic Standing .................................................................................46
    Good Standing ...................................................................................46
    Satisfactory Progress: Enrollment and Financial Aid ......................47
    Satisfactory Progress Requirements for Undergraduate Financial Aid
        Recipients......................................................................................47
    Standards for Satisfactory Progress for Undergraduates ...............47
    Degree Completion Schedule ..........................................................47
Probation and Dismissal ........................................................................48
Dismissal from a Class and Student Attendance ................................49
Policy Regarding Disruption of Class ...................................................49
Representation of the University by a Student......................................49
Graduate Studies .........................................................................................50
Commission on Graduate Studies.........................................................50
Graduate Faculty ....................................................................................50
Admission ...............................................................................................50
    Bachelor's Degree Requirement......................................................50
    Prerequisite Course Requirements ..................................................50
    Admission Categories .......................................................................50
    Formal Application for Admission .....................................................51
Advising and Registration ......................................................................52
Readmission ...........................................................................................52
Admission to Candidacy .........................................................................52
Minimum Hour and GPA Requirement...................................................52
Special Requirements.............................................................................53
Applicable Bulletin...................................................................................53
Thesis ......................................................................................................53
Applied Research Projects .....................................................................53
Internships and Residencies..................................................................53
Comprehensive Examination ..................................................................54
Time Limit.................................................................................................54
Graduation Requirements.......................................................................54
Academic Load ........................................................................................54
Transfer of Graduate Credit....................................................................54
Independent Study ..................................................................................55
Grades and Minimum Performance Requirements ..............................55
    Probation and Dismissal ..................................................................55
Completion of Credit Courses.................................................................55
Withdrawal ...............................................................................................56
Grades for Thesis ...................................................................................56
Student Expenses ........................................................................................57

000121

**TRINITY UNIVERSITY**

Deposits ....................................................................................................57
Fees and Penalties for Special Purposes..........................................................58
Tuition and Fees for Part-Time Students..........................................................59
Graduate Student Expenses for 2006-07 .........................................................59
Advance Deposit .........................................................................................60
Graduate Assistantships and Scholarships .......................................................60
Statement of Policy Regarding Tuition and Student Fees....................................60
Statement of Policies Regarding Student Expenses...........................................60
Schedule of Reduced Costs Upon Approved Withdrawal or for Courses
        Dropped ...........................................................................................61
        Tuition Insurance ...............................................................................62
Student Ownership and/or Operation of Automobiles .........................................62
Veterans' Benefits ......................................................................................63
Courses of Study.........................................................................................64
        Explanation of Course Numbers............................................................64
Course Abbreviations ..................................................................................65
        Abbreviations Used in Courses of Study .................................................65
African American Studies ..............................................................................66
American Intercultural Studies .......................................................................67
Art and Art History ......................................................................................69
Biology......................................................................................................80
Business Administration ...............................................................................89
Chemistry ................................................................................................103
Classical Studies .......................................................................................110
Cognitive Science......................................................................................119
Communication .........................................................................................120
Communication Management .......................................................................126
Comparative Literature ...............................................................................127
Computer Science......................................................................................130
Economics................................................................................................137
Education .................................................................................................145
Engineering Science ..................................................................................171
English.....................................................................................................179
Environmental Studies ...............................................................................189
Film Studies Minor .....................................................................................191
General Education......................................................................................192
Geosciences.............................................................................................193
Health Care Administration ..........................................................................199
History .....................................................................................................207
International Studies....................................................................................217
Linguistics................................................................................................230
Mathematics.............................................................................................233
Medieval and Renaissance Studies ...............................................................240
Modern Languages and Literatures ...............................................................243
Music ......................................................................................................259
Neuroscience ...........................................................................................272
New Media ...............................................................................................274
Philosophy................................................................................................276
Physical Education .....................................................................................282

iv

TABLE OF CONTENTS

Physics and Astronomy ............................................................................................288
Political Science ......................................................................................................295
Psychology .............................................................................................................304
Religion ..................................................................................................................309
Scientific Computing................................................................................................315
Sociology and Anthropology....................................................................................317
Speech and Drama .................................................................................................329
Urban Studies.........................................................................................................341
Women's and Gender Studies .................................................................................346
Board of Trustees....................................................................................................350
Trustees Emeriti .....................................................................................................351
Chairs of the Board of Trustees ..............................................................................351
Presidents of Trinity University.................................................................................352
Officers of the University .........................................................................................353
Trinity University Faculty .........................................................................................354
Trinity University Professors Emeriti ........................................................................368
Endowed Distinguished Professorships....................................................................369
Endowed Faculty Fellowships..................................................................................369
Statement of Institutional Mission ...........................................................................372
Diversity for Excellence at Trinity – A Statement of Intent ........................................372
Trinity University: Commitment to Excellence............................................................373
History ....................................................................................................................373
Index ......................................................................................................................374

000123

**STUDENT NOTES**

vi

000124

department chair if they plan to enroll in BIOL 4399. Attendance at the weekly Biology Seminar, which consists of presentations of original research from diverse fields of Biology, is required.

Prerequisites: Senior standing, completion of BIOL 3398, and submission of a formal research proposal to the department chair prior to the semester of enrollment in the course.

**BIOL 4399    Senior Seminar and Thesis Research II**
This course is a continuation of student projects begun in BIOL 4398. Students are required to write a thesis and make an oral presentation of their research project at an appropriate venue. Attendance at the weekly Biology Seminar is also required. Prerequisite: BIOL 4398.

# BUSINESS ADMINISTRATION

WILLIAM T. BURKE III, J.D., Associate Professor
RICHARD M. BURR, Ph.D., Professor
PHILIP L. COOLEY, Ph.D., Dick and Peggy Prassel Distinguished Professor of Business Administration
J. CHARLENE DAVIS, Ph.D., Associate Professor
FRED H. DORNER, Ph.D., Associate Professor
CARL M. HUBBARD, Ph.D., Professor
J. RICHARD JONES, Ph.D., George R. Brown Distinguished Professor of Business Administration
RITA D. KOSNIK, Ph.D., Professor
KEITH LINDSEY, Ph.D., Assistant Professor
JOHN D. RICE, J.D., C.P.A., Associate Professor
KIM R. ROBERTSON, Ph.D., Associate Professor
PETREA K. SANDLIN, Ph.D., Associate Professor
LINDA B. SPECHT, J.D., C.P.A., Associate Professor
EUGENIO D. SUAREZ, Ph.D., Assistant Professor
DONALD F. VAN EYNDE, Ph.D., Professor
SANKARAN VENKATESWAR, Ph.D., Associate Professor
DARRYL G. WALDRON, Ph.D., Professor
DANIEL T. WALZ, Ph.D., Professor; Chair

## THE MAJOR

The Department of Business Administration offers two undergraduate degree programs. The Bachelor of Science in Business Administration degree is designed to accommodate those students who want to pursue specialized study in the following areas of concentration: accounting, finance, management, marketing, or international business. The Bachelor of Arts degree is designed to accommodate those students who do not wish to pursue an in-depth study of one of the areas in Business Administration and those students who would like to undertake a double major, where one of those majors is Business Administration. Both of these degree programs are accredited by AACSB International – The Association to Advance Collegiate Schools of Business.

Students pursuing the Bachelor of Science degree complete a core of 24 semester hours, a course in Quantitative Managerial Decision Making, at least twelve semester hours in an area of concentration, and sufficient elective hours to bring the total in Business Administration courses to at least 45 semester hours. Students pursuing the Bachelor of Arts degree complete a core of 24 semester hours and nine hours of electives beyond that core.

000125

**TRINITY UNIVERSITY**

The two degree programs are designed to fulfill the needs of students who, upon graduation, intend immediately to pursue a career in business, government, or the non-profit sector, as well as those students who plan to undertake graduate study in either Business Administration or law. This is accomplished through a core that includes those courses prospective employers are most apt to require and that are generally required as prerequisites for the Master of Business Administration degree, as well as being desired courses for graduate study in law.

Students should apply for admission to major in Business Administration early in the Sophomore year so that they may be assigned a major advisor. The advising process is an integral part of the Business Administration major as it provides a basis for the development of a comprehensive program that best meets both the academic and career objectives of the student. The general requirements for the Bachelor of Science and Bachelor of Arts degrees are listed below. For full admission to the major in Business Administration, a student must first complete ACCT 1301, BUSN 2301/ECON 2320, and ECON 1311 with grades of C or better.

## MINOR IN BUSINESS ADMINISTRATION

In addition to the two degree programs offered to business majors, the Department offers a minor in Business Administration to students who would like to explore the subject of business in depth but whose primary interests lie elsewhere. Requirements for the minor are the completion of at least 18 semester hours of business courses. At least nine of these hours must be at the upper-division level.

The specific courses required for the minor will be selected under the supervision of a departmental advisor and will be tailored to the interests and needs of the student. None of the courses used to satisfy these requirements may be taken Pass/Fail.

## MINOR IN BUSINESS ADMINISTRATION LEGAL STUDIES

The Business Administration Legal Studies Minor is designed for students who would like to develop a practical understanding of legal theory and the rules of law applicable to public and private institutions, with emphasis on business enterprises. Students contemplating graduate studies in business, law, medicine, or other professional areas and those who intend to serve in an organizational leadership capacity would find that the Legal Studies Minor complements their major field of study.

Completion of 18 credit hours in the following distribution:

| | | |
|---|---|---|
| A. | Completion of the following nine hours of core coursework: | |
| | ACCT 1301 | Fundamentals of Accounting |
| | BUSN 3302 | Legal Concepts of Business I |
| | BUSN 3341 | Legal Concepts of Business II |

B.    At least one three-hour course in law focusing on business regulation:BUSN/ ECON 3338, BUSN 3361, ECON 3336, ECON 3339, or appropriate BUSN 3-90 or other course approved by the minor advisor.

C.    At least one three-hour course in law applicable to business from a perspective other than business or economics: COMM 3362, PHIL 3353, PLSI 3351, SOCI 3350 or other law course outside of business and economics approved by the minor advisor.

D.    One additional three-hour course in law from either B or C above.

Note:    If a student wishes to pursue a minor in Business Administration and a minor in Business Administration Legal Studies, the courses required by one minor cannot simultaneously be counted to fulfill the requirements of the other. Moreover, a student may not major in Business Administration and receive a minor in Business Administration or a minor in Business Administration Legal Studies.

000126

## MINOR IN COMMUNICATION MANAGEMENT

The minor in Communication Management is an interdisciplinary program that studies both advertising and public relations as part of the management of communication processes by combining mass media, speech communication, marketing, and business principles.

The requirement for the minor in Communication Management is the completion of 21 semester hours as follows:

Twelve hours of required study consisting of the following courses:

| | |
|---|---|
| COMM 3362 | Media Law and Policy |
| MGMT 2301 | Management of Organizations |
| MKTG 2301 | Principles of Marketing |
| SPCH 3334 | Persuasion |

Nine hours in elective courses from the following courses:

| | |
|---|---|
| COMM 3324 | Ethics and the Mass Media |
| COMM 3360 | Principles of Public Relations |
| COMM 3361 | Principles of Advertising |
| MGMT 3371 | Human Resources Management |
| MGMT 3372 | Organizational Behavior |
| MKTG 3381 | Consumer Behavior |
| MKTG 3382 | Promotion Management |
| MKTG 4381 | Marketing Management |
| SPCH 3362/ | |
| BUSN 3311 | Organizational Communication |
| *SPCH 4397 | Internship |

*As approved by minor advisor.

## BACHELOR OF SCIENCE IN BUSINESS ADMINISTRATION DEGREE

The requirements for the Bachelor of Science in Business Administration degree are as follows:

I.   The common curriculum

II.  A core curriculum in Business Administration (27 hours): ACCT 1301, 1302; BUSN 2301, 3302, 4301*; FNCE 3301**; MGMT 2301; MIS 2301; and MKTG 2301.

III. Completion of BUSN 3303.

IV.  Completion of a concentration in Business Administration, choosing from one of the following: Accounting, Finance, Management, Marketing, and International Business. No course taken by a student may count toward more than one concentration requirement.

   A.  Accounting Concentration: Students choosing this concentration must complete ACCT 3341, 3342, 3343, 4344, and BUSN 3341. Prospective students should note that this concentration only partially satisfies the educational requirements for the Uniform Certified Public Accountant Examination in the state of Texas. The Department of Business Administration offers a two-semester Master of Science in Accounting degree program. Upon completion of the program, the student is awarded the degree of Master of Science in Accounting and is qualified to take the Uniform Certified Public Accountant Examination in the state of Texas. Students interested in this program may obtain material describing prerequisite courses, the course of study, and admission procedures and requirements from the Department of Business Administration.

   B.  Finance Concentration: Students choosing this concentration should complete

000127

**TRINITY UNIVERSITY**

FNCE 3352 and 4351. Additionally, students should complete 6 hours from the courses that follow: ACCT 3341, 3342, FNCE 3351 (ECON 3356), FNCE 3361 (ECON 3361), or FNCE 3353.

C. Management Concentration: Students choosing this option should complete MGMT 3371 and 9 hours from the courses that follow: MGMT 3361, MGMT 3372, MGMT 3383, and MGMT 4371.

D. Marketing Concentration: Students choosing this option should complete MKTG 3383, 4381, and an additional 6 hours from the courses that follow: MKTG 3361, 3381, or 3382.

E. International Business Concentration: Students choosing this option should complete each of the following requirements (students should note that coursework taken to complete the requirements specified under sections c) and d) below does not count toward the 45 semester hours in business courses required for the Bachelor of Science degree):

   a) 9 hours from the following international business concentration area courses: BUSN 3361, FNCE 3361, MGMT 3361, or MKTG 3361.

   b) An international experiential requirement consisting of one of the following: Completion of at least one semester of study abroad and the completion of BUSN 3396. Completion of an approved international internship, or other meaningful international work experience, and the completion of an additional 3-hour course from the international concentration list specified in section a) above.

   c) One 3-hour interdisciplinary international course selected from the following (or another 3-hour non-business course approved by the International Business faculty):

| | |
|---|---|
| COMM 3322 | International Communication (Also listed as SPCH 3374.) |
| ECON 3318 | The Global Economy |
| ECON 3327 | Comparative Economic Systems |
| ECON 3341 | Economic Development of Mexico |
| ECON 3342 | Latin American Economic History |
| ECON 3347 | International Trade |
| PLSI 3331 | Political Economy of the U.S., Europe and Japan |
| PLSI 3342 | International Law |
| SPCH 3372 | Intercultural Communication |

   d) A foreign language requirement consisting of the successful completion of a foreign language course numbered 2302, or its equivalent.

   The student's objective should be to take sufficient work in the above foreign language to be proficient in this language. Students who do not feel that they are proficient should consider taking additional courses in the foreign language and in the Languages across the Curriculum program if the courses are presented in a foreign language that is relevant to the student. Students are encouraged to gain exposure to a second foreign language.

V. Completion of electives to bring the total in Business Administration courses to at least 45 semester hours.

VI. Completion of the Senior Experience: BUSN 4301.

VII. Completion of general electives outside of Business Administration sufficient to bring the total semester hours earned for a degree to 124.

A student who pursues either a major or a minor in Business Administration must take at least 50% of the Business Administration credit hours that apply toward his/her degree at Trinity University.

At least 50% of the credit hours required for a concentration in the Bachelor of Science degree in Business Administration must be taken at Trinity University.

*Students should note that ECON 1312 is prerequisite for BUSN 4301. In order to satisfy this prerequisite requirement, ECON 1312 may not be taken on a pass/fail basis.
**Students should note that ECON 1311 is prerequisite for FNCE 3301. In order to satisfy this prerequisite requirement, ECON 1311 may not be taken on a pass/fail basis.

000128

## BACHELOR OF ARTS IN BUSINESS ADMINISTRATION DEGREE

The requirements for the Bachelor of Arts Degree with a major in Business Administration are as follows:

I.   The common curriculum

II.  A core curriculum in Business Administration (27 hours): ACCT 1301, 1302; BUSN 2301, 3302, 4301*; FNCE 3301**; MGMT 2301; MIS 2301; and MKTG 2301.

III. Completion of six hours of electives in Business Administration.

IV.  Completion of the Senior Experience: BUSN 4301.

V.   Completion of general electives outside of Business Administration sufficient to bring the total semester hours earned for a degree to 124.

A student who pursues either a major or a minor in Business Administration must take at least 50% of the Business Administration credit hours that apply toward his/her degree at Trinity University.

*Students should note that ECON 1312 is prerequisite for BUSN 4301. In order to satisfy this prerequisite requirement, ECON 1312 may not be taken on a pass/fail basis.
**Students should note that ECON 1311 is prerequisite for FNCE 3301. In order to satisfy this prerequisite requirement, ECON 1311 may not be taken on a pass/fail basis.

## MASTER OF SCIENCE IN ACCOUNTING DEGREE PROGRAM

The two-semester Master of Science in Accounting degree program is structured to develop and perfect technical, theoretical, and interpersonal skills required of accounting professionals. This degree program is accredited by AACSB International – The Association to Advance Collegiate Schools of Business. Upon completion of the program of study, the student is awarded the degree of Master of Science in Accounting and has satisfied the educational requirements for the Uniform Certified Public Accountant Examination in the state of Texas.

The requirements for full admission to the program include:
1. Senior standing as an undergraduate student, or a baccalaureate degree.
2. Completion of six undergraduate Accounting courses (ACCT 1301, 1302, 3341,3342, 3343, 4344) or their equivalent with acceptable grades. Students who do not have an undergraduate business degree will need three additional business courses to meet CPA exam requirements in Texas.
3. A grade point average of 3.00 or better on the last 60 hours of undergraduate level work and an average of 3.00 or better in the undergraduate major.
4. Acceptable scores not more than six years old on the Graduate Management Admissions Test (GMAT).
5. Two letters of recommendation from professors or employers regarding the applicant's character, motivation, and intellectual ability.

Students who do not meet the requirements for unconditional acceptance may be considered for acceptance on a conditional basis.

000129

TRINITY UNIVERSITY

## COURSE OF STUDY

The Graduate Program in Accounting consists of ten graduate level courses, six of which are grounded in traditional areas of accounting study:

| | |
|---|---|
| ACCT 5341 | Accounting Theory |
| ACCT 5342 | Accounting Information Systems |
| ACCT 5343 | Seminar in Advanced Federal Taxes |
| ACCT 5344 | Advanced Auditing and Assurance Services |
| ACCT 5345 | Advanced Managerial Accounting |
| ACCT 5346 | Advanced Financial and Nonprofit Accounting |

In addition, BUSN 5349, Seminar in Law, Ethics, and Professional Responsibilities, and MGMT 5372, Conflict Management, are to be completed, along with two elective courses to be chosen from the following:

| | |
|---|---|
| BUSN 5390 | Seminar in Business |
| FNCE 5390 | Seminar in Finance |

## *COURSES*

### *ACCOUNTING*

**ACCT 1301  Fundamentals of Financial Accounting**
An introduction to business and the basic concepts of financial accounting. The course incorporates identifying, analyzing, measuring, recording, and communicating financial information for businesses that are organized and operated for profit. Emphasis is placed on applications of these concepts to real world situations.

**ACCT 1302  Fundamentals of Managerial Accounting**
An introduction to cost and managerial accounting with special focus on the application of cost accounting techniques such as managerial planning, control, and decision making tools. A special effort is made to integrate standards of ethical conduct for management accountants throughout the course.
Prerequisite: ACCT 1301.

**ACCT 3341  Intermediate Financial Accounting I**
A comprehensive study of the conceptual bases and standards of financial accounting. The course focuses on analyzing transactions and internal events in terms of current accounting theory and applying this theory in financial reporting.
Prerequisites: ACCT 1301 and Junior standing or consent of instructor.

**ACCT 3342  Intermediate Financial Accounting II**
A continuation of ACCT 3341 with emphasis on accounting for shareholders' equity, debt securities, investments, pensions, leases, and other contemporary accounting topics.
Prerequisite: ACCT 3341.

**ACCT 3343  Introduction to Federal Income Tax**
An introduction to federal income tax law, primarily as it applies to individuals. Emphasis is placed on the various facets of calculating tax liability, the conceptual and theoretical bases of tax law, and practical problems encountered in its application.
Prerequisites: ACCT 1301 and Junior standing.

**ACCT 3-90  Studies in Accounting**
Designed for students wishing to continue the study of accounting beyond regularly offered courses. Credit from one to six hours. No more than a total of six hours credit may be earned in 3-90 courses in business administration.
Prerequisites: Consent of Instructor and Junior standing.

000130

**BUSINESS ADMINISTRATION**

**ACCT 4344**   **Auditing**
A study of accounting attestation standards and procedures. Topics include audit objectives, ethics, auditor's legal liability, generally accepted auditing standards, audit planning, and internal audit functions.
Prerequisite: ACCT 3342.

**ACCT 4697**   **Internship in Accounting**
A supervised internship where the student works with an accounting or business firm learning accounting procedures and practices. The internship will normally be completed by working for an organization on a full-time basis over a period of eight weeks during the spring semester of the senior year. Must be taken on a Pass/Fail basis.
Prerequisite: Senior standing.

### *BUSINESS*

**BUSN 2301**   **Statistics for Management and Economics**
Applications of statistical techniques to business and economics. Decision making based on sampling theory, parametric tests of significance, simple and multiple regression and correlation, and time series analysis. (Also listed as ECON 2320.)

**BUSN 3302**   **Legal Concepts of Business I**
Studies the American legal system, principles of the law of contracts, negotiable instruments, sales, and business ethics.

**BUSN 3303**   **Quantitative Managerial Decision Making**
The study of statistical and quantitative techniques applicable to managerial decision making including probability distributions, decision analysis, linear programming, inventory control models, queuing models, simulation, PERT, and Markov processes. Extensive application of computer assisted analysis is included.
Prerequisite: BUSN 2301.

**BUSN 3311**   **Organizational Communication**
Studies the theory and practice of communication within organizations. Includes the fit of communication into organizational theory; communication climate and cultures; leadership and management styles; information networking; and the diagnosis and evaluation of communication problems. (Also listed as SPCH 3362.)

**BUSN 3313**   **The American Corporation**
For description see ECON 3362.

**BUSN 3330**   **The Culture of Business in China**
A seminar on Sino-American cross-cultural communication in a business context. Students will read selected texts, including excerpts from Sunzi's The Art of War, and conduct daily discussions and role playing on such subjects as how to conduct interpersonal relationships and the strategies of business negotiation. (Also listed as CHIN 3330.)
Prerequisites: Junior standing and 6 hours of Business Administration or 6 hours of Chinese or consent of instructor.

**BUSN 3338**   **Government Regulation of Business**
Economic analysis of direct government regulatory activity. The course first explores how regulation arises from the political process. These insights, and the tools of microeconomic theory, are then applied to analyze public policy in such fields as electricity, telecommunications, broadcasting, transportation and safety. (Also listed as ECON 3338.)
Prerequisite: Three hours of upper-division Economics, or consent of instructor.

000131

**TRINITY UNIVERSITY**

**BUSN 3340**    **Haciendo negocios en Latinoamérica (Doing Business in Latin America)**
This course is both a language and an applied business course. On the language part, it is intended to increase the Spanish proficiency in reading, writing, and speaking. The other aspect of the course includes a thorough understanding of cultural, political, and economic aspects of the Latin American business environment. Moreover, the course will immerse the student in the intricacies of exporting to, importing from, establishing a new business in, or operating a foreign branch in a Latin American country.
Prerequisites: ECON 1311, Spanish proficiency, and consent of instructor. (Also listed as INTL 3340.)

**BUSN 3341**    **Legal Concepts of Business II**
Provides the principles of the law of business organizations and regulation; agency, partnerships, corporations, property, debtor-creditor rights, bankruptcy; additional topics include trusts, wills, business and professional responsibility.
Prerequisites: BUSN 3302 and Junior standing, or consent of instructor.

**BUSN 3344**    **Economic and Business History of the United States to 1865**
A study of the development of American business and the economy through the U.S. Civil War. (Also listed as ECON 3344 and HIST 3360).
Prerequisites: ECON 1311 and 3 hours of U.S. history or consent of instructor.

**BUSN 3345**    **Economic and Business History of the United States Since 1865**
A study of the development of American business and the economy from the U.S. Civil War to the present. (Also listed as ECON 3345 and HIST 3361).
Prerequisites: ECON 1311 and 3 hours of U.S. history or consent of instructor.

**BUSN 3346**    **La economía española y la Unión Europea (The Spanish Economy and the European Union)**
An examination of Spain's economic development and its position within the European Union. The business, economic, and political transformation of Spain from a struggling nation with an authoritarian regime to an economic power with an open and democratic society are studied. The course also examines the development of the European Union, with a special focus on its influence on the Spanish business environment. The experiential component of the course includes visits to businesses, government agencies, and NGOs in Spain. (Also listed as ECON 3346 and INTL 3346.)
Prerequisites: ECON 1311, three additional hours in business or economics, SPAN 2302 or the equivalent, and consent of instructor.

**BUSN 3355**    **Entrepreneurship and Venture Planning**
This course is designed to provide a practical, comprehensive, basic understanding of entrepreneurship. The process is explored from the inception of an idea through exit strategies. Emphasis is placed on the development of a business plan with focus on legal structure, accounting, business ethics, marketing, and finance.
Prerequisites: Admission to the major in Business Administration, completion of at least 15 hours of the core curriculum in Business Administration, Junior standing, and consent of instructor.

**BUSN 3361**    **International Business Law**
Surveys the law of international trade and business with a focus on international contracts, torts insurance, and trade law.
Prerequisite: BUSN 3302 or consent of instructor.

000132

**BUSN 3372    Práctica profesional en España (Internship in Spain)**
A supervised summer internship in Spain. Students enrolled in BUSN 3372 will serve as interns with various firms, trade groups, governmental agencies, or public interest groups where they will work and gain experience related to the Spanish economy and business world. The nature of the student's responsibilities will vary with the internship involved and be subject to the approval of the supervising faculty member. (Also listed as ECON 3372 and INTL 3372.)
Prerequisites: ECON 1311, three additional hours in business or economics, SPAN 2302 or the equivalent, and consent of instructor.

**BUSN 3-90    Studies in Business**
Designed for students wishing to continue the study of business beyond areas offered in regular classroom work. Credit from one to six hours. No more than a total of six hours credit may be earned in 3 90 courses in business administration. Prerequisites: Consent of instructor and Junior standing.

**BUSN 3396    Internship in International Business**
A supervised internationally oriented internship. Students enrolled in BUSN 3396 will serve as interns with various firms, trade groups, governmental agencies, or public interest groups where they will work and gain experience related to a country other than their home country. The nature of the student's responsibilities will vary with the internship involved and be subject to the approval of the supervising faculty member. To earn credit for BUSN 3396, a student must serve as an intern throughout the semester or summer term that he/she is registered for BUSN 3396. Credit will not be given for internships served prior to or after the semester or summer term in which the student is registered for BUSN 3396. Credit for BUSN 3396 will not be given for internships that are served where either the owner or manager of the host organization or the host supervisor is a relative of the student intern. Must be taken Pass/Fail. Students may earn credit for either BUSN 3396 or 3397, but not both.
Prerequisites: Admission to the major in Business Administration and a declared concentration in International Business, completion of at least 15 hours in the core curriculum in Business Administration, Junior standing, and consent of instructor.

**BUSN 3397    Internship in Business Administration**
Students enrolled in BUSN 3397 will serve as interns with various firms, trade groups, governmental agencies, or public interest groups on the basis on individual preferences and the availability of assignments. The nature of the student's responsibilities will vary with the internship involved and be subject to the approval of the supervising faculty member. To earn credit for BUSN 3397, a student must serve as an intern throughout the semester or summer term that he/she is registered for BUSN 3397. Credit will not be given for internships served prior to or after the semester or summer term in which the student is registered for BUSN 3397. Credit for BUSN 3397 will not be given for internships that are served where either the owner or manager of the host organization or the host supervisor is a relative of the student intern. Must be taken Pass/Fail. Students may earn credit for either BUSN 3397 or 3396, but not both.
Prerequisites: Admission to the major in Business Administration, completion of at least 15 hours in the core curriculum in Business Administration, Junior standing, and consent of instructor.

**BUSN 4301    Business Policy and Strategy**
A study in which decision making is emphasized through the analysis of company operations in policy formulation and administration. A course in which the student can apply knowledge acquired in other courses to business problems.
Prerequisites: Completion of all other Business Core courses, ECON 1312, and Senior standing. This course fulfills the Senior Experience requirement of the University's Common Curriculum.

000133

**TRINITY UNIVERSITY**

## *FINANCE*

**FNCE 3301**   **Financial Administration of Business Firms**
Financial decision making in organizations; planning and managing cash flows, raising, and allocating funds. Topics include cost of capital, capital budgeting, working capital management, and financial planning. Emphasis on non-financial corporations.
Prerequisites: ACCT 1301, ECON 1311, and BUSN 2301.

**FNCE 3348**   **International Monetary Systems**
A study of the principles and practices of foreign exchange, international money markets, the balance of payments, payments adjustment mechanism and the national policies for achieving both domestic and international objectives. Coverage includes the description and history of the relevant national and international institutions. Practice is provided in reading and understanding recent international economic events and current policy issues. (Also listed as ECON 3348.)
Prerequisites: ECON 1311 and 1312.

**FNCE 3351**   **Financial Institutions and Markets**
Analytical investigation of the structure, efficiency, and regulation of financial markets and institutions. Topics include determination of the level and structure of interest rates, asset valuation and the flow of funds between markets, theory and practice of financial intermediation, and the social utility of the financial sector. (Also listed as ECON 3356.)
Prerequisites: Junior standing and ECON 1311, 1312.

**FNCE 3352**   **Investment Principles and Analysis**
Analysis of common stock, bonds, options, and futures. Topics include financial markets, valuation of securities, technical analysis, market efficiency, and portfolio theory.
Prerequisites: FNCE 3301 and Junior standing.

**FNCE 3353**   **Student Managed Fund I**
Combines study of security analysis and portfolio management with practical demands of hands-on money management. Provides opportunity to invest university endowment funds. Economic, industry, and company analysis. Economic and financial forecasts. Valuation models. Portfolio theory. Investment philosophy. Ethics in investing. Capital market performance history. Managing endowment funds. Portfolio performance measurement. To be taken in the first semester of the academic year.
Prerequisites: FNCE 3301, 3352, and consent of instructor.

**FNCE 3354**   **Student Managed Fund II**
A continuation of FNCE 3353. Combines study of security analysis and portfolio management with practical demands of hands-on money management. Provides opportunity to invest university endowment funds. Economic, industry, and company analysis. Economic and financial forecasts. Valuation models. Portfolio theory. Investment philosophy. Ethics in investing. Capital market performance history. Managing endowment funds. Portfolio performance measurement. To be taken in the second semester of the academic year.
Prerequisites: FNCE 3301, 3352, 3353, and consent of instructor.

**FNCE 3361**   **International Finance**
This course emphasizes the study of the global exchange rate and associated derivatives markets with particular emphasis on foreign risk hedging; the study of financial equilibrium relations and their effects on the international capital markets, and the potential arbitrage opportunities that result in the absence of equilibrium; and the use of case studies to illustrate the application of theoretical tools on the multinational corporate environment. (Also listed as ECON 3361.)
Prerequisite: FNCE 3301 or consent of instructor.

000134

**BUSINESS ADMINISTRATION**

**FNCE 3-90**   **Studies in Finance**
Designed for students wishing to continue the study of finance beyond areas offered in regular classroom work. Credit from one to six hours. No more than a total of six hours credit may be earned in 3-90 courses in Business Administration. Prerequisites: FNCE 3301, consent of instructor, and Junior standing.

**FNCE 4351**   **Financial Management and Policy**
Advanced study of financial theories and practices. Emphasis on case studies to develop analytical thinking about problems faced by business firms. Topics include capital budgeting, risk analysis, leasing, bankruptcy, and mergers. Prerequisites: FNCE 3301 and Junior standing.

## *MANAGEMENT*

**MGMT 2301**   **Management of Organizations**
This course studies the management activities and processes required to successfully attain organizational goals. It includes an introduction to the principles of decision making, leadership, motivation, conflict resolution, managerial ethics, and social responsibility. Emphasis is placed on both theory and practical application in order to prepare students for future managerial roles.

**MGMT 3311**   **Labor Economics and Labor Relations**
For description see ECON 3329.

**MGMT 3361**   **International Management**
The global marketplace, its structure and dynamics, significant economic, political and cultural influences, and global resource flows will be studied from the perspective of the management strategist. Within this context, strategy formulation and implementation, the creation of an optimal portfolio of strategic business units, and the analysis of global operating and financial flows will be studied, assuming the objective of maximizing shareholder value. Prerequisite: Junior standing or consent of instructor.

**MGMT 3371**   **Human Resources Management**
Examines by discussion and experiential learning techniques the major activities associated with the area of Human Resource Management: equal employment opportunity, personnel planning and selection, training and management development, employee discipline, labor-management relations, and current topics such as AIDS and substance abuse in the workplace. Special emphasis is placed on practical application of this knowledge to general management in all types of organizations.

**MGMT 3372**   **Organizational Behavior**
Examines the nature of interpersonal and group relations in work organizations using behavioral science and modern management thought. A study of organizations as socio-technical systems with emphasis on communication, motivation, leadership, conflict resolution, and organizational development. Prerequisites: MGMT 2301 and Junior standing.

**MGMT 3383**   **Management of Health Care Organizations**
This course provides the unique knowledge and skills necessary to understand and effectively manage individuals and groups in challenging health care organizations such as hospitals, medical group practices, and nursing homes. The focus is on developing a theoretical and practical approach to managerial functions as related to dealing with health care professionals and workers, developing a conceptual understanding of the health care system in which the organization operates, and understanding the relationship between the organization, its regulatory environment, and the reimbursement system. Case studies are used to provide real-world applications relevant to health care management. (Also listed as HCAD 3383.) Prerequisite: Junior standing.

000135

**TRINITY UNIVERSITY**

**MGMT 3-90**     **Studies in Management**
Designed for students wishing to continue the study of management beyond areas offered in regular classroom work. Credit from one to six hours. No more than a total of six hours credit may be earned in 3-90 courses in Business Administration. Prerequisites: Consent of instructor and Junior standing.

**MGMT 4371**     **Strategic Management**
A study of the formulation and implementation of corporate level strategies such as mergers and acquisitions, retrenchment, and entrepreneurship. The course also studies current trends in the business world and features presentations by local executives.
Prerequisite: Senior standing or consent of instructor.

## MANAGEMENT INFORMATION SYSTEMS

**MIS 2301**     **Fundamentals of Information Systems**
Systems theory, information quality, decision making, and the organizational role of information systems are introduced. Information technology, including computing and telecommunications systems, are stressed. Concepts of organizations, information systems growth, and process improvement are introduced.

## MARKETING

**MKTG 2301**     **Principles of Marketing**
Introduction to the marketing function within an organization. This course examines the relationship of the marketing process and the broader aspects of the economic, legal, technological, and competitive environments. Coverage includes those strategies associated with product planning, pricing, promotion, distribution, consumer behavior, and marketing research.

**MKTG 3361**     **International Marketing**
Examination of the international marketing environment from the perspective of a marketing manager. Includes the study of the nature of and problems and opportunities in the global marketplace. Strategic application of marketing principles to compete effectively in world markets.
Prerequisites: MKTG 2301 and Junior standing, or consent of instructor.

**MKTG 3381**     **Consumer Behavior**
The study of consumer decision making and the influence upon those decisions. Examines the behavior of consumers throughout the range of prepurchase, purchase, and post purchase activities with reference to both internal psychological processes and external environmental influences on behavior.
Prerequisites: MKTG 2301 and Junior standing.

**MKTG 3382**     **Promotion Management**
A study of the promotion activities of business firms; analysis of consumer buying behavior and motivation; personal selling; advertising and sales promotional techniques and the development of an integrated promotional plan.
Prerequisites: MKTG 2301 and Junior standing.

**MKTG 3383**     **Marketing and Business Research**
The application of both behavioral and quantitative research to business problems. Topics include: research design, information sources, measurement techniques, questionnaire design, sampling, data analysis, and applications within the marketing mix.
Prerequisites: MKTG 2301, BUSN 2301, and Junior standing.

**MKTG 3-90**     **Studies in Marketing**
Designed for students wishing to continue the study of marketing beyond areas offered in regular classroom work. Credit from one to six hours. No more than a total of six hours credit may be earned in 3 90 courses in Business Administration. Prerequisites: Consent of instructor, MKTG 2301, and Junior standing.

100

000136

**MKTG 4381**     **Marketing Management**
The role of marketing in business and society. The management of the marketing function and its interrelationship with other functional areas within the organization. Problems, decisions and the decision-making process of marketing managers. Strategy formation, execution, and control.
Prerequisites: MKTG 2301 and Senior standing.

NOTE: Trinity does not offer a Master of Business Administration degree. However, the following courses are available for graduate students admitted to master's programs in related fields, or for non-degree students to whom the University has granted graduate admission.

## *GRADUATE COURSES*

**ACCT 5341**     **Accounting Theory**
This course will contrast financial and social accounting issues worldwide. It will review the history of accounting and the trend toward increasingly complex capital markets and financial contracts. Positive theories as to why certain practices evolved and normative theories regarding idealized practices will be contrasted.

**ACCT 5342**     **Accounting Information Systems**
This course investigates the components of accounting information systems (AIS) and dynamics of change in those systems. Focus is placed upon changing computer and networking technologies in modern accounting information systems.

**ACCT 5343**     **Seminar in Advanced Federal Taxes**
Beginning with a discussion of the sources of tax law and the basics of tax research methodology, the course will continue with coverage of corporation and shareholder taxation, taxation of partners, income taxation of trusts and estates, and the federal donative transfer taxes. Additional topics will include tax law administration, nonprofit entities, and penalty taxes.

**ACCT 5344**     **Advanced Auditing and Assurance Services**
Focusing on current issues in the area of assurance services, this course extensively utilizes authoritative pronouncement, Internet resources, and case studies. Topics may vary to include developments in theory and practice, as well as other issues that affect the role of the auditor. Students will be expected to engage in research and problem solving.

**ACCT 5345**     **Advanced Managerial Accounting**
This course develops modern management accounting information systems for decision making and control in complex organizations. The topics include cost-volume-profit analysis, linear programming, regression analysis, activity-based costing, target costing, quality costing, and strategic cost management.

**ACCT 5346**     **Advanced Financial and Nonprofit Accounting**
This course introduces students to the accounting standards for business combinations along with applicable accounting and reporting standards. Consolidated financial statements are the major focus of the course. Foreign currency concepts are studied including foreign currency transactions, forward exchange contracts and translation under the latest rules. Nonprofit accounting focuses on accounting for universities, hospitals, and government.

**BUSN 5349**     **Seminar in Law, Ethics, and Professional Responsibility**
An in-depth analysis of present and emerging ethical issues in professional life within the legal environment of business. Emphasis will be placed upon understanding professional and legal standards regarding practice, performance, and ethical behavior.

0001.87

**TRINITY UNIVERSITY**

**BUSN 5390**   **Seminar in Business**
Study of selected topics in business. May be repeated for up to six semester hours on different topics.

**FNCE 5351**   **Financial Analysis for Decision Making**
Cash flows between the firm and financial markets; financial value and its determinants; managing working capital; analyzing and planning financial performance; cost of capital and capital budgeting.
Prerequisite: Three-hour accounting course.

**FNCE 5390**   **Seminar in Finance**
Study of selected topics in finance. May be repeated for up to six semester hours on different topics.

**MGMT 5371**   **Human Resource Management**
Critical analysis of the theoretical base and current developments related to personnel activities in organizations. Recruitment and selection, remuneration and incentives, performance appraisal, and employee relations are discussed in relation to current social trends and government regulations.

**MGMT 5372**   **Conflict Management**
A study of conceptual, analytical, and communication techniques instrumental to the management of chronic and acute conflicts in a wide variety of settings. Principles and strategies of negotiation and mediation are introduced through case studies.

**MIS 5381**   **Database Management**
This course is a broad overview of the business side of the database design and management processes. This course will familiarize students with the issues, processes, and skills necessary to align database development to a business need. This course will help the student understand the key elements of a database development project and the methods used by systems analysts, such as data, file and object structures, logical design, physical design, and implementation of a Database Management System.
Prerequisite: Graduate standing or permission of instructor.

**MIS 5391**   **Knowledge Management**
This course is a survey of the principles and processes of knowledge management. This course will familiarize students with the issues that a business must address in facilitating the flow of knowledge from those in an organization who have knowledge to those who need it. This course will help the student understand key elements of the knowledge management life cycle such as knowledge creation, storage, transfer, and application; knowledge system tools; and ethical, legal, and managerial issues.
Prerequisite: Graduate standing or permission of instructor.

**MKTG 5390**   **Seminar in Marketing**
Study of selected topics in marketing. May be repeated for up to six semester hours on different topics.

000138



# STATE OF ALABAMA
## PERSONNEL DEPARTMENT
300 Folsom Administrative Building
Montgomery, Alabama 36130-4100
Telephone: (334) 242-3389 Fax: (334) 242-1110
www.personnel.state.al.us



Jackie Graham
**State Personnel Director**
Paul D. Thomas
**Deputy Director**

May 19, 2006



Virginia Hopper
200 Alpha Lane
Deatsville, AL 36022

Dear Ms. Hopper:

I am in receipt of your recent inquiry regarding your future status of employment with the State of Alabama. You asked whether you can be placed on the reemployment register for Accounting Technician, 10605 (the class in which you previously held status) if you resign your current position as Accountant, 10611. Upon review of the materials you provided and your recent applications for State employment, it was determined that you will not be eligible for placement on any register for State employment for a period of five years.

It appears that false information was provided on your most recent applications filed with the State Personnel Department (Accountant, 10611 and Staff Accountant, 10612). You first indicated that you received a Bachelor of Science degree in business administration from "Trinity University, 715 Stadium Drive, San Antonio, TX 78212." Upon the request of the Department of Finance, you submitted a copy of the diploma you received, which was issued by "Trinity College and University." Trinity University, located in San Antonio, later confirmed that it did not have any record of your attendance or receipt of a degree from that university. It also confirmed that it neither provides online or correspondence courses nor is it affiliated with any other Trinity Colleges or Universities. Additional investigation further reveals that your degree is actually from a university (currently known as Bronte International University) that is not located in Texas but in the British Virgin Islands.

Applicants for employment with the State sign a statement, certifying that "all statements on or attached to this application are true and correct" and that false statements may result in removal from an employment register. Despite having certified that all statements in your application, including statements about your education, were

000139



EXHIBIT
DHR 10

Ms. Hopper
May 19, 2006
Page 2 of 2

truthful, false information was provided on at least two applications. Pursuant to the
authority given the State Personnel Director, I am not granting your request to be placed
on the reemployment register because you made false statements of material facts on
your applications. R. 670-x-9-.01(3), State Personnel Board Rules. You will not be
permitted to be placed on any employment register with the State of Alabama for a period
of five years.

Sincerely,

Jackie Graham
State Personnel Director

# Trinity University

From Wikipedia, the free encyclopedia

A number of educational institutions carry the name **Trinity University**. Among these are the following.

- Trinity University, a private university located in San Antonio, Texas
- Trinity University, a Catholic women's college formerly known as Trinity College, located in Washington, D.C.
- Trinity International University, an Evangelical Christian college located in Deerfield, Illinois
- Trinity Western University, a private university located in Langley, British Columbia, Canada
- The University of Trinity College was sometimes referred to as Trinity University prior to its federation with the University of Toronto, located in Toronto, Canada
- Bronte International University, a diploma mill based in Tortola, British Virgin Islands, was previously known as Trinity College & University

## See also

- Trinity College (disambiguation page)

Categories: Disambiguation

This page was last modified 08:50, 23 May 2006.      All text is available under the terms of the GNU Free Documentation License (see **Copyrights** for details). Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc.
Privacy policy      About Wikipedia      Disclaimers

000141



EXHIBIT
DHR 11

# Bronte International University

From Wikipedia, the free encyclopedia

**Bronte International University** (formerly known as Trinity College & University) is an unaccredited post-secondary institution formally in South Dakota. It is widely considered to be a diploma mill, a scam operation offering meritless degrees for a fee. The "school's" webpage offers "fast" degrees from "life experience".

| Contents |
| --- |
| 1 Academics and Accreditation |
| 2 Trinity College & University in Dover, Delaware |
| 3 See also |
| 4 External links |

## Academics and Accreditation

Although the institution claims to be accredited by the Association for Online Academic Excellence (AOAE), but this is not a recognized accreditation association of higher learning[1] (http://www.chea.org/).

Bronte International University was originally known as "Trinity College & University" and should not be confused with a number of mainsteam academic institutions with similar names, listed at Trinity College.

## Trinity College & University in Dover, Delaware

The Trinity College & University in Dover, Delaware with an administrative office in Malaga, Spain is rumored to be a diploma mill, but is not the same corporation that has since been renamed Bronte International University. Unfortunately, there is much confusion surrounding the name. The Trinity College & University which later became Bronte International University is based in the British Virgin Islands, and is registered as a corporation with the United Kingdom (Tortola, BVI).They are two distinct organizations.

## See also

- List of unaccredited institutions of higher learning
- School accreditation

## External links

- Independent's story (http://weeklyindependent.com/feature1.htm)
- Daily Ummat's invastigative story
  (http://ummat.com.pk/Kahanian/misc_stories/aamir_liaquat.htm)

000142



**Important Message from the Systems Engineer/Administrator!**

Although our campus/corporate office is located in the British Virgin Islands, our documents are printed and shipped from the New Orleans metropolitan area. Our shipments are safe but delayed. Please bear with us while we cope with this situation. All orders will be sent out as soon as possible!

## College Credit for what you know.

### Education from Life, for your life NOW!

**Education as a Process, not a Place! biu-edu offers fast College Degrees and Life Experience Degrees.**

Bronte International University gives qualifying adults the opportunity to convert what is learned in life into college degrees, whether that knowledge is from professional or other accomplishments, work, religious or military training or other sources. You may have qualifications now to earn a college degree or college credits by our assessment of your prior learning, testing or portfolio. Our evaluation and assessment may lead to the award of a degree! Or perhaps a Certificate in certain specified areas of study.

The increasing globalization of work is making age-old teaching methods irrelevant. Today, adult students, especially, need to learn a whole new set of fundamental skills. The age of desk-bound workers is closing, being replaced with workers free to hop from client to client and country to country at the speed of a DSL connection. **GETTING STARTED**

#### THERE IS NO CHARGE FOR SUBMITTING THE APPLICATION FOR ASSESSMENT!

A fast college degree gives applicants the opportunity to learn new fundamental skills. A life experience degree helps applicants convert the knowledge gained from life into college degrees. Whether you live in the USA, CANADA, UNITED KINGDOM, HONG KONG, SINGAPORE, MALAYSIA, AUSTRALIA, SOUTH AFRICA, INDIA, MEXICO, BAHAMA ISLANDS, JAMAICA, KARACHI PAKISTAN, LAHORE PAKISTAN, BRITISH VIRGIN ISLANDS, CAYMAN ISLANDS, NEW ZEALAND, JAPAN or INDONESIA we look forward to hearing from you

© 2004 by Bronte International University. Please read our
**Privacy Notice**



**UNDERGRADUATE PROG**
Get college credit for life experience

**TACTICAL TRAINING AN
MANAGEMENT CENTER**



MindLea
e-Learning that wo

**LET US PUT THE P
OF e-LEARNING I
YOUR HANDS**
Click Here For More Informat





EXHIBIT
D H R 12
000143
6/21/06



**Getting Started**

Getting Started
Experiential Learning

How to Apply

BIU Fees

Credit Evaluation

Learning

**About Us**

**Memberships and Accreditations**

**Frequently Asked Questions**

We use the term "experiential learning" as the term applies to all learning received in our lives. All assessments of your experiential prior learning are prepared by professionals knowledgeable in PLA assessments and reviewed and supervised by educators holding Certification from a university program approved in PLA by the U.S. Department of Education.

Experiential learning is traced to early references, as early as the second century B.C. in China and given credence by philosophers John Dewey and Piaget. During our assessment, we focus on your accomplishments and knowledge and how they relate to academic standards set for college course work. When our assessment concludes that the knowledge gained through experiential learning equates to the learning that is expected from college courses, then the assessment results in college credit for you.

**Advantages of Bronte International University:**

**\* Degree \* Letter of Recommendation \* Student Record \***

**Verifications**

By earning a college degree or certificate from us, you demonstrate that your experiential learning from work or volunteer activities, the military, business seminars, professional workplace training, and independent study are accepted as equivalent to the knowledge gained by students attending classes in the traditional method. You have a Degree, our Letter of Recommendation, a Student Record and a verifiable source for checking by employers or others.

**Enhance your Resume**

Job applicants with a good resume, some pertinent experience, a college degree and willingness to work hard to succeed have a much better chance of becoming employed in higher paying jobs than those who do not have these qualifications. A Bronte International University degree opens up new opportunities for you.

**Application Process**

The process of applying is easy. All you have invested is taking the minutes necessary to submit our application form. Upon receipt of the information, our assessors shall determine what steps are necessary by you in order to earn a degree from Bronte International University. Within 48 hours, usually, applicants are in receipt of our preliminary report. APPLY NOW!

000144



## HOW TO APPLY

**How to Apply**

**Prior Learning Assessment - College Credit for What You Know Now**
To apply for assessment of your qualifications for college credit for your
current knowledge and learning from work and life experiences, leading to an
Associates and or Bachelor Degree **CLICK HERE FOR APPLICATION**. There
is NO APPPLICATION FEE!!

**Pre and Post Baccalaureate Certifications**
To apply for assessment of your qualifications to earn a Bronte International
University Certificate in a selected category of learning, submit the standard
application including details of your background and knowledge and state what
certificate you wish. If your assessment results in the need for you to take one
or more correspondence courses to meet the qualifications, your Faculty
Advisor will notify you within 48 hours, usually, and you can then decide what
action to take. CLICK HERE FOR APPLICATION. There is NO APPLICATION FEE!

© 2004 by Bronte International University. Please read our Privacy Notice

000145



HOME    |    BIU FASTTRACK    |    AVAILABLE DEGREES    |    BIU CAREERS    |    CONTA

Undergraduate
Program

Certificate of Tax and
Financial Planning

Available Degrees

Course Descriptions

Graduate Business
Certificate Program

# UNDERGRADUATE
# PROGRAM

**Associate Degrees Available through Prior Learning Assessment (PLA)**

**Associate Degrees**



BIU help
all I ever
Yo

Require a minimum of 60 semester hours of credit. Credits granted as a result of credit awarded for courses completed elsewhere and accepted or as a result of PLA, all count toward the total credits required.

**Associate Degrees Available**

Bronte International University offers most Associate degrees with the exception of degrees in the legal and medical fields. Below is a sampling of the most frequently requested Associate and Bachelor's degrees.

**Associate in Applied Science (AS) with major concentration in:**

Administrative Skills
Applied Electronic Studies
Applied Health Studies
Mechanics and Maintenance
Occupational Studies

**Associate in Science and Management (ASM)**

**Associate in Science and Applied Science and Technology (ASAST)**

**Associate in Science in Natural Sciences and Mathematics (ASNSM)**

**Associate in Arts (AA)**

**Associate in Science in Public and Social Services (ASPSS)**

**APPLY HERE**

**Bachelor Degrees Available through Prior Learning Assessment (PLA)**

A Bachelor degree requires a minimum of 120 credit hours of credit. This credit can be from a combination of course credits accepted and transferred from other institutions, PLA credits granted by Bronte International University for knowledge gained through work and life experiences and courses completed at Bronte International University.

**Bachelor Degrees Available**

000146

**Bachelor Degrees Available**

Bronte International University offers most Bachelor's degrees with the exception of Medicine, Law, and Aviation. Below is only a sampling of the most frequently requested Associate and Bachelor's degrees:

**Bachelor of Arts (BA)**
Credit requirements are distributed among the traditional liberal arts areas ( i. e., humanities, social sciences, natural sciences, mathematics and free electives).

**Bachelor of Science (BSc)**
The BSc is the basic degree with majors in scientific and some technical disciplines.

**Bachelor of Science in Applied Science and Technology (BSAST)**
The area of major corresponds to your previous studies, expertise and or occupation.

**Bachelor of Science in Business Administration (BSBA)**
A curriculum in business and in arts and sciences.

**Bachelor of Science in Health Sciences (BSHS)**
For applicants already employed in the health field.

**Bachelor of Science in Human Services (BSHS)**
For applicants who work in appropriate positions in human services areas represented by this specialization.

**Bachelor of Business Administration (BBA)**
The basic business degree with majors in business.

**CLICK HERE TO APPLY**

© 2004 by Bronte International University. Please read our **Privacy Notice**

000147



Our fees are Prior Learning Assessment (PLA) fees based upon the number and type of credit hours sought by an applicant toward a Certificate, Associates or Bachelor degree. Fees are NEVER based upon the amount of credit earned, if any. So-called 'diploma mills' use this tactic to the discredit of legitimate organizations that attempt to practice the standards of PLA in compliance with recommendations of the U.S. Department of Education. In other words, our fees are based upon the work involved in assessing the number of units assessed and NOT the number of units awarded.

BIU help
all I ever
Yo

**This is What You Get for Your Money!**

**DEGREE**
Printed on the highest quality parchment paper to the highest standards, it is easily comparable or better than the finest produced by any university in the world. It is 8.5 x 11 inches.

VIEW THE DEGREE

**STUDENT RECORD**
Upon graduation, the university issues the official academic record, the STUDENT RECORD. This important document is proof of graduation and is based upon our assessment of your qualifications, showing all college level courses credited, all pertinent information, including research and other topics. *A FEE OF $95.00 IS REQUIRED FOR THIS SERVICE. All previous courses recorded on a sealed transcript must be mailed to our student records office. Please allow 2 to 4 weeks for delivery.*

VIEW THE STUDENT RECORD

**ACADEMIC LETTER OF RECOMMENDATION**
A formal letter from the university is sent verifying the conferring of your degree and the date of your graduation.

VIEW THE LETTER OF RECOMMENDATION

**ALUMNI IDENTIFICATION CARD**
A wallet sized Identification Card showing your name and confirming your status as a member of the alumni.

VIEW THE I.D. CARD

**REPLICA OF YOUR DEGREE ETCHED IN BRONZE**
A special offer with a Retail Value of $149 for only $39.95: YOUR degree is etched in bronze on a beautiful bronze plaque for wall display.

VIEW THE BRONZE PLAQUE

000148

**FOR GRADUATES !**
LIFETIME CHARTER MEMBERSHIP IN CIPM-USA for only $24.95!
In addition to the Degree, Student Record, Letter of Recommendation, Bronze
Plaque and Lifetime Verification Service, we also offer a CHARTER
MEMBERSHIP into the exclusive and limited Chartered Institute of Professional
Management (CIPM-USA). The CIPM is a worldwide professional organization
devoted to management development and personal development. CIPM
members have exclusive opportunities to build their professional knowledge
and to meet other like-minded professionals in all parts of the world.

Membership in CIPM is $300 per year but Bronte International University has
arranged for its Bachelor and Master degree graduates to obtain a LIFETIME
CHARTER MEMBERSHIP for only $24.95! This offer is good for a limited time
only.

Membership includes a beautiful Certificate of Membership, showing your
Charter Membership, an ideal credential to hang on your office wall and to
copy and hand over to your Human Resources Department for placement in
your file. You will also receive a wallet size Membership Card!
VISIT CIPM-USA WEBSITE (www.cipmusa.org)

**PAYMENT METHODS**

AMEX, VISA, MASTERCARD, DISCOVER CARD, CHECK, MONEY ORDER OR
BANK WIRE TRANSFER

Fee payments are never accepted unless and until an applicant is approved.
DO NOT SEND OR ENCLOSE PAYMENT WITH YOUR APPLICATION. Upon
approval, we will send you our Notification of Acceptance Letter, via email.
You are requested to make payment at the time of your acceptance of our
offer.

Certificates - $195
Associate Degree - $695
Bachelor - $695

Note: A discount of 10 percent is offered to all who pay by bank wire.

**Shipping Charges**

All shipping is via FedEx or UPS unless otherwise requested. All approved
transactions are shipped within five working days of confirmation of receipt of
payment.

Domestic: $15.00
Canada: $50.00
International: $135.00

**REFUND POLICY**

Bronte International University replaces at NO CHARGE to you any shipment
damaged or lost.

If within three (3) days of receipt of your documents, you decide that we have
fallen short of your expectations, simply return the complete package, just as
you received it, and we will adjust, credit, exchange or refund your fees.

WHAT ARE YOU WAITING FOR? THERE IS NO CHARGE FOR APPLYING.
CLICK HERE

000149

CLICK HERE

© 2004 by Bronte International University. Please read our **Privacy Notice**

000150

6/7/06



HOME    BIU FASTTRACK    AVAILABLE DEGREES    BIU CAREERS    CONTA

Undergraduate
Program

Certificate of Tax and
Financial Planning

Available Degrees

Course Descriptions

# COURSE
# DESCRIPTIONS

Below are a sampling of course descriptions for some of the majors offered by
Bronte International University. The courses listed below are college level
academic courses.

BIU help
all I ever
Y(

These courses are considered for the purpose of establishing EQUIVALENCY of
knowledge gained from work or other activities in our assessment process
based upon your qualifications.

## ACCOUNTING

ACC-101 - Principles of Financial Accounting

Financial Accounting is designed to provide students with basic level of
knowledge in recording business transactions, summarizing business
activities, and preparing, interpreting, and utilizing financial statements.
Topics focus on accounting principles, systems and cycles, transactions,
income statements, depreciation, merchandising, inventory control, assets
and liabilities, and financial partnerships.

ACC-102 - Principles of Managerial Accounting

Managerial Accounting emphasizes the information managers need to make
decisions and the types of analysis appropriate to each decision. Topics
include budgeting, cost/profit relationships, cost accounting systems, cash
flow, inventory and process costing, pricing, capital budgeting, product mix
planning, operations, control and evaluation performance.

ACC-421 - Federal Income Taxation

A comprehensive coverage of the federal income tax structure as it pertains to
individuals, partnerships and corporate taxpayers. Topics include:
classification of taxpayers; determination of gross income; exemptions;
taxable income; computation of tax; special tax computations; credits against
tax.

## ANTHROPOLOGY

AN-101 - Introduction to Anthropology

The study of culture as the expression of human values, behavior and social
organization in its unique and varied forms throughout the world, past and
present. The course attempts to document that diversity and to demonstrate
the inherent logic of each culture in the light of the problems people need to
solve and the environments to which they must adapt.

000151

## ARCHAEOLOGY

ARC-101 - Introduction to Western Archaeology

New scientific tools and sophisticated research designs are revolutionizing our ideas about what ancient societies were like, how they developed and how their civilizations collapsed. Research at the spectacular Classic Maya Center is the basis for the broadly comparative perspective of the course. Students will also learn how archaeology helps us understand ancient people by reconstructing their past.

## ART

ART-100 - A World of Art

This is a unique art appreciation course designed to give students an in-depth understanding of works of art, by first giving them an insight to the mind of the modern artist and his/her working process. Through a series of video programs, the course follows ten different contemporary artists as they work on individual projects from start to finish. As well as learning the principles of design and different types of media artists employ, students will learn about the process of artistic creation.

ART-166 - Art History I

Examines the works of art that have come to define the Western visual tradition from ancient Greece through the Renaissance. An appreciation of the formal qualities, iconography and technical achievements of significant works of art is emphasized. The course also shows how these works of art closely reflect the prevailing attitudes of the society in which they were created, as well as the goals of the artists.

ART-167 - Art History II

This course is the second half of Western Art History and continues to examine the works of art that have come to define the Western visual tradition from the Baroque period to the present day. An appreciation of the formal qualities, iconography and technical achievements of significant works of art is emphasized. The course also shows how these works of art closely reflect the prevailing attitudes of the society in which they were created, as well as the goals of the artists.

## ASIAN STUDIES

ASS-301 - Asian Studies I

This course offers a survey of the modern history, economics, politics and cultures of the Pacific Basin region. This interdisciplinary Asian- Studies course explores how the Pacific Basin has evolved to emerge as a principle political and economic center for the next century. Throughout the course, four major themes emerge: modernity versus tradition; the conflict between East and West; democracy, political authority and economic growth; and the role of the United States in the Pacific.

AST-101 - Introductory Astronomy

Introductory Astronomy explores a broad range of astronomy topics, concepts and principles, from the motions of the visible sky to dark matter, from our own planet to the stars and galaxies. The course examines evidence for the big bang and continuing evolution of the universe and tracks the formation, life, and death of the stars. Throughout the course, special emphasis is placed

000152

on the scientific evidence that astronomers have come to know about the universe, and how they continue to seek answers to some of the most fundamental questions.

## BIOLOGY

BIO-101 - Introductory Biology

This course is designed as an introductory biology course for non-science majors. The video programs reveal current trends in molecular biology, illustrate scientists at work and discuss the challenges and opportunities in this growing field. The course incorporates natural history examples and includes a general introduction to the nature of life. Topics also include DNA; genetics; reproduction; animal physiology, including circulation and immunology; and ecology.

BIO-108 - Nutrition

This introductory course is intended to provide accurate and scientifically sound information on human nutrition. Topics covered in the course include food choices; the digestive system; metabolism; the effects of carbohydrates, fats, and proteins on health; nutrition in various stages of the life cycle; vitamins and minerals; and the effect of diet in the presence of diabetes and cardiovascular disease.

## BUSINESS EDUCATION

BUE-101 - Personal Finance for 2000 and Beyond

A one-semester course in financial planning that provides information for making sound financial choices.

## BUSINESS

BUS-101 - Introduction to Business

Introduction to Business is a one semester course for students who want to expand their understanding about business. The course presents an inside view of business, dissecting the realities and complexities of the ever-changing world of business in today's modern society. From the internal functions of a business to the challenges of business to the challenges of business on an international scale, the course provides a comprehensive view of the contemporary environment of business.

BUS-161 - Business Mathematics

The following topics are covered in this course: integers, fractions and decimals; round numbers; complex fractions; ratios, proportions, and percentages; averages; formulas and linear equations; business applications.

BUS-421 - Business Policy

Capstone review of senior management decision areas, using concepts covered in an undergraduate course in business policy or corporate planning. Topics include: corporate goals and resources, financial analysis, long-range plans, policy models, and management strategy. Case problems are used to integrate theories and apply concepts to simulate situations.

## CHEMISTRY

CHE-101 - Survey of Chemistry

000153

CHE-100 - Survey of Chemistry

Developed for non-science majors, this course de-emphasizes mathematical problem solving in favor of presenting a unified view of chemistry. Chemical principles, facts and theories are presented through practical applications, illustrations and experiments. The historical foundations, recent developments and future directions of chemistry are also presented. This course will not satisfy the chemistry requirement for Natural Science or Applied Science and Technology degree programs.

CHE-111 - General Chemistry I

Presents the essential concepts of chemistry and how we come to know and understand those concepts, focusing on the study of molecules and how their atoms bond together. Suitable for nonscience majors.

CHE-112 - General Chemistry II

Builds on knowledge gained in CHE-111-OL General Chemistry I. Includes study of liquids and solids, chemical reactivity, chemical kinetics acid-base chemistry, thermodynamics, and electrochemistry. Suitable for nonscience majors.

CHE-240 - Elementary Organic Chemistry

A survey of the basic principles of organic chemistry. Topics include saturated, unsaturated and aromatic hydrocarbons; isomerism, sugars, fats and oils; proteins and nucleic acids; and molecular structure and spectroscopy.

## COMPUTER INFORMATION SYSTEMS

CIS-107 - Computer Concepts and Applications

The course is designed to: provide a comprehensive overview of the comprehensive overview of the computer, what it is, what it can and cannot do, how it operates, and how it may be instructed to solve problems; familiarize learners with the terminology of date processing; examine the application of the computer to a broad range of organizational settings and social environments; prepare learners to understand and utilize computers in both their personal and professional lives.

## COMMUNICATIONS

COM-120 - Introduction to Mass Communications I

Mass communication and the new media technologies of cyberspace have become central to the psychological, social, economic, and political realities of the human experience. It is more important than ever for students of all disciplines to understand the role the media play in their world, their culture, and their lives. This course examines the media innovations, inventions, industries, and people that historically and currently have changed and challenged our world. Emphasizing the history of mass media as well as the current trends, this course presents information and activities designed to enable students to appreciate and evaluate the quality of print, audio, video, film and television. The course considers ethics, advertising, public relations, and audience feedback in the context of mass communication. Global media on society are also discussed. Topics covered include: Media History; Mass Media in Society; Print History; Images in Media; Newspaper Industry; Book Industry; Radio History; Radio Industry; recording Industry; Film History.

COM-121 - Introduction to Mass Communications II

000154

Mass communication and the new media technologies or cyberspace have become central to the psychological, social economic, and political realities of the human experience. It is more important than ever for students of all disciplines to understand the role the media plays in their world, their culture, and their lives. This course examines the media innovations, inventions, industries, and people that historically and currently have changed and challenged our world. Emphasizing the history of mass media as well as the current trends, this course presents information and activities to enable students to appreciate and evaluate the quality of print, audio, video, film and television. The course considers ethics, advertising, public relations, and audience feedback in the context of mass communication. Global media and the effect of mass media on society are also discussed. Topics covered include: Television History; Broadcast Television; Cable TV and Beyond; Television News; Print News; Public Relations; Advertising Media Rights and Responsibilities; Media Ethics; Audience and Feedback; Media Impact.

COM-209 - Public Speaking

Public Speaking focuses on developing effective presenting skills in front of live audiences. The course moves from an overview of topic- selection, research, structuring, writing, and rehearsal skills to student participation on topics similar to what may be encountered in business or social situations. Historical and contemporary speeches are analyzed, practical techniques are emphasized in message delivery, audience expectations, informative and persuasive approaches, the use of supportive materials and audio-visuals, gesture and physical environment, impromptu speeches, question/answer segments, panel structures, and the use of humor. Students produce three presentations on video tape for instructor review, beyond any previous sales or social presentations that the student regularly makes. A fourteen-part study guide is provided for the student to respond to by engaging in structuring, rehearsing, and delivering their speeches. Detailed outlines are submitted prior to actual presentations for instructor review and commentary. Students review the speaking style of two live speakers during the course.

COM-322 - Language in Social Contexts

Language is the center of all human activity. It defines who we are, what we can accomplish , what we have learned about our past and finally, what future generations will come to learn about us. In learning about language, we come to more fully appreciate who we are. This course will consider several aspects of how the language we speak and the societies we live in affect each other.

COM-335 - Elements of Intercultural Communication

This course presents a broad theoretical base in the study of intercultural communications. Its emphasis is the study of the many complex elements and processes involved in the sending and receiving of messages within intercultural contexts. The aim of the course is to increase the student's sensitivity, understanding, and awareness of intercultural differences and similarities that lead to more effective communication. The basic concepts, principles and skills for improving communication between persons from different minority, racial, ethnic, cultural and intercultural backgrounds will be covered.

**COMPUTER SCIENCE**

COS-101 - Introduction to Computers

This course provides a broad, general introduction to computers including an introducton to programming using the QBASIC language. the course covers hardware and software fundamentals, essential computer applications, computer networking, how to use a computer to solve a problem and the impact of the information age on our work, our homes, society and the future. The course assists students in acquiring the ability to describe the uses of a

000155

variety of computer hardware and software, explain how computers are used for a variety of applications, and provides insight into computer networking and its impact upon society. Students learn how to write programs using the QBASIC language to solve problems.

COS-116 - C Programming

C Programming provides an opportunity to study and gain experience with one of the most popular computer languages. Students will learn to write, debug and run programs in C language- the increasingly popular UNIX-related, intermediate-level software development language. The course covers operations, variables, loops, functions, pointers, input-output, data types, structure and file operations.

COS-213 - C++ Programming

C++ is an object-oriented extension of the C Computer Language. C++ is the most popular and high-potential object-oriented programming language in the United States and possibly the world. This course explores C++ programming in the context of object-oriented software development. Object orientation will be defined in terms of five object characteristics (encapsulation, relationship, inheritance, polymorphism, and dynamic building) used to build object-oriented programs.

COS-231 - Assembly Language

An introduction to the study of the basic structure and language of machines. Topics include basic concepts of Boolean algebra, number systems, language, addressing techniques, data representation, file organization, symbolic coding and assembly systems, use of macros, batch operation and job handling.

COS-241 - Data Structures

Advanced techniques for program construction and testing are emphasized. Topics include linked lists, trees, sorting, searching, string manipulation, and dynamic storage.

COS-330 - Computer Architecture

The analysis and design of the major elements of a digital computer. The specification of the interconnection of these elements to form a digital computer. This specification is accomplished with the aid of a special purpose register transfer language (similar to programming language). Control of the register-transfer sequence is treated from both the hardwired and microprogrammed view points. Interrupts and I/O are treated.

COS-352 - Operating Systems

Students will acquire an understanding of the role that an operating system has in the computing environment. The student will have hands on experience and assignments on four major operating systems ranging from microcomputer to mainframes. These operating systems are MS-DOS, VMS, UNIX, IBM, USE. Topics will include process management, device management, file structures, utilities, performance evaluation and networking.

**CONTROLS**

CTR-211 - Electronic Instrumentation and Control

Automatic testing of electronic devices; electronic instrumentation and control: physical properties and their measurement. Industrial electronic circuit applications; interfacing process variables; motor motor control and

000156

Bronte International University                                                Page 2 of 20

servo systems; numeric control systems; programmable controllers; industrial robots.

## EARTH SCIENCE

EAS-101 - General Earth Science

This course introduces basic concepts of science in general and geoscience in particular. The course emphasizes the evolution of the earth and the development of the theoretical model of the earth as a whole. Topics include earth and other planets in the solar system; earth's oceans, interior and atmosphere; and a look toward the earth's future. It is designed for students with a general interest in and curiosity about the earth, and is not intended for science majors.

## ECONOMICS

ECO-111 - Macroeconomics

Macroeconomics deals with broad economic aggregates, such as national income, the overall level of prices, employment and unemployment, and the money supply. Topics covered include the meanings and measurements of gross national product; business cycles; the effect of government expenditure and taxation; causes of inflation and unemployment; and international trade and the balance of payments. The course examines the major historic and contemporary events that have shaped the 20th century American economics. The course involves solving economic problems which require basic college mathematical skills.

ECO-112 - Microeconomics

This course demonstrates how the basic principles of economics apply to current U.S. economic problems and provides practice in applying economic analysis. It focuses on individual economic units and how purchase and production decisions determine prices and quantities sold. These principles are applied to a wide variety of economic problems which require basic college mathematical skills.

ECO-490 - International Economics

Pure or "real" aspects of international trade, including the basic comparative advantage model, commercial policy (tariffs, quotas, etc.), economic integration, role of international trade in economic development. Monetary aspects of international trade, including international capital movements, foreign exchange market, concepts and measurement of balance of payments, alternative means of correcting disequilibrium in the balance of payments, and international monetary arrangements.

## ENGINEERING MECHANICS

EGM-330 - Fluid Mechanics

The properties and behavior of fluids: density, pressure, fluid static, buoyancy, hydraulic devices. Course examines fluid dynamics, continuity of flow, Bernoulli's equation, Venturi's principle, the Pilot tube, and fundamentals of dynamic lift. Orifices, nozzles, tubes, valves, and other applications of flow control devices. Discussion of viscosity and flow losses are incorporated.

## ENGLISH COMPOSITION

ENC-101 - English Composition I

000157

This course focuses on teaching English composition and rhetoric from a process perspective. With an emphasis on audience awareness and purpose for writing, this course presents deliberate strategies for prewriting and revision. As the first course on college level writing, there is emphasis on the skills needed for academic and business writing.

ENC-102 - English Composition II

A continuation of English Composition I. Essay writing, writing a research paper, writing across the curriculum, writing for business and writing about literature are the essential components of this course. The course objectives are developed through applications to real life situations. Some library research is required.

**ENGLISH**

ENG-201 - Technical Writing

Technical writing for industry, business and research, focusing on the special requirements of the professional report.

ENVIRONMENTAL SCIENCE

ENS-200 - Environmental Science

This course provides a systematic inquiry into the state of the global environment. It focuses on the threats to different natural systems and the complex interconnections between human society and the environment. It provides an understanding of the sciences and ways of thinking involved in the study of the environment

**FILM**

FIL-110 - American Cinema

American Cinema is an introductory course in film studies. Through this course, students will learn to become more active and critical viewers as they question the images of America they see on the movie screen and redefine their own relationship to those images. The course endeavors to help students to increase their understanding of films as art, as cultural artifacts, as an economic force and as a system of representation and communication. Students will learn about the invention of the motion picture camera, the rise of the studio system, and the production of popular genres such as the western, the comedy, and the combat film, while examining the development of an American narrative tradition and the evolution of character with genres.

**FINANCE**

FIN-301 - Principles of Finance

Managerial finance and the environment within which the financial decision-maker functions. Topics include: concepts and tools of financial analysis; working capital management; capital budgeting; the cost of capital; long-term financial management. Familiarity with basic accounting is essential.

**GEOLOGY**

GEO-151 - Physical Geology

Description of composition and structure of earth physical processes which

000158

change earth's surface.

## HISTORY

HIS-101 - Western Civilization I

Exploring the cultural and philosophical movements that have influenced the Western world from ancient times to the present. The course covers the influential pre Western civilizations through the classic period of the High Middle Ages. Material is integrated from a variety of academic areas and stimulates critical thinking.

HIS-102 - Western Civilization II

Exploring the cultural philosophical movements that have influenced the Western world from ancient times to the present. The course commences with the end of the Middle Ages and continues through industrial modernization to the present. Material is integrated from a variety of academic areas and stimulates critical thinking.

HIS-113 - American History I

This course focuses on the origin and growth of the United States from 1492 to 1865. It also examines the social, economic and political development of the country with special emphasis on the major events from the English settlement at Jamestown to the Civil War.

HIS-114 - American History II

This course focuses on the transformation of the United States from 1865 to the present. Emphasis is on the transformation from an agrarian nation and minor member of the international community to an industrial world power. Beginning with the reconstruction of the South after the Civil War, the course traces the social, economic and political development of the country through the 1980s.

HIS-210 - American Civil Rights Movement

This course offers a comprehensive history of the people, stories, events and issues of the 20th century struggle for social justice in America. The course examines the Civil Rights Movement in terms of its impact on American society. It also considers the rise of other movements which transformed the face of American culture and discusses their influences on creating a new generation of American leadership.

HIS-219 - Introduction to the History of Women And Family in America

This a course on women and the family in the United States from 1607 to 1870, which emphasizes the diverse experiences of ordinary people - of Indians and immigrants, of slaves and free African-Americans, of indentured servants and pioneer families - as it examines change in both the ideals and the reality of family life. Two other themes which complement the diversity and ideal/real themes are the gender division of labor in families and family resilience in the face of social and economic change.

HIS-235 - American Civil War

Based on the award-winning PBS series "The Civil War," this course presents the entire sweep of the war, from the battlefields to the homefronts, from the politicians and generals to the enlisted men and their families. Attention is given to the causes of the war, why the North won and the assassination of Lincoln

000159

Lincoln.

HIS-261 - Introduction to the Chinese History and Culture

This course examines China's people, history, and heritage and explores a civilization that is more than 5,000 years old. Ancestral customs and beliefs, which still survive in parts of the countryside, are discussed. And the events of Tiananmen Square, where political tensions erupted in apocalyptic violence, are also examined. Intimate, rarely seen glimpses of daily life reveal the conflict between long- established customs and government-mandated changes. The course explores such issues as causes for the political and cultural forces that have unified China despite the great variety of its regions and its people; the incendiary public discontent that flared into violence at Tiananmen Square; and whether China's future is more likely to be one of turbulence and upheaval or peaceful evolution.

HIS-301 - African History and Culture

African History and Culture examines the history and contemporary life of Africa through its triple heritage: indigenous, Islamic and Western. This course offers a new perspective on Africa, explores the real story of the continent and looks at modern Africa with new insight. The course also examines African economic and social systems, examining both inherent conflicts and Africa's relationships with the rest of the world.

HIS-302 - The Renaissance: Origins of the Modern West

The Renaissance brought transformation of systems of government, technology, economic enterprise, social ideas and art that continue to influence contemporary society. This course explores the fundamental changes that occurred in Europe between the late 14th and late 17th centuries and shows how the issues raised in this period continue to influence the modern world. Topics focus on politics, war, dissent, economics, art and science, as well as on rulers, religious leaders, and soldiers.

HIS-310 - The Middle East

This course is not a traditional history course, but a multidisciplinary perspective on a region of the world which effects the entire world. The course focuses on the complex interrelationships of history, religion, economics, diplomacy, politics, geography and military strategy in the Middle East. Study is focused on four topics: the physical and cultural setting, the Middle East and the West, the twentieth century, and problem areas.

HIS-333 - Modern Latin America and the Caribbean

This course presents a multidisciplinary study of the 20th century political, economic, social and cultural history of Latin America and the Caribbean. It covers key issues and events crucial to understanding the development of the modern day Americans; the relationship of Latin America and the Caribbean to the rest of the world; historical roots of regional tensions; national economics of the Americas; political instability, reform movements and revolutions; impact of migration and urbanization; regional ethnic identities; role of women; religious upheaval; cultural/artistic movements; and issues of sovereignty

HIS-356 - War and American Society

Focuses on the effects of war on American society, from the Revolutionary War to the present.

**HUMANITIES**

000160

HUM-409 - The Age of the Enlightenment

This course explores the culture of the Age of Reason at its height through the in-depth study of a number of major texts and of certain leading figures. There is an interdisciplinary approach embodying, for instance, historical, literary and philosophical approaches. The works of fiction and poetry, philosophy, history, science, music and art are studied in their own right, but are also interconnected as mutually illuminating phenomena.

## JOURNALISM

JOU-352 - News Writing

News Writing is a comprehensive journalism course designed to teach students how to start, develop and polish hard news and feature stories. In addition, related styles, such as editorial and column writing, are explored along with issues of language use, media ethics and media law. The course explores both journalism styles in broadcast and public relations, as well as print journalism.

## LAW

LAW-201 -Business Law

An introductory course to the area of business law. Topics covered are the nature and meaning of law, contract law, sales contracts, commercial paper, agency law, property and the influence of government regulation.

## LITERATURE

LIT-101 - Introduction to Modern English and American Literature I

Introduces students to English and American works from the period between 1789 and 1901. Provides a general introduction to literature and literary analysis; discussion of major cultural movements of the 19th century; and an anthology which includes selections by Blake, Wordsworth, Keats, Whitman, Dickinson, and Browning.

LIT-102 - Introduction to Modern English and American Literature II

Introduces students to English and American prose and poetry of the 20th century. Explores the ways in which 20th century writers have sought to go beyond the literature of earlier eras by experimenting with new ideas and new forms of expression. Examines influential figures of literary modernism - writers who sought ways to respond to the fragmentation and impersonality of modern life. Also examines postmodernist writers from the period after World War II to the present.

LIT-130 - Analysis and Interpretation of Literature

Incorporating both contemporary and traditional works, this course is organized around three major genres of literature - short fiction, poetry and drama - allowing students to examine the literary elements of character, plot and symbolism. Critics and noted authors share perspectives on various works and the craft of writing. The course also places a strong emphasis on writing about literature as a way to learn and use advanced compositional techniques.

LIT-221 - Introduction to Children's Literature

Designed to inform students about the history and diversity of children's literature, this course covers a variety of recommended works and suggests

000161

criteria for selecting and evaluating alternative books. Specific genres covered include traditional fiction, historical fiction, multi-cultural literature, works of contemporary realistic fiction and information books. Requires regular access to a library with children's books.

LIT-320 - Shakespeare I

Examines eight plays to illustrate Shakespeare's range and variety. One history, three comedies, three tragedies, and a romance are covered.

LIT-337 - Twentieth-Century African American Novel

While focusing on the contemporary black novel, the course emphasizes the development, diversity, and quality of African American literature. Works other than popular and current novels promote a wider acquaintanceship with some of the major African American writers of the 20th century.

LIT-347 - Modern American Poetry

Modern American Poetry chronicles the collective achievement of America's great poets and their contributions to our national poetry. The course focuses on works of poetry rather than on biography, and conveys poetry as a dynamic, living art form in this country. Documentary, dramatic and experimental film techniques are skillfully combined in this course.

## MANAGEMENT

MAN-301 - Principles of Management

Introductory course in management. Includes essential skills in planning and organizing, staffing and directing, controlling decision making, motivation, communication, and the application of management principles to the business organization.

MAN-331 - Human Resources Management

The following topics are covered: The field of personnel; Employment; Job analysis; Training and Development; Performance Appraisal; Motivation, Communication, and Leadership Styles; Compensation; Security; Personnel Legislation; Labor Relations, and; Current issues.

MAN-372 - International Management

This subject places an emphasis on business behavior and organization including comparative management in various cultures. Management practices in Europe, Asia, Latin and South Americas, and Africa are contrasted with the strategies and operating principles of American firms. Consideration is given to analysis and comparison of the factors that influence business policy and organizational behavior in different societies and the implications of cultural differences on the rapidly growing trend toward multinational companies.

MAN-373 - Managerial Communications

The application of oral and written communication prinicples to managerial situations; an overview, simulation, and analysis of the communication process in the business environment. Topics include: alleviation of barriers; structure; information overload; interpersonal techniques such as transactional analysis, nonverbal and behavioral aspects.

MAN-432 - Small Business Management

000162

Small Business Management provides students with an understanding of the tools entrepreneurs require to compete effectively in the world of business. Students observe a variety of small businesses in action and gain a first hand look at how to start a small business, evaluate business opportunities, market products or services, manage personnel and fiscal demands, and more. Wrap-up discussions feature business experts who analyze the issues addressed by the business owners and offer relevant advise

## MARKETING

MAR-306 - Creating and Implementing the Electronic Enterprise

Explores the theories, concepts, practices, and technologies being developed to plan, implement, and manage product- and service-based electronic enterprises.

MAR-310 - Principles of Sales

Designed to introduce students to the principles of selling and to the role of the professional salesperson in the marketing process. The course explores the characteristics and skills necessary for success in sales; techniques for importance of relationship building, product knowledge, and post-sales service in long-term, consultative-style selling; territory and sales management; and selling in the global marketplace.

MAR-432 - Product and Services Development for Electronic Enterprise

Examines the market research, idea-generation, project-creation, testing, and commercialization processes that are involved in product development. Looks at how the use of electronic media for promotion and delivery is likely to affect those processes.

MAR-441 - Marketing with Electronic Media

Examines marketing as an organizational strategy, with emphasis on marketing communications as the component most relevant to usage of electronic media. Investigates the range of tools that enable electronic marketing.

## MATHEMATICS

MAT-115 - Intermediate Algebra

Topics include operations with algebraic expressions, linear equations and inequalities, systems of linear equations, algebraic fractions and fractional equations, application, graphing, and an introduction to functions. One year of high school algebra is needed to succeed in the course.

MAT-121 - College Algebra

An introductory college algebra course which provides an understanding of algebraic process and practical applications. Topics include quadratics, systems of linear equations, inequalities, complex numbers and logarithms, permutations and combinations, composite and inverse functions, and polynomial, exponential, and logarithmic functions.

MAT-128 - Precalculus for Business

Precalculus is designed to prepare students for courses in calculus and higher mathematics. It is broadbased to prepare students for courses in business. Active participation by students is fostered by means of a variety of activities.

000163

Learning is facilitated by shifting the focus from purely computational skills emphasized in more elementary mathematics courses to truly analytical skills. Topics covered include equations and inequalities; linear and quadratic functions; trigonometric functions, identities, equations and applications; systems of equations and inequalities, and analytic geometry (parabola) and series and sequences.

MAT-129 - Precalculus for Technology

Precalculus is designed to follow courses in college alegebra, and to prepare students for courses in calculus and higher mathematics. It is broad-based to prepare students for courses in technology. Specific target population is students in the Applied Science and Technology degree program. Active participation by students is fostered by means of variety of activities. Learning is facilitated by shifting the focus from purely computational skills emphasized in more elementary mathematics courses to truly analytical skill. Topics covered include: exponential and logarithmic functions; exponential and trigonometric functions; exponential and trigonometric functions; trigonometric identities and equations, applications of trigonometry; systems of equations, systems of inequalities, series and sequences; and analytic geometry.

MAT-231 - Calculus I

Calculus I is an intensive, higher level course in mathematics that builds on courses like Precalculus for Technology. It aims at serving the needs of a wide student audience, including students in engineering mathematics, the physical and life sciences, and economics, and is constructed around multiple focal points to help students become creative and efficient problem solvers, using technology as a means of discovery of numerical, graphical and analytical solutions to problems In addition, communication skills are emphasized, and students are required to interpret, describe, discuss,justify and conjecture as they search for solutions to problems. Real-life applications provide links with students' life worlds. Topics covered in he course include: the Cartesian plane, limits and continuity, problems of tangents, velocity and instantaneous rates of change, rules for differentiation, implicit differentiation, maxima and minima theory, antiderivatives and the indefinite integral, exponential and logarithmic functions, and area between curves.

MAT-232 - Calculus II

Calculus II is an intensive, higher level course in mathematics that builds on Calculus I. It aims at serving the needs of a wide student audience, including students in engineering, mathematics, the physical and life sciences, and economics, and is constructed around multiple focal points with the intention of helping students become creative and efficient problem solvers, using technology as a means of discovery of numerical graphical and analytical solutions to problems. In addition, communication skills are emphasized, and students are required to interpret, describe, dicuss, justify and conjecture as they search for solutions to problems. Real-life applications provide links with students' life worlds. Topics covered in the course include: inverse function: exponential, logarithmic, and inverse trigonometric functions; techniques of integration; parametric equations and polar coordinates; infinite sequences and series; three-dimensional analytic geometry and vectors; partial derivatives.

MAT-270 - Discrete Mathematics

This course is an introduction to sets, alphabets, formal languages and elementary logic and the study of recursively defined functions, algebraic structures and relations with emphasis on applications to computer science.

**MECHANICAL ENGINEERING TECHNOLOGY**

000164

MET-311 - Machine Design I

The application of principles of mechanisms and strength of materials to mechanical design. Topics include theories of failure, fatigue, weldments, fasteners, spring and other machine elements subject to static and dynamic loading.

MET-312 - Machine Design II

A continuation of Machine Design I. Including the design of power screws, brakes, clutches, belt and chain drives, gears, gear trains, bearings, thick-wall cylinders, and other machine elements.

## NUCLEAR TECHNOLOGY

NUC-412 - Radiation Biophysics

A study of the effects of radiation at the cellular and subcellular level. Emphasis will be placed on the chemical effects of ionizing radiation, the dose-response relationship in macromolecules, and the over all effects at the cellular level.

NUC-413 - Radiation Interactions

An advanced undergraduate course, which builds upon fundamental charged particles with matter. The course serves two purposes. First, it reviews the physics of the atom, radioactive decay and the interaction of charged particles with matter. Second, it describes the methods of radiation detection, and radiation dosimetry and shielding. Topics include the atomic model, nuclear radiation and the nucleus, radioactive decay curves, interaction of heavy charged particles with matter, interactions of electrons and positrons with matter, characteristics of charged particle tracks, interactions of photons with matter, methods of radiation detection, energy absorption and radiation dosimetry, and radiation attenuation and shielding

NUC-452 - Radiation Dosimetry

An advanced undergraduate course dealing with an analysis of the deposition of energy in tissue building upon the fundamental concepts taught in NUC-412-GS Radiation Biophysics and NUC-413-GS Radiation Interactions. This course involves a study of the theories currently in use to determine doses received both from radiation sources and radioactive materials located outside and from with the body. The various models which describe the distribution of radionuclides within the body and specific interactions with the organic systems are covered, along with an evaluation of various dosimetric systems.

## OPERATIONS MANAGEMENT

OPM-301 - Intro to Operations Management

Survey of operations management using system concepts to stress coordination, optimization, & control of materials, equipment & people to the management of all types of organizations. Topics include: logistics; production; purchasing; inventory control; and other areas of operations management & research.

## PHILOSOPHY

PHI-286 - Contemporary Ethics

Ethical traditions, ethical analysis of issues arising in interpersonal and

000165

Ethical traditions, ethical analysis of issues arising in interpersonal and personal-societal relationships and in professional and occupational roles (such as law, government, medicine, business, military service, journalism), relationships between ethical traditions and ethical analysis of situations.

PHI-376 - Major Philosophers: From Socrates to Sartre

Examines six major philosophers of Western Civilization: Plato, Descartes, Hume, Hegel, Marx and Sartre. Each philosopher's distinctive treatment of the real problems of his time conditioned the way in which later thinkers dealt with similar problems, and raised new problems which became the subject matter for future thought and investigation.

PHI-384 - Ethics and the Business Professional

This course focuses primarily on ethics as applied to business professionals. In addition to introducing many concepts of ethics, the course encourages students to develop practical methods and models for thinking about and resolving ethical issues and conflicts, and applying these to ethical issues and problems that arise in business. It investigates institutions and their personnel and practices in light of ethical considerations, covering a broad range of political, economic, societal and philosophical views.

## PHOTOGRAPHY (FILM)

PHO-101 - Introduction to Photography

Introduction to Photography is designed to help students discover and develop the skills required to use photography confidently and effectively. A major emphasis of the course is to improve visual awareness. The Internet provides exciting opportunities to share rich visual experiences by viewing and studying students' work as well as the works of professional photographers. Completion of assignments will require students to interact frequently with assigned textbook, relevant web sites, and to apply these insights to their own photography. Significant discovery occurs through studying and sharing commentary pertaining to visual materials. For this reason, the instructor will routinely select student photographs from each assignment and moderate constructive commentary resulting from students viewing that work in an "online" gallery.

## PHYSICS

PHY-111 - Physics I

First-semester introductory course intended for nonscience majors. Focuses on mechanics and the properties of matter and includes study of motion and energy.

PHY-112 - Physics II

Second-semester introductory course intended for nonscience majors. Emphasizes the comprehension of topics such as electricity, magnetism, electromagnetism, light, and optics.

## POLITICAL SCIENCE

POS-110 - American Government

This American government survey course explores the development and nature of American political culture, constitutional and structural arrangements, policy-making processes, and sources of conflict and consensus. Provides opportunities for students to learn how to access their

government.

POS-309 - Dilemmas of War and Peace

This course examines war and peace historically and in the contemporary world. It is designed to provide a comprehensive introduction to the problem of war and peace as it confronts the human race. In the context of the potential scale and destructiveness of modern warfare, the course explores and encourages critical thinking on the history of war and peace, the causes of war, the role of cultural and structural aspects influencing war and peace, and visions and strategies for the future.

POS-310 - Constitutional Issues

This is a course on constitutional rights and public policy. The focus of the course is a series of thirteen controversial constitutional issues, such as capital punishment, affirmative action, abortion, executive privilege and national security vs. freedom of the press. The course examines the human stories behind landmark Supreme Court cases which have helped define the Bill of Rights; how the Constitution adapts to changing times; how the Supreme Court corrects the errors of past courts; and how the balance between individual and societal rights is achieved.

**PSYCHOLOGY**

PSY-101 -Introduction to Psychology

This course examines the fundamental principles and major concepts of psychology. Topics include: the brain and behavior, sensation and perception, conditioning and learning, motivation and emotion, life- span development, the self, stress and health issues, and the methodology of psychology.

PSY-211 - Developmental Psychology

The study of lifespan development; biological development; perception; learning and memory; cognition and language; social, emotional and personality development.

PSY-317 - Worlds of Childhood

Worlds of childhood, and advanced-level child development course, traces life's most extraordinary journey - the universal journey from babyhood to puberty. The course is distinguished by its multicultural and cross-cultural focus. Examining twelve families living on five continents, this course serves as a visually exciting and vital resource for learning how children grow in the many diverse and pluralistic worlds of childhood

PSY-322 - Research in Experimental Psychology

An introduction to the research methods used by experimental psychologists as they attempt to understand the behavior of humans and lower animals. Examples of research studies, chosen from a variety of areas of experimental psychology, demonstrate these methods and provide an understanding of the type of knowledge these studies have produced.

PSY-331 - Introduction to Counseling

This course offers a discussion of the theories and techniques of counseling, with emphasis on developing listening, attending and observational skills.

PSY-350 - Abnormal Psychology

000167

Explores the complex causes, manifestations and treatments of common behavioral disorders. Abnormal behavior is introduced in the context of psychological well-being to show that these behaviors range along a continuum from functional to dysfunctional.

PSY-369 - People and Organizations

This course focuses on two broad concerns: the nature of modern bureaucracies and the ways in which they affect their individual members, and the ways in which bureaucracies affect contemporary society. The approach to these issues is primary analytical and theoretical, with specific concerns presented within the context of organizational studies.

Social Psychology

This course surveys the field of social psychology and explores major topics, including communication, friendship, prejudice, conformity, leadership, aggression and altruism. The course aims to teach students to evaluate interpersonal communication and media presentations of current issues.

**RELIGION**

REL-371 - Myth and Culture

Myth and Culture presents the world's mythologies as taken from the lectures of Joseph Campbell, world-renowned scholar and mythologist. Students will gain an understanding of mythology's role in human history and religions throughout the world. Topics include: origins of man and myth, gods and goddesses, eastern philosophy, Arthurian legends, Tristan and Isolde, the Tibetan Book of the Dead and more

REL-439 -The Religious Quest

The course is designed as an intensive one-semester course in world religions. Emphasis is on specific forms of religious expression and practice, rather than the more abstract or theological aspects. Religions covered by the course are those of the majority of humankind and living traditions in today's world (Hinduism, Buddhism, religions of China and Japan, Judaism, Christianity, Islam and several African religions).

**SOCIOLOGY**

SOC-101 - Introduction to Sociology

What is the link between an individual and society? What is the social/ cultural impact on the development of personality? How does modern society differ from societies of the past? These questions are representative of those explained in this course, which examines the broad range of human social relationships and social structures, and the many forces - historical, cultural and environmental - that shape them. The central aim of this course is to guide students in the development of a sociological imagination grounded in a knowledge of sociological perspectives.

SOC-210 - Marriage and the Family

Marriage and the family provides students with an understanding of the various approaches to studying the family and the varieties of U.S. family forms. It explores the family life cycle - mate selection, parenting and the major processes of family interaction. Lastly, it looks at some of the problematic aspects of the U.S. family, including stress, divorce and the elderly.

000168

SOC-315 - Social Gerontology

This course in gerontology is designed to provide students with an understanding of old age as a stage of life. It examines the impact of society on aging and of aging on society, provides a foundation for understanding the processes of aging and old age, and introduces considerations regarding the importance of health-related and/or medical perspectives in studying aging. The approach of the course responds to the demographic wave that is sweeping our nation and world by exploring questions about what roles people will play in their eighth, ninth and tenth decades, and how institutions may evolve to address their needs.

SOC-322 - Dealing with Diversity

Failure to deal with diversity in society has led to increasing polarization among groups of people, and with increasing tension, frustration and anger. Based on the premise that the more we understand, the less we fear, this course introduces people from many diverse poopulations-Native Americans, Hispanic-Americans, Asian- Americans and Euro-Americans. Dealing With Diversity assists the different constraints and motivations of people from differing backgrounds.

SOC-335 - The Adult Years

This is an interdisciplinary social science course that explores the inner lives of adults and the relationships of those inner lives to family, work, education, and the community. The course focuses on adult years as composed of variability and change rather than predictable, sequential developmental stages. The course dispels myths about adult life and incorporates current research on adults.

SOC-376 - Women and Social Action

The course examines the impact gender stereotypes and barriers have on women's lives and how they intersect with other systems, such as age class, disability, ethnicity, race, religion and sexual orientation. This course will assist the student in analyzing and evaluating whether or not the goals and methods of particular social actions are consistent with an empowerment model of social change.

**SOCIAL SCIENCES**

SOS-110 - Living in the Information Age

Living in the Information Age is an introductory level course intended primarily for students who are reentering academic study after a considerable hiatus in their formal schooling. Students will assess and strengthen their academic skills in reading, writing, calculating, and computing; and complete a number of assignments which will put these skills to practical use. The subject matter of the course is of natural interest and will also complement the instructional methods, which rely heavily on the use of computers and electronic communications. Students enrolling for this course must have access to a computer with CD ROM drive and a floppy disk drive. Windows 95 required.

SOS-304 - Drugs and Society

This course focuses on physiological, psychological and sociological aspects of drug abuse, including identification and discussion of historical and contemporary patterns. It endeavors to provide a balanced, factual account of drug abuse, including legal and ethical issues, pharmacological aspects and approaches to treatment and prevention of substance abuse. The course

000169

examines past and present drug abuse treatment modalities and analyses factors and institutions at local, state and national level that affect the delivery of drug abuse services.

## SPANISH

SPA-101 - Elementary Spanish I

An introduction to the spoken and written language, emphasizing the skills of comprehension, speaking, reading, and writing.

SPA-102 - Elementary Spanish II

Continued study of the introduction to the spoken and written language, emphasizing the skills of comprehension, speaking, reading, and writing.

SPA-103 - Elementary Spanish III

Continued study of the introduction to the spoken and written language, emphasizing the skills of comprehension, speaking, reading, and writing.

## STATISTICS

STA-201 - Principles of Statistics

An introduction to descriptive and inferential statistics. Measures of central tendency; variability; correlation; regression; hypothesis testing; non-parametric statistics.

© 2004 by Bronte International University. Please read our **Privacy Notice**

000170



**HOME**    **BIU FASTTRACK**    **AVAILABLE DEGREES**    **BIU CAREERS**    **CONTA**

Getting Started

How to Apply

Fees

Credit For Prior
Learning

About Us

Memberships and
Accreditations

Frequently Asked
Questions

# MEMBERSHIP AND
# ACCREDITATIONS

Bronte International University and their associates support efforts worldwide
of educators that strive to improve delivery and content of education this
century.

Bronte International University has been approved by the Association of
Private Colleges and Universities, and is Accredited by the **Association for
Online Academic Excellence.**

© 2004 by Bronte International University. Please read our **Privacy Notice**



BIU help
all I ever
Yo



EXHIBIT

D#R 13

000171

6/22/06



Search    Home

Your Guide to Health-Related Education and Training    Send This Page to a Friend

# Bw Wary of Nonrecognized Accreditation Agencies

### Stephen Barrett, M.D.

Accreditation constitutes public recognition that an educational program meets the administrative, organizational, and financial criteria of a recognized agency. In the United States, educational standards for schools are set by a network of agencies approved by the U.S. Office of Education (USOE) or the Council on Recognition of Postsecondary Accreditation (CORPA). USOE or CORPA do not accredit individual schools, but they approve the national and regional agencies that do so. Almost all such agencies are voluntary and nongovernmental.

In addition to nonaccredited schools, there are also nonrecognized agencies. The following entities are not approved by the U.S. Department of Education. Therefore any so-called "accreditation" by these entities should be considered meaningless:

- Accrediting Commission International—based in Arkansas
- Accreditation Governing Commission of the United States of America
- American Association of Drugless Practitioners Commission on Accreditation
- American Association of International Medical Graduates
- American Council of Private Colleges and Universities
- American Naturopathic Medical Certification and Accreditation Board (ANMCAB)
- Association for Distance Learning (ADLP)
- Association for Online Academic Excellence—possibly based in Wales
- Association of Christian Colleges and Theological Schools—based in Virginia
- Board of Online Universities Accreditation
- Central States Council on Distance Education—4401 Connecticut Avenue NW, Suite 205, Washington DC 20001
- Commission on Medical Denturtry Accreditation (COMDA)
- Council for International Education Accreditation (CIEA)
- Council on Medical Denuritry Education (COMDE)
- Distance Graduation Accrediting Association
- Distance Learning Council of Europe
- European Council for Distance & Open Learning
- Examining Board of Natural Medicine Practitioners
- Higher Education Accreditation Commission
- Higher Education Services Association
- Inter-Collegiate Joint Committee on Academic Standards
- International Accreditation Agency for Online Universities
- International Accreditation Association
- International Accreditation for Universities, Colleges and Institutes
- International Accrediting Association for Colleges and Universities
- International Association of Universities and Schools

000172

- International Commission for Higher Education
- International Commission of Open Post Secondary Education
- International Council for Open and Distance Education
- International University Accrediting Association—based in California
- National Academy of Higher Education (NAHE)
- National Commission on Higher Education
- National Distance Learning Accreditation Council
- Non-Traditional Course Accreditation Body
- Southern Accrediting Association of Bible Institutes and Colleges
- United Congress of Colleges—Ireland, UK
- US-DETC—Nevada (not to be confused with the legitimate DETC, based in Washington DC.)
- Universal Council for Online Education Accreditation
- Virtual University Accrediting Association—based in California
- World Association of Universities and Colleges—based in Nevada
- World Online Education Accrediting Commission
- World-wide Accreditation Commission of Christian Educational Institutions

This page was posted on August 5, 2005.

---

Make a Donation  |  Search All of Our Affiliated Sites  |  Home

**Sponsored Links to Recommended Companies**

- Netflix: Free 2-week trial of DVD rentals by mail; 55,000 titles available
- Lazar's Luggage Superstore: Competitive prices on quality luggage, fine business cases, hard-to-find travel accessories
- Amazon Books: Internet's leading source of books, electronics, tools, toys, and many other consumer goods.
- ConsumerLab.com: Evaluates the quality of dietary supplement and herbal products.
- Healthgrades: Check your doctors' training, board certifications, and disciplinary actions.

000173

QuickLinks        About AJU        Admissions        Academic Programs        Brian Tracy

Home
Student Center
Faculty Center
Human Resources
Search Site

**ANDREW JACKSON**
U N I V E R S I T Y

800-429-9⬚

# Distance Education

Information
*Need help? E-mail us*

000174

Andrew Jackson University's degree programs are designed for individuals who know how to manage their time and need a method of study permitting flexibility. Most mid-career adults are involved in numerous concurrent pursuits including family obligations, employment responsibilities, and leisure activities, as well as voluntary civic, community or religious involvement.

When the need arises, Andrew Jackson University is there to help motivated students achieve goals of career enhancement, professional development, or self-fulfillment.

Our educational method provides focused, online, directed learning experiences. Textbook-based courses - along with an online classroom - enable students to study when it is most convenient, progress individually, and earn a degree without the frustration of scheduling traditional or virtual class attendance.

**ANDREW JACKSON UNIVERSITY**
We deliver quality education to your doorstep.

000175

# DEPOSITION OF VIRGINIA HOPPER
# VOLUME II

## May 20, 2008

## Pages 1 through 293

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL 36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

000001

Page 1

1                IN THE UNITED STATES DISTRICT COURT

2                FOR THE MIDDLE DISTRICT OF ALABAMA

3                        NORTHERN DIVISION

4

5    VIRGINIA HOPPER,

6            Plaintiff,

7    Vs.                                    CIVIL ACTION NO.

                                            2:07-CV-457-MEF

8    JACKIE GRAHAM, et al.,

9            Defendants.

10

11

                 * * * * * * * * * * * *

12

                        VOLUME II

13

14               * * * * * * * * * * * *

15       DEPOSITION OF VIRGINIA HOPPER, taken pursuant

16   to stipulation and agreement before Pamela A. Wilbanks,

17   Certified Court Reporter, ACCR# 391, Registered

18   Professional Reporter and Commissioner for the State of

19   Alabama at Large, in the Law Offices of Jim

20   DeBardelaben, 1505 Madison Avenue, Montgomery, Alabama,

21   on Tuesday, May 20, 2008, commencing at approximately

22   9:00 a.m.

23               * * * * * * * * * * * *

000002



Page 2

```
 1
 2                  APPEARANCES
 3
 4   FOR THE PLAINTIFF:
 5   Mr. Jim L. DeBardelaben
     Attorney at Law
 6   1505 Madison Avenue
     Montgomery, Alabama
 7
     FOR THE DEFENDANTS:
 8
     Ms. Joana S. Ellis
 9   Ms. Alice Ann Byrne
     State of Alabama
10   Personnel Department
     300 Folsom Administrative Bldg.
11   64 North Union Street
     Suite 316
12   Montgomery, Alabama
13   FOR THE DEFENDANT WALLEY:
14   Mr. Joel C. Marsh
     Alabama Department of Human Resources
15   50 Ripley Street
     Post Office Box 30400
16   Montgomery, Alabama
17   ALSO PRESENT:
18   Ms. Jackie Graham
19
           * * * * * * * * * * * * *
20
             EXAMINATION INDEX
21
     BY MR. MARSH . . . . . . . . . . . . .   5
22   BY MS. ELLIS . . . . . . . . . . . . .  135
     BY MR. MARSH . . . . . . . . . . . . .  281
23   BY MS. ELLIS . . . . . . . . . . . . .  291
```

Page 4

```
 1           DEFENDANT'S EXHIBIT INDEX CONTINUED
 2   17   8/14/06 letter to Ms. Hopper from DHR       126
          concerning termination of employment
 3
     18   Recommended Order o the State Personnel      129
 4        Board
 5   19   Copy of the decision in the matter of the    130
          appeal of Virginia Hopper
 6
     20   5/15/06 letter to Jackie Graham from Mr.     180
 7        Hopper
 8   21   Application for Staff Accountant dated       237
          5/28/03
 9
     22   Application for Accountant dated 7/25/03     237
10
11
12               STIPULATION
13
        It is hereby stipulated and agreed by and
14
     between counsel representing the parties that the
15
     deposition of VIRGINIA HOPPER is taken pursuant to the
16
     Federal Rules of Civil Procedure and that said
17
     deposition may be taken before Pamela A. Wilbanks,
18
     Registered Professional Reporter and Commissioner for
19
     the State of Alabama at Large, without the formality of
20
     a commission, that objections to questions other than
21
     objections as to the form of the question need not be
22
     made at this time but may be reserved for a ruling at
23
```

Page 3

```
 1           DEFENDANT'S EXHIBIT INDEX
 2   1   Copy of Notice of Deposition             12
 3   2   Copy of Re-Notice of Deposition          12
 4   3   Transcript from Trinity College &        18
         University listing course titles and
 5       numbers
 6   4   Letter from Trinity College & University to   18
         graduates
 7
     5   Letter from Trinity College & University  19
 8
     6   Commission on Colleges Institutional      19
 9       Details for Trinity University printed of
         the Internet
10
     7   Department of Business Administration     20
11       common curriculum from Trinity University's
         Web site
12
     8   Business Core Curriculum                  20
13
     9   Transcript from Trinity listing course    21
14       titles and numbers and handwritten results
15   10  Copy of diploma                           22
16   11  Transcript of classes from Troy University  25
17   12  Application for account clerk dated 8/28/98  48
18   13  Application for Accounting Tech I dated    55
         10/25/99
19
     14  Application for Accountant dated 11/21/03  69
20
     15  Charge letter to Ms. Hopper from DHR dated  123
21       5/9/06
22   16  Amendment dated 6/12/06 to original charge  124
         letter
23
```

Page 5

```
 1   evidence or used for any other purpose by either party
 2   provided for by the Statute.
 3        It is further stipulated and agreed by and
 4   between counsel representing the parties in this case
 5   that the filing of said deposition is hereby waived and
 6   may be introduced at the trial of this case or used in
 7   any other manner by either party hereto provided for by
 8   the Statute regardless of the waiving of the filing of
 9   the same.
10        It is further stipulated and agreed by and
11   between the parties hereto and the witness that the
12   signature of the witness to this deposition is hereby
13   waived.
14
15           * * * * * * * * * * * * *
16              VIRGINIA HOPPER
17        The witness, after having first been duly sworn
18   to speak the truth, the whole truth and nothing but the
19   truth testified as follows:
20              EXAMINATION
21   BY MR. MARSH:
22   Q.   Ms. Hopper, as I introduced myself last week,
23        I'm just going to do it again for the record.
```

Deposition of Virginia Hopper, Vol. II                                                    May 20, 2008

Page 6

1    I'm Joel Marsh, and I represent Commissioner
2    Page Walley who is one of the defendants in this
3    case, as you know. He's the only defendant that
4    I represent. Ms. Ellis represents the other
5    defendants in the lawsuit. We both will be
6    asking some questions today.
7        As I discussed last time, if at any point
8    you don't understand something that I say,
9    please stop me. Ask me to restate the
10   question. I want to ensure that you understand
11   the questions when you provide the answers.
12   Please ask me to clarify anything that you do
13   not understand.
14   A.  Okay.
15   Q.  If you're getting tired or need a break, you
16   need to let us know so we can take a break
17   because these answers are very important, and we
18   need to make sure that you're able to give them
19   properly.
20       When we were here last time, there was a
21   discussion about some of the medications that
22   you were taking, and you gave us a list of
23   medications that you were taking. Since then

Page 7

1    have you added any medications to that list, any
2    additional medications that you are taking that
3    we did not discuss last time?
4    A.  No.
5    Q.  Are any of those medications that you are no
6    longer taking? Have you stopped taking any of
7    those medications?
8    A.  No.
9    Q.  You also discussed the doctors that you had seen
10   last time that we were here. Since then have
11   you seen any additional doctors other than the
12   ones that you had described?
13   A.  No.
14   Q.  Tell me what medications you took yesterday just
15   so we'll know what was in your system
16   yesterday.
17   A.  I took all the medications that were on the list
18   that I gave you.
19   Q.  Can you describe which ones those were? Do you
20   recall which ones those were?
21   A.  No, sir. I probably wouldn't be able to tell
22   you all of them. I know Topamax, Celexa,
23   Ativan. They were all that was on the list.

Page 8

1    Q.  So the entire list?
2    A.  Yes, sir.
3    Q.  Did you take them at the recommended dosage?
4    A.  Yes, sir.
5    Q.  You didn't take any more than you were supposed
6    to?
7    A.  No, sir.
8    Q.  What about this morning? What medications have
9    you taken this morning?
10   A.  I've taken the Topamax, the Celexa, and Ativan.
11   Q.  Did you take those at the recommended dosages?
12   A.  Yes, sir.
13   Q.  You didn't exceed those dosages?
14   A.  No, sir.
15   Q.  Are there any other medications over the counter
16   otherwise that you've taken in the last two
17   days?
18   A.  Yes, sir. I took a Vitamin E and -- I can't
19   think of my other vitamin, but it was just a
20   vitamin.
21   Q.  Have you taken any illegal substances, illegal
22   drugs, at all in the past 30 days?
23   A.  No, sir. I've never taken any illegal drugs in

Page 9

1    my life.
2    Q.  Have you taken any prescriptions that were not
3    prescribed to you that were prescribed to
4    someone else?
5    A.  No, sir.
6    Q.  Do you feel like you're capable of doing this
7    deposition this morning?
8    A.  Yes, sir.
9    Q.  Do you feel like you're capable of answering the
10   questions that are put to you this morning?
11   A.  Yes, sir.
12   Q.  Do you feel like you'll be able to remember the
13   facts of this case?
14   A.  Yes, sir.
15   Q.  Ms. Hopper, tell me where you were born.
16   A.  Scottsboro, Alabama.
17   Q.  And tell me where you were raised.
18   A.  Scottsboro, Alabama and Montgomery, Alabama.
19   Q.  When did you move to Montgomery?
20   A.  When I was approximately three years old.
21   Q.  And who did you live with in Montgomery?
22   A.  With my mother and father.
23   Q.  Do you have any siblings?

Page 10

1   A.  Yes, sir.
2   Q.  Tell me what your -- the names of your
3       siblings.
4   A.  Barbara, James, Jr.
5   Q.  Give me the last names also.
6   A.  Swearengin is the last name of all of them.
7           James, Jr., Tommy Joe, Billy Lee, Robert
8       Edward.
9   Q.  How many brothers and sisters do you have?
10  A.  I have one sister and four brothers.
11  Q.  Now, you said you moved to Montgomery when you
12      were three. Have you lived here all your life?
13  A.  Yes, sir.
14  Q.  Have you ever lived anywhere else since then?
15  A.  No, sir.
16  Q.  And what is your current address?
17  A.  Deatsville.
18  Q.  Can you give me the full address?
19  A.  200 Alpha Lane, Deatsville, Alabama.
20  Q.  Is that in the city limits of Deatsville?
21  A.  Yes, sir.
22  Q.  How long have you lived there?
23  A.  Thirty-six years.

Page 11

1   Q.  Are you married?
2   A.  Yes, sir.
3   Q.  And who is your husband?
4   A.  Donald H. Hopper, Sr.
5   Q.  I'm sorry. Give me that first name again.
6   A.  Donald H. Hopper, Sr.
7   Q.  And how long have you been married?
8   A.  Thirty-six years.
9   Q.  And that's entirely to this one -- to Donald?
10  A.  Yes, sir.
11  Q.  Do you have children?
12  A.  Yes, sir.
13  Q.  What are their names and ages?
14  A.  Donald H. Hopper, Jr., he's 31; Heather Gail
15      Edwards -- Hopper Edwards, she's 27.
16  Q.  And these are your only two children?
17  A.  Yes, sir.
18  Q.  Do these children currently live with you or do
19      they live elsewhere?
20  A.  They live elsewhere.
21  Q.  When did these children move out of your home?
22      Do you recall?
23  A.  Let me think about it.

Page 12

1   Q.  Has it been within the last five years?
2   A.  Oh, it's been longer than that. Let's see.
3       Donnie has been gone from home 13 years, and
4       then Heather moved right out of high school
5       because she moved when she went off to college.
6       So she moved when she was, I'll just say,
7       approximately 18.
8           (Defendant's Exhibits 1 and 2 marked
9           for identification.)
10  Q.  I'm marking as Exhibit 1 and 2 -- This Exhibit 1
11      and 2 is the notice of deposition that you were
12      provided in this case and a renotice of
13      deposition that was provided for this new date.
14      Have you seen those documents?
15          MR. DEBARDELABEN: I don't think I've
16          seen them.
17          MS. ELLIS: I e-mailed it to Dana, the
18          renotice. I e-mailed it to Dana
19          and told her it was exactly the
20          same --
21  A.  Have I seen them before?
22  Q.  Yes --
23  A.  No.

Page 13

1           MS. ELLIS: -- except the date.
2   Q.  Let me direct your attention to page 3 of both
3       documents.
4           MR. DEBARDELABEN: Didn't we bring all
5           this stuff last time?
6           MR. MARSH: I'm sorry?
7           MR. DEBARDELABEN: Didn't we give you
8           all this stuff last time?
9           MR. MARSH: I just want to confirm
10          that. We didn't go through what
11          she gave us. I just want to make
12          sure what she gave us was what we
13          asked for.
14          MR. DEBARDELABEN: We gave you
15          everything that we could find. If
16          you asked for it, she wouldn't
17          know it. If it's the same
18          thing --
19          MR. MARSH: Let me get her to look at
20          it. I just want to confirm that
21          she agrees with it.
22          MR. DEBARDELABEN: And she wouldn't
23          know.

Page 14

1    MR. MARSH:  She should know what she
2         has and what she's provided.  And
3         I've got a copy of what she gave,
4         which I will be happy to show her
5         also.
6   Q.   Go ahead and look at page 3 of those.
7   A.   You only want me to look at page 3?
8   Q.   That's what I'm interested in, yes, ma'am.  You
9        can continue on to page 4.
10       Tell me which exhibit you were just looking
11       at.  Was that 1 or 2?
12  A.   One.
13  Q.   Those lists of request of documents, to your
14       knowledge have you provided all the documents in
15       your possession that respond to these requests
16       to your attorney, Mr. DeBardelaben?
17  A.   Well, I don't really know how to answer you
18       because I don't know about paragraph 34 and I
19       don't know about paragraph 48.
20  Q.   You said 34.  Oh, in the complaint?  There's
21       paragraph 34.
22       MR. DEBARDELABEN:  I'm going to
23            interpose an objection on

Page 15

1         paragraph 34.  To interpret
2         paragraph 34, she would have to
3         have legal knowledge, and she does
4         not have the knowledge to
5         interpret what is said in
6         paragraph 34 because that's not
7         factual.  That's going with legal
8         knowledge, and she doesn't have
9         that knowledge.  However, what she
10        can answer in relation to that ...
11  Q.   If you will, read 34.  If you can't answer it,
12       you can tell me that.  But I need you to look at
13       it and tell me if there's any documents related
14       to that that you have not provided to your
15       attorney.
16  A.   I don't understand all of 34.
17  Q.   Which parts of it do you not understand?
18  A.   I don't understand the constitutional and
19       statutory provisions, denial of due process,
20       equal protection of the law, in excess of the
21       authority of the agency, all that.
22  Q.   Have you provide all the documents that you have
23       related to this case to your attorney?

Page 16

1   A.   Yes, sir.
2   Q.   Is there anything at all that you have in your
3        possession that you've not provided?
4   A.   No, sir.
5   Q.   Other than the references to the complaint, is
6        there anything that's requested in any of these
7        lists that you've not provided to your attorney?
8   A.   No, sir.
9        MR. MARSH:  Mr. DeBardelaben, is it
10            your representation that you've
11            provided everything to us that you
12            have in response to our request?
13       MR. DEBARDELABEN:  Everything that I
14            know I have, y'all have got it.
15            Now, I'm not going to say there's
16            something that I did not see, but
17            I think I provided you everything
18            I've got.
19       MR. MARSH:  In terms of something you
20            didn't see, that was in your
21            files?
22       MR. DEBARDELABEN:  Yeah.  You know,
23            when you go through files, you

Page 17

1         think you get everything.  But I
2         have no knowledge of anything that
3         I didn't provide you, and I went
4         through them about three times.
5        MR. MARSH:  We would request that you
6            check --
7        MR. DEBARDELABEN:  If I see anything,
8            I will certainly send it to you.
9        MR. MARSH:  If there's anything that
10           we have not received, we need to
11           receive it right away, and we make
12           that request today.
13       MR. DEBARDELABEN:  If I see it.
14       MR. MARSH:  But it's your
15           representation today that there's
16           nothing that you're aware of that
17           you have not provided?
18       MR. DEBARDELABEN:  Not that I'm aware
19           of, no.  But I've learned never to
20           say there's not something there.
21           I've been accused of not making a
22           copy of a second page when I
23           thought it was made or leave out

Page 18

1    the tenth page of a long document
2    or something like that.
3    Q.   Ms. Hopper, I want to show you the documents --
4    some of the documents; I'm not going to go
5    through all of these -- that you did provide or
6    your attorney provided in response to our
7    request for discovery.
8        (Defendant's Exhibit 3 marked for
9        identification.)
10   Q.   I'll mark this first one Defendant's Exhibit
11   Number 3. Can you tell me what that exhibit
12   is? Just describe what the document is.
13   A.   It's a transcript.
14   Q.   From where?
15   A.   Trinity College & University.
16       (Defendant's Exhibit 4 marked for
17       identification.)
18   Q.   Tell me what Defendant's Exhibit 4 is.
19   A.   It's a letter from Trinity College & University.
20   Q.   And that's a letter that you received?
21   A.   Yes, sir. I believe it is. It looks like it.
22   Q.   Do you have any reason to believe that's not the
23   letter that you received from them?

Page 19

1    A.   No, sir.
2        (Defendant's Exhibit 5 marked for
3        identification.)
4    Q.   Let me show you Defendant's Exhibit 5. Tell me
5    what that is, please.
6    A.   It is also a letter from Trinity College &
7    University.
8    Q.   And is that a letter that you received?
9    A.   Yes, sir.
10       (Defendant's Exhibit 6 marked for
11       identification.)
12   Q.   Defendant's Exhibit 6, do you know what that
13   document is?
14   A.   I suppose that it's --
15       MR. DEBARDELABEN: If you know, tell
16       him. If you don't know, don't
17       suppose.
18   A.   I know what the document says. I don't know
19   exactly what you would call this.
20   Q.   Is that a document that was in your possession
21   that you provided to your attorney?
22   A.   Yes, sir.
23   Q.   Where did you receive that document from?

Page 20

1    A.   I printed it off the Internet.
2        (Defendant's Exhibit 7 marked for
3        identification.)
4    Q.   And Exhibit 7?
5    A.   This is a list of classes.
6    Q.   Classes from where?
7    A.   Trinity University.
8    Q.   Is that the Trinity University in San Antonio,
9    Texas?
10   A.   I really don't know.
11   Q.   Where did you get that document from?
12   A.   Off the Internet.
13   Q.   Do you recall what the Internet page you were
14   looking at said at the top?
15   A.   I see what it says at the top. I don't
16   necessarily recall it, but I can read it off
17   this page.
18   Q.   Is it your belief that that's from Trinity
19   University in San Antonio, Texas?
20   A.   I don't know.
21       (Defendant's Exhibit 8 marked for
22       identification.)
23   Q.   I'll show you Defendant's Exhibit 8.

Page 21

1    A.   It's a list of classes.
2    Q.   Classes from where?
3    A.   I don't know.
4    Q.   Is that a document that you provided to your
5    attorney?
6    A.   Yes, sir.
7    Q.   Where did you get that document from?
8    A.   The Internet.
9    Q.   Do you recall what pages you were looking at
10   when you downloaded that document?
11   A.   No, sir.
12       (Defendant's Exhibit 9 marked for
13       identification.)
14   Q.   Let me show you Defendant's Exhibit 9. Do you
15   know what that document is?
16   A.   Transcript.
17   Q.   Transcript from where?
18   A.   Trinity College & University.
19   Q.   And the handwriting on the side of that, is that
20   your handwriting?
21   A.   Yes, sir.
22   Q.   What's that a list of?
23   A.   That's a list of other classes.

Page 22

1   Q.   When you say other classes, what do you mean by
2        that?
3   A.   The other classes that I had taken, additional
4        classes, other than what's listed on this
5        transcript.
6             (Defendant's Exhibit 10 marked for
7              identification.)
8   Q.   Finally, let me show you Defendant's Exhibit
9        10.  Do you know what that is?
10  A.   It's a copy of a diploma.
11  Q.   Is that the diploma from Trinity College &
12       University?
13  A.   Yes, sir.
14  Q.   And did you receive that document from that
15       institution?
16  A.   Yes, sir.
17  Q.   Ms. Hopper, would you tell me about your
18       education?  Where did you go to high school?
19  A.   Lee.
20  Q.   Is that here in Montgomery?
21  A.   Yes, sir.
22  Q.   And when did you graduate?
23  A.   1971.

Page 23

1   Q.   What is the next education that you had, the
2        next school or college that you attended after
3        that?
4   A.   It would be -- do you mean ...
5   Q.   As far as formal education.  After Lee did you
6        attend a college or university or training
7        school?  Anything like that?
8   A.   Vocational school.  I went to vocational school.
9   Q.   And what was the name of the vocational school?
10  A.   Wetumpka Vocation.
11  Q.   When did you go there?
12  A.   1993-'94.
13  Q.   Did you attend full-time?
14  A.   No, sir.  These were classes at night.
15  Q.   And what classes did you take there?
16  A.   Introduction into Accounting and some computer
17       classes.
18  Q.   Do you recall what those were?
19  A.   It was a Windows class.  That's all I remember.
20  Q.   Do you recall how many classes total you took
21       there?
22  A.   No, sir.  I don't remember if it was two, maybe
23       three.

Page 24

1   Q.   Did you get a credit for each of the classes you
2        took there?
3   A.   Yes, sir.
4   Q.   So you completed all the requirements for those
5        classes?
6   A.   Yes, sir.
7   Q.   But the only non-computer class you took was
8        Introduction to Accounting?
9   A.   I believe so.
10  Q.   After that what's the next time you've taken any
11       classes from any educational institution?
12  A.   Do you want me -- are you talking about the
13       seminars or are you --
14  Q.   No.  I'm talking about classes from a university
15       or college or --
16  A.   It would be Troy University.
17  Q.   When did you go there?
18  A.   I don't remember the dates.
19  Q.   Do you remember approximately?  Was it ten years
20       ago?  Five years ago?
21  A.   I believe I started taking some classes in '93,
22       but I cannot be sure.
23  Q.   Do you know which classes you took there?

Page 25

1   A.   Principles of Accounting --
2   Q.   Let me show you this transcript.  It's an easier
3        way to do this.  You tell me if this is
4        accurate.
5             (Defendant's Exhibit 11 marked for
6              identification.)
7   Q.   Let me show you what I've marked as Exhibit 11.
8        Is that a transcript for you from Troy
9        University?
10  A.   It is.
11  Q.   The first course listed is Principles of
12       Accounting.  Do you recall when you took that?
13  A.   It lists on here '98, I believe.
14  Q.   Do you have any reason to believe that would not
15       be true?
16  A.   No, sir.  That would be right I'm sure.
17  Q.   And you completed that course and got credit for
18       it?
19  A.   That's correct.
20  Q.   How many hours was that course?  How many hours
21       did you have to spend in class for that course?
22            MR. DEBARDELABEN:  Object.  You've
23             asked two questions.  Which one do

Page 26

1      you want her to answer?
2   Q.   How many hours a week did you spend attending
3        that course?
4   A.   Is it going to list it on here?
5   Q.   I don't know, ma'am. I'm just asking what your
6        memory is.
7   A.   I don't recall.
8   Q.   Does --
9   A.   I mean, you can cipher it from here.
10  Q.   Did you attend once a week? More than once a
11       week? Do you recall how many times you went?
12  A.   Particularly on this one, I do not. On some of
13       them I went twice a week. I don't remember.
14  Q.   For this course did you actually attend a class
15       at Troy University?
16  A.   I did.
17  Q.   And that was here in Montgomery; is that right?
18  A.   It was.
19  Q.   Did you have to take exams for that course?
20  A.   I did.
21  Q.   Were there any papers or other outside work that
22       you had to complete?
23  A.   There was.

Page 27

1   Q.   Can you tell me what that was?
2   A.   No. I don't recall.
3   Q.   But there was some additional things in addition
4        to your exams?
5   A.   Right.
6   Q.   And you received a grade for that course?
7   A.   I did.
8   Q.   Look at the second course, Principles of
9        Accounting II. If we're going by the dates on
10       here, it was completed in 1998. Does that sound
11       accurate to you?
12  A.   Yes.
13  Q.   Do you recall how many hours a week you spent in
14       class for that course?
15  A.   I do not.
16  Q.   Did you --
17  A.   It would be the normal, whatever.
18  Q.   Do you know how many credit hours you got credit
19       for that course?
20  A.   I'm sure it's listed.
21  Q.   You don't recall yourself how many credit hours
22       you got?
23  A.   No.

Page 28

1   Q.   But this was a class that you actually attended
2        at Troy University?
3   A.   Right.
4   Q.   And did you have exams in that course?
5   A.   I did.
6   Q.   Did you have other outside work in addition to
7        exams?
8   A.   I did.
9   Q.   The next course, Governmental Accounting, it
10       says it was completed in 1999. Does that appear
11       to be accurate to you?
12  A.   It does.
13  Q.   Do you recall how many hours that course was
14       that you attended each week?
15  A.   I don't.
16  Q.   Did you attend classes at Troy University for
17       this course?
18  A.   I did.
19  Q.   And were there exams in that course?
20  A.   There was.
21  Q.   And did you have other outside work in addition
22       to the exams?
23  A.   I'm sure I did.

Page 29

1   Q.   You're not sure or --
2   A.   I said I am sure I did, yes.
3   Q.   And then Managerial Accounting, it appears it
4        was taken in 2000 or completed in 2000. Does
5        that appear to be accurate to you?
6   A.   Yes.
7   Q.   And, again, do you know how many hours a week
8        you spent in class on that course?
9   A.   I don't.
10  Q.   But you attended classes at Troy?
11  A.   I did.
12  Q.   And there were exams in that course?
13  A.   Yes.
14  Q.   And other outside work in addition to exams?
15  A.   Yes.
16  Q.   Basic Microcomputing completed in 2000. Is that
17       accurate?
18  A.   Yes.
19  Q.   Again, were there exams in that course?
20  A.   Yes.
21  Q.   And did you attend at Troy University?
22  A.   Yes.
23  Q.   Do you recall how many hours you spent in class

Page 30

1      for that one?
2   A.   I do not.
3   Q.   Intermediate Accounting, it says it was
4        completed in 2003.  Is that accurate?
5   A.   Yes.
6   Q.   And do you recall in that course how many hours
7        you spent a week in that course?
8   A.   No, sir.
9   Q.   Did you attend classes at Troy?
10  A.   I did.
11  Q.   Do you recall if it was once a week or more than
12       once a week?
13  A.   It was more than once a week.
14  Q.   And there were exams that you took in that
15       course?
16  A.   There was, yes.
17  Q.   And was there other outside work that you had to
18       complete?
19  A.   Yes.
20  Q.   Other than these courses, are there any other
21       courses from Troy University that you have
22       taken?
23  A.   No, sir.

Page 31

1   Q.   And when I say that, I'm including any courses
2        you would have taken online other than just
3        attending there.  Anything else at all?
4   A.   No.
5   Q.   Now, other than Troy -- again, I'm not talking
6        about seminars and things -- what other
7        education have you had prior to getting your
8        degree from Trinity College & University?  Any
9        other institutions you've attended?  Trade
10       schools?  Anything like that?
11  A.   That's all.
12  Q.   Now, specifically with the Troy University
13       courses, in general, especially -- Let's don't
14       talk in general.  Let's talk about the last
15       course you took.  That would be Intermediate
16       Accounting in 2003.
17           About how much time did you have to spend
18       outside of class on this course getting ready
19       for it, preparing for exams, writing papers?
20  A.   I don't recall.
21  Q.   Did you have to spend time outside of class
22       getting ready for class?
23  A.   I did.

Page 32

1   Q.   Do you think it would have been more than one
2        hour a week?
3   A.   Probably.
4   Q.   Do you think it would have been more than five
5        hours a week?
6   A.   No, I don't think it would have been more than
7        that.
8   Q.   So you would have spent roughly between one and
9        five hours a week in preparation for the class?
10           MR. DEBARDELABEN:  Object to the form.
11  Q.   You can answer the question.
12  A.   Maybe two.
13  Q.   Two hours?
14  A.   Maybe.
15  Q.   Would that include when you had exams?  Only two
16       hours a week when you were getting ready for
17       exams?
18  A.   Probably.
19  Q.   Your other courses that you took, was there a
20       similar amount of time you spent outside of
21       class preparing and getting ready for those
22       courses?
23  A.   Yes.

Page 33

1   Q.   Now I'd like to discuss -- you mentioned this is
2        all the formal training you've had through an
3        educational institution or trade school or
4        something similar.
5   A.   Yes.
6   Q.   What other education do you have in terms of
7        seminars, classes you may have attended,
8        work-related educational opportunities?  Can you
9        describe what those are?
10  A.   Can we just look at that, Joel, instead of me
11       trying to remember all that?
12  Q.   What do we need to look at for you to help your
13       memory on that?
14  A.   Wherever we had listed it before, because I know
15       I cannot sit here and tell you that again.
16  Q.   Let me show you Exhibit 9.  Those handwritten
17       courses, does that refresh your memory in terms
18       of what courses you've taken?
19  A.   Yes, somewhat.
20  Q.   You also testified about this at the previous
21       hearing.  Do you need to look at that transcript
22       to refresh your memory on that?
23  A.   If you want to go over each one of them, it

Page 34

1    would be --
2  Q.  Yes, I do.
3        I'm going to show you a copy of the page
4      from the transcript of June 22, 2006, which was
5      a hearing that was held at DHR starting on
6      what's listed as page 50 -- starting actually on
7      page 49.  The question was:  And tell me more
8      specifically.  What else did you provide them?
9      You said you provided them information on other
10     courses.  Tell me what other courses you've
11     taken.
12       Starting here, look over that and see if
13     that refreshes your memory concerning the other
14     courses that you've had.
15  A.  Okay.
16  Q.  Does that refresh your memory?
17  A.  It does.
18  Q.  So tell me about the other courses you've had.
19     What's the first course?
20  A.  Advanced Technology Group.
21  Q.  What is that?
22  A.  That was a computer class in Excel at AUM.
23  Q.  Do you know when you took that?

Page 35

1  A.  1999.
2  Q.  And how long was that course?
3  A.  I believe it was two days.
4  Q.  And how did you happen to take that course?  Was
5      it work-related or did you take it on your own?
6  A.  It was work-related.
7  Q.  And it was on how to operate the Excel program?
8  A.  Yes.
9  Q.  Do you recall how many hours each day you were
10     in that course?
11  A.  Eight.  You know, they gave us a lunch break,
12     but they called it an eight-hour course.
13  Q.  What was the next course you took?
14  A.  NAIC Reinsurance.
15  Q.  Please describe what that is.
16  A.  That's a national -- let me see if -- I can't
17     remember it right now.  Let me see what this
18     says.  I think it was a National Association of
19     Insurance Commissioners.
20  Q.  Do you recall taking that course?
21  A.  I do.
22  Q.  What was it teaching you?
23  A.  A lot of it was -- It was in 1996, and a lot of

Page 36

1      it was how to allocate reinsurance and also how
2      to file and receive reinsurance.  There were
3      layers of catastrophic claims that you had to
4      refile.
5  Q.  And was this work-related or did you take it on
6      your own?
7  A.  It was work-related.
8  Q.  Where were you working at that time?
9  A.  Receivership Division with the State Insurance
10     Department.
11  Q.  And how many days was this course?
12  A.  Two days.
13  Q.  Would that be two eight-hours days?
14  A.  Yes, sir.
15  Q.  Including lunch and breaks?
16  A.  Yes, sir.
17  Q.  What was the next course you took?
18  A.  Now, I have vocational school, but you already
19     have that down.  Do you want to include that?
20  Q.  No.  Besides what we've already discussed.  You
21     said -- You mentioned you went to Wetumpka
22     Vocational School.  Did you describe all the
23     courses you took there when we discussed --

Page 37

1  A.  I believe I did, but that's also on my
2      application.
3  Q.  Was there any other vocational school you
4      attended?
5  A.  No, sir.
6        Now, I had NAIC Reinsurance in '95.  One of
7      them was '95 and one was in '96.  That was in
8      Texas also, two days.
9  Q.  And was that course similar to the other
10     reinsurance course?
11  A.  Yes, sir.
12  Q.  What was the next course you took?
13  A.  NOLHGA.
14  Q.  And what is that course?
15  A.  National Association of Insurance
16     Commissioners -- No.  That was the National
17     Association of Life and Health Guaranty
18     Association.
19  Q.  And what were you taught in that course?
20  A.  It was similar:  How to collect and coordinate
21     life and health.  It was quite different from
22     the other because with life insurance, it's a
23     one-time collection and accounting for.  Health

Deposition of Virginia Hopper, Vol. II                                    May 20, 2008

Page 38

1       insurance is a lot different from casualty.
2    Q.  And how many days was that course?
3    A.  It was two also.
4    Q.  And it would be two eight-hour days?
5    A.  Yes.
6    Q.  Was this also while you were employed with the
7        Department of Insurance?  Did you say the
8        Department of Insurance?
9    A.  Yes, sir.
10   Q.  What was your duty title at the Department of
11       Insurance?
12   A.  When I first went there, it was Reinsurance
13       Specialist.  Then it was Accounting Tech, and
14       when I left it was an Accountant.
15   Q.  And was that an Accountant under the State merit
16       system?
17   A.  No.
18   Q.  These are not State merit system positions?
19   A.  No, sir.
20   Q.  What was the next course you took?
21   A.  SIR/NCIGF.  That was also a guaranty fund
22       training.
23   Q.  What type of information did you receive in this

Page 39

1        course?
2    A.  It was just insurance and accounting for, how to
3        file for and account for this type information.
4        It was a working seminar.  It was actually work,
5        not just listening to it.  It was a working
6        seminar.  That was in '94.
7    Q.  How many days?
8    A.  It was two also.
9    Q.  And the previous course, the NOLHGA, when did
10       you take that?  I forgot to ask the date of
11       that.
12   A.  Let me see if I can find it over here because
13       it's off on this sheet.
14   Q.  Do you recall the approximate time frame?
15   A.  I believe that says '96.
16   Q.  Is that accurate to you?
17   A.  I think so.  It was all about in that time
18       frame.
19   Q.  The last course you mentioned was the
20       SIR/NCIGF.  What was the next course you took
21       after that?
22   A.  That's all.  The only other thing I have down
23       here is the vocational.

Page 40

1    Q.  Are there any other courses or training that
2        you've had that we haven't discussed?
3    A.  Not other than the Association of Governmental
4        Accountants.
5    Q.  What is that?
6    A.  The governmental accountant, the State pays for
7        that.  And once a month we had a meeting, and
8        once a year you go to the training sessions.
9        And you get five credit hours for attending
10       that.  And you might want to go back and correct
11       it.  I don't know if it matters or not, but on
12       this transcript it said '95.
13   Q.  I'm sorry.  Correct what?
14   A.  That last date I gave you for that NOLHGA
15       Reinsurance.
16   Q.  Okay.  Let me go back to the one you were
17       describing, the Association of Governmental
18       Assistants.
19   A.  Association of Governmental Accountants.
20   Q.  Accountants.  I'm sorry.
21       Once a year there was training.  How many
22       times did you attend these training sessions?
23   A.  I think I was a member from 2001.  You didn't

Page 41

1        have to be an accountant to be a member if you
2        was in the accounting series.  So you went every
3        year.  You got five credit hours.
4    Q.  2001 to what?
5    A.  2006.
6    Q.  And how many days were these training sessions?
7    A.  One day.
8    Q.  So that would have been five sessions you
9        attended?
10   A.  (Witness nods head positively.)
11   Q.  Each one day?
12   A.  You got a certificate for five credit hours.
13   Q.  And would those be eight-hour days?
14   A.  Yes, sir.
15   Q.  With breaks and lunch?
16   A.  Yes.
17   Q.  What else?  Any other training that you've
18       attended?
19   A.  No, sir.
20   Q.  You mentioned earlier about your two children.
21       Do they have college degrees?
22   A.  They do.
23   Q.  What is your son's degree in?

Deposition of Virginia Hopper, Vol. II                                  May 20, 2008

Page 42

1  A.  Computer science.
2  Q.  And what is your daughter's degree in?
3  A.  Heather has a double degree.  I think it's --
4      It's not computer science, but it's
5      computer-related somehow.  She has business
6      administration and --
7  Q.  And something to do with computer science?
8  A.  Computer information or something.
9  Q.  That's fine.  I don't need the exact.
10     How many years did your son attend the
11     university to get that degree?
12  A.  Well, Donnie was already married, and he took
13     his part-time.  So I don't really know.  I mean,
14     it was like that.  He wasn't living at home, and
15     he was already married.
16  Q.  Where did he attend?
17  A.  Troy.
18  Q.  So you don't know how long it took him to get
19     that degree?
20  A.  No, sir.  It took him a while.  He was married.
21     He was working.  And he just went, I guess you
22     would say, part-time on and off.  It took him a
23     while.

Page 43

1  Q.  What about your daughter?  When did she get her
2     degree?
3  A.  She got her degree from Faulkner, and she went
4     five years because she got two degrees.  She
5     lived away from home.
6  Q.  Did she attend full-time?
7  A.  Yes, sir.
8  Q.  She got the degree when?
9  A.  I suppose -- She graduated in '98.  I don't
10     know.  I don't remember years right now, Joel.
11  Q.  How old was she when she got the degree?
12  A.  Well, she went right out of high school, and she
13     got it -- Right out of high school, she went
14     five years and graduated from college.
15  Q.  So she would have been 17, 18, do you recall,
16     when she --
17  A.  When she graduated, yes, sir, she would have
18     been 18, I believe.
19  Q.  And you say she was not living at home during
20     this time?
21  A.  No, sir.
22  Q.  Let's talk a little bit about your work
23     history.  After high school what's the first job

Page 44

1     that you held?
2  A.  After high school?
3  Q.  Yes, ma'am.
4  A.  I guess it was in a department store.
5  Q.  How long did you work there?
6  A.  Oh, heavens.  I don't know.  I worked at the
7     service desk.  I don't know.
8  Q.  Roughly.  Was it one year or five years?
9  A.  Maybe a year.
10  Q.  Why did you leave that job?
11  A.  I think I went to work at an insurance company.
12  Q.  What insurance company was that?
13  A.  American General.
14  Q.  Do you recall approximately when you started
15     working for them?
16  A.  I do not.
17  Q.  Do you recall how long you worked for them?
18  A.  Maybe a year.
19  Q.  Why did you leave that job?
20  A.  Went to work for the State.
21  Q.  Do you know when you started with the State?
22  A.  I do not.
23  Q.  What was the first job you held with the State?

Page 45

1  A.  Account Clerk, I guess, or Clerk Typist or
2     something.  I don't recall right now.
3  Q.  And which agency did you work for?
4  A.  I don't recall.
5  Q.  So your first job as Account Clerk, you don't
6     remember who you were working for?
7        MS. ELLIS:  Clerk Typist I think she
8        said.
9  A.  I think it was a Clerk Typist.
10  Q.  Clerk Typist.
11  A.  I don't know.  I know y'all can look that up.  I
12     don't recall right now.
13  Q.  Do you remember your next job?
14        MR. DEBARDELABEN:  Do you need a
15        break?  I know you're on
16        medication.
17        MR. MARSH:  If you need a break, we
18        can take a break.
19        MR. DEBARDELABEN:  If you want to go
20        ahead, that's up to you.
21        THE WITNESS:  I'll go ahead.
22  A.  I can't recall.
23  Q.  What's the first job you recall having with the

Deposition of Virginia Hopper, Vol. II                                        May 20, 2008

Page 46

1      State that you can remember?
2   A.  In revenue. Revenue Department.
3   Q.  And when was that?
4   A.  I can't remember the year.
5   Q.  Do you remember approximately? Was it ...
6   A.  It was before I had any children.
7   Q.  What was your position with the Revenue
8       Department?
9   A.  I think it was Clerk Typist. I'm not real sure.
10  Q.  You said this was prior to your children being
11      born?
12  A.  Uh-huh (positive response).
13          MS. ELLIS: You need to say yes.
14          MR. DEBARDELABEN: You need to say --
15          THE WITNESS: Yes.
16  Q.  How long did you work at the Revenue Department?
17  A.  Joel, I don't know. I can't recall.
18  Q.  Do you remember what your next position was, the
19      next agency you worked for?
20          THE WITNESS: Let's take a break.
21          MR. MARSH: Okay. We'll take a break.
22          (Brief recess.)
23  Q.  (Continuing by Mr. Marsh) When we broke we were

Page 47

1       talking about your positions, and I think we can
2       probably jump forward a little bit. I am
3       looking at a copy of some of your earlier
4       personnel records. It appears you were a Clerk
5       Typist through many different jobs. Let me kind
6       of jump up to when you started with the
7       Department of Conservation.
8           This said you were a Clerk Typist I there
9       in, I believe it is, 1979. Does that sound
10      accurate? Do you recall working at the
11      Department of Conservation?
12  A.  No, sir, I do not.
13  Q.  You don't have any memory of working there?
14  A.  No, sir.
15          Department of Conservation?
16  Q.  Yes. In the administrative building here in
17      Montgomery.
18  A.  No, sir.
19  Q.  This would have been, it appears, in '79.
20      It says employee only worked one day. Do
21      you recall only working one day at the
22      Department of Conservation?
23  A.  I do not remember the Department of Conservation

Page 48

1       at all.
2   Q.  It says you were not recommended for
3       reemployment. Does that trigger your memory of
4       anything that happened at the Department of
5       Conservation?
6   A.  No, sir. I do not recall Conservation at all.
7   Q.  What was the first job you held that was not a
8       Clerk Typist with the State?
9   A.  I have it listed on my resume or application if
10      you could look at that. That might would help
11      me.
12          (Defendant's Exhibit 12 marked for
13          identification.)
14  Q.  Let's mark this. I'll show you what I've marked
15      as Exhibit 12. Do you know what that document
16      is?
17  A.  It's an application for Account Clerk.
18  Q.  What's the date at the bottom of that that you
19      applied for this position?
20  A.  8/28/98.
21  Q.  Did you complete this application?
22  A.  Yes, sir.
23  Q.  Is that your signature at the bottom?

Page 49

1   A.  It is.
2   Q.  If you look at the attachments to that, what
3       appears to be a resume, is that your resume?
4   A.  Yes, sir.
5   Q.  And did you prepare that resume?
6   A.  Yes, sir.
7   Q.  Now, in looking at that resume, does that
8       refresh your memory concerning the positions
9       that you've held with the State?
10  A.  It doesn't refresh my memory, but I can tell you
11      what's on this paper.
12  Q.  Well, let me ask this. You've discussed your
13      Department of Revenue position, which according
14      to your resume was from 1975 to 1976. Do you
15      believe that's accurate?
16  A.  I would think so.
17  Q.  Well, is this your resume that you prepared?
18  A.  Yes, sir.
19  Q.  Do you have any reason to believe that's not
20      accurate?
21  A.  No, sir.
22  Q.  And after working there, according to your
23      resume, from '76 to '77, you worked at the

Deposition of Virginia Hopper, Vol. II

May 20, 2008

Page 50

1    Department of Health as a Clerk Typist.
2    A.  Yes, sir.
3    Q.  Is that correct?
4    A.  Yes, sir.
5    Q.  Now, why did you leave the Department of Revenue
6        to go to the Department of Health?
7    A.  I don't recall.
8    Q.  Did you get a promotion?
9    A.  It doesn't look like it.  I don't recall.  It
10       doesn't look like it.
11   Q.  And then according to your resume, from '78 to
12       '79 you worked at the Department of Corrections
13       at the Kilby Correctional Institution.
14   A.  Yes, sir.
15   Q.  Is that accurate?
16   A.  Yes, sir.
17   Q.  Now, why did you leave the Department of Health
18       to go to the Department of Corrections?
19   A.  I don't recall.
20   Q.  And was your position at the Department of
21       Corrections a Medical Records Clerk Typist?
22   A.  Yes, sir.
23   Q.  And then according to your resume, you left the

Page 51

1    Department of Corrections in '79, and there is
2    no --
3    A.  I stayed at home.
4    Q.  -- work?
5    A.  Right.  I stayed at home for a while with my
6        children.
7    Q.  Was the next job that you held starting in 1994
8        with the Department of Insurance?
9    A.  Yes, sir.
10   Q.  Between '79 and '94, was there any place at all
11       that you worked?
12   A.  No, sir.
13   Q.  Now, let's look back at the front of this
14       application, Exhibit 12.  On that application
15       under education, you said, see attached.  Now,
16       looking at the second page, which is your
17       resume, under the education section, did you
18       prepare that information there?
19   A.  Yes, sir.
20   Q.  And does that list all the education you've had
21       to that point?
22   A.  Yes, sir.
23   Q.  In looking at that, are there any of these

Page 52

1    classes that we haven't already discussed or
2    courses that you've taken that we've not already
3    discussed?
4    A.  No, sir.
5    Q.  Now, the SIR/NCIGF Working Together Seminar,
6        you've already discussed that one?
7    A.  Yes.
8    Q.  I don't remember "working together."  What does
9        that mean?
10   A.  Well, see, SIR and the NCIGF, which is the
11       guaranty fund, they were two different
12       organizations so I guess they just titled it
13       that.
14   Q.  And this was a position for Account Clerk; is
15       that right?
16   A.  Yes, sir.
17   Q.  And was this the first time you completed an
18       application for Account Clerk?
19   A.  I'm not sure about that.
20   Q.  Do you recall if you had another application
21       prior to this?
22   A.  No, sir, I do not.
23   Q.  On this application tell me the courses that

Page 53

1    you've got listed in the bottom part of the
2    application where it says list courses and hours
3    which are particularly relevant to the
4    position.
5    A.  TSUM, Principles of Accounting II, five quarter
6        hours; TSUM, Principles of Accounting I, five
7        quarter hours; Wetumpka, supposed to be,
8        Vocational School, Intro Into Accounting.
9    Q.  And those are the only three courses that you
10       had taken at that point?
11   A.  Yes.
12   Q.  And these are all the three courses that we have
13       previously discussed?
14   A.  Yes, sir.
15   Q.  And did you get hired as an Account Clerk?
16   A.  You know, Joel, I don't recall.  At some point I
17       did.  I don't know if it was this particular
18       time or not.  I worked as an Account Clerk.  Let
19       me just say that.
20   Q.  What was the first position you recall working
21       as an Account Clerk?
22   A.  The first position I recall was at Revenue.
23   Q.  But that was a non-merit --

Deposition of Virginia Hopper, Vol. II                                    May 20, 2008

Page 54

```
1    A.   No.
2    Q.   -- Account Clerk position?
3    A.   Revenue was not.
4    Q.   I'm sorry.  Revenue.
5         So you were an Account Clerk at the Revenue
6         Department?
7    A.   No.  I think I was a Clerk Typist at Revenue.  I
8         don't know.
9    Q.   I don't want to confuse you.  Stop and think.
10        You filled out this application for Account
11        Clerk in 1998.
12   A.   In '98.
13   Q.   Prior to 1998 to your memory, had you worked as
14        an Account Clerk?
15   A.   I don't think so.
16   Q.   I'm sorry.  Was that "I don't think so"?
17   A.   I don't think so.
18   Q.   As a result of this application, then, where did
19        you go to work?
20   A.   I think DHR.  DHR.
21   Q.   Let me show you what I've marked as Exhibit 13,
22        which is -- Defendant's Exhibit 13, can you look
23        at that and tell me what that is?
```

Page 55

```
1         (Defendant's Exhibit 13 marked for
2         identification.)
3    A.   Application for Accounting Tech I.
4    Q.   You've attached to that a resume.  If you'd look
5         over about the fourth page ...
6    A.   Okay.
7    Q.   Is that your resume?
8    A.   Yes.
9    Q.   And did you prepare that resume?
10   A.   Yes.
11   Q.   If you would look at that, maybe this will help
12        as far as your job history.  According to this
13        resume, you worked from '78 to '79 at the
14        Department of Corrections, which you've already
15        discussed.  And then in '94 you went to work for
16        the Department of Insurance.
17   A.   Uh-huh (positive response).
18        MS. ELLIS:  You need to say yes or no.
19   A.   Yes.
20   Q.   To your recollection is that correct?
21   A.   Yes.
22   Q.   Now, you mentioned earlier you had gone to work
23        for DHR.  Would that be incorrect based on what
```

Page 56

```
1         you see now?
2    A.   No.  I think that's right.
3    Q.   I'm sorry?
4    A.   That's correct.
5    Q.   Which is correct?
6    A.   That I went to work for DHR when I left
7         Receivership.
8    Q.   Oh, when you left Receivership?
9    A.   Yes.
10   Q.   But after coming back to work after taking off
11        for several years to stay at home, is the first
12        job you worked with the Department of
13        Receivership?
14   A.   Yes.
15   Q.   Let me jump back to the previous exhibit.  Go
16        back to 12, if you would, the application for
17        Account Clerk.  Is there anything in that
18        application or in the attached resume that you
19        believe is not correct or true?
20   A.   No, sir.
21   Q.   Now, how long did you work at the Department of
22        Insurance?
23   A.   From '94 until I went to work with DHR.
```

Page 57

```
1    Q.   Do you recall when you went to work for DHR?
2    A.   No, sir.
3    Q.   And would this be prior to you working for the
4         Department of Finance?
5    A.   Yes, sir.
6    Q.   Why did you leave the Department of Insurance?
7    A.   To get a merit system position.
8    Q.   And what position did you hold with DHR?
9    A.   Account Clerk.
10   Q.   And do you recall how long you worked for DHR?
11   A.   Approximately two years.  Maybe -- Two years.
12   Q.   Why did you leave DHR?
13   A.   Transferred to Comptroller's Office.
14   Q.   Do you know when that was?
15   A.   Approximately 2002.
16   Q.   Now, did you go work there as an Account Clerk
17        or as an Account Technician?
18   A.   Technician.
19   Q.   So was that a promotion when you moved to the
20        Comptroller's Office?
21   A.   No, sir.  I got a promotion as Account Tech at
22        DHR.
23   Q.   And why did you leave DHR to go over to the
```

Page 58

1    Department of Comptroller?
2    A.  I was working with a person that I didn't get
3         along with.
4    Q.  At DHR?
5    A.  Yes, sir.
6    Q.  Who was that?
7    A.  Marie Coley.
8    Q.  Was your leaving DHR voluntary on your part?
9    A.  Yes, sir.
10   Q.  Were you asked to leave?
11   A.  No, sir.
12   Q.  While you were at DHR is when you got promoted
13        to the Account Technician I; is that right?
14   A.  Yes, sir.
15   Q.  And is that your application for the Account
16        Technician I?
17   A.  Yes, sir.
18   Q.  And that's your signature at the bottom?
19   A.  Yes, sir.
20   Q.  And this application was completed on 10/25/99?
21   A.  Yes, sir.
22   Q.  Now, when completing this application on
23        schools, you've got listed Robert E. Lee and

Page 59

1         Troy State in Montgomery.  Is that information
2         accurate?
3    A.  Yes, sir.
4    Q.  Tell me the courses you've listed as having
5         taken at the time you submitted this
6         application.
7    A.  I listed Principles of Accounting I, Principles
8         of Accounting II, and Governmental Accounting.
9    Q.  And there's an additional course listed there.
10        Are you saying you did not list that one on your
11        application?
12   A.  I did not list that one, but I think I was
13        taking that course at the time.
14   Q.  But you hadn't completed the course?
15   A.  I can't recall, but ...
16   Q.  Do you know who wrote that on this application?
17   A.  I do not know.
18   Q.  Do you know the circumstances as to why it was
19        written on your application?
20        MR. DEBARDELABEN:  Let me bring up a
21        point of order here.  I have an
22        application that's furnished to me
23        by the personnel department, and

Page 60

1         it does not show this additional
2         course listed.  And you have an
3         application -- it's the same
4         application -- and I just want
5         everybody to see it.
6    MS. BYRNE:  We've seen it.
7    MR. DEBARDELABEN:  It shows the
8         additional course listed.
9    MS. BYRNE:  Right.
10   MR. DEBARDELABEN:  This is one that I
11        have, and it does not show this
12        additional course.
13   MR. MARSH:  Okay.
14   MR. DEBARDELABEN:  And I don't know --
15   MR. MARSH:  She's already testified
16        that that wasn't her writing on
17        there.  So if you want to
18        introduce that later --
19   MS. BYRNE:  I guess you get to depose
20        our people about that, but --
21   MR. DEBARDELABEN:  Well --
22   MS. BYRNE:  -- we can explain it.  But
23        ask her how many she turned in.

Page 61

1         Maybe that will be of some
2         assistance.
3    MR. DEBARDELABEN:  I'm just looking at
4         the official one y'all gave me and
5         wondering if there was some mix-up
6         some way and -- not trying to --
7    MR. MARSH:  That's not really what we
8         need to resolve here.  If you want
9         to resolve that with other
10        witnesses --
11   MR. DEBARDELABEN:  Just a point of
12        order.
13   Q.  Let me ask you.  Was there another application
14        you submitted for Account Tech I other than this
15        one?
16   A.  Well, I don't recall, but ...
17   Q.  You only recall submitting this one?
18        MR. DEBARDELABEN:  You just look at
19        this one, and we'll worry about
20        this one later.
21   A.  I don't recall.
22   Q.  Do you recall anybody telling you or hearing any
23        information as to how that additional course

Deposition of Virginia Hopper, Vol. II                                          May 20, 2008

Page 62

1       came to be written on your application?
2    A.  No, sir.
3    Q.  Have you taken this Managerial Accounting
4       course?
5    A.  Yes, sir.
6    Q.  When did you first realize that this course had
7       been written on your application?
8    A.  I guess when you pointed it out to me.
9    Q.  In this deposition or earlier?
10   A.  No, sir, earlier. An earlier deposition.
11   Q.  In one of the hearings that was held?
12   A.  Yes, sir.
13   Q.  So prior to that, you had no knowledge that this
14      course had been written on your application?
15   A.  No, sir.
16   Q.  Is there anything else on that application that
17      you did not prepare or write? I'm referring
18      to --
19   A.  AC 140.
20   Q.  I'm referring to the Account Tech I on Exhibit
21      13 you're looking at. Tell me again.
22   A.  The AC 140.
23   Q.  That's written down under the list of courses?

Page 63

1    A.  Yes, sir.
2    Q.  Do you know who wrote that in there?
3    A.  No, sir.
4    Q.  Do you have any information about why that was
5       written on there?
6    A.  No, sir.
7    Q.  Have you taken a course that could be
8       characterized as AC 140?
9    A.  Yes, sir. That would -- Yes, sir.
10   Q.  What course is that?
11   A.  It's a computer course.
12   Q.  Computer course?
13   A.  Yes, sir.
14   Q.  Did you provide information to anyone at State
15      Personnel or anyone connected with this
16      application that you had taken that course?
17   A.  I'm sure.
18   Q.  I'm sorry?
19   A.  I'm sure.
20   Q.  You're sure that you did?
21   A.  Yes, sir.
22   Q.  Do you recall who you would have talked to about
23      this course?

Page 64

1    A.  Not exactly, no, sir.
2    Q.  Is that course a course that would be
3       particularly related to the position as
4       Accounting Technician I?
5    A.  No, sir.
6    Q.  Other than those two things that you've already
7       mentioned, is there anything else on this
8       application that you did not write on there?
9    A.  No, sir.
10   Q.  If you would look at page 2, anything on that
11      page that you did not write?
12   A.  No, sir.
13   Q.  Page 3?
14   A.  No, sir.
15   Q.  Turning to page 4 is what appears to be your
16      resume. Did you prepare this resume?
17   A.  Yes, sir.
18   Q.  If you would look at -- There's three pages of
19      that resume. Would you look at each page and
20      tell me if you prepared each page of that
21      resume?
22   A.  Yes, sir.
23   Q.  And on the first page of that under education,

Page 65

1       does that represent all the education that you
2       had at that point in time?
3    A.  To the best of my knowledge.
4    Q.  Do you have any reason to believe that would not
5       be accurate?
6    A.  No, sir.
7    Q.  Now, when did you go to work for the
8       Comptroller's Office?
9    A.  2002.
10   Q.  And that was as the Account Technician?
11   A.  Yes.
12   Q.  What were your duties there?
13   A.  I'm sure they are listed, Joel, if you can look
14      at that.
15   Q.  Well, can you recall what your duties were?
16   A.  Excuse me. Mr. Marsh.
17   Q.  Do you recall what your duties were there?
18   A.  Not exactly.
19   Q.  Who did you work for at the Comptroller's
20      Office?
21   A.  Bob Childry, Mack Reed.
22          MS. BYRNE: I'm sorry. I'm having a
23      hard time.

Page 66

1    A.   Bob Childry, Mack Reed.
2         My immediate supervisor was Jenny Brackin.
3    Q.   Did you work for Ms. Brackin the entire time you
4         were at the Comptroller's Office?
5    A.   I did.
6    Q.   When did you leave the Comptroller's Office?
7    A.   April 2006.
8    Q.   Why did you leave?
9    A.   I left because Jenny Brackin was basically
10        harassing me.
11   Q.   And in what respect was she harassing you?
12   A.   The way she was talking to me.  The way she was
13        treating me.
14   Q.   Can you describe what that was?  You said the
15        way she was talking to you.  How did what she
16        said constitute harassment?
17   A.   Her tone, the fact that she said to me I did not
18        sit down and eat lunch with her every day.
19        Sometimes the fact that she didn't speak at all
20        all day long.  Maybe that's not harassment.
21        Maybe it's more of a hostile work environment.
22   Q.   Did you report this to anybody higher up in the
23        chain?

Page 67

1    A.   Yes, sir.
2    Q.   Who would that be?
3    A.   Bob Childry.
4    Q.   And what was his response?
5    A.   I had already talked to DHR about transferring.
6         As a matter of fact, I had talked to them a
7         couple of times before.  I had talked to Craig
8         Nelson about transferring back to my position.
9         I liked my job at DHR.  The lady had transferred
10        about two months after I did.
11   Q.   Is that Ms. Coley you're talking about?
12   A.   Yes.  Needless to say, I wish I hadn't
13        transferred.
14        They said as soon as they got an opening.
15        So when I found out they had an opening, I
16        wanted to transfer back to DHR anyway.  So when
17        I talked to him about that and everything was
18        secure -- I had already talked to him a couple
19        of times.
20   Q.   You're talking him.  Mr. Childry?
21   A.   Mr. Childry.
22        And I was told that he had instructed
23        them -- at different times he had told them to

Page 68

1         include me with different things, and I was
2         told -- and they would just decide they weren't
3         going to.  And so he had instructed them to make
4         sure they let me know about different things,
5         because her response with them was, she's not
6         going to want to do it anyway.  So I was told
7         that he told them they needed to let me know
8         anyway and make my own decision, other than them
9         deciding that's just not what I wanted to do.
10        So when I knew that I was going to be able
11        to go back to DHR, I took my letter in to him
12        and let him know that I would be transferring.
13        I gave him a two-week's notice and let him know
14        I was going to be transferring.  And that same
15        morning, he gave me a letter to let me know
16        there was an investigation going on.  And I
17        said --
18   Q.   Let's hold up before we get into the
19        investigation.  I want to go back to what was
20        happening in the office.
21        When you said not including you, are you
22        talking about in social events or not including
23        you in work activities?  What were they not

Page 69

1         including you in?
2    A.   Both.
3    Q.   Was this preventing you from performing your job
4         in any way?
5    A.   No, sir.
6    Q.   I'm going to come back in a little bit to the
7         investigation part.  I don't want to jump into
8         that right now.
9         Now, at Comptroller you went there as an
10        Account Technician.  Was that your position the
11        entire time you were there?
12   A.   No, sir.  I was promoted to Accountant.
13        (Defendant's Exhibit 14 marked for
14        identification.)
15   Q.   Let me show you what's marked as Defendant's
16        Exhibit 14.  Can you tell me what that is?
17   A.   That's an application for an Accountant.
18   Q.   And this is dated November 21, 2003.  Is that
19        your signature at the bottom?
20   A.   It is.
21   Q.   Is this the first time that you had applied or
22        submitted an application as an Accountant?
23   A.   No, sir.

Page 70

| | |
|---|---|
| 1 | Q.  Do you know when the previous one was? |
| 2 | A.  The end of June or either the first of July of |
| 3 | 2003. |
| 4 | Q.  And why did you submit a new application? |
| 5 | A.  Got a letter from State Personnel.  I had tested |
| 6 | and was on the register, and I got a letter from |
| 7 | State Personnel saying they were purging that |
| 8 | register and if you wanted to remain on the |
| 9 | register, you needed to reapply. |
| 10 | Q.  And this November 21, 2003 application was the |
| 11 | re-application you did? |
| 12 | A.  Yes. |
| 13 | Q.  To your knowledge was there anything different |
| 14 | on this application than the previous one you |
| 15 | had done for an Accountant? |
| 16 | A.  To my knowledge, no, but I haven't seen the |
| 17 | other one. |
| 18 | Q.  In looking at Exhibit 14, which is the |
| 19 | application for Accountant, would you look over |
| 20 | that first page?  Did you complete everything |
| 21 | that was on this application? |
| 22 | A.  Yes, sir. |
| 23 | Q.  Is there anything on that first page that you |

Page 71

| | |
|---|---|
| 1 | did not do? |
| 2 | A.  No, sir. |
| 3 | Q.  Would you look at the second page of the |
| 4 | application?  Is there anything on that second |
| 5 | page you did not complete yourself? |
| 6 | A.  No, sir. |
| 7 | Q.  If you look at the third page, it appears to be |
| 8 | a list of courses.  The top of it says: Courses |
| 9 | which are particularly related to the position. |
| 10 | Is this an attachment that you completed? |
| 11 | A.  Yes, sir. |
| 12 | Q.  And you prepared and listed all the courses that |
| 13 | were listed here? |
| 14 | A.  Yes, sir. |
| 15 | Q.  Did anyone else prepare anything that's on this |
| 16 | page? |
| 17 | A.  The check marks I did not put there. |
| 18 | Q.  You did not put the check marks? |
| 19 | A.  No, sir. |
| 20 | Q.  Is there anything else on this page that you did |
| 21 | not prepare yourself? |
| 22 | A.  No, sir. |
| 23 | Q.  If you turn to the next page, it appears to be a |

Page 72

| | |
|---|---|
| 1 | resume with Virginia Hopper written at the top. |
| 2 | Was this your resume you submitted with the |
| 3 | application? |
| 4 | A.  Yes, sir. |
| 5 | Q.  And did you prepare this resume yourself? |
| 6 | A.  Yes, sir. |
| 7 | Q.  And everything on this first page you, yourself, |
| 8 | prepared? |
| 9 | A.  Yes, sir. |
| 10 | Q.  Go to the second page, please.  The second page |
| 11 | of your resume, is there anything on this page |
| 12 | you did not yourself prepare? |
| 13 | A.  No, sir. |
| 14 | Q.  And the third page, same question.  Did you |
| 15 | prepare everything that's on this third page? |
| 16 | A.  Yes, sir. |
| 17 | Q.  And you submitted this application and list of |
| 18 | courses -- Excuse me. |
| 19 | You submitted this resume and the list of |
| 20 | courses along with your application for an |
| 21 | accountant? |
| 22 | A.  Yes, sir. |
| 23 | Q.  And I'm sorry.  You told me this.  When did you |

Page 73

| | |
|---|---|
| 1 | get promoted to accountant? |
| 2 | A.  I don't think I did tell you. |
| 3 | Q.  Okay.  Do you recall when you were promoted to |
| 4 | accountant? |
| 5 | A.  Maybe June of '04 approximately. |
| 6 | Q.  And that was while you were at the Comptroller's |
| 7 | Office? |
| 8 | A.  Yes, sir. |
| 9 | Q.  When you transferred to DHR, was that a |
| 10 | promotion or a transfer? |
| 11 | A.  Just a transfer.  A lateral transfer. |
| 12 | Q.  I'm sorry? |
| 13 | A.  Lateral transfer. |
| 14 | Q.  I'm going to switch gears for a minute, and |
| 15 | we'll come back to these applications a little |
| 16 | bit later. |
| 17 | Tell me how you first heard about Trinity |
| 18 | College & University. |
| 19 | A.  Online. |
| 20 | Q.  I'm sorry? |
| 21 | A.  Online. |
| 22 | Q.  That would be on the computer? |
| 23 | A.  Yes. |

Page 74

1  Q.  And describe how you found out about it or how
2      you came to know about that particular
3      institution.
4  A.  I did a search for online degrees.
5  Q.  And why did you do this?
6  A.  Because I wanted a degree, but I wanted to do it
7      online.
8  Q.  And when approximately would this have been?
9  A.  I probably started searching early 2002.
10 Q.  And how did you know about getting a degree
11     online, that that was even a possibility?
12 A.  Well, I know at orientation at Troy, they -- I
13     mean, there are numerous things that you knew,
14     but just for -- one example was I know when we
15     had orientation at Troy, they talked about
16     taking classes online, Distance Learning. You
17     know, it's just something that you just know
18     about.
19 Q.  So you started researching that in 2002. And do
20     you recall how you happened to come across
21     Trinity College & University?
22 A.  When it came up with online degrees, they were
23     one that you could pick to research about or

Page 75

1      that you could look at for online degrees.
2  Q.  What other institutions other than Trinity
3      College & University did you look at for online
4      degrees?
5  A.  Several.
6  Q.  Do you recall any of those?
7  A.  No, sir. I know one that I was very interested
8      in was in North Alabama, but at this point I
9      can't recall the name of it.
10 Q.  Did you ever look at -- You mentioned Troy
11     University. Did you ever look at Troy's online
12     degree program?
13 A.  I did.
14 Q.  Do you recall what you found out about their
15     program?
16 A.  I don't at this time.
17 Q.  You said this was about 2002. When did you
18     actually take steps to inquire further about any
19     of these online programs?
20 A.  I don't know. It was about a month or a month
21     and a half after I started researching into it.
22 Q.  And what was the next steps you took towards
23     trying to get an online degree?

Page 76

1  A.  I made an application with Trinity College &
2      University.
3  Q.  Did you make an application to any other
4      institution other than that one?
5  A.  No, sir.
6  Q.  Did you consider doing it with Troy since you
7      had already taken classes there?
8  A.  I did. And I went and talked to a counselor
9      there.
10 Q.  And what did the counselor tell you?
11 A.  Well, when I left there, I was considering
12     trying to CLEP some classes and different
13     things. We just talked for a long time. As a
14     matter of fact, I went back and talked to him a
15     couple of times.
16 Q.  Why did you decide not to do that at Troy?
17 A.  Numerous reasons. After I made application with
18     this school, I went back and talked to him after
19     I had answered about my application and talked
20     to them the first time on the telephone. And
21     they -- Troy would not take any of the credits
22     that I might get from this school, but Trinity
23     would take credits from Troy. And the counselor

Page 77

1      actually told me that it might be better to go
2      ahead and transfer credits from Troy to them.
3  Q.  So Troy would not accept -- told you they would
4      not accept any of the credits from this Trinity
5      College & University?
6  A.  Yes, sir.
7  Q.  What did the counselor say would be involved in
8      taking an online course or online degree from
9      Troy University?
10 A.  I really don't recall. I know we talked about
11     it, but I don't recall exactly what --
12 Q.  Did they discuss the types of courses you would
13     have to take or the type of work that would be
14     involved in that?
15 A.  No, sir. We didn't go into that.
16 Q.  Was it your understanding at Troy University
17     that you would have to take courses online?
18 A.  I'm sure it was.
19 Q.  And that you would have to do actual coursework?
20 A.  Yes, sir.
21 Q.  Now, you may have said this. Did you actually
22     submit an application to anybody besides Trinity
23     College & University?

Page 78

1   A.  No, sir.
2   Q.  Tell me what you did when you submitted your
3       application.  What was the next step you did
4       when you decided to go forward with this?
5   A.  I called them on the telephone.
6   Q.  And the number was located where?  Where did you
7       find the number?
8   A.  On the Web page.
9   Q.  Now, had anybody recommended this institution to
10      you?
11  A.  No, sir.
12  Q.  You were making this call strictly based on what
13      you read about them on their Web page?
14  A.  Yes.  Because I had questions.  It said if you
15      have questions, please call.
16  Q.  And do you know who you talked to when you
17      called?
18  A.  Shelley or Shirley.
19  Q.  What questions did you have?  What was your
20      conversation?
21  A.  I had a lot of questions.
22  Q.  Can you tell me what those questions were?
23  A.  My main question or my first main concern that

Page 79

1       they had said was about the work history,
2       because they kept repeating that you did not get
3       any credit for life experiences, that no
4       institution anywhere would give you any credit
5       for life experiences, that it was work history
6       and it had to be a certain type of work
7       history.  That's the reason I sent them my
8       resumes and in detail told them what I had
9       done.  And that was a lot of what we talked
10      about was what I had done at Receivership.  She
11      was most interested in what I had done at
12      Receivership.  We talked for a long time in what
13      I had done there and what a lot of my duties had
14      encountered in Receivership.  She was interested
15      in what I had done with the brokers overseas,
16      filing with Lloyds of London and that type
17      thing, the layers of reinsurance.  She seemed
18      really interested in trying to get in-depth of
19      what had been done.
20          And then she started on the part of the
21      accreditation and told me they were accredited
22      and actually told me who they were accredited
23      with and told me where to click on their Web

Page 80

1       site for the accreditation, and I did print it
2       off.  And it had a list of schools on there also
3       that they were listed with that was accredited
4       through there.  And they appeared to be
5       name-brand schools that you had heard of.
6   Q.  What else did you discuss with her on this
7       occasion?
8   A.  We talked about a lot of things about the school
9       and how they gave you -- how they came up with
10      what your credits were and how they gave them to
11      you.  And at one point we talked about knowing
12      your work history.  She wanted to know about
13      your writings and how many times you had written
14      about different things.  And she also told me I
15      was going to have to write a paper for English,
16      and she also told me that if they did not come
17      up --
18          Now, she also told me that the fee was not
19      for the diploma.  She told me this about three
20      times.  It was for verifying the information
21      that you had sent them, that it was not for the
22      diploma.  It was verifying the information that
23      you had sent them.  And she also said that if

Page 81

1       you did not -- if -- when they verified all the
2       information, if you did not have enough to come
3       up with the credits that you needed that you
4       would have to take classes.  She asked me about
5       three times, do you understand that.  And I
6       said, yes, ma'am, I do.
7           And she also said as a service that they
8       would go ahead and send you the information to
9       apply for it if you came up to that or whenever
10      you didn't.  It was including that fee.  Not the
11      cost of the cap and gown and ring but the fact
12      they would help you go ahead and arrange for
13      that, and that she would go ahead and set up at
14      that time when you needed to for your motel
15      room, set up for you to fly to San Antonio --
16      the words she said was San Antonio -- for you to
17      walk and set up everything for your family
18      members or whoever was coming with you.
19  Q.  So she was telling you in this initial phone
20      call she would go ahead and set up your
21      graduation?
22  A.  It would be a part of the fee.  It would not be
23      in that fee, but she would help you -- She was

Page 82

1    just telling me their services and what they
2    did. It wasn't that we would do it now, but
3    that was the services and what they did for
4    you. But, you know, she couldn't tell me
5    anything then. She told me she had to verify
6    all the information that I had sent her and that
7    she was going to let me know if she needed
8    anything else from me, and she was going to let
9    me know if I did not qualify, if I would have to
10   take classes. And she was explaining to me what
11   it was going to cost me if I had to take
12   classes. But she said this is the services that
13   we provide you.
14   Q.    Was there anything on their Web site that told
15         you where this university was located?
16   A.    The thing that was on the Web site and the only
17         thing that was on it -- It was called Trinity
18         then, and the only thing that was on the Web
19         site was the student verification. It had that
20         Louisiana address. And at that time what was on
21         the Web site was Trinity Education. It was edu.
22   Q.    What else did you talk about?
23   A.    That was about all we probably talked about that

Page 83

1    first time, but we were on the phone, I think it
2    was, approximately an hour and ten to twenty
3    minutes.
4    Q.    And then what did you do next in regards to
5          getting your application submitted?
6    A.    I had already submitted my application online to
7          her.
8    Q.    Well, let me back up because my question was
9          what was the first thing you had done. Let's
10         back up.
11               What's the first thing you did in terms of
12         submitting your application?
13   A.    I submitted my application online.
14   Q.    When did you do that? Do you recall the date?
15   A.    Oh, no, sir. I don't recall the date.
16   Q.    And what did you submit?
17   A.    You know, it was just a brief description, and
18         then I faxed to her -- after I talked to her on
19         the telephone --
20   Q.    Brief description of what?
21   A.    Of my personal information and then my work
22         history.
23   Q.    So you submitted a brief description of personal

Page 84

1    information and your work history?
2    A.    Yes.
3    Q.    What else did you submit online in that
4          initial --
5    A.    That's all I submitted online.
6    Q.    Did you provide any educational information
7          online?
8    A.    Yes, sir.
9    Q.    What educational information did you provide?
10   A.    Just general education. I sent her the detail
11         when I faxed it.
12   Q.    Tell me what you faxed to her.
13   A.    I faxed her all that information we talked
14         about.
15   Q.    I need to specifically understand exactly what
16         you faxed her. If you need me to look back at
17         those, we can.
18               Did you fax her information about the course
19         you took at Wetumpka Vocational School?
20   A.    Yes, sir.
21   Q.    And did you fax her the information about the
22         courses you took at Troy?
23   A.    The courses I had had at the time I faxed it to

Page 85

1    her.
2    Q.    And how many was that?
3    A.    Those are what I faxed her, that and this
4          (indicating).
5    Q.    If you read off for me, because I'm having
6          trouble reading some of it, exactly the
7          information that you faxed to her.
8    A.    From Troy, Principles I, Principles II,
9          Governmental, and Managerial.
10   Q.    And those are courses you're referring to?
11   A.    Yes, sir.
12   Q.    So there were four courses from Troy that you
13         faxed to her?
14   A.    Right.
15   Q.    Now, when you faxed her information, what
16         exactly did you send her, the name of the course
17         and the course number?
18   A.    Yes, sir.
19   Q.    Was there anything else about the course you
20         sent her?
21   A.    No, sir. Well, you know, where I took it, the
22         school and the school address.
23   Q.    What else did you fax to her?

Page 86

1    A.   AUM Advanced Technology Group, NAIC Reinsurance,
2         the vocational school, NAIC Reinsurance I --
3         sent those separate for the years -- NOLHGA
4         Reinsurance, SIR and NCIGF Working Together
5         Seminar, the vocational school for that year.
6         And when I listed those -- I did it out sort of
7         like in a spreadsheet for her, the school and
8         the address.  And then when I did those, I just
9         put the year and where we took it.
10   Q.   And the name of the course you took?
11   A.   Yes, sir.
12   Q.   Do you have the spreadsheet that you prepared
13        for her?
14   A.   I don't think so, because if I had, I would have
15        provided it to Mr. DeBardelaben.
16   Q.   So on the spreadsheet you had the course name,
17        the date you took it, where you took it --
18   A.   Well, I had like the year listed.
19   Q.   The year listed.
20        Was there anything else on that spreadsheet?
21   A.   No, sir.
22   Q.   Did you give her certificates or anything like
23        that?

Page 87

1    A.   No, sir.
2    Q.   And these courses that you just described to me
3         are the same courses that we discussed earlier
4         in this deposition?
5    A.   Yes, sir.
6    Q.   Did you send her any information about any
7         course that you took anywhere that you have not
8         already described in this deposition?
9    A.   No, sir.
10   Q.   Now, in addition to that, what else did you send
11        to her either on the online application or in
12        the fax?
13   A.   Just detail of work.
14   Q.   How was that submitted to her?
15   A.   In writing.  Excuse me.  Let me say this.  A lot
16        of it was questions that she had back when I was
17        talking to her on the phone.
18   Q.   Let's concentrate first on what you submitted in
19        writing.
20        Describe what it was that you sent to her
21        about your work.
22   A.   It was basically the copy of my resume part from
23        the Receivership.

Page 88

1    Q.   What else did you send her?
2    A.   I think that's about all.
3    Q.   Let me make sure I've got this.
4         You submitted the name of the four courses
5         you took at Troy University?
6    A.   (Witness nods head positively.)
7    Q.   I need you to respond affirmatively.
8    A.   Yes.
9    Q.   And you submitted to her a spreadsheet listing
10        the seminars that we've previously discussed
11        that you took; is that correct?
12   A.   Yes.
13   Q.   And you supplied her the portion of your resume
14        while you worked at the Department of
15        Receivership?
16   A.   Yes.
17   Q.   What else did you provide in writing?
18   A.   To her?
19   Q.   To her or -- at that point.
20   A.   I think that's all at that point.
21   Q.   And this was prior to the conversation you had
22        on the phone with her or after?
23   A.   Prior.

Page 89

1    Q.   So you submitted those items.  You submitted --
2         Then you had the phone conversation.  What was
3         the next thing that happened in the step of
4         making this application?
5    A.   She called me back.  I don't know if this is
6         making application, but she called me back and
7         we had more discussion.
8    Q.   What were those discussions about?
9    A.   She just had more questions for me.
10   Q.   Such as?  What kind of things was she asking
11        you?
12   A.   She just asked me about my work history, because,
13        see, she had told me I was going to have to
14        write at least one paper for English.
15   Q.   And how long was -- The second phone call, how
16        long was it after the first phone call?
17   A.   Maybe a week.
18   Q.   What else was said in the second phone call?
19   A.   The discussion about work was about it.
20   Q.   What was the next step that occurred in you
21        attempting to get this application submitted?
22   A.   I think she called me one more time because she
23        told me I was not going to have to take any

Deposition of Virginia Hopper, Vol. II                                                        May 20, 2008

Page 90

1      courses and I didn't have to write that paper
2      and that I would receive a diploma from them.
3   Q.  And about how long after the second phone call
4      was this?
5   A.  Well, I think that was in early May.
6   Q.  Which would have been how long after you started
7      the process?
8   A.  Maybe six months. Five or six months, something
9      like that.
10  Q.  I think you said earlier the second phone call
11     came about a week after the first phone call.
12     So was there a large gap before the third phone
13     call?
14  A.  Yes, sir.
15  Q.  You said early May of what year?
16  A.  2002.
17  Q.  And in this third phone call she said -- tell me
18     again what she said.
19  A.  She told me that they had researched and that I
20     had enough credits to receive a diploma and that
21     I was not going to have to take any courses and
22     that I did not have to write my paper on
23     English. I did not have to write a paper for

Page 91

1      English credit.
2   Q.  Now, at any time did you question them how you
3      could get a degree without taking any courses
4      from them?
5   A.  Well, she had explained that to me.
6   Q.  And you accepted her explanation?
7   A.  Yes, sir.
8   Q.  Nothing about that explanation seemed odd, that
9      you could get a full college degree having only
10     taken four college courses?
11  A.  Well, not the way that she explained it to me.
12     Plus, I thought I was talking to Trinity
13     University, and I thought they had a very high
14     reputation. And I really thought that it was
15     just a really high reputable institution, and I
16     didn't think anything about -- After I talked to
17     her and asked her what I wanted to and she said
18     that they were accredited, I believed her.
19  Q.  Who --
20  A.  And I could call her and ask her things, and she
21     would call me back. So I didn't think anything
22     about it at all. And I read on other
23     institutions, and -- there were several that

Page 92

1      gave credit for different things. Some of them
2      for work history and some for other things. And
3      when I read on the Web site the government was
4      paying for military servicemen to get degrees
5      from this institution, I thought it was Trinity
6      University. So at first I sort of had a
7      question, but after I talked to her, I felt just
8      as comfortable as anything. And I didn't even
9      question anymore, especially after I talked to
10     her that long length of time and then she called
11     me back several times.
12  Q.  Now, what was the next step in this process
13     after the third phone call?
14  A.  I guess about a month or a month and a half
15     later -- it might have been two months -- I got
16     my degree in the mail.
17  Q.  Is that Defendant's Exhibit 10? Is that the
18     piece of paper you're referring to?
19  A.  Yes, sir.
20  Q.  And did you also receive in the mail Defendant's
21     Exhibit 3, which is the list of courses they
22     gave you credit for?
23  A.  Sir?

Page 93

1   Q.  Did you receive that at the same time?
2   A.  Yes, sir.
3   Q.  And Exhibits 4 and 5, did you receive those at
4      the same time?
5   A.  Yes, sir.
6   Q.  Now, how much did you pay this institution,
7      Trinity College & University?
8   A.  I think it was a little over $700.
9   Q.  And at what point did you pay them?
10  A.  I can't remember exactly what point, if it was
11     after -- I believe it was after she said
12     actually that I had actually -- that she had
13     actually verified everything and that I
14     qualified to receive the degree.
15  Q.  Did you receive any other paperwork from them
16     other than what I've just showed you?
17  A.  A little card -- alumni card.
18  Q.  Anything else?
19  A.  Not that I recall.
20  Q.  Did you have any other phone conversations with
21     them other than the three that you've already
22     described?
23  A.  No, sir.

24 (Pages 90 to 93)

Page 94

1  Q.  Did you send them anything other than what
2      you've already described in the fax and the
3      online application you did at the start of the
4      process?
5  A.  No, sir.
6  Q.  Have you had any conversations with them since
7      you received this material in the mail --
8  A.  No, sir.
9  Q.  -- the piece of paper showing that they were
10     giving you credit for these courses?
11 A.  No, sir.
12 Q.  Now, let me show you again Defendant's Exhibit
13     3.  Now, that was the list of courses they said
14     they were giving you credit for; is that right?
15 A.  (Witness nods head positively.)
16 Q.  You've got --
17 A.  Yes.
18 Q.  Now, if you'll look over this course title, the
19     first course is Introduction to Business.  Do
20     you know what in your work history that entitled
21     you credit for that course?
22 A.  No, sir.
23 Q.  I guess it's Personal Financial Management.

Page 95

1      Personal Fin MGMT is the next course listed.  Do
2      you know what in your background, your work or
3      your courses you've taken that entitled you to
4      get credit for that particular course?
5  A.  No, sir.
6  Q.  How about the third course, Introduction to
7      Business Administration?  Do you know what in
8      your background, education, or training entitled
9      you to get credit for that course?
10 A.  No, sir.
11 Q.  I think I added up 34 courses that were listed
12     there.  Would you just look and see if that
13     count appears to be accurate to you?
14 A.  That's correct.
15 Q.  Do you know on any of these courses what was
16     considered in your background, education, or
17     work experience that entitled you to credit for
18     these courses?
19 A.  No, sir.  I don't know how they determined it.
20 Q.  Yet, despite that knowledge, you never
21     questioned the fact that you could legitimately
22     get credit for 34 college courses when you had
23     no idea what it was based on?

Page 96

1  A.  No, sir.  I just knew what she told me.
2  Q.  One of the courses here is Economic Geography.
3      Have you done anything in your experience,
4      education, or training, or work that you can
5      think of that would have entitled you for credit
6      for a course entitled Economic Geography?
7  A.  Not unless it was some of our international
8      business dealings with the insurance.
9  Q.  Did you travel to these international locations?
10 A.  No, sir.
11 Q.  History of Civilization is another course listed
12     here.  What in your background, training,
13     education, or otherwise do you have that would
14     relate to getting credit for a course called
15     History of Civilization?
16 A.  Again, how they determine out of what I provided
17     them I do not know.
18 Q.  I'm asking can you think of anything now that
19     would apply to that.
20         MR. DEBARDELABEN:  Object to form.
21         She doesn't know how they
22         determine it so she can't answer
23         your question.

Page 97

1         MR. MARSH:  I'm not asking how they
2         determined it.  I'm asking if she
3         knows of anything in her
4         background that would relate to a
5         course entitled History of
6         Civilization.
7  Q.  Do you know of anything in your background?
8         MR. DEBARDELABEN:  Object to the
9         form.  Same question.
10 A.  I can't answer that.
11 Q.  Why not?
12 A.  Because I don't know.
13 Q.  Is the response you don't know anything in your
14     background that would relate to that course?
15 A.  I just can't answer the question.  I don't know
16     how they would have determined that.
17 Q.  That's not my question.  I'm not asking how they
18     determined it.  I'm asking:  Are you aware of
19     anything, you, in your background that would
20     relate to a course entitled History of
21     Civilization?
22         MR. DEBARDELABEN:  I'm going to object
23         again.  We don't even know what

## SETTLEMENT AGREEMENT AND
## FULL AND FINAL GENERAL RELEASE

### Definitions

For purposes of this Settlement Agreement and Full and Final General Release:

1.    "Agreement" refers to this Settlement Agreement and Full and Final General Release.

2.    "Trinity University" refers to Trinity University and its Affiliates.

3.    "Marks" refer to (i) United States Service Mark Registration No. 1,635,763 for TRINITY UNIVERSITY to identify educational services namely providing courses of instruction at the college level; (ii) United States Trademark Registration No. 2,273,474 for TRINITY UNIVERSITY to identify towels and blankets, clipboards, notepads, notebooks, stationery, window stickers, bumper stickers, bookmarks, tote bags, athletic bags, drinking glasses, plastic cups, coffee mugs, t-shirts, sweat shirts, underpants, stockings, sweaters, jackets, suspenders, athletic shorts, night shirts, caps, hats, aprons, baby booties and cloth baby bibs; (iii) United States Service Mark Registration No. 1,635,765 for TRINITY UNIVERSITY E TRIBUS UNUM 1869 SAN ANTONIO, TEXAS & DESIGN to identify educational services namely providing courses of instruction at the college level; and (iv) United States Trademark Registration No. 1,642,057 for TRINITY UNIVERSITY E TRIBUS UNUM 1869 SAN ANTONIO, TEXAS & DESIGN to identify pencils, pens, file folders, notebooks, desks or wall counters, loose leaf binders, books, covers, stationery, letter openers, paper napkins and doilies, paper pendants, window stickers, paper name badges, printed window signs, wrapping paper, playing cards, glass and plastic beverage ware, coffee cups and paper plates, t-shirts, sweatshirts, athletic shorts, sweat pants, tank tops, caps and hats.

4.    "Trinity College" refers to Trinity College and University and its Affiliates.

5.    "Claims" refers to and includes any and all claims, rights, demands, debts, liabilities, controversies, and causes of action, of any and every character, whether known or unknown, asserted or unasserted, liquidated or unliquidated, accrued or unaccrued, mature or not yet mature, at law or in equity, whether in contract, in tort, or under statute (including without limitation claims for economic loss, lost profits, loss of capital, emotional distress, mental anguish, personal injuries, punitive damages, or future damages, or under the laws of the State of Texas), or under any other theory, of any nature whatsoever, arising at any time from the beginning of the World through and including the effective date of this Agreement.

6.    "Complaint" refers to and includes any and all complaints and other pleadings that the Parties filed or could have filed, including without limitation the Plaintiff's Original Complaint, in Cause No. SA-04-313-OG, *Trinity University v. Trinity College & University*, pending in the United States District Court for the Western District of Texas, San Antonio Division.

**EXHIBIT "A"**

7.    "Lawsuit" refers to Cause No. SA-04-313-OG, *Trinity University v. Trinity College & University*, pending in the United States District Court for the Western District of Texas, San Antonio Division.

8.    "Party" and "Parties" refer to and include Trinity University and Trinity College, as defined herein.

### Recitals

**Whereas**, disputes and claims have arisen between Trinity University and Trinity College concerning the use of the Marks; and

**Whereas**, Trinity University is, and at all relevant times has been, the sole and exclusive holder of all rights, title, and interest in the Marks; and

**Whereas**, the Parties have agreed to fully and finally compromise and settle any and all disputes between them; and

**Whereas**, in furtherance of such settlement the Parties have agreed to the undertakings set forth below.

**Therefore**, as material considerations and inducements to the execution of this Agreement and in consideration of the mutual promises set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Trinity University and Trinity College hereby contract, covenant and agree as follows:

### Agreements and Releases

1.    **Agreement To Cease Using the Marks**.  Subject to subparagraph (f) below, Trinity College agrees that it will cease:

      (a)    Using the term or word "Trinity" or any other word, symbol, phrase or term, similar to Trinity, in connection with the promotion, advertising or sale of any product or service associated with or related to educational services or products associated with educational services, including but not limited to diplomas, graduation invitations, towels and blankets, clipboards, notepads, notebooks, stationery, window stickers, bumper stickers, bookmarks, tote bags, athletic bags, drinking glasses, plastic cups, coffee mugs, t-shirts, sweat shirts, underpants, stockings, sweaters, jackets, suspenders, athletic shorts, night shirts, caps, hats, aprons, baby booties and cloth baby bibs;

      (b)    Using the Marks defined above or any other word, symbol, phrase or term, similar to the Marks, in connection with the promotion, advertising or sale of any product or service associated with or related to educational services or products associated with educational services, including but not limited to diplomas, graduation invitations, towels and blankets, clipboards, notepads, notebooks, stationery, window stickers, bumper stickers,

2

000202

bookmarks, tote bags, athletic bags, drinking glasses, plastic cups, coffee mugs, t-shirts, sweat shirts, underpants, stockings, sweaters, jackets, suspenders, athletic shorts, night shirts, caps, hats, aprons, baby booties and cloth baby bibs;

(c)     Infringing Trinity University's registered Marks;

(d)     Using any name, phrase, symbol or term which is likely to dilute the distinctive or famous nature of the Marks; and

(e)     Unfairly competing with Trinity University in any manner whatsoever.

(f)     Trinity College may display the phrase "Formerly Trinity College & University" at the bottom of the homepage of the institution's website, adjacent to the institution's copyright and privacy notice, in seven-point font, for a period of six (6) months from the execution date of this Agreement, after which the phrase must be removed; any use of the phrase not specifically provided for in this subsection is prohibited. Trinity College further agrees to cease using the word or term "Trinity" in the institution's web address, and to refrain from using the word or term "Trinity" in any future web address.

2.     **Destruction of Infringing Items.**  Trinity College agrees to deliver up for destruction and to destroy products and promotional materials associated with educational services, including but not limited to diplomas, graduation invitations, towels and blankets, clipboards, notepads, notebooks, stationery, window stickers, bumper stickers, bookmarks, tote bags, athletic bags, drinking glasses, plastic cups, coffee mugs, t-shirts, sweat shirts, underpants, stockings, sweaters, jackets, suspenders, athletic shorts, night shirts, caps, hats, aprons, baby booties and cloth baby bibs that use the Marks, or use the word "Trinity" or any other word, symbol, phrase or term, similar to Trinity.

3.     **Disposition of Lawsuit.**  The Parties shall file an Agreed Motion for Entry of Permanent Injunction and Final Agreed Judgment in the form set forth in the attached Exhibit "A," and shall submit to the Court for entry a Permanent Injunction and Final Agreed Judgment in the form set forth in the attached Exhibit "B."

4.     **Release of Trinity College by Trinity University.**  Contingent upon the performance of the obligations of Trinity College as set forth in paragraphs 1 through 3 above, Trinity University hereby forever releases and discharges Trinity College, from any and all further liability related to or arising from Trinity College's use of the Marks prior to the date of this Settlement Agreement.

5.     **Release of Trinity University by Trinity College.**  In consideration of the foregoing, Trinity College hereby forever releases and discharges Trinity University, from any and all claims, rights, demands, debts, liabilities, damages, controversies and causes of action, known or unknown, asserted or unasserted, liquidated or unliquidated, fixed or contingent, accrued or

000203

unaccrued, of any nature whatsoever whether sounding in tort, contract, statute or any other theory of liability, which may be asserted by Trinity College against Trinity University and its present and former parents, subsidiaries, affiliates, predecessors, successors, shareholders, partners, officers, directors, agents, representatives, employees, attorneys, heirs, executors, administrators, personal representatives, successors and assigns arising directly or indirectly out of the Lawsuit, or otherwise, which Trinity College may now have or ever have had in the past against Trinity University.

6.    **Authority and Ownership of Claims.**

(a)    Trinity University represents, covenants and warrants that it has the full authority and capacity to make this Agreement and to grant the releases set forth herein, that it is the sole owner of any and all Claims ever possessed by it against Trinity College and that no portion of any Claims that it ever may have possessed against Trinity College has been sold, assigned, transferred, pledged or hypothecated to any third party.

(b)    Trinity College represents, covenants and warrants that it has the full authority and capacity to make this Agreement and to grant the releases set forth herein, that it is the sole owner of any and all Claims ever possessed by it against Trinity University and that no portion of any Claims that it ever may have possessed against Trinity University has been sold, assigned, transferred, pledged or hypothecated to any third party.

7.    **Full and Final Settlement.**    The Parties understand and agree that the performances specified in this Agreement are in full settlement, satisfaction and compensation for all Claims that Trinity University may have against Trinity College.

8.    **Enforcement of Settlement Agreement.**    Should any Party to this Settlement Agreement incur any expenses in enforcing any of the provisions hereof, the losing Party shall pay to the prevailing Party all reasonable expenses incurred, including court costs, and the amount thereof may be recovered by original action, counterclaims or otherwise.

9.    **Successors and Assigns.**    This Agreement shall be binding upon and inure to the benefit of each of the Parties hereto and their respective successors and assigns.

10.    **Amendment.**    This Agreement may not be amended or otherwise changed except by an agreement in writing signed by each of the Parties hereto.

11.    **Severability.**    If any provision of this Agreement is or may be held by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions shall nonetheless survive and continue in full force and effect without being impaired or invalidated in any way.

12.    **Counterparts.**    This Agreement may be executed in several counterparts, each of which shall be an original and each of which shall constitute but one and the same instrument.

13.    **Complete Agreement.**    Each Party acknowledges that this Agreement constitutes the full, final and complete settlement of their differences and supersedes all other written or oral

4

000204

exchanges, arrangements, or negotiations between them concerning the subject matter of this Agreement, and further acknowledges that there are no representations, agreements, arrangements, or understandings, oral or written, concerning the subject matter of this Agreement that are not fully expressed herein or therein.

14.    **Headings and Construction.**    Headings in this Agreement are for the convenience of the Parties and are not to be used in construing the Agreement. This Agreement shall not be construed or interpreted against either Party, either by having drafted this Agreement or otherwise, but shall be construed and interpreted as to give the fullest effect to the releases set forth herein.

15.    **Each Party expressly represents and warrants to the other that it has carefully read this Agreement, understands its contents, and signs this Agreement as its own free act.**

**In witness whereof,** the Parties have caused this Agreement to be executed to be effective October 4. , 2004.

Executed in San Antonio, Texas, by:

**Trinity University**

By: _Craig McCoy_
Craig McCoy
Its: Vice-President for Fiscal Affairs
Date: _10/18/04_

Executed in _Ketaireycut_ , by:

**Trinity College and University**

By _Thomas P. Williams_
Thomas P. Williams
Its: President
Date: _10/4/04_

67639X.1

000205

State of Texas     §
                         §
County of Bexar   §

      **Before me,** the undersigned authority, on this date personally appeared Craig McCoy, the Vice President for Fiscal Affairs of Trinity University, known to me to be the person whose name is subscribed to the foregoing Settlement Agreement and Full and Final General Release, and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

      **Given** under my hand and seal of office on <u>October 18</u>, 2004.



                                           Maria L. Soto
                                        Notary Public, State of Texas

State of _L A_     §
Parish of _Jefferson_  §
~~County~~ of _Jefferson_  §

      **Before me,** the undersigned authority, on this date personally appeared _Thomas P. Williams_, the President of Trinity College and University, known to me to be the person whose name is subscribed to the foregoing Settlement Agreement and Full and Final General Release, and acknowledged to me that he/she executed the same for the purposes and consideration therein expressed.

      **Given** under my hand and seal of office on <u>Oct. 4</u>, 2004.

                                        Notary Public, State of _LA_

676398.1

000206

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| TRINITY UNIVERSITY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. SA04CA0313-OG |
| | § | |
| TRINITY COLLEGE & UNIVERSITY, | § | |
| | § | |
| Defendant. | § | |

## JOINT MOTION FOR ENTRY OF AGREED FINAL JUDGMENT AND ORDER OF PERMANENT INJUNCTION

Plaintiff, Trinity University ("Trinity University") and Defendant, Trinity College & University ("Trinity College") file this Joint Motion for Entry of Agreed Final Judgment and Order of Permanent Injunction in the above-referenced action.

1.    The parties have settled and compromised the case and part of the settlement involves the entry of an Agreed Final Judgment and Order of Permanent Injunction. A copy of the proposed Agreed Final Judgment and Order of Permanent Injunction is attached hereto as Exhibit "A" and incorporated herein by reference.

WHEREFORE, premises considered, Plaintiff and Defendant requests the Court to enter the Agreed Final Judgment and Order of Permanent Injunction attached hereto as Exhibit "A" and for other and further relief to which it may be entitled.

## EXHIBIT "A"

676746.1

Respectfully submitted,

COX SMITH MATTHEWS INCORPORATED
112 E. Pecan Street, Suite 1800
San Antonio, Texas 78205
(210) 554-5500
(210) 226-8395 (Fax)


By:_____
          J. Daniel Harkins
          State Bar No. 09008990
          M. Elizabeth Parks
          State Bar No. 24027594

ATTORNEYS FOR PLAINTIFF,
TRINITY UNIVERSITY


CHARLES W. HANOR, P.C.
750 Rittiman Road
San Antonio, Texas 78209
(210) 558-9500
(210) 558-9509 (Fax)

By:_____
          Charles W. Hanor
          State Bar No. 08928800

ATTORNEYS FOR DEFENDANT,
TRINITY COLLEGE & UNIVERSITY

676746.1

2

000208

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| TRINITY UNIVERSITY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. SA04CA0313-OG |
| | § | |
| TRINITY COLLEGE & UNIVERSITY, | § | |
| | § | |
| Defendant. | § | |

## AGREED FINAL JUDGMENT AND
## ORDER OF PERMANENT INJUNCTION

On this date, the referenced cause came on for hearing. The parties appeared by and through their respective counsel of record and announced to the Court that they had reached an agreement and requested entry of the Judgment. A jury was waived and the Court, based on the pleadings, evidence and papers on file, and the stipulation of Plaintiff Trinity University ("Trinity University") and Defendant Trinity College & University ("Trinity College"), is of the opinion and finds that the allegations of Trinity University's Complaint have been admitted and the Court finds as follows:

1.    Trinity is a nationally recognized liberal arts and sciences institution noted for its exceptional faculty and commitment to the comprehensive preparation of its student body. Trinity has been ranked number one for ten consecutive years among colleges and universities that offer a full range of undergraduate and master level programs in the western part of the United States by *U. S. News & World Report*.

2.    Because of Trinity's reputation among educational services industry, and due to the many publications containing the TRINITY UNIVERSITY trademark that are

**EXHIBIT "B"**    000209

sent to current and potential students of Trinity each year, the TRINITY UNIVERSITY trademark has become well known to its customers and to the general public.

3.    The TRINITY UNIVERSITY trademark is distinctive in the educational services industry, and has become synonymous with high-quality education.

4.    Trinity is the owner of United States Service Mark Registration No. 1,635,763 for TRINITY UNIVERSITY to identify educational services, namely providing courses of instruction at the college level.  This Registration is valid, uncontestable under the provisions of section 15 of the Lanham Act, 15 U.S.C. §1065.

5.    Trinity is the owner of United States Trademark Registration No. 2,273,474 for TRINITY UNIVERSITY to identify towels and blankets, clipboards, notepads, notebooks, stationery, window stickers, bumper stickers, bookmarks, tote bags, athletic bags, drinking glasses, plastic cups, coffee mugs, t-shirts, sweat shirts, underpants, stockings, sweaters, jackets, suspenders, athletic shorts, night shirts, caps, hats, aprons, baby booties and cloth baby bibs.  This Registration is valid and uncontestable.

6.    The TRINITY UNIVERSITY trademark is famous within the education community in the United States.

7.    Defendant has adopted and used, without permission, the TRINITY UNIVERSITY mark, or a substantially similar mark, for and in connection with the sale of diplomas, sweatshirts, jackets, T-shirts, athletic shirts, denim shirts, duffle bags, tote bags, pencils, coffee mugs, key chains and rings.

8.    Defendant's use of the name "TRINITY COLLEGE & UNIVERSITY" has created confusion in the market place. On January 20, 2004, the Philadelphia Daily

2

676758.1

000210

News reported that a local charter-school promoter purchased a doctorate degree through the internet from a Trinity University in San Antonio, Texas. The next day, the Philadelphia Daily News posted a retraction, indication that the promoter had obtained the degree through the internet.

9.    TRINITY UNIVERSITY is a trademark and service mark for, among other things, educational services namely providing courses of instruction at the college level and towels and blankets, clipboards, notepads, notebooks, stationery, window stickers, bumper stickers, bookmarks, tote bags, athletic bags, drinking glasses, plastic cups, coffee mugs, t-shirts, sweat shirts, underpants, stockings, sweaters, jackets, suspenders, athletic shorts, night shirts, caps, hats, aprons, baby booties and cloth baby bibs owned by Trinity.

10.    Defendant's use of TRINITY COLLEGE & UNIVERSITY, which is confusingly similar to TRINITY UNIVERSITY has caused confusion to customers, and is likely to continue to cause confusion to customer. Defendant's use of TRINITY COLLEGE & UNIVERSITY is likely to confuse a significant number of customers into believing that Defendant, Defendant's products and/or Defendant's diplomas are sponsored by or are otherwise associated with Trinity, or that the party's products come from a common source.

11.    Defendant's acts constitute infringement of Trinity's U.S. Trademark Registration Nos. 1,635,763, and 2,273,474, and trademark infringement under the common law.

12.    Trinity has been, and continues to be, damaged by such acts in a manner that cannot be fully measured or compensated in economic terms. Defendant's acts have

3

676758.1

000211

damaged, and threaten to continue damaging, Trinity's reputation and goodwill and put Trinity in a position where it cannot control its reputation and goodwill.

13.    Trinity's TRINITY UNIVERSITY trademark is famous in this judicial district and elsewhere throughout the United States to persons involved in educational services through substantially exclusive and continuous use in such industry.

14.    Defendant's acts, as alleged above, have resulted in a dilution of the distinctiveness of Trinity's TRINITY UNIVERSITY trademark, in violation of 15 U.S.C. § 1125(c).

15.    Trinity has been, and continues to be, damaged by such trademark dilution in a manner and amount that cannot be fully measured or compensated in economic terms.

16.    Defendant's acts constitute injury to the business reputation of Trinity and dilution of the distinctive quality of the TRINITY UNIVERSITY trademark registered under the Federal Trademark Act in violation of Texas Business & Commerce Code § 16.29.

17.    Defendant's acts have caused and will continue to cause Trinity monetary damages in an amount not presently capable of determination.  Trinity has suffered irreparable harm and injury due to Defendant's actions and will continue to suffer irreparable harm and injury unless Defendant is enjoined from its unlawful activities. Trinity has no adequate remedy at law.

The Court is of the opinion and finds that Plaintiff Trinity University is entitled to recover injunctive relief against Trinity College and joining use of the mark TRINITY or any other word, symbol, phrase or term similar to TRINITY.

4

IT IS, THEREFORE, ORDERED that, subject to subsection (f) below, Defendant Trinity College & University, their agents, servants, employees and all persons or entities acting in connection or in concert with it, are permanently enjoined and restrained from

(a)    Using the word "Trinity" or any other word, symbol, phrase or term, similar to Trinity, in connection with the promotion, advertising or sale of any product or service associated with or related to educational services or products associated with educational services, including but not limited to diplomas, graduation invitations, towels and blankets, clipboards, notepads, notebooks, stationery, window stickers, bumper stickers, bookmarks, tote bags, athletic bags, drinking glasses, plastic cups, coffee mugs, t-shirts, sweat shirts, underpants, stockings, sweaters, jackets, suspenders, athletic shorts, night shirts, caps, hats, aprons, baby booties and cloth baby bibs;

(b)    Using the Marks defined above or any other word, symbol, phrase or term, similar to the Marks, in connection with the promotion, advertising or sale of any product or service associated with or related to educational services or products associated with educational services, including but not limited to diplomas, graduation invitations, towels and blankets, clipboards, notepads, notebooks, stationery, window stickers, bumper stickers, bookmarks, tote bags, athletic bags, drinking glasses, plastic cups, coffee mugs, t-shirts, sweat shirts, underpants, stockings, sweaters, jackets, suspenders, athletic shorts, night shirts, caps, hats, aprons, baby booties and cloth baby bibs;

(c)    Infringing Trinity University's registered Marks;

(d)    Using any name, phrase, symbol or term which is likely to dilute the distinctive or famous nature of the Marks;

(e)    Unfairly competing with Trinity University in any manner whatsoever; and

(f)    Trinity College may display the phrase "Formerly Trinity College & University" at the bottom of the homepage of the institution's website, adjacent to the institution's copyright and privacy notice, in seven-point font, for a period of six (6) months from the execution date of this Agreement, after which the phrase must be removed; any use of the phrase not specifically provided for in this subsection is prohibited. Trinity College further agrees to cease using the word or term "Trinity" in the institution's web address, and to refrain from using the word or term "Trinity" in any future web address.

5

000213

IT IS FURTHER, ORDERED ADJUDGED and DECREED that Trinity College & University shall deliver up for destruction and to destroy all products and promotional materials associated with educational services, including but not limited to diplomas, graduation invitations, towels and blankets, clipboards, notepads, notebooks, stationery, window stickers, bumper stickers, bookmarks, tote bags, athletic bags, drinking glasses, plastic cups, coffee mugs, t-shirts, sweat shirts, underpants, stockings, sweaters, jackets, suspenders, athletic shorts, night shirts, caps, hats, aprons, baby booties and cloth baby bibs that use the Marks, or use the word "Trinity" or any other word, symbol, phrase or term, similar to Trinity.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that all relief not expressly granted herein is denied.

Signed and ordered this _____ day of _____, 2004.

HONORABLE ORLANDO GARCIA
UNITED STATES DISTRICT JUDGE

6

676758.1

000214

APPROVED AS TO FORM:

COX SMITH MATTHEWS INCORPORATED
112 E. Pecan Street, Suite 1800
San Antonio, Texas 78205
(210) 554-5500
(210) 226-8395 (Fax)


By:_____
        J. Daniel Harkins
        State Bar No. 09008990
        M. Elizabeth Parks
        State Bar No. 24027594

ATTORNEYS FOR PLAINTIFF,
TRINITY UNIVERSITY

CHARLES W. HANOR, P.C.
750 Rittiman Road
San Antonio, Texas 78209
(210) 558-9500
(210) 558-9509 (Fax)


By:_____
        Charles W. Hanor
        State Bar No. 08928800

ATTORNEYS FOR DEFENDANT,
TRINITY COLLEGE & UNIVERSITY

7

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| TRINITY UNIVERSITY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. SA04CA0313-OG |
| | § | |
| TRINITY COLLEGE & UNIVERSITY, | § | |
| | § | |
| Defendant. | § | |

## FINAL JUDGMENT AND
## ORDER OF PERMANENT INJUNCTION

On this date, the referenced cause came on for hearing. Trinity University appeared by and through its counsel of record, announced to the Court that the parties had reached an agreement, and requested entry of a judgment. A jury was waived and the Court, based on the pleadings, evidence and papers on file, and the agreement of Plaintiff Trinity University ("Trinity University") and Defendant Trinity College & University ("Trinity College"), is of the opinion and finds that the allegations of Trinity University's Complaint have been admitted and the Court finds as follows:

1.    Trinity is a nationally recognized liberal arts and sciences institution noted for its exceptional faculty and commitment to the comprehensive preparation of its student body. Trinity has been ranked number one for ten consecutive years among colleges and universities that offer a full range of undergraduate and master level programs in the western part of the United States by *U. S. News & World Report*.

2.    Because of Trinity's reputation among educational services industry, and due to the many publications containing the TRINITY UNIVERSITY trademark that are

EXHIBIT "B"

sent to current and potential students of Trinity each year, the TRINITY UNIVERSITY trademark has become well known to its customers and to the general public.

3.     The TRINITY UNIVERSITY trademark is distinctive in the educational services industry, and has become synonymous with high-quality education.

4.     Trinity is the owner of United States Service Mark Registration No. 1,635,763 for TRINITY UNIVERSITY to identify educational services, namely providing courses of instruction at the college level.     This Registration is valid, uncontestable under the provisions of section 15 of the Lanham Act, 15 U.S.C. §1065.

5.     Trinity is the owner of United States Trademark Registration No. 2,273,474 for TRINITY UNIVERSITY to identify towels and blankets, clipboards, notepads, notebooks, stationery, window stickers, bumper stickers, bookmarks, tote bags, athletic bags, drinking glasses, plastic cups, coffee mugs, t-shirts, sweat shirts, underpants, stockings, sweaters, jackets, suspenders, athletic shorts, night shirts, caps, hats, aprons, baby booties and cloth baby bibs.     This Registration is valid and uncontestable.

6.     The TRINITY UNIVERSITY trademark is famous within the education community in the United States.

7.     Defendant has adopted and used, without permission, the TRINITY UNIVERSITY mark, or a substantially similar mark, for and in connection with the sale of diplomas, sweatshirts, jackets, T-shirts, athletic shirts, denim shirts, duffle bags, tote bags, pencils, coffee mugs, key chains and rings.

8.     Defendant's use of the name "TRINITY COLLEGE & UNIVERSITY" has created confusion in the market place.  On January 20, 2004, the Philadelphia Daily

2

News reported that a local charter-school promoter purchased a doctorate degree through the internet from a Trinity University in San Antonio, Texas. The next day, the Philadelphia Daily News posted a retraction, indication that the promoter had obtained the degree through the internet.

9.      TRINITY UNIVERSITY is a trademark and service mark for, among other things, educational services namely providing courses of instruction at the college level and towels and blankets, clipboards, notepads, notebooks, stationery, window stickers, bumper stickers, bookmarks, tote bags, athletic bags, drinking glasses, plastic cups, coffee mugs, t-shirts, sweat shirts, underpants, stockings, sweaters, jackets, suspenders, athletic shorts, night shirts, caps, hats, aprons, baby booties and cloth baby bibs owned by Trinity.

10.     Defendant's use of TRINITY COLLEGE & UNIVERSITY, which is confusingly similar to TRINITY UNIVERSITY has caused confusion to customers, and is likely to continue to cause confusion to customer. Defendant's use of TRINITY COLLEGE & UNIVERSITY is likely to confuse a significant number of customers into believing that Defendant, Defendant's products and/or Defendant's diplomas are sponsored by or are otherwise associated with Trinity, or that the party's products come from a common source.

11.     Defendant's acts constitute infringement of Trinity's U.S. Trademark Registration Nos. 1,635,763, and 2,273,474, and trademark infringement under the common law.

12.     Trinity has been, and continues to be, damaged by such acts in a manner that cannot be fully measured or compensated in economic terms. Defendant's acts have

3

707048.1

damaged, and threaten to continue damaging, Trinity's reputation and goodwill and put Trinity in a position where it cannot control its reputation and goodwill.

13.     Trinity's TRINITY UNIVERSITY trademark is famous in this judicial district and elsewhere throughout the United States to persons involved in educational services through substantially exclusive and continuous use in such industry.

14.     Defendant's acts, as alleged above, have resulted in a dilution of the distinctiveness of Trinity's TRINITY UNIVERSITY trademark, in violation of 15 U.S.C. § 1125(c).

15.     Trinity has been, and continues to be, damaged by such trademark dilution in a manner and amount that cannot be fully measured or compensated in economic terms.

16.     Defendant's acts constitute injury to the business reputation of Trinity and dilution of the distinctive quality of the TRINITY UNIVERSITY trademark registered under the Federal Trademark Act in violation of Texas Business & Commerce Code § 16.29.

17.     Defendant's acts have caused and will continue to cause Trinity monetary damages in an amount not presently capable of determination.  Trinity has suffered irreparable harm and injury due to Defendant's actions and will continue to suffer irreparable harm and injury unless Defendant is enjoined from its unlawful activities. Trinity has no adequate remedy at law.

The Court is of the opinion and finds that Plaintiff Trinity University is entitled to recover injunctive relief against Trinity College and joining use of the mark TRINITY or any other word, symbol, phrase or term similar to TRINITY.

4

707048.1

000319

IT IS, THEREFORE, ORDERED that, subject to subsection (f) below, Defendant Trinity College & University, their agents, servants, employees and all persons or entities acting in connection or in concert with it, are permanently enjoined and restrained from

(a)   Using the word "Trinity" or any other word, symbol, phrase or term, similar to Trinity, in connection with the promotion, advertising or sale of any product or service associated with or related to educational services or products associated with educational services, including but not limited to diplomas, graduation invitations, towels and blankets, clipboards, notepads, notebooks, stationery, window stickers, bumper stickers, bookmarks, tote bags, athletic bags, drinking glasses, plastic cups, coffee mugs, t-shirts, sweat shirts, underpants, stockings, sweaters, jackets, suspenders, athletic shorts, night shirts, caps, hats, aprons, baby booties and cloth baby bibs;

(b)   Using the Marks defined above or any other word, symbol, phrase or term, similar to the Marks, in connection with the promotion, advertising or sale of any product or service associated with or related to educational services or products associated with educational services, including but not limited to diplomas, graduation invitations, towels and blankets, clipboards, notepads, notebooks, stationery, window stickers, bumper stickers, bookmarks, tote bags, athletic bags, drinking glasses, plastic cups, coffee mugs, t-shirts, sweat shirts, underpants, stockings, sweaters, jackets, suspenders, athletic shorts, night shirts, caps, hats, aprons, baby booties and cloth baby bibs;

(c)   Infringing Trinity University's registered Marks;

(d)   Using any name, phrase, symbol or term which is likely to dilute the distinctive or famous nature of the Marks;

(e)   Unfairly competing with Trinity University in any manner whatsoever; and

(f)   Trinity College may display the phrase "Formerly Trinity College & University" at the bottom of the homepage of the institution's website, adjacent to the institution's copyright and privacy notice, in seven-point font, for a period of six (6) months from the execution date of this Agreement, after which the phrase must be removed; any use of the phrase not specifically provided for in this subsection is prohibited. Trinity College further agrees to cease using the word or term "Trinity" in the institution's web address, and to refrain from using the word or term "Trinity" in any future web address.

5

IT IS FURTHER, ORDERED ADJUDGED and DECREED that Trinity College & University shall deliver up for destruction and to destroy all products and promotional materials associated with educational services, including but not limited to diplomas, graduation invitations, towels and blankets, clipboards, notepads, notebooks, stationery, window stickers, bumper stickers, bookmarks, tote bags, athletic bags, drinking glasses, plastic cups, coffee mugs, t-shirts, sweat shirts, underpants, stockings, sweaters, jackets, suspenders, athletic shorts, night shirts, caps, hats, aprons, baby booties and cloth baby bibs that use the Marks, or use the word "Trinity" or any other word, symbol, phrase or term, similar to Trinity.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that all relief not expressly granted herein is denied.

Signed and ordered this ____ day of _____, 2004.


_____
HONORABLE ORLANDO GARCIA
UNITED STATES DISTRICT JUDGE

6

707048.1

000221

RECEIVED

OCT 22 2004

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____ DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

TRINITY UNIVERSITY,                    §
                                        §
    Plaintiff,                          §
                                        §
v.                                      §    Civil Action No. SA04CA0313-OG
                                        §
TRINITY COLLEGE & UNIVERSITY,          §
                                        §
    Defendant.                          §

## FINAL JUDGMENT AND
## ORDER OF PERMANENT INJUNCTION

On this date, the referenced cause came on for hearing. Trinity University appeared by and through its counsel of record, announced to the Court that the parties had reached an agreement, and requested entry of a judgment. A jury was waived and the Court, based on the pleadings, evidence and papers on file, and the agreement of Plaintiff Trinity University ("Trinity University") and Defendant Trinity College & University ("Trinity College"), is of the opinion and finds that the allegations of Trinity University's Complaint have been admitted and the Court finds as follows:

1.    Trinity is a nationally recognized liberal arts and sciences institution noted for its exceptional faculty and commitment to the comprehensive preparation of its student body. Trinity has been ranked number one for ten consecutive years among colleges and universities that offer a full range of undergraduate and master level programs in the western part of the United States by *U. S. News & World Report*.

2.    Because of Trinity's reputation among educational services industry, and due to the many publications containing the TRINITY UNIVERSITY trademark that are

000222

sent to current and potential students of Trinity each year, the TRINITY UNIVERSITY trademark has become well known to its customers and to the general public.

3.    The TRINITY UNIVERSITY trademark is distinctive in the educational services industry, and has become synonymous with high-quality education.

4.    Trinity is the owner of United States Service Mark Registration No. 1,635,763 for TRINITY UNIVERSITY to identify educational services, namely providing courses of instruction at the college level.    This Registration is valid, uncontestable under the provisions of section 15 of the Lanham Act, 15 U.S.C. §1065.

5.    Trinity is the owner of United States Trademark Registration No. 2,273,474 for TRINITY UNIVERSITY to identify towels and blankets, clipboards, notepads, notebooks, stationery, window stickers, bumper stickers, bookmarks, tote bags, athletic bags, drinking glasses, plastic cups, coffee mugs, t-shirts, sweat shirts, underpants, stockings, sweaters, jackets, suspenders, athletic shorts, night shirts, caps, hats, aprons, baby booties and cloth baby bibs.    This Registration is valid and uncontestable.

6.    The TRINITY UNIVERSITY trademark is famous within the education community in the United States.

7.    Defendant has adopted and used, without permission, the TRINITY UNIVERSITY mark, or a substantially similar mark, for and in connection with the sale of diplomas, sweatshirts, jackets, T-shirts, athletic shirts, denim shirts, duffle bags, tote bags, pencils, coffee mugs, key chains and rings.

8.    Defendant's use of the name "TRINITY COLLEGE & UNIVERSITY" has created confusion in the market place.    On January 20, 2004, the Philadelphia Daily

2

000223

News reported that a local charter-school promoter purchased a doctorate degree through the internet from a Trinity University in San Antonio, Texas. The next day, the Philadelphia Daily News posted a retraction, indication that the promoter had obtained the degree through the internet.

9.    TRINITY UNIVERSITY is a trademark and service mark for, among other things, educational services namely providing courses of instruction at the college level and towels and blankets, clipboards, notepads, notebooks, stationery, window stickers, bumper stickers, bookmarks, tote bags, athletic bags, drinking glasses, plastic cups, coffee mugs, t-shirts, sweat shirts, underpants, stockings, sweaters, jackets, suspenders, athletic shorts, night shirts, caps, hats, aprons, baby booties and cloth baby bibs owned by Trinity.

10.    Defendant's use of TRINITY COLLEGE & UNIVERSITY, which is confusingly similar to TRINITY UNIVERSITY has caused confusion to customers, and is likely to continue to cause confusion to customer. Defendant's use of TRINITY COLLEGE & UNIVERSITY is likely to confuse a significant number of customers into believing that Defendant, Defendant's products and/or Defendant's diplomas are sponsored by or are otherwise associated with Trinity, or that the party's products come from a common source.

11.    Defendant's acts constitute infringement of Trinity's U.S. Trademark Registration Nos. 1,635,763, and 2,273,474, and trademark infringement under the common law.

12.    Trinity has been, and continues to be, damaged by such acts in a manner that cannot be fully measured or compensated in economic terms. Defendant's acts have

3

000224

damaged, and threaten to continue damaging, Trinity's reputation and goodwill and put Trinity in a position where it cannot control its reputation and goodwill.

13.    Trinity's TRINITY UNIVERSITY trademark is famous in this judicial district and elsewhere throughout the United States to persons involved in educational services through substantially exclusive and continuous use in such industry.

14.    Defendant's acts, as alleged above, have resulted in a dilution of the distinctiveness of Trinity's TRINITY UNIVERSITY trademark, in violation of 15 U.S.C. § 1125(c).

15.    Trinity has been, and continues to be, damaged by such trademark dilution in a manner and amount that cannot be fully measured or compensated in economic terms.

16.    Defendant's acts constitute injury to the business reputation of Trinity and dilution of the distinctive quality of the TRINITY UNIVERSITY trademark registered under the Federal Trademark Act in violation of Texas Business & Commerce Code § 16.29.

17.    Defendant's acts have caused and will continue to cause Trinity monetary damages in an amount not presently capable of determination. Trinity has suffered irreparable harm and injury due to Defendant's actions and will continue to suffer irreparable harm and injury unless Defendant is enjoined from its unlawful activities. Trinity has no adequate remedy at law.

The Court is of the opinion and finds that Plaintiff Trinity University is entitled to recover injunctive relief against Trinity College and joining use of the mark TRINITY or any other word, symbol, phrase or term similar to TRINITY.

4

# Regional and National Accrediting Agencies Recognized by the United States Department of Education

Accrediting Council for Independent Colleges and Schools
Distance Education and Training Council
Middle States Association of Colleges and Schools
New England Association of Schools and Colleges
North Central Association of Colleges and Schools
Northwest Association of Schools and Colleges
Southern Association of Colleges and Schools
Western Association of Schools and Colleges

# Accrediting Bodies NOT Recognized by the United States Department of Education

Accrediting Commission for Specialized Colleges
Accrediting Commission International (ACI)
Accrediting Council for Colleges and Schoools
Alternative Institution Accrediting Association
American Association of Non-traditional Colleges and Universities
American Association of Schools
American Council of Private Colleges and Universities (ACPCU)
American Education Association for the Accreditation of Schools, Colleges &
Universities
American International Commission for Excellence in Higher Education, Inc.
Arizona Commission of Non-Traditional Private Postsecondary Education
✳ Association for Online Academic Excellence✳
Association of Accredited Private Schools
Association of Career Training Schools
Association of World Universities and Colleges
Commission for the Accreditation of European Non-Traditional Universities
Council for the Accreditation of Correspondence Schools
Council on Post Secondary Alternative Accreditation
Distance Education Council of America
Distance Graduation Accrediting Association (DGAA)
Global Accreditation Commission
Integra Accreditation Association
International Academic Accrediting Commission
International Accrediting Association
International Accrediting Commission for Postsecondary Institutions
International Accrediting Commission for Schools, Colleges, and Theological
Seminaries
International Association of Colleges and Universities
International Association of Non-Traditional Schools

000176

International Commission for the Accreditation of Colleges and Universities
Middle States Accrediting Board
Midwestern States Accreditation Agency
National Accreditation Association
National Association for Private Post-Secondary Education
National Association of Alternative Schools and Colleges
National Association of Open Campus Colleges
National Association for Private Nontraditional Schools and Colleges
National Council of Schools and Colleges
Pacific Association of Schools and Colleges
The Association for Online Distance Learning
Virtual University Accrediting Association
West European Accrediting Society
Western Association of Private Alternative Schools
Western Association of Schools and Colleges (this is also the name of a legitimate regional accreditor)
Western Council on Non-Traditional Private Post Secondary Education
World Association of Universities and Colleges
Worldwide Accrediting Commission

CLOSE

000177

# Bronte
## International University

has conferred upon

# John Q. Sample

the degree, rank with academic status

## Bachelor of Science

with a major in

## Business Administration

Distinction

All requirements of the Board of Regents and Examiners
having been successfully completed. All rights and privileges
thereunto appertaining are hereby awarded.

Signed and sealed upon this seventh day of May
Two thousand and four

*Roxana Ho. King Jr.*
Dean of Studies

*Dominick Christian George*
Head of Examiners

000178

EXHIBIT
DHR 14



# State of Alabama
# Department of Human Resources

S. Gordon Persons Building
50 Ripley Street
P.O. Box 304000
Montgomery, Alabama 36130-4000
(334) 242-1310
www.dhr.state.al.us

**BOB RILEY**
*Governor*

Page B. Walley, Ph.D.
*Commissioner*

June 12, 2006

Mrs. Virginia Hopper
200 Alpha Lane
Deatsville, AL 36022

*RE: Amendment to original charge letter of May 9, 2006.*

Dear Mrs. Hopper:

This is to inform you that the administrative hearing has been rescheduled for Thursday, June 22, 2006, at 9:00 a.m. in the South Meeting Room of the Gordon Persons Building, 50 N. Ripley Street, Montgomery, Alabama. The purpose of the hearing is to hear charges and evidence concerning false information contained on your job application for Accountant *and evidence that you are not qualified for your current position as an accountant*. The composition and conduct of this hearing will be in accordance with Chapter 5 of the departmental Personnel Policies and Procedures Manual. You are expected to appear at this disciplinary hearing at the date and time specified. Changes in scheduling will be made only for good cause and if the request is made at least forty-eight hours prior to the hearing.

It has been brought to my attention that you have violated *Rules of the State Personnel Board,* 670-X-19-.01 (2) (f), Falsification of records – Application for Employment.

On your Application for Examination for Accountant, you indicated you received a B.S. degree in Business Administration from Trinity University, 715, Stadium Drive, San Antonio, Texas 78212, in May 2002. You further attached a list of courses you completed that were particularly related to the accounting position. Trinity University in San Antonio, Texas has stated they have been unable to locate records verifying that you were enrolled at that university. Furthermore, several of the course numbers listed in the attachment to your application did not correspond with the course numbers listed in Trinity's curriculum.

0001779



EXHIBIT
DHR 15

Falsification of records is a serious violation that could result in discharge on the first offense. Your signature on the employment application certifies that all statements on the application and any attachments to the application are true and correct; and that any false statements could result in removal from the register or release from employment.

*You were hired and are currently employed as an Accountant (10611) in the DHR Finance Office. In order to qualify for this position, an employee must have a Bachelor's Degree with a major in Accounting or Business Administration and have completed five (5) college level accounting courses including Principles I & II and Intermediate I and II, or equivalent courses. Evidence indicates that you do not have a degree from an actual school or university but obtained the degree from a "diploma mill" calling itself Trinity College and University, and that you did not attend any classes at this university. Furthermore, there is no evidence that you have taken Intermediate Accounting II.*

If evidence provided to the hearing officer supports these charges, it could result in disciplinary actions of increasing severity, including suspension up to 30 days in a calendar year, demotion, or termination of employment. The Department will be seeking termination of your employment.

With the exception of records and materials protected by federal and state laws and regulations, all pertinent materials dealing with this matter will be made available in the Department of Human Resources Legal Office, Gordon Persons Building. A request for review of this material must be made in advance by you or your legal counsel. If you intend to have an attorney, please notify the Personnel Division as soon as possible.

Sincerely,

Page B. Walley, Ph.D.
Commissioner

I have been informed of the foregoing and accept a copy of the same this the 12 day of June 2006.

Virginia S. Hopper

Thomas A. King, Personnel Director

000180

AUM -Advance Technology Group - 1999

NAIC Reinsurance Seminar  - 1996

NOLHGA Seminar  - 1995

NAIC Reinsurance Seminar - 1995

Wetumpka Vocational School - 1995
            Windows 3.1

SIR/NCIGF Working Together Seminar 1994

Department Training
            Windows 95 + 98

Wetumpka Vocational School 1993
         Computer Applications I + II
         Basic Accounting

Troy State University
Prin of Accounting I
Prin of Accounting II
Governmental Accounting
Managerial Accounting



000181

# TROY University
*Trojan Web Express*

Menu
FAQ
Log Out

0360263 Virginia Hopper

## Course/Section and Title

| | Grade | Credits | CEUs | Repeat | Term |
|---|---|---|---|---|---|
| 1 ACT-291 WS Principles of Accounting I | A | 3.33 | | | 98/SP |
| 2 ACT-292 WS Principles of Accounting II | A | 3.33 | | | 98/SU |
| 3 ACT-394 AA Governmental Accounting | B | 3.33 | | | 99/SU |
| 4 ACT-293 AA Managerial Accounting | C | 3.33 | | | 00/WN |
| 5 CIS-140 AC Basic Microcomputing | A | 2.00 | | | 00/WN |
| 6 ACT-3391 BAR Intermediate Accounting | A | 3.00 | | | 03/SP |

| Total Earned | 18.33 |
|---|---|
| Total Grade Points | 63.33 |
| Cumulative GPA | 3.455 |

WebAdvisor

Menu  FAQ  Log Out

000282

## RESPONSIBILITIES/RESULTS

A) Audits various claims for deaf/foreign language interpreters and American Legion/UDC Scholarships within 5 days of receipt of claim to determine they are legal and proper with no valid complaints to supervisor.

B) Records miscellaneous refund payments received and prepares checks for deposit to the State Treasury following established procedures with no valid complaints to supervisor.

C) Processes vouchers for deaf/foreign language interpreters, American Legion/UDC Scholarships, and other miscellaneous payments into the AFNS "E" region and CAS(State's Central Accounting System) with no valid delays in payments reported to supervisor.

D) Verifies warrant amounts, posts warrant data and mails payments to vendors no later than on day following the date of issuance with no valid complaints to supervisor.

E) Enters/processes Requests for Cash Transfers from departments into CAS, Interfund Cash Transfer System, on a daily basis after approval of supervisor.

F) Reviews & processes Requests for Electronic Warrants from departments in CAS on a daily basis and balances with Treasurer's Office with no valid complaints to supervisor.

G) Maintains files for vouchers, cash transfers, and electronic warrants so that accurate records may be accessed regularly with no loss of time because files cannot be located with no valid complaints to supervisor.

H) Communicates with staff and other public officials such that responses are completed to inquiries within specified timeframes and in a professional and courteous manner with no valid complaints to supervisor.

I) Assists administrative staff and other co-workers with miscellaneous tasks in order to ensure that the office functions in an efficient manner with no occasion of valid complaint to supervisor.

J) Aids in processing end of fiscal year accounts payable journal vouchers ensuring that data is correct and proper with no valid complaints to supervisor.



June 2000 - DHR Acct Payable Section -
        as Acct Clerk

Feb 2001 - Acct Tech

Reconcile purchase orders and invoices  - 50%
verify, code and balance records
check for completeness and accuracy of invoices

Prepare data to be processed by computer to
generate payment voucher -         25%
calculate accounting distribution
Allocate cost items to a variety of accounts
according to prescribed classifications

Maintain records in accordance with
established procedures.
Record payment date, payment amounts,
and balances per vendor accounts.
Check balances and retrieve data from an
accounting system by use of a computer.

I am responsible for correctly coding
and processing invoices for payment,
completely and accurately. I spend a
good deal of time preparing data to be
processed to generate payment vouchers

000184

services rendered of products produced to
support the dept needs.

000185

Form 13P
Revised (1/1/1998)

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
### Personnel Department

## *PREAPPRAISAL*

Employee Name: __VIRGINIA HOPPER__                     Social Security Number: ___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__

Agency: _____FINANCE_____                               Division:___CONTROL & ACCOUNTS__

Classification: __ACCOUNTING TECH__                    Class Code: ___10605__

Period Covered From: __2/23/02__ To: _6/1/02__

---

**RESPONSIBILITIES/RESULTS:** Responsibilities and results on which an employee will be rated should be listed below. These areas should be discussed with the employee during the Preappraisal session at the beginning of each appraisal year. Please refer to the Performance Appraisal Manual for instruction on how to develop responsibilities and results.

## RESPONSIBILITIES/RESULTS

A) Audits various claims for deaf/foreign language interpreters and American Legion/UDC Scholarships within 5 days of receipt of claim to determine they are legal and proper with no valid complaints to supervisor.

B) Records miscellaneous refund payments received and prepares checks for deposit to the State Treasury following established procedures with no valid complaints to supervisor.

C) Processes vouchers for deaf/foreign language interpreters, American Legion/UDC Scholarships, and other miscellaneous payments into the AFNS "E" region and CAS(State's Central Accounting System) with no valid delays in payments reported to supervisor.

D) Verifies warrant amounts, posts warrant data and mails payments to vendors no later than on day following the date of issuance with no valid complaints to supervisor.

E) Enters/processes Requests for Cash Transfers from departments into CAS, Interfund Cash Transfer System, on a daily basis after approval of supervisor.

F) Reviews & processes Requests for Electronic Warrants from departments in CAS on a daily basis and balances with Treasurer's Office with no valid complaints to supervisor.

G) Maintains files for vouchers, cash transfers, and electronic warrants so that accurate records may be accessed regularly with no loss of time because files cannot be located with no valid complaints to supervisor.

H) Communicates with staff and other public officials such that responses are completed to inquiries within specified timeframes and in a professional and courteous manner with no valid complaints to supervisor.

I) Assists administrative staff and other co-workers with miscellaneous tasks in order to ensure that the office functions in an efficient manner with no occasion of valid complaint to supervisor.

J) Aids in processing end of fiscal year accounts payable journal vouchers ensuring that data is correct and proper with no valid complaints to supervisor.

000186

- Estate Management - manage day to day activities of insolvent insurance companies

- Delegate or assign task for the estates to the support team

- Review and approve status reports and petitions before they are filed with the courts

- Reconcile Bank Statement for all estates

- Prepare cash balance, transactions, and missing check reports

- Retrieve data from an on line accounting system

- Schedules of short term investment maturities

- Journalize and enter data into an on line accounting system

- Compile and prepare subsidiary accounts

- Prepare and process checks by on computer system

- Calculate and file claims subject to reinsurance

- Research records and provide medical updates on claimants for reinsurers

- Account receivables, agents collection accounts, premium collections

- Calculate and process return of premium

- Communicate with policyholders and agents

- Communicate with providers on behalf of claimants

- Maintain mortgage loan accounts



FOB JAMES, JR.
GOVERNOR

### STATE OF ALABAMA
### DEPARTMENT OF INSURANCE
201 MONROE STREET, SUITE 1700
POST OFFICE BOX 303351
MONTGOMERY, ALABAMA 36130-3351
Telephone: (334) 269-3550
Facsimile: (334) 241-4192

MICHAEL DeBELLIS
COMMISSIONER

DEPUTY COMMISSIONER
DAVID PARSONS

DEPUTY COMMISSIONER
JOHN HYDEN

CHIEF EXAMINER
RICHARD L. FORD

STATE FIRE MARSHAL
JOHN S. ROBISON

GENERAL COUNSEL
MICHAEL A. BOWNES

LICENSING MANAGER
LINDA PUGH

MEMO

October 1, 1997

TO:         Receivership Division Employees

FROM:       Michael DeBellis, Commissioner

RE:         Employment Agreements

As you may know, the new employment contracts with each of you contemplate you officially becoming "state employees," paid through state warrants, with state medical insurance and retirement, but with no State Merit System protection. These contracts have not yet been approved through all official channels. Nevertheless, these agreements set forth our new employment relationships with each of you, along with your new job responsibilities. The only things that we cannot now do are payment through state warrants, state insurance and state retirement. Therefore, we will continue to pay through the Receivership account, with the old Blue Cross insurance policy. No retirement will be withheld at this point. The office, nevertheless, is now operating pursuant to the new office procedures.

As you also know, paychecks are delivered two weeks in arrears. Therefore, the checks you will receive on October 10 will be for the work week that ended September 25. That will be your last check under the old employment relationship. The pay period that began on September 29 will be in accordance with your new employment agreements for a forty-hour work-week. Your first paychecks under the new agreements will be delivered on October 24.

All administrative expenses incurred prior to October 1 will be paid under the old method. All administrative expenditures incurred on and after October 1 will be handled under the new procedure through the Insurance Department.

MD/RN/bc

000188



**FOB JAMES, JR.**
GOVERNOR

## STATE OF ALABAMA
### DEPARTMENT OF INSURANCE
### RECEIVERSHIP DIVISION
64 North Union Street, Suite 749
Post Office Box 303353
MONTGOMERY, ALABAMA  36130-3353
Telephone: (334) 353-4110
Facsimile: (334) 353-4223

**MICHAEL DeBELLIS**
COMMISSIONER

**RALPH R. NORMAN, III**
ACTING CHIEF
RECEIVERSHIP DIVISION

## MEMORANDUM

TO:        Virginia Hopper

FROM:      Ralph R. Norman

DATE:      August 21, 1997

---

With the approval of Mr. Michael DeBellis, Commissioner, I am pleased to offer you a contract for a position with the Receivership Division effective October 1, 1997. The contract is attached.

You are offered a position in the classification of **Accounting Technician II**. Your salary will be set at step **13** based on your experience with the State of Alabama.

Please review and if you accept, sign the contract and return to me by 12:00 noon on Monday, August 25, 1997.

000189

STATE OF ALABAMA                              {

                                             {

COUNTY OF MONTGOMERY                          {

## PERSONAL SERVICES CONTRACT

This agreement is entered into by and between the **State of Alabama, Department of Insurance** (hereinafter referred to as the "Department"), and **Virginia Hopper**, hereinafter referred to as the Contract Employee.

### WITNESSETH:

The Department and the Contract Employee, for the consideration hereinafter set forth, agree as follows:

1.   The Contract Employee shall perform the following services for the Department in the Receivership Division:

     a) Enter data accurately and efficiently into an on line accounting system.

     b) Follow establish accounting controls.

     c) Compile and prepare statistical reports.

     d) Perform a variety of work in auxiliary bookkeeping functions.

     e) Maintain good documentation on all transactions for which responsibility has been assigned.

     f) Conduct necessary research from existing records to accurately process transactions.

     g) Prepare verbal or written response to inquiries or other assigned tasks.

     h) Reconcile accounts, bank statements as assigned.

2.   The manner in which the services are to be performed and the specific hours to be worked by the Contract Employee shall be determined by the Department. All services are to be performed in accordance with professional and ethical standards.

3.   The beginning date of this agreement is October 1, 1997, and the ending date is September 30, 1998.

4.   As payment for the services stated above, the Contract Employee shall receive the sum of $1,150.00 bi-weekly, for a total not to exceed $29,900.

5.   Annual renewals of this contract will reflect step increases using existing merit system policy at the time of renewal and any legislative provided pay raises granted to state employees. For purpose of step increases the anniversary date of the Contract Employee is October 1.

6.   The Department shall reimburse Contract Employee for travel and/or per diem in accordance with Sections 36-7-20, et seq., Code of Alabama 1975.

7.   For the purpose of this contract, the Contract Employee shall participate in the State Employees Retirement System, may participate in the State Employees Insurance Plan, will earn sick leave and annual leave each pay period, will be eligible for the Family Medical Leave, and will be paid for accumulated annual leave upon termination, but shall serve at the will of the Commissioner of the Insurance Department. It is understood that there is no entitlement to any State Merit System benefits to anyone working under this agreement. **000190**

8.   The Contract Employee shall follow all leave procedures of the Department of Insurance and work policies



Personal Services Contract
Virginia Hopper
Page Two

9. This contract and employment may be terminated by either party to this contract with 30 days written notice to the other party. At the discretion of the Commissioner, the employee may or may not be asked to work past the date of notification of contract termination and prior to the last date of pay.

10. This agreement is subject to termination in the event of proration of the fund from which payment under this agreement is to be made, or a reduction in the number of open receiverships.

11. The Department will perform a performance appraisal of the Contract Employee using the state performance appraisal system and will inform the Contract Employee no later than July 31, 1998, whether the Department will recommend that this contract be renewed effective October 1, 1998, and, if so, what the rate of compensation will be upon renewal.

12. The Contract Employee shall be required to sign a confidentiality agreement and adhere to its terms as a condition of continued employment.

13. Upon termination of this agreement, Contract Employee shall deliver all records, notes, data, memoranda, evidence and other items of any nature that are in Contract Employee's possession or under Contract Employee's control that are the Department's property or in any way relate to the subject upon which the Contract Employee is working on behalf of the Department.

14. The Contract Employee's obligations under this agreement may not be assigned or transferred to any other person, firm or corporation without the prior written consent of the Department.

15. It is agreed that the terms and commitments contained herein shall not be constituted as a debt of the State of Alabama in violation of Article II, Section 213 of the Constitution of Alabama, 1901, as amended by Amendment Number 26. It is further agreed that if any provision of this contract shall contravene any statute or Constitutional provision or amendment, either now in effect or which may, during the course of this contract, be enacted, then that conflicting provision in the contract shall be deemed null and void.

16. The Contract Employee's sole remedy for the settlement of any and all disputes arising under the terms of this agreement shall be limited to the filing of a claim with the Board of Adjustment of the State of Alabama.

17. This agreement contains the entire agreement of the parties and there are no other promises or conditions in any other agreements whether oral or written. This agreement supersedes any prior written or oral agreements between the parties.

18. Neither party shall have the right to assign or transfer its rights or obligations under this contract without the written consent of the other party. This agreement shall not be subject to modification or amendment except by written agreement with the appropriate authorized signatures.

19. If any provision of this agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this agreement is invalid or unenforceable, but that by limiting such provision it would become valid or enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

20. The Department, notwithstanding any provision of this agreement or amendments hereto, does not release or waive its right to assert sovereign immunity and/or any other affirmative or defensive right or claim it may have under law.

000191

History for Employee number 225, Virginia Hopper

| Date | Description of Change of Status |
|------|--------------------------------|
| 02/22/94 | Hired on 02/15/94<br>Pay started at $10.00<br>Marital code set at 3<br>Department entered as 1 |
| 08/23/94 | Pay raised on 08/24/94<br>Pay changed from $10.00 to $10.50 |
| 10/04/94 | Pay raised on 10/01/94<br>Pay changed from $10.50 to $11.34 |
| 03/08/95 | Pay raised on 03/08/95<br>Pay changed from $11.34 to $12.00 |
| 07/05/95 | Pay raised on 07/12/95<br>Pay changed from $12.00 to $12.60 |
| 03/04/96 | Pay raised on 02/26/96<br>Pay changed from $12.60 to $13.23 |
| 10/22/97 | Pay raised on 10/01/97<br>Pay changed from $13.23 to $14.38 |
| 10/07/98 | Pay raised on 10/01/98<br>Pay changed from $14.38 to $15.53 |
| 10/14/98 | Pay changed from $15.53 to $16.31 |

2993

RECEIVERSHIP DIVISION 78
SPECIAL ACCOUNT
P.O. BOX 303353
MONTGOMERY, AL 36130-3353

AMSOUTH BANK OF ALABAMA
MONTGOMERY, AL
61-1/620

05/19/2000

PAY TO THE
ORDER OF ___ VIRGINIA HOPPER                                     $ **913.97

Nine Hundred Thirteen and 97/100************************************************************* DOLLARS

Security feature
included.
Details on back

COPY NOT NEGOTIABLE

MEMO ___ 61 VACATION 13 SICK

⑈002993⑈ ⑆0620000019⑆ 1916236 7⑈

---

2993

RECEIVERSHIP DIVISION / SPECIAL ACCOUNT

VIRGINIA HOPPER                                            05/19/2000
[4046 PR PAYABLE]              HOPPER PER END 05/05/00              1,304.80
[4032 ESCROW PAY]/FED WH       HOPPER PER END 05/05/00               -203.51
[4032 ESCROW PAY]/FICA         HOPPER PER END 05/05/00                -80.90
[4032 ESCROW PAY]/MC           HOPPER PER END 05/05/00                -18.92
[4032 ESCROW PAY]/ST WH        HOPPER PER END 05/05/00                -44.30
[4032 ESCROW PAY]/LNL          HOPPER PER END 05/05/00                -43.20

2065 AMSOUTH       61 VACATION 13 SICK                                913.97

RECEIVERSHIP DIVISION / SPECIAL ACCOUNT                               2993

VIRGINIA HOPPER                                            05/19/2000
[4046 PR PAYABLE]              HOPPER PER END 05/05/00              1,304.80
[4032 ESCROW PAY]/FED WH       HOPPER PER END 05/05/00               -203.51
[4032 ESCROW PAY]/FICA         HOPPER PER END 05/05/00                -80.90
[4032 ESCROW PAY]/MC           HOPPER PER END 05/05/00                -18.92
[4032 ESCROW PAY]/ST WH        HOPPER PER END 05/05/00                -44.30
[4032 ESCROW PAY]/LNL          HOPPER PER END 05/05/00                -43.20

PAYMENT RECORD

2065 AMSOUTH       61 VACATION 13 SICK                                913.97

000193

DO NOT WRITE IN THIS SPACE

# STATE OF ALABAMA
# APPLICATION FOR EXAMINATION

RETURN TO
STATE PERSONNEL DEPARTMENT
MONTGOMERY, ALABAMA 36130

## AN EQUAL OPPORTUNITY EMPLOYER

### General Instructions

A separate application is required for each job. **Do not write in shaded areas.** Complete all parts of the application. Applications not properly completed will be returned.

Examination For Which You Are Applying (one per application)        Option (if applicable)

## ENTER SOCIAL SECURITY NUMBER BELOW.

4 2 3 - 7 4 - 4 1 9 0

Full Name  Virginia              S.              Hopper
           First            Middle                     Last

Address ·  200  ALPHA  LN.
           House or Apartment Number          Street

DEATSVILLE              AL          ELMORE              36022
City                    State       County              Zip Code

Telephone Number: Home (334) 285-6226       Work (334) 353-4112
                       Area Code                 Area Code

The following information is required for governmental reporting or recordkeeping purposes:

Date of Birth    05      06      54        Sex (check one)  1. ( ) Male   2. (✓) Female
                (Month)  (Day)  (Year)

Race (check one)  1. (✓) White   2. ( ) Black   3. ( ) Hispanic   4. ( ) Asian or Pacific Islander   5. ( ) American Indian or Alaskan Native

## EDUCATION: CIRCLE THE HIGHEST GRADE OF SCHOOL COMPLETED.

1  2  3  4  5  6  7  8  9  10  11  (12)  (GED)    College  1  2  3  4    Graduate  1  2  3  4

### PROVIDE INFORMATION ON ALL SCHOOLS ATTENDED. SPECIFY UNDERGRADUATE OR GRADUATE WORK.

| Name and Location of School | Dates of Attendance Month/Year From | To | Credit Hours Sem. | Qtr. | Did You Graduate? Yes | No | Type of Degree and Date | Major |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

### PROFESSIONAL LICENSE OR CERTIFICATE

| License/Certificate Issued By | Field/Trade/Specialization | License/Certificate No. | Issue Date | Expiration Date |
|---|---|---|---|---|
| | | | | |
| | | | | |

LIST COURSES (AND HOURS) WHICH ARE PARTICULARLY RELATED TO THE POSITION (attach additional sheets, if needed).

SIR/NCIGF Seminar    16.5    NOLHGA Seminar
NAIC Reinsurance Seminar  12    NAIC/SIR Insolvency  10

000284

## CERTIFICATE

I affirm that all statements on or attached to this application are true and correct to the best of my knowledge. I know that any false statements may cause me to be denied the chance for testing, to be removed from a register, or released from employment. I have no prior knowledge of the examination. I will not discuss the test I have taken. I further authorize the release of all relevant prior employment, military service and criminal records. If employed I agree, consistent with applicable laws, to receive compensatory time off in lieu of overtime compensation for any overtime hours worked.

SOCIAL SECURITY NUMBER : 4 2 3 . 1 1 . 1 1 1 1

References: At the time of interview, you may be asked to furnish names and addresses of reliable persons, not relatives or present employer, who now you well enough to give information about you.

f you need special testing aids and/or services in order to accommodate a disability or health problem, please indicate here:

ave you ever been involuntarily terminated, discharged, forced or asked to resign from any job?    ( ) Yes    (✓) No

you answered Yes to the above question, attach an explanation on a separate sheet noting any mitigating or extenuating circumstances.

ave you ever been convicted of a misdemeanor or felony crime?    ( ) Yes    (✓) No

you answered Yes to the above question, list in the space below all prior misdemeanor and felony convictions and any extenuating or mitigating rcumstances regarding such convictions.  If necessary, you may use a separate sheet or sheets and attach to application.

OTE: A CRIMINAL CONVICTION WILL NOT NECESSARILY BE A BAR TO CONSIDERATION FOR EMPLOYMENT, EXCEPT THAT A FELONY ONVICTION WILL BAR EMPLOYMENT IN A LAW ENFORCEMENT JOB;  THE DISCLOSURE OF A MISDEMEANOR CONVICTION WILL NOT UTOMATICALLY RESULT IN DISQUALIFICATION.  CRIMINAL HISTORIES WILL BE SUBMITTED TO THE NATIONAL CRIME INFORMATION ENTER (NCIC) FOR VERIFICATION.  FAILURE TO DISCLOSE A CONVICTION MAY BE CONSIDERED AS GROUNDS FOR DISQUALIFICATION. OR THESE REASONS, APPLICANTS SHOULD BE CAREFUL TO DISCLOSE ALL CRIMINAL CONVICTIONS.

## WORK HISTORY
### THIS SECTION MUST BE COMPLETED REGARDLESS OF WHETHER OR NOT A RESUME' IS ATTACHED.

gin with your PRESENT or most recent employment.  List in REVERSE ORDER periods of employment.  Each time you changed jobs or your le changed should be listed as a separate period.  Describe in detail your duties. (Attach additional sheets if needed.)

Current or Last Employer: State of Alabama Insurance Dept.
Your Official Job Title: Reinsurance Coordinator
dress: Receivership Division 64 North Union, Mont. Al
Type of Business: Liquidators Office

| FROM |  | TO |  | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
|------|--|----|--|--------------|--------------------------|------------------|---------------|-------------------------------|
| onth 2 | Year 94 | Month Present | Year | 35 | 40 | $ 10.00 Per hr. | $ 13.23 Per hr. | (✓) Yes ( ) No |

nber/Title of Employees You Supervised a Continuing Basis

Equipment You Operated: Phone System #86 Computer Printer, Fax, Copier, Adding Machine

ne, Title and Telephone Number upervisor: Barbara Spears - Deputy Receiver / 334) 353-4115

Reason for Leaving:

cribe Your Duties in Detail: Reinsurance - Review EOC, update reports and file claims, receive and post payments, uest medical reports and progress status on claimants from GA, coordinate information with nsurers. Collection Accounts: Agencies and insured - receive and post payments, contact en payment are late. Agent Balances - create invoices notify and collect balances, set up ment plans prepare Promissory Notes, Assign account numbers, Produce monthly reports agents accounts and monies received and adjustments to accounts. Quarterly reports utstanding balances, receivables on agents accounts and reinsurance delinquent accounts t amounts

mployer: State of Alabama Dept of Corrections
Your Official Job Title: Clerk - Typist - Medical Records
ress: Kilby Correctional Facility - Montgomery
Type of Business: Correctional

| FROM |  | TO |  | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
|------|--|----|--|--------------|--------------------------|------------------|---------------|-------------------------------|
| onth | Year 74 | Month 7 | Year 74 | 6 |  | $ Per | $ Per | (✓) Yes ( ) No |

nber/Title of Employees You Supervised Continuing Basis

Equipment You Operated: Typewriter Adding Machine Copier

e, Title and Telephone Number upervisor: Dr Null

Reason for Leaving: Baptist Medical Center took over Medical Services at Kilby.

ribe Your Duties in Detail: ck medical history of incoming inmates, set up files on each, updated medical d dental records, scheduled appointments for inmates to see the doctor dentist.

000185

EXHIBIT
2
Hopper

PENGAD 800-631-6989

# Trinity

## College & University

has conferred upon

## Virginia Swearengin Hopper

the degree, rank and academic status

### Bachelor of Science

with a major in

### Business Administration

#### Distinction

All requirements of the Board of Regents and Examiners
having been successfully completed. All rights and privileges
thereunto appertaining are hereby awarded.

Signed and sealed upon this twenty-fifth day of May
two thousand and two

_Rowena Jo. King Ho_
Dean of Scribes

_Dominick Christian Joseph_
Board of Examiners

EXHIBIT
3
Hopper

PENGAD 800-631-6989



3/10/2003

**EXHIBIT**

4

Hopper

RECEIVED

OCT 22 2004

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY _____ DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| TRINITY UNIVERSITY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. SA04CA0313-OG |
| | § | |
| TRINITY COLLEGE & UNIVERSITY, | § | |
| | § | |
| Defendant. | § | |

**MOTION FOR ENTRY OF FINAL JUDGMENT AND
ORDER OF PERMANENT INJUNCTION**

TO THE HONORABLE JUDGE OF THE DISTRICT COURT

COMES NOW Plaintiff, Trinity University ("Trinity University") and files this Motion for Entry of Final Judgment and Order of Permanent Injunction in the above-referenced action, and would respectfully show the Court the following:

1.    The parties have settled and compromised the case. A copy of the Settlement Agreement and Full and Final General Release ("Settlement Agreement") is attached hereto as Exhibit "A" and incorporated herein by reference. Paragraph 3 of the Settlement Agreement provides that the parties agree to the entry of a Final Judgment and Order of Permanent Injunction. A copy of the proposed Final Judgment and Order of Permanent Injunction is attached hereto as Exhibit "B" and incorporated herein by reference.

WHEREFORE, premises considered, Plaintiff requests that this Court enter the Final Judgment and Order of Permanent Injunction attached hereto as Exhibit "B" and for other and further relief to which it may be entitled.

707049.1

Respectfully submitted,

COX SMITH MATTHEWS INCORPORATED
112 E. Pecan Street, Suite 1800
San Antonio, Texas 78205
(210) 554-5500
(210) 226-8395 (Fax)

By:_____
    J. Daniel Harkins
    State Bar No. 09008990
    M. Elizabeth Parks
    State Bar No. 24027594

ATTORNEYS FOR PLAINTIFF,
TRINITY UNIVERSITY

707049.1

2

**Certificate of Service**

I hereby certify that a true and correct copy of the foregoing Plaintiff's Motion for

Entry Final Judgment and Order of Permanent Injunction was served upon the following

counsel on this 22 day of October, 2004:

Albert Nicaud
Nicaud, Sunseri & Fradella, L.L.C.
3000 18th Street
Metairie, Louisiana 70002

Mr. Charlie W. Hanor
Attorneys at Law
750 Rittiman Road
San Antonio, Texas  78209

707049.1                                             3                                    000200

IT IS, THEREFORE, ORDERED that, subject to subsection (f) below, Defendant

Trinity College & University, their agents, servants, employees and all persons or entities

acting in connection or in concert with it, are permanently enjoined and restrained from

(a)  Using the word "Trinity" or any other word, symbol, phrase or term, similar to Trinity, in connection with the promotion, advertising or sale of any product or service associated with or related to educational services or products associated with educational services, including but not limited to diplomas, graduation invitations, towels and blankets, clipboards, notepads, notebooks, stationery, window stickers, bumper stickers, bookmarks, tote bags, athletic bags, drinking glasses, plastic cups, coffee mugs, t-shirts, sweat shirts, underpants, stockings, sweaters, jackets, suspenders, athletic shorts, night shirts, caps, hats, aprons, baby booties and cloth baby bibs;

(b)  Using the Marks defined above or any other word, symbol, phrase or term, similar to the Marks, in connection with the promotion, advertising or sale of any product or service associated with or related to educational services or products associated with educational services, including but not limited to diplomas, graduation invitations, towels and blankets, clipboards, notepads, notebooks, stationery, window stickers, bumper stickers, bookmarks, tote bags, athletic bags, drinking glasses, plastic cups, coffee mugs, t-shirts, sweat shirts, underpants, stockings, sweaters, jackets, suspenders, athletic shorts, night shirts, caps, hats, aprons, baby booties and cloth baby bibs;

(c)  Infringing Trinity University's registered Marks;

(d)  Using any name, phrase, symbol or term which is likely to dilute the distinctive or famous nature of the Marks;

(e)  Unfairly competing with Trinity University in any manner whatsoever; and

(f)  Trinity College may display the phrase "Formerly Trinity College & University" at the bottom of the homepage of the institution's website, adjacent to the institution's copyright and privacy notice, in seven-point font, for a period of six (6) months from the execution date of this Agreement, after which the phrase must be removed; any use of the phrase not specifically provided for in this subsection is prohibited. Trinity College further agrees to cease using the word or term "Trinity" in the institution's web address, and to refrain from using the word or term "Trinity" in any future web address.

5

IT IS FURTHER, ORDERED ADJUDGED and DECREED that Trinity College & University shall deliver up for destruction and to destroy all products and promotional materials associated with educational services, including but not limited to diplomas, graduation invitations, towels and blankets, clipboards, notepads, notebooks, stationery, window stickers, bumper stickers, bookmarks, tote bags, athletic bags, drinking glasses, plastic cups, coffee mugs, t-shirts, sweat shirts, underpants, stockings, sweaters, jackets, suspenders, athletic shorts, night shirts, caps, hats, aprons, baby booties and cloth baby bibs that use the Marks, or use the word "Trinity" or any other word, symbol, phrase or term, similar to Trinity.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that all relief not expressly granted herein is denied.

Signed and ordered this _____ day of _____, 2004.

_____
HONORABLE ORLANDO GARCIA
UNITED STATES DISTRICT JUDGE

6

FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

NOV - 9 2004

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
                    DEPUTY CLERK

TRINITY UNIVERSITY,                    §
                                       §
Plaintiff,                             §
                                       §
v.                                     §     Civil Action No. SA04CA0313-OG
                                       §
TRINITY COLLEGE & UNIVERSITY,          §
                                       §
Defendant.                             §

## FINAL JUDGMENT AND
## ORDER OF PERMANENT INJUNCTION

On this date, the referenced cause came on for hearing. Trinity University appeared by and through its counsel of record, announced to the Court that the parties had reached an agreement, and requested entry of a judgment. A jury was waived and the Court, based on the pleadings, evidence and papers on file, and the agreement of Plaintiff Trinity University ("Trinity University") and Defendant Trinity College & University ("Trinity College"), is of the opinion and finds that the allegations of Trinity University's Complaint have been admitted and the Court finds as follows:

1.      Trinity is a nationally recognized liberal arts and sciences institution noted for its exceptional faculty and commitment to the comprehensive preparation of its student body. Trinity has been ranked number one for ten consecutive years among colleges and universities that offer a full range of undergraduate and master level programs in the western part of the United States by *U. S. News & World Report.*

2.      Because of Trinity's reputation among educational services industry, and due to the many publications containing the TRINITY UNIVERSITY trademark that are

707048.1





EXHIBIT

5
Hopper

000228

sent to current and potential students of Trinity each year, the TRINITY UNIVERSITY trademark has become well known to its customers and to the general public.

3.    The TRINITY UNIVERSITY trademark is distinctive in the educational services industry, and has become synonymous with high-quality education.

4.    Trinity is the owner of United States Service Mark Registration No. 1,635,763 for TRINITY UNIVERSITY to identify educational services, namely providing courses of instruction at the college level.    This Registration is valid, uncontestable under the provisions of section 15 of the Lanham Act, 15 U.S.C. §1065.

5.    Trinity is the owner of United States Trademark Registration No. 2,273,474 for TRINITY UNIVERSITY to identify towels and blankets, clipboards, notepads, notebooks, stationery, window stickers, bumper stickers, bookmarks, tote bags, athletic bags, drinking glasses, plastic cups, coffee mugs, t-shirts, sweat shirts, underpants, stockings, sweaters, jackets, suspenders, athletic shorts, night shirts, caps, hats, aprons, baby booties and cloth baby bibs.    This Registration is valid and uncontestable.

6.    The TRINITY UNIVERSITY trademark is famous within the education community in the United States.

7.    <u>Defendant has adopted and used, without permission, the TRINITY UNIVERSITY mark, or a substantially similar mark,</u> for and in connection with the sale of diplomas, sweatshirts, jackets, T-shirts, athletic shirts, denim shirts, duffle bags, tote bags, pencils, coffee mugs, key chains and rings.

*Court finds.*

8.    Defendant's use of the name "TRINITY COLLEGE & UNIVERSITY" has created confusion in the market place.    On January 20, 2004, the Philadelphia Daily

2

News reported that a local charter-school promoter purchased a doctorate degree through the internet from a Trinity University in San Antonio, Texas. The next day, the Philadelphia Daily News posted a retraction, indication that the promoter had obtained the degree through the internet.

9.    TRINITY UNIVERSITY is a trademark and service mark for, among other things, educational services namely providing courses of instruction at the college level and towels and blankets, clipboards, notepads, notebooks, stationery, window stickers, bumper stickers, bookmarks, tote bags, athletic bags, drinking glasses, plastic cups, coffee mugs, t-shirts, sweat shirts, underpants, stockings, sweaters, jackets, suspenders, athletic shorts, night shirts, caps, hats, aprons, baby booties and cloth baby bibs owned by Trinity.

10.    Defendant's use of TRINITY COLLEGE & UNIVERSITY, which is confusingly similar to TRINITY UNIVERSITY has caused confusion to customers, and is likely to continue to cause confusion to customer. Defendant's use of TRINITY COLLEGE & UNIVERSITY is likely to confuse a significant number of customers into believing that Defendant, Defendant's products and/or Defendant's diplomas are sponsored by or are otherwise associated with Trinity, or that the party's products come from a common source.

*Court finds*

11.    Defendant's acts constitute infringement of Trinity's U.S. Trademark Registration Nos. 1,635,763, and 2,273,474, and trademark infringement under the common law.

12.    Trinity has been, and continues to be, damaged by such acts in a manner that cannot be fully measured or compensated in economic terms. Defendant's acts have

3

damaged, and threaten to continue damaging, Trinity's reputation and goodwill and put Trinity in a position where it cannot control its reputation and goodwill.

13.    Trinity's TRINITY UNIVERSITY trademark is famous in this judicial district and elsewhere throughout the United States to persons involved in educational services through substantially exclusive and continuous use in such industry.

14.    Defendant's acts, as alleged above, have resulted in a dilution of the distinctiveness of Trinity's TRINITY UNIVERSITY trademark, in violation of 15 U.S.C. § 1125(c).

15.    Trinity has been, and continues to be, damaged by such trademark dilution in a manner and amount that cannot be fully measured or compensated in economic terms.

16.    Defendant's acts constitute injury to the business reputation of Trinity and dilution of the distinctive quality of the TRINITY UNIVERSITY trademark registered under the Federal Trademark Act in violation of Texas Business & Commerce Code § 16.29.

17.    Defendant's acts have caused and will continue to cause Trinity monetary damages in an amount not presently capable of determination. Trinity has suffered irreparable harm and injury due to Defendant's actions and will continue to suffer irreparable harm and injury unless Defendant is enjoined from its unlawful activities. Trinity has no adequate remedy at law.

The Court is of the opinion and finds that Plaintiff Trinity University is entitled to ~~recover~~ injunctive relief against Trinity College and ~~joining~~ enjoining use of the mark TRINITY or any other word, symbol, phrase or term similar to TRINITY.

4

IT IS, THEREFORE, ORDERED that, subject to subsection (f) below, Defendant Trinity College & University, their agents, servants, employees and all persons or entities acting in connection or in concert with it, are permanently enjoined and restrained from

(a)  Using the word "Trinity" or any other word, symbol, phrase or term, similar to Trinity, in connection with the promotion, advertising or sale of any product or service associated with or related to educational services or products associated with educational services, including but not limited to diplomas, graduation invitations, towels and blankets, clipboards, notepads, notebooks, stationery, window stickers, bumper stickers, bookmarks, tote bags, athletic bags, drinking glasses, plastic cups, coffee mugs, t-shirts, sweat shirts, underpants, stockings, sweaters, jackets, suspenders, athletic shorts, night shirts, caps, hats, aprons, baby booties and cloth baby bibs;

(b)  Using the Marks defined above or any other word, symbol, phrase or term, similar to the Marks, in connection with the promotion, advertising or sale of any product or service associated with or related to educational services or products associated with educational services, including but not limited to diplomas, graduation invitations, towels and blankets, clipboards, notepads, notebooks, stationery, window stickers, bumper stickers, bookmarks, tote bags, athletic bags, drinking glasses, plastic cups, coffee mugs, t-shirts, sweat shirts, underpants, stockings, sweaters, jackets, suspenders, athletic shorts, night shirts, caps, hats, aprons, baby booties and cloth baby bibs;

(c)  Infringing Trinity University's registered Marks;

(d)  Using any name, phrase, symbol or term which is likely to dilute the distinctive or famous nature of the Marks;

(e)  Unfairly competing with Trinity University in any manner whatsoever; and

(f)  Trinity College may display the phrase "Formerly Trinity College & University" at the bottom of the homepage of the institution's website, adjacent to the institution's copyright and privacy notice, in seven-point font, for a period of six (6) months from the execution date of this Agreement, after which the phrase must be removed; any use of the phrase not specifically provided for in this subsection is prohibited. Trinity College further agrees to cease using the word or term "Trinity" in the institution's web address, and to refrain from using the word or term "Trinity" in any future web address.

*Can we find out, I think they caused the web address to go to Trinity University, backbox 2 s ??*

5

707048.1

000???

IT IS FURTHER, ORDERED ADJUDGED and DECREED that Trinity College & University shall deliver up for destruction and to destroy all products and promotional materials associated with educational services, including but not limited to diplomas, graduation invitations, towels and blankets, clipboards, notepads, notebooks, stationery, window stickers, bumper stickers, bookmarks, tote bags, athletic bags, drinking glasses, plastic cups, coffee mugs, t-shirts, sweat shirts, underpants, stockings, sweaters, jackets, suspenders, athletic shorts, night shirts, caps, hats, aprons, baby booties and cloth baby bibs that use the Marks, or use the word "Trinity" or any other word, symbol, phrase or term, similar to Trinity.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that all relief not expressly granted herein is denied.

Signed and ordered this _9th_ day of _November_ 2004.

_Royal Furger_
HONORABLE ORLANDO GARCIA
UNITED STATES DISTRICT JUDGE

6

000283

YOU COULD HAVE RECEIVED THIS NOTICE YESTERDAY BY FAX.

Just complete and return the authorization below and you will
receive notice of orders and judgments which do not require
special mailing requirements, within hours of their entry on
WESTERN DISTRICT OF TEXAS cases in which you would normally
be noticed.  It's FREE and it's FAST.  DO NOT SUBMIT MORE
THAN ONE AUTHORIZATION.  Allow 2 weeks to process.

M. Elizabeth Parks
Cox & Smith, Inc.
112 E. Pecan Street                                    NOV ' 3
Suite 1800
San Antonio, TX  78205


- - - - - - - - - - - - - - - - - - - -


5:04-cv-00313 #9
6 page(s)
11/12/04
tm

- - - - - - - - - - - - - - - - - - - -


AUTHORIZATION TO SEND ORDERS AND
JUDGMENTS BY FACSIMILE TRANSMISSION

The Clerk of Court for the Western District of Texas is authorized to
transmit notice of entries of judgments and orders under Fed.R.Civ.P. 77,
Fed.R.Crim.P. 49 by facsimile transmission in ANY WESTERN DISTRICT
OF TEXAS CASE in which this capability exists, and the undersigned
appears as attorney of record.  I understand that this electronic
notice will be in lieu of notice by mail.  The following telephone
number is dedicated for facsimile transmissions.

FAX NUMBER :_____    Firm Name _____

Signature: _____    Address: _____

Printed Name: _____          _____

State Bar No: _____  Phone No: _____

Mail to:   Clerk, Western District of Texas
           Attn: Operations/Quality Control
           727 E. Durango Blvd. - Suite A500
           San Antonio, TX  78206

Or Fax to: 210-472-6587, Attn: Operations/Quality Control

              Visit our website at: www.txwd.uscourts.gov


000224

# TROY UNIVERSITY™

**TROY UNIVERSITY**
UNIVERSITY RECORDS
TROY, ALABAMA 36082
(334)-670-3166

WARNING: THE BACK OF THIS DOCUMENT CONTAINS HEAT SENSITIVE INK. DO NOT ACCEPT IF NOT PRESENT.

06/15/06                          TROY University-Undergraduate                    Page 1

Virginia S. Hopper                                  ID Number: 0360263
200 Alpha Lane                                      SSN: 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
Deatsville AL 36022                                 GECE Taken: N

EXHIBIT
6
Hopper

## ISSUED TO STUDENT

| Course | Num | Sec | Title | | Grd R | Hrs Att | Hrs Cmpt | Grade Points |
|--------|-----|-----|-------|--|-------|---------|----------|--------------|

*******************************************************************
Troy State University Montgomery credit prior to TROY University Fall 2005 merger
*******************************************************************

ACT   291  WS    PRINCIPLES OF ACCOUNTING I        A       3.33   3.33  13.3334
                      98/SP Totals:    3.33        13.3334  GPA =  4.0000
                  Cumulative Totals:   3.33   3.33  13.3334  GPA =  4.0000
                  Institutional Totals: 3.33  3.33  13.3334  GPA =  4.0000

ACT   292  WS    PRINCIPLES OF ACCOUNTING I        A       3.33   3.33  13.3334
                      98/SU Totals:    3.33        13.3334  GPA =  4.0000
                  Cumulative Totals:   6.67   6.67  26.6668  GPA =  4.0000
                  Institutional Totals: 6.67  6.67  26.6668  GPA =  4.0000

ACT   394  AA    GOVERNMENTAL ACCOUNTING           B       3.33   3.33  10.0001
                      99/SU Totals:    3.33  3.33  10.0001  GPA =  3.0000
                  Cumulative Totals:  10.00 10.00  36.6669  GPA =  3.6667
                  Institutional Totals: 10.00 10.00 36.6669  GPA =  3.6667
                      Dean's Honor List

ACT   293  AA    MANAGERIAL ACCOUNTING             C       3.33   3.33   6.6667
CIS   140  AC    BASIC MICROCOMPUTING              A       2.00   2.00   8.0000
                      00/WN Totals:    5.33  5.33  14.6667  GPA =  2.7500
                  Cumulative Totals:  15.33 15.33  51.3336  GPA =  3.3478
                  Institutional Totals: 15.33 15.33 51.3336  GPA =  3.3478

ACT   3391 BAR   INTERMEDIATE ACCOUNTING I         A       3.00   3.00  12.0000
                      03/SP Totals:    3.00  3.00  12.0000  GPA =  4.0000
                  Cumulative Totals:  18.33 18.33  63.3336  GPA =  3.4545
                  Institutional Totals: 18.33 18.33 63.3336  GPA =  3.4545
                      Transcript Verified

CUMULATIVE TOT: CRED.ATT = 18.33 CRED.CPT = 18.33 GRD.PTS = 63.3336 GPA = 3.4545
                  Official copy must bear signature of the Registrar.

## ISSUED TO STUDENT

000235

*(signature: Vickie M. Miles)*

ISSUED TO STUDENT *(vertical, right margin)*

# TROY UNIVERSITY™

**TROY UNIVERSITY**
UNIVERSITY RECORDS
TROY, ALABAMA 36082
(334)-670-3166

WARNING: THE BACK OF THIS DOCUMENT CONTAINS HEAT SENSITIVE INK. DO NOT ACCEPT IF NOT PRESENT.

Page 2

ISSUED

TROY UNIVERSITY

ISSUED TO STUDENT

This transcript is printed on secured paper and does not require a raised seal.

RECEIVED

APR 14 2004

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____ DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| TRINITY UNIVERSITY, | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | §  **SA04CA0313  OG** |
| | §  Civil Action No. |
| TRINITY COLLEGE & UNIVERSITY, | § |
| | § |
| Defendant. | § |

## ORIGINAL COMPLAINT

Plaintiff, Trinity University ("Trinity"), files this Original Complaint seeking relief from Defendant, Trinity College & University.

## NATURE OF THE CASE

1. This is an action for injunctive relief, damages, and other relief based on Defendant's infringement and dilution of Trinity's registered trademark "TRINITY UNIVERSITY."

## JURISDICTION AND VENUE

2. The Court has jurisdiction over the infringement claim pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1338(a) (trademark case), and 28 U.S.C. § 1367 (diversity of citizenship). The Court has supplemental jurisdiction over the state trademark dilution claim pursuant to 28 U.S.C. § 1338(b). Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c), because a substantial part of the events giving rise to Trinity's claim occurred here.

661663.1

EXHIBIT

7

Hopper

000237

PENGAD 800-631-6889

## THE PARTIES

3.    Trinity is a non-profit corporation chartered under the laws of Texas, with its principal place of business at 715 Stadium Drive, San Antonio, Texas 78213.

4.    Defendant Trinity College & University is, upon information and belief, a registered corporation in Tortola, British Virgin Islands, with agent offices located worldwide. Defendant Trinity College & University engages and/or has engaged in business in Texas, but has not designated a resident agent for service of process in Texas and does not maintain a regular place of business in Texas.  This action arises out of Trinity College & University's business in Texas.  As such, pursuant to Tex. Civ. Prac. & Rem. Code §17.041 *et. seq*, Trinity College & University may be served with process through the Texas Secretary of State, which can forward a copy of the process by certified mail, return receipt requested, to Trinity College & University, 901 Veterans Blvd., Ste. #203, Metairie, Louisiana, 70005.

## FACTS COMMON TO ALL COUNTS

5.    Trinity is a nationally recognized liberal arts and sciences institution noted for its exceptional faculty and commitment to the comprehensive preparation of its student body.  Trinity has been ranked number one for ten consecutive years among colleges and universities that offer a full range of undergraduate and master level programs in the western part of the United States by *U. S. News & World Report*.

6.    Because of Trinity's reputation among educational services industry, and due to the many publications containing the TRINITY UNIVERSITY trademark that are sent to current and potential students of Trinity each year, the TRINITY UNIVERSITY trademark has become well known to its customers and to the general public.

7.    The TRINITY UNIVERSITY trademark is distinctive in the educational services industry, and has become synonymous with high-quality education.

8.    Trinity is the owner of United States Service Mark Registration No. 1,635,763 for TRINITY UNIVERSITY to identify educational services, namely providing courses of instruction

2

000238

at the college level. This Registration is valid, uncontestable under the provisions of section 15 of the Lanham Act, 15 U.S.C. §1065, and attached hereto as Exhibit 1, and by this reference is incorporated herein.

9.      Trinity is the owner of United States Trademark Registration No. 2,273,474 for TRINITY UNIVERSITY to identify towels and blankets, clipboards, notepads, notebooks, stationery, window stickers, bumper stickers, bookmarks, tote bags, athletic bags, drinking glasses, plastic cups, coffee mugs, t-shirts, sweat shirts, underpants, stockings, sweaters, jackets, suspenders, athletic shorts, night shirts, caps, hats, aprons, baby booties and cloth baby bibs. This Registration is valid, uncontestable, and attached hereto as Exhibit 2, and by this reference is incorporated herein.

10.     The TRINITY UNIVERSITY trademark is famous within the education community in the United States.

11.     Defendant has adopted and used, and continues to use, without permission, the TRINITY UNIVERSITY mark, or a substantially similar mark, for and in connection with the sale of diplomas, sweatshirts, jackets, T-shirts, athletic shirts, denim shirts, duffle bags, tote bags, pencils, coffee mugs, key chains and rings. Copies of the web pages depicting Defendant's products are attached hereto as Exhibit 3, and are incorporated herein by reference.

12.     In an attempt to resolve this matter amicably, Mr. Craig McCoy, Vice President for Fiscal Affairs of Trinity, contacted Trinity College & University through the email provided on the Trinity College & University website, requesting that they cease using the Trinity College and University mark, or any other mark similar and likely to cause confusion with the TRINITY UNIVERSITY mark. Trinity College & University refused to cease using the Trinity mark.

13.     In order to protect the property rights of Trinity, Mr. McCoy retained counsel to facilitate a resolution to this matter. Counsel for Trinity has contacted Trinity College & University and informed them of Trinity's rights to the marks and demanded that they cease to use the marks.

14.    The requests were ignored and Trinity College & University continues to infringe on Trinity's trademark rights by providing products for sale using the Trinity mark, or a substantially similar mark.

15.    On information and belief, Defendant chose "TRINITY COLLEGE & UNIVERSITY," and has continued to use "TRINITY COLLEGE & UNIVERSITY" for such graduation products with full knowledge of Trinity's use and rights in the trademark TRINITY UNIVERSITY.

16.    Defendant's use of the name "TRINITY COLLEGE & UNIVERSITY" has created confusion in the market place.  On January 20, 2004, the Philadelphia Daily News reported that a local charter-school promoter purchased a doctorate degree through the internet from a Trinity University in San Antonio, Texas.  The next day, the Philadelphia Daily News posted a retraction, indication that the promoter had obtained the degree through the internet.  A true and correct copy of the web pages posting this article and retraction is attached hereto as Exhibit 4.

### FIRST CAUSE OF ACTION
### TRADEMARK INFRINGEMENT

17.    Trinity realleges each of the allegations in Paragraphs 1-16 above as though fully set forth herein.

18.    TRINITY UNIVERSITY is a trademark and service mark for, among other things, educational services namely providing courses of instruction at the college level and towels and blankets, clipboards, notepads, notebooks, stationery, window stickers, bumper stickers, bookmarks, tote bags, athletic bags, drinking glasses, plastic cups, coffee mugs, t-shirts, sweat shirts, underpants, stockings, sweaters, jackets, suspenders, athletic shorts, night shirts, caps, hats, aprons, baby booties and cloth baby bibs owned by Trinity.

19.    Defendant's use of TRINITY COLLEGE & UNIVERSITY, which is confusingly similar to TRINITY UNIVERSITY has caused confusion to customers, and is likely to continue to cause confusion to customer.  Defendant's use of TRINITY COLLEGE & UNIVERSITY is

4

000240

likely to confuse a significant number of customers into believing that Defendant, Defendant's products and/or Defendant's diplomas are sponsored by or are otherwise associated with Trinity, or that the party's products come from a common source.

20.    Defendant's acts constitute infringement of Trinity's U.S. Trademark Registration Nos. 1,635,763, and 2,273,474, and trademark infringement under the common law.

21.    Defendant knew of Trinity's rights in and to the TRINITY UNIVERSITY trademark, but has refused to cease its infringing activities.    Defendant's use of the mark TRINITY UNIVERSITY in violation of Trinity's rights has been knowing, willful and deliberate, making this an exceptional case within the meaning of 15 U.S.C. § 1117.

22.    Trinity has been, and continues to be, damaged by such acts in a manner that cannot be fully measured or compensated in economic terms.    Defendant's acts have damaged, and threaten to continue damaging, Trinity's reputation and goodwill and put Trinity in a position where it cannot control its reputation and goodwill.

## SECOND CAUSE OF ACTION
## FEDERAL TRADEMARK DILUTION

23.    Trinity realleges each of the allegations in Paragraphs 1-22 above as though fully set forth herein.

24.    Trinity's TRINITY UNIVERSITY trademark is famous in this judicial district and elsewhere throughout the United States to persons involved in educational services through substantially exclusive and continuous use in such industry.

25.    Defendant's acts, as alleged above, have resulted in a dilution of the distinctiveness of Trinity's TRINITY UNIVERSITY trademark, in violation of 15 U.S.C. § 1125(c).

26.    Trinity has been, and continues to be, damaged by such trademark dilution in a manner and amount that cannot be fully measured or compensated in economic terms.

681663.1

000241

## THIRD CAUSE OF ACTION
## TEXAS TRADEMARK DILUTION

27.     Trinity realleges each of the allegations in Paragraphs 1-26 above as though fully set forth herein.

28.     Defendant's acts constitute injury to the business reputation of Trinity and dilution of the distinctive quality of the TRINITY UNIVERSITY trademark registered under the Federal Trademark Act in violation of Texas Business & Commerce Code § 16.29.

29.     Defendant's acts have caused and will continue to cause Trinity monetary damages in an amount not presently capable of determination.  Trinity has suffered irreparable harm and injury due to Defendant's actions and will continue to suffer irreparable harm and injury unless Defendant is enjoined from its unlawful activities.   Trinity has no adequate remedy at law. Accordingly, Trinity seeks permanent injunctive relief against Defendant with respect to any further promotion, distribution or sale of products through use of the TRINITY UNIVERSITY mark, as described above.

## JURY DEMAND

30.     Trinity requests a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Trinity prays for judgment against Defendant as follows:

1.     That Defendant and its officers, agents, servants, employees and all persons in active concert or participation with them, be enjoined and restrained during the pendency of this action and perpetually from:

> (a)     Using the term "Trinity" or any other word, symbol, phrase or term, similar to Trinity's trademarks TRINITY UNIVERSITY, in connection with the promotion, advertising or sale of any product or service associated with or related to educational services or products, unless expressly authorized by Trinity;

661663.1

000242

(b)    Infringing Trinity's registered TRINITY UNIVERSITY trademark;

(c)    Using any name, phrase, symbol or term which is likely to dilute the distinctive or famous nature of Trinity's TRINITY UNIVERSITY trademark; and

2.    A report in writing and under oath, setting forth in detail the manner in which Defendant has complied with the injunction;

3.    That Defendant be required to pay to Trinity such damages as Trinity has sustained or will sustain in consequence of Trinity College & University's unlawful acts and to account for all gains, profits and advantages derived by Trinity College & University's attributable to such acts;

4.    That Defendant be required to deliver up for destruction and to destroy all diplomas, sweatshirts, jackets, T-shirts, athletic shirts, denim shirts, duffle bags, tote bags, pencils, coffee mugs, key chains and rings and the like bearing the mark TRINITY UNIVERSITY.

4.    That the award of damages, gains and/or profits be increased, as provided by 15 U.S.C. § 11.17, or as otherwise provided by law;

5.    That Defendant be ordered to pay over to Trinity the costs of this action, including reasonable attorneys' fees, costs, and interest, as provided by 15 U.S.C. § 1117, or as otherwise provided by law; and

6.    That Defendant be required to pay Trinity monetary damages suffered as a result of common law trademark infringement, dilution and exemplary damages due to the malicious, fraudulent, deliberate and/or willful nature of Defendant's acts.

000243

661663.1

7.    That Trinity has such other further relief as this Court may deem just and proper.

Respectfully submitted,

COX & SMITH INCORPORATED
112 E. Pecan Street, Suite 1800
San Antonio, Texas 78205
(210) 554-5500
(210) 226-8395 (Fax)

By: _____

    J. Daniel Harkins
    State Bar No. 09008990
    M. Elizabeth Parks
    State Bar No. 24027594

ATTORNEYS FOR PLAINTIFF,
TRINITY UNIVERSITY

661663.1

000244

Int. Cl.: 41

Prior U.S. Cl.: 107

**United States Patent and Trademark Office**

Reg. No. 1,635,763
Registered Feb. 19, 1991

## SERVICE MARK
### PRINCIPAL REGISTER

## TRINITY UNIVERSITY

TRINITY UNIVERSITY (TEXAS NON-PROFIT CORPORATION)
715 STADIUM DRIVE
SAN ANTONIO, TX 78212

FOR: EDUCATIONAL SERVICES, NAMELY PROVIDING COURSES OF INSTRUCTION AT THE COLLEGE LEVEL, IN CLASS 41 (U.S. CL. 107).

FIRST USE 8-13-1870; IN COMMERCE 8-13-1870.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "UNIVERSITY", APART FROM THE MARK AS SHOWN.

SER. NO. 74-036,651, FILED 3-9-1990.

DAVID CHO, EXAMINING ATTORNEY

# EXHIBIT 1

Int. Cls.: 16, 18, 21, 24 and 25

Prior U.S. Cls.: 1, 2, 3, 5, 13, 22, 23, 29, 30, 33,
37, 38, 39, 40, 41, 42 and 50

Reg. No. 2,273,474

## United States Patent and Trademark Office

Registered Aug. 31, 1999

## TRADEMARK
### PRINCIPAL REGISTER

## TRINITY UNIVERSITY

TRINITY UNIVERSITY (TEXAS NON-PROFIT
CORPORATION)
715 STADIUM DRIVE
SAN ANTONIO, TX 78212

FOR: CLIP BOARDS, NOTEPADS, NOTE-
BOOKS, STATIONERY, WINDOW STICKERS,
BUMPER STICKERS, AND BOOKMARKS, IN
CLASS 16 (U.S. CLS. 2, 5, 22, 23, 29, 37, 38 AND
50).
FIRST USE 5-0-1971; IN COMMERCE
5-0-1971.
FOR: TOTE BAGS AND ATHLETIC BAGS,
IN CLASS 18 (U.S. CLS. 1, 2, 3, 22 AND 41).
FIRST USE 5-0-1971; IN COMMERCE
5-0-1971.
FOR: DRINKING GLASSES, PLASTIC CUPS,
AND COFFEE MUGS, IN CLASS 21 (U.S. CLS. 2,
13, 23, 29, 30, 33, 40 AND 50).
FIRST USE 5-0-1971; IN COMMERCE
5-0-1971.

FOR: TOWELS AND BLANKETS, IN CLASS
24 (U.S. CLS. 42 AND 50).
FIRST USE 5-0-1971; IN COMMERCE
5-0-1971.
FOR: T-SHIRTS, SWEAT SHIRTS, UNDER-
PANTS, STOCKINGS, SWEATERS, JACKETS,
SUSPENDERS, ATHLETIC SHORTS, NIGHT
SHIRTS, CAPS, HATS, APRONS, BABY BOO-
TIES AND CLOTH BABY BIBS, IN CLASS 25
(U.S. CLS. 22 AND 39).
FIRST USE 5-0-1971; IN COMMERCE
5-0-1971.
OWNER OF U.S. REG. NOS. 1,635,763,
1,635,765, AND 1,642,057.

SER. NO. 75-365,924, FILED 9-30-1997.

GEORGE POLOGEORGIS, EXAMINING AT-
TORNEY

## EXHIBIT 2



**ONLINE STORE**

**Half-Zip Chill Fleece**

Trinity
achie
wanted

polyester, no-pull ultra-soft Chill Fleece,
pullover styling with set-in sleeves,
half zipper zips to top of collar, logoed zipper
pull, black lycra binding trim on cuffs and
bottom, two front seam pockets, machine
washable

**Price: $48.00** item #: S-001, M-002, L-003, XL-
004, 2XL-005

*Click on image to view
larger*

Click Here to Order

**SWEAT SHIRT**



**Fruit of the Loom**

sizes: S-2XL

**12 Ounce Supercotton Set-in Sleeve
Sweatshirt**

90% cotton, 10% polyester, 12 ounce, preshrunk,
double-needle cover stitched seams, seamless
cotton rib collar, rib cuffs and waistband with
Lycra, extra length and width specifications for a
full cut and loose fit

**Price: $38.00** item #: S-006, M-007, L-008, XL-
009, 2XL-010

*Click on image to view
larger*

Click Here to Order

**TEE-SHIRT**



**Fruit of the Loom Lofteez**

sizes: S-4XL

**EXHIBIT 3**

000247

Trinity College and University

Toll Free (866) 831-4854
Email (for verifications): degreehelp@trinity-college.edu
Fax (for verifications - toll free): 1-866-831-4857

Page 1 of 1



PENGAD 800-631-6989

EXHIBIT

2

Hopper

Trinity College and University

College credit is NOT and shall NEVER be offered for life experience. There is
not one credible authority in the world that will disagree with this statement,
although so-called 'opportunities' to gain a 'degree' from this method are
readily available through internet sources. At Trinity College and University,
we do not offer "credit for experience" and never will. Such offers should be
taken at your own risk.

Page 1 of 1

Trinity College and University

Page 1 of 1

We do not award college credit for experience and this must be made clear. Professional educators worldwide agree that 'life experience' in and of itself is NOT worthy of college credit. Whatever you do, you must understand this, so that you can explain it to others. What PLA is concerned with is learning, regardless of how it was obtained. We assess the information furnished and gathered, to determine the level of your skills, knowledge and competence that you acquired from your work experience, your voluntary activities, your avocation, your military service, your homemaking experience and knowledge from independent study. In brief, we analyze your "experiential learning" and this term describes legitimately most of the learning that occurs in our lives.

Trinity College and University

We use the term "experiential learning" as the term applies to all learning received in our lives. All assessments of your experiential prior learning are prepared by professionals knowledgeable in PLA assessments and reviewed and supervised by educators holding Certification from a university program approved in PLA by the U.S. Department of Education.

Experiential learning is traced to early references, as early as the second century B.C. in China and given credence by philosophers John Dewey and Piaget. During our assessment, we focus on your accomplishments and knowledge and how they relate to academic standards set for college course work. When our assessment concludes that the knowledge gained through experiential learning equates to the learning that is expected from college courses, then the assessment results in college credit for you.

000251

Trinity College and University

## Verifications

By earning a college degree or certificate from us, you demonstrate that your experiential learning from work or volunteer activities, the military, business seminars, professional workplace training, and independent study are accepted as equivalent to the knowledge gained by students attending classes in the traditional method. You have a Degree, our Letter of Recommendation, a Student Record and a verifiable source for checking by employers or others.

Page 1 of 1

Trinity College and University

**can my boss verify my degree and the date that I received it?**

A. Yes. Anyone authorized by you in writing, may confirm the degree awarded and the date. All requests must be in writing, in order to protect your privacy.

Page 1 of 1

Trinity College and University

**What percentage of applicants actually gain a college degree from assessing their prior learning and academic background from their application?**

A. Less than three percent.

Page 1 of 1

000254

# TRINITY
## COLLEGE & UNIVERSITY

HOME | TRINITY FASTTRACK | AVAILABLE DEGREES | TRINITY CAREERS | CONTACT US | TRINITY STORE

Getting Started

How to Apply

Fees

Credit For Prior Learning

About Us

Memberships and Accreditations

Frequently Asked Questions

© 1999-2004 by Trinity College & University. Please read our **Privacy Notice**

# MEMBERSHIP AND
# ACCREDITATIONS

Trinity College and University and their associates support efforts worldwide of educators that strive to improve delivery and content of education this century.

Trinity College & University has been approved by the Association of Private Colleges and Universities, and is Accredited by the **Association for Online Academic Excellence.**

Trinity helped me achieve all I ever wanted. Thank You, Trinity.

PENGAD 800-631-6989

EXHIBIT
9
Hefner

000255

# TRINITY COLLEGE & UNIVERSITY



**Price $1.00**
Item#: LP-033

**Price $6.00**
Item#: CM-034

**Price $1.00**
Item#: KC-035



**Price $3.00**
Item#: T-036

**Price $42.00**
Item#: G-037



**Price $42.00**
Item#: D020

**Price $15.00**
Item#: TW010



**Price $40.00**
Item#: T009

600 Denier polyester fabric 23 1/2 x 15 1/2 x 6, extremely durable and eater-resistant with inside pvc coating, one outside pocket, contrasting color bottom and extra long self fabric handles reinforced seams and stress points.

Duffel: 420 Denier Body and Rubberized bottom with water resistant PVC coating 23 1/4" x 11 1/4" x 11 1/4", mesh water bottle pocket, shoe/wet pocket with hard-wire mesh for ventilation, adjustable/detachable shoulder strap with sport pad, sport zipper pulls, black trim.

Towel: 100% Cotton, 30" x 60", sheared woven terry.



**Price $279.00**
Item#: R-38

**Price $299.00**
Item#: R-39

10k gold ring with a royal blue stone and a "Trinity College" imprint.



EXHIBIT
10
Hopper
PENGAD 800-631-6989



**Price $38.00**
Item#: S-006, M-007, L-008, XL-009, 2XL-010

Fruit of the Loom
Sizes S-2XL
12 Ounce Supercotton
Set-In Sleeve Sweatshirt
90% cotton, 10% polyester, 12 ounce, preshrunk,
double needle cover stitched seams, seamless
cotton rib collar, rib cuffs and waistband with Lycra,
extra length and width specifications for a full cut and loose fit.



**Price $34.00**
Item#: S-023, M-024, L-025, XL-026, 2XL-027, 3XL-028

Sizes: S-3XL
100% cotton, 7 ounce, pique knit, two button clean
finished placket, clear buttons, contoured welt knit
collar and cuffs, taped neck with reinforced stitching,
double-needle hem



**Price $18.00**
Item#: S-011, M-012, L-003, XL-014, 2XL-015, 3XL-016, 4XL-017

Fruit of the Loom Lofteez
Sizes S-4XL
100% cotton, 6 ounce,
jersey knit, preshrunk, double needle stitching in neck,
armholes, sleeves, and bottom hem, European cut armholes,
set-in seamless collarette, oversized cut, shoulder to shoulder
taping, softer hand.



**Price $48.00**
Item#: S-001, M-002, L-003, XL-004, 2XL-005

Sizes: S-3XL
100% polyester, no-pull ultra-soft Chill Fleece, 7.8 ounce,
pullover styling with set-in sleeves, half zipper zips to top
of collar, logoed zipper pull, black lycra binding trim on
cuffs and bottom, two front seam pockets, machine washable.



**Price $38.00**
Item#: S-018, M-019, L-020, XL-021, 2XL-022

Fruit of the Loom Lofteez
Sizes S-4XL
100% cotton, 6.5 ounce,
double needle cover stitching, button down collar, left chest
button-through pocket, three button cuff, woodtone buttons.



**Price $7.00**
Sizes: XS-L
Item#: XS-029, S-030, M-031, L-032

**Price $5.00**

000257

STATE OF ALABAMA
## DEPARTMENT OF FINANCE
OFFICE OF PERSONNEL
64 North Union Street, Suite 200A
Montgomery, Alabama 36130-2630
Telephone: (334) 242-3199
Fax: (334) 353-0868

BOB RILEY
Governor

JAMES ALLEN MAIN
Director of Finance

RACHEL DICKINSON
Acting Division Director

January 4, 2006

MEMORANDUM

TO:        VIRGINIA S HOPPER
           CONTROLS & ACCOUNTS

FROM:      Tina Russell
           Personnel Assistant

SUBJECT:   Annual Raise – January

The Finance Director has approved the Annual Raise List for September, 2006.

Based on your latest Employee Performance Rating you will receive a 02 step salary increase effective January 07, 2006

Your biweekly rate of pay will increase to $1,633.00 and will be reflected in the pay warrant you receive on February 03, 2006.

PPB



**EXHIBIT**

11

Hopper

PENGAD 800-631-6989

000255

**Form 13**
**Revised (06/2005)**

## EMPLOYEE PERFORMANCE *APPRAISAL*
### STATE OF ALABAMA
### Personnel Department

Employee Name: <u>VIRGINIA S HOPPER</u>

Agency: <u>010/FINANCE</u>

Classification: <u>ACCOUNTANT</u>

Period Covered From: <u>11/01/2004</u> To: <u>11/01/2005</u>

Social Security Number: <u>423 -74 -4190</u>

Division: <u>103A/CONTROLS & ACCOUNTS</u>

Class Code: <u>10611</u> Position #: <u>01638102</u>

Annual Raise Effective: <u>JANUARY 2006</u>

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed. Signatures denote supervisor and employee discussion and receipt of form. Employee signature does not denote agreement. All signatures are mandatory.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN 422 - 74 - 2868 | | SSN 421 - 78 - 1172 |
| *Jeanne C. Bracken* | *Virginia Hopper* | *William M. Reel* |
| Rater Signature | Employee Signature | Reviewer Signature |
| 10/21/05 | 10/21/2005 | 10-25-05 |
| Date | Date | Date |
| JCB | | |
| Initial if comments attached | Initial if comments attached | Initial if comments attached |

---

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score. Mandatory documentation is to be maintained in the agency's personnel files if a "Does Not Meet" or "Consistently Exceeds" rating is given.

| 37 | - | – 0 – | = | 37 |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

This employee's work:

| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 - 26.6) | Exceeds Standards (26.7 - 36.6) | Consistently Exceeds Standards (36.7 - 40) |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☒ x |

---

**WORK HABITS:** Check the appropriate space for each Work Habit area. Work Habits pertain to conduct occurring in this Appraisal period. Provide an explanation below for marking any work habit as "Unsatisfactory." Attach additional sheets if necessary.

| | Unsatisfactory | Satisfactory | |
|---|---|---|---|
| Attendance | | X | |
| Punctuality | | X | |
| Cooperation with Coworkers | | X | |
| Compliance with Rules | | X | |

000259

JUSTIFICATION
OF PERFORMANCE RATING
FOR VIRGINIA S. HOPPER
October 21, 2005

Virginia S. Hopper is being rated in the "Consistently Exceeds Standards" category on the attached Employee Performance Appraisal.  Her work during this period has been excellent and she routinely handles the daily activities of her position in an exemplary manner.  Her efforts exceed the requirements of her job, and the tasks she has performed have been done in a manner that consistently exceeds the established standards.  Her cooperative attitude, her willingness to help other employees as well as her display of initiative are qualities which an exceptional employee displays.  She therefore deserves to receive the rating she has been given on the performance appraisal.



STATE OF ALABAMA

# DEPARTMENT OF FINANCE

OFFICE OF PERSONNEL

64 NORTH UNION STREET, SUITE 200A

Montgomery, Alabama 36130-2630

Telephone (334) 242-3199

Fax (334) 353-0868

MARSHA MANNING
Acting Division Director

BOB RILEY
Governor

JAMES ALLEN MAIN
Director of Finance

## M E M O R A N D U M

January 12, 2005

TO:     Virginia S. Hopper
        Control & Accounts

FROM:   Tina Russell *Russell*

SUBJECT:  Probationary Salary Increase

On December 25, 2004, you completed the required six-month probationary period. Effective January 8, 2005, you received a probationary increase to $1,467.80 biweekly. This increase will be reflected in your salary warrant received on February 4, 2005.

cc:  Finance Accounting

000261

**Form 13F     EMPLOYEE PROBATIONARY PERFORMANCE APPRAISAL**
Revised (1/15/2003)
### STATE OF ALABAMA
### Personnel Department

Employee Name: _VIRGINIA C HOPPER_     Social Security Number: _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_

Agency: _CONFERENCE_     Division: _COMPTROLLER G S ACCOUNTS_

Classification: _SECRETARY_     Class Code: _10511_

Period Covered From: _04/08/2004_ To: _12-07 2004_     Position Number: _1523100_

---

***APPRAISAL SIGNATURES:*** Signatures are to be provided after the form has been completed. All signatures are required. Employee's signature denotes discussion not agreement.

SSN _422 - 74 - 2868_    Signature *Jeanne C. Bracken*    _11-22-04_ *JCB*
RATING SUPERVISOR                  Date / Initial if comments are attached

*Virginia Hopper*    _11-22-04_
EMPLOYEE Signature        Date / Initial if comments are attached

SSN _421-78 - 1172_    Signature *William McReel*    _11-22-04_
REVIEWING SUPERVISOR            Date / Initial if comments are attached

It is recommended that the employee be:
___ Continued probationally in the position named (reason stated in Disciplinary Actions area)
_X_ Given permanent status in the position. Probationary increase to $ _1,467.80_ Step _10_ Effective _1/8/05_
___ Terminated before the end of the probationary period (reason stated in Disciplinary Actions Area)

*James Allen Main* aus      _11/30/04_
APPOINTING AUTHORITY Signature          Date

---

***PROBATIONARY PERFORMANCE APPRAISAL SCORE:*** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Probationary Performance Appraisal Score.

| 37 | − | −0− | = | 37 |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Probationary Performance Appraisal Score |

This employee's work:

| ☐ | ☐ | ☐ | ☐ | ☒ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards (36.7 – 40) |

---

***WORK HABITS :*** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the probationary period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

|  | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

NOV 2004 RECEIVED ...Personnel... Department

000262

***RESPONSIBILITIES:*** List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this probationary period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| *Responsibility* | *Rating* |
|---|---|
| 1.    AUDITS | 3 |
| 2.    RECORDS | 4 |
| 3.    PROCESSES | 4 |
| 4.    VERIFIES | 4 |
| 5.    ENTERS | 3 |
| 6.    REVIEWS | 4 |
| 7.    MAINTAINS | 4 |
| 8.    COMMUNICATES | 4 |
| 9.    ASSISTS | 4 |
| 10.    AIDS | 3 |

***RESPONSIBILITY SCORE:***

| 37 | ÷ | 10 | = | 3.7 | x | 10 | = | 37 |
|---|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

***DISCIPLINARY ACTIONS:*** Any disciplinary action taken with the employee during this probationary period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

_____

_____

_____

_____

***DISCIPLINARY SCORE:*** This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings. Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this probationary period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE: __________

000263

JUSTIFICATION
OF PERFORMANCE RATING FOR
VIRGINIA S. HOPPER
November 22, 2004


Virginia S. Hopper is being rated in the "Consistently Exceeds Standards" category on the attached Probationary Performance Appraisal. Her work during the probationary period has been excellent. Mrs. Hopper handles the daily activities of her job in a very expedient and professional manner. Her cooperative attitude, her willingness to help other employees and her initiative are qualities of an exceptional employee. She deserves to be rated as such on this appraisal.



NOV 2004
RECEIVED
Office of Personnel
Department of
Finance

000264

**Form 13P**                        **EMPLOYEE PERFORMANCE APPRAISAL**
Revised (1/1/1998)                            STATE OF ALABAMA
                                            Personnel Department

### *PREAPPRAISAL*

Employee Name: __VIRGINIA S HOPPER__                Social Security Number: __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__

Agency: __010/FINANCE__                    Division: __1030/CONTROLS & ACCOUNTS__

Classification: __ACCOUNTANT__                    Class Code: __10811__

Period Covered From: __12 26 04__  To: __10 1 05__

---

**RESPONSIBILITIES/RESULTS:** Responsibilities and results on which an employee will be rated should be listed below. These areas should be discussed with the employee during the Preappraisal session at the beginning of each appraisal year. Please refer to the Performance Appraisal Manual for instruction on how to develop responsibilities and results.

### RESPONSIBILITIES/RESULTS

A)  Audits various claims for deaf/foreign language interpreters, American Legion/UDC Scholarships, and mental commitments within 7 days of receipt of claim to determine they are legal and proper with no valid complaints to supervisor.

B)  Records miscellaneous refund payments received and prepares checks for deposit to the State Treasury following established procedures with no valid complaints to supervisor.

C)  Processes vouchers for deaf/foreign language interpreters, American Legion/UDC Scholarships, and other miscellaneous payments into the AFNS "E" region and CAS(State's Central Accounting System) with no valid delays in payments reported to supervisor.

D)  Verifies warrant amounts, posts warrant data and mails payments to vendors no later than on day following the date of issuance with no valid complaints to supervisor.

E)  Enters/processes Requests for Cash Transfers from departments into CAS, Interfund Cash Transfer System, on a daily basis after approval of supervisor.

F)  Reviews & processes Requests for Electronic Warrants from departments in CAS on a daily basis and balances with Treasurer's Office with no valid complaints to supervisor.

G)  Maintains files for vouchers, cash transfers, and electronic warrants so that accurate records may be accessed regularly with no loss of time because files cannot be located with no valid complaints to supervisor.

H)  Communicates with staff and other public officials such that responses are completed to inquiries within specified timeframes and in a professional and courteous manner with no valid complaints to supervisor.

I)  Assists administrative staff and other co-workers with miscellaneous tasks in order to ensure that the office functions in an efficient manner with no occasion of valid complaint to supervisor.

J)  Aids in processing end of fiscal year accounts payable journal vouchers ensuring that data is correct and proper with no valid complaints to supervisor.

000265

**WORK HABITS:**   Provide a check in the appropriate space when the policies and procedures concerning the following areas have been discussed with the employee.  In particular, the attendance and punctuality policies should be provided to the employee in writing.  For instructions, refer to the performance appraisal manual and policies of the agency.

CHECK IF DISCUSSED:

✓ _____   Attendance

✓ _____   Punctuality

✓ _____   Cooperation with Coworkers

✓ _____   Compliance with Rules

**PREAPPRAISAL SIGNATURES:** Date of Session: _____11/22/04_____

Employee Signature: *Virginia Hopper*

Rater Signature: *Jeanne C. Brackin*

Reviewer Signature: *William McKell*

## MIDAPPRAISAL

Describe the employee's performance strength(s) as observed during the first half of the appraisal period.

Mrs. Hopper is very knowledgable of accounting principles and procedures and has gained substantial knowledge of the state's accounting system.  She shows initiative in recommending improvements and solving problems with regards to her work.  She also has considerable experience with personal computers.

Describe area(s) of the employee's performance that need improvement as observed during the first half of the appraisal period.

_____

_____

_____

_____

Document the action plan that has been discussed to improve the areas of weakness.

_____

_____

_____

000266

A midappraisal has been held and performance has been discussed:

Date: _____
Employee Signature: *Virginia Hopper*          Rater Signature: *Jeanne C. Brackin*

OFFICE OF THE GOVERNOR



JAMES ALLEN MAIN
DIRECTOR OF FINANCE

BOB RILEY
GOVERNOR

(334) 242-7160
FAX: (334) 353-3300

**STATE OF ALABAMA**

STATE CAPITOL
MONTGOMERY, ALABAMA 36130

October 4, 2004

Virginia Hopper
Dept. of Finance - Office of the State Comptroller
100 North Union Street, Suite 220
Montgomery, Alabama 36130-2602

Dear Virginia,

I wanted to send you my personal note of appreciation for your dedication and unwavering commitment to your work even during the adverse conditions posed by Hurricane Ivan. I appreciate the fact that you recognized that you perform a duty essential to the workings of this state. For this, I am truly grateful.

Very truly yours,

James Allen Main
Director of Finance

JAM/dsn

cc:  Personnel File



BOB RILEY
Governor

STATE OF ALABAMA
DEPARTMENT OF FINANCE
OFFICE OF PERSONNEL
64 North Union Street, Suite 200A
Montgomery, Alabama 36130-2630
Telephone: (334) 242-3199
Fax: (334) 353-0868

JAMES ALLEN MAIN
Director of Finance

July 2, 2004

MARSHA MANNING
Acting Division Director

M E M O R A N D U M

TO: Virginia S. Hopper
Control & Accounts

FROM: Gena Fulmer
Finance Personnel

SUBJECT: Appointment

Effective June 26, 2004, you were appointed to the classification of Accountant
(10611) at the salary of $1,398.00 biweekly. You will receive your first check at this
rate July 23, 2004.

You are required to serve a six months probationary period.

Congratulations on your appointment.

cc: Bob Childree
Accounting and Administration
Personnel File



**STATE OF ALABAMA**
**DEPARTMENT OF FINANCE**
**OFFICE OF THE STATE COMPTROLLER**
RSA UNION
100 North Union Street, Suite 220
Montgomery, Alabama 36130-2602
Telephone (334) 242-7050
FAX (334) 242-2440

BOB RILEY
Governor

DRAYTON NABERS, JR.
Director of Finance

ROBERT L. CHILDREE
State Comptroller

May 28, 2004

M E M O R A N D U M

TO:        Drayton Nabers, Jr.
           Director of Finance

THROUGH:   Bill Newton
           Assistant Director of Finance

FROM:      Robert L. Childree
           State Comptroller

SUBJET:    Promotion of Virginia Hopper

    Attached is a memo from Jeanne Brackin, Supervisor of Fiscal Management in my office requesting consideration regarding promotion of Virginia Hopper. I have reviewed her request and concur with the recommendation. It is my opinion that Virginia has accepted new and more difficult job tasks, performed them in an exemplary manner and that her job duties have become those of an entry level accountant.

    Therefore, I am requesting that Virginia Hopper be promoted to the position of "Accountant" and that the required personnel actions be approved to accomplish that. This action will not result in additional budget requirements and will insure that the Finance Department retain a very valuable employee.

    Thank you for your favorable consideration of this request.

RLC/sgb

000269



**BOB RILEY**
Governor

DRAYTON NABERS, JR
Director of Finance

# STATE OF ALABAMA
## DEPARTMENT OF FINANCE
### OFFICE OF THE STATE COMPTROLLER
RSA UNION
100 North Union Street, Suite 220
Montgomery, Alabama 36130-2602
Telephone (334) 242-7050
FAX (334) 242-2440

ROBERT L. CHILDREE
State Comptroller

May 24, 2004

**M E M O R A N D U M**

TO:         Robert L. Childree
            State Comptroller

FROM:       Jeanne Brackin
            Fiscal Management Supervisor

SUBJECT:    Promotion for Virginia Hopper

I would like to recommend that Virginia S. Hopper's position be
upgraded to an Accountant I and she be promoted. Virginia is on
the Accountant I register and she has received inquiries about
job openings. I feel she already performs her job in a manner
that far exceeds the requirements of an Accounting Technician and
she has the knowledge and abilities that warrant this promotion.

Gloria Marchant of our office retired about a year ago and I have
not been allowed to replace the Account Clerk position. As a
result, Virginia has absorbed several of the Account Clerk's
duties for the past year, as well as performing the duties of her
Accounting Technician position. Virginia's cooperative attitude,
her willingness to help, and her display of initiative are
qualities of an exceptional and valuable employee of the Finance
Department and is much deserving of a promotion to Accountant I.

Let me know if there is anything that I can do to help expedite
this promotion for Virginia.

JB/jb

000270

Form 13
Revised (1/1/1999)

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
### Personnel Department

Number
of Steps

Employee Name: VIRGINIA S HOPPER

Social Security Number: 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

Agency: 010/FINANCE

Division: 103A/CONTROLS & ACCOUNTS

Classification: ACCOUNTING TECHNICIAN

Class Code: 10605

Period Covered From: 06/01/2003    To: 06/01/2004

Annual Raise Effective: AUGUST 2004

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN 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 | | SSN 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 |
| Jeanne C. Brackin | Virginia S. Hopper | William M. Reed |
| Signature | Signature | Signature |
| 5-13-04 | 05/13/2004 | 5-13-04 |
| Date | Date | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

| 37 | − | 0 | = | 37 |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

This employee's work:

| □ Does Not Meet Standards (6.6 or below) | □ Partially Meets Standards (6.7 – 16.6) | □ Meets Standards (16.7 – 26.6) | □ Exceeds Standards (26.7 – 36.6) | XX Consistently Exceeds Standards (36.7 – 40) |
|---|---|---|---|---|

**WORK HABITS :** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | XX | □ |
| Punctuality | XX | □ |
| Cooperation with Coworkers | XX | □ |
| Compliance with Rules | XX | □ |

000271

RESPONSIBILITIES: Review each of the employee's responsibilities below as documented or and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| Responsibility | | Rating |
|---|---|---|
| 1. | Audits | 3 |
| 2. | Records | 4 |
| 3. | Processes | 4 |
| 4. | Verifies | 4 |
| 5. | Enters/Processes | 3 |
| 6. | Reviews & processes | 4 |
| 7. | Maintains | 4 |
| 8. | Communicates | 4 |
| 9. | Assists | 4 |
| 10. | Aids | 3 |

**RESPONSIBILITY SCORE:**

| 37 | ÷ | 10 | = | 3.7 | x | 10 | = | 37.0 |
|---|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

_____

_____

_____

_____

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE:        0

JUSTIFICATION
OF PERFORMANCE RATING
FOR VIRGINIA S. HOPPER
May 13, 2004


Virginia S. Hopper is being rated in the "Consistently Exceeds Standards" category on the attached Employee Performance Appraisal.  Her work during this period has been excellent and she routinely handles the daily activities of her position in an exemplary manner.  Her efforts exceed the requirements of her job, and the tasks she has performed have been done in a manner that consistently exceeds the established standards.  Her cooperative attitude, her willingness to help other employees as well as her display of initiative are qualities which an exceptional employee displays.  She therefore deserves to receive the rating she has been given on the performance appraisal.



000273

Form 13P
Revised (1/1/1998)

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
Personnel Department

*PREAPPRAISAL*

Employee Name: VIRGINIA S HOPPER

Social Security Number: 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

Agency: 010/FINANCE

Division: 103A/CONTROLS & ACCOUNTS

Classification: ACCOUNTING TECHNICIAN

Class Code: 10605

Period Covered From: 06/01/2003    To:    06/01/2004

**RESPONSIBILITIES/RESULTS:** Responsibilities and results on which an employee will be rated should be listed below. These areas should be discussed with the employee during the Preappraisal session at the beginning of each appraisal year. Please refer to the Performance Appraisal Manual for instruction on how to develop responsibilities and results.

## RESPONSIBILITIES/RESULTS

A)  Audits various claims for deaf/foreign language interpreters, American Legion/UDC Scholarships, and mental commitments within 7 days of receipt of claim to determine they are legal and proper with no valid complaints to supervisor.

B)  Records miscellaneous refund payments received and prepares checks for deposit to the State Treasury following established procedures with no valid complaints to supervisor.

C)  Processes vouchers for deaf/foreign language interpreters, American Legion/UDC Scholarships, and other miscellaneous payments into the AFNS "E" region and CAS(State's Central Accounting System) with no valid delays in payments reported to supervisor.

D)  Verifies warrant amounts, posts warrant data and mails payments to vendors no later than on day following the date of issuance with no valid complaints to supervisor.

E)  Enters/processes Requests for Cash Transfers from departments into CAS, Interfund Cash Transfer System, on a daily basis after approval of supervisor.

F)  Reviews & processes Requests for Electronic Warrants from departments in CAS on a daily basis and balances with Treasurer's Office with no valid complaints to supervisor.

G)  Maintains files for vouchers, cash transfers, and electronic warrants so that accurate records may be accessed regularly with no loss of time because files cannot be located with no valid complaints to supervisor.

H)  Communicates with staff and other public officials such that responses are completed to inquiries within specified timeframes and in a professional and courteous manner with no valid complaints to supervisor.

I)  Assists administrative staff and other co-workers with miscellaneous tasks in order to ensure that the office functions in an efficient manner with no occasion of valid complaint to supervisor.

J)  Aids in processing end of fiscal year accounts payable journal vouchers ensuring that data is correct and proper with no valid complaints to supervisor.

000274

**WORK HABITS:** Provide a check in the appropriate space when the policies and procedures concerning the following areas have been discussed with the employee. In particular, the attendance and punctuality policies should be provided to the employee in writing. For instructions, refer to the performance appraisal manual and policies of the agency.

CHECK IF DISCUSSED:

  _____✓_____  Attendance

  _____✓_____  Punctuality

  _____✓_____  Cooperation with Coworkers

  _____✓_____  Compliance with Rules

---

**PREAPPRAISAL SIGNATURES:** Date of Session: _____5/22/03_____

Employee Signature: *Virginia S. Hopper*

Rater Signature: *Jeanne C. Brackin*

Reviewer Signature: *William Mack Reed*

---

## MIDAPPRAISAL

Describe the employee's performance strength(s) as observed during the first half of the appraisal period.

Mrs. Hopper is very knowledgable of accounting principles and procedures and has gained substantial knowledge of the state's accounting system. She shows initiative in recommending improvements and solving problems with regards to her work.

Mrs. Hopper also has considerable experience with personal computers, which is a tremendous asset to this office. She has a good working relation ship with co-workers.

Describe area(s) of the employee's performance that need improvement as observed during the first half of the appraisal period.

_____

_____

_____

Document the action plan that has been discussed to improve the areas of weakness.

_____

_____

_____

**000275**

A midappraisal has been held and performance has been discussed:

Date: 02/19/04

Employee Signature: *Virginia S. Hopper*    Rater Signature: *Jeanne C. Brackin*

Page 98

1    the course is.
2          MR. MARSH:  And that's kind of what
3          I'm getting to.
4                She can answer the question.
5          If she doesn't know, she can say
6          she doesn't know.  But I'm
7          saying --
8          MR. DEBARDELABEN:  She doesn't know
9          how they determine what's --
10         MR. MARSH:  That's not my question,
11         how they determine it.  I'm not
12         asking how they determined it.
13   Q.  I'm saying do you know of anything.  If you
14         don't know of anything, that's fine.  I'm asking
15         you what you know, not what they know or what
16         they did.
17   A.  I don't know.
18   Q.  A course entitled Logistics Management, do you
19         know what a course like that would entail?
20   A.  Joel, I don't know these.  Are we going to go
21         over each one?
22   Q.  No, ma'am.
23         Do you know what Logistics Management would

Page 99

1    entail?
2    A.  No.
3    Q.  Maybe the easiest way to ask this is:  Do you
4          know in any of these courses what your
5          background or experience would entitle to get
6          you credit for these?
7    A.  Well, yes.
8    Q.  Which ones are those?
9    A.  I would think Intro to Business, Managerial
10         Effectiveness, Financial Management, Business
11         Writing, Money and Banking.
12   Q.  Financial management.  What in your background
13         would relate to financial management?
14   A.  I don't know, Joel.
15   Q.  I'm sorry.  I thought you just told me that was
16         a course that you did have some background in.
17   A.  Well, I do.  But, I mean, sitting here saying
18         out of it to me what your have -- I could
19         go down through there and think a lot of it,
20         just like Business Math, Business Math II,
21         Accounting Principles, English Composition.  We
22         all would sit down there and say that because we
23         have the ability to write.

Page 100

1    Q.  Other than that ability to write, is there
2          anything that in your background that you think
3          would entitle you credit for English
4          Composition?
5    A.  No, sir.
6          MR. MARSH:  Let's take a break.
7          (Brief recess.)
8    Q.  (Continuing by Mr. Marsh)  You had testified
9          earlier before we took the break that you had
10         paid, I think you said it was, $700 to Trinity
11         College & University.  How did you pay that?
12   A.  Credit card.
13   Q.  And was that done online or did you do it on the
14         phone?
15   A.  On the phone.
16   Q.  And did you get a receipt for that credit card
17         payment?
18   A.  Yes.
19   Q.  Do you have a copy of that receipt?
20   A.  No, sir.
21   Q.  Did you get a credit card statement from your
22         credit card company?
23   A.  Yes, sir.

Page 101

1    Q.  Do you have a copy of that?
2    A.  No, sir.
3    Q.  Do you know what credit card it was?
4    A.  What do you mean, like --
5    Q.  Which bank was it?
6    A.  I do not know.
7    Q.  Do you still have the credit card that you used?
8    A.  No, sir.
9    Q.  You don't recall whether it was a VISA or
10         MasterCharge?
11   A.  MasterCard, I think.  We have both.
12   Q.  Did they give you any kind of a written receipt
13         for the fact that you paid the money?
14   A.  Yes, sir.
15   Q.  And do you have that?
16   A.  No, sir.
17   Q.  What happened to these documents?
18   A.  We purge them after so long.  That was 2002.
19   Q.  You say "we".  You and your --
20   A.  Husband.
21   Q.  -- husband?
22         When you were talking to Trinity College &
23         University about this program that they have,

Page 102

1   did you discuss this with anybody else in terms
2   of what you were doing: Family, friends,
3   coworkers?
4   A.  My husband.  Mentioned it to -- I was trying to
5       think of the counselor at Troy.
6   Q.  Specifically did you tell anybody the fact that
7       you were getting a college degree without taking
8       any additional courses?
9   A.  In those words?
10  Q.  Or similar words.
11  A.  No.
12  Q.  Or even similar words.
13  A.  Probably.
14  Q.  Did anybody you discussed this with raise any
15      concerns about it?
16  A.  No, sir.
17  Q.  Did you discuss it with your children?
18  A.  Yes, sir.
19  Q.  What did you discuss with them?
20  A.  Just that I was getting a degree online.
21  Q.  Did you give them the specifics about how you
22      were getting the degree?
23  A.  No, sir.

Page 103

1   Q.  What about at work?  Did you tell anybody at
2       work about this?
3   A.  Just that I was completing my degree online and
4       that I was getting credit for work history.
5   Q.  Who did you tell this to?
6   A.  Jenny Brackin, I know.
7   Q.  What did you tell her?
8   A.  That I was completing my degree and that I was
9       getting it online.
10  Q.  Anybody else?
11  A.  I can't think of anyone specific.
12  Q.  Let's go back and look at Defendant's Exhibit
13      14, which is the application for Accountant.
14          MR. DEBARDELABEN:  The 11/21/2003 one?
15          THE WITNESS:  Uh-huh (positive
16              response).
17  Q.  You testified before that everything on this
18      application would be, with the exception of the
19      check marks on the third page, things that you
20      completed yourself; is that accurate?
21  A.  It is.
22  Q.  Now, on the first page of this resume, you've
23      listed the schools that you've attended.  And on

Page 104

1   that you've listed Trinity University and
2   specifically gave an address in San Antonio,
3   Texas -- a street address in San Antonio,
4   Texas.  Did you get this off the Trinity College
5   & University Web site?
6   A.  No.
7   Q.  Did you get it off the list of courses that they
8       sent you?
9   A.  No.
10  Q.  Where did you get that from?
11  A.  The accreditation site.
12  Q.  What is that?
13  A.  There's a place that you can look up on the
14      Internet where it has accreditations, and it has
15      addresses.
16  Q.  So this site was not associated with the Trinity
17      College & University site?
18  A.  It said Trinity University, which is what the
19      Web site said.  And so I looked it up, and
20      that's where I got the address because I
21      couldn't find an address anywhere, a specific
22      address.
23  Q.  Is there anything on any of these documents that

Page 105

1   they sent you that has an address for them?
2   A.  No, sir.
3   Q.  Did that raise any concerns with you, that none
4       of their documentation had an address on it?
5   A.  No, sir.
6   Q.  Didn't occur to you that could be an issue with
7       this institution?
8   A.  No, sir.
9   Q.  Before looking this up on the Web site you
10      referenced, had you seen this 715 Stadium Drive,
11      San Antonio, Texas address anywhere else on any
12      documentation that you had?
13  A.  No, sir.
14  Q.  So you didn't know if this was Trinity College &
15      University's address or not when you wrote it
16      down here, did you?
17  A.  I thought it was.
18  Q.  Now, what about the Louisiana address that you
19      said you were previously aware of?
20  A.  It said student verification.
21  Q.  But that was the only address you had seen
22      anywhere associated with Trinity College &
23      University?

Page 106

1   A.  Yes, sir.
2   Q.  But you didn't choose to use that address?
3   A.  Well, I didn't think the student verification
4       would be the address to use.
5   Q.  Would you look at page 3?  These courses that
6       were listed here under the title courses which
7       are particularly related to the position, which
8       of those courses did you take at Troy
9       University?
10  A.  The ones that have the check mark beside them.
11  Q.  That would be the first five?
12  A.  Yes, sir.
13  Q.  Going down to including Governmental Accounting?
14  A.  Yes, sir.
15  Q.  Accounting 394.
16      Where did the remaining courses -- Where did
17      you take the remaining courses?
18  A.  That was courses that came from Trinity College
19      & University.
20  Q.  Is there any other institution besides those
21      where any of these courses came from?
22  A.  No, sir.
23  Q.  Now, you completed this application on

Page 107

1       11/21/2003, which would have been after you
2       received your list of courses from Trinity
3       College & University; is that correct?
4   A.  Yes, sir.
5   Q.  But, in fact, the courses that you've listed on
6       here don't correspond to the courses that are
7       listed on your transcript from Trinity College &
8       University, do they?
9   A.  No, sir.
10  Q.  You haven't been given credit for any of the
11      courses that are listed on this list of courses,
12      have you?
13  A.  Trinity College & University said that those
14      courses had now changed, and these were the
15      numbers and the courses that was there.
16  Q.  When did you have this conversation with Trinity
17      College & University?
18  A.  When I started filling out this application, I
19      went online and was looking back at this.  And
20      that -- there was a new listing of courses, and
21      I printed it off.  And I looked at that, and
22      they weren't the same.  So I called Trinity
23      College & University back, and I asked about

Page 108

1       it.  Well, actually, the first time I had a
2       sheet, and I got what I now know as Trinity
3       University in San Antonio, Texas.  And I talked
4       to a lady there, and I was trying to explain
5       everything to her.  I suppose I had her
6       confused, and she said to me, you need to call
7       the person you talked to before.  So I found
8       a -- I can't remember if it was a 1-886 or a
9       1-66 number or something like that.  And I got
10      back hold of the lady I had previously talked
11      to.
12  Q.  Let me stop right there.  I'm sorry.
13      What were you talking to the woman at
14      Trinity College in San Antonio, Texas -- what
15      was your conversation with her?
16  A.  I had a list of classes, and what I had pulled
17      up off the Internet were different classes.  And
18      I couldn't understand why so I was trying to ask
19      about what was the difference in the classes.
20      And I was telling her that I have a transcript
21      that has some classes on it, and now it appears
22      they are not the classes that I'm looking at.
23      And I kept trying to explain that to her:  I'm

Page 109

1       trying to fill out a resume, and the classes are
2       not the same.
3   Q.  And she didn't understand what you were talking
4       about?
5   A.  Right.
6   Q.  Because, in fact, your transcript didn't come
7       from Trinity University in San Antonio, did it?
8   A.  Right.
9   Q.  So she couldn't figure out --
10  A.  Right.
11  Q.  -- the discussion?
12  A.  And so I guess I was just driving her nuts.  But
13      she said, you need to call the person you
14      previously talked to.  So I kept looking until I
15      found another number, because I got that off the
16      Internet where I got the address because I was
17      filling this out.  And they had a number there,
18      and that's the number I called.
19  Q.  And what did they tell you?
20  A.  When I called San Antonio, Texas, she told me to
21      call the person I had previously spoken with
22      about my courses.
23  Q.  And did you do that?

Deposition of Virginia Hopper, Vol. II                 May 20, 2008

Page 110

1   A.  I did.
2   Q.  And what was that conversation about?
3   A.  About the courses being different than what was
4       listed on my sheet and what I now found on the
5       Internet.
6   Q.  And what did she specifically tell you?
7   A.  She told me the course numbers and names had
8       changed, but they were the exact same courses.
9       And I got her to go over -- I asked her each
10      one.  And as we went over them, I checked off
11      the little box of what she told me substituted
12      for what.
13   Q.  Why did you not just use the courses listed that
14      you had from a transcript?
15   A.  Because I thought if these were the new courses,
16      when they checked the courses, this would be
17      what they got.
18   Q.  But you didn't take the new course.  You didn't
19      take any of these courses, did you?
20   A.  No, sir.  But if she said they substituted for
21      them, that's what you would now see.
22   Q.  One of the courses listed was Auditing.  Which
23      course substituted for Auditing off the original

Page 111

1       transcript?
2   A.  I would have to have my little slip where I
3       matched my boxes.
4   Q.  Where is that slip?
5   A.  Well, y'all have a copy of it, because I went
6       over each one and marked it.
7          (Off-the-record discussion.)
8          THE WITNESS:  I know it was at the
9            first DHR hearing.
10        MR. DEBARDELABEN:  They had it at the
11          DHR hearing?
12        THE WITNESS:  Yes, sir.  Because the
13          administrative law judge took it
14          and looked at it.  It might have
15          been one of those that I gave him
16          my original and he said he would
17          make copies and get it back to
18          everybody.
19        MS. BYRNE:  Is this what you're
20          referring to?
21        THE WITNESS:  Yes, ma'am.
22        (Brief off-the-record discussion.)
23   Q.  Let me show you what we marked earlier as

Page 112

1       Defendant's Exhibit 7.  Now, is this the box
2       you're talking about you used --
3   A.  Yes, sir.
4   Q.  -- or the list you used?
5   A.  And this is the number I called.
6   Q.  At the bottom?
7   A.  Yes, sir.
8   Q.  And so you're saying -- Where did you get this
9       list from?
10   A.  This is the number I called the first time, and
11      she told me to call the people I had talked to
12      previously.
13   Q.  Where did you get this list from?
14   A.  Off the Internet.
15   Q.  Off the Internet of Trinity University in San
16      Antonio or Trinity College & University?
17   A.  I don't know.  But I do know at the time I
18      thought it was Trinity College & University.
19   Q.  How are you finding this Web site each time?
20      Are you just typing in the name or what?
21   A.  It listed Trinity EDU, and it will have it at
22      the bottom of all those exhibits under there
23      that says Trinity EDU.

Page 113

1   Q.  And this is the -- you called her and asked her
2       what?  I see the number, yes, ma'am.
3   A.  No.  I'm talking about it says Trinity EDU.
4   Q.  Right.  Yes.
5   A.  So I said these are not the courses that's
6       listed on my transcript, and I don't understand
7       that.  And she said that the course numbers and
8       names have changed, but they are the same
9       courses.  And so I asked her, then you tell me,
10      and I called off these -- And I said for each
11      one, tell me, because I didn't particularly like
12      that, but I knew Troy had just done that.
13         So she started telling me which ones was
14      covering for what, and I had -- I was marking
15      them off as she told me.
16   Q.  Let me go back to my original question.  I was
17      asking about Accounting 4344 Auditing.  Now, how
18      did you come to list this on your application?
19      I'm now referring to Exhibit 14.
20   A.  She told me -- It substituted for something on
21      here.  She told me what it substituted for, and
22      I marked it and that's why I listed it.
23   Q.  I'm sorry.  Substituted for what?  What course

Page 114

1    did that substitute for?
2  A.  Well, I don't know.  But you see how I marked
3    each one that she told me that it substituted
4    for?  That's what I listed on here.
5  Q.  So you listed each of the courses on here that
6    you have check marks on by here?
7  A.  Yes, sir.  And that's because she told me it
8    substituted for one on here.  I may have one --
9    Where is the one that I marked on?  I may have
10    it marked there.
11  Q.  I'm showing you Exhibit 7.
12  A.  See, I put check marks by them.  I was trying to
13    keep up with them.  It says equivalent, see
14    attached list.
15  Q.  See attached list?
16  A.  Yes, sir.  I started marking them -- As she was
17    going down and telling me, I was marking them
18    off here.  That's what she was telling me they
19    substituted for.
20  Q.  Now, let me get to the one I'm asking about
21    here.  We're getting ahead of ourselves.  The
22    one I'm asking about is the Auditing course, the
23    one that is listed down here for Auditing.  I

Page 115

1    want to know which course off your transcript
2    relates to the Auditing course that you listed
3    on your application.
4  A.  I don't have it marked.  I don't know.  But I
5    know that that's what happened.
6  Q.  Do you see anything on your transcript that even
7    mentions Auditing course?
8  A.  No, sir.
9  Q.  Course Number FNCE -- I'm looking now at Exhibit
10    13 again, your application.  Course Number FNCE
11    33351, which is entitled INSTIT and MKTS, which
12    I assume is Institutions and Markets, you've
13    listed that on your application.  That course is
14    not on your transcript.  Which course
15    corresponds from your transcript to that
16    course?
17  A.  I don't know.  I don't have it marked.  I just
18    have check marks by them over here so I don't
19    have the number written here to here.
20  Q.  Finance course, FNCE 3352, Investments, that
21    isn't on your transcript.  Do you know which
22    course corresponds from your transcript to the
23    course that's listed there?

Page 116

1  A.  No, sir.  Again, I just have a check mark.
2  Q.  Marketing course, MKTG 3381, Consumer Behavior
3    is listed on your application for State
4    employment.  What course would that correspond
5    to on your transcript?
6  A.  Joel, I just have a check mark.  I have a check
7    mark here, and I marked it off here.  The only
8    one that I have that I wrote over here is
9    Finance 3361 and Marketing 3361.  I drew two
10    arrows, and I guess I did it because it went for
11    two of them.  That was 1900 E, if you want to
12    see that.  It's got a check mark there, and the
13    only reason I can think I wrote that is because
14    it was for two of them, if you want to look at
15    that.
16  Q.  How about Business Law I and II which you listed
17    on your application?
18  A.  I just have a check mark by them.
19  Q.  Do you see anything at all on there that
20    relates -- that would tell you it relates to
21    Business Law I and II that's on your transcript?
22  A.  No, sir.  Like I said, the only thing I
23    corresponded back was that one, I guess, because

Page 117

1    it was supposedly -- it was supposed to be for
2    those.
3  Q.  Ms. Hopper, did you not see anything wrong with
4    listing courses on your application that you did
5    no work for, that you don't know why you got
6    credit for, and which were not on your original
7    transcript?  Do you not see a problem with that,
8    Ms. Hopper?
9  A.  Well, no, sir.  She said they changed the course
10    number -- name and numbers.  It was from the
11    institution.
12  Q.  And you took that at face value?  Is that your
13    testimony?
14  A.  Yes.
15  Q.  You never questioned the fact that course
16    numbers, course names were changed, that there
17    would be any problem with that?
18  A.  No, sir.
19  Q.  Which courses can you tell me that are listed on
20    your application that you know relate to some
21    course on your transcript?  Can you tell me if
22    any of them relate to a specific course on your
23    transcript?

Deposition of Virginia Hopper, Vol. II                                        May 20, 2008

Page 118

1   A.  I can't tell you that. Like I said, this one
2       specifically marks that that was 1900 E, and I
3       guess the reason I marked it, it was for two of
4       them. And then I checked it off there, but I
5       did like that so that would do that
6       (indicating).
7   Q.  So you're saying for the 1900 E, which on your
8       transcript is International Financial
9       Management, you gave yourself credit for two
10      courses on your application?
11  A.  She told me that those two substituted for that
12      one. I didn't give myself that.
13  Q.  And who were you talking to again?
14  A.  It was either Shirley or Cheryl at Trinity
15      College & University, which I believe to be
16      Trinity University.
17  Q.  Tell me what happened after you submitted this
18      application and you got the job as an
19      accountant. When did somebody first start
20      questioning your degree?
21  A.  April 2006.
22  Q.  And what happened?
23  A.  I walked in and gave my resignation letter

Page 119

1       saying that I was transferring to DHR. After I
2       gave my resignation letter saying I was
3       transferring to DHR, Mr. Childry, who I gave it
4       to, said that he was glad for me and that he
5       thought that was the very best thing for me to
6       do at this point in time, because I had talked
7       to him several times about other issues. And
8       then he handed me a letter to ask me to produce
9       my diploma. And so I told him I would, if he
10      would wait right there. As soon as I got
11      home -- I would drive home and be back that
12      afternoon, which I did. When I got back, he had
13      already gone home.
14  Q.  And then what happened?
15  A.  That was late afternoon.
16  Q.  Did he talk to you the next day?
17  A.  Yes, sir.
18  Q.  Did you give him the diploma the next day or the
19      piece of paper that you had?
20  A.  No, sir. I went over to State Personnel looking
21      for Rachel Dickerson because she, I thought, was
22      our finance personnel person, but she had gone
23      home also. So -- Excuse me. I talked to Paul

Page 120

1       Thomas, and Paul Thomas told me to take it to
2       her. So the very next morning, I took it to
3       her.
4   Q.  What conversation did you have with her?
5   A.  I showed her the letter that Mr. Childry had
6       gave me, and she was not aware of any of it.
7   Q.  Which letter was this? I'm sorry.
8   A.  Just asking for my diploma.
9   Q.  Okay.
10  A.  And I showed her the letter that Bob Childry had
11      gave me. She was not aware of the letter or the
12      request for the diploma, but she asked me could
13      she have the letter. And I said no, but you can
14      make a copy of it. So she made a copy of the
15      letter and my diploma, and apparently she
16      e-mailed it to Mr. Childry. And then I walked
17      back across the street to talk to Mr. Childry.
18  Q.  And what was that conversation about?
19  A.  He said everything looked fine to him, and he
20      considered the matter closed and that he wished
21      me well. And I said in lieu of the way that I
22      had been treated and talked to in my office with
23      Jenny Brackin that I wished to take two weeks'

Page 121

1       leave and then just return to DHR. And he said
2       he would be glad to sign my papers for me and
3       that I could do that. So I took two weeks'
4       leave and reported to DHR at the end of that
5       two-weeks period. So in my mind, and I assume
6       in Mr. Childry's mind, everything was settled
7       and done with. So I went to DHR thinking
8       everything was fine. That's the words he had
9       said: Everything was cleared up.
10  Q.  When did you next hear that there was a problem
11      with your degree?
12  A.  When my supervisor told me that Butch King would
13      like to see me in his office when he told me
14      that there was an investigation and that there
15      was a problem.
16  Q.  What did you do when you heard this?
17  A.  I tried to contact them to see what was going
18      on.
19  Q.  Them being ...
20  A.  The university.
21  Q.  Trinity College & University?
22  A.  Yes, sir. To see what was going on. And I
23      continued to try, but I couldn't get an answer.

31 (Pages 118 to 121)

Deposition of Virginia Hopper, Vol. II

May 20, 2008

Page 122

1     We called and called and called and tried to
2     e-mail. Couldn't get any response from it. So
3     we thought that -- A recording came on just
4     saying that the lines were down. So we just
5     thought that it was because Katrina had came
6     through and destroyed everything.
7  Q.  Now, who were you trying to contact? You were
8     trying to talk to someone in Louisiana; is that
9     correct?
10  A.  Yes, sir.
11  Q.  So at this point you were trying to reach the
12     Louisiana people as opposed to the folks in
13     Texas?
14  A.  Yes, sir. That's because of what everybody was
15     telling me.
16  Q.  So what happened next? What's the next
17     conversation you had with folks at work about
18     this or folks at State Personnel or the finance
19     office?
20  A.  I didn't have any more conversation with people
21     at the finance office. Butch King I guess had
22     the charge letter. I can't remember the exact
23     order. But he brought me in and presented the

Page 123

1     charge letter. It said to resign or that I
2     would have a hearing. It actually said to
3     resign or I would be fired. And he presented me
4     with a charge letter and told me to go home and
5     think about it for a while. And then I started
6     trying to do some research and continued trying
7     to get in touch with them, being the university.
8  Q.  So was this the first time you hadn't been able
9     to reach Trinity College & University when
10     you --
11  A.  Yes, sir.
12  Q.  -- contacted them?
13  A.  Yes, sir.
14        (Defendant's Exhibit 15 marked for
15        identification.)
16  Q.  Let me show you what I've marked as Defendant's
17     Exhibit 15. Do you recognize that as the charge
18     letter that was served on you by the Department
19     of Human Resources?
20  A.  Yes, sir.
21  Q.  Does that charge letter explain what the
22     accusations were against you?
23        MR. DEBARDELABEN: I'm going to object

Page 124

1     to her answering what this
2     explains. It speaks for itself,
3     and it is what it is. I don't
4     think she knows what it explains.
5        MR. MARSH: Let me ask her that.
6  Q.  Do you know what that is telling you?
7  A.  I know it's a charge letter. That's all that I
8     know.
9  Q.  And did this charge letter explain to you that
10     you would have a hearing about these charges?
11  A.  Yes, it did.
12        (Defendant's Exhibit 16 marked for
13        identification.)
14  Q.  Let me show you what I've marked as Defendant's
15     Exhibit 16, which is an amendment to the
16     original charge letter. Is that your signature
17     on the second page of that charge letter?
18  A.  It is.
19  Q.  And if you could, go back to 15 also and look at
20     the second page of that and tell me if that's
21     your signature on the second page.
22  A.  It is.
23  Q.  So you got both of these documents?

Page 125

1  A.  Yes.
2  Q.  And in the amended charge letter, which is dated
3     June 12, 2006, does that paragraph inform you
4     that you have a hearing?
5  A.  It does.
6  Q.  Was there a hearing on these charges?
7  A.  Yes, sir.
8  Q.  And you attended that hearing?
9  A.  Yes, sir.
10  Q.  And your attorney, Mr. DeBardelaben, attended
11     that hearing?
12  A.  Yes, sir.
13  Q.  Represented you at that hearing?
14  A.  Yes, sir.
15  Q.  Were you allowed to present evidence at that
16     hearing?
17  A.  Yes, sir.
18  Q.  Did you testify at that hearing?
19  A.  Yes, sir.
20  Q.  Were you allowed or was your attorney allowed to
21     cross-examine witnesses at that hearing?
22  A.  Yes, sir.
23  Q.  And were you allowed to make or was your

000033

Deposition of Virginia Hopper, Vol. II                                          May 20, 2008

Page 126

1    attorney allowed to make arguments to the
2    hearing officer as to what was the appropriate
3    resolution of your case?
4    A.  I'm not sure about that.
5           (Defendant's Exhibit 17 marked for
6           identification.)
7    Q.  Let me show you what I've marked as Defendant's
8    Exhibit 17, a letter notifying you that your
9    employment was terminated.  You received a copy
10   of that letter?
11   A.  Yes.
12   Q.  And attached to it is the recommendations from
13   the hearing officer; is that correct?
14   A.  Yes.
15   Q.  And this is signed by Commissioner Walley, Page
16   Walley, the Commissioner of DHR.  Were you
17   notified in the last paragraph of that letter
18   that you had the right to appeal this decision
19   to the State Personnel Board?
20   A.  Yes.
21   Q.  And did you appeal that decision to the State
22   Personnel Board?
23   A.  Yes.

Page 127

1    Q.  And was there a subsequent hearing conducted on
2    your case?
3    A.  Yes.
4    Q.  And the hearing officer was Mr. Dan Morris; is
5    that right?
6    A.  I believe that's correct.
7    Q.  Did you know Mr. Morris prior to that hearing?
8    A.  No, sir.
9    Q.  To your knowledge did he know you prior to that
10   hearing?
11   A.  No, sir.
12   Q.  Did you know that he was not a part of State
13   Personnel but actually worked for the Department
14   of Transportation?
15   A.  No, sir.  I didn't know anything about him.
16   Q.  Did you know the hearing was over at the
17   Department of Transportation?
18   A.  Yes, sir.
19   Q.  At that hearing were you represented by your
20   attorney, Mr. DeBardelaben?
21   A.  I was.
22   Q.  Did you present evidence at that hearing?  Did
23   you present documents for consideration at that

Page 128

1    hearing?
2    A.  Yes, sir.
3    Q.  Did you call witnesses?
4    A.  Yes, sir.
5    Q.  Did you testify?
6    A.  Yes, sir.
7    Q.  Was your attorney allowed to cross-examine the
8    witnesses that were called against you?
9    A.  Yes, sir.
10   Q.  Is there anything that you recall that you were
11   not allowed to do that you wanted to do at that
12   hearing?
13   A.  I don't think I would be able to answer that.
14   Q.  I'm just asking from your perspective.  I know
15   you're not a lawyer.  From your own perspective,
16   was there anything that you were not allowed to
17   do at that hearing that you wanted to do?
18   A.  Yes.  But I don't know if from a legal
19   standpoint that would have been allowed.
20   Q.  What was that?
21   A.  There were different questions I would have
22   liked to have asked.
23   Q.  And your attorney was asking the questions; is

Page 129

1    that correct?  He was your representative asking
2    the questions on your behalf?
3    A.  Yes.
4    Q.  And at that hearing there were breaks where you
5    had an opportunity to talk to your attorney; is
6    that correct?
7    A.  Yes.
8           (Defendant's Exhibit 18 marked for
9           identification.)
10   Q.  I'll show you what's marked as Defendant's
11   Exhibit 18, Recommended Order to the State
12   Personnel Board.  It's a ten-page document
13   signed on the last page by Mr. Dan Morris, the
14   Assistant Director of the Department of
15   Transportation.
16         And Mr. Morris recommended in that
17   recommended order that your termination be
18   upheld; is that correct?
19   A.  Yes.
20   Q.  And this decision -- did you or your attorney
21   ever request a hearing before the entire
22   personnel board?
23   A.  Yes.

Deposition of Virginia Hopper, Vol. II                                    May 20, 2008

Page 130

1          (Defendant's Exhibit 19 marked for
2          identification.)
3    Q.   Let me show you what I'm marking as Defendant's
4         Exhibit 19.  Is that the decision that came from
5         the personnel board?
6    A.   Yes, sir.
7    Q.   And there was -- I asked you earlier if you
8         requested a hearing.  There actually was a
9         hearing before the State Personnel Board?
10   A.   Yes, sir.
11   Q.   And did you attend that hearing?
12   A.   Yes, sir.
13   Q.   And was your attorney present at that hearing?
14   A.   Yes, sir.
15   Q.   And was your attorney allowed to make an
16        argument to the personnel board about your case?
17   A.   Yes, sir.
18   Q.   And at the conclusion of that or sometime after
19        that, you received this letter upholding your
20        termination; is that accurate?
21   A.   I believe so, yes.
22   Q.   Ms. Hopper, you filed a lawsuit in this case.
23        That's why we're here today, correct?

Page 131

1    A.   It is.
2    Q.   And in that lawsuit, a complaint was filed and
3         served on the defendants.  I'm not going to
4         introduce it.  It's already part of the record.
5              Did you see the complaint that was
6         offered -- I mean, that was served on the
7         defendants?
8    A.   No, sir.
9    Q.   Did you authorize your attorney to file a
10        complaint on your behalf?
11   A.   Yes, sir.
12   Q.   And you're aware that he was filing a complaint?
13   A.   Yes.
14   Q.   The complaint listed out -- I'm not going to ask
15        you legal questions -- listed out four counts,
16        and I'm going to ask you some questions which
17        you may or may not know.  If you don't know,
18        that's fine.  Again, I'm not trying to turn you
19        into a lawyer.
20             One of the counts was a petition for review
21        of the decision to terminate you, and there were
22        several allegations in that complaint, the
23        first, that it was a violation of constitutional

Page 132

1         and statutory provisions, a denial of due
2         process, and equal protection of the law.
3         Again, I'm not asking a legal opinion.
4              Do you know yourself personally anything
5         that happened to you that would tell you it was
6         a constitutional or statutory violation?
7              MR. DEBARDELABEN:  I want to object.
8                She's not qualified to answer
9                that.  She can't even attempt.
10               You're asking a convoluted
11               question.
12   Q.   Do you understand what that means?
13   A.   No, sir, I do not.
14   Q.   The second allegation is excess of the authority
15        of the agency.  Do you understand what that
16        means?
17   A.   No, sir.
18   Q.   Third is unlawful procedure.  Do you know what
19        that means?
20   A.   No, sir.
21   Q.   Are you aware personally of any unlawful
22        procedure that you know of in this process?
23   A.   No, sir.

Page 133

1    Q.   The next one was affected by error of law, and
2         I'm not going to even ask you that one.
3              And then finally it says:  Unreasonable,
4         arbitrary, capricious, or abusive discretion.
5         Do you understand what those things mean?
6    A.   No, sir.
7    Q.   So you wouldn't be able to tell me any facts
8         that relate to those --
9    A.   No, sir.
10   Q.   -- if you don't understand the terms?
11             Count II and III really deal with State
12        Personnel and not Commissioner Walley.  The
13        fourth count was a count of conspiracy.  Tell me
14        what you know about any conversation that
15        Commissioner Walley had with anybody involved in
16        this case.  What do you know about conversations
17        he had with anybody else?
18   A.   I don't know.
19   Q.   Do you know of any conversations that he had
20        with anybody else --
21   A.   No, sir.
22   Q.   -- about the case?  I'm sorry?
23   A.   I do not know.

Page 134

1    Q.   Do you know of any written communications that
2         Commissioner Walley had with anybody else about
3         this case?
4    A.   No.
5    Q.   Do you know if Commissioner Walley was involved
6         in any meetings with anybody concerning this
7         case?  I'm just asking what you know.
8    A.   No.
9    Q.   And that's a no.
10        Do you know if Commissioner Walley entered
11        into any agreements with anybody concerning this
12        case?
13   A.   No.
14   Q.   Do you know if Commissioner Walley talked to any
15        members of the State Personnel Board about the
16        case?
17   A.   I do not know.
18   Q.   Or had any written communication or other
19        communication with any members of the State
20        Personnel Board?
21   A.   I do not know.
22   Q.   And do you know if Commissioner Walley had any
23        communications of any nature with Ms. Jackie

Page 135

1         Graham concerning this case?
2    A.   I do not know.
3         MR. MARSH:  I think that's all I've
4              got at this time.  I may have some
5              follow-up questions after
6              Ms. Ellis questions you.  But I
7              think that's all I've got right
8              now.  If I have any documents I
9              didn't do, I'll come back to them.
10        MR. DEBARDELABEN:  Let's take a quick
11             break.
12        MS. ELLIS:  Sure.
13        (Brief recess.)
14             EXAMINATION
15   BY MS. ELLIS:
16   Q.   Ms. Hopper, again, my name is Joana Ellis, and
17        I'm going to be asking you some questions.  Just
18        as Mr. Marsh told you, if I ask you something
19        you don't understand, just ask me to repeat it
20        or ask it a different way and I'll be glad to.
21        Is that okay?
22   A.   (Witness nods head positively.)
23   Q.   I'm going to do my best not to ask you the same

Page 136

1         questions that Mr. Marsh asked you because I
2         know we'd all like to get out of here.  That may
3         mean it sounds like I'm kind of hopping around a
4         little bit.  I don't mean to be, other than the
5         fact that I'm trying not to repeat what he's
6         already asked you.
7              Now, I want to ask you just a few more
8         background questions about your family members
9         because I know you've asked for a jury trial in
10        this case.  And so generally when that's done,
11        the attorneys ask about family members and where
12        they work and that sort of thing because when
13        we're selecting the jury, we want to make sure
14        we don't get anyone from your family or anyone
15        they work with and that sort of thing on the
16        jury.  So I'm not trying to pry.  That's the
17        reason why it's done.
18             Now, your sister, her name is Barbara,
19        correct?
20   A.   Correct.
21   Q.   Now, I thought I saw in something that at one
22        time her last name was Spears; is that correct?
23   A.   That's correct.

Page 137

1    Q.   Is it presently Spears or has she gone back --
2    A.   It is.
3    Q.   Because when you gave her name earlier, you gave
4         her maiden name, and I just wanted to make sure
5         that she is a Spears.
6    A.   Barbara Spears.
7    Q.   Your sister worked with you at the Insurance
8         Department, correct?
9    A.   Correct.
10   Q.   Now, when y'all were there, did y'all work there
11        the whole time together?
12   A.   No.
13   Q.   Did she leave before you did?
14   A.   She went there before I did, and she left before
15        I did.
16   Q.   Did y'all both work under Denise Azar when she
17        was the receiver?  She still is the receiver?
18   A.   Barbara worked under Nelson Burnette most of the
19        time, and Denise was there when Barbara left.
20        Barbara was not there long with Denise.
21   Q.   And you were there about two-and-a-half years at
22        least with Denise; is that correct?
23   A.   Correct.

Page 138

1  Q.  Was Denise Azar your immediate supervisor?
2  A.  She was.
3  Q.  During that time did Denise Azar appear to be to
4      you an honest and truthful person?
5  A.  Yes.
6  Q.  Where does your sister Barbara Spears presently
7      work?
8  A.  With another insurance company.
9  Q.  What company is that?
10 A.  Anchor General Managing Agency.
11 Q.  Is that in Montgomery?
12 A.  It is.
13 Q.  And what is her husband's first name?
14 A.  Bobby Joe Spears.
15 Q.  Where does he work?
16 A.  He's retired.
17 Q.  Where did he work?
18 A.  Fire department.
19 Q.  Is that Montgomery Fire --
20 A.  City.
21 Q.  -- Department?
22     Now, does your sister Barbara Spears have a
23     college degree?

Page 139

1  A.  No.
2  Q.  Has she ever taken any college courses?
3  A.  Yes.
4  Q.  And where has she taken courses to your
5      knowledge?
6  A.  She lacks one semester graduating. I think it
7      was Troy and Alabama State.
8  Q.  Does she to your knowledge plan to take that
9      course to get --
10 A.  No.
11 Q.  -- to graduate?
12 A.  No.
13 Q.  Do you consider you and your sister Barbara
14     Spears to be close?
15 A.  No, ma'am.
16     MS. BYRNE: I'm sorry. I can't hear
17     you.
18     THE WITNESS: No, ma'am.
19 Q.  Is there any animosity between you?
20 A.  No, ma'am.
21 Q.  Do you consider yourself to be close to any of
22     your brothers?
23 A.  No, ma'am.

Page 140

1  Q.  Is there any animosity between --
2  A.  No, ma'am.
3  Q.  Let me finish and it will make the record
4      straight.
5      Is there any animosity between you and any
6      of your brothers?
7  A.  No.
8  Q.  And do you consider yourself to be close to your
9      daughter?
10 A.  Yes.
11 Q.  Do you consider yourself to be close to your
12     son?
13 A.  Yes.
14 Q.  Is your son still married?
15 A.  Yes.
16 Q.  What is his wife's name?
17 A.  Trina Marie.
18 Q.  And what was her maiden name?
19 A.  Pruitt.
20 Q.  Does she work anywhere outside the home?
21 A.  She does.
22 Q.  Where does she work?
23 A.  She's an RN at Jackson's Hospital.

Page 141

1  Q.  And your son presently works where?
2  A.  Public Health.
3  Q.  Have you ever been involved in any lawsuits
4      other than the present one that you filed?
5  A.  No, ma'am.
6  Q.  Have you ever sued anyone or been sued?
7  A.  No, ma'am.
8  Q.  Have you ever been to court for any reason?
9  A.  No, ma'am.
10 Q.  And this is just a standard question I ask
11     everybody so please don't be insulted by it, but
12     have you ever had any criminal charges against
13     you?
14 A.  No, ma'am.
15 Q.  Have you ever filed for bankruptcy?
16 A.  No, ma'am.
17 Q.  Have you ever consulted an attorney about
18     bankruptcy?
19 A.  No, ma'am.
20 Q.  When you took the courses at Troy, how did you
21     pay for those courses: By check? Credit card?
22     What method?
23 A.  Probably check.

Page 142

1  Q. And approximately how much did you pay for each
2     course that you took at Troy University?
3  A. I don't remember.
4        MS. BYRNE: I'm sorry. I'm having --
5           if you could speak up -- I know
6           it's getting long but, I'm having
7           real hard trouble hearing you.
8  Q. And when you took the courses at Troy and you
9     paid probably by check, what bank were you using
10    at that time?
11 A. We have several bank accounts so I don't know
12    what they were drawn on.
13 Q. What were the bank accounts?
14 A. I'm not going to give you that information. I
15    don't think you need that.
16 Q. I'm not asking you for the account number, just
17    the bank.
18 A. I know, but I don't think you need that
19    information. I'm not going to give it to you.
20       (Off-the-record discussion.)
21 A. Does she have what bank it was drawn on?
22 Q. No.
23 A. Was it a check?

Page 143

1  Q. It was marked check, I believe. It was marked
2     check or money order.
3        MS. BYRNE: There's a question pending
4           on the table so she doesn't get to
5           ask questions if there's a
6           question pending.
7  A. AmSouth.
8        MS. BYRNE: I'm sorry?
9        THE WITNESS: AmSouth.
10 A. That was my account so I'm assuming that's what
11    it was drawn on.
12       MS. BYRNE: That's wasn't the
13          question.
14       THE WITNESS: What was the question?
15       MS. BYRNE: Would you repeat the
16          question?
17       MR. DEBARDELABEN: I'm going to
18          object. We have one attorney
19          asking the questions.
20       MS. BYRNE: You're right, and I
21          apologize. It's just getting a
22          little frustrating, but I will try
23          to restrain myself.

Page 144

1  A. What was the question, please?
2  Q. I wanted to know -- You said you weren't sure
3     which bank your checks might have been drawn on
4     for Troy University from the courses, and you
5     said you used several different banks.
6  A. Okay. AmSouth was my account so I'm going to
7     tell you that it was AmSouth.
8  Q. And that was in your name?
9  A. Yes, ma'am.
10 Q. When you were looking at the information, the
11    Web pages on Trinity College & University or
12    Trinity University, was anyone there with you
13    while you were looking at the information on the
14    Web pages?
15 A. No, ma'am.
16 Q. And were you looking -- did you have a home
17    computer that you were using?
18 A. Yes, ma'am.
19 Q. Did you ever look at any information while you
20    were at work on either Trinity College &
21    University or Trinity University?
22 A. When I was looking for online universities?
23 Q. Right.

Page 145

1  A. No, ma'am.
2  Q. Or anytime after that, did you ever pull up any
3     information when you were at work pertaining to
4     Trinity College & University or Trinity
5     University?
6  A. I don't think so.
7  Q. You could have. You're just not sure?
8  A. Right.
9  Q. Now, when you printed off the documents that
10    have already been discussed as exhibits, at that
11    time or around that same time when you were
12    looking into an online degree and you said that
13    you had looked at some documents and you printed
14    them off, did you show those documents to
15    anyone, such as your husband or daughter or
16    anyone?
17 A. (No response).
18 Q. If you answered I was looking down, and I didn't
19    hear it.
20 A. I'm thinking.
21 Q. Oh. I'm sorry.
22 A. I do not think so.
23 Q. Did you discuss with anyone -- your husband or

Page 146

1    your daughter or friend or anyone -- about what
2    you had seen online when you were first looking
3    into an online degree?
4    A.  When I was first looking into it, probably not.
5    You know, in passing I might have just said
6    something about I'm looking online, but nothing
7    specific.
8    Q.  When is the first time you mentioned to your
9    daughter that you were considering trying to
10   obtain an online degree?
11   A.  I don't recall.
12   Q.  Was it before or after you sent -- well, before
13   or after you made a payment -- made the payment
14   to --
15   A.  It would have been after.
16   Q.  Let me finish the sentence.
17       -- before or after you made the payment to
18   Trinity College and University?
19   A.  It would have been after I received my degree
20   from them.
21   Q.  And forgive me, but I can't remember what your
22   answer to the question was.  When Mr. Marsh
23   asked you when you made the payment by credit

Page 147

1    card, did you give them the information over the
2    phone or did you type it in on the computer?
3    Your card number, expiration date, and that sort
4    of thing.
5    A.  Over the phone.
6    Q.  And when it showed up on your credit card
7    statement that you had made that payment, what
8    did it say on the credit card statement?
9    A.  Oh, I don't recall.
10   Q.  You don't have any idea?
11   A.  I don't recall.
12   Q.  Did it have the word "Trinity"?
13   A.  I don't recall.
14   Q.  Do you still use the same credit card that you
15   used at the time that you made the payment to --
16   A.  No, ma'am.
17   Q.  Do you still have any information that would
18   have that card number on it even if you still
19   don't have the card?
20   A.  I don't think so.
21   Q.  Did you request any type of deduction on your
22   tax return for educational expenses?
23   A.  No, ma'am.

Page 148

1    Q.  Did you ever do that in connection with the
2    courses that you took at Troy?
3    A.  I don't think so.
4    Q.  When you received the information that was
5    marked Defendant's Exhibits 4 and 5 and, it's
6    probably going to be, 3 -- No, it's 10.
7        Did you testify earlier that you received
8    those three at the same time?
9    A.  Yes, ma'am.
10   Q.  And how did you receive them?  Was it through
11   regular mail or UPS or fax?  How did they send
12   that information to you?
13       MS. ELLIS:  Did I state the exhibit
14           numbers for the record?
15       MR. DEBARDELABEN:  No, you didn't.
16       MS. ELLIS:  Let me make that clear.
17   Q.  Exhibits 4, 5, and 10, when you received those
18   three exhibits, how did they come to you?
19   A.  They either came in the mail or like FedEx in
20   the thicker, big envelope.
21   Q.  And what was the return address?
22   A.  Oh, Lord.  I do not recall.
23   Q.  Did you --

Page 149

1    A.  You've got to remember.  This is 2002.
2    Q.  Was there anything else in the envelope other
3    than Exhibits 4, 5, and 10?  Of course, I know
4    these are copies of what you received, but --
5    A.  The --
6    Q.  -- the originals -- I'm sorry.  Go ahead.
7    A.  The transcript, alumni card.
8    Q.  The transcript is Exhibit 3.  So Exhibit 3 was
9    with the other information as well that was
10   mailed to you, correct?
11   A.  Correct.
12   Q.  And do you still have a copy of the alumni card?
13   A.  No.
14   Q.  Was it a card like you would put in your wallet?
15   A.  Right.
16   Q.  And what did you do with that card when you
17   received it?
18   A.  When all this came up and I was told that this
19   was not what I thought it was, I actually cut it
20   up.  I was very upset.  I just cut it up and
21   said, you know ...
22   Q.  Had you ever made a copy of the card before you
23   cut it up?

Page 150

1   A.  No.  I just put it in my billfold, and that's
2      where it was.
3   Q.  And at what point did you put it in your
4      billfold, right after you received it --
5   A.  Yes, ma'am.
6   Q.  -- with these documents?
7   A.  When I received it.
8   Q.  And what did that card say?
9   A.  I can't recall, but it was just a card with --
10      you know, saying alumni.
11   Q.  Did it say Trinity College & University?
12   A.  Oh, yes, it did.
13   Q.  And are you like me that anywhere I go, I've got
14      my purse with my wallet in it?  Are you one of
15      those types that you've always got your purse
16      and wallet with you at work and when you're
17      shopping and that sort of thing?
18   A.  No.  As a matter of fact, a lots of times at
19      work I left it in my trunk.
20   Q.  But you had it in your car outside?
21   A.  Yes.
22   Q.  And you could have referred to your card at any
23      time if you wanted to, just to go out to your

Page 151

1      car and get it?
2   A.  Yes.
3   Q.  Anything else that was received in that packet
4      in addition to the exhibits we've just discussed
5      and the card that you cut up?
6   A.  No.
7   Q.  Was anybody present when you cut up the card,
8      like your husband or anybody else?
9   A.  No.
10   Q.  Did you tell anyone you had cut up the card?
11   A.  No.
12   Q.  Did you cut up the card because you were angry?
13   A.  Yes.
14   Q.  Why were you angry?
15   A.  Because it wasn't what I thought it was.
16   Q.  And what did you think it was?
17   A.  I thought I had -- I thought the school was
18      Trinity University in San Antonio, Texas.
19   Q.  But you stated earlier that the card said
20      Trinity College & University, correct?
21   A.  Correct.
22   Q.  Did the card have an address on it to your
23      recollection?

Page 152

1   A.  No, it did not.
2   Q.  What did you do with the Exhibit 10 after you
3      received it?  In other words, where did you put
4      it?  Did you frame it?  Did you put it in a
5      drawer?  What did you do with Exhibit 10?
6   A.  It's in a nice folder type.
7   Q.  It was in one of those --
8   A.  Yes, ma'am.
9   Q.  -- like my niece got last night at the high
10      school graduation where you open it up and it
11      keeps it secure?
12   A.  Yes, ma'am.
13   Q.  Did you still have it in that?
14   A.  Oh, yes, ma'am.
15   Q.  Where is it now?  At your house?
16   A.  Yes.  Well, actually -- Yes, that's where it's
17      kept.
18   Q.  And did you ever show it to anyone?
19   A.  Oh, yes.
20   Q.  Who did you show it to?
21   A.  Everybody.
22   Q.  When you say everybody, now --
23   A.  My mother, my father.  You know, people normally

Page 153

1      that you would show to when you received a
2      college degree.
3   Q.  Well, you're going to have to be a little more
4      specific.
5   A.  To my children.
6   Q.  Your husband?
7   A.  Yes, my husband.
8   Q.  Anyone else?
9   A.  Oh, yeah.  I mean, friends, neighbors.
10   Q.  And when you showed it to them, did anyone ask
11      you any questions about it?
12   A.  No.  They were just really happy and glad for
13      me.
14   Q.  Did your daughter ever ask you what you had to
15      do to obtain it?
16   A.  No, ma'am.  I just said that I got it online.
17   Q.  Did any of the people that you showed Exhibit 10
18      to ever ask you what you had to do online to
19      obtain Exhibit 10?
20   A.  No, ma'am.  I just said that I had obtained --
21      completed my degree, I think is what -- I
22      completed my degree online.
23   Q.  That's the phrase you would use:  I completed my

Page 154

1    degree online?
2  A.  Yes, ma'am.
3  Q.  Was anybody extra nosy and asked you how much it
4        cost?
5  A.  No, ma'am.  No one ever asked me that.
6  Q.  The same question -- Let me ask you the same
7        question about the transcript, Exhibit 3.  Did
8        you show that to anyone after you received it in
9        the mail or UPS or however it came?
10  A.  No, ma'am.
11  Q.  Did you ever discuss with your family members,
12        your friends, or your neighbors what courses you
13        had been given -- were supposed to have been
14        given credit for by Trinity College &
15        University?
16  A.  No, ma'am.
17  Q.  In other words, even if you didn't show them
18        this piece of paper, did you talk to them about
19        it?
20  A.  No, ma'am.
21  Q.  Now, when your daughter was in college, I know
22        you said she lived on campus, but was it your
23        understanding that for every course for which

Page 155

1        she received college credit, she actually went
2        to class and probably had a book or two for it
3        and took an exam in order to get credit for that
4        class?
5  A.  Yes, ma'am.
6  Q.  And is the same true for your son?
7  A.  Yes, ma'am.
8  Q.  Your daughter was on scholarship; is that
9        correct?
10  A.  Yes, ma'am.
11  Q.  What kind of scholarship was she on at Faulkner?
12  A.  Academic.
13  Q.  Did your daughter ever show you her transcript
14        of her grades or anything like that throughout
15        the time she was in college?
16  A.  No, ma'am.
17        MS. BYRNE:  I'm sorry?
18        THE WITNESS:  No, ma'am.
19  A.  I kept up with her grades best I could since,
20        you know, you're not privy to what they do.
21  Q.  That's right.
22        Tell me everyone you've told that you have
23        filed a lawsuit.  This particular lawsuit, who

Page 156

1        have you told that you filed it?
2  A.  My husband, my pastor.
3  Q.  What's your pastor's name?
4  A.  Billy Driver.
5  Q.  And is that the church that you listed on your
6        application -- resume?
7  A.  No, ma'am.
8  Q.  Which church?
9  A.  Spirit Walk Ministries.
10  Q.  Where is that located?
11  A.  Prattville.
12  Q.  What was the reason for telling your pastor that
13        you filed a lawsuit?
14  A.  Well, he's my spiritual leader.  So when you
15        have turmoil, you talk to them for guidance.
16  Q.  Who else have you told you filed a lawsuit?
17        Your husband and your pastor and who else?
18  A.  Probably the only other people that know it
19        would be my children, besides my attorney.
20  Q.  And did you tell your children that you were
21        going to file the lawsuit or did you just tell
22        them after you had filed it?
23  A.  After.

Page 157

1  Q.  And what was your purpose for telling the
2        children that you had filed a lawsuit?
3  A.  Because they are my children.
4  Q.  Any other reason?
5  A.  No.
6  Q.  Have you ever been to San Antonio, Texas?
7  A.  Yes, ma'am.
8  Q.  And when have you been to San Antonio?
9  A.  '94 or '95 and maybe '96.
10  Q.  And that was in connection with what reason,
11        business or pleasure?
12  A.  Business.
13  Q.  Was that in connection with the NAIC seminar?
14  A.  Work, uh-huh (positive response).
15  Q.  For the receivership?
16  A.  Yeah.
17  Q.  So every time you've been to San Antonio, Texas,
18        it was in connection with being sent there by
19        the Receivership Division?
20  A.  Correct.
21  Q.  Have you ever been to any other cities in Texas?
22  A.  No.
23  Q.  When you were in San Antonio, Texas, did you

Page 158

1    visit the campus of Trinity University?
2    A.  No, ma'am.
3    Q.  Have you ever visited the campus of Trinity
4        University?
5    A.  No, ma'am.
6    Q.  Now, looking at your transcript, which has been
7        marked Defendant's Exhibit 3, how many semester
8        hours did Trinity College & University state on
9        this piece of paper that it was awarding you?
10   A.  102.
11   Q.  Where do you see that number?
12   A.  Wouldn't you say that was it?
13   Q.  Okay.  What is the -- The 22 stands for what?
14   A.  I think that's Applied Learning, wouldn't you?
15   Q.  I don't know.
16       Applied Learning, what do you believe that
17       means or did somebody tell what you that means?
18   A.  No.  I don't know.
19       MS. BYRNE:  I can't hear a thing.  I'm
20       sorry.
21       MR. DEBARDELABEN:  I'm having a
22       problem hearing them both.
23       MS. BYRNE:  Yeah, I am too.

Page 159

1        MS. ELLIS:  I'll try to speak up.
2    Q.  So the question was -- We'll go over it again
3        since they couldn't hear it.
4        You said that you think APL stands for
5        Applied Learning, correct?
6    A.  That's what I think.
7    Q.  And what makes you think that?
8    A.  I really don't know.
9    Q.  Were you told that when you talked to anyone at
10       Trinity College & University?
11   A.  No, ma'am.  I don't know.  I really don't know.
12   Q.  So the total hours you were given for CRU and
13       APL, the total semester hours is how much?
14   A.  124.
15   Q.  Now, how many hours on this particular document,
16       this transcript, Defendant's Exhibit 3, can you
17       attribute to courses that you actually took at
18       Troy University, if any?
19   A.  I can't answer that.
20   Q.  Are your Troy University courses reflected on
21       Exhibit 3?  Are they listed on Exhibit 3?
22   A.  I can't answer that.  I sent to her the ones I
23       had taken at that time.

Page 160

1    Q.  In other words, are they described in the list,
2        the courses you took at Troy University?  Are
3        they described in the list?
4    A.  Exactly by name, no, ma'am.  I only see one
5        that's -- Well, I only see two that's described
6        exactly by name.
7    Q.  And what are those? if you'll just read those
8        out for the record.
9    A.  Accounting Principles I and Principles of
10       Accounting II.
11   Q.  Does it indicate on Exhibit 3 how many semester
12       hours you were provided for those two courses?
13   A.  No, ma'am.
14   Q.  Now, you testified earlier when Mr. Marsh was
15       asking you questions that it was your best
16       recollection that you started looking for online
17       degrees in early 2002, correct?
18   A.  Uh-huh (positive response).  Yes.
19   Q.  And then you received your piece of paper marked
20       Exhibit 10.  It says signed and sealed upon this
21       25th day of May 2002, correct?
22   A.  Yes, ma'am.
23   Q.  So the period of time between the time that you

Page 161

1        first contacted someone at Trinity College &
2        University and the time that you received
3        Exhibit 10 was less than five months, correct?
4    A.  Well, I think it was six months or so because
5        even though I started looking in early 2002, I
6        probably did not start talking to them -- and
7        I'm not exact but -- You know, maybe it was two
8        months later.  But, see, I didn't receive this
9        in May.  It was over a little bit, and I can't
10       remember exactly when.  But that's the date this
11       has on it, but it might have been, you know,
12       like late June.  I can't remember exactly.
13   Q.  But as far as not considering when you received
14       it but the actual date of it --
15   A.  Yes, ma'am.
16   Q.  -- approximately --
17       If you go from the date of it on Defendant's
18       Exhibit 10 and then going backwards,
19       approximately how long was it between the time
20       you first talked to somebody at Trinity College
21       & University and the time that's the date on
22       Defendant's Exhibit 10?
23   A.  Okay.  And that's what I had said.  I guess I

000042

Page 162

1    would approximate -- I don't know.  I guess I
2    would approximate maybe five months, I guess.  I
3    can't be exact.  I know before we came up with
4    six months, but, you know --
5  Q.  May is the fifth --
6  A.  Fifth month.
7  Q.  So it would really be less --
8  A.  But all of these are approximates.  I can't go
9    back -- When I say early 2002, it might have
10    been November or December of 2001.  I know it
11    seems to me that I worked with doing that for
12    quite some time.  So I just would say
13    approximately from the time I started till the
14    time -- I would say somewhere between five and
15    six months.  So maybe early 2002 is not correct,
16    you know.
17  Q.  Well, could early 2002 be correct as far as when
18    you actually started talking to Trinity College
19    & University?
20  A.  Yes, ma'am, it could be.
21  Q.  Now, when you talked to the lady at Trinity
22    College & University and she had asked you for
23    information which you submitted, you submitted

Page 163

1    that information online or on the phone to her
2    as far as your work at the Insurance Department
3    and that sort of thing?
4  A.  I told her about it on the telephone, but then I
5    faxed her a lot of information.  But we talked
6    again on the phone, and we talked more in detail
7    with it because she had a good many questions.
8  Q.  And what fax machine did you use when you sent
9    her the information?
10  A.  From home.
11  Q.  And what is your -- Do you still have that same
12    fax machine?
13  A.  I don't know it's the same one, but my fax
14    number is my phone number.
15  Q.  What is that?
16  A.  334-285-6226.
17  Q.  How many times did you -- How many different
18    times did you fax information to Trinity College
19    & University?
20  A.  Two times.
21  Q.  Now, when you provided information either by fax
22    or by telephone or any other way, did you give
23    the individual you were speaking with at Trinity

Page 164

1    College & University any particular telephone
2    numbers to call or individuals with whom they
3    should speak in order to verify the information
4    that you had given them?
5  A.  No, ma'am.  Not other than what was listed on
6    the paper.
7  Q.  And what would have been listed on the paper, as
8    an example, for the Receivership Department of
9    the Department of Insurance?  Would anything
10    else have been listed?
11  A.  Like at the school, like Wetumpka Vocational
12    School, it would have been the address there.
13  Q.  What about for the Insurance Department, the
14    Receivership Division?  Did you have an address
15    or give them a telephone number?
16  A.  No.  It just said State of Alabama.
17  Q.  Did you give them the name of a person to
18    contact such as Denise Azar or anyone else at
19    the Receivership Division?
20  A.  You know, how it was listed on my resume would
21    have been how it would have went through there.
22  Q.  I've never seen on your resume where there was a
23    particular person.

Page 165

1  A.  I can't recall, but that's how it went.  How I
2    faxed it to her, that's how it went to her.
3  Q.  But you didn't add any additional information
4    giving this person a telephone number to call or
5    a contact person to verify any of your
6    information?
7  A.  No, ma'am.
8  Q.  Have you ever heard from any source that Trinity
9    College & University actually did contact anyone
10    from any school to verify any of the information
11    you had provided?
12  A.  No, ma'am.
13  Q.  Did you ever contact anyone, say, at the
14    Receivership Division at the Department of
15    Insurance and ask them, by the way, has anybody
16    called to verify any of my information?
17  A.  No, ma'am.
18  Q.  Did anyone at Trinity College & University ever
19    ask you for additional contact information so
20    that that person could or someone there could
21    verify what you had provided?
22  A.  No, ma'am.
23  Q.  What is a student who is taking a college course

Page 166

1    called Statistics supposed to learn?
2    A.  They would learn how to aggregate numbers, how
3        to divide out or come up with information on --
4        I would think, on -- You know, like a lot of
5        data was given to them and how you would come up
6        with how to divide or come up with numbers of
7        how that data would be divided out under certain
8        circumstances.
9    Q.  As of the date on this piece of paper that's
10       Defendant's Exhibit 10, which is May 25, 2002,
11       in your opinion would you have been able to pass
12       a test in the course of Statistics that would be
13       given at Troy University at that time?
14   A.  I don't know.
15   Q.  Don't have any idea?
16   A.  I haven't ever tried it.  I don't know.
17   Q.  Haven't ever tried what?
18   A.  To pass a test on Statistics.
19       (Brief off-the-record discussion.)
20   Q.  On the date of this piece of paper that's marked
21       Defendant's Exhibit 10, at that time in your
22       opinion, would you have been able to take and
23       pass an exam for Business Math II that was being

Page 167

1        given at Troy University?
2    A.  I would think so.
3    Q.  You would think you could pass Business Math
4        II.  What makes you think that?
5    A.  Just for the fact that -- I think I could pass
6        Business Math II for as long as I've worked with
7        numbers and as much of it as I have done.
8    Q.  But you've never taken a course in Business Math
9        II, correct?
10   A.  I think I can pass it.
11       MS. BYRNE:  I'm sorry?
12   Q.  But the question is:  You've never taken a
13       course in Business Math II, correct?
14   A.  Correct.
15   Q.  Have you ever opened a textbook that is used for
16       a Business Math II course?
17   A.  Not past high school, no.
18       MS. BYRNE:  I'm sorry?
19       THE WITNESS:  No.
20       MS. ELLIS:  No.
21   Q.  At the time that you or -- the time and date of
22       Exhibit 10, which is May 25 of 2002, in your
23       opinion would you have been able to pass a

Page 168

1        course on Economic Geography that was given at
2        Troy University at that time?
3    A.  I don't know.
4    Q.  Have you ever taken a course in Economic
5        Geography?
6    A.  No.
7    Q.  Have you ever seen an exam for Economic
8        Geography?
9    A.  No.
10       MR. DEBARDELABEN:  You have to answer.
11       THE WITNESS:  I said no.
12       MR. DEBARDELABEN:  She couldn't hear
13          you.
14       THE WITNESS:  No.
15   Q.  What in your opinion would a course entitled
16       Economic Geography involve?
17   A.  I don't know.
18   Q.  At the time that you -- the date of Exhibit 10
19       or the time that you received Exhibit 10, in
20       your opinion would you have been able to have
21       taken and passed a course of Economics I at Troy
22       University?
23   A.  I would think so.

Page 169

1    Q.  On what do you base that?
2    A.  Because I think so.
3    Q.  Any other reason other than you just think so?
4    A.  No.
5    Q.  Have you ever studied a textbook on Economics I?
6    A.  Yes.
7    Q.  When did you do that?
8    A.  A couple of years ago.
9    Q.  Now, I was asking you, though, about the time
10       that you -- either the date of Exhibit 10 or the
11       time you received it.  At that time --
12   A.  Oh, excuse me.
13   Q.  At that time had you ever even opened a textbook
14       on Economics I?
15   A.  No.
16   Q.  Ever taken a test on Economics I?
17   A.  No.
18   Q.  If you heard someone use the phrase, my daughter
19       is attending school at Faulkner University, what
20       would that mean to you?
21   A.  That she was attending school at Faulkner.
22   Q.  Would that mean to you that she's physically on
23       the campus and going to classes?

Page 170

1   A.  It would.
2   Q.  So when you use the word "attending," that means
3       to you physically there and going and taking
4       courses, correct?
5   A.  Correct.
6   Q.  Would you expect that just the average person
7       off the street would agree with you, that
8       generally speaking if someone says my child is
9       attending college at such-and-such, that it is
10      certainly expected a reasonable person would
11      think, well, that means that child is actually
12      on campus attending classes?
13              MR. DEBARDELABEN:  Object to the
14          form.  You can answer if you can.
15  A.  I don't guess I can tell you what people think.
16      I can just tell you what I think.
17  Q.  And what you think is --
18  A.  Yes.
19  Q.  -- that that means actually on a campus
20      attending courses, correct?
21  A.  Yes.
22  Q.  In your complaint that you filed in court, you
23      made a claim for public humiliation.  Can you

Page 171

1       tell me what the basis of that claim is?
2   A.  Well, I'm an honest person.  I put what I
3       believed to be the truth, and I don't lie.  And
4       I feel if nobody else but you people look at me
5       as saying that I lied, that I intentionally
6       lied.  Now, people can make a mistake, and you
7       wouldn't be looked at maybe as being a liar.  So
8       that's in this case what I feel like, that
9       people now -- Like I said, if no one else but
10      just you people look at me as being a liar.
11  Q.  Do you believe that your daughter looks at you
12      as being a liar?
13  A.  No, ma'am.
14  Q.  Do you believe your husband looks at you as
15      being a liar?
16  A.  No, ma'am.
17  Q.  Do you believe your son looks at you as being a
18      liar?
19  A.  No, ma'am.
20  Q.  Do you believe your siblings look at you as
21      being a liar?
22  A.  I don't know that my siblings even know -- at
23      least all of them -- even what's going on.

Page 172

1   Q.  Do you believe that your pastor --
2   A.  I do not believe my pastor does, but I know
3       there's probably -- anybody that knows and
4       doesn't know the facts of this, which I'm sure
5       that people who have just said, she was fired
6       for marking her application wrong, that's what
7       they feel like.  That's public humiliation.
8   Q.  And who are those people you're speaking of --
9   A.  I'm sure it's anybody at DHR.  I'm sure it's
10      anybody at Finance, people that I've worked
11      with.
12  Q.  Name the people.
13  A.  You want me to name people I've worked with?
14  Q.  When you claim public humiliation, I need to
15      know who --
16  A.  Jenny Brackin, Pam Harris, Bob Childry, Mack
17      Reed, all the people up and down the hall.  Do
18      you want me to continue naming names?
19  Q.  Yes.
20  A.  Connie Constance, Diane Lindsey.  I can just
21      keep going.  Jim Connell.  You know, I could
22      just sit down and just keep writing a list of
23      all these people.

Page 173

1   Q.  Have any of these people actually expressed any
2       opinion to you about --
3   A.  I've had several to call me and ask me what
4       happened.
5   Q.  Did they express an opinion to you that they
6       feel you're a liar?
7   A.  I've had a couple to ask me if I was.
8   Q.  And what did you answer?
9   A.  What did I --
10  Q.  What did you answer?
11  A.  I answered no, that I was not.
12  Q.  Did the person --
13  A.  But then they came back and said, you know, you
14      were fired.
15  Q.  Now, who are those people?
16  A.  One of them was Diane Lindsey.  Another one
17      asked my son when he still worked at DHR.
18  Q.  Who was that?
19  A.  I don't know.
20  Q.  You can't remember his name?
21  A.  I would have to ask him to get the name.
22      I had another one who sent word to me that
23      he knew that's what they were saying, but he

Page 174

1  knew me as a person and he did not believe
2  that. That's pretty much public humiliation.
3  Q.  For people to tell you they don't believe that
4       you're a liar?
5  A.  No. That people are saying that you're a liar.
6  Q.  But then those people are saying they don't
7       believe you're a liar.
8  A.  No. I had one who said people are talking about
9       it and saying that your mother is a liar, but I
10      know her and I know that she would not do that.
11           And to say does your daughter believe you
12      are, that's not public. Daughter would not be
13      considered public.
14 Q.  Was Faulkner University on the semester system
15      when your daughter was in school there?
16 A.  I don't know.
17 Q.  What is your best recollection of the average
18      number of hours that she took each either
19      semester or quarter? I know it varies from each
20      time.
21 A.  I don't know.
22 Q.  But if she's going full-time, what would be the
23      average number or a range of hours?

Page 175

1  A.  I don't know. She took care of all that
2       herself, you know. She never asked me what
3       classes should I take, how many should I take.
4       She took care of all her scheduling and all her
5       doings.
6  Q.  In speaking with her each semester or quarter,
7       what was your understanding of the number of
8       classes she generally took?
9  A.  I really don't know.
10 Q.  Was it more than four?
11 A.  I don't know. I don't know.
12 Q.  Was it more than ten?
13 A.  Oh, I know it -- I'm sure it wasn't more than
14      ten. There wouldn't be enough hours. Well, I
15      don't know in a quarter would it be more. I
16      don't know.
17 Q.  I'm saying courses, now.
18 A.  Yeah. I don't know. I don't know.
19 Q.  You're saying you have no idea --
20 A.  I have no idea.
21 Q.  -- how many courses your daughter took any
22      particular semester or quarter at Faulkner?
23 A.  (Witness nods head negatively.)

Page 176

1           MR. DEBARDELABEN: You have to answer.
2  A.  I do not know. No, I don't know. She took care
3       of all her scheduling and all her planning. She
4       took care of all her business from the very
5       beginning.
6  Q.  And she never talked to you about her courses or
7       what she was taking?
8  A.  Huh-uh (negative response). No, she didn't.
9       No, she didn't. We sent what money she needed,
10      and she took care of all her business.
11 Q.  Did you ever audit any courses at Troy
12      University or any other university?
13 A.  No.
14 Q.  Did you ever sign up for any courses at Troy and
15      then drop the course?
16 A.  No.
17 Q.  You testified earlier that you were interested
18      in a school in North Alabama, correct?
19 A.  Uh-huh (positive response). Yes.
20 Q.  And what made you interested in that particular
21      school, and what was the name of it?
22 A.  I can't recall the name of it. I just remember
23      spending a couple of days reading the

Page 177

1       information on the Internet.
2  Q.  And why did you not choose that particular
3       school?
4  A.  I don't recall.
5  Q.  Don't have any idea?
6  A.  I do not. I don't recall.
7  Q.  Did you ever call anyone at that school and talk
8       to anybody at that school?
9  A.  No, I did not.
10 Q.  And you testified earlier that you did look into
11      Troy's online degree program.
12 A.  Yes, I did.
13 Q.  And why did you not choose to use Troy's online
14      degree program?
15 A.  I talked to a counselor. I believe his name was
16      Kenny Rogers. That's why I can remember it. He
17      said they wouldn't take any work related for
18      credits.
19 Q.  What did he say would be needed for credits?
20 A.  Oh, I don't recall. I was telling him that I
21      was looking at something on the Internet, and
22      they would take some work history for credits.
23      And he said that Troy would not do that.

Page 178

```
1    Q.   Did he explain to you that the online degree
2         program at Troy involved actually studying and
3         taking tests?
4    A.   No.  We didn't talk about that.  I was just
5         telling him what I was reading on the Internet,
6         and he told me he knew a lot of schools did
7         that, they would give you credit for, you know,
8         like military work and let you transfer credits
9         in for things like that.  I can't remember -- I
10        know it was military work and something else.
11        But he said that they did not.  So he said if
12        you could do that, it would probably get you
13        your degree faster and that he did know that a
14        lot of those places would let you use credits
15        from some other schools like Troy.  You know, a
16        lot of schools wouldn't, but a lot of schools
17        would, just like, you know, in Montgomery, AUM
18        would not take Troy credits and sometimes Troy
19        doesn't take AUM credits.  So he was saying you
20        do and some don't.  So if you could do that,
21        that might would be a better way for you to go.
22        So that's the reason I had decided to do that.
23   Q.   Why did he say that Troy would not take any
```

Page 179

```
1         credits from Trinity College & University?
2    A.   They do not just take work history for credits.
3    Q.   Did he appear to be familiar with Trinity
4         College & University?
5    A.   He didn't act like he wasn't.  He didn't really
6         tell me either way, but he didn't act like he
7         wasn't.
8    Q.   Now, why did you not continue to just take
9         courses at Troy as you had been doing with your
10        accounting courses?
11   A.   Well, sometimes they were late at night and
12        different things like that.  Going online would
13        have just been more convenient.  You would have
14        a gap sometime when you got off from work, and
15        it was far for me to go home and then maybe come
16        back at eight o'clock at night, going back and
17        forth.  So it would have been just a little more
18        convenient for me to take them online.
19   Q.   And to take a course online, what does that mean
20        to you?
21   A.   To take the course online, I wasn't exactly
22        sure.  I had never taken one online.  I also
23        looked into taking some television courses.  I
```

Page 180

```
1         wasn't sure about that either.  But to take a
2         course online, I just assumed you got your work
3         assignments and that you did that and turned it
4         in online.  But that's how I got into finding
5         Trinity.
6    Q.   You assumed that to take a course online meant
7         you get your assignments, and then did you also
8         assume that you would take a test and be graded?
9    A.   Yes.  But I didn't know what all was out there,
10        but that's how I got into finding Trinity.
11             (Defendant's Exhibit 20 marked for
12             identification.)
13   Q.   I'm showing you what's been marked as
14        Defendant's Exhibit 20.  Can you identify that
15        for me, please?  By identify, just tell me what
16        it is and the date on it and who it's from and
17        who it's to.
18   A.   It's a letter that I wrote Jackie Graham on May
19        15, 2006.
20   Q.   Let me ask you about the -- What is the reason
21        for writing this letter?  Was it in response to
22        a letter from Ms. Graham asking you for some
23        information?
```

Page 181

```
1    A.   I think I had wrote her a letter before this.
2    Q.   I'm not trying --
3    A.   She had asked me for my transcripts.  I think
4         that's right.  And I wrote her back and sent her
5         my transcripts from Troy, and I told her why I
6         would not be sending my transcripts from Trinity
7         College.
8    Q.   That's what I wanted to ask you about.  In the
9         second sentence on Exhibit 20, you state:  I
10        will not be able to attach my transcript from
11        Trinity College & University.  I have came to
12        the knowledge the transcript and diploma are not
13        as they were represented to me.
14             Is that a correct statement?  I know the
15        sentence goes on, but is that correct?
16   A.   Yes.
17   Q.   Did I read that correctly?
18   A.   Yes.
19   Q.   And what did you mean by that, by that sentence,
20        when you wrote that to Ms. Graham?
21   A.   Well, after they told me and I got to thinking
22        about it, you know, they must know what they are
23        talking about.
```

Page 182

1  Q.  They being ...
2  A.  After I had gone into Butch King's office and
3      they said they had done this investigation, that
4      I'm thinking, you know, they wouldn't just tell
5      me this.  So I thought, well, if that's the
6      case, then, you know, I don't want to just keep
7      saying that.  I don't want to keep saying I have
8      a diploma if they said it wasn't a diploma.  So
9      I wasn't going to send that to her and keep
10     telling her that if that was not the truth.  So
11     they told me that it was not.  And so I was
12     wanting to ask her -- If this is the case and
13     this is not what they said it was, I was going
14     to ask her could I just roll back to Accounting
15     Tech because I had been in a permanent position
16     as an Accountant Tech before I was promoted to
17     an Accountant.
18        So I had asked to meet with her, and I had
19     been over to her office, and they said she was
20     busy.  I had been over there twice.  One time I
21     just left.  One time I went over and sit for a
22     few minutes to wait for her, you know, trying to
23     see her to talk to her.  So I put this in there

Page 183

1      trying to, you know, explain to her.
2  Q.  And at the time that you wrote this letter on
3      May 15 of 2006, you truthfully stated, did you
4      not, that you had come to the knowledge that the
5      transcript and diploma were not as they had been
6      represented to you, correct?
7  A.  I was going by what Butch King had told me in
8      his office, that they had done an investigation
9      and they did not believe it to be valid.
10 Q.  And at this time when you wrote this particular
11     letter on May 15 of 2006, you did not believe
12     that it was valid, correct?
13 A.  Like I said, I was going by what they said.  And
14     if I could have just rolled back to the
15     Accounting Tech, I would have just rolled back
16     and kept working at that.
17 Q.  That's not my question, though.
18        MS. ELLIS:  Would you read my question
19     back, please?
20        (The immediately preceding question
21        was read back by the court
22        reporter.)
23 A.  Like I said, I believed what Butch King was

Page 184

1      telling me at the time.
2  Q.  That's not really answering my question.
3        MS. ELLIS:  Would you read the
4        question again?
5        (The following was read back by the
6        court reporter:  And at this time
7        when you wrote this particular
8        letter on May 15 of -- )
9        MS. BYRNE:  She's looking at what
10       you're writing, and I know you're
11       not --
12       MR. DEBARDELABEN:  Do you want to see
13       what I'm writing?  I'm doodling.
14       MS. BYRNE:  That's fine, but --
15       MR. DEBARDELABEN:  Let her make an
16       objection.
17       MS. BYRNE:  That's not an objection.
18       That's a point of order.
19       MR. DEBARDELABEN:  I am doodling.
20       MS. BYRNE:  That's fine.  But it looks
21       kind of strange when you all the
22       sudden start leaning over -- she
23       leans over and is trying to look

Page 185

1      over at what you're writing.
2        MR. DEBARDELABEN:  Well, it can look
3        strange.  I am not doing anything
4        improper.
5        MS. BYRNE:  I understand.  I wasn't
6        saying you were.
7        MR. DEBARDELABEN:  You can come over
8        and look at my doodling if you
9        want to.
10       MS. BYRNE:  Jim, I was not saying you
11       were.  I just ask that you please
12       have her not look at you.  I was
13       trying to bring it to everyone's
14       attention.  If you have a problem
15       with that, I'm very sorry.
16       MR. DEBARDELABEN:  Ms. Byrne, if you
17       want to make an objection --
18       MS. BYRNE:  I'm not making an
19       objection, but I don't have to sit
20       here like a potted plant.
21       MR. DEBARDELABEN:  I think Ms. Ellis
22       has the floor, and this is her
23       deposition at this point in time.

Deposition of Virginia Hopper, Vol. II                                                    May 20, 2008

Page 186

1    MS. BYRNE:  It is her deposition, but
2        I think when I see something that
3        may be a violation that I have the
4        right to bring it to the
5        attention --
6    MR. DEBARDELABEN:  The only thing
7        that's been a violation is when
8        you started objecting and asking
9        questions.
10   MS. BYRNE:  And I did apologize for
11       that.
12   MR. DEBARDELABEN:  And I haven't done
13       it yet.  So let's go on with the
14       deposition.
15   Q.  Ms. Hopper, I'll get the court reporter to read
16       the question to you again.
17           (The following was read back by the
18           court reporter:  And at this time
19           when you wrote this particular
20           letter on May 15 of 2006, you did
21           not believe that it was valid,
22           correct?)
23   A.  Yes.

Page 187

1    Q.  Now, when you stated in the letter that you
2        would not be able to attach your transcript,
3        what did you mean by that, that you would not be
4        able to attach it?
5    A.  It wasn't that I couldn't have put it on here,
6        but if it wasn't what it was supposed to be, I
7        didn't want to keep doing that.
8    Q.  You testified earlier that Jenny Brackin was,
9        quote, basically harassing me, quote.  Correct?
10   A.  Yes, ma'am.
11   Q.  And how long do you claim that Ms. Brackin had
12       been, quote, basically harassing, quote, you
13       prior to the time that you left Finance and went
14       to DHR?
15   A.  Since around six of 2004.
16           (Brief off-the-record discussion.)
17   Q.  Explain to me in further detail what you contend
18       Ms. Brackin was doing that constituted
19       harassment of you since June of 2004.
20   A.  Well, the first thing I noticed was she wanted
21       to walk at lunch.  And if I didn't walk, she
22       wouldn't talk to me, because I did walk with her
23       mainly at lunch.  If I didn't walk, she wouldn't

Page 188

1    talk to me.  Like I said, this may not be,
2    quote -- these things may not be harassment.  I
3    stayed -- There was three people in our office.
4    I mainly stayed in my cubical.  I was up front.
5    Kind of stayed more to myself.
6        And a lots of times it was the fact that she
7    didn't talk to us.  Most of the time -- when we
8    didn't walk at lunch, if you didn't go to lunch
9    with her -- There came a point in time when
10   Heather worked across the street and Donnie went
11   to work across the street at DHR, and, you know,
12   downtown you can't hardly go to lunch and get
13   back anywhere.  Heather's husband had got where
14   he was picking us up, and we would go to lunch
15   together.
16       So at one point she was upset, and she said,
17   it's been over a month since you sat at the
18   table and ate lunch with us.  So she was upset
19   about that.  This is not her tone, but she was
20   upset about that.  And on those times I would
21   ask her did she want to go to lunch with us, you
22   know, at different times, and she wouldn't.  So
23   she would be upset and mad about that, you know,

Page 189

1    just short and hateful and say different remarks
2    because of things like that.
3    Q.  Now, tell me specifically.  Did she say anything
4        hateful to you?
5    A.  Oh, yeah.
6    Q.  Tell me an example.
7    A.  She said I was obsessed with my children.
8    Q.  Anything else?
9    A.  And she told that to Bob Childry.
10   Q.  Anything else?
11   A.  Some things I probably don't want to say.
12   Q.  Well, I need you to say them.  I need you to.
13   A.  I don't know anything else.
14           MS. BYRNE:  I can't hear you.
15   A.  I don't know anything else.
16   Q.  No.  I think you do, and you need to tell me.
17       Ms. Brackin is a witness in this case, and she's
18       being deposed by your attorney so I don't want
19       any surprises.  I want to know what you say she
20       said to you that you contend was spiteful or
21       whatever word you used, or hateful.
22   A.  Well, I know the parking was an issue, and I
23       left my car at Big Ten one day to get my tires

Page 190

1    replaced. The next day I had left -- I drove
2    the TrailBlazer instead of my car so my parking
3    pass was in my car and not in my TrailBlazer.
4    And so I asked somebody could I use their card
5    to get in, and they didn't have theirs. Theirs
6    was in my (sic) car. So I asked Peggy Bowing if
7    I could borrow hers because I had just parked in
8    a meter. And I asked her could I borrow hers,
9    and she didn't have hers, but someone else ran
10   down to get theirs so I could move out of the
11   meter and get in the place.
12       She saw me doing that, and she had the
13   misconception that I let Donnie use my card
14   sometimes, but I didn't. And so I think she was
15   mad because she thought I did. And so she said
16   that nobody could lend anybody their card,
17   meaning that they couldn't lend me their card to
18   get in the meter thing. And so she just was
19   really upset about that, and she was raising her
20   voice about it. And I really didn't think
21   anything about it, but the next day I called
22   Donna Gant and was asking her about that, you
23   know, because that's not like really borrowing

Page 191

1    anybody's card or taking anybody's parking place
2    because I had a parking place. Not an assigned
3    parking place, but I had a place.
4        And so when I went in the next morning
5    because -- She had said you signed a piece of
6    paper saying this, this, and this, and you
7    wouldn't borrow anybody's card. So I told her
8    that I called her, and, of course, she was
9    really mad. And she said, like, I dare you to
10   call somebody when I'm your supervisor. Well, I
11   really didn't think that was going above her
12   head just to call somebody and say is this
13   illegal for you to do, because that's what she
14   was threatening me with: This is illegal for
15   you to do because you borrowed her card. But I
16   didn't really borrow it. I just wanted to get
17   in, or this was the way I looked at it. I
18   didn't borrow her card. I did, but I only
19   wanted to get in, not to borrow her card to take
20   somebody's parking place. It was my parking
21   place. I just needed a way to get in. But she
22   was looking at it I borrowed her card, and I'm
23   not supposed to borrow anybody's card. So she

Page 192

1    was really mad about that. I went over her
2    head. She's my supervisor, and she dared me to
3    go over her head.
4        But I told her -- I said, well, I apologize,
5    but I didn't think it was going over your head.
6    This lady is in charge of the parking deck so I
7    just called her to ask her is it okay if you use
8    somebody's card like that just to get in. See,
9    I know a lot of people do that. You're not
10   taking somebody's place. You're just borrowing
11   somebody's card to get in to use it. And so she
12   just kept on about that. So I know she would
13   stand there and watch me park and things like
14   that because she was just sure that Donnie, Jr.
15   was using my parking place or I was letting him
16   in which was not the case at all. So she
17   watched me go in and park and things like that.
18       But, now, she did some of that stuff to
19   other people too. Bob's secretary was -- this
20   is beyond the scope of -- she was sick and out a
21   lot. So Jenny was going to go to her house and
22   watch her and make sure she was sick and she was
23   at home and things like that. Just little

Page 193

1    things like that.
2    Q.  Well, you described that -- the word that you
3         use in describing Ms. Brackin's actions is you
4         said she said hateful things to you or was
5         hateful to you. Anything else other than what
6         you've told me?
7    A.  Well, you know, just -- you come in sometime,
8         and it would just be hateful something to you,
9         just --
10   Q.  That's what I'm asking you. Tell me --
11   A.  Tell you exactly what she said?
12   Q.  Yes. Exactly.
13   A.  I can't think of anything. I'm not going -- I
14        can't think of anything.
15   Q.  Are you going to think of something later and
16        say it in court and surprise us?
17   A.  No. I probably wouldn't say that in front of
18        anybody.
19   Q.  Well, probably?
20   A.  No.
21   Q.  If you know something, you need to tell me
22        because if it's going to come out in court, it's
23        not fair to me not to know it now.

Page 194

1    A.   Yeah.  I won't.
2    Q.   Nothing else?
3    A.   (Witness nods head negatively.)
4    Q.   You need to say --
5    A.   No.
6    Q.   Did you ever put anything in writing?  Any kind
7         of complaint against Ms. Brackin, did you ever
8         put anything in writing?
9    A.   No.
10   Q.   Did you ever record any conversations with
11        Ms. Brackin?
12   A.   No.
13   Q.   Did you ever record any conversations with
14        anybody at State Personnel?
15   A.   No.
16   Q.   Did you ever record any conversations that you
17        had with anybody at DHR?
18   A.   No.
19   Q.   Did you ever record any conversations that you
20        had with anyone at Finance or the Comptroller's
21        Office?
22   A.   No.
23   Q.   To your knowledge did anyone ever have a

Page 195

1         conversation with someone on your behalf and
2         that person recorded that conversation?
3    A.   No.
4             MR. DEBARDELABEN:  Other than
5             depositions and hearings?
6         MS. ELLIS:  Right.
7    Q.   For example, did you ever have your husband call
8         somebody and your husband was recording that
9         person as he was talking?
10   A.   No.
11   Q.   Now, you stated that you reported what you
12        considered to be a hostile work environment to
13        Bob Childry, correct?
14   A.   Yes, ma'am.
15   Q.   And on how many occasions did you report what
16        you considered to be a hostile work environment
17        to Mr. Childry?
18   A.   Twice.
19   Q.   And on what dates?  You probably don't remember
20        exact dates, but in connection with the time
21        that you turned in your resignation letter.
22   A.   Okay.  I can't remember the first one, but we
23        had a conversation about it.  And I know he had

Page 196

1         a conversation with her about it because he came
2         back and talked to me.  I do know the second one
3         was the day I turned in my resignation letter.
4    Q.   How long before the second conversation with
5         Mr. Childry did the first conversation you're
6         referring to take place?  Weeks?  Months?  A
7         year?
8    A.   Months.
9    Q.   Several months?
10   A.   Yes.
11   Q.   And to your knowledge, did Mr. Childry write
12        anything down about your conversation with him
13        or any conversation that he may have had with
14        Ms. Brackin after he talked to you if he did
15        have one?
16   A.   I don't know.
17   Q.   You've never seen anything in writing about
18        that?
19   A.   No, ma'am.
20   Q.   Were you ever written up by Ms. Brackin?
21   A.   No, ma'am.
22   Q.   Were you ever written up by Mr. Childry?
23   A.   No, ma'am.

Page 197

1    Q.   To your knowledge did Mr. Childry ever write up
2         Ms. Brackin?
3    A.   Not that I know of.  No, ma'am.
4             MS. ELLIS:  We need to take a break.
5             (Brief recess.)
6    Q.   (Continuing by Ms. Ellis)  Ms. Hopper, when we
7         took a break, I was asking you about
8         conversations with Mr. Childry, and we've talked
9         about two times that you had met with him.
10   A.   Yes.
11   Q.   Tell me what was discussed the first time you
12        met with Mr. Childry.  We're talking about in
13        terms of your discussion about Ms. Brackin.
14   A.   I just went in and sat down and talked to him
15        and told him how I felt about what was going on
16        in the office.  And he explained to me that he
17        thought that that had been a two-office person
18        for a long time, and for the third person to be
19        included, it was hard for them to adjust to
20        that.
21   Q.   Now, how long had you been there at that point?
22        How many years?
23   A.   Probably a little while.

Page 198

1  Q.  Well --
2  A.  But that's what he had said. And he said just
3      to hang in there and that he would have a talk.
4  Q.  Have a talk with whom?
5  A.  With Jenny Brackin. And, actually, the reason I
6      went in was because they had gone across the
7      street to the Treasurer's Office.
8  Q.  They being who?
9  A.  Jenny Brackin. But we just had had the talk,
10     and he said he would have a talk with them --
11     with Jenny Brackin.
12  Q.  And then your second conversation with
13     Mr. Childry about Ms. Brackin, you said that
14     occurred on the date that you turned in your
15     resignation, or was I mistaken?
16  A.  No. That was the date I turned in my
17     resignation letter.
18  Q.  Tell me what you said and he said.
19  A.  I just told him that I was transferring to DHR,
20     and he said he thought at that point that would
21     be a good move for me. And he gave me a letter
22     requesting my diploma, said there was an ongoing
23     investigation, and he gave me a letter

Page 199

1     requesting my diploma.
2  Q.  Anything else said?
3  A.  He had led me to believe they were asking for
4     everyone's diploma up and down the hall, every
5     accountant's diploma. So I specifically asked
6     him: Are you asking for everyone's. And he
7     finally said, well, no. And I said, well, then,
8     tell me that this is coming from Jenny Brackin.
9     And so he told me, well, yes, it is. And I
10     said, well, you know, then, I'm glad I had
11     already made this decision. He said, I think
12     it's probably best for everybody. But I told
13     him at that point -- it was probably three
14     o'clock in the afternoon -- as soon as I can get
15     home and get back, I will have it.
16  Q.  Anything else said about Ms. Brackin during that
17     conversation with Mr. Childry?
18  A.  Well, yes.
19  Q.  Okay. You've got to tell me.
20  A.  He said -- I asked him, you know, if he knew
21     what her problem was, and he said, I think it's
22     more of a thing of a scorned woman. He said,
23     you know what the Bible says; it's better to

Page 200

1     sleep on the housetop than be around a scorned
2     woman.
3  Q.  Anything else?
4  A.  Elaborated on that a little bit, and that was
5     about all.
6  Q.  When he elaborated, what did he say?
7  A.  Well, I asked him what exactly did that mean,
8     the fact -- why would she be a scorned woman.
9     And he said one thing he thought, Mack had just
10     left and she was quite upset about that, and she
11     was quite upset that people around her was
12     getting promoted and it had taken her several
13     years to even get her first promotion and that
14     it had taken her a lot of years to get where she
15     was at, and she wasn't feeling that around the
16     young people that was coming in, not being me.
17     I'm as old as she is. But some of the young
18     people coming in.
19  Q.  Anything else?
20  A.  No, ma'am.
21  Q.  This is jumping around again, but I just saw a
22     reference in your personnel file of somebody
23     named Michael K. Jones who graduated from

Page 201

1     Faulkner University. Who is that?
2  A.  You saw that in my file?
3  Q.  You were supposed to take a test on a certain
4     day, and you've got a letter saying I can't take
5     the test because I've got to attend a
6     graduation.
7  A.  Uh-huh (positive response). He was a friend
8     that was graduating from Faulkner.
9  Q.  I just thought that might be your son, and that
10     wasn't your son's name so I was just confused.
11  A.  No.
12  Q.  That's just a son of a friend of yours?
13  A.  Yes.
14  Q.  And what's your friend's name?
15  A.  He was the friend that was graduating from
16     Faulkner.
17  Q.  Michael K. Jones, correct?
18  A.  Correct.
19  Q.  Does he work for the State?
20  A.  No.
21  Q.  And is he approximately your age?
22  A.  No.
23  Q.  How do you know him?

Page 202

1   A.  He was just a friend.  He was a personal family
2       friend.
3   Q.  When you worked at the Receivership Division
4       before Denise Azar got there as receiver, who
5       was your supervisor?
6   A.  Right before she got there, Dr. Rex Jones was.
7   Q.  Was your sister ever your supervisor?
8   A.  No.
9   Q.  And just a few more -- I'm going back to a few
10      more background questions.  And this goes --
11      since you've asked for a jury, I have to ask for
12      your relatives.
13          What's your son-in-law's name?
14  A.  Toby Lee Edwards.
15  Q.  Where does he work?
16  A.  Brendle Fire Equipment.
17  Q.  Does he have a college degree?
18  A.  No.
19  Q.  Has ever taken any college courses to your
20      knowledge?
21  A.  No.
22  Q.  In May of 2002, which is the date of Exhibit 10,
23      had your son at that point finished college?

Page 203

1   A.  No.
2   Q.  Do you recall how much he had left?  Was he
3       halfway finished?  Was he almost finished?  Was
4       he not even halfway?
5   A.  Oh, yeah.  He was probably almost finished.
6   Q.  Did you assist him in paying for his college?
7   A.  No, ma'am.
8   Q.  Did he ever get a loan from you and pay you
9       back?
10  A.  He didn't get a loan.  I mean, we -- when he
11      first started school, we probably bought his
12      books.  But later they were doing it
13      themselves.  So at that time we were not
14      probably doing anything.
15  Q.  Did you ever tell anyone or recommend to anyone
16      that that person go online and deal with Trinity
17      College University instead of actually attending
18      classes at a school?
19  A.  No, ma'am.
20  Q.  And I think I forgot to ask you.  If I did, I'm
21      sorry.
22          What is your husband's occupation?
23  A.  He's retired.

Page 204

1   Q.  And what did he do before he retired?
2   A.  He drove for United Parcel Service.
3   Q.  When did he retire?
4   A.  November of 2005.
5   Q.  At any time that you worked with Ms. Brackin,
6       did you consider yourselves to be friends?
7   A.  Yes, ma'am.
8   Q.  Did you ever consider trying to transfer the
9       credits that you had or the courses that you
10      took at the Wetumpka Vocational School to Troy
11      University?
12  A.  I think I asked him about that.  I asked a
13      counselor about that.
14  Q.  The counselor at Troy?
15  A.  Yes, ma'am.
16  Q.  And what were you told?
17  A.  I think he -- they didn't accept those.
18  Q.  Did that surprise you?
19  A.  A little bit.
20  Q.  Now, I believe you testified not earlier today
21      but at another time -- correct me if I'm
22      wrong -- that at one time you thought that
23      Trinity College & University was an accredited

Page 205

1       school.
2   A.  Yes, ma'am.
3   Q.  And did you find out later that it was not an
4       accredited school?
5   A.  They have an accreditation, but it's not
6       accredited with the list that Ms. Graham
7       provided.
8   Q.  Were you disappointed when you found that out?
9   A.  Yes, ma'am.
10  Q.  And why were you disappointed?
11  A.  Because when I looked it up on the Internet, I
12      thought that it was the accreditation that was
13      listed under that list that the State would
14      accept.
15  Q.  Was that important to you?
16  A.  Yes, ma'am.
17  Q.  When you had your conversations with the
18      individual at Trinity College & University, was
19      it a 1-800 number you were calling or were you
20      calling long distance?
21  A.  No.  It wasn't a long distance number, but I
22      believe on looking on this sheet, it was a 1-866
23      or 1-886, which is toll-free.

Deposition of Virginia Hopper, Vol. II                                                          May 20, 2008

---

Page 206

1  Q.  I should have asked if it was a toll-free
2       number.
3            It was a toll-free number, correct?
4  A.  Correct.
5  Q.  Did you have any conversations with anybody at
6       Trinity College & University when you were at
7       your office?
8  A.  I don't recall.
9  Q.  Could have?  Just don't recall?
10 A.  Right.
11 Q.  You testified earlier that you had a
12      conversation with Paul Thomas; is that correct?
13 A.  Correct.
14 Q.  On how many occasions have you had conversations
15      with Paul Thomas?
16 A.  One.
17 Q.  Was it in person or on the telephone?
18 A.  In person.
19 Q.  And did you have an appointment or did you just
20      go see him?
21 A.  No, ma'am.  He was the only one left in that
22      building that day we went -- That afternoon when
23      I got back to show my diploma to Bob Childry, he

---

Page 207

1       was gone.  So I went across the street to
2       personnel, and he was the only one I could find
3       in the building.
4  Q.  Did you just wander around until you found a
5       person or did you --
6  A.  No, ma'am.  I went up to personnel just thinking
7       somebody might still be there.  He was the one
8       we ran into sort of.
9  Q.  Who is "we"?
10 A.  Me and my husband.
11 Q.  And tell me exactly or your best recollection of
12      what Mr. Thomas said and what you said and if
13      your husband said anything, everything that was
14      said during that conversation.
15 A.  I can't recall exactly.  I do know I showed him
16      my diploma, and I told him about the letter that
17      Mr. Childry had presented to me earlier that
18      afternoon.  Mr. Thomas, I know, told me to go
19      take it to Rachel Dickerson.
20 Q.  Dickinson.
21 A.  Dickinson.
22           So he told me where her office was.  We went
23      to her office, and she had gone for the

---

Page 208

1       afternoon.  So we decided there wasn't anything
2       else we could do that day.  We went home.
3  Q.  Ms. Dickinson's office was in what building?
4  A.  It was the admin building, I believe.
5  Q.  Do you think it was in the same building where
6       Mr. Thomas was?
7  A.  Yes, ma'am.  That is where it was.
8  Q.  Did you take any notes or did you record your
9       conversation with Paul Thomas?
10 A.  No, ma'am.
11 Q.  During the oral argument before the State
12      Personnel Board, I believe you testified earlier
13      that you were present.
14 A.  Yes, ma'am.
15 Q.  Was Ms. Jackie Graham present?
16 A.  Oh, I don't recall.
17 Q.  Don't recall one way or the other?
18 A.  No, ma'am.
19 Q.  That was not significant to you one way or the
20      other whether she was present?
21 A.  I can't remember who was there.  I can't
22      remember.
23 Q.  Was it significant to you one way or the other

---

Page 209

1       whether she was present?
2  A.  I just don't recall about that much.  It didn't
3       seem like we were there long.
4  Q.  Now, you wanted at some point during your
5       employment at the State to be promoted from
6       Accountant Tech to Accountant, correct?
7  A.  Yes, ma'am.
8  Q.  Why?  Why was that important to you?
9  A.  Well, I just felt like it was a promotion so
10      I --
11 Q.  Why would you want a promotion?
12 A.  I guess it's just the natural progression, just
13      like you would like to go from an Account Clerk
14      to Accounting Tech to an Accountant.
15 Q.  And was at least one factor in that that you
16      would like to make more money?
17 A.  Well, now, from Accounting Tech to the
18      Accountant was just one step in the increase.
19 Q.  Right at that time, correct?
20 A.  Well, no, ma'am.  I believe even if you reach
21      the top -- I believe if you reach the top of the
22      Accounting Tech, to top out at an Accountant at
23      that time was just one step.  I believe.  I

---

Deposition of Virginia Hopper, Vol. II                                    May 20, 2008

Page 210

1    might be wrong, but I think that's right.
2  Q.  Now, you also applied for Staff Accountant,
3    correct?
4  A.  Correct.
5  Q.  Now, why would you want to be a Staff
6    Accountant?
7  A.  Still just the natural progression of.  That
8    would still be an increase, and that would have
9    been -- You know, you would have continued to
10    have gotten pay increases there.  And I don't
11    know the difference in the pay scales there.
12  Q.  Around the time that you put in your application
13    for Staff Accountant, did you pull it up to see
14    what the pay range was for Staff Accountant?
15  A.  No, ma'am.  Actually, Jenny Brackin was the one
16    that urged me to put in for the Staff
17    Accountant.  She kept saying, you need to go for
18    that; you need to go for that.
19  Q.  Why do you think she was encouraging you to do
20    that?
21  A.  I don't know.  I thought because -- Actually,
22    she was trying to get promoted to the IV.  They
23    wouldn't promote her until they could promote

Page 211

1    Pam to the III.  And I didn't think about it at
2    the time, but now I think about it because then
3    there would be a II, a III, and a IV and they
4    could all get their promotion.  But I know she
5    just kept saying, you need to try for that; you
6    need to go ahead and go for that.
7  Q.  So she was encouraging you to --
8  A.  Yes, ma'am.
9  Q.  -- to --
10  A.  But I'm not saying that I would not have liked
11    that.  I'm not saying that at all.  That would
12    have been, you know -- It would have been nice
13    to have been promoted, and I do know that that
14    pay increase would have been more.  I'm not
15    saying that.  But I'm just saying that's where
16    it even came up that I even thought about it
17    because she kept saying that.  But don't think
18    that I'm not saying that I wouldn't have been
19    glad or wouldn't have thought that would have
20    been a nice promotion.  And it would have also
21    been the pay increase too.  I'm not saying that
22    I wouldn't have thought that wouldn't have been
23    nice by any means.

Page 212

1  Q.  I understand what you're saying.
2    During the time that you were looking online
3    at the information at Trinity College &
4    University or any of the other schools when you
5    were gathering information, did you talk to your
6    sister about it?
7  A.  No, ma'am.
8  Q.  At what point did you first mention to your
9    daughter that you were looking online or
10    attempting to get a degree without actually
11    going to -- physically going to a college?
12  A.  I believe that I told both of my children after
13    I actually received my degree.
14  Q.  After you received Defendant's Exhibit 10?
15  A.  Yes, ma'am.
16  Q.  Why did you not tell them beforehand?
17  A.  I guess we just never did talk about it, and
18    they are always just real busy doing their
19    own -- you know, in and out and everything.
20  Q.  You didn't want to get their advice on it since
21    they both had actually been through college?
22  A.  No, ma'am.
23  Q.  Since you left State employment, have you

Page 213

1    received any salary or wages from any source?
2    Any kind of income from any source?
3  A.  No, ma'am.
4  Q.  Do you and your husband file joint tax returns?
5  A.  Yes, ma'am.
6  Q.  And have you filed federal and state returns for
7    the last five years?
8  A.  Yes, ma'am.
9  Q.  And who does your returns?  Do you do them
10    yourself or --
11  A.  Yes, ma'am.
12  Q.  Have you done your returns yourself for the last
13    five years?
14  A.  Yes, ma'am.
15  Q.  Do you have copies of them?
16  A.  Yes, ma'am.
17  Q.  I know I asked you earlier if you had ever been
18    to court for any reason, if you had ever been
19    involved in any other lawsuits.  But have you
20    ever given testimony under oath other than today
21    and then the times you were under oath in
22    connection with the administrative process
23    having to do with this matter?

Page 214

1  A.  No, ma'am.  Other than all this incorporated.
2  Q.  Right.  I was just asking you any other
3      unrelated time where you gave testimony under
4      oath.
5  A.  No.
6  Q.  I know Mr. Marsh asked you some questions
7      earlier about your claim and your complaint that
8      there was a conspiracy, and I need to ask you
9      some questions about that also.
10     In Count IV of the complaint that you filed
11     with the court, you claim that there was a
12     conspiracy between Defendant Jackie Graham,
13     Defendant Walley and, quote, various and sundry
14     others, including but not limited to, the
15     personnel director and assistant personnel
16     director at the Department of Human Resources,
17     end quote.
18     Is that still your contention today?  Are
19     you still making that claim that there was a
20     conspiracy?
21 A.  Yes, ma'am.
22 Q.  And when you say various and sundry others, who
23     else do you contend was in this conspiracy with

Page 215

1      Ms. Graham, Mr. Walley, the personnel director,
2      and assistant personnel director at DHR?
3  A.  I can't answer that.
4  Q.  Well, you need to because you put it in your
5      lawsuit.
6  A.  You would have to ask my attorney that.
7  Q.  So you don't -- Sitting here today you can't
8      name any other person who was in this what you
9      claim to be a conspiracy?
10         MR. DEBARDELABEN:  I'm going to
11         object.  Number one, you're asking
12         for a legal definition.  She's not
13         qualified to give a legal
14         definition.  She can tell you the
15         facts.  You asked her to give what
16         amounts to a legal opinion on what
17         a conspiracy is.
18         MS. ELLIS:  I'm just asking her for
19         the names of the people.
20         MR. DEBARDELABEN:  You used the word
21         "conspiracy" and did not explain
22         what it meant so it makes her have
23         to have legal knowledge.  Anything

Page 216

1      she knows about a conspiracy she
2      got from me, which his
3      attorney-client privilege, because
4      she doesn't know what conspiracy
5      is.
6      MS. ELLIS:  But she agreed she's still
7      contending there was a conspiracy.
8      MR. DEBARDELABEN:  If she knows what
9      it is.  But anything she knows
10     about a conspiracy came from me.
11     I mean, she can tell you the
12     facts, but she can't --
13     MS. ELLIS:  That's what I'm asking for
14     is facts.  What other
15     individuals --
16     MR. DEBARDELABEN:  But she can't
17     answer what a conspiracy is.
18     MS. ELLIS:  I'm not asking for
19     anything other than facts.
20 Q.  And the facts I'm asking for, name the other
21     people who are the various and sundry others who
22     are a part of what you contend to be this
23     conspiracy to harm you.

Page 217

1  A.  I don't know the answer to that.
2  Q.  So sitting here today, you just can't give me the
3      name of anybody else you claim is in this what
4      you claim to be a conspiracy?
5  A.  I don't understand how to answer you.
6  Q.  Well, you just give me the names.  For instance,
7      in your complaint you put that part of the
8      conspiracy was Defendant Graham, Defendant
9      Walley, the personnel director, and assistant
10     personnel director at DHR.
11     Do you understand you put that in your
12     complaint?  You named those people as part of
13     the conspiracy, correct?
14 A.  Yeah.  But you don't understand.  I don't
15     understand how to answer you to say --
16 Q.  All I'm asking you is give me some names of
17     anybody else who is a part of this conspiracy
18     that you're claiming.  And if you don't know
19     anybody else who is a part of the conspiracy,
20     that's fine.  I'm just asking you to name names
21     for me of anybody that you claim is part of the
22     conspiracy in addition to the four people that
23     you've already put it your complaint.

Deposition of Virginia Hopper, Vol. II                                            May 20, 2008

Page 218

1  A.  Then can you tell me -- See, I may be thinking
2      one thing and you tell me what the conspiracy
3      entails.
4  Q.  You can just read that because it sets forth in
5      your complaint what the conspiracy entails, what
6      you're claiming it entails.
7          MR. DEBARDELABEN: I'm going to enter
8          an objection. That's legal
9          terminology based on what she
10         communicated to a lawyer, and
11         there's no way possible for her to
12         answer that without having a legal
13         degree or legal knowledge.
14         MS. ELLIS: Well, she put down she has
15         Business Law and Business Law I so
16         she was able to represent to the
17         State that she had two Business
18         Law courses.
19         MR. DEBARDELABEN: And Business Law is
20         not tort law, and you know it, and
21         that is not a verified complaint.
22         She did not sign.
23  Q.  Can you name any other people that you claim are

Page 219

1      in the conspiracy as you sit here today?
2  A.  No.
3  Q.  Now, do you have any reason to believe that
4      Ms. Jackie Graham has any -- had any reason to
5      have any ill will toward you?
6  A.  I don't know.
7  Q.  You don't know of any reason sitting here today
8      that Ms. Graham had any reason to have any ill
9      will toward you, correct?
10 A.  Correct.
11 Q.  Ms. Hopper, I'm showing you what has previously
12     been marked as Defendant's Exhibit 14. And just
13     to shortcut things, this is the application that
14     you filled out for the Accountant position dated
15     11/21/03. Would you agree with me that when you
16     put on here Trinity University -- where it says
17     the name and location of the school that you had
18     attended and you put Trinity University, 715
19     Stadium Drive, San Antonio, Texas 78212, that
20     that was false information?
21 A.  To say where I attended school, to say that was
22     false, yes.
23 Q.  You agree with me?

Page 220

1  A.  Yes.
2  Q.  When you did your research online on Trinity
3      College & University, did you ever see the term,
4      quote, diploma mill, quote being used?
5  A.  No, ma'am.
6  Q.  In general research that you did online, did you
7      ever see anything making a reference to quote,
8      diploma mill, quote?
9  A.  No, ma'am.
10 Q.  Never saw that term being used?
11 A.  No, ma'am.
12 Q.  When you decided to look at online diplomas, did
13     you talk with your brother James Swearengin
14     about it?
15 A.  No, ma'am.
16 Q.  Are you aware that he received a diploma by
17     sending in his resume?
18 A.  No. And I don't believe that's a true
19     statement.
20 Q.  Do you think what he did was different than what
21     you did?
22 A.  After the hearing -- I didn't know anything
23     about it until the hearing, and I believe, yes,

Page 221

1      ma'am.
2  Q.  Why do you think what he did was different than
3      what you did?
4  A.  What was said in the hearing was that he applied
5      for classes -- did classwork, took tests, and a
6      lot of different things like that.
7  Q.  At the time he was doing that, did you know he
8      was doing that?
9  A.  No, ma'am.
10 Q.  And you said y'all are not close, correct?
11 A.  Yes, ma'am.
12 Q.  How did you expect Trinity College & University
13     to verify the insurance classes that you took in
14     Texas in the mid-'90s?
15 A.  I assumed they would call out there or e-mail or
16     fax out there and get the information.
17 Q.  Call where?
18 A.  However they set up that and get the information
19     just like --
20 Q.  NAIC?
21 A.  Well, yes, ma'am, or however they did it. I
22     assume people that say they do that have ways to
23     do that.

Page 222

1  Q.  Well, when did you take the Excel training
2      class?  Let me rephrase the question.  Here it
3      is.  We're looking at Exhibit 9.
4          Where did you take the Excel class?
5  A.  Advanced Technology Group.
6  Q.  That was at AUM?
7  A.  AUM Technical Center.
8  Q.  How did you expect Trinity College & University
9      to verify that you had taken that course at AUM?
10 A.  Well, I sent them the name of the center and the
11     address and the year.
12 Q.  On what did you send the address?
13 A.  I sent it through a worksheet or spreadsheet
14     type thing.  It was a little worksheet with the
15     stuff listed out.
16 Q.  You didn't keep a copy of that?
17 A.  No, ma'am.  I don't have it now.  I probably had
18     it for a while, but I didn't continue to keep
19     it.
20 Q.  Did you --
21 A.  Like I said, remember, this is 2002.
22 Q.  Did you tell anyone that you were taking or had
23     taken a Business Law course at Troy or Troy in

Page 223

1      Montgomery?
2  A.  No, ma'am.
3  Q.  To your knowledge has your husband ever been
4      involved in a lawsuit being a plaintiff or
5      defendant?
6  A.  No, ma'am.
7  Q.  So your husband has never filed a lawsuit to
8      your knowledge?
9  A.  No, ma'am.
10 Q.  What about your daughter?  To your knowledge has
11     she ever filed a lawsuit or been sued?
12 A.  No, ma'am.
13 Q.  What about your son?  To your knowledge has he
14     ever filed a lawsuit or been sued?
15 A.  No, ma'am.
16 Q.  And does your son -- I know you said y'all were
17     close, but does he actually live close by you?
18 A.  Yes, ma'am.
19 Q.  Where does he live in relation to you?
20 A.  Next door.
21 Q.  How long has he been living next door to you?
22 A.  Twelve, thirteen years.
23 Q.  Now, correct me if I'm wrong, but I believe you

Page 224

1      testified -- I may be wrong -- that in December
2      of 2003 was when you told your friends and/or
3      family members that you were thinking about
4      going to Texas to walk across the stage.
5  A.  No, ma'am.  That's not correct.
6  Q.  Did you ever tell friends or family members that
7      you were considering going to Texas to walk
8      across the stage or to participate in some sort
9      of graduation ceremony?
10 A.  Yes, ma'am.  I think we talked about it, but it
11     wouldn't have been in December of 2003.
12 Q.  When would it have been?
13 A.  It might have been in December of -- Maybe it
14     would have been October or November of 2002 or
15     even earlier.  It was in 2002.  It would have
16     had to have been.
17 Q.  Why would you have waited that long to talk to
18     them about that if you got the piece of paper
19     that was marked as Defendant's Exhibit 10 -- I
20     think you said you may have gotten it a few
21     weeks after the date on it.  If you got that in
22     June of '02, why did you wait all those months
23     to talk to your family about going to Texas?

Page 225

1  A.  Because they set up to have the walk and the
2      actual graduation for the people that graduated
3      online when they had several of them.  They
4      didn't do it right at that time for one or two.
5  Q.  How do you know that?
6  A.  Because that's what Trinity College & University
7      told me.  They set up a date to have that walk.
8  Q.  In what conversation did they tell you that?
9  A.  The one where she told me that they set up to
10     have -- when she called me back to tell me I was
11     going to get my diploma, and she was wanting to
12     set up the airline tickets and go ahead and set
13     up for the hotel reservations and wanting to
14     know how many family would be coming and things
15     like that.
16 Q.  Now, you took one or more courses at Troy after
17     you received Defendant's Exhibit 10 from --
18 A.  Took one more after.
19 Q.  Why did you do that?
20 A.  Because you had to have five accounting courses
21     for the Accountant, one being Intermediate I.
22     It says Intermediate I or II or an equivalent.
23 Q.  What was your rate of pay at the Insurance

Page 226

```
1        Department when you left there?
2    A.  I don't recall.
3    Q.  That was under a contract, correct?
4    A.  Yes.
5    Q.  Do you have a copy of that contract?
6    A.  I do.
7    Q.  You do?  At home?
8    A.  Yes.
9    Q.  Would you please make sure that that copy of
10        that contract is not discarded?
11   A.  Yes.
12   Q.  Can you tell me the names of any persons who
13        have actually told someone that you are a liar
14        or are an untruthful person or something along
15        those lines?
16   A.  Sitting right here right now, no.
17   Q.  This year -- Let's just take it from the first
18        part of January to the present.  Explain to me
19        your daily activities.  What do you do every
20        day?
21   A.  I need a break.
22        MS. ELLIS:  Okay.
23        MS. BYRNE:  There is a question
```

Page 227

```
1        pending.  If you answer the
2        question, you can break.
3        MR. DEBARDELABEN:  You can break right
4        now.
5        MS. ELLIS:  She can break.
6        MR. DEBARDELABEN:  You do not -- It
7        wasn't your question.
8        MS. BYRNE:  Jim, it's not the
9        question.  I'm an attorney of
10        record in this case.  And when you
11        do things that I consider
12        improper, I think I have a right
13        to bring them on the record to the
14        attention of the court.  And
15        please let it be noted that he is
16        breaking with a question pending.
17        MR. DEBARDELABEN:  After the attorney
18        asking the questions said okay
19        before the objection was noted.
20        MS. BYRNE:  I did not make an
21        objection.  I asked you not to
22        violate what I consider
23        appropriate protocol.
```

Page 228

```
1        (Brief recess.)
2    Q.  (Continuing by Ms. Ellis) I believe the question
3        I asked you before the break was what do you do
4        on a daily basis.
5    A.  You said this past year?
6    Q.  Right.
7    A.  Well, this past year I've been fighting
8        depression and anxiety, and I've been having
9        seizures.  So a lot of times I haven't been
10        getting out of the house, and I've been staying
11        at home.  So I haven't had a regular schedule of
12        doing a lot of things.
13   Q.  Well, what have you been able to do?  When you
14        do get out of the house, where are you able to
15        go?
16   A.  For probably -- I just really mainly go to
17        church and back.  I haven't -- have missed more
18        church in the last year than I have in the last
19        twenty.
20   Q.  Do you go to the grocery store?
21   A.  Not often.  Donnie usually does most of that
22        now.
23   Q.  And when you have prescriptions to pick up, do
```

Page 229

```
1        you go to the pharmacy and pick them up?
2    A.  No, ma'am.
3    Q.  Do you ride with your husband when he goes to
4        the grocery store?
5    A.  Sometimes I do.  A lot of times he just does it.
6    Q.  So are you saying that this entire year you've
7        never actually been to the pharmacy to pick up a
8        prescription?
9    A.  Oh, no, ma'am.  I've been, you know, several
10        times.  I've been to the grocery store a couple
11        of times.  We went to the park one day, you
12        know, to get out.  And I walk around sometimes
13        in the yard, but you said on a daily basis.
14   Q.  Right.  I'm asking for examples of things that
15        you do on a daily basis.
16        Do you have any grandchildren?
17   A.  Yes, ma'am.
18   Q.  How many do you have?
19   A.  I have three.
20   Q.  What ages are they?
21   A.  Twelve, a year, and four months.
22   Q.  Does the 12-year-old belong to --
23   A.  Donnie.
```

Deposition of Virginia Hopper, Vol. II                                                                May 20, 2008

Page 230

1   Q.   And then --
2   A.   The year-old belongs to Heather and the
3        four-month-old belongs to Donnie.
4   Q.   This year have you had the opportunity to
5        babysit --
6   A.   Yes.  I tried to and, you know, it didn't work
7        that I could.  And I couldn't do as much as I
8        do, but Donnie is there.  So I guess --
9             MR. DEBARDELABEN:  There's two
10            Donnies.  Donnie, Sr. and Jr.
11  A.   Donnie, Sr. is at home all the time.
12  Q.   So the grandchildren do come to your home on
13       occasion?
14  A.   Oh, yeah.  They come by.  They are there.  I
15       tried to babysit regularly.  Just like Donnie
16       said:  If I watch the children, he has to watch
17       me.  So ...
18  Q.   You're saying that's Donnie, Sr.?
19  A.   Yes, ma'am.
20  Q.   Are you able to -- I guess you've probably got
21       two in diapers, correct?
22  A.   Yes, ma'am.
23  Q.   Are you able to change diapers?

Page 231

1   A.   Yes, ma'am.
2   Q.   Are you able to give a bottle?
3   A.   Oh, yes.
4   Q.   Able to bathe them?
5   A.   No, ma'am.  I don't bathe them.
6   Q.   In the last year, have you done -- other than
7        going to the grocery store, have you gone
8        anywhere else to do any type of shopping?
9   A.   We shop online mainly.
10  Q.   But in answer to my question, in the past
11       year --
12  A.   I'm not saying I've never been.  It's not a
13       regular thing.
14  Q.   I'm not asking you regular right now.
15  A.   Yes.
16  Q.   Where else have you been?
17  A.   Where else have I been shopping?
18  Q.   Right.
19  A.   Maybe to Belk's in Prattville.  Maybe to
20       Wal-Mart.
21  Q.   Have you driven yourself to those places at all
22       during the last --
23  A.   No, ma'am.

Page 232

1   Q.   Have you driven anywhere even if somebody is in
2        the car with you in the last two years?
3   A.   No, ma'am.
4   Q.   Since you no longer work for the State as of the
5        date you left your job at the State, have you
6        been on any trips?
7   A.   Yes, ma'am.
8   Q.   Where have you been?
9   A.   I can see it.  I can't get the name right now.
10  Q.   Is it in Alabama?
11  A.   No.  Stone Mountain, Georgia.  Is that at
12       Christmas they do all the snow and --
13            Stone Mountain, Georgia at Christmas.
14  Q.   What year was that?
15  A.   It wasn't last Christmas but the Christmas
16       before.
17  Q.   So it would have been Christmas of '06?
18  A.   (Witness nods head positively.)
19  Q.   Correct?
20  A.   Yes.
21  Q.   And who was there with you on that trip?
22  A.   Donnie, Sr., Toby, and Heather and their
23       daughter.

Page 233

1   Q.   Since you no longer work for the State, have you
2        been on any other trips anywhere?
3   A.   No, ma'am.
4   Q.   Are you able to prepare meals?
5   A.   Occasionally.  I might do two a week.
6   Q.   So who does many of the meals?
7   A.   Donnie, Sr.
8   Q.   Are you able to bathe yourself?
9   A.   Yes, ma'am.
10  Q.   Are you able to dress yourself?
11  A.   Yes, ma'am.
12  Q.   When you have gone to the grocery store or
13       Wal-Mart or Belk, has anyone gone with you other
14       than your husband?
15  A.   Sometimes Heather has gone.
16  Q.   Anyone else?
17  A.   No, ma'am.
18  Q.   Who does keep Heather's children or child?  She
19       has one, right?  Who keeps Heather's child?
20  A.   Toby's sister goes to their house and keeps ...
21  Q.   When they are at your house, is that during the
22       day or night or it varies?
23  A.   During the day when they're there.  Now, they

Page 234

1    come -- she comes to my house sometimes, but
2    Donnie, Sr. is always there.
3    Q.  She being your grandchild?
4    A.  Yes.
5    Q.  Does Donnie, Sr. bathe your granddaughter?
6    A.  No, ma'am.
7    Q.  Are you able to feed your granddaughter when
8        she's at your house?
9    A.  Yes, ma'am.
10   Q.  When you applied to Trinity College & University
11       or sent the information in, did the person you
12       talked to caution you or advise you to discuss
13       the program with your employer to determine
14       whether a degree or piece of paper from Trinity
15       College & University would be acceptable?
16   A.  No, ma'am.
17   Q.  And you testified earlier -- I was asking you
18       why you took a course at Troy after you received
19       the piece of paper from Trinity College &
20       University marked Exhibit 10. Tell me your
21       answer again.
22   A.  Requirement specifically said you had to have
23       Intermediate I and II or an equivalent.

Page 235

1    Q.  Now, on your application dated 11/21 of '03,
2        which has been marked Defendant's Exhibit 14,
3        what Accounting courses did you list when you
4        prepared that list to attach to your
5        application?
6    A.  Principles of Accounting I, II, Managerial
7        Accounting, Intermediate I, and Governmental.
8    Q.  How many is that?
9    A.  Five.
10   Q.  There are no other accounting courses listed on
11       there?
12   A.  Financial Accounting, Managerial accounting.
13       That's all I see.
14   Q.  How many total?
15   A.  Seven.
16   Q.  Did you ever check to -- Also there's listed as
17       ACCT beside that auditing. So would you
18       consider that to be an accounting course as
19       well?
20   A.  Oh, I guess, yes.
21   Q.  So that would be eight accounting courses?
22   A.  Okay.
23   Q.  Correct?

Page 236

1    A.  Yes.
2    Q.  Did you ever check to see if one of those
3        courses would substitute for Intermediate
4        Accounting II? Is that the one you said you
5        needed?
6    A.  Yes, ma'am. But these courses -- these and
7        these course numbers I did not know about until
8        I had taken my Intermediate Accounting. This
9        was what I was previously looking at before.
10   Q.  You need to say for the record what you're
11       saying.
12   A.  Exhibit 3, before -- because I just went on to
13       take my Intermediate I. And then when I came
14       back to fill this out was where the issue of the
15       numbers -- the accounting names and numbers had
16       changed.
17   Q.  And tell me again approximately what date that
18       was.
19   A.  It was around about the time of filling this
20       application out.
21   Q.  You need to state which application you're
22       referring to and the date for the record.
23   A.  Well, actually, there was an application before

Page 237

1    this one, and I would assume that the date on it
2    was going to be somewhere around the end of June
3    or July, because -- It should be a copy of this
4    one because I think we -- I just copied this one
5    from that one. So it's really going to be
6    before this application. There's going to be
7    another Accountant I application or another
8    Accountant application before this one.
9    Q.  Are you referring to -- We're going to need to
10       mark this.
11           (Defendant's Exhibit 21 marked for
12            identification.)
13   Q.  Are you referring to Defendant's Exhibit 21
14       which is dated May 28 of 2003, and it's an
15       application for Staff Accountant?
16   A.  No, ma'am. There's another one for accountant.
17   Q.  And you think it's an '03?
18   A.  It is '03.
19           (Defendant's Exhibit 22 marked for
20            identification.)
21   Q.  Let's mark this as Defendant's Exhibit 22. Are
22       you referring to Defendant's Exhibit 22, which
23       is an application dated 7/25/03 for the position

Page 238

1       of Accountant?
2  A. Yes, ma'am.
3  Q. What accounting course have you listed as an
4       attachment to your application that's marked
5       Exhibit 22?
6  A. On the front of it, I list Principles of
7       Accounting I, II, Governmental Accounting,
8       Managerial Accounting, and Intermediate
9       Accounting.
10 Q. But on the list that is attached to that, what
11      accounting courses are on that, the list you
12      typed out?
13 A. What do you mean, these?
14 Q. That list you typed out, correct.
15 A. It has Financial Accounting, Managerial
16      Accounting, and Auditing.
17 Q. Can you find the exhibit for me where you had
18      written down the telephone number for Trinity
19      University?
20 A. (Witness complies.)
21 Q. This is Exhibit 7. Now, is this number at the
22      bottom the telephone number for Trinity
23      University? Is that correct?

Page 239

1  A. I don't know if -- No. That's going to be
2       Trinity College & University. Trinity's number
3       is on the sheet that shows where they were
4       accredited -- accreditation page.
5  Q. Have we marked that as an exhibit?
6  A. Yes, ma'am, I believe.
7  Q. Exhibit 6. On Exhibit 6 where is the telephone
8       number for Trinity University?
9  A. (Witness points).
10 Q. So you're pointing to the middle of the page of
11      the telephone number Area Code 212-999-7011,
12      correct?
13 A. I think that's correct.
14 Q. And you actually called that telephone number,
15      correct?
16 A. Yes, ma'am.
17 Q. And --
18 A. I called some number on that page. Let me say
19      that. I got in touch with those people.
20 Q. And you talked to someone at Trinity University
21      rather than Trinity College & University,
22      correct?
23 A. Correct.

Page 240

1  Q. And what were you told by that -- What was the
2       reason for your call?
3  A. I pulled this sheet off the Internet. These
4       course numbers were different than the course
5       numbers I had.
6  Q. And so --
7  A. I didn't understand that. I wanted some
8       clarification why they were different.
9  Q. So then you called that telephone number, and
10      the person on the line told you what?
11 A. I needed to talk to the person I had talked to
12      before. I must have had her totally confused.
13      She told me the best thing I could do was to
14      call the person I talked to before and see if
15      they can help me.
16 Q. Why didn't you originally or initially call the
17      person you had talked to before?
18 A. Because I had pulled that up on accreditation,
19      and I was using that for the accreditation. And
20      then when I had that, I was trying to see what
21      the difference was. And I was calling her
22      trying to explain my position to see what the
23      difference was. I was trying to find out why

Page 241

1       they were different. That's what I had in front
2       of me with the phone number on it.
3  Q. And did she explain to you that you had called
4       Trinity University rather than Trinity College &
5       University?
6  A. No, ma'am. She just said that I needed to
7       call -- When she kept saying that she didn't
8       understand what I was talking about and I kept
9       trying to explain it to her, she said, well, the
10      best thing she could tell me was just to try to
11      get in touch with the person that I had talked
12      to before. You know, you must have a different
13      person. What you need to do is try to call the
14      person you talked to before and see if they can
15      help you.
16 Q. Now, when you called this telephone number
17      that's on Defendant's Exhibit 6, did you think
18      you were calling Trinity University or Trinity
19      College & University?
20 A. Trinity University.
21 Q. Why did you think that?
22 A. Because that's who I was talking to all the time
23      was Trinity University.

Deposition of Virginia Hopper, Vol. II

May 20, 2008

Page 242

1  Q.  Even though you received Exhibit 10 that says
2      Trinity College & University?
3  A.  Yes, ma'am.
4  Q.  And even though you had received Exhibit 4,
5      which says Trinity College & University?
6  A.  Yes, ma'am.
7  Q.  And even though you had received Defendant's
8      Exhibit 5, which says Trinity College &
9      University?
10 A.  Yes, ma'am.
11 Q.  When you were at State Personnel and you said
12     you couldn't find anybody and then you ended up
13     talking to Paul Thomas, was your daughter not in
14     the building at that time?
15 A.  No, ma'am.  Everyone had gone home for the
16     afternoon.
17 Q.  Did you tell your daughter that you had had a
18     conversation with Paul Thomas?
19 A.  I can't recall.  I can't recall that.  I think I
20     did -- I can't recall.
21 Q.  Any reason why you would not have mentioned it
22     to your daughter?
23 A.  Because Heather worked at State Personnel, and I

Page 243

1      didn't want her to be involved or it to affect
2      her job in any way.  She worked for Mr. Thomas,
3      and all this happening, she didn't need to know
4      about it or be hurt with it.
5  Q.  And in your opinion --
6  A.  And didn't need to be -- It didn't need to
7      affect her.  She had a personal life, and she
8      didn't need to be involved in it.
9  Q.  And that's important to you?
10 A.  It's very much important to me.
11 Q.  That the investigation was kept separate from
12     your daughter, correct?
13 A.  Very much important to me.
14 Q.  And was that the way it was handled to your
15     knowledge, that the investigation was kept
16     separate from your daughter?
17 A.  From my side, yes, ma'am.
18 Q.  From anybody's side while the investigation was
19     going on and you were writing the letters and
20     getting letters from Ms. Graham and writing
21     Ms. Graham --
22 A.  I've tried not to talk to her about it so I hope
23     so because I don't think it's fair to her.  She

Page 244

1      goes to work down there, and I do not want any
2      conflict or her to have any hurt feelings.
3  Q.  Has she expressed to you that there has been any
4      such problem?
5  A.  We haven't talked about it.  I do not talk to
6      her about it so I don't ask her about it.
7  Q.  So when I asked you has she expressed to you if
8      there's been any such problem, has she?
9  A.  No, ma'am, she hasn't.
10 Q.  You've told me about the conversation with Paul
11     Thomas at State Personnel.  Did you talk with
12     anyone at State Personnel after you talked to
13     Paul Thomas?
14 A.  That day, no, ma'am.
15 Q.  At any other time before you obtained an
16     attorney?
17 A.  Yes.  The next morning we went down -- The very
18     next morning early, me and my husband went to
19     Rachel Dickerson's office and took a copy of the
20     letter -- took the original letter from Bob
21     Childry, a copy of my diploma.
22 Q.  And was anybody present when you spoke with
23     Ms. Dickinson other than your husband?

Page 245

1  A.  No, ma'am.
2  Q.  Did you take any notes or record your
3      conversation with Ms. Dickinson?
4  A.  No, ma'am.
5  Q.  Did your husband?
6  A.  No, ma'am.
7  Q.  And tell me everything that was said other than
8      what you just told me.  Anything in addition
9      that was said when you met with Ms. Dickinson?
10 A.  No, ma'am.  We showed her the letter and a copy
11     of the diploma.  She had not seen the letter.
12     Said she didn't know anything about it, and the
13     letter said indeed that it came from Finance
14     Personnel.  She said she had not seen it.
15     Didn't know anything about it.  She asked me
16     could she have the letter, and we said no, but
17     you're welcome to make a copy.  She made a copy
18     of that and my diploma.  And we left there and
19     went straight to Bob Childry's office.
20 Q.  Did you have any further conversations in person
21     or by telephone with Ms. Dickinson?
22 A.  Later.  Not that day.
23 Q.  Tell me about the later conversation that you

Deposition of Virginia Hopper, Vol. II                                              May 20, 2008

Page 246

1    had. Was it by telephone or in person?
2  A.  I went over there two or three times. It was
3      all, you know, about my file, about the diploma,
4      things of that nature. Mainly she couldn't find
5      my file the next time I went over there. She
6      couldn't find my file.
7  Q.  You mean your personnel file?
8  A.  My personnel file. She couldn't find it. I
9      think one time a girl named Heather found it,
10     and we got to look at it. And then I went back
11     and talked to Rachel. She couldn't find it, and
12     I told her I would wait until she did. And she
13     said she couldn't find it. So I left and she
14     was going to e-mail me and let me know when she
15     did find it, and I never heard from her. And so
16     we went back, and she couldn't find it. So
17     I said, well, I will just wait, you know, until
18     you do.
19         And we waited a really long time, and she
20     kept telling me that she didn't know when she
21     could find it. So I did leave that day. When I
22     went back the third time, I told her I would
23     stay until she did find it. And she said, well,

Page 247

1      I guess it's been put in the dead file because
2      you no longer work for Finance. And I said,
3      well, I will just stay. So I think I waited
4      about 30 minutes. And she called different
5      people and went in and out and said, well, I
6      just am not able to find it. I said, well, you
7      know, I'll prepare just to stay the afternoon
8      until you do. And so finally she told me it was
9      over at Legal and Finance and that she would go
10     and get it and come back. And I think that's
11     the last time I spoke with her.
12  Q.  Did she go and get it and come back?
13  A.  Yes, ma'am, she did.
14  Q.  And did you review it?
15  A.  Yes, ma'am.
16  Q.  Any other conversations that you had with people
17     at State Personnel other than Paul Thomas and
18     Ms. Dickinson either by telephone or in person?
19  A.  About this?
20  Q.  About this matter.
21  A.  Not that I can recall.
22  Q.  Have you ever had a conversation with anyone at
23     State Personnel about your son's application or

Page 248

1      job or college courses or anything along those
2      lines?
3  A.  I don't think so.
4  Q.  Specifically have you ever had a conversation
5      with Lee -- I'm not sure how to pronounce --
6         MS. BYRNE: Frier.
7  Q.  -- Frier?
8  A.  Oh, I've had several conversations with Lee
9      about my applications and Donnie's also.
10  Q.  Donnie being your son?
11  A.  Yes.
12  Q.  How many conversations did you have with
13     Mr. Frier talking about your son? How many
14     conversations did you have with him about your
15     son?
16  A.  I think only one.
17  Q.  Was it in person or --
18  A.  In person.
19  Q.  Was your son present?
20  A.  No.
21  Q.  Was anyone else present?
22  A.  No.
23  Q.  And tell me about that conversation. What was

Page 249

1      the reason for it and what was said by you and
2      what was said by Mr. Frier?
3  A.  Mr. Frier had wrote Donnie a letter about one of
4      his classes, and he had looked into it. Some
5      classes they covered certain things, and I have
6      to say this terminology because I didn't know
7      about the class. They covered certain areas and
8      certain subject matter. And some of them taught
9      that class without covering certain subject
10     matter, and so he didn't know whether to
11     actually -- Whatever Donnie was applying for --
12     I don't recall what it was -- he didn't know
13     whether to give him credit or not.
14         And so I was downtown was the reason I
15     walked over to talk to him to find out about
16     it. And the only thing he wanted to do was for
17     that instructor to write a letter letting him
18     know exactly what subject matter or exactly what
19     they covered in class. And for whatever he was
20     looking for, if it was covered in that, then he
21     would have gotten certain credit for something.
22         And so I took that information and took it
23     to Donnie, and Donnie took it to his

Page 250

1        instructor. And I guess he wrote a letter
2        saying -- to the best of my knowledge, he wrote
3        a letter saying whatever he covered in his
4        classes, to what extent or whatever he took.
5        And the instructor wrote it, and I'm assuming he
6        mailed it to Lee.
7    Q.  Any other conversations with Lee about --
8    A.  Donnie, Jr.?
9    Q.  -- your son, Donnie, Jr.?
10   A.  No, ma'am.
11   Q.  Approximately when did that conversation take
12       place?
13   A.  I really cannot recall. I know --
14   Q.  Where were you working?
15   A.  Where was I working?
16   Q.  Which agency?
17   A.  I was working in the Comptroller's Office, I
18       believe. Comptroller's Office.
19   Q.  Do you believe that conversation took place
20       within the year -- within your last year with
21       the State or before that?
22   A.  I think before that.
23   Q.  Do you have a judgment as to in what year that

Page 251

1        conversation took place?
2    A.  No, ma'am, I don't.
3    Q.  Other than your daughter, are you related by
4        blood or marriage to anyone else at State
5        Personnel?
6    A.  In State Personnel?
7    Q.  Uh-huh (positive response).
8    A.  No, ma'am.
9    Q.  Other than your daughter and your son, are you
10       related by blood or marriage to anyone else who
11       works in state government?
12   A.  In state government?
13   Q.  Right.
14   A.  I have a nephew that works as an air condition
15       tech.
16   Q.  What agency?
17   A.  I don't know.
18   Q.  What's his name?
19   A.  Tommy Joe Swearengin, Jr. And I have a
20       sister-in-law that works for the Secretary of
21       State, Elaine Swearengin.
22   Q.  And what is her job there at the Secretary of
23       State's office?

Page 252

1    A.  I don't know. I don't know.
2    Q.  Do you know whether either of those individuals
3        has a college degree?
4    A.  No, ma'am, I don't.
5    Q.  You don't know one way or the other?
6    A.  No, ma'am, I don't.
7    Q.  When you had your conversation with Bob Childry
8        about your diploma, did you explain to him that
9        you had actually never attended courses other
10       than the courses you had taken at Troy?
11   A.  Yes, ma'am.
12   Q.  Tell me what you said to him about that? because
13       you didn't tell me earlier when I asked you
14       everything y'all talked about.
15   A.  I just told him that it was a degree online and
16       that I got credit for work history and for
17       courses that I had taken. It wasn't any great
18       detail. That's just all that was said about it.
19   Q.  Did you specify that the courses you had taken
20       were courses at Troy?
21   A.  That was part of what was said, courses that I
22       had taken. And I'm sure he knew Troy because I
23       was going to Troy while I was there. I took

Page 253

1        that one course.
2    Q.  That's the way you phrased it: Courses you had
3        taken online?
4    A.  No, ma'am. I said I had taken -- that I had got
5        my degree online and that it would have been --
6        I think he said something about working for
7        years on it, and I said, well, I had gotten
8        credit for classes that I had taken at different
9        times back as far as '93 or '94. And I said I
10       got credit for some courses I had taken at
11       Troy. That was about the extent of the
12       conversation. That may not be word for word,
13       but that's about the extent of the conversation.
14   Q.  Did you ever specifically tell him that you had
15       never actually attended any course at Trinity
16       College & University?
17   A.  Specifically, no, ma'am.
18   Q.  Did you tell him that you had never taken an
19       online course where you would have had materials
20       and studied and taken an exam in connection with
21       your diploma, the piece of paper you received
22       and that you showed Mr. Childry from Trinity
23       College & University?

Page 254

```
1    A.   No, ma'am.
2         MS. ELLIS.   We need a break.
3         (Brief recess.)
4    Q.   (Continuing by Ms. Ellis)  Heather's husband's
5         name is Toby, correct?
6    A.   Correct.
7    Q.   And you're saying that Toby's sister sometimes
8         babysits Heather's child?
9    A.   Yes, ma'am.
10   Q.   And what is Toby's sister's name?
11   A.   Toni.
12   Q.   Toni?
13   A.   Yes.
14   Q.   What's her last name?
15   A.   I don't know.
16   Q.   And does she have a job?
17   A.   No.
18   Q.   Does she go to school anywhere?
19   A.   No.
20   Q.   Does she live close by where Heather and Toby
21        live?
22   A.   No.
23   Q.   Does she live in Montgomery?
```

Page 255

```
1    A.   No.
2    Q.   Where does she live?
3    A.   Eclectic.
4    Q.   Does she keep the child on a daily basis?
5    A.   She keeps her -- I don't know how many days a
6         week, but she drives to Heather and Toby's
7         house.
8    Q.   And you don't know how many -- whether it's
9         Monday, Tuesday, Wednesday, Thursday, and Friday
10        or how many days?
11   A.   She keeps her, like, three days out of the week.
12   Q.   And then who keeps Heather's child the other
13        days out of the week?
14   A.   We do.
15   Q.   You and Donnie, Sr.?
16   A.   Yes.
17   Q.   Is it certain days of the week that y'all keep
18        Heather's child?
19   A.   Not always.
20   Q.   You don't have --
21   A.   Some weeks she may keep her four, you know.
22   Q.   You don't have it set up like she keeps her --
23   A.   No.
```

Page 256

```
1    Q.   -- she being Toni -- keeps Monday, Wednesday,
2         and Friday and you do Tuesday and Thursday?
3    A.   No.
4    Q.   But generally speaking --
5    A.   It was going to be that way, but it got to where
6         it couldn't be that way.  I just couldn't do
7         it.  You know, like I said, Donnie is there all
8         the time, but he doesn't think it's a good thing
9         for me.
10   Q.   But generally speaking Toni keeps Heather's
11        child three days a week, and then Heather's
12        child goes to your house two days a week?
13   A.   Right.  See, like this week she was there one
14        day.  She will be there one day.
15   Q.   And then who keeps your son's children on a
16        daily basis?  I guess one of them is school age,
17        right?
18   A.   Correct.  She's twelve years old.
19   Q.   But the young one, who keeps --
20   A.   She's an RN and she works their schedule around
21        they can work it.  Trina, the wife, is an RN,
22        and she works her schedule around how they can
23        make it work.
```

Page 257

```
1    Q.   In other words --
2    A.   Like she works Friday night, and Donnie is home
3         on Saturday.
4    Q.   In other words, she and Donnie trade out --
5    A.   Right.
6    Q.   -- and so they don't have someone come in and
7         keep their youngest child?
8    A.   Correct.
9    Q.   But on occasion you and your husband do keep one
10        or more of Donnie, Jr.'s children?
11   A.   Incorrect.
12   Q.   Never?
13   A.   Well, I wouldn't say never, but as far as
14        keeping them for them is once ...
15   Q.   I just said on occasion.  My question just
16        said:  On occasion you and your husband do keep
17        one or both of Donnie, Jr.'s children?
18   A.   My grandchildren come to our home sometimes.
19   Q.   And they come to your home sometimes without
20        their parents staying the entire time?
21   A.   Yes.
22   Q.   Now, when Heather's child does come to your
23        house, however many days a week, is she dropped
```

000066

Page 258

| | |
|---|---|
| 1 | off by Heather or do you and your husband go get |
| 2 | the child? |
| 3 | A. She's dropped off usually by Toby. |
| 4 | Q. Do you and your husband ever go to Heather and |
| 5 | Toby's house and stay with the child? |
| 6 | A. No. |
| 7 | Q. Do you and your husband ever go to Heather and |
| 8 | Toby's house to pick up the child? |
| 9 | A. No. |
| 10 | Q. Now, before you transferred to DHR from Finance, |
| 11 | did you contact any other agencies about the |
| 12 | possibility of transferring to that agency other |
| 13 | than DHR? |
| 14 | A. No. |
| 15 | Q. Did you have anyone on your behalf make any |
| 16 | inquiries with other agencies? |
| 17 | A. No. |
| 18 | Q. Agencies other than DHR? |
| 19 | A. No. |
| 20 | Q. Who at DHR did you contact about transferring |
| 21 | there? |
| 22 | A. Craig Nelson first. |
| 23 | Q. And did you know him from -- |

Page 259

| | |
|---|---|
| 1 | A. Worked for him previously. |
| 2 | Q. Are you related to him in any way? |
| 3 | A. I'm not personally related to him, but he is my |
| 4 | daughter-in-law's uncle. |
| 5 | Q. And the friend you mentioned earlier, Michael K. |
| 6 | Jones, where does he work? |
| 7 | A. He's a schoolteacher. |
| 8 | Q. At what school? |
| 9 | A. I don't know. |
| 10 | Q. Does he teach at a college or elementary school? |
| 11 | A. I think it's a high school. I know where he |
| 12 | worked one time. I don't know where he's at |
| 13 | now. |
| 14 | Q. Where did he work at one time? |
| 15 | A. I want to think something like Reed High School |
| 16 | or somewhere up close to Auburn. |
| 17 | Q. And how do you know him? |
| 18 | A. He's a personal friend of the family. |
| 19 | Q. Have you talked to Mr. Jones about your lawsuit? |
| 20 | A. No. |
| 21 | Q. Have you talked to Mr. Jones about the fact that |
| 22 | you contacted Trinity College & University and |
| 23 | eventually obtained the piece of paper marked |

Page 260

| | |
|---|---|
| 1 | Exhibit 10? |
| 2 | A. No. I haven't seen him in probably five years. |
| 3 | Q. Have you talked to him on the phone? |
| 4 | A. No. Excuse me. Maybe seven years. I don't |
| 5 | know. A long time. |
| 6 | Q. You told me earlier about two conversations you |
| 7 | had with Mr. Childry where you talked about |
| 8 | Ms. Brackin, correct? |
| 9 | A. Correct. |
| 10 | Q. One of the things that you said when you were |
| 11 | telling me about one of the conversations is |
| 12 | that they had gone over to the Treasurer's |
| 13 | Office at the time that you talked to |
| 14 | Mr. Childry. Who is "they"? |
| 15 | A. No, ma'am. Not at the time I talked to him. |
| 16 | That was part of the reason I had talked to |
| 17 | him. That being the two workers in the office |
| 18 | other than myself. Jenny Brackin and Pam |
| 19 | Harris, the other two workers in my office. |
| 20 | Q. Pam ... |
| 21 | A. Harris. |
| 22 | Q. Harris. |
| 23 | I'm just confused. I'm sorry. What was the |

Page 261

| | |
|---|---|
| 1 | significance of your saying they went over to |
| 2 | the Treasurer's Office? |
| 3 | A. The Treasurer's Office invited Comptroller's |
| 4 | Office over for a get-together -- it was a |
| 5 | barbecue out on the grounds -- and they just got |
| 6 | up and left. So Mr. Childry came by and said |
| 7 | why aren't you over there. They never told me |
| 8 | about it, and he was a little upset that they |
| 9 | didn't. So when he asked them why they didn't |
| 10 | tell me, he was told, well, she wouldn't have |
| 11 | wanted to go anyway. That was one thing he |
| 12 | talked to Jenny about: Y'all need to ask her. |
| 13 | You need to tell her about it and let her make |
| 14 | up her own mind whether she want to go or not, |
| 15 | not just walk away and never mention it. |
| 16 | Q. To your knowledge do you have to be an |
| 17 | Accountant with the State before you can qualify |
| 18 | to be a Staff Accountant? |
| 19 | A. To the best of my knowledge. |
| 20 | Q. You do to the best of your knowledge? |
| 21 | A. Yes. That would be what I think. |
| 22 | Q. Did you talk to either your son or daughter or |
| 23 | both of them about any problems you were having |

Page 262

1      with Jenny Brackin when she was your supervisor?
2   A.  Yes.
3   Q.  And did you talk to both of them --
4   A.  Yes.
5   Q.  -- or just one of them?
6          On how many occasions?
7   A.  I don't recall.
8   Q.  Did you talk to them in person?  By telephone?
9   A.  In person.
10  Q.  What did you talk to your daughter about?
11  A.  I don't know.  I probably just mentioned it in
12      passing.
13  Q.  Mentioned what?
14  A.  Different incidences as they happened.
15  Q.  Any instances other than what you've already
16      told me in deposition?
17  A.  I don't recall.
18  Q.  What about with your son?  Did you mention to
19      him any instances other than what you have told
20      me about earlier today, instances that you
21      mentioned or situations with Ms. Brackin?
22  A.  I don't recall.
23  Q.  Have you talked to anyone else other than your

Page 263

1      son or daughter about any problems that you felt
2      you were having with Ms. Brackin?
3          MR. DEBARDELABEN:  And other than
4             Mr. Childry?
5          MS. ELLIS:  Right.
6   Q.  Other than what you've already testified to.
7   A.  Mack Reed.
8   Q.  On how many occasions did you talk to Mack Reed
9      about what you perceived to be problems between
10      you and Ms. Brackin?
11  A.  I don't recall.  It was just in conversation
12      just talking.  My husband.  That would be all.
13  Q.  I'm sorry?
14  A.  And that would probably be all.
15  Q.  What about Pam Harris?  Did you ever talk to Pam
16      Harris about any problems you perceived you were
17      having with Ms. Brackin?
18  A.  No.
19  Q.  Did you talk with Mack Reed or your husband
20      about any problems you felt you were having with
21      Ms. Brackin other than the problems you've
22      already told me today in deposition?
23  A.  I don't recall.

Page 264

1   Q.  Well, do you recall any other instances or bases
2      for any problems that you felt you were having
3      with Ms. Brackin other than what you told me
4      today?
5   A.  No.
6   Q.  How did you become aware of the lawsuit that
7      Trinity University had filed against Trinity
8      College & University?
9   A.  Jenny Brackin told Donnie, Sr.
10  Q.  And did she tell him on the phone or in person?
11  A.  She told him on the telephone.
12  Q.  And had he called her or had she called him?
13  A.  He called her.
14  Q.  And on how many occasions did he call
15      Ms. Brackin?
16  A.  One.
17  Q.  And what was his purpose for calling her to your
18      knowledge?
19  A.  You know, I don't really recall what his purpose
20      was.
21  Q.  Did you know that he was going to make the call
22      prior to the time that he made it?
23  A.  I did.

Page 265

1   Q.  And did he express to you why he was about to
2      call Ms. Brackin?
3   A.  I believe at the time he did.
4   Q.  And what is your best recollection of what he
5      told you?  It doesn't have to be word for word.
6      Just your best recollection the reason why your
7      husband said he was planning to call
8      Ms. Brackin.
9   A.  I just don't recall why he said he was going to
10      call her.
11  Q.  Were you present when your husband was on the
12      telephone talking with Ms. Brackin?
13  A.  Only part of it.
14  Q.  And were you on another line?
15  A.  Oh, no, ma'am.
16  Q.  Why were you present for only part of the time
17      that your husband was talking to Ms. Brackin?
18  A.  Because I walked out of the room.
19  Q.  And what did your husband -- did you hear
20      anything that Ms. Brackin said when she was
21      talking to your husband?  In other words, did he
22      hold the phone out or was she speaking loudly
23      where you could hear anything she said?

Deposition of Virginia Hopper, Vol. II                                                May 20, 2008

Page 266

1   A.   No, ma'am.
2   Q.   What did your husband say to Ms. Brackin --
3              MR. DEBARDELABEN:  I'm going --
4   Q.   -- that you heard?
5              MR. DEBARDELABEN:  -- to enter an
6              objection.  I think that might
7              come into the husband and wife
8              privilege, but -- what they would
9              say with each other, but --
10             MS. ELLIS:  No.  No.  What I'm asking
11             is what did she hear her husband
12             saying to Ms. Brackin.
13             MR. DEBARDELABEN:  Maybe he wouldn't
14             have said it unless he was saying
15             it around his wife, but she can
16             answer it.  I'm just --
17             MS. ELLIS:  In other words, there's a
18             third party involved,
19             Ms. Brackin.  And I'm just saying
20             what did she hear him saying to
21             Ms. Brackin.
22             MR. DEBARDELABEN:  I'm just entering

Page 267

1              an objection.  I don't know if I
2              should or not so I'm entering it.
3   A.   The only thing I heard him say to her was that
4        he told her that -- first he asked, you know, do
5        you want to talk to me.  And apparently she said
6        she did because they kept talking.  And then he
7        just told her -- explained to her that he
8        thought the whole situation was wrong and that
9        he thought that they should -- that she should
10       listen to me and see what happened -- exactly
11       how it happened.  She said for me to call Jackie
12       Graham and talk to her and let her know what
13       happened.  Then she told Donnie that there was a
14       lawsuit and was he aware of that and then told
15       him to look it up, that Trinity had sued Trinity
16       because of using their name.
17  Q.   That Trinity University had sued Trinity College
18       & University?
19  A.   For using their name.  And that's all I really
20       know about it because, like I said, I just
21       walked on out.
22  Q.   Did your husband record that conversation?
23  A.   No, ma'am.

Page 268

1   Q.   Did he make any notes about the conversation?
2   A.   No, ma'am.
3   Q.   Now, based upon the experience and the courses
4        that you submitted to Trinity College &
5        University, is it fair to state that Trinity
6        College & University apparently did not believe
7        you qualified for credit for five accounting
8        courses?
9   A.   Now, ask me that again.
10  Q.   I don't know if I can.
11             MS. ELLIS:  Can you read that back?
12             (The immediately preceding question
13             was read back by the court
14             reporter.)
15             MR. DEBARDELABEN:  Object to the form.
16  A.   I don't understand what you're asking me.
17  Q.   Based upon the information that you submitted to
18       Trinity College & University, Trinity College &
19       University gave you credit on Defendant's
20       Exhibit 3 for how many accounting courses?
21             MR. DEBARDELABEN:  We're going to
22             object to the form.
23  A.   They don't even have numbers beside them.  I

Page 269

1        don't know.  I can't look at this and tell.
2   Q.   You can't look at the names of them and tell?
3   A.   I can't look at that and tell.  Maybe that's why
4        they changed it.
5   Q.   I'm referring you to Defendant's Exhibit 14,
6        which is an application submitted for the
7        position of Accountant on November 21 of 2003.
8        Based upon the list that you typed out and
9        submitted to -- with this application, how many
10       accounting courses did you contend by adding
11       that list to your application that Trinity
12       University had given you credit for?
13  A.   Three.
14  Q.   Three in addition to what you had taken at
15       Troy?  Is that what you're saying?
16  A.   Correct.
17  Q.   Did you ever check to see if one of those three
18       courses would be considered by the State to be
19       equivalent to the last course that you took at
20       Troy University in 2003, the Intermediate
21       Accounting I?
22  A.   No, I didn't.
23  Q.   Why not?

Deposition of Virginia Hopper, Vol. II

May 20, 2008

Page 270

1  A.  Because I was looking at that list before this
2      transferred over, and it specifically said
3      Intermediate I, and then it said Intermediate II
4      or equivalent.
5  Q.  So you read "or equivalent" just to apply to
6      Intermediate II?
7  A.  II.
8  Q.  That's the way you read it?
9  A.  It said I or II or equivalent.
10 Q.  Did you read it that same way for Governmental
11     Accounting?
12 A.  Well, now, I was told by Lori Braswell that
13     because of the course number that Governmental
14     Accounting was what they substituted for II.
15 Q.  Did you go back to her and ask for her
16     advice regarding whether one of these courses
17     for which Trinity College & University gave you
18     credit for, one of these three accounting
19     courses in addition to what you had taken, would
20     substitute for Principles of Accounting I?
21 A.  I already had all those classes by that time.  I
22     already even had Governmental.  The only thing I
23     had to have was Intermediate I.

Page 271

1  Q.  I misspoke.  I meant to ask you about
2      Intermediate I.
3          Did you ever go and talk to anyone at State
4      Personnel to ask them whether any of the
5      courses -- accounting courses for which Trinity
6      College & University had given you credit could
7      substitute for Intermediate Accounting I?
8  A.  No, ma'am.
9  Q.  Why not?
10 A.  Because I thought you had to have Intermediate
11     I.
12 Q.  Why did you ask whether Governmental Accounting
13     could substitute?
14 A.  Because it said "or equivalent".
15 Q.  Did it say "or equivalent" after -- How many
16     times did it say "or equivalent," just once?
17 A.  Uh-huh (positive response).
18 Q.  So why did you think that applied to
19     Governmental Accounting but did not apply to
20     Intermediate Accounting I?
21 A.  That's the way I read it.
22 Q.  That's your best answer?
23 A.  That's my only answer.

Page 272

1  Q.  Who do you contend would be witnesses to your
2      claim of mental and emotional anguish that you
3      are making in your complaint?
4  A.  My therapist.
5  Q.  Anyone else?
6  A.  No.
7  Q.  Have you talked to your therapist about any
8      other events that have occurred in your life
9      other than the loss of your job with the State?
10 A.  I have.
11 Q.  Tell me what other events you have discussed
12     with your therapist.
13 A.  No.
14     MS. ELLIS:  Are you claiming
15         privilege?
16     MR. DEBARDELABEN:  I haven't even
17         seen --
18     COURT REPORTER:  I can't hear you.
19     MS. BYRNE:  I'm sorry.  I can't hear
20         you.
21     MR. DEBARDELABEN:  I said I haven't
22         even seen his notes.  I don't know
23         what she discussed with him.  If

Page 273

1      you want me to take a break and
2      let me discuss it with her because
3      I --
4      MS. ELLIS:  Okay.  We'll take a break
5          and let you discuss it with her.
6          I need to ask her about it.
7      MR. DEBARDELABEN:  I understand.
8      (Brief recess.)
9      (The following was read back by the
10         court reporter:  Tell me what other
11         events you have discussed with your
12         therapist.)
13 A.  Besides losing my job, let's see, my father took
14     his life.
15 Q.  When did that occur?
16 A.  February of 2005.
17     We had a huge conflict with settling of the
18     estate with my siblings.  I had cancer.  My
19     husband lost his mother unexpectedly.  There was
20     a huge problem with settling that estate.
21     There's just him and his brother.
22 Q.  I'm going to interrupt you a little bit.
23     When did his mother pass away, your

Deposition of Virginia Hopper, Vol. II                                                    May 20, 2008

Page 274

1    husband's mother?
2    A.   2003.
3    Q.   And they also had a problem -- conflicts with
4         settling the estate?
5    A.   Yes.
6    Q.   I'm sorry. Go ahead.
7    A.   And I had an escaped convict break in on me and
8         the children and tied us up and left us there
9         and stole the car.
10   Q.   When did that occur?
11   A.   In 1981.
12   Q.   You say the children. Your two children?
13   A.   Yes. And traumatic things, that's probably the
14        most.
15   Q.   Has the conflict with settling the estate --
16        your father's estate been resolved?
17   A.   It has.
18   Q.   When was it resolved approximately?
19   A.   Beginning of 2006.
20   Q.   And y'all didn't have to go to court over that?
21   A.   No, ma'am.
22   Q.   Did anybody get lawyers for it?
23   A.   No.

Page 275

1    Q.   How were y'all able to resolve it or did you
2         have a mediator come in?
3    A.   We just finally settled it.
4    Q.   Sat down and figured it out?
5    A.   Yes.
6    Q.   Let me ask you about -- This is the transcript
7         of the first hearing on June 22 of 2006. This
8         was the one before Phillip Tyler. Do you
9         remember that one?
10   A.   I do.
11   Q.   I'm not going to mark this as an exhibit, but on
12        page 130 you were asked a question by your
13        attorney, Mr. DeBardeleben. You were asked:
14        Let me ask you about this. Is the reason you
15        thought Trinity College & University was an
16        acceptable college is that it -- the information
17        you had showed that it was accredited --
18        information you had showed that it was
19        accredited. And you answered yes, sir.
20             Did I read that correctly?
21   A.   Yes.
22             (Off-the-record discussion.)
23   Q.   What did you understand the phrase "acceptable

Page 276

1    college" to mean?
2    A.   That it would be acceptable to the State because
3         it was accredited. I think that's -- That's
4         what I would take that to say; did you think it
5         was acceptable because it had a big thing that
6         said accredited.
7    Q.   And you now understand that it was not
8         acceptable --
9    A.   To the State.
10   Q.   -- to the State?
11   A.   Yes, ma'am.
12   Q.   Why is that?
13   A.   Because they've told me so.
14   Q.   But it's also your opinion, correct?
15   A.   Well, it's not on any list that they take that
16        I've seen because now they have a list on their
17        Web site that said these are where we take
18        accepted colleges from. But it wasn't there
19        then, but it is now and so they are not listed
20        there.
21   Q.   But the phrase "acceptable college," to you that
22        means acceptable to the State of Alabama?
23   A.   Correct.

Page 277

1    Q.   In the situation that you talked to your
2         therapist about with the inmate, was the inmate
3         caught?
4    A.   Ten years later he was brought back to -- he was
5         extradited back to Alabama.
6    Q.   Did you have to testify at the trial or
7         anything?
8    A.   Yes, ma'am.
9    Q.   So you have been to court to testify?
10   A.   Oh, I'm sorry. Yes.
11   Q.   That's okay.
12             And what was the inmate's name?
13   A.   Edward M. Allison.
14   Q.   The last name?
15   A.   Allison.
16   Q.   And was the inmate convicted?
17   A.   He was.
18   Q.   The credit card bill or the credit card that you
19        used to pay the fee from Trinity College &
20        University, how did you pay for the charges on
21        that credit card?
22   A.   By check.
23   Q.   And on what account? A check from what account

Page 278

| 1 | | did you use? |
|---|---|---|
| 2 | A. | AmSouth Bank. |
| 3 | Q. | And that bank account is in your name alone or |
| 4 | | your name and your husband's name? |
| 5 | A. | My name. |
| 6 | Q. | Is it still presently active? |
| 7 | A. | No, ma'am. |
| 8 | Q. | When -- |
| 9 | A. | AmSouth is not in existence anymore. |
| 10 | Q. | True. |
| 11 | | Was that account closed or was it |
| 12 | | transferred in a sense -- I don't know the |
| 13 | | correct terminology -- |
| 14 | A. | When AmSouth Bank quit being in existence, it |
| 15 | | was closed. But it wasn't closed until then, |
| 16 | | which has been sort of recently. I mean, not a |
| 17 | | long time ago, but ... |
| 18 | Q. | And then Regions bought out AmSouth, correct? |
| 19 | A. | Well, now it's like RCB or -- |
| 20 | Q. | Where do you bank now? |
| 21 | A. | I have First Community Bank and Colonial. |
| 22 | Q. | Have you opened that account since the AmSouth |
| 23 | | account was closed? |

Page 279

| 1 | A. | No. |
|---|---|---|
| 2 | Q. | And in whose name is the present account? |
| 3 | A. | Both of ours. |
| 4 | Q. | You and your husband? |
| 5 | A. | Yes. |
| 6 | Q. | Have you ever thought about suing Trinity |
| 7 | | College & University? |
| 8 | A. | I've thought about a lot of things. |
| 9 | Q. | I know that, but have you ever thought about |
| 10 | | suing Trinity College & University? |
| 11 | A. | Yes. |
| 12 | Q. | Do you intend to do so? |
| 13 | A. | I don't know at this point. |
| 14 | Q. | So you haven't made a decision one way or the |
| 15 | | other? |
| 16 | A. | No, ma'am. |
| 17 | Q. | And what factors are keeping you from making |
| 18 | | that decision? |
| 19 | A. | Oh, I don't know. It's just like -- I don't |
| 20 | | know. |
| 21 | Q. | Have you ever attempted to contact Trinity |
| 22 | | College & University to make any complaint? |
| 23 | A. | Yes, ma'am. |

Page 280

| 1 | Q. | And were you successful? |
|---|---|---|
| 2 | A. | No, ma'am. |
| 3 | Q. | How did you attempt to contact them? |
| 4 | A. | Telephone, e-mail. |
| 5 | Q. | The person at Trinity College & University that |
| 6 | | you talked to on several occasions when you |
| 7 | | called the toll-free number, when that person |
| 8 | | answered the phone -- |
| 9 | | First of all, let me ask you this. When you |
| 10 | | called did you get straight to that person or |
| 11 | | did you have to ask for that person, the one |
| 12 | | that you always talked to? |
| 13 | A. | Sometimes I got straight through to her. |
| 14 | | Sometimes I had to leave a message, and she |
| 15 | | returned a call. |
| 16 | Q. | In other words, when you called the toll-free |
| 17 | | number, did it go to a receptionist or voice |
| 18 | | mail or something and then you had to push -- |
| 19 | A. | Sometimes it went to a receptionist. One time I |
| 20 | | got a voice mail, left a message, and she called |
| 21 | | back. One time I got her right away, but she |
| 22 | | still had to call me back. But, see, they |
| 23 | | always called me back. |

Page 281

| 1 | Q. | And when the receptionist would answer the |
|---|---|---|
| 2 | | phone, what would the receptionist say? |
| 3 | A. | Trinity. |
| 4 | Q. | And what did the voice mail message for the |
| 5 | | person that you usually talked to say? |
| 6 | A. | I can't recall. |
| 7 | | MS. ELLIS: That's all I have right |
| 8 | | now. I think Mr. Marsh has a few |
| 9 | | more questions. |
| 10 | | MR. MARSH: I actually have a very few |
| 11 | | more questions. |
| 12 | | EXAMINATION |
| 13 | BY MR. MARSH: |
| 14 | Q. | I've just got a couple points of clarification I |
| 15 | | need to go over with you, Ms. Hopper. |
| 16 | | In showing you Defendant's Exhibit 3, which |
| 17 | | is the transcript that you received from Trinity |
| 18 | | College & University, and also Defendant's |
| 19 | | Exhibit 13, which is -- that's not the right |
| 20 | | one; I need 14 -- Defendant's Exhibit 14, which |
| 21 | | is your application for Accountant which on page |
| 22 | | 3 you list the courses that you took, in looking |
| 23 | | at both of those course listings, both in your |

Page 282

1 transcript on 3 and then the courses on your
2 application other than the ones that you took at
3 Troy University, for all of these courses that
4 you got credit from from Trinity College &
5 University, did you do any online coursework to
6 get credit for any of these courses?
7 A. No, sir.
8 Q. Did you ever read a book or any other material
9 that was assigned to you for credit for these
10 courses?
11 A. No, sir.
12 Q. Did you have to take any exam or test to get
13 credit for these courses?
14 A. No, sir.
15 Q. Did you ever prepare a paper, a project, any
16 other submission to them that you prepared to
17 get credit for the courses?
18 A. No, sir.
19 Q. The credit for these courses was solely based on
20 the information you provided about prior
21 education, training courses, and your work
22 experience; is that correct?
23      MR. DEBARDELABEN: I'm going to object

Page 283

1      to the form. She can answer as
2      far as she knows.
3 Q. Is that accurate that it was based on what you
4 submitted from your prior education courses,
5 your training courses, and your work experience?
6      MR. DEBARDELABEN: Object to the form.
7 Q. You can answer the question.
8 A. Ask me again.
9 Q. I'm trying to clarify exactly what the credit
10 was based on. And you've testified earlier that
11 you provided them with a list of your courses
12 that you took, both at Troy State and also the
13 Wetumpka Technical School or whatever that
14 was -- Vocational School, and the work-related
15 courses, seminars that you took. You also
16 testified you sent them information about your
17 work with the Department of Insurance.
18      Was there anything else that you gave them
19 or did for them that they used in giving you
20 credit for these courses besides those things?
21      MR. DEBARDELABEN: Object to the
22      form. Go ahead and answer.
23 A. Okay. Now, the Insurance Department,

Page 284

1 Receivership Division was not the only work
2 history I sent them. That's what she was most
3 interested in that she kept asking me questions
4 about. But the information I told you was what
5 I faxed to her. But that was what she had most
6 questions back to me about.
7 Q. So there was other work information you
8 provided --
9 A. Yes, sir. I sent her my resume, but the
10 Receivership information was what she had most
11 questions back to me about.
12 Q. So if we expand that to your entire work history
13 and the previous education courses that you
14 took, was there anything else that you did to
15 receive credit for these courses?
16 A. No, sir. If I understood you right, my answer
17 is no.
18 Q. Well, tell me if you didn't understand. Let's
19 go back over it again.
20 A. What I faxed to her was my resume, my work
21 history, the courses that I had taken at Troy,
22 and the other classes that I had attended like
23 the work seminars and TechnaCenter and that

Page 285

1 information that we had talked about. Is that
2 what you asked me?
3 Q. Yes, ma'am.
4 A. Then my answer is that's what I sent her and
5 that's the information that this came back to me
6 from is what I understand.
7 Q. And there was nothing else beyond what you just
8 described that you got credit -- that enabled
9 you to get credit as listed on these two
10 exhibits?
11 A. No, sir.
12 Q. I asked you earlier some questions about
13 conversations or what you knew about
14 conversations Commissioner Walley may have had
15 with certain individuals, but I want to expand
16 that just a little bit.
17      Are you aware of any conversation
18 Commissioner Walley had with anybody at all
19 concerning your employment or this case and your
20 diploma, degree or whatever you call it, from
21 Trinity College University? Are you aware of
22 any conversation that he had with anybody about
23 you or this employment?

Page 286

1     MR. DEBARDELABEN: Object to the
2     form. I don't understand it.
3  Q.  Commissioner Walley is the one that terminated
4     your employment with DHR. Do you know
5     personally whether he had any conversation with
6     anybody concerning either your employment or
7     this degree or piece of paper, whatever we're
8     calling it, from Trinity College & University?
9  A.  Do I have personal knowledge of that?
10 Q.  Yes, ma'am.
11 A.  No.
12 Q.  Do you have any knowledge of any written
13    communication -- either e-mail, letters,
14    memos -- that he may have had with anybody
15    concerning this matter?
16 A.  Only when I e-mailed him and asked him could I
17    meet with him, and he e-mailed me back and said
18    he had been advised not to.
19 Q.  Other than that was there anything else that
20    you're aware of, any conversation he may have
21    had or written communication he had from anybody
22    else?
23 A.  No.

Page 287

1  Q.  Are you aware of any agreement concerning your
2     case, your employment, or your situation with
3     DHR that he had with anybody? Any agreement at
4     all with anybody that you're aware of?
5  A.  That he had?
6  Q.  Yes, ma'am.
7  A.  Not that he had personally. I don't know that
8     he had it personally.
9  Q.  Are you aware of an agreement that he had
10    otherwise? I'm not sure I understand your
11    answer. You said not that he had personally.
12    What do you mean by that?
13 A.  I don't know that he had a personal agreement.
14 Q.  Do you plan to use this degree from Trinity
15    College & University for other work that you may
16    apply for in the future?
17 A.  If I ever use this for anything, if I work
18    outside state government, I will say this is
19    Trinity College & University. Let them look at
20    it and see what they think about it. I know
21    this is not Trinity University in San Antonio,
22    Texas.
23 Q.  If you use this for subsequent employment, would

Page 288

1     you explain how you got credit for these
2     courses?
3  A.  Oh, yes, sir.
4  Q.  Do you think it's unreasonable that DHR -- With
5     what you know now, do you think it's
6     unreasonable that DHR or the State is not giving
7     you credit for having a degree from Trinity
8     College & University?
9  A.  Not for not having this degree, no, sir. That's
10    the policy for them not to take it. I do not.
11 Q.  And you don't think that's unreasonable based on
12    what you know now?
13 A.  Not for this particular side of it, no, sir. I
14    think I've been treated unfairly.
15 Q.  In what ways specifically?
16 A.  That they didn't listen to my side of it and
17    understand what happened to me and at least let
18    me roll back. I didn't ask to stay an
19    Accountant. I asked to roll back to what I was
20    a permanent thing of before.
21 Q.  And do you understand that you don't qualify for
22    the Accountant position at this point?
23 A.  Yes, sir. In the State's eyes, I understand

Page 289

1     that.
2  Q.  And you said that your side was not listened
3     to. As you testified earlier, you had the
4     opportunity to present this in front of a
5     hearing at DHR, a hearing before the State
6     Personnel Board, and then a final argument
7     before the State Personnel Board. You had an
8     opportunity all three times to explain your
9     side?
10    MR. DEBARDELABEN: Object to the
11    form.
12    MR. MARSH: I'll do it one at a time.
13 Q.  You had an opportunity to explain your side of
14    the story to the DHR hearing officer; is that
15    correct?
16 A.  I know I had a hearing.
17 Q.  And did you have an opportunity to testify at
18    that hearing?
19 A.  Yes.
20 Q.  Was anything preventing you from testifying the
21    way you wanted to testify at that hearing?
22 A.  No.
23 Q.  And you had a hearing in front of Mr. Dan Morris



Page 290

1    who was the hearing officer for the State
2    Personnel Board; is that accurate?
3  A.  Yes.
4  Q.  And you had an opportunity to testify and
5    present evidence at that hearing?
6  A.  Yes.
7  Q.  And finally your attorney had an opportunity to
8    argue your case before the full state board; is
9    that correct?
10  A.  Yes.
11  Q.  And have you seen a mental health professional
12    prior to losing your job with DHR?
13  A.  No.
14  Q.  At any time in your life?
15  A.  No, sir.
16  Q.  And when I say mental health professional, I'm
17    including psychologists, psychiatrists,
18    counselor, mental health nurse, anybody remotely
19    related to the mental health profession.  Is
20    that still your answer:  You have not seen
21    anybody?
22  A.  That's my answer.
23  Q.  Have you ever been diagnosed with any mental

Page 291

1    health disorder, psychological disorder of any
2    nature --
3  A.  No.
4  Q.  -- prior to losing your job?
5  A.  No, sir.
6        MR. MARSH:  That's all I've got.
7            EXAMINATION
8  BY MS. ELLIS:
9  Q.  Ms. Hopper, tell me every claim that you are
10    making against Jackie Graham.  I don't mean in
11    legal terms, but tell me how you say that Jackie
12    Graham has somehow harmed you and why you are
13    suing her.
14  A.  I don't have the answer to that.  You'll have to
15    ask my attorney.
16  Q.  You can't answer my question?
17  A.  No.
18        MS. ELLIS:  That's all.
19        (Deposition concluded at
20          approximately 4:00 p.m.)
21        * * * * * * * * * * * *
22        FURTHER DEPONENT SAITH NOT
23        * * * * * * * * * * * * *

Page 292

1            REPORTER'S CERTIFICATE
2  STATE OF ALABAMA:
3  MONTGOMERY COUNTY:
4      I, Pamela A. Wilbanks, CCR, Registered
5  Professional Reporter, and Commissioner for the State
6  of Alabama at Large, do hereby certify that I reported
7  the deposition of:
8          VIRGINIA HOPPER
9  who was first duly sworn by me to speak the truth, the
10  whole truth and nothing but the truth, in the matter
11  of:
12      VIRGINIA HOPPER,
13      Plaintiff,
14      Vs.
15      JACKIE GRAHAM, et al.,
16      Defendants.
17      In The U.S. District Court
18      For the Middle District of Alabama
19      Northern Division
20      2:07-CV-457-MEF
21  on Tuesday, May 20, 2008.
22      The foregoing 291 computer printed pages
23

Page 293

1  examination of said witness by counsel for the parties
2  set out herein.  The reading and signing of same is
3  hereby waived.
4      I further certify that I am neither of kin nor
5  of counsel to the parties to said cause nor in any
6  manner interested in the results thereof.
7      This 23rd day of May 2008.
8
9
10
11
12
13
14
15
    _____
    Pamela A. Wilbanks, ACCR #334
16  Expiration Date:  9-30-2008
    Registered Professional Reporter
17  and Commissioner for the State
    of Alabama at Large
18
19
20
21
22
23

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

VIRGINIA HOPPER,                    )
                                    )
  Plaintiff,                       )
                                    )
v.                                  )        Case No.: 2:07-cv-457-MEF
                                    )
JACKIE GRAHAM, et al.,              )
                                    )
  Defendants.                      )

## NOTICE OF DEPOSITION *DUCES TECUM*

Please take notice that the Defendants, in accordance with Rule 30 of the

*Federal Rules of Civil Procedure*, will take the deposition of the Plaintiff,

Virginia Hopper, commencing on **Tuesday, April 29, 2008, at 9:00 a.m.** at the

offices of Jim L. DeBardelaben, 1505 Madison Avenue, Montgomery, Alabama

36107, upon oral examination before a notary public or some other officer

authorized by law to administer oaths. The deposition will continue from day

to day until completed (and in accordance with the Court's Scheduling Order

limitations).

## DEFINITIONS

1.   "The Plaintiff" shall mean Virginia Hopper.

2.   "Documents" shall mean any written, recorded, filmed, or graphic

matter, whether produced or reproduced, or on paper, cards, tapes, film,

electronic facsimile, computer storage device, or any other media, including but

000076



DEFENDANT'S
EXHIBIT
7

not limited to files, personal or intra-office memoranda, notes, minutes, records, photographs, correspondence, emails, diaries, computer generated instant messages, tax returns, checks, check stubs, reports, credit card statements, credit card receipts, money order receipts, cashier check receipts, studies, charts, graphs, statements, notebooks, intra-company communications, handwritten notes, agreements, books, pamphlets, periodicals, professional manuals, appointment or other calendars, recordings of oral conversations or meetings, work papers, and also including but not limited to originals and all copies which are different in any way from the originals, whether by interlineation, receipt stamp, notation, indication of copies sent or received and drafts.

3.    "Communication" shall mean any contact, oral or written, formal or informal at any time or place, under any circumstances, in any manner whereby a statement of any nature is transmitted, disclosed, exchanged or transferred, and shall include, without limitation, any documents containing, constituting, reflecting, memorializing, referring or relating to any such contact.

4.    "Trinity University" shall mean the Trinity University located in San Antonio, Texas.

5.    All references to "Trinity College and University" shall include requests for documents relating in any way to Bronte International University (BIU) based upon the name change from Trinity College and University to BIU after the Plaintiff completed her application.

000077

## DOCUMENT REQUEST

Pursuant to Rule 34 of the *Federal Rules of Civil Procedure*, the deponent, Virginia Hopper, is requested to bring with her to said deposition the following documents:

1.  Any and all transcripts received by or on behalf of the Plaintiff from Trinity College and University.

2.  Any and all "diplomas" or similar documents received by or on behalf of the Plaintiff from Trinity College and University.

3.  Any and all documents related in any way to Trinity University and/or Trinity College and University that are or have ever been in the Plaintiff's possession or control and/or reviewed by the Plaintiff at any time.

4.  Any and all documents that evidence or relate in any way to payment(s) made by the Plaintiff or made on behalf of the Plaintiff to Trinity College and University.

5.  Any and all documents that evidence or relate in any way to payment(s) made by the Plaintiff or made on behalf of the Plaintiff to Trinity University.

6.  Any and all documents that relate in any way to communications between the Plaintiff and any former or present employee of the State of Alabama regarding any and all matters made the subject of the Plaintiff's Complaint.

7.  Any and all documents in the Plaintiff's possession or control that the Plaintiff claims support or relate in any way to the Plaintiff's contention in paragraph 34 of her Complaint that the finding of the Personnel Board upholding her termination was in violation of constitutional and statutory provisions, i.e., denial of due process and equal protection of law.

8.  Any and all documents in the Plaintiff's possession or control that the Plaintiff claims support or relate in any way to the Plaintiff's contention in paragraph 34 of her Complaint that the finding of the Personnel Board upholding her termination was in excess of the

000078

authority of the agency.

9.    Any and all documents in the Plaintiff's possession or control that the Plaintiff claims support or relate in any way to the Plaintiff's contention in paragraph 34 of her Complaint that the finding of the Personnel Board upholding her termination was in violation of agency rules.

10.    Any and all documents in the Plaintiff's possession or control that the Plaintiff claims support or relate in any way to the Plaintiff's contention in paragraph 34 of her Complaint that the finding of the Personnel Board upholding her termination was made on unlawful procedure.

11.    Any and all documents in the Plaintiff's possession or control that the Plaintiff claims support or relate in any way to the Plaintiff's contention in paragraph 34 of her Complaint that the finding of the Personnel Board upholding her termination was affected by error of law.

12.    Any and all documents in the Plaintiff's possession or control that the Plaintiff claims support or relate in any way to the Plaintiff's contention in paragraph 34 of her Complaint that the finding of the Personnel Board upholding her termination was erroneous in view of the reliable, probative and substantial evidence on the whole record.

13.    Any and all documents in the Plaintiff's possession or control that the Plaintiff claims support or relate in any way to the Plaintiff's contention in paragraph 34 of her Complaint that the finding of the Personnel Board upholding her termination was unreasonable, arbitrary or capricious, characterized by an abuse of discretion or was clearly an unwarranted exercise of discretion.

14.    Any and all documents in the Plaintiff's possession or control that the Plaintiff contends support or relate in any way to her allegation in paragraph 48 of her Complaint that two or more defendants conspired to deny the Plaintiff a fair and unbiased hearing and deny her due process and equal protection of the laws as guaranteed by the *Constitution of Alabama* 1901 and the *Constitution of the United States of America*.

000079

15.   Any and all documents that relate in any way to communications between the Plaintiff and anyone associated, directly or indirectly, with Trinity University and/or Trinity College and University.

Respectfully submitted,

JOANA S. ELLIS          (ELL014)
ALICE ANN BYRNE         (BYR015)
Attorneys for Defendants Graham,
The Personnel Board of the State of
Alabama,   Dickson,   McMillan,
O'Neal, McNair, and Anderson

OF COUNSEL:

Alabama State Personnel Department
Legal Division
64 North Union Street
Folsom Administrative Bldg., Suite 316
Montgomery, Alabama 36130
Telephone:  (334) 353-0046
Facsimile:  (334) 353-4481
Email:      joana.ellis@personnel.alabama.gov

JOEL MARSH
Attorney for Defendant Walley

OF COUNSEL:

Alabama Department of Human Resources
Post Office Box 30400
Montgomery, Alabama 36130
Telephone:  (334) 242-9330
Facsimile:  (334) 242-0689
Email:      joel.marsh@dhr.alabama.gov

000080

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon the following by email and placing a copy in the United States mail, properly addressed and postage prepaid on this the 22nd day of April 2008.

Jim L. DeBardelaben, Esq.
Attorney at Law
Post Office Box 152
Montgomery, Alabama 36101-0152

OF COUNSEL

000081

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

VIRGINIA HOPPER,                        )
                                        )
  Plaintiff,                            )
                                        )
v.                                      )        Case No.: 2:07-cv-457-MEF
                                        )
JACKIE GRAHAM, et al.,                  )
                                        )
  Defendants.                           )

## RE-NOTICE OF DEPOSITION *DUCES TECUM*

Please take notice that the Defendants, in accordance with Rule 30 of the *Federal Rules of Civil Procedure*, will take the deposition of the Plaintiff, Virginia Hopper, commencing on **Tuesday, May 20, 2008, at 9:00 a.m.** at the offices of Jim L. DeBardelaben, 1505 Madison Avenue, Montgomery, Alabama 36107, upon oral examination before a notary public or some other officer authorized by law to administer oaths. The deposition will continue from day to day until completed (and in accordance with the Court's Scheduling Order limitations).

### DEFINITIONS

1.    "The Plaintiff" shall mean Virginia Hopper.

2.    "Documents" shall mean any written, recorded, filmed, or graphic matter, whether produced or reproduced, or on paper, cards, tapes, film, electronic facsimile, computer storage device, or any other media, including but

000082



not limited to files, personal or intra-office memoranda, notes, minutes, records, photographs, correspondence, emails, diaries, computer generated instant messages, tax returns, checks, check stubs, reports, credit card statements, credit card receipts, money order receipts, cashier check receipts, studies, charts, graphs, statements, notebooks, intra-company communications, handwritten notes, agreements, books, pamphlets, periodicals, professional manuals, appointment or other calendars, recordings of oral conversations or meetings, work papers, and also including but not limited to originals and all copies which are different in any way from the originals, whether by interlineation, receipt stamp, notation, indication of copies sent or received and drafts.

3.     "Communication" shall mean any contact, oral or written, formal or informal at any time or place, under any circumstances, in any manner whereby a statement of any nature is transmitted, disclosed, exchanged or transferred, and shall include, without limitation, any documents containing, constituting, reflecting, memorializing, referring or relating to any such contact.

4.     "Trinity University" shall mean the Trinity University located in San Antonio, Texas.

5.     All references to "Trinity College and University" shall include requests for documents relating in any way to Bronte International University (BIU) based upon the name change from Trinity College and University to BIU after the Plaintiff completed her application.

000083

## DOCUMENT REQUEST

Pursuant to Rule 34 of the *Federal Rules of Civil Procedure*, the deponent, Virginia Hopper, is requested to bring with her to said deposition the following documents:

1.  Any and all transcripts received by or on behalf of the Plaintiff from Trinity College and University.

2.  Any and all "diplomas" or similar documents received by or on behalf of the Plaintiff from Trinity College and University.

3.  Any and all documents related in any way to Trinity University and/or Trinity College and University that are or have ever been in the Plaintiff's possession or control and/or reviewed by the Plaintiff at any time.

4.  Any and all documents that evidence or relate in any way to payment(s) made by the Plaintiff or made on behalf of the Plaintiff to Trinity College and University.

5.  Any and all documents that evidence or relate in any way to payment(s) made by the Plaintiff or made on behalf of the Plaintiff to Trinity University.

6.  Any and all documents that relate in any way to communications between the Plaintiff and any former or present employee of the State of Alabama regarding any and all matters made the subject of the Plaintiff's Complaint.

7.  Any and all documents in the Plaintiff's possession or control that the Plaintiff claims support or relate in any way to the Plaintiff's contention in paragraph 34 of her Complaint that the finding of the Personnel Board upholding her termination was in violation of constitutional and statutory provisions, i.e., denial of due process and equal protection of law.

8.  Any and all documents in the Plaintiff's possession or control that the Plaintiff claims support or relate in any way to the Plaintiff's contention in paragraph 34 of her Complaint that the finding of the Personnel Board upholding her termination was in excess of the

000084

authority of the agency.

9.  Any and all documents in the Plaintiff's possession or control that the Plaintiff claims support or relate in any way to the Plaintiff's contention in paragraph 34 of her Complaint that the finding of the Personnel Board upholding her termination was in violation of agency rules.

10. Any and all documents in the Plaintiff's possession or control that the Plaintiff claims support or relate in any way to the Plaintiff's contention in paragraph 34 of her Complaint that the finding of the Personnel Board upholding her termination was made on unlawful procedure.

11. Any and all documents in the Plaintiff's possession or control that the Plaintiff claims support or relate in any way to the Plaintiff's contention in paragraph 34 of her Complaint that the finding of the Personnel Board upholding her termination was affected by error of law.

12. Any and all documents in the Plaintiff's possession or control that the Plaintiff claims support or relate in any way to the Plaintiff's contention in paragraph 34 of her Complaint that the finding of the Personnel Board upholding her termination was erroneous in view of the reliable, probative and substantial evidence on the whole record.

13. Any and all documents in the Plaintiff's possession or control that the Plaintiff claims support or relate in any way to the Plaintiff's contention in paragraph 34 of her Complaint that the finding of the Personnel Board upholding her termination was unreasonable, arbitrary or capricious, characterized by an abuse of discretion or was clearly an unwarranted exercise of discretion.

14. Any and all documents in the Plaintiff's possession or control that the Plaintiff contends support or relate in any way to her allegation in paragraph 48 of her Complaint that two or more defendants conspired to deny the Plaintiff a fair and unbiased hearing and deny her due process and equal protection of the laws as guaranteed by the *Constitution of Alabama* 1901 and the *Constitution of the United States of America.*

000085

15. Any and all documents that relate in any way to communications between the Plaintiff and anyone associated, directly or indirectly, with Trinity University and/or Trinity College and University.

Respectfully submitted,

JOANA S. ELLIS        (ELL014)
ALICE ANN BYRNE       (BYR015)
Attorneys for Defendants Graham,
The Personnel Board of the State of
Alabama, Dickson, McMillan,
O'Neal, McNair, and Anderson

OF COUNSEL:

Alabama State Personnel Department
Legal Division
64 North Union Street
Folsom Administrative Bldg., Suite 316
Montgomery, Alabama 36130
Telephone:  (334) 353-0046
Facsimile:  (334) 353-4481
Email:      joana.ellis@personnel.alabama.gov

JOEL MARSH
Attorney for Defendant Walley

OF COUNSEL:

Alabama Department of Human Resources
Post Office Box 30400
Montgomery, Alabama 36130
Telephone:  (334) 242-9330
Facsimile:  (334) 242-0689
Email:      joel.marsh@dhr.alabama.gov

000086

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon the following by email and placing a copy in the United States mail, properly addressed and postage prepaid on this the 9th day of May 2008.

Jim L. DeBardelaben, Esq.
Attorney at Law
Post Office Box 152
Montgomery, Alabama 36101-0152

OF COUNSEL

000087



# TRINITY
## COLLEGE & UNIVERSITY

http://www.Trinity-College.edu
Verification Fax (Toll Free): 866-831-4857

**STUDENT IDENTIFICATION:**

*Federal Law Prohibits the Release of Information
On This Document Without Proper Authorization.*

Virginia Swearengin Hopper
200 Alpha Lane
Deatsville, AL 36022

**DEGREE(S) GRANTED:**

Bachelor of Science
with major concentration
in Business Administration
*25 May 2002*

**GRADING SYSTEM:**

P  Passing          I  Incomplete
F  Failure          W  Withdrew

| COURSE TITLE | COURSE NUMBER | RESULT |
|---|---|---|
| Intro to Bus | 101 | P |
| Personal Fin Mgmt | 102 | P |
| Intro to Bus Admin | 104 | P |
| Small Bus Mgmt | 106 | P |
| Small Bus Capital | 107 | P |
| International Marketing Mgmt | 108 | P |
| Principles of Supervision | 221 | P |
| Employee Rel & Practice | 224 | P |
| Principles of Marketing I | 345E | P |
| Advanced Org Behavior | 305 | P |
| Principles of Marketing Concepts | 278E | P |
| Performance Appraisal & Prod | 340 | P |
| Analysis of Financial Statements | 286 | P |
| Managerial Effectiveness | 388 | P |
| Principles of Marketing II (Adv) | 405 | P |
| Principles of Mgmt | 314 | P |
| Financial Mgmt | 412 | P |
| Logistics Mgmt | 370 | P |
| Business Writing | 290 | P |
| Problems in Logistics Concepts | 414 | P |
| Money & Banking | 299 | P |
| Money & Capitol Markts | 4110E | P |
| Decision Making for Mgmt | 480 | P |
| Economic Geography | 395E | P |
| Financial Inst & Markts | 470 | P |
| Economics I | 505 | P |
| Planning & Budgeting | 200E | P |
| Business Math | 160 | P |
| Business Math-2 | 162 | P |
| Accounting Prin - 1 | 169 | P |
| Prin of Acctg-II | 170 | P |
| Hist of Civilization | 144 | P |
| International Financial Mgmt | 1900E | P |
| English Composition - Intermediate | 277 | P |

CRU: 102
APL:   22

*This transcript is not valid unless it contains the seal
of the university.*

124

000088

DEFENDANT'S
EXHIBIT
3
PENGAD 800-631-6989



Dear Graduate:

Trinity College & University congratulates you on your degree.

We welcome you as an alumnus and wish you prosperity, happiness and success at the occasion of this new chapter in your career.

Please find enclosed your diploma, diploma cover, student record, academic letter of recommendation, alumni identification card, and bronze plaque. In addition we have enclosed your membership certificate and identification card to the *Chartered Institute of Professional Management.*

As a Trinity Alumni, please visit our Trinity Store at **www.trinity-college.edu/store** for class rings, tote bags, golf and denim shirts, and other specialty items.

Sincerely,

T. P. Watters
Trinity College & University

000089





# TRINITY
### COLLEGE & UNIVERSITY

TO WHOM IT MAY CONCERN:

Ms. VIRGINIA SWEARENGIN HOPPER is conferred the degree, rank and academic status Bachelor of Science with Distinction Business Administration effective 25 May 2002 upon as a consequence of Trinity's widely reputed programme, our appraisal of her comparative skills and her previous and present academic and work experience.

She successfully completed all requirements of Trinity's Board of Examiners within the mutually agreed time limitations. Hence it is Trinity's privilege to recommend the academic experience, methodical working and educational assiduity of Ms. HOPPER to you since we bear the true conviction that Ms. HOPPER shall not cease to expose her capacities as a meaningful acquisition to fitting your purposes.

Our assessment is for career advancement. This letter does not commit any professional organization to accept our assessment in lieu of its own established classification requirements.

For the Board of Examiners

AJH

000090



DEFENDANT'S EXHIBIT
5
PENGAD 800-631-6989



# Commission on Colleges
## Southern Association of Colleges and Schools

1866 Southern Lane
Decatur, Georgia 30033
Phone (404) 679-4500
Fax (404) 679-4558

**COC**
COMMISSION ON COLLEGES

Home Page

## INSTITUTIONAL DETAILS

**Institution Name:** Trinity University ✛
**CEO:** Dr. John R. Brazil
**Title:** President
**Address 1:** 715 Stadium Drive ✛
**Address 2:**
**City:** San Antonio **State:** TX **Zip:** 78212-7200
**Country:**
**Institution Phone:** (210) 999-7011
**Level:** III
**Status:** Accredited
**Public Sanctions:** NONE
**Accredited:** 1946
**Reaffirmed:** 1997
**Next Reaffirmation:** 2008
**Control:** Private Not-for-Profit

*San Antonio, TX*

©2001 Commission on Colleges — Maintained by: Computer Operations Email: **Webmaster** Updated: 03/28/01



*M-F 8:00 - 5:00 05/13/2006*

000091



DEFENDANT'S EXHIBIT 6

Department of Business Administration at Trinity University Homepage

Page 1 of 1



## BACHELOR OF ARTS IN BUSINESS ADMINISTRATION

B.A.

### COMMON CURRICULUM

**Business Core Curriculum**

| | | |
|---|---|---|
| MGMT 2301 (Management) | BUSN 3301 (Statistics) | |
| MKTG 2301 (Marketing) | BUSN 3302 (Busn Law I) | |
| ACCT 1301 (Busn Law I) | FNCE 3301 (Finance) | |
| ACCT 1302 (Mgr'l Accounting) | BUSN 4301 (Busn Policy) | |

24 Hours

B.S.

### BACHELOR OF SCIENCE IN BUSINESS ADMINISTRATION

BUSN 3303 Quant/Mgr'l Decision Making

**Business Electives**
9 Hours

**Accounting**
- ACCT 3341 (Advanced I)
- ACCT 3342 (Advanced II)
- ACCT 3343 (Intermed I)
- ACCT 3344 (Tax)
- ACCT 4344 (Auditing)
- BUSN 3341 (Busn Law I)
- BUSN 3341 (Busn Law II)
15 Hours

**Finance**
- FNCE 3351 (Bank & Mkts)
- FNCE 3352 (Investments)
- FNCE 4351 (Mgmt/Policy)
9 Hours

**Management**
- MGMT 3371 (Hum Res Mgmt)
- MGMT 3312 (Org Behav'r)
- MGMT 4371 (Strat Mgmt)
9 Hours

**Marketing**
- MKTG 3383 (Mktg Research)
- MKTG 4381 (Mktg Mgmt)
- MKTG 3381 (Consum Behav)
- MKTG 3382 (Promo Mgmt)
9 Hours

**Int'l Business**
- BUSN 3361 (Int'l Busn Law)
- FNCE 3361 (Int'l Finance)
- MGMT 3361 (Int'l Mgmt)
- MKTG 3361 (Int'l Mktg)
9 Hours

ELECTIVES IN BUSINESS TO BRING TOTAL HOURS TO 45

ELECTIVES TO BRING TOTAL HOURS TO 124

DEGREE


DEFENDANT'S
EXHIBIT
7

000092

866-831-4855 *  *

http://www.trinity.edu/departments/business_admin/index.htm

3/1/ .03

## Business Core Curriculum

These are the core requirements of virtually all undergraduate degrees in Business Administration.

| Accountancy Core Courses | ACCT 1301<br>Financial Accounting | ACCT 1302<br>Managerial Accounting |
|---|---|---|
| Core: Statistics for Management and Economics | | BUSN 3301 |
| Core: Legal Concepts of Business I | | BUSN 3302 |
| Core: Quantitative Managerial Decision Making | | BUSN 3303 |
| Core: Financial Administration of Business Firms | | FNCE 3301 |
| Core: Management of Organizations | | MGMT 2301 |
| Core: Principles of Marketing | | MKTG 2301 |
| Core: Business Policy and Strategy | | BUSN 4301 |

BACHELOR OF SCIENCE IN BUSINESS ADMINISTRATION

### Bachelor of Science Electives

### "Electives" in Business Administration (18 Credits)

Note that some "electives" become required courses for the following concentrations:
| Accounting (15 Credits) | Finance (9 Credits) | International Business (9 Credits)
| Management (9 Credits) | | Marketing (9 Credits) |

Required Courses in Concentrations of Study Are Listed Below (note that many students elect to take two concentrations):

### Accounting Concentration Requirements (15 Credits)

000093

DEFENDANT'S
EXHIBIT
8

PENGAD 800-631-6989



## TRINITY

**STUDENT IDENTIFICATION:**

*Federal Law Prohibits the Release of Information On This Document Without Proper Authorization.*

Virginia Swearengin Hopper
200 Alpha Lane
Deatsville, AL 36022

**DEGREE(S) GRANTED:**

Bachelor of Science
with major concentration
in Business Administration
*25 May 2002*

**GRADING SYSTEM:**

| | |
|---|---|
| P  Passing | I  Incomplete |
| F  Failure | W  Withdraw |

| COURSE TITLE | COURSE NUMBER | RESULT |
|---|---|---|
| Intro to Bus | 101 | |
| Personal Fin Mgmt | 102 | P |
| Intro to Bus Admin | 104 | P |
| Small Bus Mgmt | 106 | P |
| Small Bus Capital | 107 | P |
| International Marketing Mgmt | 108 | P |
| Principles of Supervision | 221 | P |
| Employee Rel & Practice | 224 | P |
| Principles of Marketing I | 345E | P |
| Advanced Org Behavior | 305 | P |
| Principles of Marketing Concepts | 278E | P |
| Performance Appraisal & Prod | 340 | P |
| Analysis of Financial Statements | 286 | P |
| Managerial Effectiveness | 388 | P |
| Principles of Marketing II (Adv) | 405 | P |
| Principles of Mgmt | 314 | P |
| Financial Mgmt | 412 | P |
| Logistics Mgmt | 370 | P |
| Business Writing | 290 | P |
| Problems in Logistics Concepts | 414 | P |
| Money & Banking | 299 | P |
| Money & Capitol Markts | 4110E | P |
| Decision Making for Mgmt | 480 | P |
| Economic Geography | 395E | P |
| Financial Inst & Markts | 470 | P |
| Economics I | 505 | P |
| Planning & Budgeting | 200E | P |
| Business Math | 160 | P |
| Business Math-2 | 162 | P |
| Accounting Prin - I | 169 | P |
| Prin of Acctg-II | 170 | P |
| Hist of Civilization | 144 | P |
| International Financial Mgmt | 1900E | P |
| English Composition - Intermediate | 277 | P |

**CRU: 102**
**APL: 22**

124

*This transcript is not valid unless it contains the seal of the university.*

*Handwritten notes:*

AUM – Advance
Technology Group – 99
Excel

NAIC Reinsurance – 96

Vec School – 95
windows; 51

NAIC Reinsurance – 95

NOLHGA Reinsurance – 4

SIR/NCIGF Working
Seminar – 94

Vec School – 93
Comp Appl I & II
Intro Acct

Prin I
Prin II
Governmental
Managerial

000094


DEFENDANT'S
EXHIBIT
9



# Trinity
## College & University

has conferred upon

## Virginia Sweavigin Hopper

the degree, rank and academic status

### Bachelor of Science

with a major in

### Business Administration

### Distinction

All requirements of the Board of Regents and Examiners
having been successfully completed. All rights and privileges
thereunto appertaining are hereby awarded.

Signed and sealed upon this twenty-fifth day of May
two thousand and two

_Roberta C. King_
Dean of Scholars

_Reverend Christian Dean_

000095



DEFENDANT'S
EXHIBIT

10

# TROY UNIVERSITY



**TROY UNIVERSITY**
UNIVERSITY RECORDS
TROY, ALABAMA 36082
(334)-670-3166

WARNING: THE BACK OF THIS DOCUMENT CONTAINS HEAT SENSITIVE INK. DO NOT ACCEPT IF NOT PRESENT.

06/15/06                          TROY University-Undergraduate                                    Page 1

Virginia S. Hopper                                      ID Number: 0360263
200 Alpha Lane                                          SSN: 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
Deatsville AL 36022                                     GECE Taken: N



EXHIBIT
6
Hopper

## ISSUED TO STUDENT

| Course | Num | Sec | Title | Grd R | Hrs Att | Hrs Cmpt | Grade Points |
|--------|-----|-----|-------|-------|---------|----------|--------------|

****************************************************************
Troy State University Montgomery credit prior to TROY University Fall 2005 merger.
****************************************************************

| ACT | 291 | WS | PRINCIPLES OF ACCOUNTING I | A | 3.33 | 3.33 | 13.3334 |

```
             98/SP Totals:   3.33    3.33   13.3334 GPA =  4.0000
           Cumulative Totals: 3.33    3.33   13.3334 GPA =  4.0000
          Institutional Totals: 3.33   3.33   13.3334 GPA =  4.0000
```

| ACT | 292 | WS | PRINCIPLES OF ACCOUNTING II | A | 3.33 | 3.33 | 13.3334 |

```
             98/SU Totals:   3.33    3.33   13.3334 GPA =  4.0000
           Cumulative Totals: 6.67    6.67   26.6668 GPA =  4.0000
          Institutional Totals: 6.67   6.67   26.6668 GPA =  4.0000
```

| ACT | 394 | AA | GOVERNMENTAL ACCOUNTING | B | 3.33 | 3.33 | 10.0001 |

```
             99/SU Totals:   3.33    3.33   10.0001 GPA =  3.0000
           Cumulative Totals: 10.00  10.00   36.6669 GPA =  3.6667
          Institutional Totals: 10.00 10.00   36.6669 GPA =  3.6667
                    Dean's Honor List
```

| ACT | 293 | AA | MANAGERIAL ACCOUNTING | C | 3.33 | 3.33 | 6.6667 |
| CIS | 140 | AC | BASIC MICROCOMPUTING | A | 2.00 | 2.00 | 8.0000 |

```
             00/WN Totals:   5.33    5.33   14.6667 GPA =  2.7500
           Cumulative Totals: 15.33  15.33   51.3336 GPA =  3.3478
          Institutional Totals: 15.33 15.33   51.3336 GPA =  3.3478
```

| ACT | 3391 | BAR | INTERMEDIATE ACCOUNTING I | A | 3.00 | 3.00 | 12.0000 |

```
             03/SP Totals:   3.00    3.00   12.0000 GPA =  4.0000
           Cumulative Totals: 18.33  18.33   63.3336 GPA =  3.4545
          Institutional Totals: 18.33 18.33   63.3336 GPA =  3.4545
                    Transcript Verified
```

DEFENDANT'S
EXHIBIT
11

CUMULATIVE TOT: CRED.ATT =   18.33 CRED.CPT =   18.33 GRD.PTS =  63.3336 GPA =   3.4545
Official copy must bear signature of the Registrar.

*Vickie M. Miles*

## ISSUED TO STUDENT

000096

# TROY UNIVERSITY™



TROY UNIVERSITY
UNIVERSITY RECORDS
TROY, ALABAMA 36082
(334)-670-3166

WARNING: THE BACK OF THIS DOCUMENT CONTAINS HEAT SENSITIVE INK. DO NOT ACCEPT IF NOT PRESENT.

06/15/06                TROY University Undergraduate                          Page 2

Virginia S. Hopper                      ID. Number: 0360263
200 Alpha Lane                          SSN: 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
Deatsville AL 36022                     GECE Taken: N

ISSUED TO STUDENT

INSTITUTIONAL TOTAL CRED ATT 18.33 CRED CPM TRCUBGE GRD PTS 83.3835 GPA-VERS 4545

Form - Revised November 1997
DO NOT WRITE IN THIS SPACE

## APPLICATION FOR EXAMINATION

RETURN TO: STATE PERSONNEL DEPARTMENT
64 NORTH UNION STREET, SUITE 300
MONTGOMERY, ALABAMA 36130

AN EQUAL OPPORTUNITY EMPLOYER

**General Instructions**

A separate application is required for each job. **Do not write in shaded areas.** Complete all parts of the application. Applications not properly completed will be returned. Photocopied and facsimile applications will be accepted.

ENTER SOCIAL SECURITY NUMBER BELOW.

| 4 | 2 | 3 | - | 7 | 4 | - | 4 | 1 | 9 | 0 |

**Examination For Which You Are Applying (one per application)**  10601

Account Clerk

**Option (if applicable)** 10601

Full Name  Virginia  S.  Hopper
First    Middle    Last

Address  200 Alpha Lane
House or Apartment Number    Street

Deatsville    AL    Elmore    36022
City    State    County    Zip Code

Telephone Number: Home ( 334 ) 285-6226    Work ( 334 ) 353-4112
Area Code    Area Code

**The following information is required for governmental reporting or recordkeeping purposes:**

Date of Birth  5  6  54  Sex (check one) 1. ( ) Male  2. (X) Female
(Month) (Day) (Year)

Race (check one) 1. (X) White  2. ( ) Black  3. ( ) Hispanic  4. ( ) Asian or Pacific Islander  5. ( ) American Indian or Alaskan Native  6. ( ) Other

EDUCATION:
High School Graduate or GED? (X) Yes ( ) No

CIRCLE OR BRACKET THE HIGHEST GRADE OF SCHOOL COMPLETED.
1 2 3 4 5 6 7 8 9 10 11 [ 12 ] College 1 2 3 4

PROVIDE INFORMATION ON ALL SCHOOLS ATTENDED. SPECIFY UNDERGRADUATE OR GRADUATE WORK.

| Name and Location of School | Dates of Attendance Month/Year From | To | Credit Hours Sem. | Qtr. | Did You Graduate? Yes | No | Type of Degree and Date | Major |
|---|---|---|---|---|---|---|---|---|
| See Attached | | | | | | | | |

PROFESSIONAL LICENSE OR CERTIFICATE

| License/Certificate Issued By | Field/Trade/Specialization | License/Certificate No. | Issue Date | Expiration Date |
|---|---|---|---|---|

LIST COURSES (AND HOURS) WHICH ARE PARTICULARLY RELATED TO THE POSITION (attach additional sheets, if needed).
TSUM Principles of Accounting II 5qtr. hrs.
TSUM Principles of Accounting I 5qtr. hrs.
WCS Intro into Accounting

### CERTIFICATION STATEMENT

I certify that all statements on or attached to this application are true and correct to the best of my knowledge. I know that any false statements may cause me to be denied the chance for testing, to be removed from an employment register, or to be released from employment. I will not discuss the test I have taken. I further authorize the release of all relevant prior employment, military service and criminal records. If employed I agree, consistent with applicable laws, to receive compensatory time off in lieu of overtime compensation for overtime hours worked.

000098

Signature  Virginia S. Hopper    Date 8/28/98

During the application process, including testing and employment consideration,
your name may be removed from an employment register for any disqualifying reason.

DEFENDANT'S EXHIBIT

200 Alpha Lane
Deatsville, Alabama
36022

Phone (334) 285-6226

# Virginia Hopper

**Objective**
To make effective use of my experience, work skills, and personal attributes in a position in accounting.

**Qualifications**
Experience in accounting, insurance experience in underwriting, return of premium, Workers Compensation reinsurance claims, computer skills, general office skills, and organizational skills.

**Education**
Lee High School          Montgomery, Alabama
Troy State University      Montgomery, Alabama
Wetumpka Vocational School  1993
    Computer Applications I & II
    Accounting
Wetumpka Vocational School  1995
    Windows 3.1
SIR/NCIGF Working Together Seminar  1994
NAIC Reinsurance Seminar  1995
NOLHGA Seminar  1995
NAIC Reinsurance Seminar  1996

**Computer Skills**
Proficient in WordPerfect 6.0, Lotus 1-2-3,  Dbase III, and Quicken
Currently  training in Word, Excel, and Access

**Employment History**
2/94 – Present     **State of Alabama, Department of Insurance**

**Receivership Division  (Contract)**

   Accounting Technician II

- Reconcile Bank Statement for all estates

000099

- Prepare cash balance, transactions, and missing check reports
- Retrieve data from an on line accounting system
- Schedules of short term investment maturities
- Journalize and enter data into an on line accounting system
- Compile and prepare subsidiary accounts
- Prepare and process checks by on computer system
- Calculate and file claims subject to reinsurance
- Research records and provide medical updates on claimants for reinsurers
- Account receivables, agents collection accounts, premium collections
- Calculate and process return of premium
- Communicate with policyholders and agents
- Communicate with providers on behalf of claimants
- Maintain mortgage loan accounts

After fifteen years as homemaker and mother of two, I returned to the business world.

1/78 – 7/79    **State of Alabama, Department of Corrections**

**Kilby Correctional Institution**

Medical Records Clerk Typist

- Interviewed incoming inmates and prepared medical history files
- Maintained daily records on inmate patients, updated medical and dental file
- Scheduled appointments for doctor and dentist
- Calculated and prepared reports of inmates funds

8/76 – 10/77    **State of Alabama, Department of Health**

000100

Vital Statistics

## Clerk Typist

- Checked and coded birth certificates from every county in the state
- Communicated with county officials for necessary information
- Numbered and bound birth certificates into volumes monthly

1/75 – 7/76   **State of Alabama, Department of Revenue**

**Sales Tax Division**

## Clerk Typist

- Interviewed applicants and issued sales tax numbers
- Checked monthly sales tax reports
- Closed tax numbers for business
- Corrected and updated information on licensed business

9/71 – 12/74   **American Fire and Casualty Insurance Company**

## Insurance Clerk

- Prepared rate quotes
- Calculated return of unearned premium
- Prepared check request
- Accounts receivables, received and posted premium payments

**Extracurricular**    Member of First Assembly of God church choir and drama team.

000101

Form 3. Revised January 1999

**DO NOT WRITE IN THIS SPACE**

RECEIVED

Oct 25  2 36 PM '99

STATE OF ~~~~~
PERSONNEL DEPARTMENT

# APPLICATION FOR EXAMINATION

RETURN TO: STATE OF ALABAMA
PERSONNEL DEPARTMENT
64 NORTH UNION STREET
P O BOX 304100
MONTGOMERY, ALABAMA 36130-4100

AN EQUAL OPPORTUNITY EMPLOYER

**General Instructions**

A separate application is required for each job. **Do not write in shaded areas.** Complete all parts of the application. Applications not properly completed will be returned. Photocopied and facsimile applications will be accepted.

ENTER SOCIAL SECURITY NUMBER BELOW.

| 4 | 2 | 3 | - | 7 | 4 | - | 4 | 1 | 9 | 0 |

Examination For Which You Are Applying (one per application) [ 10603 ]    Option (if applicable)

Accounting Tech I - 10603

Full Name: Virginia (First)    S. (Middle)    Hopper (Last)

Address: 260 (House or Apartment Number)    Alpha (Street)    Lane.

Deatsville (City)    AL (State)    Elmore (County)    36022 (Zip Code)

Telephone Number: Home (334) 285-6226 (Area Code)    Work (334) 353-4112 (Area Code)

**The following information is required for governmental reporting or recordkeeping purposes:**

Date of Birth: C5 (Month)    C6 (Day)    54 (Year)    Sex (check one) 1. ( ) Male   2. (✓) Female

Race (check one) 1. (✓) White   2. ( ) Black   3. ( ) Hispanic   4. ( ) Asian or Pacific Islander   5. ( ) American Indian or Alaskan Native   6. ( ) Other

---

**EDUCATION:**    CIRCLE OR BRACKET THE HIGHEST GRADE OF SCHOOL COMPLETED.    ED 00 / LC

High School Graduate or GED? (✓) Yes ( ) No    1  2  3  4  5  6  7  8  9  10  11  (12)  College 1  2  3  4

PROVIDE INFORMATION ON ALL SCHOOLS ATTENDED. SPECIFY UNDERGRADUATE OR GRADUATE WORK.

| Name and Location of School | Dates of Attendance Month/Year From | To | Credit Hours Sem. | Qtr. | Did You Graduate? Yes | No | Type of Degree and Date | Major |
|---|---|---|---|---|---|---|---|---|
| Robert E. Lee - Montgomery | 9/66 | 5/71 | | | ✓ | | Award 5/71 | Business |
| Troy State - Montgomery | 6/98 | 8/99 | 15 hrs. | | | | | |

PROFESSIONAL LICENSE OR CERTIFICATE

| License/Certificate Issued By | Field/Trade/Specialization | License/Certificate No. | Issue Date | Expiration Date |
|---|---|---|---|---|
| | | | | |

LIST COURSES (AND HOURS) WHICH ARE PARTICULARLY RELATED TO THE POSITION (attach additional sheets, if needed).

Principles of Accounting I    5 hrs.    Governmental Accounting    5 hrs.    CC 140
Principles of Accounting II    5 hrs.    AA Managerial Acc.    5 hrs. D/C

## CERTIFICATION STATEMENT

I certify that all statements on or attached to this application are true and correct to the best of my knowledge. I know that any false statements may cause me to be denied the chance for testing, to be removed from an employment register, or to be released from employment. I will not discuss the test I have taken. I further authorize the release of all relevant prior employment, military service and criminal records. If employed I agree, consistent with applicable laws, to receive compensatory time off in lieu of overtime compensation for any overtime hours worked.

000102

Signature: Virginia S. Hopper    Date 10/25/99

During the application process, including testing and employment consideration, your name may be removed from an employment register for any disqualifying reason.

DEFENDANT'S EXHIBIT 13

PENGAD 800-631-6989

SOCIAL SECURITY NUMBER : 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

| NAME | ADDRESS AND PHONE NUMBER | EMPLOYER |
|------|--------------------------|----------|
| ...ttie Walker | 40 Weoka Rd. Wetumpka (334) 567-5952 | State of AL - Dept. of Insurance |
| ...rina McLain | 8816 Green Chase Dr. Mont (334) 215-0174 | State of AL - Dept of Insurance |
| ...ev Morris Pate | 1822 Winona Ave. Mont (334) 264-4995 | Pastor - First Assembly - Millbrook |

...ould you need testing accommodations due to a health problem or disability, you must contact the State Personnel Department.

...ave you ever been involuntarily terminated, discharged, forced or asked to resign from any job?    ( ) Yes  (✓) No

...f you answered Yes to the above question, attach an explanation on a separate sheet noting any mitigating or extenuating circumstances.

...ave you ever been convicted of a misdemeanor or felony crime?    ( ) Yes  ( ) No

...f you answered Yes to the above question, list in the space below all prior misdemeanor and felony convictions and any extenuating or mitigating circumstances regarding such convictions.  If necessary, you may use a separate sheet or sheets and attach to application.

N...: A CRIMINAL CONVICTION WILL NOT NECESSARILY BE A BAR TO CONSIDERATION FOR EMPLOYMENT, EXCEPT THAT A FELONY CONVICTION WILL BAR EMPLOYMENT IN A LAW ENFORCEMENT JOB;  THE DISCLOSURE OF A MISDEMEANOR CONVICTION WILL NOT AUTOMATICALLY RESULT IN DISQUALIFICATION.  CRIMINAL HISTORIES WILL BE SUBMITTED TO THE NATIONAL CRIME INFORMATION CENTER (NCIC) FOR VERIFICATION.  FAILURE TO DISCLOSE A CONVICTION MAY BE CONSIDERED AS GROUNDS FOR DISQUALIFICATION. FOR THESE REASONS, APPLICANTS SHOULD BE CAREFUL TO DISCLOSE ALL CRIMINAL CONVICTIONS.

## WORK HISTORY
## THIS SECTION MUST BE COMPLETED REGARDLESS OF WHETHER OR NOT A 'RESUME' IS ATTACHED.

Begin with your PRESENT or most recent employment. List in REVERSE ORDER periods of employment. Each time you changed jobs or your title changed should be listed as a separate period. Describe in detail your duties. (Attach additional sheets if needed.)

| 1. Current or Last Employer See Attached Resume. | Your Official Job Title |
|---|---|

Address — Type of Business

| FROM Month Year | TO Month Year | Total Months | Number of Hours Per Week | Beginning Salary $ ___ Per ___ | Ending Salary $ ___ Per ___ | May we contact your employer? ( ) Yes  ( ) No |
|---|---|---|---|---|---|---|

Number/Title of Employees You Supervised On a Continuing Basis — Equipment You Operated

Name, Title and Telephone Number of Supervisor — Reason for Leaving

Describe Your Duties in Detail

000103

SOCIAL SECURITY NUMBER : 4 2 3 · 7 4 · 4 1 9 0

| | | | | | | | |
|---|---|---|---|---|---|---|---|

**2. Employer**

Your Official Job Title

Address

Type of Business

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
|---|---|---|---|---|---|---|---|---|
| Month | Year | Month | Year | | | $ ___ Per ___ | $ ___ Per ___ | ( ) Yes  ( ) No |

Number/Title of Employees You Supervised On a Continuing Basis

Equipment You Operated

Name, Title and Telephone Number of Supervisor

Reason for Leaving

Describe Your Duties in Detail

---

**3. Employer**

Your Official Job Title

Address

Type of Business

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
|---|---|---|---|---|---|---|---|---|
| Month | Year | Month | Year | | | $ ___ Per ___ | $ ___ Per ___ | ( ) Yes  ( ) No |

Number/Title of Employees You Supervised On a Continuing Basis

Equipment You Operated

Name, Title and Telephone Number of Supervisor

Reason for Leaving

Describe Your Duties in Detail

---

**4. Employer**

Your Official Job Title

Address

Type of Business

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
|---|---|---|---|---|---|---|---|---|
| Month | Year | Month | Year | | | $ ___ Per ___ | $ ___ Per ___ | ( ) Yes  ( ) No |

Number/Title of Employees You Supervised On a Continuing Basis

Equipment You Operated

Name, Title and Telephone Number of Supervisor

Reason for Leaving

Describe Your Duties in Detail

5. USING THE ABOVE FORMAT, SHOW OTHER EXPERIENCE BY USING ADDITIONAL SHEETS.

000104

# Virginia Hopper

200 Alpha Lane
Deatsville, Alabama 36022
Phone (334) 285-6226

**Objective**
To make effective use of my experience, work skills, and personal attributes in a position in State Government.

**Qualifications**
Experience in accounting, insurance experience in underwriting, Workers Compensation reinsurance claims, researching and investigating claims and complaints, computer skills, general office skills, and organizational skills. Office management skills and ability to communicate well with others.

**Education**
Troy State University   Montgomery, Alabama
AUM- Advance Technology Group 1999
    MS Excel 97
NAIC Reinsurance Seminar  1996
Wetumpka Vocational School  1995
    Windows 3.1
NAIC Reinsurance Seminar  1995
NOLHGA Seminar  1995
SIR/NCIGF Working Together Seminar  1994
Wetumpka Vocational School  1993
    Computer Applications I & II
    Intro Accounting
Lee High School   Montgomery, Alabama  Gradation Date: May 1971

**Computer Skills**
Proficient in WordPerfect 6.0, Lotus 1-2-3,  Dbase III, Quicken and Excel
Good working knowledge of Access and Word

**Employment History**
2/94 – Present    **State of Alabama, Department of Insurance**

**Receivership Division  (Contract)**

Accounting Technician II

- Estate Management - manage day to day activities of insolvent insurance companies

000105

- Delegate or assign task to the support team as needed

- Supervise work of the office support team performing duties in processing division records, procedures and production

- Confer with support team members to solve problems relating to coordination of work and other matters

- Review and approve status reports and petitions on each estate before they are filed with the courts

- Reconcile Bank Statement for all estates

- Prepare Balances Sheets and Income Statements

- Prepare cash balance, transactions, and missing check reports

- Schedules of short term investment maturities

- Journalize and enter data into an on line accounting system

- Compile and prepare subsidiary accounts

- Calculate and file claims subject to reinsurance

- Prepare and process checks by computer

- Verify and approve bills for payment

- Communicate with attorneys and accountants to provide financial information on receivership estates

- Interview complainants, policyholders, and agents and correspond in order to gather information and resolve complaints

- Evaluate contractual provisions of insurance policies and provide a means of expediting or settling claims

- Prepare computer and tapes for nightly back

1/78 – 7/79    **State of Alabama, Department of Corrections**

**Kilby Correctional Institution**

Medical Records Clerk Typist

- Interviewed incoming inmates and prepared medical history files

- Maintained daily records on inmate patients

- Updated medical and dental files

000106

- Scheduled appointments for doctor and dentist
- Calculated and prepared reports of inmates funds

8/76 – 10/77   **State of Alabama, Department of Health**

**Vital Statistics**

Clerk Typist

- Checked and coded birth certificates from every county in the state
- Communicated with county officials for necessary information
- Numbered and bound birth certificates into volumes monthly

1/75 – 7/76   **State of Alabama, Department of Revenue**

**Sales Tax Division**

Clerk Typist

- Interviewed applicants and issued sales tax numbers
- Checked monthly sales tax reports
- Closed tax numbers for business
- Corrected and updated information on licensed business

9 71 – 12/74   **American Fire and Casualty Insurance Company**

Insurance Clerk

- Prepared rate quotes
- Calculated return of unearned premium
- Prepared check request
- Accounts receivables, received and posted premium payments
- Answer calls for general questions from consumers

**Extracurricular**     Member of First Assembly of God church choir and drama team.
**activities**

000107

SOCIAL SECURITY NUMBER: 423 74 4190

## COMPLETE THIS SECTION IF YOU ARE CLAIMING VETERAN'S PREFERENCE

If you claim Veteran's Preference, check the type below. Attach copies (which will not be returned) of the required documents to your application to support your claim.

1 ( ) Veteran (5 points) - Requires DD214 or document showing dates of service and type of discharge. If this has been submitted previously and is on file with this office, you may disregard this requirement.

2 ( ) Disabled Veteran (10 points) - Requires DD214 or other document as above and letter of disability from V.A. dated within last 6 months. V.A. letter must be kept updated until register is established or you lose the extra 5 points.

3 ( ) Deceased Veteran's spouse (10 points) - Requires DD214 or other document as above and marriage and death certificates. Cannot be claimed if spouse remarries.

4 ( ) Disabled Veteran's spouse (10 points) - Requires DD214 or other document as above and V.A. letter of disability dated within last 6 months. Cannot be claimed unless still married to disabled veteran.

5 ( ) Permanently Disabled Veteran (10 points) - Requires DD214 or other document as above indicating veteran is permanently disabled or DD214 or other document and V.A. letter indicating permanent disability.

## COMPLETE THIS SECTION IN ORDER TO BE SCHEDULED FOR WRITTEN EXAMS

Written exams will be given in the places below for which a sufficient number of applicants express preference. Indicate by number your 1st, 2nd and 3rd choices.

1 ( ) Alexander City    3 ( ) Birmingham    5 ( ) Dothan    7 ( ) Linden    9 ( ) Montgomery    12 ( ) Tuscaloosa
2 ( ) Andalusia    4 ( ) Decatur    6 ( ) Jacksonville    8 ( ) Mobile    10 ( ) Selma

If you qualify, you will receive a notice showing the place and time you are to report for the exam.

### Where did you learn of this job? (check all that apply)

1 ( ) State Employment Service    5 (✓) Friend/Relative    9 ( ) Legislative Representative    13 ( ) TV/Radio Commercial
2 ( ) Job Announcement Notice    6 ( ) Dept. News Bulletin    10 ( ) State Recruiter/Counselor    14 ( ) Other _____
3 ( ) Newspaper    7 ( ) Rehabilitation Services    11 ( ) State Personnel Dept. Information Board
4 ( ) College Placement/Career Office    8 ( ) High School Counselor    12 ( ) Outreach Program (i.e. Church)

## AVAILABILITY

81 - Northwest Alabama
17 Colbert
30 Franklin
39 Lauderdale
40 Lawrence

84 - Jasper/Winfield Area
29 Fayette
38 Lamar
47 Marion
64 Walker
67 Winston

87 - East Central Alabama
08 Autauga
09 Chambers
14 Clay
15 Cleburne
19 Coosa
56 Randolph
61 Talladega
62 Tallapoosa

90 - Montgomery Area
01 Autauga
26 Elmore
43 Lowndes
51 Montgomery

93 - South Central Alabama
07 Butler
18 Conecuh
20 Covington
21 Crenshaw
27 Escambia
50 Monroe

82 - Huntsville/Decatur Area
36 Jackson
42 Limestone
45 Madison
48 Marshall
52 Morgan

85 - Tuscaloosa Area
04 Bibb
32 Greene
33 Hale
54 Pickens
60 Sumter
63 Tuscaloosa

88 - Southwest Alabama
12 Choctaw
13 Clarke
46 Marengo
65 Washington

91 - Phenix City/Troy Area
03 Barbour
06 Bullock
41 Lee
44 Macon
55 Pike
57 Russell

94 - Dothan Area
16 Coffee
23 Dale
31 Geneva
34 Henry
35 Houston

83 - Northeast Alabama
19 Cherokee
25 DeKalb
28 Etowah

86 - Birmingham Area
05 Blount
22 Cullman
37 Jefferson
58 Shelby
59 St. Clair

89 - Selma/Clanton Area
11 Chilton
24 Dallas
53 Perry
66 Wilcox

92 - Mobile Area
02 Baldwin
49 Mobile

95 - Statewide
(You will be considered for vacancies throughout the state. Relocation may be necessary)



Please answer the following questions with care. List in the spaces provided those areas of the state in which you would accept employment. You will be considered for employment only in the locations you indicate. You may choose a combination of up to three counties and/or regions from the list above. If you list a region, you will be considered for all counties in that region. The counties in each region are listed alphabetically below the region. You will not be considered for jobs involving overnight travel or shift work unless you so indicate.

List the numbers of up to 3 counties and/or regions where you are willing to work    90 _____ _____

If you want to be considered for appointment by only certain state agencies, indicate here _____

Will you accept work involving overnight travel? ( ) Yes (✓) No    Will you accept part-time work? ( ) Yes (✓) No

Will you accept temporary work? ( ) Yes (✓) No

Which shifts are you willing to work? 0. ( ) all shifts   1. ( ) 1st only   2. ( ) 2nd only   3. ( ) 3rd only   4. ( ) 1st and 2nd only   5. ( ) 1st & 3rd only   6. ( ) 2nd & 3rd only

Enter the earliest date you will be available to interview for employment. (Your name will not appear on a list of eligibles until this date.)    11 / 15 / 99
Month   Day   Year

NOTE:    Your name will be placed on inactive status for this class after declining three offers of employment, consideration or failing to reply to an agency's inquiry concerning your availability. Your name may be restored to the active register by written request.

000108

Form 3 - Revised November 2000

**APPLICATION FOR EXAMINATION**

DO NOT WRITE IN THIS SPACE

RETURN TO: STATE OF ALABAMA
PERSONNEL DEPARTMENT
64 NORTH UNION STREET
P O BOX 304100
MONTGOMERY, ALABAMA 36130-4100

AN EQUAL OPPORTUNITY EMPLOYER

**General Instructions**

A separate application is required for each job. **Do not write in shaded areas.** Complete all parts of the application. Applications not properly completed will be returned. Photocopied and facsimile applications will be accepted.

ENTER SOCIAL SECURITY NUMBER BELOW.

| 4 | 2 | 3 | - | 7 | 4 | - | 4 | 1 | 9 | 0 |

Examination For Which You Are Applying (one per application)   | 10611 |   Option (if applicable)

10611 Accountant

Full Name   Virginia   (First)   S   (Middle)   Hopper   (Last)

Address   200   Alpha Lane
House or Apartment Number    Street

Deatsville   (City)   AL   (State)   Elmore   (County) 26   36022   (Zip Code)

Telephone Number: Home ( 334 ) 285-6226    Work ( 334 ) 242-2224
Area Code    Area Code

**The following information is required for governmental reporting or recordkeeping purposes:**

Date of Birth   05   06   1954    Sex (check one) 1. ( ) Male   2. (X) Female
(Month)  (Day)  (Year)

Race (check one) 1. (X) White   2. ( ) Black   3. ( ) Hispanic   4. ( ) Asian or Pacific Islander   5. ( ) American Indian or Alaskan Native   6. ( ) Other

---

**EDUCATION:**

High School Diploma or GED? (X) Yes ( ) No

CIRCLE OR BRACKET THE HIGHEST GRADE OF SCHOOL COMPLETED.

1  2  3  4  5  6  7  8  9  10  11  [12]  College 1  2  3  [4]

ED  3/
LC  700

**PROVIDE INFORMATION ON ALL SCHOOLS ATTENDED.  SPECIFY UNDERGRADUATE OR GRADUATE WORK.**

| Name and Location of School | Dates of Attendance Month/Year From | To | Credit Hours Sem. | Qtr. | Did You Graduate? Yes | No | Type of Degree and Date | Major |
|---|---|---|---|---|---|---|---|---|
| Trinity University  715 Stadium Dr | | | | | X | | BS – May 2002 | Bus Admin |
| San Antonio, TX 78212 | | | | | | | | |

**PROFESSIONAL LICENSE OR CERTIFICATE**

| License/Certificate Issued By | Field/Trade/Specialization | License/Certificate No. | Issue Date | Expiration Date |
|---|---|---|---|---|
| | | | | |

**LIST COURSES (AND HOURS) WHICH ARE PARTICULARLY RELATED TO THE POSITION** (attach additional sheets, if needed).

See attached list

---

**CERTIFICATION STATEMENT**

I certify that all statements on or attached to this application are true and correct to the best of my knowledge. I know that any false statements may cause me to be denied the chance for testing, to be removed from an employment register, or to be released from employment. I will not discuss the test I have taken. I further authorize the release of all relevant prior employment, military service, academic/school and criminal records. If employed I agree, consistent with applicable laws, to receive compensatory time off in lieu of overtime compensation for any overtime hours worked.

000109

Signature   Virginia S. Hopper    Date  11/21/2003

During the application process, including testing and employment consideration, your name may be removed from an employment register for any disqualifying reason.

DEFENDANT'S EXHIBIT
14

SOCIAL SECURITY NUMBER :  4  2  3 - 7  4 - 4  1  9  0

List three reliable persons, not relatives or present employer, who know you well enough to give information about you.

| NAME | ADDRESS AND PHONE NUMBER | EMPLOYER |
|---|---|---|
| Peggy Stieringer | 645 Japonica Rd  Prattville, AL     271-7742 | State Of Alabama ADEM |
| Vicke Vuittonet | 633 Cousins Rd  Wetumpka, AL     514-0441 | |
| Craig Nelson | 240 Second Street  Wetumpka AL     567-8839 | State of Alabama  DHR |

Should you need testing accommodations due to a health problem or disability, you must contact the State Personnel Department.

Have you ever been involuntarily terminated, discharged, forced or asked to resign from any job?    ( )    Yes    ( X ) No

If you answered **Yes** to the above question, attach an explanation on a separate sheet noting any mitigating or extenuating circumstances.

Have you ever been convicted of a misdemeanor or felony crime?    ( )    Yes    (X )No

If you answered **Yes** to the above question, list in the space below all prior misdemeanor and felony convictions and any extenuating or mitigating circumstances regarding such convictions.  If necessary, you may use a separate sheet or sheets and attach to application.

_____
_____
_____
_____

NOTE: A CRIMINAL CONVICTION WILL NOT NECESSARILY BE A BAR TO CONSIDERATION FOR EMPLOYMENT, EXCEPT THAT A FELONY CONVICTION WILL BAR EMPLOYMENT IN A LAW ENFORCEMENT JOB;  THE DISCLOSURE OF A MISDEMEANOR CONVICTION WILL NOT AUTOMATICALLY RESULT IN DISQUALIFICATION.  CRIMINAL HISTORIES WILL BE SUBMITTED TO THE NATIONAL CRIME INFORMATION CENTER (NCIC) FOR VERIFICATION.  FAILURE TO DISCLOSE A CONVICTION MAY BE CONSIDERED AS GROUNDS FOR DISQUALIFICATION. FOR THESE REASONS, APPLICANTS SHOULD BE CAREFUL TO DISCLOSE <u>ALL</u> CRIMINAL CONVICTIONS.

## WORK HISTORY
### THIS SECTION MUST BE COMPLETED REGARDLESS OF WHETHER OR NOT A RESUME' IS ATTACHED.

Begin with your PRESENT or most recent employment.  List in REVERSE ORDER periods of employment.  <u>Each</u> <u>time</u> <u>you</u> <u>changed</u> <u>jobs</u> <u>or</u> <u>your</u> <u>title</u> <u>changed</u> <u>should</u> <u>be</u> <u>listed</u> <u>as</u> <u>a</u> <u>separate</u> <u>period.</u>  Describe in detail your duties. (Attach additional sheets if needed.)

| 1. Current or Last Employer     SEE ATTACHED | Your Official Job Title |
|---|---|
| Address | Type of Business |

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
|---|---|---|---|---|---|---|---|---|
| Month | Year | Month | Year | | | $_____ Per _____ | $_____ Per _____ | ( ) Yes    ( ) No |

| Number/Title of Employees You Supervised On a Continuing Basis | Equipment You Operated |
|---|---|
| Name, Title and Telephone Number of Supervisor | Reason for Leaving |
| Describe Your Duties in Detail | |

Virginia Hopper    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

COURSES WHICH ARE PARTICULARLY RELATED TO THE POSITION

ACCT 291   Prin of Acct I

ACCT 292   Prin of Acct II

ACCT 293   Managerial Acct

ACCT 391   Intermediate Acct I

ACCT 394   Governmental Acct

ACCT 1301   Financial Accounting

ACCT 1302   Managerial Accounting

ACCT 4344   Auditing

MGMT 2301   Management

KTG 2302   Marketing

MGMT 3372   Org Behavior

FNCE 3301 Finance

FNCE 3351 Instit & Mkts

FNCE 3352   Investments

FNCE 4351   Mgmt/Policy

MKTG 4381   Mktg Mgmt

MKTG 3381   Consum Behavior

BUSN 3301 Statistics

BUSN 3302   Busn Law I

BUSN 3341  Busn Law II

BUSN 4301 Busn Policy

BUSN 3303 Quant/Mgr'l Decision Making

# Virginia Hopper
SS# 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

200 Alpha Lane
Deatsville, Alabama 36022
Phone (334) 285-6226

**Objective**

To make effective use of my experience, work skills, and personal attributes as an accountant in State Government.

**Qualifications**

Experience in accounting, researching and investigating claims and complaints, computer skills, office skills, and organizational skills. Office management skills and ability to communicate well with others.

**Education**

Trinity University   San Antonio, TX 78212-7200   Gradation Date: May 2002
Troy State University    Montgomery, Alabama
AUM- Advance Technology Group 1999
Lee High School   Montgomery, Alabama   Gradation Date: May 1971

**Computer Skills**

Proficient in Word, Lotus 1-2-3, Dbase III, Quicken and Excel
Good working knowledge of Access, State's Systems, CAS (Central Accounting System), and AFNS Regions

**Employment History**

2/2002 – Present   **State of Alabama, Department of Finance**
**Office of State Comptroller - Accounting Tech**

- Audit various claims to determine they are legal and proper

- Record miscellaneous refund payments received and prepare checks for deposit to the State Treasury

- Process vouchers for payments into the AFNS "E" region and CAS (State's Central Accounting System)

- Audit warrant amounts, post warrant data and mail payments to vendors

- Enter and process Request for Cash Transfers from departments into CAS, Interfund Cash Transfer System, on a daily basis

- Audit and process Electronic Warrants from departments in CAS on a daily basis and balance with Treasurer's Office

- Schedule, enter into CAS, and approve Debt Service payments

- Maintain and review expenditure and budgetary control accounts and report as to account status

- Make adjustment journal vouchers, verifying current accounting principles and mathematical accuracy

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 Virginia Hopper

- Process end of fiscal year accounts payable journal vouchers ensuring that data is correct and proper

**6/2000-2/2002  State of Alabama, Department of Human Resources**
**Finance Division – Accounting Tech**

- Investigate, research, and resolve problems in order to assist vendors, resolve discrepancies, and correct departmental records

- Set up purchase orders and record the accounting codes

- Reconcile purchase orders and invoices; verify, code, and balance   records

- Calculate accounting distribution, allocate cost items to a variety of accounts

- Record payment dates, payment amounts, and balances per vendor accounts

- Check balances and retrieve data from the accounting system

- Prepare data and complete computer input forms to be processed by computer to generate payment voucher

- Batched documents to be keypunched, maintained control totals, and balance control totals to compute-generated totals

- Assist in the development of modifications and additions to accounting system and operations

**2/1994 – 6/2000  State of Alabama, Department of Insurance**
**Receivership Division  - Accountant (Contract)**

- Estate Management - manage day to day activities of insolvent insurance companies

- Delegate or assign task to the support team as needed

- Supervise work of the office support team performing duties in processing division records, procedures and production

- Review and approve status reports and petitions on each estate before they are filed with the courts

- Authorized check signer

- Reconcile bank statements and investment statements for all estates

- Prepare Balances Sheets and Income Statements



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  Virginia Hopper

- Prepare cash balance, transactions, and missing check reports

- Maintain schedule of investment maturities, contact bank to purchase or sell

- Journalize and enter data into an on line accounting system

- Compile and prepare subsidiary accounts, post data to general ledger accounts from subsidiary

- Calculate and file claims subject to reinsurance

- Prepare and process checks by computer

- Audit and approve bills for payment

- Interview complainants, policyholders, and agents and correspond in order to gather information and resolve complaints

- Evaluate contractual provisions of insurance policies and provide a means of expediting or settling claims

**Extracurricular Activities**    Member of First Assembly of God church choir and drama team.

000114





# State of Alabama
# Department of Human Resources

S. Gordon Persons Building
50 Ripley Street
P.O. Box 304000
Montgomery, Alabama 36130-4000
(334) 242-1310
www.dhr.state.al.us

**BOB RILEY**
*Governor*

Page B. Walley, Ph.I
*Commissioner*

May 9, 2006

Mrs. Virginia Hopper
200 Alpha Lane
Deatsville, AL 36022

Dear Mrs. Hopper:

This is to inform you that an administrative hearing will be held on Tuesday, June 13, 2006, at 9:00 a.m. in the South Meeting Room of the Gordon Persons Building, 50 N. Ripley Street, Montgomery, Alabama. The purpose of the hearing is to hear charges and evidence concerning false information contained on your job application for Accountant. The composition and conduct of this hearing will be in accordance with Chapter 5 of the departmental Personnel Policies and Procedures Manual. You are expected to appear at this disciplinary hearing at the date and time specified. Changes in scheduling will be made only for good cause and if the request is made at least forty-eight hours prior to the hearing.

It has been brought to my attention that you have violated *Rules of the State Personnel Board,* 670-X-19-.01, (2) (f), Falsification of records – Application for Employment.

On your Application for Examination for Accountant, you indicated you received a B.S. degree in Business Administration from Trinity University, 715, Stadium Drive, San Antonio, Texas 78212, in May 2002. You further attached a list of courses you completed that were particularly related to the accounting position. Trinity University in San Antonio, Texas has stated they have been unable to locate records verifying that you were enrolled at that university. Furthermore, several of the course numbers listed in the attachment to your application did not correspond with the course numbers listed in Trinity's curriculum.

Falsification of records is a more serious violation that could result in discharge on the first offense. Your signature on the employment application certifies that all statements on the application and any attachments to the application are true and correct; and that any false statements could result in removal from the register or release from employment.



**EXHIBIT**

**DEFENDANT'S EXHIBIT**

15

000115

An Affirmative Action /Equal Opportunity Employer

If evidence provided to the hearing officer supports these charges, it could result in disciplinary actions of increasing severity, including suspension up to 30 days in a calendar year, demotion, or termination of employment. The Department will be seeking termination of your employment.

With the exception of records and materials protected by federal and state laws and regulations, all pertinent materials dealing with this matter will be made available in the Department of Human Resources Legal Office, Gordon Persons Building. A request for review of this material must be made in advance by you or your legal counsel. If you intend to have an attorney, please notify the Personnel Division as soon as possible.

Sincerely,

Page B. Walley, Ph.D.
Commissioner

I have been informed of the foregoing and accept a copy of the same this the
12 day of ___ 2006.

Virginia S. Hopper

Thomas A. King, Personnel Director

000116




# State of Alabama
# Department of Human Resources

S. Gordon Persons Building
50 Ripley Street
P.O. Box 304000
Montgomery, Alabama 36130-4000
(334) 242-1310
www.dhr.state.al.us

**BOB RILEY**
*Governor*

**Page B. Walley, Ph.D.**
*Commissioner*

June 12, 2006

Mrs. Virginia Hopper
200 Alpha Lane
Deatsville, AL 36022

**RE:  *Amendment to original charge letter of May 9, 2006.***

Dear Mrs. Hopper:

This is to inform you that the administrative hearing has been rescheduled for Thursday, June 22, 2006, at 9:00 a.m. in the South Meeting Room of the Gordon Persons Building, 50 N. Ripley Street, Montgomery, Alabama.  The purpose of the hearing is to hear charges and evidence concerning false information contained on your job application for Accountant ***and evidence that you are not qualified for your current position as an accountant***.  The composition and conduct of this hearing will be in accordance with Chapter 5 of the departmental Personnel Policies and Procedures Manual.  You are expected to appear at this disciplinary hearing at the date and time specified.  Changes in scheduling will be made only for good cause and if the request is made at least forty-eight hours prior to the hearing.

It has been brought to my attention that you have violated *Rules of the State Personnel Board,* 670-X-19-.01 (2) (f), Falsification of records – Application for Employment.

On your Application for Examination for Accountant, you indicated you received a B.S. degree in Business Administration from Trinity University, 715, Stadium Drive, San Antonio, Texas 78212, in May 2002.  You further attached a list of courses you completed that were particularly related to the accounting position.  Trinity University in San Antonio, Texas has stated they have been unable to locate records verifying that you were enrolled at that university.  Furthermore, several of the course numbers listed in the attachment to your application did not correspond with the course numbers listed in Trinity's curriculum.



EXHIBIT
3



DEFENDANT'S
EXHIBIT
16

000117

An Affirmative Action /Equal Opportunity Employer

Falsification of records is a serious violation that could result in discharge on the first offense. Your signature on the employment application certifies that all statements on the application and any attachments to the application are true and correct; and that any false statements could result in removal from the register or release from employment.

*You were hired and are currently employed as an Accountant (10611) in the DHR Finance Office. In order to qualify for this position, an employee must have a Bachelor's Degree with a major in Accounting or Business Administration and have completed five (5) college level accounting courses including Principles I & II and Intermediate I and II, or equivalent courses. Evidence indicates that you do not have a degree from an actual school or university but obtained the degree from a "diploma mill" calling itself Trinity College and University, and that you did not attend any classes at this university. Furthermore, there is no evidence that you have taken Intermediate Accounting II.*

If evidence provided to the hearing officer supports these charges, it could result in disciplinary actions of increasing severity, including suspension up to 30 days in a calendar year, demotion, or termination of employment. The Department will be seeking termination of your employment.

With the exception of records and materials protected by federal and state laws and regulations, all pertinent materials dealing with this matter will be made available in the Department of Human Resources Legal Office, Gordon Persons Building. A request for review of this material must be made in advance by you or your legal counsel. If you intend to have an attorney, please notify the Personnel Division as soon as possible.

Sincerely,

Page B. Walley, Ph.D.
Commissioner

I have been informed of the foregoing and accept a copy of the same this the
_12_ day of _June_ _____ 2006.

Virginia S. Hopper

Thomas A. King, Personnel Director

000118





# State of Alabama
# Department of Human Resources

S. Gordon Persons Building
50 Ripley Street
P.O. Box 304000
Montgomery, Alabama 36130-4000
(334) 242-1310
www.dhr.state.al.us

**BOB RILEY**
*Governor*

**Page B. Walley, Ph.D.**
*Commissioner*

August 14, 2006

Virginia Hopper
200 Alpha Lane
Deatsville, Alabama 36022

Dear Ms. Hopper:

This is to inform you that effective at 3:30 p.m. August 14, 2006, your employment with the Department of Human Resources will be terminated. This action has been made necessary because of your violation of the <u>Rules of the State Personnel Board</u>.

Specifically, you were charged with falsifying your State of Alabama employment application in violation of Rule 670-x-19-.01 (2)(f) Falsification of Records of the <u>Rules of the State Personnel Board</u>. You indicated on your application for Accountant that you had a college degree. You do not meet the qualifications of the Accountant classification due to your not having a valid college degree nor the required classes for an Accountant position.

On June 22, 2006, an administrative hearing was held at the Department of Human Resources. The hearing officer that heard the facts in this personnel matter has found that the evidence and testimony supports the charges. A copy of their recommendation to the appointing authority is attached.

You are advised that you have the right, within 10 days after receipt of written notice of dismissal, to request a hearing before the State Personnel Board. Such request should be addressed directly to the Director, State Personnel Department, 64 N. Union Street, Montgomery, Alabama 36130.

Sincerely,

Page B. Walley, PhD
Commissioner

DEFENDANT'S
EXHIBIT
17

000119

BEFORE THE STATE OF ALABAMA
DEPARTMENT OF HUMAN RESOURCES



IN RE:      VIRGINIA HOPPER
            ADMINISTRATIVE PERSONNEL HEARING

## RECOMMENDATION OF THE HEARING OFFICER

This matter came to be heard at an administrative personnel hearing concerning Virginia Hopper's employment with the Alabama Department of Human Resources (DHR). The hearing was held on June 22, 2006. Mrs. Hopper was present and was represented by her counsel Jim DeBardeleben. Mr. DeBardeleben questioned the DHR witness, examined the evidence, presented testimony, and offered exhibits on behalf of Mrs. Hopper. DHR was represented by its attorney, Hon. Joel C. Marsh.

Mrs. Hopper was charged by DHR with falsification of records in her application for employment in violation of the <u>Rules of the State Personnel Board, 670-X-19-.01(2)(f)</u>, and with not meeting the qualifications for her accountant position with DHR because she does not have a college degree. Specifically, her charge letter states as follows:

> On your Application for Examination for Accountant, you indicated you received a B.S. degree in Business Administration from Trinity University, 715 Stadium Drive, San Antonio, Texas 78212, in May 2002. You further attached a list of courses you completed that were particularly related to the accounting position. Trinity University in San Antonio, Texas has stated that they have been unable to locate records verifying that you were enrolled at that university. Furthermore, several of the course numbers listed in the attachment to your application did not correspond with the course numbers listed in Trinity's curriculum.

> Falsification of records is a serious violation that could result in discharge on the first offense. Your signature on the employment application certifies that all statements on the application and any attachments to the application are true and correct; and that any false statements could result in removal from the register or release from employment.

1

000120

You were hired and are currently employed as an Accountant (10611) in the DHR Finance Office. In order to qualify for this position, an employee must have a Bachelor's Degree with a major in Accounting or Business Administration and have completed five (5) college level accounting courses including Principles I and II and Intermediate I and II, or equivalent courses. Evidence indicates that you do not have a degree from an actual school or university but obtained the degree from a "diploma mill" calling itself Trinity College and University, and that you did not attend any classes at this university. Furthermore, there is no evidence that you have taken Intermediate Accounting II.

## FINDINGS OF FACT

The evidence presented at the aforementioned hearing shows that Mrs. Hopper stated on her Application Examination for an Accountant position that she had a B.S. degree, dated May 2002, from Trinity University, located at 715 Stadium Drive, San Antonio, Texas 78212. She also listed on her application 22 courses that she had taken that were related to the accountant position that she was seeking. However, evidence produced at the hearing, including Mrs. Hopper's own testimony, established that, for 17 of these courses, Mrs. Hopper has not attended any college class for the credit, but instead was given course credit for these courses by an entity called "Trinity College and University" located in the British Virgin Islands. Credit for these 17 courses was given to her based on her attendance at work-related seminars and on her work experience. Trinity University in San Antonio, Texas has no record of Mrs. Hopper ever being registered as a student or receiving credit for any courses. Consequently, the undersigned hearing officer finds that Mrs. Hopper falsified information on her Application Examination for Accountant in violation of the Rules of the State Personnel Board, Rules of the State Personnel Board, 670-X-19-.01(2)(f).

Mrs. Hopper testified that she mistakenly listed Trinity University of San Antonio on her application and that she believed that she had a legitimate college degree. However, the undersigned hearing officer finds that Mrs. Hopper knew she did not have a degree from Trinity University in

2

San Antonio and she knew that she did not have a valid college degree when she completed the application for accountant. In addition, the position of Accountant with DHR requires that the applicant have a Bachelor's degree with a major in Accounting or Business Administration, and that the applicant must have completed five (5) college level accounting courses, including Intermediate Accounting II. The evidence presented at the hearing clearly demonstrated that Mrs. Hopper does not have a valid college degree, and that she has not taken Intermediate Accounting II, or an equivalent course. Consequently, the undersigned hearing officer finds Mrs. Hopper that is not qualified for the position of Accountant with DHR.

## CONCLUSIONS OF LAW

The undersigned recommends that Mrs. Hopper be discharged from her employment with DHR because: she falsified her Accountant application; she is not qualified for the position of Accountant because she does not have a valid college degree; and because she has not taken all of the required courses for the position of Accountant with DHR.

DONE this 7th day of August, 2006.

_____

Philip O. Tyler
Administrative Hearing Officer

Post Office Box 3310
Auburn, Alabama 36831-3310
Phone: (334) 821-3892
Fax: (334) 826-9467

000122

BEFORE THE PERSONNEL BOARD
IN THE MATTER OF

VIRGINIA S. HOPPER,   )
           )
  Appellant,    )
           )
v.          )  Case No: 06-036
           )
           )
ALABAMA DEPARTMENT OF )
HUMAN RESOURCES    )
           )
  Appellee.     )

## RECOMMENDED ORDER TO THE STATE PERSONNEL BOARD

A hearing was held on December 18, 2006, at the offices of the Alabama Department of Transportation in Montgomery, Alabama. Jim Debardelaben, Esq., appeared as counsel on behalf of Virginia S. Hopper ("Hopper"). Joel C. Marsh, Esq., appeared as counsel on behalf of the Alabama Department of Human Resources ("DHR"). Ms. Hopper attended the hearing.

DHR introduced into evidence 9 exhibits consecutively numbered as 1-9. Hopper introduced into evidence 17 exhibits consecutively numbered 1-17.

DHR called as witnesses:

 (1) Thomas Stanley Goolsby

 (2) Darby Forrester

 (3) Jeanne Brackim



RECEIVED
FEB 2007

DEFENDANT'S
EXHIBIT
18

000123

(4) Virginia S. Hopper

Hopper called as witnesses:

(1) Dr. Page Walley

(2) James Swearengin, Jr.

(3) Jackie Graham

(4) Thomas King

## I.  PROCEDURAL HISTORY AND CHARGES

Hopper was charged with falsification of records in her application for employment with the State of Alabama in violation of the <u>Rules of the State Personnel Board, 670-X-19-.01(2)(f)</u>, and with not meeting the qualifications for her Accountant position with DHR as she does not have a college degree. Specifically, her charge letter states as follows:

> On your Application for Examination for Accountant, you indicated you received a B.S. degree in Business Administration from Trinity University, 715, Stadium Drive, San Antonio, Texas 78212, in May 2002. You further attached a list of courses you completed that were particularly related to the accounting position. Trinity University in San Antonio, Texas has stated they have been unable to locate records verifying that you were enrolled at that university. Furthermore, several of the course numbers listed in the attachment to your application did not correspond with the course numbers listed in Trinity's curriculum.

> Falsification of records is a serious violation that could result in discharge on the first offense. Your signature on the employment application certifies that all statements on the application and any attachments to the application are true and

2

000124

correct; and that any false statements could result in removal from the register or release from employment.

You were hired and are currently employed as an Accountant (10611) in the DHR Finance Office. In order to qualify for this position, an employee must have a Bachelor's Degree with a major in Accounting or Business Administration and have completed five (5) college level accounting courses including Principles I & II and Intermediate I and II, or equivalent courses. Evidence indicates that you do not have a degree from an actual school or university but obtained the degree from a "diploma mill" calling itself Trinity College and University, and that you did not attend any classes at this university. Furthermore, there is no evidence that you have taken Intermediate Accounting II.

On June 22, 2006, DHR held an Administrative Hearing. The hearing officer that heard the facts in this matter found that the evidence and testimony supports the charges. After the hearing, DHR notified Hopper by letter, dated August 14, 2006, that DHR was terminating Hopper's employment, effective August 14, 2006.

Hopper timely appealed the termination to the Alabama State Personnel Board on or about August 14, 2006.

This matter was originally assigned to Judge Julia Jordon Weller, administrative law judge for Alabama State Personnel Board. However, Hopper objected to Ms. Weller as the administrative law judge because she was employed by the State Personnel Department which was involved in this matter and several of the employees of the State Personnel Department were to be called as witnesses. As a consequence the undersigned was appointed

3

000125

as administrative law judge to hear this matter and make a finding and recommendation to the State Personnel Board. Mr. Debardelaben counsel for Hopper at the beginning of the hearing objected to the procedure of the hearing. He stated, "Ms. Graham, the Personnel Director, took an active participation in this case. When we objected to State Personnel carrying out this procedure, Ms. Graham, herself, who's already made a recommendation, took an active participation, appointed you. I don't - - I think that in and of itself denies certain Constitutional rights to Ms. Hopper with a person who had a direct interest making the appointment." Mr. Debardelaben stated he was not objecting to me as the Administrative Law Judge, he simply was objecting to the procedure. On October 17, 2006, I issued an order that states in part "the Director of the State Personnel Board has assigned this case to the undersigned hearing officer or Administrative Law Judge (hereinafter "ALJ"). If any party objects to the ALJ based upon any currently disclosed matter, or any other matter known to the party (or with reasonable diligence should be known) which would required recusal, the objecting party is ORDERED to file within 5 calendar days of the issuance of this order, a motion for recusal with the Director of the State Personnel Board." No objection was filed with the State Personnel Board and the issue was not raised until the date of the hearing on December 18, 2006. I find the objection untimely.

4

000126

## II. ISSUE

Did DHR produce sufficient evidence to warrant dismissal of Hopper

from her position as an Accountant?

## III. DISCUSSION

### Standard of Review

The purpose of the Administrative Appeal is to determine if the

termination of the employee is warranted and supported by the evidence.

*Kucera v. Ballard,* 485 So. 2d 345 (Ala. Civ. App. 1986); *Thompson v.*

*Alabama Depart. of Mental Health*, 477 So. 2d 427 (Ala. Civ. App. 1985);

*Roberson v. Personnel Bd. Of the State of Alabama,* 390 So. 2d 658 (Ala.

Civ. App. 1980). Recently in Earl v. State Personnel Board, slip op,

2030508 (March 14, 2006) the Alabama Court of Civil Appeals reiterated:

> "[D]ismissal by an appointing authority ... is reviewable by the
> personnel board only to determine if the reasons stated for the
> dismissal are sustained by the evidence presented at hearing."

Slip op. at p. 27, quoting Johnston v. State Personnel Bd., 447 So. 2d 752,

755 (Ala. Civ. App. 1983).[1]  In determining whether an employee's

dismissal is warranted, the departmental agency bears the burden of proving

the charges warrant termination by a "preponderance of the evidence."

---

[1]The Alabama Court of Civil Appeals went further to hold: 'both this court and
the circuit court must take the administrative agency's order as "prima facie just and
reasonable' and neither this court nor the circuit court may "substitute its judgment for
that of the agency as to the weight of the evidence on questions of fact." Slip op at 27,
citing Ala. Code 1975, § 41-22-20 (k); State Dept. of Human Res. V. Gilbert, 681 So. 2d
560, 562 (Ala. Civ. App. 1995).

5

000127

The law is well settled that a "preponderance of the evidence" standard requires a showing of a *probability* that the employee is guilty of the acts as charged. Thus, there must be more than a mere possibility or one possibility among others that the facts support the disciplinary action at issue, the evidence must establish that *more probably than not*, the employee performed, or failed to properly perform, as charged. *See Metropolitan Stevedore Co. v. Rambo*, 521 U.S. 121, 117 S. Ct. 1953, 138 L. Ed. 2d. 327 (1997), holding that a "significant possibility" falls far short of the APA's preponderance of the evidence standard; *See also Wright v. State of Tex.*, 533 F. 2d 185 (5th Cir. 1976).[2]

## IV. FINDINGS

After a careful review of all testimony and exhibits, I find that Hopper falsified information on her Application for Examination for Accountant in violation of the Rules of the State Personnel Board, Rules of the State Personnel Board, 670-X-19-.01(2)(f). Hopper stated on her application that she had a B.S. degree, dated May 2002, from Trinity University, 715 Stadium Drive, San Antonio, Texas 78212. She also listed on her application 22 courses that she had taken that were related to the accountant

---

[2] Bonner v. City of Pritchard, 661 F. 2d 1206, 1209 (11th Cir. 1981 the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

6

position that she was seeking. However, evidence produced at the hearing, including Hopper's own testimony, established that, for 17 of these courses, Hopper has not attended any college class for the credit, but instead was given course credit for these courses by an entity called "Trinity College and University" located in the British Virgin Islands. Credit for these 17 courses was given to her based on her attendance at a few work-related seminars and her work experience. The Trinity University located in San Antonio, Texas has no record of Hopper ever being registered as a student or receiving credit for any courses.

Hopper testified that she listed Trinity University of San Antonio, Texas on her application because she believed that was the institution that issued the "Diploma" she received and that she believed that she had a legitimate college degree from Trinity University. However, she had in her possession a document, a "Diploma", that was from "Trinity College and University." Hopper also testified that she utilized the internet mainly to communicate with "Trinity College and University." As a result of a lawsuit by Trinity University in San Antonio, Texas against "Trinity College and University", the name of "Trinity College and University" was changed to Bronte International University. DHR exhibit 9 clearly shows that a "sham diploma" could be obtained by paying six hundred and ninety-five dollars to Bronte International University a.k.a Trinity College and

7

University.  Hopper also asserted that the announcement for examination by State Personnel failed to mention that it required a four year degree. However, the announcement stated one needed a bachelor degree in Accounting or Business Administration.  The definition of "bachelor" degree is the lowest degree conferred by a four year college or university. Clearly this showed that it required a degree from a four year college.

I do not find her testimony to be creditable.  I find that Ms. Hopper knew or should have known she did not have a degree from Trinity University in San Antonio and knew that she did not have a valid college degree when she completed the application for accountant.

I also find that Hopper is not qualified for the position of Accountant with DHR, see <u>Rules of the State Personnel Board, 670x-9</u>.  The position requires that the applicant have a Bachelor's degree with a major in Accounting or Business Administration and that the applicant must have completed 5 college level accounting courses, including Intermediate Accounting II, or an equivalent course.  The evidence presented at the hearing clearly demonstrated that she does not have a valid degree, but rather has a piece of paper from a "diploma mill," and furthermore, that she has not taken Intermediate Accounting II, or an equivalent course.

8

## V.  CONCLUSIONS

Ms. Hopper's discharge from employment with DHR should be upheld for the following reasons:

1. She falsified her Accountant application with the State of Alabama as she knew that she did not have a valid degree from Trinity University in San Antonio, Texas.

2. She is not qualified for the position of Accountant as she does not have a valid college degree from any college or university.

3. She is not qualified for the position of Accountant as she has not taken all of the courses required for the position and does not have a valid college degree.

I also find that each of these three grounds for discharge, if considered alone, would be sufficient grounds by itself for upholding the discharge.

000131

Done this 29ᵗʰ day of January, 2007.


L. Daniel Morris, Jr., Assistant
Director, Department of
Transportation and Administrative
Law Judge for this matter
1409 Coliseum Boulevard
P. O. Box 30350
Montgomery, Alabama 36130
Phone: (334) 242-6775
Fax: (334) 353-6505

10

**BEFORE THE PERSONNEL BOARD OF THE STATE OF ALABAMA**

**IN THE MATTER OF**

**THE APPEAL OF**

**VIRGINIA HOPPER**

**MARCH 14, 2007**

This matter came before the Board upon the dismissal of the Employee from her employment with the Department of Human Resources. The Employee was dismissed effective August 14, 2006 based upon charges contained in a letter to the Employee dated the same. This matter was assigned to L. Daniel Morris to hear as an Administrative Law Judge. A hearing was held on this matter on December 18, 2006. The Administrative Law Judge's Report is now before the Board for consideration. The Board has also had the benefit of oral argument.

Essentially, the charges against the Employee are a result of an application the Employee submitted to the State claiming that she had a college degree. The college degree which the Employee claims is a certificate bought over the internet. The Department alleges that she violated State Personnel Board Rule 670-X-19-.01(2)(f) Faslification of Records.

The Administrative Law Judge found that the totality of the evidence warrants dismissal in this cause and recommended that the Employee's dismissal be sustained. The Board hereby adopts by reference the findings of fact and conclusions of law as found by the Administrative Law Judge as a part of this Order as if fully set forth herein.

The Board has carefully considered the Administrative Law Judge's Report in this case and is of the opinion that the decision of the appointing 00133



DEFENDANT'S EXHIBIT

9

authority to dismiss the Employee is supported by the evidence and that the termination is warranted.

It is therefore the Order of this Board that the decision of the appointing authority to dismiss the Employee is hereby affirmed.

JACKIE GRAHAM
SECRETARY

JOE N. DICKSON
CHAIRMAN

JOHN MCMILLAN
MEMBER

JOYCE P. O'NEAL
MEMBER

ELLEN G. MCNAIR
MEMBER

JAMES H. ANDERSON
MEMBER

Virginia Hopper
200 Alpha Lane
Deatsville, AL 36022

May 15, 2006

Jackie Graham
State Personnel Director
300 Folsom Administrative Building
Montgomery, AL 36130-4100

Dear Jackie,

I am attaching my transcript from Troy University, Montgomery. I will not be able to attach my transcript from Trinity College & University; I have came to the knowledge the transcript and diploma are not as they were represented to me and at this point I do not want to list them or claim them. This is the problem I am having with my position as Accountant and for the request to fall back as an Accounting Tech.

I would like to meet with you, go over my position, and explain the events as they happened. I do not know if this would make a difference, but I did sign my name to what I believed to be the truth.

If more information is needed please contact me at 334 242-9447, work number at DHR or 334 285-6226, home number or e-mail dhvhop02@msn.com.

Thank you so much for your time and your consideration in this matter is greatly appreciated.


Sincerely,

Virginia Hopper

Virginia Hopper


Enclosures

000135



Form 7 Revised November 2000

| DO NOT WRITE IN THIS SPACE | APPLICATION FOR EXAMINATION | General Instructions |
|---|---|---|

RETURN TO: STATE OF ALABAMA
PERSONNEL DEPARTMENT
64 NORTH UNION STREET
P O BOX 304100
MONTGOMERY, ALABAMA 36130-4100

AN EQUAL OPPORTUNITY EMPLOYER

General Instructions

A separate application is required for each job. Do not write in shaded areas. Complete all parts of the application. Applications not properly completed will be returned. Photocopied and facsimile applications will be accepted.



ENTER SOCIAL SECURITY NUMBER BELOW:

| 4 | 2 | 3 | - | 7 | 4 | - | 4 | 1 | 9 | 0 |
|---|---|---|---|---|---|---|---|---|---|---|

**Examination For Which You Are Applying (one per application)**

10612 - Staff Accountant          10612          Option (if applicable)

Full Name    Virginia                    S                    Hopper
                  First                    Middle                Last

Address    200    Alpha Lane
              House or Apartment Number        Street

Deatsville              Alabama              Elmore          26          36022
City                    State                County                      Zip Code

Telephone Number: Home ( 334 ) 285-6226          Work ( 334 ) 242-2224
                          Area Code                        Area Code

**The following information is required for governmental reporting or recordkeeping purposes:**

Date of Birth    05    06    1954          Sex (check one)   1. ( ) Male    2. (X) Female
                    (Month) (Day) (Year)

Race (check one)  1. (X) White   2. ( ) Black   3. ( ) Hispanic  4. ( ) Asian or Pacific Islander   5. ( ) American Indian or Alaskan Native  6.( ) Other

**EDUCATION:**

High School Diploma or GED?  (X) Yes  ( ) No

CIRCLE OR BRACKET THE HIGHEST GRADE OF SCHOOL COMPLETED.

1  2  3  4  5  6  7  8  9  10  11  12    College  1  2  3  [4]       ED 31   LC 700

PROVIDE INFORMATION ON ALL SCHOOLS ATTENDED.  SPECIFY UNDERGRADUATE OR GRADUATE WORK.

| Name and Location of School | Dates of Attendance Month/Year | | Credit Hours | | Did You Graduate? | | Type of Degree and Date | Major |
|---|---|---|---|---|---|---|---|---|
| | From | To | Sem. | Qtr. | Yes | No | | |
| Trinity University, San Antonio, TX | 9/94 | 5/2002 | 124 | | X | | BS | Bus Admin |
| | | | | | | | | |
| | | | | | | | | |

**PROFESSIONAL LICENSE OR CERTIFICATE**

| License/Certificate Issued By | Field/Trade/Specialization | License/Certificate No. | Issue Date | Expiration Date |
|---|---|---|---|---|
| | | | | |
| | | | | |

LIST COURSES (AND HOURS) WHICH ARE PARTICULARLY RELATED TO THE POSITION (attach additional sheets, if needed).

Governmental Accounting    3 hrs    Managerial Accounting    3 hrs    Prin of Accounting II    3 hrs

Intermediate Accounting    3 hrs    Prin of Accounting I    3 hrs    ( See Attached for list)

**CERTIFICATION STATEMENT**

I certify that all statements on or attached to this application are true and correct to the best of my knowledge. I know that any false statements may cause me to be denied the chance for testing, to be removed from an employment register, or to be released from employment. I will not discuss the test I have taken. I further authorize the release of all relevant prior employment, military service, academic/school and criminal records. If employed I agree, consistent with applicable laws, to receive compensatory time off in lieu of overtime compensation for any overtime hours worked.

000136

Signature   Virginia S. Hopper                    Date    May 28, 2003

During the application process, including testing and employment consideration,
your name may be removed from an employment register for any disqualifying reason.

DEFENDANT'S EXHIBIT 21

PENGAD 800-631-6989

SOCIAL SECURITY NUMBER :  4   2   3 - 7   4 - 4   1   9   0

List three reliable persons, not relatives or present employer, who know you well enough to give information about you.

| NAME | ADDRESS AND PHONE NUMBER | EMPLOYER |
|------|--------------------------|----------|
| Craig Nelson | 240 Second Street Wetumpka, Alabama   567-8839 | State of Alabama - DHR |
| Peggy Stieringer | 645 Japonica Road  Prattville, Alabama   365-7837 | State of Alabama - ADEM |
| Betty Jackson | 3955 Faunsdale Road Montgomery, Alabama  277-7615 | State of Alabama - ADEM |

Should you need testing accommodations due to a health problem or disability, you must contact the State Personnel Department.

Have you ever been involuntarily terminated, discharged, forced or asked to resign from any job?   ( )   Yes   (X )      No

If you answered **Yes** to the above question, attach an explanation on a separate sheet noting any mitigating or extenuating circumstances.

Have you ever been convicted of a misdemeanor or felony crime?    ( )   Yes   (X ) No

If you answered **Yes** to the above question, list in the space below all prior misdemeanor and felony convictions and any extenuating or mitigating circumstances regarding such convictions.  If necessary, you may use a separate sheet or sheets and attach to application.

_____
_____
_____
_____

NOTE: A CRIMINAL CONVICTION WILL NOT NECESSARILY BE A BAR TO CONSIDERATION FOR EMPLOYMENT, EXCEPT THAT A FELONY CONVICTION WILL BAR EMPLOYMENT IN A LAW ENFORCEMENT JOB; THE DISCLOSURE OF A MISDEMEANOR CONVICTION WILL NOT AUTOMATICALLY RESULT IN DISQUALIFICATION.  CRIMINAL HISTORIES WILL BE SUBMITTED TO THE NATIONAL CRIME INFORMATION CENTER (NCIC) FOR VERIFICATION.  FAILURE TO DISCLOSE A CONVICTION MAY BE CONSIDERED AS GROUNDS FOR DISQUALIFICATION. FOR THESE REASONS, APPLICANTS SHOULD BE CAREFUL TO DISCLOSE <u>ALL</u> CRIMINAL CONVICTIONS.

## WORK HISTORY
## THIS SECTION MUST BE COMPLETED REGARDLESS OF WHETHER OR NOT A RESUME' IS ATTACHED.

Begin with your PRESENT or most recent employment.  List in REVERSE ORDER periods of employment.  <u>Each</u> <u>time</u> <u>you</u> <u>changed</u> <u>jobs</u> <u>or</u> <u>your</u> <u>title</u> <u>changed</u> <u>should</u> <u>be</u> <u>listed</u> <u>as</u> <u>a</u> <u>separate</u> <u>period.</u>  Describe in detail your duties. (Attach additional sheets if needed.)

| 1. Current or Last Employer | | | | | | | |
|---|---|---|---|---|---|---|---|
| **See Attached Resume** | | | | Your Official Job Title | | | |
| Address | | | | Type of Business | | | |
| FROM<br>Month     Year | TO<br>Month     Year | Total<br>Months | Number of Hours<br>Per Week | Beginning Salary | Ending Salary | | May we contact your<br>employer? |
| | | | $        Per | $        Per | | ( ) Yes   ( ) No |
| Number/Title of Employees You Supervised<br>On a Continuing Basis | | | | Equipment You Operated | | | |
| Name, Title and Telephone Number<br>of Supervisor | | | | Reason for Leaving | | | |
| Describe Your Duties in Detail | | | | | | | |

000137

Virginia Hopper   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

LIST COURSES (AND HOURS) WHICH ARE PARTICULARLY RELATED TO THE POSITION  (attach additional sheets, if needed).

ACCT 1301   Financial Accounting

ACCT 1302   Managerial Accounting

ACCT 4344   Auditing

MGMT 2301   Management

MKTG 2302   Marketing

MGMT 3372   Org Behavior

FNCE 3301 Finance

FNCE 3351 Instit & Mkts

FNCE 3352  Investments

FNCE 4351  Mgmt/Policy

MKTG 4381   Mktg Mgmt

MKTG 3381  Consum Behavior

BUSN 3301 Statistics

BUSN 3302  Busn Law I

BUSN 3341 Busn Law II

BUSN 4301 Busn Policy

BUSN 3303 Quant/Mgr'l Decision Making

# Virginia Hopper
SS# 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

200 Alpha Lane
Deatsville, Alabama 36022
Phone (334) 285-6226

**Objective**

To make effective use of my experience, work skills, and personal attributes as an accountant in State Government.

**Qualifications**

Experience in accounting, researching and investigating claims and complaints, computer skills, office skills, and organizational skills. Office management skills and ability to communicate well with others.

**Education**

Trinity University  San Antonio, TX 78212-7200  Gradation Date: May 2002
Troy State University   Montgomery, Alabama
AUM- Advance Technology Group 1999
Lee High School   Montgomery, Alabama   Gradation Date: May 1971

**Computer Skills**

Proficient in Word, Lotus 1-2-3,  Dbase III, Quicken and Excel
Good working knowledge of Access

**Employment History**

2/2002 – Present   **State of Alabama, Department of Finance**

**Office of State Comptroller**

- Audits various claims to determine they are legal and proper

- Records miscellaneous refund payments received and prepares checks for deposit to the State Treasury

- Processes vouchers for payments into the AFNS "E" region and CAS (State's Central Accounting System)

- Verifies warrant amounts, post warrant data and mails payments to vendors

- Enters and processes Request for Cash Transfers from departments into CAS, Interfund Cash Transfer System, on a daily basis

- Reviews and processes Request for Electronic Warrants from departments in CAS on a daily basis and balances with Treasurer's Office

- Schedules, enters into CAS, and approves Debt Service payments

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  Virginia Hopper

- Maintains and reviews expenditure and budgetary control accounts and reports as to account status

- Make adjustment journal vouchers, verifying current accounting principles and mathematical accuracy

- Process end of fiscal year accounts payable journal vouchers ensuring that data is correct and proper

6/2000-2/2002  **State of Alabama, Department of Human Resources**

**Finance Division**



- Investigate, research, and resolve problems in order to assist vendors, resolve discrepancies, and correct departmental records

- Set up purchase orders and record the accounting codes

- Reconcile purchase orders and invoices; verify, code, and balance records

- Calculate accounting distribution, allocate cost items to a variety of accounts

- Record payment dates, payment amounts, and balances per vendor accounts

- Check balances and retrieve data from the accounting system

- Prepare data and complete computer input forms to be processed by computer to generate payment voucher

- Batched documents to be keypunched, maintained control totals, and balanced control totals to compute-generated totals

- Assist in the development of modifications and additions to accounting system and operations

2/1994 – 6/2000  **State of Alabama, Department of Insurance**

**Receivership Division  (Contract)**

- Estate Management - manage day to day activities of insolvent insurance companies

- Delegate or assign task to the support team as needed

- Supervise work of the office support team performing duties in
- processing division records, procedures and production

000140

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   Virginia Hopper

- Review and approve status reports and petitions on each estate before they are filed with the courts

- Authorized check signer

- Reconcile bank statements and investment statements for all estates

- Prepare Balances Sheets and Income Statements

- Prepare cash balance, transactions, and missing check reports

- Maintain schedule of investment maturities, contact bank to purchase or sell

- Journalize and enter data into an on line accounting system

- Compile and prepare subsidiary accounts, post data to general ledger accounts from subsidiary reports

- Calculate and file claims subject to reinsurance

- Prepare and process checks by computer

- Audit and approve bills for payment

- Interview complainants, policyholders, and agents and correspond in order to gather information and resolve complaints

- Evaluate contractual provisions of insurance policies and provide a means of expediting or settling claims

**Extracurricular activities**          Member of First Assembly of God church choir and drama team.

000141

SOCIAL SECURITY NUMBER : ___4___ ___2___ ___3___ - ___7___ ___4___ - ___4___ ___1___ ___9___ ___0___

## COMPLETE THIS SECTION IF YOU ARE CLAIMING VETERAN'S PREFERENCE

you claim Veteran's Preference, check the type below.  Attach copies (which will not be returned) of the required documents to your application to support your claim.

1 ( )  Veteran (5 points) - Requires DD214 or document showing dates of service and type of discharge.  If this has been submitted previously and is on file with this office, you may disregard this requirement.

2 ( )  Disabled Veteran (10 points) - Requires DD214 or other document as above and letter of disability from V.A. dated within last 6 months.  V.A. letter must be kept updated until register is established or you lose the extra 5 points.

3 ( )  Deceased Veteran's spouse (10 points) - Requires DD214 or other document as above and marriage and death certificates.  Cannot be claimed if spouse remarries.

4 ( )  Disabled Veteran's spouse (10 points) - Requires DD214 or other document as above and V.A. letter of disability dated within last 6 months.  Cannot be claimed unless still married to disabled veteran.

5 ( )  Permanently Disabled Veteran (10 points) - Requires DD214 or other document as above indicating veteran is permanently disabled or DD214 or other document and V.A. letter indicating permanent disability.

## COMPLETE THIS SECTION IN ORDER TO BE SCHEDULED FOR WRITTEN EXAMS

Written exams will be given in the places below for which a sufficient number of applicants express preference.  Indicate by number your 1st, 2nd and 3rd choices.

1 ( )  Alexander City      3 ( )  Birmingham      5 ( )  Dothan        7 ( )  Linden        9 (1)  Montgomery      12 ( )  Tuscaloosa
2 ( )  Andalusia           4 ( )  Decatur         6 ( )  Jacksonville  8 ( )  Mobile       10 ( )  Selma

If you qualify, you will receive a notice showing the place and time you are to report for the exam.

## Where did you learn of this job? (check all that apply)

1 ( )  State Employment Service       5 ( )  Friend/Relative         9 ( )  Legislative Representative      13 ( )  TV/Radio Commercial
2 ( )  Job Announcement Notice        6 ( )  Dept. News Bulletin    10 ( )  State Recruiter/Counselor       14 ( )  Other _____
3 ( )  Newspaper                      7 ( )  Rehabilitation Services 11 ( )  State Personnel Dept. Information Board  15 (X)  State Personnel Dept. Website
4 ( )  College Placement/Career Office 8 ( )  High School Counselor  12 ( )  Outreach Program (i.e. Church)  16 ( )  Other Website

## AVAILABILITY



**81 - Northwest Alabama**
17 Colbert
30 Franklin
39 Lauderdale
40 Lawrence

**84 - Jasper/**
Winfield Area
29 Fayette
38 Lamar
47 Marion
64 Walker
67 Winston

**87 - East Central Alabama**
08 Calhoun
09 Chambers
14 Clay
15 Cleburne
19 Coosa
56 Randolph
61 Talladega
62 Tallapoosa

**90 - Montgomery Area**
01 Autauga
26 Elmore
43 Lowndes
51 Montgomery

**93 - South Central Alabama**
07 Butler
18 Conecuh
20 Covington
21 Crenshaw
27 Escambia
50 Monroe

**82 - Huntsville/**
Decatur Area
36 Jackson
42 Limestone
45 Madison
48 Marshall
52 Morgan

**85 - Tuscaloosa Area**
04 Bibb
32 Greene
33 Hale
54 Pickens
60 Sumter
63 Tuscaloosa

**88 - Southwest Alabama**
12 Choctaw
13 Clarke
46 Marengo
65 Washington

**91 - Phenix City/**
Troy Area
03 Barbour
06 Bullock
41 Lee
44 Macon
55 Pike
57 Russell

**94 - Dothan Area**
16 Coffee
23 Dale
31 Geneva
34 Henry
35 Houston

**83 - Northeast Alabama**
10 Cherokee
25 DeKalb
28 Etowah

**86 - Birmingham Area**
05 Blount
22 Cullman
37 Jefferson
58 Shelby
59 St. Clair

**89 - Selma/Clanton Area**
11 Chilton
24 Dallas
53 Perry
66 Wilcox

**92 - Mobile Area**
02 Baldwin
49 Mobile

**95 - Statewide**
(You will be considered for vacancies throughout the state. Relocation may be necessary)

Please answer the following questions with care.  List in the spaces provided those areas of the state in which you would accept employment  You will be considered for employment only in the locations you indicate.  You may choose a combination of up to three counties and/or regions from the list above.  If you list a region, you will be considered available for all counties in that region.  The counties in each region are listed alphabetically below the region.  You will not be considered for jobs involving overnight travel or shift work unless you so indicate.

List the numbers of up to 3 counties and/or regions where you are willing to work ___90___  _____  _____

If you want to be considered for appointment by only certain state agencies, indicate here _____

Will you accept work involving overnight travel?  ( ) Yes  (X) No      Will you accept part-time work?  ( ) Yes  (X) No

l you accept temporary work?  ( ) Yes  (X) No

Which shifts are you willing to work?  0. ( ) all shifts  1. (X) 1st only  2. ( ) 2nd only  3. ( ) 3rd only  4. ( ) 1st and 2nd only  5. ( ) 1st & 3rd only  6. ( ) 2nd & 3rd only

Enter the earliest date you will be available to interview for employment. (Your name will not appear on a list of eligibles until this date.)  ___05___  ___28___  ___2003___
                                                                                                                                          Month  Day  Year

NOTE:    Your name will be placed on inactive status for this class after declining three offers of employment consideration or failing to reply to an agency's inquiry concerning your availability.  Your name may be restored to the active register by written request.

000142

Form 3 - Revised November 2000

DO NOT WRITE IN THIS SPACE

RECEIVED

2003 JUL 25 P 4: 19

DEPARTMENT
.. ALABAMA

# APPLICATION FOR EXAMINATION

RETURN TO: STATE OF ALABAMA
PERSONNEL DEPARTMENT
64 NORTH UNION STREET
P O BOX 304100
MONTGOMERY, ALABAMA 36130-4100

AN EQUAL OPPORTUNITY EMPLOYER

**General Instructions**

A separate application is required for each job. **Do not write in shaded areas.** Complete all parts of the application. Applications not properly completed will be returned. Photocopied and facsimile applications will be accepted.

ENTER SOCIAL SECURITY NUMBER BELOW.    JUL 29 2003

| 4 | 2 | 3 | - | 7 | 4 | - | 4 | 1 | 9 | 0 |

| Examination For Which You Are Applying (one per application) | 10611 | Option (if applicable) |
| --- | --- | --- |
| 10611  Accountant | | |

Full Name    Virginia                S                    Hopper
             First             Middle                    Last

Address    200    Alpha Lane
           House or Apartment Number            Street

           Deatsville            AL            Elmore        26    36022
           City                  State         County              Zip Code

Telephone Number:  Home ( 334 ) 285-6226            Work ( 334 )    242-2224
                        Area Code                        Area Code

### The following information is required for governmental reporting or recordkeeping purposes:

Date of Birth    05      06      1954        Sex (check one) 1. ( ) Male   2. (X) Female
                (Month)  (Day)   (Year)

Race (check one)  1. (X) White   2. ( ) Black   3. ( ) Hispanic  4. ( ) Asian or Pacific Islander   5. ( ) American Indian or Alaskan Native  6. ( ) Other

| EDUCATION: | CIRCLE OR BRACKET THE HIGHEST GRADE OF SCHOOL COMPLETED. | ED | 30 |
| --- | --- | --- | --- |
| High School Diploma or GED? (x) Yes ( ) No | 1  2  3  4  5  6  7  8  9  10  11  [12]  College 1  2  3  [4] | LC | 700 |

### PROVIDE INFORMATION ON ALL SCHOOLS ATTENDED.  SPECIFY UNDERGRADUATE OR GRADUATE WORK.

| Name and Location of School | Dates of Attendance Month/Year | | Credit Hours | | Did You Graduate? | | Type of Degree and Date | Major |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | From | To | Sem. | Qtr. | Yes | No | | |
| Trinity University  715 Stadium Dr | | | | | | X | Business Admin | BS May 2002 |
| San Antonio, TX 78212 | | | | | | | | |

### PROFESSIONAL LICENSE OR CERTIFICATE

| License/Certificate Issued By | Field/Trade/Specialization | License/Certificate No. | Issue Date | Expiration Date |
| --- | --- | --- | --- | --- |
| | | | | |
| | | | | |

### LIST COURSES (AND HOURS) WHICH ARE PARTICULARLY RELATED TO THE POSITION (attach additional sheets, if needed).

| 291 – Prin of Acct I | 3 | 394 – Governmental Acct | 3 | 3391 – Intermediate Acct I | 3 |
| --- | --- | --- | --- | --- | --- |
| 292 – Prin Of Acct II | 3 | 293 – Managerial Acct | 3 | (See attached list) (for additional courses) | |

## CERTIFICATION STATEMENT

I certify that all statements on or attached to this application are true and correct to the best of my knowledge.  I know that any false statements may cause me to be denied the chance for testing, to be removed from an employment register, or to be released from employment.  I will not discuss the test I have taken.  I further authorize the release of all relevant prior employment, military service, academic/school and criminal records.  If employed I agree, consistent with applicable laws, to receive compensatory time off in lieu of overtime compensation for any overtime hours worked.

Signature  Virginia S. Hopper            Date  07/25/2003

During the application process, including testing and employment consideration,
your name may be removed from an employment register for any disqualifying reason.

DEFENDANT'S EXHIBIT
22
PENGAD 800-631-6989
000143

SOCIAL SECURITY NUMBER :   4   2   3 - 7   4 - 4   1   9   0

st three reliable persons, not relatives or present employer, who know you well enough to give information about you.

| NAME | ADDRESS AND PHONE NUMBER | EMPLOYER |
|------|--------------------------|----------|
| Peggy Stieringer | 645 Japonica Rd  Prattville, AL        271-7742 | State Of Alabama ADEM |
| Vicke Vuittonet | 633 Cousins Rd  Wetumpka, AL        514-0441 | |
| Craig Nelson | 240 Second Street  Wetumpka AL     567-8839 | State of Alabama  DHR |

Should you need testing accommodations due to a health problem or disability, you must contact the State Personnel Department.

Have you ever been involuntarily terminated, discharged, forced or asked to resign from any job?    ( )    **Yes**    ( X ) No

If you answered **Yes** to the above question, attach an explanation on a separate sheet noting any mitigating or extenuating circumstances.

Have you ever been convicted of a misdemeanor or felony crime?    ( )    **Yes**    ( X )No

If you answered **Yes** to the above question, list in the space below all prior misdemeanor and felony convictions and any extenuating or mitigating circumstances regarding such convictions.  If necessary, you may use a separate sheet or sheets and attach to application.

_____
_____
_____
_____
_____

TE: A CRIMINAL CONVICTION WILL NOT NECESSARILY BE A BAR TO CONSIDERATION FOR EMPLOYMENT, EXCEPT THAT A FELONY NVICTION WILL BAR EMPLOYMENT IN A LAW ENFORCEMENT JOB;  THE DISCLOSURE OF A MISDEMEANOR CONVICTION WILL NOT AUTOMATICALLY RESULT IN DISQUALIFICATION.  CRIMINAL HISTORIES WILL BE SUBMITTED TO THE NATIONAL CRIME INFORMATION CENTER (NCIC) FOR VERIFICATION.  FAILURE TO DISCLOSE A CONVICTION MAY BE CONSIDERED AS GROUNDS FOR DISQUALIFICATION. FOR THESE REASONS,  APPLICANTS SHOULD BE CAREFUL TO DISCLOSE ALL CRIMINAL CONVICTIONS.

## WORK HISTORY
### THIS SECTION MUST BE COMPLETED REGARDLESS OF WHETHER OR NOT A RESUME' IS ATTACHED.

Begin with your PRESENT or most recent employment.  List in REVERSE ORDER periods of employment.  Each time you changed jobs or your title changed should be listed as a separate period.  Describe in detail your duties. (Attach additional sheets if needed.)

| 1. Current or Last Employer      SEE ATTACHED | | | | | | Your Official Job Title | |
|---|---|---|---|---|---|---|---|
| Address | | | | | | Type of Business | |

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
|---|---|---|---|---|---|---|---|---|
| Month | Year | Month | Year | | | $ _____ Per _____ | $ _____ Per _____ | ( ) Yes   ( ) No |

| Number/Title of Employees You Supervised On a Continuing Basis | Equipment You Operated |
|---|---|
| Name, Title and Telephone Number of Supervisor | Reason for Leaving |

Describe Your Duties in Detail

_____
_____
_____
_____

000144

SOCIAL SECURITY NUMBER : 4 2 3 - 7 4 - 4 1 9 0

| 2. Employer SEE ATTACHED | | | | Your Official Job Title | | | |
|---|---|---|---|---|---|---|---|
| Address | | | | Type of Business | | | |

| FROM Month Year | TO Month Year | Total Months | Number of Hours Per Week | Beginning Salary $_____ Per _____ | Ending Salary $_____ Per_____ | May we contact your employer? ( ) Yes  ( ) No |
|---|---|---|---|---|---|---|

| Number/Title of Employees You Supervised On a Continuing Basis | Equipment You Operated |
|---|---|
| Name, Title and Telephone Number of Supervisor | Reason for Leaving |

Describe Your Duties in Detail

---

| 3. Employer | | | | Your Official Job Title | | | |
|---|---|---|---|---|---|---|---|
| Address | | | | Type of Business | | | |

| FROM Month Year | TO Month Year | Total Months | Number of Hours Per Week | Beginning Salary $_____ Per _____ | Ending Salary $_____ Per_____ | May we contact your employer? ( ) Yes  ( ) No |
|---|---|---|---|---|---|---|

| Number/Title of Employees You Supervised Continuing Basis | Equipment You Operated |
|---|---|
| Name, Title and Telephone Number of Supervisor | Reason for Leaving |

Describe Your Duties in Detail

---

| 4. Employer | | | | Your Official Job Title | | | |
|---|---|---|---|---|---|---|---|
| Address | | | | Type of Business | | | |

| FROM Month Year | TO Month Year | Total Months | Number of Hours Per Week | Beginning Salary $_____ Per _____ | Ending Salary $_____ Per_____ | May we contact your employer? ( ) Yes  ( ) No |
|---|---|---|---|---|---|---|

| Number/Title of Employees You Supervised On a Continuing Basis | Equipment You Operated |
|---|---|
| Name, Title and Telephone Number of Supervisor | Reason for Leaving |

Describe Your Duties in Detail

---

5. USING THE ABOVE FORMAT, SHOW OTHER EXPERIENCE BY USING ADDITIONAL SHEETS.

Virginia Hopper   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

ADDITIONAL COURSES WHICH ARE PARTICULARLY RELATED TO THE POSITION

ACCT 1301   Financial Accounting

ACCT 1302   Managerial Accounting

ACCT 4344   Auditing

MGMT 2301   Management

MKTG 2302   Marketing

MGMT 3372   Org Behavior

FNCE 3301 Finance

FNCE 3351 Instit & Mkts

FNCE 3352   Investments

FNCE 4351  Mgmt/Policy

MKTG 4381  Mktg Mgmt

MKTG 3381   Consum Behavior

BUSN 3301 Statistics

BUSN 3302  Busn Law I

BUSN 3341 Busn Law II

BUSN 4301 Busn Policy

BUSN 3303 Quant/Mgr'l Decision Making

Pl___ _____ _____ close  take

Please see top sheet:

| Course | Hours | Course | Hours |
|--------|-------|--------|-------|
| 291 - Prin of Acct I - 3 | | 394 - Governmental Acct - 3 | |
| 292 - Prin of Acct II 3 | | 293 - Managerial Acct - 3 | |
| | | 3391 - Intermediate Acct I - 3 | |

000146

# Virginia Hopper
SS# 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

200 Alpha Lane
Deatsville, Alabama 36022
Phone (334) 285-6226

**Objective**

To make effective use of my experience, work skills, and personal attributes as an accountant in State Government.

**Qualifications**

Experience in accounting, researching and investigating claims and complaints, computer skills, office skills, and organizational skills. Office management skills and ability to communicate well with others.

**Education**

Trinity University   San Antonio, TX 78212-7200   Gradation Date: May 2002
Troy State University   Montgomery, Alabama
AUM- Advance Technology Group 1999
Lee High School   Montgomery, Alabama   Gradation Date: May 1971

**Computer Skills**

Proficient in Word, Lotus 1-2-3, Dbase III, Quicken and Excel
Good working knowledge of Access, State's Systems, CAS (Central Accounting System), and AFNS Regions

**Employment History**

2/2002 – Present   **State of Alabama, Department of Finance**

**Office of State Comptroller**

- Audits various claims to determine they are legal and proper

- Records miscellaneous refund payments received and prepares checks for deposit to the State Treasury

- Processes vouchers for payments into the AFNS "E" region and CAS (State's Central Accounting System)

- Verifies warrant amounts, post warrant data and mails payments to vendors

- Enters and processes Request for Cash Transfers from departments into CAS, Interfund Cash Transfer System, on a daily basis

- Reviews and processes Request for Electronic Warrants from departments in CAS on a daily basis and balances with Treasurer's Office

- Schedules, enters into CAS, and approves Debt Service payments

000147

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  Virginia Hopper

- Maintains and reviews expenditure and budgetary control accounts and reports as to account status

- Make adjustment journal vouchers, verifying current accounting principles and mathematical accuracy

- Process end of fiscal year accounts payable journal vouchers ensuring that data correct and proper

6/2000-2/2002  **State of Alabama, Department of Human Resources**

**Finance Division**

- Investigate, research, and resolve problems in order to assist vendors, resolve discrepancies, and correct departmental records

- Set up purchase orders and record the accounting codes

- Reconcile purchase orders and invoices; verify, code, and balance   records

- Calculate accounting distribution, allocate cost items to a variety of accounts

- Record payment dates, payment amounts, and balances per vendor accounts

- Check balances and retrieve data from the accounting system

- Prepare data and complete computer input forms to be processed by computer to generate payment voucher

- Batched documents to be keypunched, maintained control totals, and balanced control totals to compute-generated totals

- Assist in the development of modifications and additions to accounting system and operations

2/1994 – 6/2000   **State of Alabama, Department of Insurance**

**Receivership Division   (Contract)**

- Estate Management - manage day to day activities of insolvent insurance companies

- Delegate or assign task to the support team as needed

- Supervise work of the office support team performing duties in
- processing division records, procedures and production

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   Virginia Hopper

- Review and approve status reports and petitions on each estate before they are filed with the courts

- Authorized check signer

- Reconcile bank statements and investment statements for all estates

- Prepare Balances Sheets and Income Statements

- Prepare cash balance, transactions, and missing check reports

- Maintain schedule of investment maturities, contact bank to purchase or sell

- Journalize and enter data into an on line accounting system

- Compile and prepare subsidiary accounts, post data to general ledger accounts from subsidiary reports

- Calculate and file claims subject to reinsurance

- Prepare and process checks by computer

- Audit and approve bills for payment

- Interview complainants, policyholders, and agents and correspond in order to gather information and resolve complaints

- Evaluate contractual provisions of insurance policies and provide a means of expediting or settling claims

**Extracurricular activities**          Member of First Assembly of God church choir and drama team.

000149

SOCIAL SECURITY NUMBER : _4_ _2_ _3_ - _7_ _4_ - _4_ _1_ _9_ _0_

## COMPLETE THIS SECTION IF YOU ARE CLAIMING VETERAN'S PREFERENCE

you claim Veteran's Preference, check the type below. Attach copies (which will not be returned) of the required documents to your application to support your claim.

Veteran (5 points) - Requires DD214 or document showing dates of service and type of discharge. If this has been submitted previously and is on file with this office, you may disregard this requirement.

2 ( ) Disabled Veteran (10 points) - Requires DD214 or other document as above and letter of disability from V.A. dated within last 6 months. V.A. letter must be kept updated until register is established or you lose the extra 5 points.

3 ( ) Deceased Veteran's spouse (10 points) - Requires DD214 or other document as above and marriage and death certificates. Cannot be claimed if spouse remarries.

4 ( ) Disabled Veteran's spouse (10 points) - Requires DD214 or other document as above and V.A. letter of disability dated within last 6 months. Cannot be claimed unless still married to disabled veteran.

5 ( ) Permanently Disabled Veteran (10 points) - Requires DD214 or other document as above indicating veteran is permanently disabled or DD214 or other document and V.A. letter indicating permanent disability.

## COMPLETE THIS SECTION IN ORDER TO BE SCHEDULED FOR WRITTEN EXAMS

Written exams will be given in the places below for which a sufficient number of applicants express preference. Indicate by number your 1st, 2nd and 3rd choices.

| 1 ( ) Alexander City | 3 ( ) Birmingham | 5 ( ) Dothan | 7 ( ) Linden | 9 (X) Montgomery | 12 ( ) Tuscaloosa |
| 2 ( ) Andalusia | 4 ( ) Decatur | 6 ( ) Jacksonville | 8 ( ) Mobile | 10 ( ) Selma | |

If you qualify, you will receive a notice showing the place and time you are to report for the exam.

### Where did you learn of this job? (check all that apply)

| 1 ( ) State Employment Service | 5 ( ) Friend/Relative | 9 ( ) Legislative Representative | 13 ( ) TV/Radio Commercial |
| 2 ( ) Job Announcement Notice | 6 ( ) Dept. News Bulletin | 10 ( ) State Recruiter/Counselor | 14 ( ) Other _____ |
| 3 ( ) Newspaper | 7 ( ) Rehabilitation Services | 11 ( ) State Personnel Dept. Information Board | 15 (X) State Personnel Dept. Website |
| 4 ( ) College Placement/Career Office | 8 ( ) High School Counselor | 12 ( ) Outreach Program (i.e. Church) | 16 ( ) Other Website |

## AVAILABILITY

**81 - Northwest Alabama**
17 Colbert
30 Franklin
39 Lauderdale
40 Lawrence

**82 - Huntsville/ Decatur Area**
36 Jackson
42 Limestone
45 Madison
48 Marshall
52 Morgan

**83 - Northeast Alabama**
10 Cherokee
25 DeKalb
28 Etowah

**84 - Jasper/ Winfield Area**
29 Fayette
38 Lamar
47 Marion
64 Walker
67 Winston

**85 - Tuscaloosa Area**
04 Bibb
32 Greene
33 Hale
54 Pickens
60 Sumter
63 Tuscaloosa

**86 - Birmingham Area**
05 Blount
22 Cullman
37 Jefferson
58 Shelby
59 St. Clair

**87 - East Central Alabama**
08 Calhoun
09 Chambers
14 Clay
15 Cleburne
19 Coosa
56 Randolph
61 Talladega
62 Tallapoosa

**88 - Southwest Alabama**
12 Choctaw
13 Clarke
46 Marengo
65 Washington

**89 - Selma/Clanton Area**
11 Chilton
24 Dallas
53 Perry
66 Wilcox

**90 - Montgomery Area**
01 Autauga
26 Elmore
43 Lowndes
51 Montgomery

**91 - Phenix City/ Troy Area**
03 Barbour
06 Bullock
41 Lee
44 Macon
55 Pike
57 Russell

**92 - Mobile Area**
02 Baldwin
49 Mobile

**93 - South Central Alabama**
07 Butler
18 Conecuh
20 Covington
21 Crenshaw
27 Escambia
50 Monroe

**94 - Dothan Area**
16 Coffee
23 Dale
31 Geneva
34 Henry
35 Houston

**95 - Statewide**
(You will be considered for vacancies throughout the state. Relocation may be necessary)

Please answer the following questions with care. List in the spaces provided those areas of the state in which you would accept employment You will be considered for employment only in the locations you indicate. You may choose a combination of up to three counties and/or regions from the list above. If you list a region, you will be considered available for all counties in that region. The counties in each region are listed alphabetically below the region. You will not be considered for jobs involving overnight travel or shift work unless you so indicate.

List the numbers of up to 3 counties and/or regions where you are willing to work   90    _____   _____

If you want to be considered for appointment by only certain state agencies, indicate here _____

Will you accept work involving overnight travel?   ( ) Yes   (x) No        Will you accept part-time work?   ( ) Yes   ( x ) No

you accept temporary work?   ( ) Yes   (x ) No

Which shifts are you willing to work?   0. ( ) all shifts   1. ( ) 1st only   2. ( ) 2nd only   3. ( ) 3rd only   4. ( ) 1st and 2nd only   5. ( ) 1st & 3rd only   6. ( ) 2nd & 3rd only

Enter the earliest date you will be available to interview for employment. (Your name will not appear on a list of eligibles until this date.)   _08_  _01_  _2003_
                                                                                                    Month   Day   Year

NOTE:    Your name will be placed on inactive status for this class after declining three offers of employment consideration or failing to reply to an agency's inquiry concerning your availability. Your name may be restored to the active register by written request.

000150